**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAI'I**

| | |
|---|---|
| STATE OF HAWAI'I, <br><br> Plaintiff, <br><br><br> v. <br><br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. _____ <br><br><br> MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................. 1

FACTUAL BACKGROUND ............................................................. 2

    A.    Candidate Trump Calls For A Muslim Ban .................................... 2

    B.    President Trump Implements His Discriminatory
        Bans ......................................................................................... 4

    C.    The Order's Impact ...................................................................... 8

STANDARD OF REVIEW ................................................................ 11

ARGUMENT ................................................................................... 11

    A.    Hawaiʻi Is Likely To Succeed on the Merits of Its
        Claims ...................................................................................... 12

        1.    The Order Violates the Establishment Clause .................... 12

        2.    The Order Violates Equal Protection and the
            Fifth Amendment's Due Process Clause ........................... 18

            a.    The Order violates equal protection and
                the right to travel ....................................................... 19

            b.    The Order violates procedural due
                process ...................................................................... 21

            c.    The plenary-power doctrine does not
                change the outcome ................................................... 23

        3.    The Order is Inconsistent with the Immigration
            and Nationality Act ........................................................ 26

            a.    The order's nationality-based
                classifications violate the INA ................................... 26

b.    The Order's religion-based classifications violate the INA ...................................28

c.    The INA does not authorize the President to impose sweeping class-based restrictions on immigration ........................................29

4.    The Order's Implementation Violates the APA ..................32

B.    Hawaiʻi Will Suffer Irreparable Harm If Relief Is Not Granted ..........................................................................35

C.    The Balance of the Equities and Public Interest Favor Relief ............................................................................38

CONCLUSION .............................................................................................39

# TABLE OF AUTHORITIES

Page(s)

C<small>ASES</small>:

*Access Fund* v. *U.S. Dep't of Agric.*,
    499 F.3d 1036 (9th Cir. 2007) ....................................................13, 16

*Alfred L. Snapp & Son, Inc.* v. *Puerto Rico*,
    458 U.S. 592 (1982).........................................................................38

*Arizona Dream Act Coal.* v. *Brewer*,
    757 F.3d 1053 (9th Cir. 2014) .........................................................36

*Bond* v. *United States*,
    564 U.S. 211 (2011)..........................................................................36

*Casas-Castrillon* v. *Dep't of Homeland Sec.*,
    535 F.3d 942 (9th Cir. 2008) ...........................................................22

*Chaplaincy of Full Gospel Churches* v. *England*,
    454 F.3d 290 (D.C. Cir. 2006)........................................................35

*City of Sausalito* v. *O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) .........................................................34

*Clinton* v. *City of New York*,
    524 U.S. 417 (1998).........................................................................32

*Davis* v. *Passman*,
    442 U.S. 228 (1979).........................................................................19

*Edwards* v. *Aguillard*,
    482 U.S. 578 (1987).........................................................................15

*Employment Div.* v. *Smith*,
    494 U.S. 872 (1990).........................................................................19

*Farris* v. *Seabrook*,
    677 F.3d 858 (9th Cir. 2012) ....................................................11, 35

Page

*FDA* v. *Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)...........................................................32

*Grayned* v. *City of Rockford*,
  408 U.S. 104 (1972)...........................................................23

*Hampton* v. *Mow Sun Wong*,
  426 U.S. 88 (1976)........................................................19, 24

*Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC*,
  565 U.S. 171 (2012)......................................................12, 13

*In re Griffiths*,
  413 U.S. 717 (1973)...........................................................19

*INS* v. *Aguirre-Aguirre*,
  526 U.S. 415 (1999)...........................................................28

*INS* v. *Cardoza-Fonseca*,
  480 U.S. 421 (1987)...........................................................28

*Kent* v. *Dulles*,
  357 U.S. 116 (1958)...........................................................21

*Khan* v. *Holder*,
  584 F.3d 773 (9th Cir. 2009) ...............................................28

*Kleindienst* v. *Mandel*,
  408 U.S. 753 (1972)..............................................17, 23, 24, 25

*Kwai Fun Wong* v. *United States*,
  373 F.3d 952 (9th Cir. 2004) ...............................................24

*Landon* v. *Plasencia*,
  459 U.S. 21 (1982)........................................................21, 22

*Larson* v. *Valente*,
  456 U.S. 228 (1982)......................................................13, 17

*Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) ...................................................26

*Lemon* v. *Kurtzman*, 403 U.S. 602 (1971).............................................................13, 16, 18

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993)...............................................................................32

*Mathews* v. *Eldridge*, 424 U.S. 319 (1976)...............................................................................22

*McCreary Cty., Ky.* v. *Am. Civil Liberties Union of Ky.*, 545 U.S. 844 (2005).....................................................................15, 16

*Melendres* v. *Arpaio*, 695 F.3d 990 (9th Cir. 2012) ..............................................................38

*Miller* v. *Johnson*, 515 U.S. 900 (1995).......................................................................19, 21

*Missouri* v. *Holland*, 252 U.S. 416 (1920)...............................................................................36

*Olsen* v. *Albright*, 990 F. Supp. 31 (D.D.C. 1997) ..........................................................27

*Oracle USA, Inc.* v. *Rimini St., Inc.*, 2016 WL 5213917 (9th Cir. Sept. 21, 2016) .....................................37

*Patel* v. *INS*, 811 F.2d 377 (7th Cir. 1987) ...............................................................28

*Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963)...............................................................................22

*Sacora* v. *Thomas*, 628 F.3d 1059 (9th Cir. 2010) ............................................................33

*Shelby Cty.* v. *Holder*,
133 S. Ct. 2612 (2013) .......................................................36

*Stone* v. *Graham*,
449 U.S. 39 (1980) (per curiam) ................................13, 14

*Time Warner Cable Inc.* v. *FCC*,
729 F.3d 137 (2d Cir. 2013) ............................................33

*Town of Greece, N.Y.* v. *Galloway*,
134 S. Ct. 1811 (2014) .............................................16, 17

*United Dominion Indus.* v. *United States*,
532 U.S. 822 (2001) .................................................27, 30

*United States* v. *Juvenile Male*,
670 F.3d 999 (9th Cir. 2012) ...........................................30

*United States* v. *Windsor*,
133 S. Ct. 2675 (2013) ....................................................20

*Utley* v. *Varian Assocs., Inc.*,
811 F.2d 1279 (9th Cir. 1987) .........................................15

*Wallace* v. *Jaffree*,
472 U.S. 38 (1985) .........................................................14

*Whitman* v. *Am. Trucking Ass'ns*,
531 U.S. 457 (2001) .......................................................32

*Winter* v. *Nat. Res. Def. Council*,
555 U.S. 7 (2008) ...........................................................11

*Wong Wing Hang* v. *INS*,
360 F.2d 715 (2d Cir. 1966) (Friendly, J.) ......................28

*Zadvydas* v. *Davis*,
533 U.S. 678 (2001) .........................................21, 23, 24

STATUTES:

5 U.S.C. § 553(b)-(c) ...................................................32

5 U.S.C. § 706(2) .......................................................34

8 U.S.C. § 1152(a)(1)(A) ...............................26, 27, 28, 30

8 U.S.C. § 1182(f) ...........................................26, 29, 30, 32

8 U.S.C. § 1522(a)(5)....................................................29

Haw. Rev. Stat. §§ 378-2(1) ..........................................35

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ...............................................12, 35

U.S. Const. amend. V................................................11, 21

U.S. Const. amend. XIV ..............................................19

U.S. Const. art. I, § 8...................................................24

Hawaiʻi Const. art. 1, §§ 2, 4 .......................................35

LEGISLATIVE MATERIAL:

H.R. Rep. No. 89-745 (1965)........................................26

OTHER AUTHORITIES:

1 Annals of Cong. 730-731 (1789) ...............................13

Cong. Research Serv., Executive Authority to Exclude Aliens: In Brief (Jan. 23, 2017) ...............................................30

Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents Into the United States (Jan. 29, 2017)................................31

United Nations Convention Relating to the Status of Refugees art. 3,
July 28, 1951, 19 U.S.T. 6259 ......................................................................26, 28

# INTRODUCTION

On January 27, 2017, President Donald Trump signed an Executive Order that banned immigrants from seven Muslim-majority countries and created a preference for Christian refugees. That Order has triggered an uproar across the United States and the world. And rightfully so: As many have observed, the Order is a distressing departure from an American tradition that has long celebrated immigrants and opened its arms to the homeless, the tempest-tossed.

Hawaiʻi joins the many voices that have condemned the Order. But this pleading is not about politics or rhetoric—it is about the law. The simple fact is that the Order is unlawful. By banning Muslims and creating a preference for Christian refugees, the Order violates the Establishment Clause of the United States Constitution. By those same acts, it violates the equal protection guarantee of the Fifth Amendment. By failing utterly to provide procedures or protections of any kind for people detained or turned away at our airports, it violates the Due Process Clause. And by enshrining rank discrimination on the basis of nationality and religion, it flies in the face of statutes enacted by Congress.

Hawaiʻi and its residents are being grievously harmed by these violations of the law. The Order is keeping Hawaiʻi families apart; it is blocking Hawaiʻi residents from traveling; it is using the State's airport facilities to further discriminatory policies the State abhors; it is harming Hawaii's critical tourism

industry; it is establishing a religion in Hawaiʻi against the will of its residents; and it is blocking Hawaii's businesses and universities from hiring as they see fit. Perhaps most importantly, it is degrading the pluralistic values Hawaiʻi has worked hard to protect and subjecting an identifiable portion of its population to discrimination and second-class treatment.

Hawaiʻi respectfully asks this Court to enter a temporary restraining order blocking enforcement of key portions of the Order. The test for such a remedy is met: Hawaiʻi is likely to succeed in showing on the merits that the Order is unlawful several times over. The State is being irreparably harmed by the Order's enforcement. And those harms far outweigh the non-existent interest the Executive Branch has identified in enforcing its discriminatory regime. The motion should be granted.

## FACTUAL BACKGROUND

### A.      Candidate Trump Calls For A Muslim Ban.

Then-candidate Donald Trump made it crystal clear throughout his presidential campaign that if elected, he planned to bar Muslims from the United States. Shortly after the Paris attacks in December 2015, Mr. Trump issued a press release calling for "a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." Compl. ¶ 30 & Ex. 5. When questioned about the idea shortly thereafter, he compared it to

President Roosevelt's race-based internment of the Japanese during World War II, saying, "[Roosevelt] did the same thing." Compl. ¶ 31. And when asked what the customs process would look like for a Muslim non-citizen attempting to enter the United States, Mr. Trump said: "[T]hey would say, are you Muslim?" An interviewer responded: "And if they said 'yes,' they would not be allowed into the country." Mr. Trump said: "That's correct." *Id.*

Later, as the presumptive Republican nominee, Mr. Trump began using facially neutral language to describe the Muslim ban; he described his proposal as stopping immigration from countries "where there's a proven history of terrorism." Compl. ¶ 34. But he continued to link that idea to the need to stop "importing radical Islamic terrorism to the West through a failed immigration system." *Id.* And he continued to admit, when pressed, that his plan to ban Muslims remained intact. Asked in July 2016 whether he was retracting his call for "a total and complete shut-down of Muslim" immigration, he said: "I don't think it's a rollback. In fact, you could say it's an expansion." Compl. ¶ 36 & Ex. 6. And he explained: "People were so upset when I used the word Muslim. 'Oh, you can't use the word Muslim * * *. And I'm okay with that, because I'm talking territory instead of Muslim." *Id.*

Indeed, it is now clear that Mr. Trump—apparently recognizing that he could not come right out and implement his Muslim ban without violating the

law—was working behind the scenes to create a suitable subterfuge. In a recent television interview, one of the President's surrogates explained what happened: "So when [Donald Trump] first announced it, *he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'*" Compl. ¶ 54 & Ex. 8. After his election, the President-Elect signaled that he would not retreat from his Muslim ban. On December 21, 2016, he was asked whether he had decided "to rethink or re-evaluate [his] plans to create a Muslim registry or ban Muslim immigration to the United States." He replied: "You know my plans. All along, I've been proven to be right." Compl. ¶ 38.

Donald Trump's comments also targeted more specific groups. Throughout the presidential campaign, he vowed to curb refugee admissions, particularly from Syria. In June 2016, he issued a press release stating: "We have to stop the tremendous flow of Syrian refugees into the United States." Compl. ¶ 35. At one point, he promised to deport the 10,000 Syrian refugees the Administration had accepted for 2016. Compl. ¶ 29. Meanwhile, he asserted (wrongly) that Christian refugees from Syria were being blocked. He said in July 2015: "If you're * * * a Christian, you cannot come into this country." Compl. ¶ 28.

### B.    President Trump Implements His Discriminatory Bans.

Within one week of being sworn in as President, Donald Trump acted upon his ominous campaign promises. On January 27, 2017, he signed an Executive

Order ("Order"), entitled "Protecting the Nation From Terrorist Entry into the United States."  Compl. ¶¶ 2, 41 & Ex. 1.  When signing the Order, President Trump read its title, looked up, and said: "We all know what that means."  Compl. ¶ 43.

The Order has two dramatic effects:  It categorically bans immigration from seven Muslim-majority countries for a set period; and it halts admission of any refugees, subject to a targeted carve-out for members of "minority religion[s]" in each country.

First, Section 3(c) of the Order "suspend[s the] entry into the United States, as immigrants and nonimmigrants," of nearly all aliens from seven Muslim-majority countries—Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen—"for 90 days from the date of this order."  Exceptions are made for narrow categories of diplomats.  Putting aside those diplomats, Section 3(c) means that for 90 days *all* non-U.S. citizens from those seven countries are barred.  And it means that even people who have been living legally in the United States—foreign students enrolled in U.S. universities, refugees already granted asylum here, and people employed in the United States on temporary work visas, among others—will be halted at the border if they travel outside the United States.  Section 3(g) gives the Secretaries of Homeland Security and State discretion to "on a case-by-case basis * * * issue visas or other immigration benefits to nationals of countries for which

visas and benefits are otherwise blocked." *Id.* However, it provides no procedure for an alien to request such an exception or for the Secretaries to process one.

By its plain terms, this order bars lawful permanent residents (LPRs) from the seven prohibited nations from reentering the country. Two days after the order was issued, Secretary of Homeland Security Kelly issued a press release purporting to categorically exempt LPRs from the travel ban. Compl. ¶ 62. Four days later, the White House changed its mind and issued a memorandum stating that, despite the order's language, LPRs were not covered in the first place. Compl. ¶ 64.

While the Order's immigration ban currently applies only to people from the seven designated countries, the Order indicates that more will be added to the list. It directs the Secretary of State to "request [that] all foreign governments" provide the United States with information necessary "to adjudicate any visa, admission, or other [immigration] benefit * * * in order to determine that the individual * * * is not a security or public-safety threat." *Id.* § 3(a), (d). Foreign countries must "start providing such information [to the United States] regarding their nationals within 60 days of notification." *Id.* § 3(d). If foreign countries do not comply, the Secretaries of Homeland Security and State are directed to "submit to the President a list of [those] countries recommended for inclusion" in the immigration ban. *Id.* § 3(e).

The Order also bars refugees—and it does so in a way that discriminates based on religion. Sections 5(a) and (b) impose a 120-day moratorium on the U.S. Refugee Admissions Program, and Section 5(c) suspends entry of Syrian refugees indefinitely. When refugee admissions resume, the Order directs the Secretary of State to prioritize refugees claiming religious-based persecution, "provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b). It also provides that even during the initial 120-day period, the Secretaries of State and Homeland Security can admit refugees on a case-by-case basis, but only when doing so is "in the national interest." *Id.* § 5(e). Three circumstances automatically fulfill that criterion; one is "when the person is a religious minority in his country of nationality facing religious persecution." *Id.*

Because all seven countries named in the Order have majority-Muslim populations, these provisions create a preference for Christians. They mean that Christians (and other non-Muslim religions) may enter the United States as refugees and may obtain priority treatment, while Muslims may not. In an interview on January 27, President Trump told the Christian Broadcasting Network that his intent was to "help" Christian refugees. Compl. ¶ 53& Ex. 7.

## C.    The Order's Impact

President Trump's Order was greeted by widespread protests and
condemnation, as well as reports of chaotic conditions at the nation's airports.
Within five days, more than 100 people had been detained at U.S. airports pursuant
to the Order's directives.  Compl. ¶ 55.  That included dozens of lawful permanent
residents, an Iraqi national with Special Immigrant Visa status who had worked as
an interpreter for the U.S. army in Iraq, and a doctor at the Cleveland Clinic with a
work visa who was trying to return home from vacation.  Compl. ¶ 57.  Hundreds
of others were blocked from boarding flights to the United States or have been
notified that they can no longer come here—including foreign students with valid
visas and Syrian refugees with visas and U.S. placements already lined up. Compl.
¶ 58.  According to a Justice Department lawyer, more than 100,000 visas have
been revoked since the Order was signed.  *Id.*

Meanwhile, thousands of diplomats, former diplomats, and legislators from
both parties spoke out against the ban, calling it inhumane and discriminatory.
Hundreds of State Department officials signed a memo stating that the Order "runs
counter to core American values" including "nondiscrimination," and that
"[d]espite the Executive Order's focus on them, a vanishingly small number of
terror attacks on U.S. soil have been committed by foreign nationals" here on
visas.  Compl. ¶ 60 & Ex. 10.  Senators John McCain (R-AZ) and Lindsey Graham

(R-SC) stated: "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country." Comp. ¶ 61.

The Order quickly impacted Hawai'i too, as delineated in detail in the attached Complaint. Hawai'i is home to numerous nationals from the seven designated countries—including foreign students, refugees, and temporary workers—whose lives have now been upended by the Order. *See* Compl. ¶¶ 10-11, 14, 68. Because of the Order, they cannot leave the country for family, educational, religious, or business reasons if they wish to return. Indeed, one State employee's travel plans abroad have been severely disrupted by the Order. Decl. of John Doe 2 (Ex. B), ¶¶ 8-11. Conversely, nationals of the seven designated countries cannot relocate to or even visit Hawai'i for any reason. Compl. ¶ 69. Several Hawai'i residents are being thwarted from reuniting with their families as a result of the Order—including a U.S. citizen, and his wife and five children (all also U.S. citizens), who are being prevented from seeing or reuniting and living with their Syrian mother-in-law/mother/grandmother, Decl. of Elshikh (Ex. H), ¶¶4-7; and at least two others who are currently being separated from members of their immediate family but are too fearful of future government retaliation to provide details in a public filing, Decl. of John Doe 1 (Ex. A), ¶¶ 6, 10, 13; Decl. of John Doe 3 (Ex. C), ¶¶ 3-4.

Hawaiʻi *qua* Hawaiʻi also is being actively harmed by the Order. For example, Defendants are enforcing the Order on Hawaiʻi soil, including at Honolulu and Kona International Airports. Compl. ¶ 67. As a result of the Order, the facilities provided by Hawaiʻi's State Department of Transportation for international passengers coming into Hawaii will be used by the federal government to carry out the unlawful acts required by the Order. Compl. ¶ 71; Decl. of R. Higashi (Ex. G), ¶¶ 5-7. Likewise, State universities and agencies cannot accept qualified applicants for positions if they are nationals of one of the seven designated countries; other employers within the State cannot recruit and/or hire workers from those countries; and Hawaiʻi can no longer welcome their tourists—a direct harm to Hawaiʻi's critical tourism business. *See* Compl. ¶¶ 15, 72-78; Decl. of R. Dickson (Ex. D), ¶¶ 13-14; Decl. of G. Szigeti (Ex. F), ¶ 9; Decl. of L. Salaveria (Ex. E), ¶¶ 9-12.

Last but not least, the Order is harming Hawaii's identity and most basic values. For many in Hawaiʻi, including State officials, the Order conjures the memory of the Chinese Exclusion Acts and the post-Pearl Harbor imposition of martial law and Japanese internment. As Governor Ige said two days after President Trump signed the Order: "Hawaiʻi has a proud history as a place immigrants of diverse backgrounds can achieve their dreams through hard work. Many of our people also know all too well the consequences of giving in to fear of

newcomers. The remains of the internment camp at Honouliuli are a sad testament to that fear. We must remain true to our values and be vigilant where we see the worst part of history about to be repeated." Compl. ¶ 81.

## STANDARD OF REVIEW

To obtain a temporary restraining order or a preliminary injunction, a plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter* v. *Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test, under which 'serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Farris* v. *Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (internal quotation marks omitted).

## ARGUMENT

Hawaiʻi meets this standard. First, it has a substantial likelihood of success on the merits because the Order is unlawful several times over: Among other things, it imposes a "Muslim ban" in violation of the Establishment Clause; discriminates against particular classes of people in violation of the Fifth

11

Amendment; contravenes the Immigration and Nationality Act's prohibitions on nationality- and religion-based discrimination; and, through its implementation, violates the Administrative Procedure Act (APA). Second, Hawai'i will suffer irreparable harm if relief is not granted: The Order imposes religious harms on the state, imposes immeasurable costs on Hawaii's economy and tax revenues, and discriminates against a portion of the State's population. Third, the balance of equities tips in Hawai'i's favor. The United States will suffer no hardship if the Order is enjoined because the Government can achieve its national security objectives through other means, while remedying constitutional and statutory violations is in the public interest.

## A. Hawai'i Is Likely To Succeed on the Merits of Its Claims.

### 1. The Order Violates the Establishment Clause.

Because Sections 3(c) and Sections 5(a)-(c) and 5(e) of the Order plainly conflict with the Establishment Clause, plaintiffs are likely to succeed on their constitutional claims.

The United States was settled by an ecumenically diverse set of immigrants seeking religious freedom. *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC*, 565 U.S. 171, 182-183 (2012). The Framers enshrined that freedom in the First Amendment's Religion Clauses. One of those Clauses, the Establishment Clause, "addressed the fear that 'one sect might obtain a pre-

eminence * * * and establish a religion to which they would compel others to conform.'" *Id.* at 184 (quoting 1 Annals of Cong. 730-731 (1789) (remarks of J. Madison)). Thus "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente*, 456 U.S. 228, 244 (1982).

To determine whether a particular policy runs afoul of that command, the Ninth Circuit typically applies the three-part test from *Lemon* v. *Kurtzman*, 403 U.S. 602 (1971). *See, e.g.*, *Access Fund* v. *U.S. Dep't of Agric.*, 499 F.3d 1036, 1042-43 (9th Cir. 2007). "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion * * *; finally the statute must not foster an excessive government entanglement with religion." *Lemon*, 403 U.S. at 612-613 (internal quotation marks and citation omitted). A failure to satisfy any one of these requirements establishes a constitutional violation. The Order flunks all three.

First, while the Government has asserted in the Order itself that it serves the secular purpose of protecting against terrorism, "an 'avowed' secular purpose is not sufficient to avoid conflict with the First Amendment" where the order's actual aim is establishing a religious preference. *Stone* v. *Graham*, 449 U.S. 39, 41 (1980) (per curiam). For example, in *Stone* the Supreme Court invalidated a law requiring that the Ten Commandments be placed on classroom walls. The law

mandated that each display include a statement that "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* But that was not enough because the "pre-eminent purpose" of requiring the display was "plainly religious in nature." *Id.*

The same is true here. The President and his aides have made it abundantly clear that they intend to exclude individuals of the Muslim faith, and that this Order—which bans travel only with respect to certain Muslim-majority countries—is part of that plan. *See* Compl. ¶¶ 27-43, 53-54. Sections 5(b) and 5(e) also explicitly direct the government to prioritize religious refugee claims if the "religion of the individual is a minority religion in the individual's country"—a system of religious preference that President Trump told the media was expressly designed to favor Christians. Compl. ¶¶ 51, 53 & Ex. 7.

In the Establishment Clause context, these statements matter. Because *Lemon*'s first step is concerned with "whether [the] government's actual purpose is to endorse or disapprove of religion," courts routinely look to the public declarations of an act's originator to discern its true aim. *Wallace* v. *Jaffree*, 472 U.S. 38, 56-57 (1985) (finding an Establishment Clause violation because "[t]he sponsor of the bill * * * inserted into the legislative record—apparently without dissent—a statement indicating that the legislation was an 'effort to return

voluntary prayer' to the public schools"); *Edwards* v. *Aguillard*, 482 U.S. 578, 586-587 (1987) (examining the remarks of a bill's sponsor during a legislative hearing to determine whether a stated secular purpose was "sincere and not a sham"). Accordingly, when a challenged policy is generated by the Executive, rather than Congress, the court may examine the statements of the President and his aides. *Cf. Utley* v. *Varian Assocs., Inc.*, 811 F.2d 1279, 1285 (9th Cir. 1987) (in the affirmative action context, if a program was created by the Executive, the "analysis focus[es] on executive rather than congressional intent").

Indeed, public statements of purpose calculated to be heard by a wide audience carry particular weight. When the head of our government publicly expresses "a purpose to favor religion," it "sends the message to nonadherents that they are outsiders, not full members of the political community." *McCreary Cty., Ky.* v. *Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860-861 (2005) (internal quotation marks and ellipses omitted). Thus, the Supreme Court has explained that a policy that might otherwise pass constitutional muster may be invalidated "if the government justifies the decision with a stated desire" to promote a particular religion. *Id.*

If there were any doubt as to the actual purpose of the policy, there is no question that the President's public statements have caused citizens to reasonably *believe* that the policy is aimed at the Muslim faith: Witness, for example, the mass

protests at airports and in cities across the country and the explicit statement of two Republican Senators. *See supra* at pp. 7-8. That in and of itself is enough to demonstrate an Establishment Clause violation under the second prong of *Lemon*. This second "prong * * * asks whether, irrespective of the government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Access Fund*, 499 F.3d at 1045 (internal quotation marks omitted); *see also McCreary*, 545 U.S. at 868 n.14 (examining how a challenged action will be perceived by an "objective observer[ ]"). One need hardly do more than articulate this inquiry to understand why the Order fails. And the same is true for *Lemon*'s third prong, which considers whether a policy "foster[s] an excessive government entanglement with religion." 403 U.S. at 612-613 (internal quotation marks omitted). The exception for members of religious minorities alone hopelessly entangles the government in religious matters.

To be sure, courts are inconsistent in how or whether they invoke *Lemon*, and the Supreme Court has applied several different frameworks in analyzing potential Establishment Clause violations. But no framework permits the government to enact a policy that amounts to a governmental preference for or against a particular faith. *See, e.g.*, *Town of Greece, N.Y.* v. *Galloway*, 134 S. Ct. 1811, 1824 (2014) (declining to apply *Lemon* but upholding a policy in part because—unlike the Order—it did not "reflect an aversion or bias on the part of

town leaders against minority faiths"); *Larson*, 456 U.S. at 246 (applying strict scrutiny and invalidating a policy because it unnecessarily "grant[ed] a denominational preference").

Some of the Order's defenders attempt to avoid this conclusion by pointing to older Supreme Court cases discussing Congress's plenary power over immigration. *See, e.g.*, *Kleindienst* v. *Mandel*, 408 U.S. 753, 770 (1972). That argument fails for two independent reasons. First, as discussed in greater length below, even if it is good law, the doctrine would not apply to a policy like this one. *See infra* at pp. 22-25. Second, the plenary power cases are not relevant to the Establishment Clause anyway: The Court has never applied the doctrine with respect to policies that draw religious distinctions in the immigration context. Nor could it. Allowing an immigration exception would swallow the Establishment Clause whole. After all, a primary means of establishing a national religion is to exclude members of another faith from immigrating or to privilege the entry of members of the faith one wishes to establish. Indeed, in one of the Supreme Court's most recent Establishment Clause cases, six members of the Court agreed that requiring "an immigrant seeking naturalization * * * to bow her head and recite a Christian prayer" would unquestionably violate the Establishment Clause. *Town of Greece*, 134 S. Ct. at 1834 (Alito, J., joined by Scalia, J., concurring); *id.*

at 1842 (Kagan, J., joined by Ginsburg, J., Breyer, J., and Sotomayor, J., dissenting).

The Order's defenders have also suggested that if this Order is held to violate the Establishment Clause, then all future immigration policies that disproportionately aid or exclude members of a particular faith will be foreclosed. That is simply not so. An immigration policy with a secular purpose and design that just happens to disproportionately exclude members of a particular faith likely would survive *Lemon*. But that is not this Order. Instead, the President that issued it openly announced a desire to ban Muslims, *told his advisors he wanted their help to do just that while disguising his purpose,* and then followed through by signing a Muslim ban and tossing in a transparent fig leaf. Holding that *that* practice violates the Establishment Clause will foreclose nothing more than cynical attempts to skirt core constitutional commands.

### 2. The Order Violates Equal Protection and the Fifth Amendment's Due Process Clause.

There is little doubt that, under normal equal-protection and due-process principles, the Order is unconstitutional: It discriminates based on protected classifications, and it cannot survive strict scrutiny. The only question, then, is whether the "plenary power" doctrine excuses the constitutional violations. It does not.

### a.   The Order violates equal protection and the right to travel.

To begin, the Order violates the Constitution's guarantee of equal protection.[1]

"From its inception, our Nation welcomed and drew strength from the immigration of aliens." *In re Griffiths*, 413 U.S. 717, 719 (1973).  The "contributions" of immigrants "to the social and economic life of the country" are "self-evident." *Id*.  Thus any government classification based on alienage or national origin is "objectionable." *Hampton* v. *Mow Sun Wong*, 426 U.S. 88, 107 n.30 (1976).  Similarly, courts must "strictly scrutinize governmental classifications based on religion." *Employment Div.* v. *Smith*, 494 U.S. 872, 886 n.3 (1990).  Classifications based on religion and national origin are therefore both subject to strict scrutiny, and must be "narrowly tailored to achieving a compelling * * * interest." *Miller* v. *Johnson*, 515 U.S. 900, 904 (1995)

Sections 3(c) and 3(e)-(f) of the Order plainly flunk that test.  They are premised on differentiating among people based on national origin: People from certain countries can enter the United States, and people from other countries cannot.  In addition, those provisions as well as Sections 5(a) and (c) treat people

---

[1]   The Fourteenth Amendment's Equal Protection Clause applies only against the states, but "[i]n numerous decisions," the Supreme Court has held that the same equal protection analysis applies to the federal government through the Due Process Clause of the Fifth Amendment.  *See, e.g.*, *Davis* v. *Passman*, 442 U.S. 228, 234 (1979).

differently because of their religion: They are intentionally structured in a way that blocks Muslims while allowing Christians.

The Order is nowhere near "tailored" enough to justify that differentiation. It asserts that it is meant to prevent terrorism. But if so, it is wildly over- and under-inclusive. It is over-inclusive because it ensnares countless students, tourists, businesspeople, refugees, and other travelers lacking even the remotest connection to terrorism of any sort. And it is under-inclusive because it would not have covered *any* of the perpetrators of the worst recent terrorist attacks on American soil: September 11, the Boston Marathon bombing, San Bernardino, or Orlando. Not a single fatal terrorist attack has been perpetrated in the United States by a national of one of the seven identified countries since at least 1975. Compl. ¶ 46.

Indeed, the fit between the Order's coverage and its stated purpose is so poor that it would fail even rational-basis review. The mismatch indicates that the real purpose of the Order was simply to harm a politically unpopular group: Muslims. That is unlawful. The "Constitution's guarantee of equality 'must at the very least mean that a bare * * * desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *United States* v. *Windsor*, 133 S. Ct. 2675, 2693 (2013) (citation omitted).

Separately, the Order infringes the right to international travel. "Freedom of movement is basic in our scheme of values." *Kent* v. *Dulles*, 357 U.S. 116, 126 (1958). The right to travel abroad is therefore "part of the 'liberty'" protected by the Due Process Clause. *Id*. at 125. And because the Order curtails this right, it must be "narrowly drawn to prevent the supposed evil." *Id*. at 904. As explained above, it does not come close.

### b.    *The Order violates procedural due process.*

Sections 3(c) and 3(e)-(f) of the Order also violate procedural due process requirements. "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent," *Zadvydas* v. *Davis*, 533 U.S. 678, 693 (2001), and resident foreigners have liberty interests in being able to re-enter the United States and in being free from detention at the border, *see Landon* v. *Plasencia*, 459 U.S. 21, 32 (1982). The Government may only take away those liberty interests by "due process of law." U.S. Const. amend. V. The process that is "due" turns on three factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirement would entail." *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

The procedures in place here fall far short. Denial of reentry "is, without question, a weighty" interest, and a person in that circumstance must be given "an opportunity to present her case effectively." *Landon*, 459 U.S. at 34, 36. But the Order offers no procedural protections whatsoever: It allows for no counsel, no hearings, no inquiry, no review—no process of any sort. That will not do. At the very least, those barred from the country or detained pursuant to the Order should be given some individualized consideration of their circumstances. "[T]he returning resident alien is entitled as a matter of due process to a hearing on the charges underlying any attempt to exclude him," a principle in keeping with "the general proposition that a resident alien who leaves this country is to be regarded as retaining certain basic rights." *Rosenberg* v. *Fleuti*, 374 U.S. 449, 460 (1963).

Similarly, detention of a resident at the border is an invasion of liberty that requires the government to provide concomitant protections. "Even where detention is permissible * * * due process requires 'adequate procedural protections' to ensure that the government's asserted justification for physical confinement 'outweighs the individual's constitutionally protected interest in avoiding physical restraint.'" *Casas-Castrillon* v. *Dep't of Homeland Sec.*, 535

F.3d 942, 950 (9th Cir. 2008) (quoting *Zadvydas*, 533 U.S. at 690).  Those

protections are nonexistent here.

Moreover, while the Order authorizes executive officials to make certain

case-by-case exceptions, *see, e.g.*, Order § 3(g), it creates no mechanism for

processing those exceptions and no procedure to ensure they are applied

consistently and fairly.  That unfettered executive discretion is the antithesis of due

process.  *See Grayned* v. *City of Rockford*, 408 U.S. 104, 108-109 (1972).  It is

cold comfort for a resident seeking reentry to know that some provision for

exceptions is made, if that power is exercised arbitrarily and unreviewably.  The

Due Process Clause requires more.

### c.  *The plenary-power doctrine does not change the outcome.*

The Order's defenders again seek refuge in the plenary-power doctrine.  But

that doctrine does not help them for two reasons.

First, while it is true that the plenary-power doctrine gives Congress latitude

to "make rules for the admission of aliens," *Kleindienst*, 408 U.S. at 766 (citation

omitted), the Order here has profound discriminatory effects on aliens *already*

*within* the United States.  And the Supreme Court has made clear that political

branches' power in that area is not plenary.  To the contrary, it "is subject to

important constitutional limitations." *Zadvydas*, 533 U.S. at 695.  Specifically,

aliens who are present within the United States are entitled to the full panoply of

equal-protection and due-process protections, "whether their presence here is lawful, unlawful, temporary, or permanent." *Id*. at 693.  The Order here runs afoul of both those protections.  It prevents people present in the United States from traveling and from seeing their loved ones, and it imposes that burden on the basis of religion and national origin.  That is not constitutional, and the incantation of "plenary power" does not make it so.  *See Hampton*, 426 U.S. at 101 ("We do not agree * * * that the federal power over aliens is so plenary that any agent of the National Government may arbitrarily subject all resident aliens to different substantive rules from those applied to citizens.").

Second, the plenary-power doctrine emphasizes the broad authority of "*Congress*."  *See Kleindienst*, 408 U.S. at 766 (emphasis added).  Congress is, after all, constitutionally empowered to regulate immigration.  U.S. Const. art. I, § 8.  Even if the doctrine authorizes Congress to flatly ban a particular racial or religious group from entering the United States—a highly doubtful proposition—it certainly does not authorize the *President* to plow ahead and enact such a ban where Congress has not provided for it.  Indeed, the delegation of authority to the President here is expressly subject to the INA's antidiscrimination provision.  *See* Part 3, *infra*.  And the President surely could not take a general grant of discretion to make immigration rules and use it to decree that only whites or Christians are allowed to immigrate into the United States.  *Cf. Kwai Fun Wong* v. *United States*,

373 F.3d 952, 974 (9th Cir. 2004) ("We cannot countenance that the Constitution would permit immigration officials to engage in such behavior as rounding up all immigration parolees of a particular race solely because of a consideration such as skin color.").

The Supreme Court has made this clear. In *Kleindienst*, for example, the Court explained that when Congress "delegate[s]" the exercise of "plenary power" to the Executive, and "the Executive exercises this power negatively *on the basis of a facially legitimate and bona fide reason*, the courts will neither look behind the exercise of that discretion, nor test it." 408 U.S. at 770 (emphasis added). The inverse must also be true: When the Executive *lacks* "a facially legitimate and bona fide reason" for excluding foreigners, the plenary-power doctrine is no shield for unconstitutional discrimination.

That is the case here. As explained above, the profound mismatch between the Order's purported purpose and its scope reveals its true illegitimate purpose: to burden a politically unpopular group. Moreover, the Order's express terms and the statements of President Trump and his advisors cast grave doubt on whether the Order's stated purpose was in fact its "bona fide" impetus.

For this reason, too, the plenary-power doctrine does not insulate the Order from constitutional scrutiny, and the Order must fall.

**3. The Order is Inconsistent with the Immigration and Nationality Act**.

The Order also violates the plain terms of the immigration laws three times over. It "discriminate[s]" against prospective immigrants based on "nationality," in violation of 8 U.S.C. § 1152(a)(1)(A); it "discriminat[es]" against refugees based on "religion," in violation of the United Nations Convention Relating to the Status of Refugees art. 3, July 28, 1951, 19 U.S.T. 6259; and it grossly misapplies the President's authority to "suspend the entry" of aliens, 8 U.S.C. § 1182(f).

*a. The order's nationality-based classifications violate the INA.*

First, the Order violates the Immigration and Nationality Act's (INA) flat prohibition on nationality-based discrimination.

Section 202(a)(1)(A) of the INA provides:

> Except as specifically provided in paragraph (2) and in sections
> 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of this title, no person
> shall receive any preference or priority or be discriminated against
> in the issuance of an immigrant visa because of the person's race,
> sex, nationality, place of birth, or place of residence.

8 U.S.C. § 1152(a)(1)(A). "Congress could hardly have chosen more explicit language." *Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State, Bureau of Consular Affairs*, 45 F.3d 469, 473 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996). It "unambiguously directed that no nationality-based discrimination shall occur," *id.*, and so "eliminat[ed] * * * the national origins system as the basis for the selection of immigrations to the United States." H.R.

Rep. No. 89-745, at 8 (1965); *see Olsen* v. *Albright*, 990 F. Supp. 31, 37 (D.D.C. 1997).

The Order flouts this clear command. Section 3(c) provides that aliens "from" seven identified "countries" cannot enter the United States. Sections 3(e)-(f) authorizes the President to bar entry by "foreign nationals * * * from [additional] countries" he will subsequently identify. And Section 5 prohibits "the entry of Syrian nationals as refugees," *id.* § 5(c), and permits the Secretary of State to resume refugee admissions "only for nationals of [designated] countries," *id.* § 5(a). Each of these provisions facially discriminates on the basis of "nationality, place of birth, or place of residence," 8 U.S.C. § 1152(a)(1)(A)—exactly what Congress said the Executive cannot do. The Order thus unilaterally resurrects the "national origins system" that Congress ended in 1965.

The President cannot ignore Section 202(a)(1)(A) in this manner. Congress specified exactly when federal officials could take nationality into account: "as specifically provided in paragraph (2) [of Section 202(a)] and in sections 1101(a)(27), 1151(b)(2)(A)(i), and 1153 of" title 8. 8 U.S.C. § 1152(a)(1)(A). None of those narrow exceptions is even arguably relevant here; and by enumerating those few exemptions, Congress made clear it did not intend to authorize others. *See, e.g.*, *United Dominion Indus.* v. *United States*, 532 U.S. 822, 836 (2001) (describing *expressio unius* canon). The fact that the immigration laws

give the President some discretion makes no difference.  As courts have recognized

for decades—and as Section 202(a)(1)(A) makes clear—"discretion" in enforcing

the immigration laws "may not be exercised to discriminate invidiously against a

particular race or group."  *Wong Wing Hang* v. *INS*, 360 F.2d 715, 719 (2d Cir.

1966) (Friendly, J.); *see, e.g.*, *Patel* v. *INS*, 811 F.2d 377, 382 (7th Cir. 1987)

(same).

### b. The Order's religion-based classifications violate the INA.

Sections 5(b) and 5(e) of the Order also violate the INA by discriminating

against refugees on the basis of religion.  In 1968, the United States ratified the

United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19

U.S.T. 6223 ("UN Protocol"), a multilateral treaty that requires signatory states to

treat refugees "without discrimination as to race, religion or country of origin."

United Nations Convention Relating to the Status of Refugees art. 3, July 28, 1951,

19 U.S.T. 6259; *see* UN Protocol art. I.1 (incorporating this requirement by

reference).  Congress subsequently overhauled the INA "to bring United States

refugee law into conformity with the Protocol."  *Khan* v. *Holder*, 584 F.3d 773,

783 (9th Cir. 2009).  Accordingly, the Ninth Circuit (echoing the Supreme Court)

has held that courts must "interpret the INA in such a way as to avoid any conflict

with the Protocol, if possible."  *Id.*; *see INS* v. *Aguirre-Aguirre*, 526 U.S. 415, 426-

427 (1999); *INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 437 (1987).  Nothing in the

INA suggests that Congress intended to authorize immigration officials—or the President—to violate the Protocol's straightforward prohibition on religious discrimination. Indeed, the INA expressly prohibits *States* from discriminating against refugees with "regard to race, religion, nationality, sex, or political opinion." 8 U.S.C. § 1522(a)(5). It is inconceivable that Congress intended *federal* officials to engage in such discrimination, in clear violation of the Nation's treaty obligations. As describe above, *see supra* at pp. 19-20, the Order does precisely that, and so cannot stand.

### c. The INA does not authorize the President to impose sweeping class-based restrictions on immigration.

Sections 3(c), 3(e)-(f), 5(a), and 5(c) are also unlawful because the President lacks any affirmative authority to impose the Order's sweeping, undifferentiated, and arbitrary bans on entry.

As a basis for its immigration and refugee bans, the Order relies on Section 212(f) of the INA, which states that the President may "suspend the entry of * * * any class of aliens as immigrants or nonimmigrants" if he "finds that the[ir] entry * * * would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f); *see* Order §§ 3(c), 5(c). But Section 212(f) provides no support for the Order.

That is so for two reasons. First—as discussed above—the INA prohibits nationality discrimination, and section 212(f) does not override that limit. *See*

8 U.S.C. § 1152(a)(1)(a). Section 202(a)(1)(A), with its focus on particular

categories of protection, is more specific than Section 212(f)'s generalized grant of

discretion. It also is later-enacted—1965 versus 1952. And it enumerates specific

exceptions to its prohibition that do not include section 212(f). It therefore

overrides any authority the President would otherwise have had under Section

212(f). *See United States* v. *Juvenile Male*, 670 F.3d 999 (9th Cir. 2012)

(recognizing principle of statutory construction that "[w]here two statutes conflict,

the later-enacted, more specific provision generally governs."); *United Dominion*,

532 U.S. at 836.

   In any event, the Order's reliance on Section 212(f) stretches that provision

far beyond its limits. Presidents have invoked Section 212(f) dozens of times since

it was enacted in 1952; in every instance, they used it to suspend entry of a *discrete*

set of individuals based on an *individualized* determination that *each* prohibited

member of the class had engaged in conduct "detrimental to the [United States']

interests." *See, e.g.*, Pres. Proc. No. 8342 (Jan. 22, 2009) (suspending entry of

human traffickers); Pres. Proc. No. 5887 (Oct. 26, 1988) (suspending entry of

Sandinistas); *see generally* Cong. Research Serv., Executive Authority to Exclude

Aliens: In Brief 6-10 (Jan. 23, 2017), https://fas.org/sgp/crs/homesec/R44743.pdf.

Before now, no President attempted to invoke Section 212(f) to impose a

*categorical* bar on admission based on a *generalized* (and unsupported) claim that

*some* members of a class *might* engage in misconduct. And no President has taken the further step of establishing an *ad hoc* scheme of exceptions that allows immigration officers to admit whomever they choose on either a "case-by-case basis," Order § 3(g), or categorically, *see* Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents Into the United States (Jan. 29, 2017) (determining, within two days of the Order's issuance, that lawful permanent residents are entitled to a blanket exception).

If these novel assertions of authority were accepted, the immigration laws could be nullified by executive fiat. It is always possible to claim that some broad group might include dangerous individuals; many countries, for example, have worse records of terrorism than the seven the President singled out. *See* U.S. Dep't of State, National Consortium for the Study of Terrorism and Responses to Terrorism: Annex of Statistical Information (2016) (showing that 7 of the 10 countries with the most terrorism were not included in the Order). The President's logic would therefore permit him—and any future President—to abandon Congress's immigration system at will, and replace it with his own rules of entry governed by administrative whim.

That is not the law Congress enacted. "Congress * * * does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"—it does not, as Justice Scalia wrote, "hide elephants in mouseholes."

*Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Enabling the President to unilaterally suspend the immigration laws would surely be an elephant; and the vague terms of Section 212(f)—never once in six decades interpreted in the manner the President now proposes—are a quintessential mousehole. *See FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000) (declining to find that Congress "intended to delegate a decision of [substantial] economic and political significance" whether authority ran "[c]ontrary to [the Executive Branch's] representations" for 80 years). Indeed, it is doubtful that Congress *could* delegate such unbounded authority to the President. *See Clinton* v. *City of New York*, 524 U.S. 417, 443 (1998) (Congress cannot authorize President "to cancel portions of a duly enacted statute"); *Whitman*, 531 U.S. at 472 (Congress cannot delegate powers without an "intelligible principle" to govern their exercise). Section 212(f) cannot be construed to authorize the Order's sweeping and discriminatory immigration bans.

**4. The Order's Implementation Violates the APA**.

Finally, the Order's implementation violates the APA, both on procedural and substantive fronts.

*APA Procedural Requirements.* The APA requires that agencies provide public notice and an opportunity for comment on any rule that is "legislative" or "substantive." *Lincoln* v. *Vigil*, 508 U.S. 182, 196 (1993); *see* 5 U.S.C. § 553(b)-

32

(c).  "Substantive rules" are those that "change existing rights and obligations,"

*Time Warner Cable Inc.* v. *FCC*, 729 F.3d 137, 168 (2d Cir. 2013), and "limi[t]

administrative discretion or establish a binding norm" for agency officials to

follow, *Sacora* v. *Thomas*, 628 F.3d 1059, 1069 (9th Cir. 2010) (italics omitted).

In this case, Sections 3 and 5 of the Order are substantive because they

unquestionably affect existing "rights and obligations":  Immigrants and non-

immigrants living in the United States can no longer leave and re-enter the country,

and nationals of designated countries who have visas can no longer use them.  But

more to the point, the rules that *agencies* have to create to carry out the Order also

are (and will be) substantive rules.  After all, the Order speaks in broad generalities

and leaves it to the agencies to implement binding norms around everything from

which refugees get exemptions, to who counts as "immigrants and nonimmigrants"

under Section 3(c), to whether Section 5(e)'s in-the-national-interest exemptions

extend beyond the enumerated examples.

Those newly-minted norms will affect existing "rights and obligations" in

extraordinary ways.  To take just one example, the implementing officials have

changed their view as to whether lawful permanent residents fall within the

Order's national-interest prong *twice*—and have effectuated each change with no

more than a *press release*.  Compl. ¶¶ 62-64.  That is plainly improper.  The same

goes for the many similarly substantive rules that have been and will be promulgated under the Order's auspices.

*APA Substantive Requirements.* Defendants have also committed substantive violations of the APA. The APA prohibits federal agencies from taking any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2). The Order, and agency norms promulgated under the Order, are plainly "not in accordance with law." *See supra*, A.1-3. And Defendants' issuance and implementation of the Order has been flagrantly arbitrary and capricious. The Order has been issued and implemented abruptly and with no reasonable explanation of how its various provisions further its stated objective. *See City of Sausalito* v. *O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (agencies must at least articulate "a rational connection between the factors found and the choices made" (internal quotation marks omitted)). Just within the first 72 hours, Defendants are reported to have changed their minds three times about one of the Order's essential aspects—whether it applies to green card holders. Compl. ¶ 59. A few days later, they changed their minds yet *again*. Comp. ¶ 64. If this is not arbitrary and capricious executive action, it is hard to imagine what would be.

**B. Hawai'i Will Suffer Irreparable Harm If Relief Is Not Granted.**

Hawai'i will be irreparably harmed if Defendants are not temporarily enjoined from enforcing Sections 3(c), 3(e)-(f), 5(a)-(c), and 5(e) of the Order. Implementation of these provisions has already caused significant religious, dignitary, and economic harms in and to Hawai'i. If Defendants are not enjoined, the damage will be immeasurable. For these reasons, the State *a fortiori* satisfies the requirements of Article III standing as well.

*First*, the Order is creating an unconstitutional "establishment" of religion in Hawai'i and across the country. This harm alone is sufficient to warrant injunctive relief; in Establishment Clause cases, irreparable harm is presumed. *See, e.g.*, *Chaplaincy of Full Gospel Churches* v. *England*, 454 F.3d 290, 303 (D.C. Cir. 2006) (if a movant demonstrates a likelihood of success on an Establishment Clause claim, "this is sufficient, without more, to satisfy the irreparable harm prong"); *see also Farris*, 677 F.3d at 868 (9th Cir. 2012) (adopting the same rule for First Amendment claims generally).

*Second*, the Order is inflicting irreparable harm on the State's sovereign and dignitary interests by commanding instruments of Hawaii's government to support discriminatory conduct that is offensive to its own laws and policies. Hawaii's Constitution protects religious freedom and the equal rights of all persons. Hawai'i Const. art. 1, §§2, 4. Its statutes bar discrimination on the basis of ancestry. Haw.

Rev. Stat. §§ 378-2(1); 489-3; 515-3. And Hawai'i has a number of policies that aim to further diversity. Compl. ¶ 72. Hawai'i has a sovereign interest in seeing that its laws and policies are given effect, and in following them *itself*. *See Bond* v. *United States*, 564 U.S. 211, 221 (2011); *Missouri* v. *Holland*, 252 U.S. 416, 431 (1920).

The Order commands Hawai'i to abandon its sovereign prerogatives, and become complicit in discrimination barred by its own Constitution and statutes: The State's universities cannot enroll qualified persons from the designated countries; state governmental entities cannot hire such persons; and the State's Department of Transportation must provide areas inside the State's international airports to Customs and Border Patrol to detain and deport immigrants barred by the Order. In stopping Hawaii's governmental entities from abiding by the State's own laws and policies, the Order inflicts dignitary harms that have no remedy. *See, e.g.*, *Shelby Cty.* v. *Holder*, 133 S. Ct. 2612, 2623 (2013) (states should "retain broad autonomy in structuring their governments and pursuing legislative objectives"); *Arizona Dream Act Coal.* v. *Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (irreparable harm is threatened when "there is no adequate legal remedy").

*Third*, the Order is inflicting permanent damage on Hawaii's economy and tax revenues. Tourism is the "state's lead economic driver"; in 2015 alone, Hawai'i had 8.7 million visitor arrivals, accounting for $15 billion in spending.

Compl. ¶ 15. The Order prevents any nationals of the designated countries from visiting the State, which will result in considerable lost revenues. Decl. of G. Szigeti (Ex. F), ¶¶ 9-11 (showing thousands of visitors in 2015 from the Middle East and Africa). The Order deters Muslim immigrants and non-immigrants across America from engaging in interstate travel that involves an airport, effectively precluding travel to Hawai'i. And it will likely chill international tourism to Hawai'i more broadly, as nationals of other countries fear that they too will become subject to an immigration ban. Decl. of L. Salaveria (Ex. E), ¶¶ 11-14. These consequences will drastically reduce the State's economic output and its tax revenues, and they will inflict incalculable harm on Hawaii's reputation as a place of welcome—a brand that it is has spent significant time and energy developing internationally. *See Oracle USA, Inc.* v. *Rimini St., Inc.*, 2016 WL 5213917, at *2 (9th Cir. Sept. 21, 2016) (injunctive relief warranted when "injuries [are] difficult to quantify and compensate").

Finally, the Order inflicts irreparable damage to Hawai'i because it subjects a portion of its population to discrimination and marginalization, while denying all residents of the State the benefits of a pluralistic and inclusive society. Hawai'i is home to over 6,000 legal permanent residents, including numerous individuals from the designated countries. Compl. ¶ 10. It currently has 12,000 foreign students, including 27 graduate students from the designated countries at the

University of Hawaiʻi alone. Decl. of R. Dickson (Ex. D), ¶ 9. The University of Hawaiʻi also has at least 10 faculty members who are legal permanent residents from the designated countries, and at least 30 faculty members with valid visas from the countries. *Id.* ¶¶ 10-11. Section 3(c) of the Order subjects these Hawaii residents to second-class treatment—denying them their fundamental right to travel overseas, preventing them from tending to important family matters, and impairing their ability to complete necessary aspects of their work or study. *Id.* ¶ 12; Decl. of John Doe 3 (Ex. C), ¶¶ 3-4 . More broadly, the Order subjects all of Hawaiʻi— which prides itself on its ethnic diversity and inclusion—to a discriminatory policy that differentiates among State residents based on their national origin. *See, e.g.*, Decl. of R. Dickson (Ex. D), ¶ 13. Hawaiʻi has a quasi-sovereign interest in "securing [its] residents from the harmful effects of discrimination." *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico*, 458 U.S. 592, 609 (1982). The Order is irreparably undermining that interest.

## C.  The Balance of the Equities and Public Interest Favor Relief.

The balance of the equities and public interest factors tip decidedly in favor of Hawaiʻi. The harms the Order inflicts are immediate and severe, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres* v. *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Defendants, in contrast, have identified no exigency that demands immediate implementation of this Order. They have *no* evidence that the Order's wildly over- and under-inclusive bans will actually prevent terrorism or make the Nation more secure. Defendants can fully achieve the Order's stated goal of strengthening the country's vetting procedures without also depriving millions of people of their rights under the Constitution and federal law.

## CONCLUSION

The Motion for a Temporary Restraining Order should be granted, and Defendants should be restrained from continuing to enforce Sections 3(c), 5(a)-(c), and 5(e) of the Executive Order, in Hawaiʻi and nationwide.

DATED: Honolulu, Hawaiʻi, February 3, 2017.

Respectfully submitted,

*/s/ Douglas S. Chin*

NEAL K. KATYAL*
COLLEEN ROH SINZDAK*
MITCHELL P. REICH*
ELIZABETH HAGERTY*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email: neal.katyal@hoganlovells.com

THOMAS P. SCHMIDT*
HOGAN LOVELLS US LLP
875 Third Avenue

DOUGLAS S. CHIN (Bar No. 6465)
  Attorney General of the State of Hawaiʻi
CLYDE J. WADSWORTH (Bar No. 8495)
  Solicitor General of the State of Hawaiʻi
DEIRDRE MARIE-IHA (Bar No. 7923)
KIMBERLY T. GUIDRY (Bar No. 7813)
DONNA H. KALAMA (Bar No. 6051)
ROBERT T. NAKATSUJI (Bar No. 6743)
  Deputy Attorneys General

DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAIʻI

New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW*
ALEXANDER B. BOWERMAN*
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Pro Hac Vice Applications
  Forthcoming

425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
Email: deirdre.marie-iha@hawaii.gov

Attorneys for Plaintiff, State of Hawaiʻi