DOUGLAS S. CHIN (Bar No. 6465)
  Attorney General of the State of Hawaiʻi
CLYDE J. WADSWORTH (Bar No. 8495)
  Solicitor General of the State of Hawaiʻi
DEIRDRE MARIE-IHA (Bar No. 7923)
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAIʻI
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
Email: deirdre.marie-iha@hawaii.gov
  *Attorneys for Plaintiff, State of Hawaiʻi*

NEAL K. KATYAL*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email:
neal.katyal@hoganlovells.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs, State of
  Hawaiʻi and Ismail Elshikh*

(See Next Page For Additional Counsel)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAIʻI and ISMAIL ELSHIKH, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. 1:17-cv-00050-DKW-KJM <br><br><br> SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## **ADDITIONAL COUNSEL**

DONNA H. KALAMA (Bar No. 6051)
KIMBERLY T. GUIDRY (Bar No. 7813)
ROBERT T. NAKATSUJI (Bar No. 6743)
  Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAI'I
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239

*Attorneys for Plaintiff, State of Hawai'i*

COLLEEN ROH SINZDAK*
MITCHELL P. REICH*
ELIZABETH HAGERTY*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910

THOMAS P. SCHMIDT*
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW*
ALEXANDER B. BOWERMAN*
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs, State of
  Hawai'i and Ismail Elshikh*

**INTRODUCTION**

1.     The State of Hawaiʻi (the "State") brings this action to protect its residents, its employers, its educational institutions, and its sovereignty against illegal actions of President Donald J. Trump and the federal government, specifically: President Trump's March 6, 2017 Executive Order, "Protecting the Nation From Foreign Terrorist Entry into the United States" (the "Executive Order").[1]  Plaintiff Ismail Elshikh, PhD, the Imam of the Muslim Association of Hawaiʻi, joins the State in its challenge because the Executive Order inflicts a grave injury on Muslims in Hawaiʻi, including Dr. Elshikh, his family, and members of his Mosque.

2.     President Trump's original Executive Order dated January 27, 2017 blocked the entry into the United States, including Hawaiʻi, of any person from seven Muslim-majority countries:  Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.[2]  His new Executive Order also blocks the entry into the United States, including Hawaiʻi, of nationals from six of the same countries—all except for Iraq—as long as those individuals do not have a valid U.S. visa as of the effective date of the Executive Order, or did not have one as of 5:00 p.m. EST on January 27, 2017.  In other words, the Executive Order means that no prospective visa holder from the six designated countries will be able to enter the United States.  This second Executive Order is infected with the same legal problems as the first Order—undermining bedrock constitutional and statutory guarantees.

3.     The Executive Order means that thousands of individuals across the United States and in Hawaiʻi who have immediate family members living in the

---

[1] As of this filing, President Trump's March 6, 2017 has not yet been published in the Federal Register.  A copy of the Executive Order published on the White House website is attached as Exhibit 1, and is available at https://goo.gl/rnecqx.
[2] *See* Executive Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017).  A copy of the first Executive Order is attached as Exhibit 2.

affected countries will now be unable to receive visits from those persons or to be reunited with them in the United States. It means that universities, employers, and other institutions throughout the United States and in Hawaiʻi will be unable to recruit or to welcome qualified individuals from the six designated countries. It threatens certain non-citizens within the United States and in Hawaiʻi with the possibility that they will be unable to travel abroad and return—for instance, because their visa only permits them one entry, or because their visa will have expired during the time the Executive Order is still in place.

4. President Trump's Executive Order is subjecting a portion of Hawaii's population, including Dr. Elshikh, his family, and members of his Mosque, to discrimination and second-class treatment, in violation of both the Constitution and the Immigration and Nationality Act. The Order denies them their right to associate with family members overseas on the basis of their religion and national origin. And it results in their having to live in a country and in a State where there is the perception that the Government has established a disfavored religion.

5. The Executive Order bars students, tourists, family members, and other visitors from the State on grounds that Congress and the Constitution have expressly prohibited. It is damaging Hawaii's institutions, harming its economy, and eroding Hawaii's sovereign interests in maintaining the separation between church and state as well as in welcoming persons from all nations around the world into the fabric of its society.

6. Plaintiffs accordingly seek an Order invalidating the portions of President Trump's Executive Order challenged here.

## JURISDICTION AND VENUE

7. This Court has Federal Question Jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, the Administrative

Procedure Act ("APA"), the Immigration and Nationality Act ("INA"), and other Federal statutes.

8. The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and each Defendant is an officer of the United States sued in his official capacity.

## PARTIES

10. Plaintiffs are the State of Hawai'i and Ismail Elshikh, PhD.

11. Hawai'i is the nation's most ethnically diverse State, and is home to more than 250,000 foreign-born residents. More than 100,000 of Hawaii's foreign-born residents are non-citizens.[3]

12. Estimates from the Fiscal Policy Institute show that as of 2010, Hawai'i had the fifth-highest percentage of foreign-born workers of any State (20% of the labor force). And 22.5% of Hawai'i business owners were foreign-born.[4]

13. Thousands of people living in Hawai'i obtain lawful permanent resident status each year, including over 6,500 in 2015.[5] That includes numerous

---

[3] United States Census Bureau, *2015 American Community Survey 1-Year Estimates*, *available at* https://goo.gl/IGwJyf. A collection of the relevant data for Hawai'i is attached as Exhibit 3.

[4] The Fiscal Policy Institute, *Immigrant Small Business Owners*, at 24 (June 2012), *available at* https://goo.gl/vyNK9W.

[5] U.S. Department of Homeland Security, *Lawful Permanent Residents Supplemental Table 1: Persons Obtaining Lawful Permanent Resident Status by State or Territory of Residence and Region and Country of Birth Fiscal Year 2015*, *available at* https://goo.gl/ELYIkn. Copies of these tables for fiscal years 2005 through 2015 are attached as Exhibit 4.

individuals from the seven countries designated in the original Executive Order. According to DHS statistics, over 100 Hawai'i residents from Iran, Iraq, and Syria have obtained lawful permanent resident status since 2004 (DHS has withheld data pertaining to additional residents from the seven designated countries).[6]

14. Hawai'i is also home to 12,000 foreign students.[7] That includes numerous individuals from the seven originally-designated countries. At the University of Hawai'i, there are at least 27 graduate students from the seven countries studying pursuant to valid visas issued by the U.S. government.

15. In 2016, Hawaii's foreign students contributed over $400 million to Hawaii's economy through the payment of tuition and fees, living expenses, and other activities. These foreign students supported 7,590 jobs and generated more than $43 million in state tax revenues.[8]

16. In 2009, foreign residents (i.e., non-citizens who had not obtained lawful permanent resident status) made up 42.9% of doctorate students, and 27.7% of master's students in science, technology, engineering, and mathematics ("STEM") programs in Hawai'i.[9]

17. Hawaii's educational institutions have diverse faculties. At the University of Hawai'i, there are approximately 477 international faculty members legally present in the United States. There are at least 10 faculty members at the University who are lawful permanent residents from one of the seven designated

---

[6] *See* Exhibit 4.

[7] Hawaii Department of Business, Economic Development & Tourism, *The Economic Impact of International Students in Hawaii – 2016 Update*, at 8 (June 2016), *available at* https://goo.gl/mogNMA.

[8] *The Economic Impact of International Students in Hawaii – 2016 Update*, *supra*, at 10-11.

[9] U.S. Chamber of Commerce et al., *Help Wanted: The Role of Foreign Workers in the Innovation Economy*, at 21 (2013), *available at* https://goo.gl/c3BYBu.

countries in the original Executive Order, and 30 visiting faculty members with valid visas who are from one of the seven designated countries.

18.    Tourism is Hawaii's "lead economic driver."[10]  In 2015 alone, Hawai'i welcomed 8.7 million visitors accounting for $15 billion in spending.[11]

19.    Hawai'i is home to several airports, including Honolulu International Airport and Kona International Airport.

20.    David Yutaka Ige is the Governor of Hawai'i, the chief executive officer of the State of Hawai'i.  The Governor is responsible for overseeing the operations of the state government, protecting the welfare of Hawaii's citizens, and ensuring that the laws of the State are faithfully executed.

21.    Douglas S. Chin is the Attorney General of Hawai'i, the chief legal officer of the State.  The Attorney General is charged with representing the State in Federal Court on matters of public concern.

22.    The Constitution of the State of Hawai'i provides that "[n]o law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof."  Haw. Const. art. I, § 4.  And the State has declared that the practice of discrimination "because of race, color, religion, age, sex, including gender identity or expression, sexual orientation, marital status, national origin, ancestry, or disability" is against public policy.  Haw. Rev. Stat. Ann. § 381-1; *accord id.* §§ 489-3 & 515-3.

23.    The State has an interest in protecting the health, safety, and welfare of its residents and in safeguarding its ability to enforce state law.  The State also has an interest in "assuring that the benefits of the federal system," including the

---

[10] Hawai'i Tourism Authority, *2016 Annual Report to the Hawai'i State Legislature*, at 20, *available at* https://goo.gl/T8uiWW.

[11] Hawai'i Tourism Authority, *2015 Annual Visitor Research Report*, at 2, *available at* https://goo.gl/u3RQmX.  A copy of the table of contents and executive summary of this report is attached as Exhibit 5.

rights and privileges protected by the United States Constitution and Federal statutes, "are not denied to its general population." *Alfred L. Snapp & Sons, Inc. v. Puerto Rico*, 458 U.S. 592, 608 (1982). The State's interests extend to all of the State's residents, including individuals who suffer indirect injuries and members of the general public.

24. Plaintiff Ismail Elshikh, PhD, is an American citizen of Egyptian descent. He has been a resident of Hawai'i for over a decade.

25. Dr. Elshikh is the Imam of the Muslim Association of Hawai'i. He is a leader within Hawaii's Islamic community.

26. Dr. Elshikh's wife is of Syrian descent and is also a resident of Hawai'i.

27. Dr. Elshikh's mother-in-law is a Syrian national, living in Syria. Dr. Elshikh's wife filed an I-130 Petition for Alien Relative on behalf of her mother in September 2015. The I-130 Petition was approved in February 2016. Dr. Elshikh's mother-in-law does not currently hold a visa to enter the United States.

28. Dr. Elshikh and his wife have five children. They are all American citizens and residents of Hawai'i.

29. Defendant Donald J. Trump is the President of the United States. He issued both the original January 27, 2017 Executive Order, as well as the new March 6, 2017 Executive Order that is the subject of this Complaint.

30. Defendant U.S. Department of Homeland Security ("DHS") is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA") and the Executive Order that is the subject of this Complaint. DHS is a Department of the Executive Branch of the United States Government, and is an agency within the meaning of 5. U.S.C. § 552(f). United States Customs and Border Protection ("CBP") is an Operational and Support Component agency within DHS, and is responsible for detaining and

removing non-citizens from Iran, Syria, Somalia, Sudan, Libya, and Yemen who arrive at air, land, and sea ports across the United States, including Honolulu International Airport and Kona International Airport.

31.     Defendant John F. Kelly is the Secretary of Homeland Security.  He is responsible for implementing and enforcing the INA and the Executive Order that is the subject of this Complaint, and he oversees CBP.  He is sued in his official capacity.

32.     Defendant U.S. Department of State is a federal cabinet agency responsible for implementing the U.S. Refugee Admissions Program and the Executive Order that is the subject of this Complaint.  The Department of State is a department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

33.     Defendant Rex Tillerson is the Secretary of State.  He oversees the Department of State's implementation of the U.S. Refugee Admissions Program and the Executive Order that is the subject of this Complaint.  The Secretary of State has authority to determine and implement certain visa procedures for non-citizens.  Secretary Tillerson is sued in his official capacity.

34.     Defendant United States of America includes all government agencies and departments responsible for the implementation of the INA, and for detention and removal of non-citizens from Iran, Syria, Somalia, Sudan, Libya, and Yemen who arrive at air, land, and sea ports across the United States, including Honolulu International Airport and Kona International Airport.

## ALLEGATIONS

### A.     President Trump's Campaign Promises.

35.     President Trump repeatedly campaigned on the promise that he would ban Muslim immigrants and refugees from entering the United States, particularly from Syria, and maintained the same rhetoric after he was elected.

36.     On July 11, 2015, Mr. Trump claimed (falsely) that Christian refugees from Syria are blocked from entering the United States.  In a speech in Las Vegas, Mr. Trump said, "If you're from Syria and you're a Christian, you cannot come into this country, and they're the ones that are being decimated.  If you are Islamic . . . it's hard to believe, you can come in so easily."[12]

37.     On September 30, 2015, while speaking in New Hampshire about the 10,000 Syrian refugees the Obama Administration had accepted for 2016, Mr. Trump said "if I win, they're going back!"  He said "they could be ISIS," and referred to Syrian refugees as a "200,000-man army."[13]

38.     On December 7, 2015, shortly after the terror attacks in Paris, Mr. Trump issued a press release entitled: "Donald J. Trump Statement on Preventing Muslim Immigration."[14]  The press release stated: "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States . . . ."  The release asserted that "there is great hatred towards Americans by large segments of the Muslim population."  The press release remains accessible on www.donaldjtrump.com as of this filing.

39.     The next day, when questioned about the proposed "shutdown," Mr. Trump compared his proposal to President Franklin Roosevelt's internment of Japanese Americans during World War II, saying, "[Roosevelt] did the same

---

[12] Louis Jacobson, *Donald Trump says if you're from Syria and a Christian, you can't come to the U.S. as a refugee*, Politifact (July 20, 2015 10:00 AM ET), https://goo.gl/fucYZP.

[13] Ali Vitali, *Donald Trump in New Hampshire: Syrian Refugees Are 'Going Back*, NBC News (Oct. 1, 2015, 7:33 AM ET), https://goo.gl/4XSeGX.

[14] Press Release, Donald J. Trump for President, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015), *available at* https://goo.gl/D3OdJJ. A copy of this press release is attached as Exhibit 6.

thing."[15]  When asked what the customs process would look like for a Muslim non-citizen attempting to enter the United States, Mr. Trump said, "[T]hey would say, are you Muslim?"  The interviewer responded: "And if they said 'yes,' they would not be allowed into the country."  Mr. Trump said: "That's correct."[16]

40.     During a Republican primary debate in January 2016, Mr. Trump was asked about how his "comments about banning Muslims from entering the country created a firestorm," and whether he wanted to "rethink this position."  He said, "No."[17]

41.     A few months later, in March 2016, Mr. Trump said, during an interview, "I think Islam hates us."  Mr. Trump was asked, "Is there a war between the West and radical Islam, or between the West and Islam itself?"  He replied: "It's very hard to separate.  Because you don't know who's who."[18]

42.     Later, as the presumptive Republican nominee, Mr. Trump began using facially neutral language, at times, to describe the Muslim ban.  Following the mass shootings at an Orlando nightclub in June 2016, Mr. Trump gave a speech promising to "suspend immigration from areas of the world where there's a proven history of terrorism against the United States, Europe or our allies until we fully understand how to end these threats."  But he continued to link that idea to the need to stop "importing radical Islamic terrorism to the West through a failed

---

[15] Jenna Johnson, *Donald Trump says he is not bothered by comparisons to Hitler*, The Washington Post (Dec. 8, 2015), https://goo.gl/6G0oH7.

[16] Nick Gass, *Trump not bothered by comparisons to Hitler*, Politico (Dec. 8, 2015 7:51 AM ET), https://goo.gl/IkBzPO.

[17] The American Presidency Project, *Presidential Candidates Debates: Republican Candidates Debate in North Charleston, South Carolina* (January 14, 2016), https://goo.gl/se0aCX.

[18] *Anderson Cooper 360 Degrees: Exclusive Interview With Donald Trump* (CNN television broadcast Mar. 9, 2016, 8:00 PM ET), *transcript available at* https://goo.gl/y7s2kQ.

immigration system." He said that "to protect the quality of life for all Americans—women and children, gay and straight, Jews and Christians and all people then we need to tell the truth about radical Islam." And he criticized Hillary Clinton for, as he described it, "her refusal to say the words 'radical Islam,'" stating: "Here is what she said, exact quote, 'Muslims are peaceful and tolerant people, and have nothing whatsoever to do with terrorism.' That is Hillary Clinton." Mr. Trump further stated that the Obama administration had "put political correctness above common sense," but said that he "refuse[d] to be politically correct."

43. Mr. Trump's June 2016 speech also covered refugees. He said that "[e]ach year the United States permanently admits 100,000 immigrants from the Middle East and many more from Muslim countries outside of the Middle East. Our government has been admitting ever-growing numbers, year after year, without any effective plan for our own security."[19] He issued a press release stating: "We have to stop the tremendous flow of Syrian refugees into the United States."[20]

44. Later, on July 24, 2016, Mr. Trump was asked: "The Muslim ban. I think you've pulled back from it, but you tell me." Mr. Trump responded: "I don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories. People were so upset when I used the word Muslim. Oh, you can't use

---

[19] Ryan Teague Beckwith, *Read Donald Trump's Speech on the Orlando Shooting*, Time (June 13, 2016, 4:36 PM ET), https://goo.gl/kgHKrb.
[20] Press Release, Donald J. Trump for President, *Donald J. Trump Addresses Terrorism, Immigration, and National Security* (June 13, 2016), *available at* https://goo.gl/GcrFhw.

the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."[21]

45.     During an October 9, 2016 Presidential Debate, Mr. Trump was asked: "Your running mate said this week that the Muslim ban is no longer your position. Is that correct? And if it is, was it a mistake to have a religious test?" Mr. Trump replied: "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world." When asked to clarify whether "the Muslim ban still stands," Mr. Trump said, "It's called extreme vetting."[22]

46.     Then, on December 21, 2016, following terror attacks in Berlin, Mr. Trump was asked whether he had decided "to rethink or re-evaluate [his] plans to create a Muslim registry or ban Muslim immigration to the United States." Mr. Trump replied: "You know my plans. All along, I've been proven to be right."[23]

**B.     President Trump's First Executive Order.**

47.     Within a week of being sworn in, President Trump acted upon his ominous campaign promises to restrict Muslim immigration, curb refugee admissions, and prioritize non-Muslim refugees.

48.     In an interview on January 25, 2017, Mr. Trump discussed his plans to implement "extreme vetting" of people seeking entry into the United States. He remarked: "[N]o, it's not the Muslim ban. But it's countries that have tremendous terror. . . . [I]t's countries that people are going to come in and cause us tremendous problems."[24]

---

[21] *Meet the Press* (NBC television broadcast July 24, 2016), *transcript available at* https://goo.gl/jHc6aU. A copy of this transcript is attached as Exhibit 7.
[22] The American Presidency Project, *Presidential Debates: Presidential Debate at Washington University in St. Louis, Missouri* (Oct. 9, 2016), https://goo.gl/iIzf0A.
[23] *President-Elect Trump Remarks in Palm Beach, Florida*, C-SPAN (Dec. 21, 2016), https://goo.gl/JlMCst.
[24] *Transcript: ABC News Anchor David Muir Interviews President Trump*, ABC News (Jan. 25, 2017, 10:25 PM ET), https://goo.gl/NUzSpq.

49.     Two days later, on January 27, 2017, President Trump signed an Executive Order entitled, "Protecting the Nation From Foreign Terrorist Entry into the United States."

50.     The first Executive Order was issued without a notice and comment period and without interagency review.  Moreover, the first Executive Order was issued with little explanation of how it could further its stated objective.

51.     When signing the first Executive Order, President Trump read the title, looked up, and said: "We all know what that means."[25]  President Trump said he was "establishing a new vetting measure to keep radical Islamic terrorists out of the United States of America," and that: "We don't want them here."[26]

52.     Section 3 of the first Executive Order was entitled "Suspension of Issuance of Visas and Other Immigration Benefits to Nationals of Countries of Particular Concern."  Section 3(c) "suspend[ed] entry into the United States, as immigrants and nonimmigrants" of persons from countries referred to in Section 217(a)(12) of the INA [8 U.S.C. § 1187(a)(12)], that is: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. The majority of the population in each of these seven countries is Muslim.

53.     According to one report, not a single fatal terrorist attack has been perpetrated in the United States by a national of one of these seven countries since at least 1975.[27]  Other countries whose nationals have perpetrated fatal terrorist

---

[25] *Trump Signs Executive Orders at Pentagon*, ABC News (Jan. 27, 2017), https://goo.gl/7Jzird.

[26] Sarah Pulliam Bailey, *Trump signs order limiting refugee entry, says he will prioritize Christian refugees*, The Washington Post (Jan. 27, 2017), https://goo.gl/WF2hmS.

[27] Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, Cato Institute Blog (Jan. 25, 2017, 3:31 PM ET), https://goo.gl/BCv6rQ.

attacks in the United States are not part of either the original or the revised immigration ban.[28]

54.     Section 3(c) of the first Executive Order meant that Lawful Permanent Residents, foreign students enrolled in U.S. universities (including in Hawaiʻi), individuals employed in the United States on temporary work visas, and others were to be halted at the border if they arrived in the United States (in Hawaiʻi or elsewhere) from one of the seven designated countries, including if the individual left the country and tried to return.  Section 3(g) of the first Executive Order allowed the Secretaries of State and Homeland Security to make exceptions when they determined that doing so was "in the national interest."

55.     The first Executive Order also provided for an expansion of its immigration ban to nationals from additional countries in the future.  Section 3(d) directed the Secretary of State to (within about 30 days) "request [that] all foreign governments" provide the United States with information to determine whether a person is a security threat.  Section 3(e) directed the Secretaries of Homeland Security and State to "submit to the President a list of countries recommended for inclusion" in the ban from among any countries that did not provide the information requested.  Section 3(f) of the first Executive Order gave the Secretaries of State and Homeland Security further authority to "submit to the President the names of any additional countries recommended for similar treatment" in the future.

56.     Section 5 of the first Executive Order was entitled "Realignment of the U.S. Refugee Admissions Program for Fiscal Year 2017."  Section 5(a) directed the Secretary of State to "suspend the U.S. Refugee Admissions Program (USRAP) for 120 days."  Section 5(e) permitted the Secretaries of State and

---

[28] Scott Schane, *Immigration Ban Is Unlikely to Reduce Terrorist Threat, Experts Say*, N.Y. Times (Jan. 28, 2017), https://goo.gl/MBvOTk.

Homeland Security to admit individuals as refugees on a case-by-case basis, but only if they determined that admission of the refugee was in the "national interest," including "when the person is a religious minority in his country of nationality facing religious persecution."

57.     Section 5(b) directed the Secretaries of State and Homeland Security, "[u]pon resumption of USRAP admissions," to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." In Section 5(c), President Trump "proclaim[ed] that the entry of nationals of Syria as refugees is detrimental to the interests of the United States and thus suspend[ed] any such entry" indefinitely.

58.     In a January 27, 2017 interview with Christian Broadcasting Network, President Trump said that persecuted Christians would be given priority under the first Executive Order.  He said (once again, falsely): "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States?  If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians.  And I thought it was very, very unfair.  So we are going to help them."[29]

59.     The day after signing the first Executive Order, President Trump's advisor, Rudolph Giuliani, explained on television how the Executive Order came to be.  He said:  "When [Mr. Trump] first announced it, he said, 'Muslim ban.'  He

_____

[29] *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, Christian Broadcasting Network (Jan. 27, 2017), https://goo.gl/2GLB5q.

called me up.  He said, 'Put a commission together.  Show me the right way to do it legally.'"[30]

60.     The President and his spokespersons defended the rushed nature of their issuance of the first Executive Order on January 27, 2017, by saying that their urgency was imperative to stop the inflow of dangerous persons to the United States.  On January 30, 2017, President Trump tweeted: "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week."[31]  In a forum on January 30, 2017 at George Washington University, White House spokesman Sean Spicer said: "At the end of the day, what was the other option?  To rush it out quickly, telegraph it five days so that people could rush into this country and undermine the safety of our nation?"[32]  On February 9, 2017, President Trump claimed he had sought a one-month delay between signing and implementation, but was told by his advisors that "you can't do that because then people are gonna pour in before the toughness."[33]

61.     On February 24, 2017, a draft report published by the Department of Homeland Security—and obtained by the Associated Press—concluded that citizenship was an "unlikely indicator" of terrorism threats against the United States.  The draft report also found that very few persons from the seven countries included in President Trump's first Executive Order had carried out or attempted to

[30] Amy B. Wang, *Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally'*, The Washington Post (Jan. 29, 2017), https://goo.gl/Xog80h.  A copy of this article is attached as Exhibit 8.
[31] *See* Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 5:31 AM ET), https://goo.gl/FAEDTd.
[32] *See* Videotape: *WATCH: White House Press Secretary Sean Spicer joins forum at George Washington University to discuss the Trump Administration's "war" with the media and the access journalists should have covering the White House*, at 1:00, Fox 5 DC (Jan. 30, 2017), *available at* https://goo.gl/cpNUjT.
[33] Kevin Liptak, *Trump: I wanted month delay before travel ban, was told no*, CNN Politics (Feb. 9, 2017, 6:31 AM ET), https://goo.gl/EOez3k.

carry out terrorism activities in the United States since 2011. Specifically, the DHS report determined that 82 people were inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States. Half were U.S. citizens born in the United States, and the remaining persons were from 26 countries—with the most individuals originating from Pakistan, followed by Somalia, Bangladesh, Cuba, Ethiopia, Iraq and Uzbekistan. Of the seven countries originally included in the travel ban, only Somalia and Iraq were identified as being among the "top" countries-of-origin for the terrorists analyzed in the report.[34] The draft report related that three offenders (in the time period covered) had been from Somalia, two were from Iraq, one was from Iran, Sudan, and Yemen, and none were from Syria or Libya.[35] The draft report also found that terrorist groups in three of the original seven countries posed a threat to the United States (Iraq, Yemen, and Syria), while groups in the other four named countries in the original Executive Order were regionally focused.[36]

## C. Implementation and Judicial Enjoinment of the First Executive Order.

62. Upon the issuance of the first Executive Order, Defendants began detaining people at U.S. airports who, but for the first Executive Order, were

---

[34] Vivian Salama & Alicia A. Caldwell, *AP Exclusive: DHS report disputes threat from banned nations*, Associated Press (Feb. 24, 2017), https://goo.gl/91to90. A copy of the Associated Press article is attached as Exhibit 9. A copy of the draft DHS report is available at https://goo.gl/0yfXpZ and attached as Exhibit 10. A final version of the report, entitled *Intelligence Assessment: Most Foreign-born, US-based Violent Extremists Radicalized after Entering Homeland; Opportunities for Tailored CVE Programs Exist*, was later obtained by CNN, and is attached as Exhibit 11. *See* Tammy Kupperman, *DHS assessment: Individuals radicalized once in US*, CNN Politics (Mar. 4, 2017, 3:02 PM ET), https://goo.gl/Q6OVTd.
[35] Phil Helsel, *DHS Draft Report Casts Doubt on Extra Threat from 'Travel Ban' Nationals in U.S.*, NBC News (Feb. 24, 2017, 9:26 PM ET), https://goo.gl/gDHq6i. A copy of this NBC News article is attached as Exhibit 12.
[36] *Id.*

legally entitled to enter the United States.  Some were also removed from the United States.  Estimates indicate that over 100 people were detained upon arrival at U.S. airports.[37]

      63.    Among others, Defendants detained and/or removed:

      a.    Lawful permanent residents, including dozens at Dulles International Airport in Virginia,[38] and others at Los Angeles International Airport who were pressured to sign Form I-407 to *relinquish* their green cards;[39]

      b.    People with special immigrant visas, including an Iraqi national at John F. Kennedy International Airport who worked as an interpreter for the U.S. Army in Iraq;[40]

      c.    A doctor at the Cleveland Clinic with a valid work visa who was trying to return home from vacation;[41]

      d.    People with valid visas to visit family in the United States, including a Syrian woman sent to Saudi Arabia after being convinced by officials at O'Hare International Airport to sign paperwork cancelling her visa.[42]

---

[37] Michael D. Shear et al., *Judge Blocks Trump Order on Refugees Amid Chaos and Outcry Worldwide*, N.Y. Times (Jan. 28, 2017), https://goo.gl/OrUJEr.

[38] *See, e.g.*, Petition ¶ 2, *Aziz v. Trump*, No. 1:17-cv-116 (E.D. Va. Jan. 28, 2017).

[39] Leslie Berestein Rojas et al., *LAX immigration agents asks detainees to sign away their legal residency status, attorneys say*, Southern California Public Radio News (Jan. 30, 2017), https://goo.gl/v6JoUC; Brenda Gazzar & Cynthia Washicko, *Thousands protest Trump's immigration order at LAX*, Los Angeles Daily News (Jan. 29, 2017), https://goo.gl/1vA37M.

[40] *See, e.g.*, Petition 2, *Darweesh v. Trump*, No. 1:17-cv-00480 (E.D.N.Y. Jan. 28, 2017).

[41] Jane Morice, *Two Cleveland Clinic doctors vacationing in Iran detained in New York, then released*, Cleveland.com (Jan. 29, 2017), https://goo.gl/f0EGV3.

[42] John Rogers, *Longtime US residents, aspiring citizens caught up in ban*, StarTribune (Jan. 30, 2017, 1:45 AM ET), https://goo.gl/eEPAuE.

64.    People overseas were blocked from boarding flights to the United States or told they could no longer come here.  The State Department released information verifying that 60,000 visas were revoked between January 27, 2017, when the first Executive Order was signed, and February 3, 2017.[43]

65.    Confusion, backlash, and habeas corpus litigation arose in the wake of the first Executive Order, including with regard to whether it applied to lawful permanent residents.  Within the first 72 hours that the first Executive Order was in effect, Defendants reportedly changed their minds three times about whether it did.[44]

66.    Hundreds of State Department officials signed a memorandum circulated through the State Department's "Dissent Channel" stating that the Executive Order "runs counter to core American values" including "nondiscrimination," and that "[d]espite the Executive Order's focus on them, a vanishingly small number of terror attacks on U.S. soil have been committed by foreign nationals" here on visas.[45]

67.    Likewise, Senators John McCain (R-AZ) and Lindsey Graham (R-SC) stated: "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country."[46]

---

[43] Adam Kelsey et al., *60,000 Visas Revoked Since Immigration Executive Order Signed: State Department*, ABC News (Feb. 3, 2017, 6:32 PM ET), https://goo.gl/JwPDEa.
[44] Evan Perez et al., *Inside the confusion of the Trump executive order and travel ban*, CNN Politics (Jan. 30, 2017 11:29 AM ET), https://goo.gl/Z3kYEC.
[45] Jeffrey Gettleman, *State Department Dissent Cable on Trump's Ban Draws 1,000 Signatures*, N.Y. Times (Jan. 31, 2017), https://goo.gl/svRdIw.  A copy of the Dissent Channel memorandum is attached as Exhibit 13.
[46] Press Release, Senator John McCain, *Statement By Senators McCain & Graham On Executive Order On Immigration* (Jan. 29, 2017), *available at* https://goo.gl/EvHvmc.

68.     DHS Secretary Kelly issued a press release on Sunday, January 29, 2017, stating that: "In applying the provisions of the president's executive order, I hereby deem the entry of lawful permanent residents to be in the national interest.  Accordingly, absent the receipt of significant derogatory information indicating a serious threat to public safety and welfare, lawful permanent resident status will be a dispositive factor in our case-by-case determinations."[47]

69.     Secretary Kelly's statement thus indicated that the first Executive Order *did* apply to lawful permanent residents from the designated countries, and only the Secretary's determination under Section 3(g) that admission of lawful permanent residents, absent certain information reviewed on a case-by-case basis, is in the national interest, allows them to enter.

70.     Then, on February 1, 2017, White House Counsel Donald McGahn issued a Memorandum taking yet another position on green-card holders, now purporting to "clarify" that such persons were never covered by Sections 3 and 5 of the first Executive Order.

71.     On February 3, 2017, the District Court for the Western District of Washington entered a temporary restraining order, enjoining President Trump and his Administration from enforcing the first Executive Order.  On February 9, 2017, the Court of Appeals for the Ninth Circuit issued a *per curiam* opinion denying the Government's emergency motion for a stay of the District Court's order.  On February 16, 2017, the Government filed a brief in the Ninth Circuit advising the court that "the President intends in the near future to rescind the [first Executive] Order and replace it with a new, substantially revised Executive Order"; accordingly, the Government requested that the court "hold its consideration of the

---

[47] Press Release, U.S. Department of Homeland Security, *Statement By Secretary John Kelly On The Entry Of Lawful Permanent Residents Into The United States* (Jan. 29, 2017), *available at* https://goo.gl/6krafi.

case until the President issues the new Order and then vacate the panel's preliminary decision."[48]  On February 24, 2017, the Government filed another motion requesting that the Ninth Circuit hold its proceedings in abeyance.  On February 27, 2017, the Ninth Circuit panel denied the motion to hold appellate proceedings in abeyance and set forth a new briefing schedule.  Under that schedule, the Government's opening brief is due March 10, 2017.

### D.  President Trump's New Executive Order.

72.    On March 6, 2017—a full month after the District Court for the Western District of Washington enjoined the first Executive Order—President Trump issued the new Executive Order that is the subject of this Complaint.  The new Order is entitled "Protecting the Nation from Foreign Terrorist Entry into the United States."

73.    Also on March 6, 2017, the Department of Homeland Security published a "Q&A" document with answers to thirty-seven questions about the new Executive Order.[49]

74.    For several weeks before its release, members of the Administration had foreshadowed the arrival of the revised Executive Order.

> a.  On February 21, Senior Advisor to the President, Stephen Miller, told Fox News that the new travel ban would have the same effect as the old one.  He said: "Fundamentally, you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will

---

[48] Appellants' Supplemental Brief On *En Banc* Consideration at 4, *Washington v. Trump*, No. 17-35105 (Feb. 16, 2017), ECF No. 154.

[49] *See* Department of Homeland Security, Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States (March 6, 2017, 11:30 AM ET), https://goo.gl/zFtFg8.  A copy of this Q&A document is attached as Exhibit 14.

be addressed.  But in terms of protecting the country, those basic policies are still going to be in effect."[50]

b. The White House originally indicated it would sign the new Executive Order on Wednesday, March 1, 2017, but then postponed the announcement.  One Administration official told a news outlet on February 28 that a reason for President Trump's delay in signing an updated Executive Order was "the busy news cycle," and the desire of the President that the new order "get plenty of attention."[51]

c. A senior Administration official told a different news outlet on March 1, 2017, that a related reason for the delay in releasing the updated Executive Order was the "positive reaction" to President Trump's "first address to Congress" on the evening of Tuesday, February 28, 2017.  That article reported that "[s]igning the executive order Wednesday, as originally indicated by the White House, would have undercut the favorable coverage," and the senior Administration official "didn't deny the positive reception was part of the [A]dministration's calculus in pushing back the travel ban announcement."[52]

---

[50] *Miller: New order will be responsive to the judicial ruling; Rep. Ron DeSantis: Congress has gotten off to a slow start* (Fox News television broadcast Feb. 21, 2017), *transcript available at* https://goo.gl/wcHvHH.

[51] Shane Goldmacher & Nahal Toosi, *Trump delays signing new travel ban order, officials say*, Politico (Feb. 28, 2017, 11:51 PM ET), https://goo.gl/5UJIFz.

[52] Laura Jarrett et al., *Trump delays new travel ban after well-reviewed speech*, CNN Politics (Mar. 1, 2017, 6:01 AM ET), https://goo.gl/McqMm5.

75.     Section 1 of the new Executive Order states that its purpose is to "protect [the United States'] citizens from terrorist attacks, including those committed by foreign nationals."  Section 1(h) identifies two concrete examples of persons who have committed terrorism-related crimes in the United States, after either entering the country "legally on visas" or entering "as refugees":  "In January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses.  And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction[.]"  Iraq is no longer included in the ambit of the travel ban.

76.     Section 2(c) of the new Executive Order suspends the "entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen"—six of the seven countries that were designated in the first Order, with Iraq now omitted—for a period of "90 days from the effective date of this order."

77.     Section 3 provides for various "exceptions" and potential "waivers" to Section 2's travel ban.  Under Section 3(a), "the suspension of entry pursuant to section 2 of this order shall apply only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order; (ii) did not have a valid visa at 5:00 p.m., eastern standard time, on January 27, 2017; and (iii) do not have a valid visa on the effective date of this order."  *See* Executive Order § 3(a)(i)-(iii).

78.     Section 3(b) lists categorical "exceptions" from Section 2: lawful permanent residents; foreign nationals who are admitted or paroled into the United States "on or after the effective date of this order"; foreign nationals with "a document other than a visa . . . that permits him or her to travel to the United States

and seek entry or admission, such as an advance parole document"; dual nationals traveling on passports issued by a non-designated country; foreign nationals traveling on certain diplomatic visas; and foreign nationals who have been granted asylum as well as refugees who have been admitted to the United States. *Id.* at § 3(b)(i)-(iv).

79.     Section 3(c) provides that "a consular officer, or as appropriate, the Commissioner, U.S. Customs and Border Protection (CBP) . . . may, in the consular officer's or the CBP official's discretion, decide on a case-by-case basis to authorize the issuance of a visa to, or to permit the entry of, a foreign national for whom entry is otherwise suspended" if he or she determines that "denying entry during the suspension period would cause undue hardship . . . [and the individual's] entry would not pose a threat to national security and would be in the national interest." *Id.* § 3(c).

80.     Like the first Executive Order, the new Executive Order provides for an expansion of its immigration ban to nationals from additional countries in the future. Section 2(a) directs the Secretary of Homeland Security, in consultation with the Secretary of State as well as the Director of National Intelligence, to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA . . . to determine that the individual is not a security or public safety threat." *Id.* § 2(a). Those officials are instructed to submit a report on "the results of the worldwide review" to the President, as well as "a list of countries that do not provide adequate information," within 20 days of the effective date of the Executive Order. *Id.* § 2(b). The Secretary of State shall then "request that all foreign governments that do not supply [the necessary] information regarding their nationals begin providing it within 50 days of notification." *Id.* § 2(d). After that

50-day period, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, "shall submit to the President a list of countries recommended for inclusion" in the travel ban. *Id.* § 2(e). Those officials are also authorized to "submit to the President," at "any point after the submission of the list" of countries recommended for inclusion, "the names of additional countries recommended for similar treatment." *Id.* § 2(f).

81.    Section 6 of the Executive Order suspends the "travel" of all refugees to the United States for a period of 120 days, and suspends all "decisions" by the Secretary of Homeland Security on applications for refugee status for 120 days. *Id.* § 6(a). After those 120 days are over, "the Secretary of Homeland Security shall resume making decisions on applications for refugee status only for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined" that "additional procedures"—identified by those officials as being necessary "to ensure that individuals seeking admission as refugees do not pose a threat" to the United States—have been "implemented" and "are adequate to ensure the security and welfare of the United States." *Id.* § 6(a).

82.    Under Section 14, the revised Executive Order takes effect on March 16, 2017.

83.    In the Department of Homeland Security's Q&A document about the Executive Order, DHS relates that nationals from one of the six designated countries who are presently in the United States, and "in possession of a valid single entry visa," will have to obtain "a valid visa or other document permitting [them] to travel to and seek admission to the United States" in order to leave and obtain "subsequent entry to the United States."[53]

---

[53] *See* Exhibit 14, at Q4.

84.     In the Department of Homeland Security's Q&A document about the Executive Order, DHS also relates that international students, exchange visitors and their dependents from the six designated countries—who are in the United States presently but whose visas "expire[] while the Executive Order is in place"—will have to "obtain a new, valid visa to return to the United States" if they have to "depart the country."[54]

**E.      Effects of the New Executive Order on Individual Plaintiff Dr. Elshikh.**

85.     The new Executive Order will prevent Dr. Elshikh's mother-in-law from obtaining a visa to visit or reunite with her family in Hawai'i.  That is so even though Dr. Elshikh, his wife, and their children are all American citizens, and even though Dr. Elshikh's wife's I-130 Petition was granted.

86.     Dr. Elshikh's mother-in-law last visited the family in 2005, when she stayed for one month.  She has not met two of Dr. Elshikh's children, and only Dr. Elshikh's oldest child remembers meeting her grandmother.

87.     On January 31, 2017—after the first Executive Order was put in place—Dr. Elshikh was notified by an individual from the National Visa Center that his mother-in-law's application for an immigrant visa had been put on hold.  Then, on March 2, 2017—after the first Executive Order was enjoined—Dr. Elshikh and his family were notified by the National Visa Center that his mother-in-law's visa application had progressed to the next stage of the process and that her interview would be scheduled at an embassy overseas.  Under the new Executive Order, however, Dr. Elshikh fears that his mother-in-law will, once again, be unable to "enter" the country under Section 2(c) of the Executive Order.  The family is devastated.

---

[54] *See id.* at Q25.

88.     Dr. Elshikh's children, all twelve years of age or younger, are deeply affected by the new Executive Order.  It conveys to them a message that their own country would discriminate against individuals who share their ethnicity, including members of their own family, and who hold the same religious beliefs.

89.     Members of Dr. Elshikh's Mosque are also affected by the new Executive Order.  Muslims in the Hawaiʻi Islamic community feel that the new Executive Order targets Muslim citizens because of their religious views and national origin.  Dr. Elshikh believes that, as a result of the new Executive Order, he and members of the Mosque will not be able to associate as freely with those of other faiths.

90.     Dr. Elshikh feels that, as a result of the new Executive Order, there is now a favored and disfavored religion in Hawaiʻi and the United States, i.e., that a religion has been established.

91.     Many members of Dr. Elshikh's Mosque have family and friends living in the countries listed in the new Executive Order.  Because of the new Executive Order, they live in forced separation from those family and friends.

**F.      Effects of the New Executive Order on Plaintiff State of Hawaiʻi.**

92.     The new Executive Order also has profound effects on the State as a whole.  It prevents nationals of the six designated countries from relocating to, or even visiting, Hawaiʻi for educational, family, religious, or business reasons.

93.     Hawaiʻi currently has 27 graduate students, 10 permanent faculty members, and 30 visiting faculty members from the seven countries originally designated in the first Executive Order.  This demonstrates the extent to which the University of Hawaiʻi draws on talent from around the world, including from Muslim-majority countries, to enrich its student body and educational environment.  In the wake of the new Executive Order, Hawaiʻi will no longer be able to recruit,

accept, enroll, or welcome similar individuals from the six countries designated in the new Executive Order.

94.    The University of Hawaiʻi and other state learning institutions depend on the collaborative exchange of ideas, including among people of different religions and national backgrounds.  For this reason, the University of Hawaiʻi has study abroad or exchange programs in over thirty countries, and international agreements for faculty collaboration with over 350 international institutions spanning forty different countries.  The new Executive Order threatens such educational collaboration and harms the ability of the University of Hawaiʻi to fulfill its educational mission.

95.    Hawaiʻi is also home to numerous non-citizens from the six designated countries—foreign students, persons on exchange, visitors, and temporary workers—whose lives may be directly affected by the new Executive Order.  Some of these non-citizens may be unable to travel abroad to their home countries, for fear that they will be unable to return—for instance, if they have only a single entry visa, or if their visa will expire while the new Executive Order is in place.

96.    In addition, the new Executive Order blocks all of Hawaii's residents—including U.S. citizens—from receiving visits from, and/or reunifying with, their family members who live in these six designated countries.  In 2016, approximately 8% of Hawaii's visitors (in total) came to visit family and friends, and approximately 12% of Hawaii's visitors from the areas of the globe including the Middle East and Africa came to visit family and friends.  Under the new Executive Order, these individuals, to the extent that they live in the six designated countries, will no longer be able to travel to Hawaiʻi to visit family and friends.

97.    More broadly, the new Executive Order means that Hawaiʻi will be unable to honor the commitments to nondiscrimination and diversity embodied in

the State's Constitution, laws, and policies. For example, state agencies and universities cannot accept qualified applicants for open positions if they are residents of one of the six designated countries. This contravenes policies at the State's universities and agencies that are designed to promote diversity and recruit talent from abroad.[55]

98.     Given that the new Executive Order began life as a "Muslim ban," its implementation also means that the State will be forced to tolerate a policy that disfavors one religion and violates the Establishment Clauses of both the federal and state constitutions.

99.     Beyond these severe intangible harms, the new Executive Order has a detrimental effect on Hawaii's economy as a whole. It is not only governmental entities that are barred from recruiting and/or hiring workers from the six designated countries. Private employers within the State are similarly burdened.

100.    Further, both the first Executive Order and the new Executive Order have the effect of depressing international travel to and tourism in Hawai'i. Under the new Executive Order, Hawai'i can no longer welcome tourists from the six designated countries. This directly harms Hawaii's businesses and, in turn, the State's revenue. In 2015 alone, Hawai'i welcomed over 6,800 visitors from the Middle East and over 2,000 visitors from Africa. Data from Hawaii's Tourism Authority suggests that even during the short period of time that the first Executive Order was in place, the number of visitors to Hawai'i from the Middle East

---

[55] *See, e.g.*, State of Hawai'i, Department of Human Resources Development, Policy No. 601.001: Discrimination / Harassment-Free Workplace Policy (revised Nov. 16, 2016), *available at* https://goo.gl/7q6yzJ; University of Hawai'i, Mānoa, Policy M1.100: Non-Discrimination and Affirmative Action Policy, *available at* https://goo.gl/6YqVl8 (last visited Mar. 7, 2017 8:27 PM ET); *see also, e.g.*, *Campus Life: Diversity*, University of Hawai'i, Mānoa, https://goo.gl/3nF5C9 (last visited Mar. 7, 2017 8:27 PM ET).

(including Iran, Iraq, Syria and Yemen) fell—namely, Hawai'i had 278 visitors from the Middle East in January 2017, compared to 348 visitors from that same region in January 2016. This depressed effect on travel and tourism from the Middle East and Africa is likely to continue under the new Executive Order.

101. According to reports from travel companies and research firms, travel to the United States more broadly "took a nosedive" following President Trump's issuance of the first Executive Order.[56] For instance, an airfare prediction company found that flight search demand from 122 countries to the United States dropped 17% between January 26 and February 1, after the first Executive Order was signed.[57]

102. Even with respect to countries not currently targeted by the new Executive Order, there is a likely "chilling effect" on tourism to the United States, including Hawai'i. The new Executive Order contemplates an expansion of the immigration ban and in fact authorizes the Secretaries of State and Homeland Security to recommend additional countries for inclusion in the near future. This likely instills fear and a disinclination to travel to the United States among foreigners in other countries that President Trump has been hostile towards—i.e., residents of other Muslims countries, China, and Mexico. The new Executive Order gives rise to a global perception that the United States is an exclusionary country, and it dampens the appetite for international travel here generally.

103. A decrease in national and international tourism would have a severe impact on Hawaii's economy.

104. The new Executive Order also hinders the efforts of the State and its residents to resettle and assist refugees. Refugees from numerous countries have

---

[56] Shivani Vora, *After Travel Ban, Interest in Trips to U.S. Declines*, N.Y. Times (Feb. 20, 2017), https://goo.gl/Mz9o5T.
[57] *Id.*

resettled in Hawaiʻi in recent years.[58]  While the State's refugee program is small, it is an important part of the State's culture, and aiding refugees is central to the mission of private Hawaiʻi organizations like Catholic Charities Hawaiʻi and the Pacific Gateway Center.[59]  In late 2015, as other States objected to the admission of Syrian refugees, Governor Ige issued a statement that "slamming the door in their face would be a betrayal of our values."  Governor Ige explained:  "Hawaiʻi and our nation have a long history of welcoming refugees impacted by war and oppression.  Hawaiʻi is the Aloha State, known for its tradition of welcoming all people with tolerance and mutual respect."[60]  But as long as the new Executive Order prohibits refugee admissions, the State and its residents are prevented from helping refugees resettle in Hawaiʻi.

105.  President Trump's new Executive Order is antithetical to Hawaii's State identity and spirit.  For many in Hawaiʻi, including State officials, the Executive Order conjures up the memory of the Chinese Exclusion Acts and the imposition of martial law and Japanese internment after the bombing of Pearl Harbor.  As Governor Ige observed two days after President Trump issued the first Executive Order, "Hawaiʻi has a proud history as a place immigrants of diverse backgrounds can achieve their dreams through hard work.  Many of our people also know all too well the consequences of giving in to fear of newcomers. The remains of the internment camp at Honouliuli are a sad testament to that fear.  We

---

[58] U.S. Department of Health & Human Servs., Office of Refugee Resettlement, *Overseas Refugee Arrival Data: Fiscal Years 2012-2015*, *available at* https://goo.gl/JcgkDM.

[59] *See About: Our History*, Catholic Charities Hawaiʻi, https://goo.gl/deVBla (last visited Mar. 7, 2017, 11:35 AM ET); *About: Mission*, Pacific Gateway Center, https://goo.gl/J8bN5k (last visited Mar. 7, 2017, 11:35 AM ET).

[60] Press Release, Governor of the State of Hawaiʻi, *Governor David Ige's Statement On Syrian Refugees* (Nov. 16, 2015), *available at* https://goo.gl/gJcMIv.

must remain true to our values and be vigilant where we see the worst part of history about to be repeated."[61]

## CAUSES OF ACTION

### COUNT I

#### (First Amendment – Establishment Clause)

106.   The foregoing allegations are realleged and incorporated by reference herein.

107.   The Establishment Clause of the First Amendment prohibits the Federal Government from officially preferring one religion over another.

108.   Sections 2 and 6 of President Trump's March 6, 2017 Executive Order, as well as Defendants' statements regarding the Executive Order and their actions to implement it, are intended to disfavor Islam.

109.   Sections 2 and 6 of the Executive Order, as well as Defendants' statements regarding the Executive Order and their actions to implement it, have the effect of disfavoring Islam.

110.   Through their actions described in this Complaint, Defendants have violated the Establishment Clause.  Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawai'i residents and the sovereign interests of the State of Hawai'i.

### COUNT II

#### (Fifth Amendment – Equal Protection)

111.   The foregoing allegations are realleged and incorporated by reference herein.

---

[61] Press Release, Governor of the State of Hawai'i, *Statement of Governor David Ige On Immigration To The United States* (Jan. 29, 2017), *available at* https://goo.gl/62w1fh.

112. The Due Process Clause of the Fifth Amendment prohibits the Federal Government from denying equal protection of the laws, including on the basis of religion and/or national origin, nationality, or alienage.

113. The March 6, 2017 Executive Order was motivated by animus and a desire to discriminate on the basis of religion and/or national origin, nationality, or alienage.

114. The Executive Order differentiates between people based on their religion and/or national origin, nationality, or alienage and is accordingly subject to strict scrutiny. It fails that test, because it is over- and under-inclusive in restricting immigration for security reasons. The statements of President Trump and his advisors also provide direct evidence of the Executive Order's discriminatory motivations.

115. For the same reasons, the Executive Order is not rationally related to a legitimate government interest.

116. Sections 2 and 6 of the Executive Order, as well as Defendants' statements regarding the Executive Order and their actions to implement it, discriminate against individuals based on their religion and/or national origin, nationality, or alienage without lawful justification.

117. Through their actions described in this Complaint, Defendants have violated the Equal Protection guarantees of the Fifth Amendment. Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawai'i residents and the sovereign interests of the State of Hawai'i.

## COUNT III

### (Fifth Amendment – Substantive Due Process)

118. The foregoing allegations are realleged and incorporated by reference herein.

119. The right to international travel is protected by the Due Process Clause of the Fifth Amendment. Moreover, citizens may have a constitutionally protected interest in specific non-citizens' ability to travel to the United States.

120. The March 6, 2017 Executive Order curtails those rights for numerous individuals, without any legal justification.

121. Through their actions described in this Complaint, Defendants have violated the Substantive Due Process guarantees of the Fifth Amendment. Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawaiʻi residents and the sovereign interests of the State of Hawaiʻi.

## COUNT IV

### (Fifth Amendment – Procedural Due Process)

122. The foregoing allegations are realleged and incorporated by reference herein.

123. The Due Process Clause of the Fifth Amendment prohibits the Federal Government from depriving individuals of liberty interests without due process of law.

124. Non-citizens, including lawful permanent residents and non-immigrants holding valid visas, have a liberty interest in leaving and entering the country, and in being free from unlawful detention. Moreover, citizens may assert cognizable liberty interests with respect to noncitizen relatives who are deprived of due process.

125. The Due Process Clause establishes a minimum level of procedural protection before those liberty interests can be deprived. A non-citizen must be given an opportunity to present her case effectively, which includes a hearing and some consideration of individual circumstances.

126.  Through their actions described in this Complaint, Defendants have violated the Procedural Due Process guarantees of the Fifth Amendment. Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawaiʻi residents and the sovereign interests of the State of Hawaiʻi.

## COUNT V

### (Immigration and Nationality Act)

127.  The foregoing allegations are realleged and incorporated by reference herein.

128.  The INA provides that "[e]xcept as specifically provided" in certain subsections, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A).

129.  The INA also establishes specific criteria for determining terrorism-related inadmissibility.

130.  Sections 2 and 6 of the March 6, 2017 Executive Order violate the INA by discriminating on the basis of nationality, ignoring and modifying the statutory criteria for determining terrorism-related inadmissibility, and exceeding the President's authority under the INA, including under 8 U.S.C. §§ 1182(f) and 1185(a).

131.  Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawaiʻi residents and the sovereign interests of the State of Hawaiʻi.

## COUNT VI

### (Religious Freedom Restoration Act)

132.  The foregoing allegations are realleged and incorporated by reference herein.

133. The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(a), prohibits the Federal Government from substantially burdening the exercise of religion, even if the burden results from a rule of general applicability.

134. Section 2 of the March 6, 2017 Executive Order and Defendants' actions to implement the Executive Order impose a substantial burden on the exercise of religion.

135. Among other injuries, some non-citizens currently outside the United States cannot enter the United States to reunite with their families or religious communities. Religious communities in the United States cannot welcome visitors, including religious workers, from designated countries. And some non-citizens currently in the United States may be prevented from travelling abroad on religious trips, including pilgrimages or trips to attend religious ceremonies overseas, if they do not have the requisite travel documents or multiple-entry visas.

136. Through their actions described in this Complaint, Defendants have violated the RFRA. Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawaiʻi residents and the sovereign interests of the State of Hawaiʻi.

**COUNT VII**
**(Substantive Violation of the Administrative Procedure Act through Violations of the Constitution, Immigration and Nationality Act, and Arbitrary and Capricious Action)**

137. The foregoing allegations are realleged and incorporated by reference herein.

138. The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or

immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

139.   In enacting and implementing Sections 2 and 6 of the March 6, 2017 Executive Order, Defendants have acted contrary to the Establishment Clause and Fifth Amendment of the United States Constitution.

140.   In enacting and implementing Sections 2 and 6 of the Executive Order, Defendants have acted contrary to the INA and RFRA.  Defendants have exceeded their statutory authority, engaged in nationality- and religion-based discrimination, and failed to vindicate statutory rights guaranteed by the INA.

141.   Further, in enacting and implementing Sections 2 and 6 of the Executive Order, Defendants have acted arbitrarily and capriciously.  Among other arbitrary actions and omissions, Defendants have not offered a satisfactory explanation for the countries that are and are not included within the scope of the Executive Order.  The Executive Order purports to protect the country from terrorism, but sweeps in millions of people who have absolutely no connection to terrorism.  Through their actions described in this Complaint, Defendants have violated the substantive requirements of the APA.  Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawaiʻi residents and the sovereign interests of the State of Hawaiʻi.

## COUNT VIII

### (Procedural Violation of the Administrative Procedure Act)

142.   The foregoing allegations are realleged and incorporated by reference herein.

143.   The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

144.    The Departments of State and Homeland Security are "agencies" under the APA.  *See* 5 U.S.C. § 551(1).

145.    The APA requires that agencies follow rulemaking procedures before engaging in action that impacts substantive rights.  *See* 5 U.S.C. § 553.

146.    In implementing Sections 2 and 6 of the March 6, 2017 Executive Order, federal agencies have changed the substantive criteria by which individuals from the six designated countries may enter the United States.  This, among other actions by Defendants, impacts substantive rights.

147.    Defendants did not follow the rulemaking procedures required by the APA in enacting and implementing the Executive Order.

148.    Through their actions described in this Complaint, Defendants have violated the procedural requirements of the APA.  Defendants' violation inflicts ongoing harm upon Dr. Elshikh, his family, and members of his Mosque, as well as other Hawai'i residents and the sovereign interests of the State of Hawai'i.

## PRAYER FOR RELIEF

149.    WHEREFORE, Plaintiffs pray that the Court:

a.    Declare that Sections 2 and 6 of President Trump's Executive Order of March 6, 2017 are unauthorized by, and contrary to, the Constitution and laws of the United States;

b.    Enjoin Defendants from implementing or enforcing Sections 2 and 6 across the nation;

c.    Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended; and

d.    Award such additional relief as the interests of justice may require.

DATED:     Honolulu, Hawaiʻi, March 8, 2017.

Respectfully submitted,

*/s/ Neal K. Katyal*

DOUGLAS S. CHIN (Bar No. 6465)   NEAL K. KATYAL*
  Attorney General of the State of Hawaiʻi  COLLEEN ROH SINZDAK*
CLYDE J. WADSWORTH (Bar No. 8495)  MITCHELL P. REICH*
  Solicitor General of the State of Hawaiʻi  ELIZABETH HAGERTY*
DEIRDRE MARIE-IHA (Bar No. 7923)  THOMAS P. SCHMIDT*
DONNA H. KALAMA (Bar No. 6051)  SARA SOLOW*
KIMBERLY T. GUIDRY (Bar No. 7813)  ALEXANDER B. BOWERMAN*
ROBERT T. NAKATSUJI (Bar No. 6743)  HOGAN LOVELLS US LLP
  Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAIʻI

*\*Admitted Pro Hac Vice*

*Attorneys for Plaintiff, State of Hawaiʻi*   *Attorneys for Plaintiffs, State of Hawaiʻi and Ismail Elshikh*