# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI‘I

STATE OF HAWAI‘I and ISMAIL ELSHIKH,

                Plaintiffs,

     v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE;  REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,

                Defendants.

Civil Action No.  1:17-cv-00050-DKW-KJM

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................ 3

    A.    Candidate Trump Calls For A Muslim Ban ................................. 3

    B.    President Trump Implements His First Discriminatory Ban ..................... 5

    C.    Courts Enjoin The President's First Executive Order ............................... 8

    D.    The President Issues A Second Executive Order ..................................... 10

    E.    The New Executive Order Harms Hawaii and Its Citizens...................... 14

    F.    The New Executive Order Harms Ismail Elshikh .................................... 19

STANDARD OF REVIEW ................................................................................. 22

ARGUMENT ....................................................................................................... 22

    A.    Hawai'i Is Likely To Succeed On The Merits Of Its Claims.................. 23

        1.    The Revised Order Violates The Immigration And Nationality Act ............................................................................... 24

            a.    The revised Executive Order violates the INA's prohibition on nationality-based discrimination ................. 25

            b.    The revised Executive Order exceeds the President's authority under 8 U.S.C. § 1182(f) .................. 29

        2.    The Revised Order Is Unconstitutional......................................... 37

            a.    The revised Executive Order violates Due Process ............................................................................... 38

            b.    The revised Executive Order violates the Constitution's protections against religious discrimination .................................................................. 40

**TABLE OF CONTENTS—Continued**

**Page**

B.    The Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted ................................................... 45

C.    The Balance Of The Equities And Public Interest Favor Relief ........................................................... 49

D.    The Court Should Issue A Nationwide Injunction ................................. 50

CONCLUSION ..................................................................... 51

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Abdullah* v. *I.N.S.*,
   184 F.3d 158 (2d Cir. 1999) ...............................................................27

*Abourezk* v. *Reagen*,
   785 F.2d 1043 (D.C. Cir. 1986), *aff'd mem.*, 484 U.S. 1 (1987)............32, 33, 35

*Access Fund* v. *U.S. Dep't of Agriculture*,
   499 F.3d 1036 (9th Cir. 2007) ...........................................................41

*Alfred L. Snapp & Son* v. *Puerto Rico*,
   458 U.S. 592 (1982)............................................................................48

*Ali* v. *Fed. Bureau of Prisons*,
   552 U.S. 214 (2008)............................................................................37

*Allende* v. *Shultz*,
   845 F.2d 1111 (1st Cir. 1988).............................................................33

*Am. Foreign Serv. Ass'n* v. *Garfinkel*,
   490 U.S. 153 (1989)............................................................................24

*Arizona* v. *United States*,
   132 S. Ct. 2492 (2012).......................................................................25

*Aziz* v. *Trump*,
   No. 1:17-cv-116, 2017 WL 580855 (E.D. Va., Feb. 13, 2017)...............9, 10, 41

*Bertrand* v. *Sava*,
   684 F.2d 204 (2d Cir. 1982) .........................................................27, 28, 29

*Bond* v. *United States*,
   134 S. Ct. 2077 (2014).......................................................................24

*Chaplaincy of Full Gospel Churches* v. *England*,
   454 F.3d 290 (D.C. Cir. 2006)...........................................................46

*Circuit City Stores, Inc.* v. *Adams*,
   532 U.S. 105 (2001)............................................................................37

iii

*Clinton* v. *City of New York*,
524 U.S. 417 (1998) ........................................35

*Earth Island Inst.* v. *Ruthenbeck*,
490 F.3d 687 (9th Cir. 2006), *rev'd in part on other grounds*,
555 U.S. 488 (2009) ........................................50

*Edwards* v. *Aguillard*,
482 U.S. 578 (1987) ....................................41, 44

*Elk Grove Unified School Dist.* v. *Newdow*,
542 U.S. 1 (2004) ..........................................46

*Farris* v. *Seabrook*,
677 F.3d 858 (9th Cir. 2012) ........................23, 46

*FDA* v. *Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................34

*Freytag* v. *Commissioner*,
501 U.S. 868 (1991) ........................................25

*Galvan* v. *Press*,
347 U.S. 522 (1954) ........................................25

*Judulang* v. *Holder*,
565 U.S. 42 (2011) ..........................................27

*Kent* v. *Dulles*,
358 U.S. 116 (1958) ........................................36

*Kerry* v. *Din*,
135 S. Ct. 2128 (2015) ..............................*passim*

*Kim Ho Ma* v. *Ashcroft*,
257 F.3d 1095 (9th Cir. 2001) ......................36

*Kleindienst* v. *Mandel*,
408 U.S. 753 (1972) ........................................39

*Kwai Fun Wong* v. *United States*,
   373 F.3d 952 (9th Cir. 2004) ..............................................40

*Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State*,
   45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*,
   519 U.S. 1 (1996)..................................................................26

*Loughrin* v. *United States*,
   134 S. Ct. 2384 (2014)........................................................34

*Marbury* v. *Madison*,
   5 U.S. (1 Cranch) 137 (1803) ..............................................2

*McCreary County* v. *Am. Civil Liberties Union*,
   545 U.S. 867 (2005)..............................40, 41, 42, 43, 44

*Medellín* v. *Texas*,
   552 U.S. 491 (2008)............................................................34

*Morrison* v. *Olson*,
   487 U.S. 654 (1988)............................................................43

*New Motor Vehicle Bd.* v. *Orrin W. Fox Co.*,
   434 U.S. 1345 (1977)..........................................................47

*Olsen* v. *Albright*,
   990 F. Supp. 31 (D.D.C. 1997)....................................27, 29

*Oracle USA, Inc.* v. *Rimini St., Inc.*,
   2016 WL 5213917 (9th Cir. Sept. 21, 2016) ....................47

*Romero* v. *I.N.S.*,
   39 F.3d 977 (9th Cir. 1994) ...............................................36

*Tashima* v. *Admin. Office of U.S. Courts*,
   967 F.2d 1264 (9th Cir. 1992) ...........................................36

*Texas* v. *United States*,
   809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*,
   136 S. Ct. 2271 (2016).....................................................................47, 50

*United Dominion Indus.* v. *United States*,
   532 U.S. 822 (2001)...................................................................................29

*United States* v. *Juvenile Male*,
   670 F.3d 999 (9th Cir. 2012) ...................................................................29

*United States* v. *Windsor*,
   133 S. Ct. 2675 (2013)..............................................................................47

*United States* v. *Witkovich*,
   353 U.S. 194 (1957)....................................................................35, 36, 37

*Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*,
   429 U.S. 252 (1977)...................................................................................40

*Washington* v. *Trump*,
   No. 17-35105 (9th Cir. Feb. 4, 2017) ...................................................2, 9

*Washington* v. *Trump*,
   847 F.3d 1151 (9th Cir. 2017) .........................................................*passim*

*Whitman* v. *Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)..........................................................................34, 35

*Winter* v. *Nat. Res. Def. Council*,
   555 U.S. 7 (2008)......................................................................................23

*Wong Wing Hang* v. *Immigration & Naturalization Serv.*,
   360 F.2d 715 (2d Cir. 1966) ............................................................27, 29

*Wyoming* v. *Oklahoma*,
   502 U.S. 437 (1992)..................................................................................47

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
   343 U.S. 579 (1952)..................................................................................26

*Zadvydas* v. *Davis*,
    533 U.S. 678 (2001) ................................................. 36

*Zivotofsky* v. *Clinton*,
    566 U.S. 189 (2012) ................................................ 25

STATUTES:

8 U.S.C. § 1152(a)(1) ....................................................... 28

8 U.S.C. § 1152(a)(1)(A) ................................. 25, 26, 28

8 U.S.C. § 1153(a) ........................................................... 33

8 U.S.C. § 1182(a) ................................................ 32, 33, 37

8 U.S.C. § 1182(a)(1) ...................................................... 33

8 U.S.C. § 1182(a)(3)(B) ............................................... 30

8 U.S.C. § 1182(a)(3)(B)(i)(I)-(II) ............................. 30

8 U.S.C. § 1182(a)(3)(B)(i)(V)-(VI) .......................... 30

8 U.S.C. § 1182(a)(4)(D)(i) .......................................... 33

8 U.S.C. § 1182(a)(27) ................................................... 32

8 U.S.C. § 1182(a)(28) ............................................. 32, 33

8 U.S.C. § 1182(f) ................................................... *passim*

8 U.S.C. § 1184(a) .......................................................... 35

8 U.S.C. § 1185(a) .............................. 28, 29, 35, 49

22 U.S.C. § 2691(a) ........................................................ 33

Administrative Procedure Act ................................. 50

Chinese Exclusion Acts ........................................ 22, 51

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. O, § 203 (2015) (codified at 8 U.S.C. § 1187(a)(12)(D)(ii)) .................................31

Immigration and Naturalization Act ...........................................................24, 25, 37

Religious Freedom Restoration Act ..........................................................................40

USA PATRIOT Act, Pub. L. No. 107-56, § 411 (2001) ........................................31

Voting Rights Act .......................................................................................................26

CONSTITUTIONAL PROVISIONS:

U.S. Const. art. I ................................................................................25, 35, 46, 50

U.S. Const. amend. I ................................................................................................46

U.S. Const. amend. V ...............................................................................................38

STATE STATUTES

Haw. Rev. Stat. § 378-2(1) .....................................................................................46

Haw. Rev. Stat. Ann. § 381-1 .................................................................................16

Haw. Rev. Stat. Ann. § 489-3 ...........................................................................16, 46

Haw. Rev. Stat. Ann. § 515-3 ...........................................................................16, 46

OTHER AUTHORITIES:

H.R. Rep. No. 89-745 (1965) ..................................................................................26

H.R. Rep. No. 104-469 (1996) ................................................................................31

OTHER AUTHORITIES:

Cong. Research Serv., Executive Authority to Exclude Aliens: In Brief 6-10 (Jan. 23, 2017) ..........................................................................29, 35

## INTRODUCTION

One week after taking office, President Donald Trump fulfilled his campaign promise—made openly in speeches, in interviews, and through surrogates—to implement a "Muslim ban." He issued an Executive Order that barred every national of seven Muslim-majority countries from entering the United States and shut down all refugee admissions, with any exceptions entrusted to standardless executive discretion. During the televised signing of that Order, President Trump read the Order's title, looked up at the camera and remarked: "We all know what that means."

We do. Courts across the country swiftly concluded that the thinly veiled Muslim ban was unlikely to pass constitutional muster. And while the President signed a revised version on March 6—this time in private—we still know exactly what it means. It is another attempt by the Administration to enact a discriminatory ban that goes against the fundamental teachings of our Constitution and our immigration laws. Although it is cloaked in ostensibly neutral terms, the new Executive Order admits, strikingly, that it was altered for the purpose of "avoid[ing] * * * litigation."

Nothing of substance has changed. There is the same blanket ban on entry from Muslim-majority countries (minus one), the same sweeping shutdown of refugee admissions (absent one exception), and the same lawless warren of

1

exceptions and waivers. The courts did not tolerate the Administration's last attempt to hoodwink the judiciary, and they should not countenance this one.

The Government has said that the President's power in this area must be "unreviewable"—indeed, that "[j]udicial second-guessing of the President's national security determination *in itself* imposes substantial harm." Mot. for Administrative Stay 2, 21, *Washington* v. *Trump*, No. 17-35105, 2017 WL 655437 (9th Cir. Feb. 4, 2017) (emphasis added). But denying the judicial role in saying "what the law is" conflicts with one of our most venerated constitutional precedents. *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). In these circumstances, it is also disingenuous at best. Congress has considered and addressed the precise concerns of the Order through legislation; the Order relies on decades-old information and examples of terrorist acts planned by nationals of a country the ban no longer covers; and the U.S. Department of Homeland Security itself has acknowledged that the targeted countries are not the source of the majority of the terror threat.

The confluence of factors surrounding this Executive Order is unique. To find that the immigration laws and the Constitution bar this particular presidential action means only this: In the immigration context, where a President has pointed to no changed circumstances, *and* where Congress has legislated a different response to the threat to which he has pointed, *and* where the fit between the

President's stated purposes and the announced policy is so poor that his own Administration has questioned it, *and* where the President himself has repeatedly and publicly espoused an improper motive for his actions, the President's action must be invalidated.

**FACTUAL BACKGROUND**

**A. Candidate Trump Calls For A Muslim Ban.**

Then-candidate Donald Trump made it crystal clear throughout his presidential campaign that if elected, he planned to bar Muslims from the United States. Shortly after the Paris attacks in December 2015, Mr. Trump issued a press release calling for "a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on." Compl. ¶ 38 & Ex. 6. When questioned about the idea shortly thereafter, he compared it to President Roosevelt's race-based internment of the Japanese during World War II, saying, "[Roosevelt] did the same thing." Compl. ¶ 39. And when asked what the customs process would look like for a Muslim non-citizen attempting to enter the United States, Mr. Trump said: "[T]hey would say, are you Muslim?" An interviewer responded: "And if they said 'yes,' they would not be allowed into the country." Mr. Trump said: "That's correct." *Id.* In March of 2016, Mr. Trump discussed his motivations. During an interview he said, "I think Islam hates us." Compl. ¶ 41.

Later, as the presumptive Republican nominee, Mr. Trump began using facially neutral language to describe the Muslim ban. He described his proposal as stopping immigration from countries "where there's a proven history of terrorism." Compl. ¶ 42. Lest he appear to be backing down, Mr. Trump also made clear that his country-based plan was simply a repackaging of his proposed Muslim ban. Asked in July of 2016 whether he was retracting his call for "a total and complete shut-down of Muslim[]" immigration, he said: "I actually don't think it's a rollback. In fact, you could say it's an expansion." Compl. ¶¶ 38, 44 & Exs. 6, 7. He explained: "People were so upset when I used the word Muslim. 'Oh, you can't use the word Muslim * * *.' And I'm okay with that, because I'm talking territory instead of Muslim." *Id.*

Throughout the campaign, Mr. Trump also made clear that his plans extended to disfavoring Muslim refugees while favoring their Christian counterparts. In July 2015, he said: "If you're * * * a Christian, you cannot come into this country, and they're the ones that are being decimated. If you are Islamic * * * it's hard to believe, you can come in so easily." Compl. ¶ 36.

After his election, the President-Elect signaled that he would not retreat from his Muslim ban. On December 21, 2016, he was asked whether he had decided "to rethink or re-evaluate [his] plans to create a Muslim registry or ban Muslim

immigration to the United States." He replied: "You know my plans. All along, I've been proven to be right." Compl. ¶ 46.

**B. President Trump Implements His First Discriminatory Ban.**

A week after being sworn in as President, Donald Trump fulfilled his ominous campaign promise. On January 27, 2017, he signed an Executive Order entitled "Protecting the Nation From Foreign Terrorist Entry into the United States." Compl. ¶¶ 2, 49 & Ex. 2. During the public signing of the Order, President Trump read its title, looked up, and said: "We all know what that means." Compl. ¶ 51.

On the day the first Executive Order was released, the President made his intentions even more explicit. He informed the Christian Broadcasting Network that the Order's refugee provision was designed to prioritize Christian over Muslim refugees: "If you were a Muslim you could come in, but if you were a Christian, it was almost impossible. * * * And I thought it was very, very unfair. So we are going to help them." Compl. ¶ 58. In a television interview the next day, one of the President's surrogates, Rudolph Giuliani, was even more explicit : "So when [Donald Trump] first announced it, *he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'*" Compl. ¶ 59 & Ex. 8 (emphasis added).

The first version of President Trump's Executive Order imposed two sweeping restrictions. *First*, it banned nationals of seven Muslim-majority countries— Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen—from entering the United States for a period of 90 days. Compl. ¶ 52. The first Executive Order permitted the Secretaries of State and Homeland Security to make exceptions to this ban where they deemed it "in the national interest." Compl. ¶ 54. And it instructed the Secretaries to "submit to the President the names of any additional countries recommended for similar treatment" in the future. Compl. ¶ 55.

*Second*, the original Executive Order directed the Secretary of State to suspend the U.S. Refugee Admissions Program for 120 days. Compl. ¶ 56. Immigration officials could make exceptions to this ban, too, on a case-by-case basis, where they determined that the refugees' admission was in the "national interest." Compl. ¶ 56. The first Executive Order provided an example of such a case: where "the person is a religious minority in his country of nationality facing religious persecution." Compl. ¶ 56. The Order also indefinitely suspended refugee admissions from Syria. Compl. ¶ 57.

The first Executive Order immediately spurred widespread confusion, chaos, and outrage. The application of the travel ban was sweeping: Over 100 individuals were immediately detained at U.S. airports, and the Government revoked 60,000 visas within a period of a week. Compl. ¶ 64. Its precise scope, however, was ill-

defined. At first the Government said that the Order applied to lawful permanent residents ("LPRs"); then the Secretary of Homeland Security said that LPRs were exempt from the travel ban; then, days later, the White House Counsel "clarif[ied]" that the Order did not apply to LPRs in the first place. Compl. ¶¶ 65, 68-70.

Meanwhile, thousands of diplomats, former diplomats, and legislators from both parties spoke out against the ban, calling it inhumane and discriminatory. Hundreds of State Department officials signed a memo stating that the Executive Order "r[an] counter to core American values," including "nondiscrimination," and that "[d]espite the Executive Order's focus on them, a vanishingly small number of terror attacks on U.S. soil have been committed by foreign nationals" here on visas. Compl. ¶ 66 & Ex. 13. Senators John McCain (R-AZ) and Lindsey Graham (R-SC) stated: "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country." Compl. ¶ 67.

Critics also questioned the abrupt nature of the roll out, but the President defended the timing as a national security necessity. On January 30, 2017, President Trump tweeted: "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week." Compl. ¶ 60. On February 9, 2017, President Trump reiterated the point. He claimed he had sought a one-month delay between signing and implementation, but was told by his advisors that

"you can't do that because then people are gonna pour in before the toughness."
*Id.*

**C.  Courts Enjoin The President's First Executive Order.**

Within hours of the first Executive Order's issuance, individuals and entities began filing lawsuits and habeas corpus actions challenging the Order as unlawful. On January 30, 2017, the State of Washington (later joined by Minnesota) filed suit in the Western District of Washington, arguing that the Order violated the Due Process Clause and the Establishment Clause, along with a host of other constitutional and statutory provisions.  A few days later, the State of Hawaiʻi brought the present action.

On February 3, 2017, the District Court for the Western District of Washington entered a nationwide temporary restraining order enjoining President Trump and his Administration from enforcing the January 27 Executive Order. Compl. ¶ 71.  The Government immediately sought an emergency stay of that injunction in the Ninth Circuit, arguing that the President has "unreviewable authority to suspend the admission of any class of aliens," and that "[j]udicial second-guessing of the President's national security determination in itself imposes substantial harm."  Mot. for Administrative Stay 2, 21, *Washington*, *supra*, No. 17-35105 (emphasis added).

On February 9, 2017, the Ninth Circuit denied the Government's request for a stay. Compl. ¶ 71. The Court of Appeals held that "[t]here is no precedent to support" the Government's claim that the Order was "unreviewab[le]"; this contention, it said, "runs contrary to the fundamental structure of our constitutional democracy." *Washington* v. *Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam). The court also held that the Government was unlikely to succeed on the merits of the States' due process claim. It was "obvious," the court explained, that the first Executive Order impinged on the "due process rights" of several classes of individuals, including "persons who are in the United States, even if unlawfully"; "refugees"; and foreign nationals located abroad "who have a relationship with a U.S. resident or an institution." *Id.* at 1166. The court also noted "the serious nature of the allegations the States have raised with respect to their religious discrimination claims," but found it unnecessary to resolve those claims at this stage of the proceedings. *Id.* at 1164.

On February 13, 2017, the District Court for the Eastern District of Virginia temporarily enjoined the Order on religious-discrimination grounds. *Aziz* v. *Trump*, No. 1:17-cv-116, 2017 WL 580855 (E.D. Va. Feb. 13, 2017). Closely examining the President's past statements and the " 'sequence of events' leading up to the adoption of" the first Executive Order, the court concluded that the Order appeared to be "animated by * * * the impermissible motive of * * * disfavoring

one religious group." *Id.* at *8. It thus held that the plaintiffs in that case were therefore "likely to succeed on an Establishment Clause claim." *Id.* at *8-*9.

### D. The President Issues A Second Executive Order.

Following its multiple defeats in the courts, the Government sought a stay of appellate proceedings so that the President could "rescind the [first] Order and replace it with a new, substantially revised" version. Compl. ¶ 71. Meanwhile, the President ensured that his supporters would not doubt his continued commitment to his campaign promises. On February 21, Stephen Miller, a Senior Advisor to the President, explained during a televised interview that the revised Executive Order would "have the same basic policy outcome" as the original version, and that any changes would address "very technical issues that were brought up by the court." Compl. ¶ 74.

A few days later, a memo prepared by President Trump's own Administration severely undermined the purported national security rationale for the original—and soon-to-be revised—Executive Order. On February 25, 2017, a draft report published by the Department of Homeland Security ("DHS") concluded that citizenship was an "unlikely indicator" of terrorism threats against the United States. Compl. ¶ 61. The draft DHS report also found that very few individuals from the seven countries included in President Trump's first Executive Order had carried out or attempted to carry out terrorism activities in the United

10

States since 2011. *Id.* Specifically, the DHS report determined that 82 people had been inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States during the time surveyed. *Half* were U.S. citizens born in the United States, and the remaining persons were from 26 other countries. *Id.* The country at the top of that list, Pakistan, was not included within the travel ban. *Id.* Some of the countries included in the original and revised Executive Order's travel ban, such as Syria and Libya, were not countries-of-origin for *any* of the 82 individuals who had committed or attempted to commit terrorism crimes in the United States since 2011. *Id.*

The DHS report did not alter the President's course, but the demands of public relations did. According to the President's aides, the White House initially planned to release the revised Order on March 1, but delayed the announcement to avoid "undercut[ting] the favorable coverage" the President was receiving for a recent speech to Congress. Compl. ¶ 74.

The President finally issued a revised Executive Order on March 6, 2017. Compl. ¶ 72 & Ex. 1. Consistent with Mr. Miller's forecast, the substance of the revised Order, entitled "Protecting the Nation From Foreign Terrorist Entry into the United States," does not differ from the original. It contains both of the bans the President had initially imposed—the sweeping travel ban on nationals of

several Muslim-majority countries, and the blanket suspension of the refugee program—subject to a handful of changes designed to "avoid * * * litigation." *Id.*

*First*, Section 2 of the new Executive Order once again suspends "nationals of" several Muslim-majority countries from "entry into the United States" for a period of 90 days. Order § 2(c). As revised, the Order includes one fewer country than the original: Because of the "close cooperative relationship" between the United States and the Iraqi government, the Order says, Iraq no longer merits inclusion on the list. *Id.* § 1(g). The Order also expressly exempts individuals who are already present in the United States, or who have already been granted visas or other lawful status. *Id.* § 3(a)-(b). Otherwise, the Order bars entry by nationals of the six designated Muslim-majority countries unless they qualify for a "[c]ase-by-case waiver" deemed to be "in the national interest." *Id.* § 3(c); *see id.* (offering examples of cases in which waivers "could be appropriate").

*Second*, Section 6 of the new Executive Order again suspends the U.S. Refugee Admissions Program for a period of 120 days. *Id.* § 6(a). As in the original Order, individuals may be exempted from this prohibition if the Secretaries of State and Homeland Security determine, "on a case-by-case basis," that admission would be "in the national interest." *Id.* § 6(c). Unlike the original, this Order does not expressly list an individual's status as a "religious minority" as

a circumstance justifying such a waiver, and it does not include a Syria-specific ban on refugees.

The March 6 Executive Order also elaborates on the justification for its restrictions. It states that its aim is to prevent "the entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism." *Id.* § 1(j). It describes the ban on entry by nationals of the six designated countries as a step intended "to prevent infiltration by foreign terrorists. *Id.* §§ 1(d)-(e), 2(c). Likewise, the Order justifies its refugee ban on the ground that "individuals seeking admission as refugees" may "pose a threat to the security and welfare of the United States." *Id.* § 6(a).

Section 1(h) of the revised Executive Order identifies two concrete examples of persons who have committed terrorism-related crimes in the United States, after either entering the country "legally on visas" or entering "as refugees": "[I]n January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses." *Id.* § 1(h). "And in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction[.]" *Id.* Iraq is no longer included in the ambit

of the travel ban, *id.*, and the Order states that a waiver could be granted for a foreign national that is a "young child." *Id.* § 3(c)(v).

**E. The New Executive Order Harms Hawai'i and Its Citizens.**

The revised Executive Order inflicts numerous injuries on the State of Hawai'i and its citizens.

*First*, the Order harms the State's university system. The University of Hawai'i depends on talent from around the world, including from Muslim-majority countries, to enrich its student body and educational environment. The University currently has twenty-three graduate students, several permanent faculty members, and twenty-nine visiting faculty members from the six countries designated in the revised March 6 Executive Order. Ex. D-1, Supp. Dec. of R. Dickson ¶ 7.

In the wake of the new Executive Order, Hawai'i will no longer be able to recruit, accept, enroll, or welcome individuals from the six designated countries to its student body or faculty. This will impair the University's ability to "recruit and accept the most qualified students and faculty," *id.*, undermine its commitment to being "one of the most diverse institutions of higher education" in the world, *id.* ¶ 11, and grind to a halt certain academic programs, including the Persian Language and Culture program, *id.* ¶ 8. The Executive Order also risks "dissuad[ing] some of [the University's] current professors or scholars from continuing their scholarship in the United States" and at the University. *Id. ¶* 9.

By virtue of the Executive Order, these individuals' spouses, parents, and children are now presumptively unable to obtain a visa and join them in the United States. These persons will have to choose between continuing their work or studies in the United States and being with their family members overseas, and some will likely chose the latter course.

In addition, the new Order threatens the collaborative exchange of ideas—including among people of different religions and national backgrounds—on which the State's educational institutions depend. *Id.* ¶ 10; *see also* Compl. ¶ 94. Notably, the University of Hawaii has study abroad or exchange programs in over thirty countries, and international agreements for faculty collaboration with over 350 international institutions spanning forty different countries. *Id.* The new Executive Order will prevent the University from continuing such programs in several countries going forward.

*Second*, the new Executive Order prevents Hawaiʻi from honoring the commitments to nondiscrimination and diversity embodied in the State's Constitution, laws, and policies. Compl. ¶ 97. The Constitution of the State of Hawaiʻi provides that "[n]o law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof." Haw. Const. art. I, § 4. And the State has declared that the practice of discrimination "because of race, color, religion, age, sex, including gender identity or expression, sexual orientation,

marital status, national origin, ancestry, or disability" is against public policy. Haw. Rev. Stat. Ann. § 368-1; *accord id.* §§ 489-3 and 515-3.

Because of the new Executive Order, however, the State is denied its sovereign right to implement this policy. State agencies and universities, for example, cannot accept qualified applicants for open positions if they are residents of one of the six designated countries because they will be unable to enter the country, thwarting specific policies designed to promote diversity and recruit talent from abroad. Compl. ¶ 97. Further, given that the Order began life as a "Muslim ban," its implementation means that the State will be forced to tolerate a policy that disfavors one religion and violates the Establishment Clauses of both the federal and State constitutions.

*Third*, the new Executive Order hinders the efforts of the State and its residents to resettle and assist refugees. Compl. ¶ 104. Refugees from numerous countries have resettled in Hawai'i in recent years. *Id.* While the State's refugee program is small, it is an important part of the State's culture. In late 2015, as other States objected to the admission of Syrian refugees, Governor David Yutaka Ige issued a statement that "slamming the door in their face would be a betrayal of our values." Governor Ige explained that "Hawai'i is the Aloha State, known for its tradition of welcoming all people with tolerance and mutual respect." *Id.* As

long as the new Executive Order is in place, the State is forced to retreat on this important part of its culture and traditions.

*Fourth*, the new Executive Order harms Hawaii's economy and, by extension, the State's tax revenue. In particular, the Order will harm Hawaii's "lead economic driver," tourism. Compl. ¶ 18. In 2015 alone, Hawaiʻi welcomed over 6,800 visitors from the Middle East and over 2,000 visitors from Africa. Compl. ¶ 100. Data from Hawaii's Tourism Authority suggests that during the short period of time that the first Executive Order was in place, the number of visitors to Hawaiʻi from the Middle East (including Iran, Iraq, Syria and Yemen) fell. Ex. B-1, Supp. Dec. of G. Szigeti, ¶¶ 5-8. For instance, Hawaiʻi had 278 visitors from the Middle East in January 2017, compared to 348 visitors from that same region in January 2016. Compl. ¶ 100.

Even with respect to countries not currently targeted by the new Executive Order, there is a likely "chilling effect" on tourism to the United States, including Hawaiʻi. Ex. C-1, Supp. Dec. of L. Salaveria ¶¶ 6-10; Compl. ¶ 102. The new Executive Order contemplates an expansion of the immigration ban to more countries; it directs the Secretaries of State and Homeland Security to "conduct a worldwide review" of every country's immigration-related information systems, Order § 2(a), and to recommend additional countries for inclusion in the travel ban in the near future, *id.* § 2(b)-(f). These provisions of the new Order will instill

"uncertainty" and deter travel to the United States, Supp. Dec. Salaveria ¶ 8,

particularly among foreigners in other countries towards which the current

Administration has expressed hostility, such as other Muslim countries, China, and

Mexico. Compl. ¶ 102. This chilling effect is compounded by the Executive

Order's creation of a global perception that the United States is an exclusionary

country. *Id.*

Empirical evidence already bears out this international chilling effect.

According to reports from travel companies and research firms, travel to the United

States more broadly "took a nosedive" following President Trump's issuance of the

first Executive Order. Compl. ¶ 101. For instance, an airfare prediction company

found that flight search demand from 122 countries to the United States dropped

17% between January 26 and February 1, after the first Executive Order was

signed. *Id.*

*Fifth*, and last, Hawaii's residents will be severely harmed by the new Order.

Hawaiʻi is home to numerous non-citizens from the six designated countries—

foreign students, persons on exchange, visitors, and temporary workers—whose

lives may be directly affected by the new Executive Order. Compl. ¶ 95; *see* Ex.

E, Dec. of Ouansafi ¶¶ 8-12. Some of these non-citizens may be unable to travel

abroad to their home countries, for fear that they will be unable to return—for

instance, if they have only a single entry visa, or if their visa will expire while the new Executive Order is in place. *Id.*

The new Executive Order also blocks all of Hawaii's residents—including U.S. citizens—from receiving visits from, or reunifying with, their family members who live in these six designated countries. Compl. ¶ 96. In 2016, approximately 8% of Hawaii's visitors came to see family and friends, and approximately 12% of Hawaii's visitors from the Middle East and Africa came for family and friends. Supp. Dec. Szigeti ¶ 11. Under the new Executive Order, these individuals, to the extent that they live in the six designated countries and lack a current visa, will no longer be able to travel to Hawaiʻi.

**F. The New Executive Order Harms Ismail Elshikh.**

The situation of Plaintiff Ismail Elshikh exemplifies the harms the new Executive Order inflicts on Hawaii's citizens. Dr. Elshikh is an American citizen of Egyptian descent. Compl. ¶ 24. He has been a resident of Hawaiʻi for over a decade, and is the Imam of the Muslim Association of Hawaiʻi. Ex. A, Dec. of Elshikh ¶¶ 1-2. He is a leader within Hawaii's Islamic community. *Id.*

Dr. Elshikh has a wife and several children under the age of twelve, all of whom are also American citizens. *Id.* ¶ 3. Dr. Elshikh's wife is of Syrian descent and is also a resident of Hawaiʻi. *Id.* ¶ 1. His mother-in-law is a Syrian national, living in Syria. *Id.* ¶ 4. She last visited the family in 2005. *Id.* ¶ 5. She has never

met two of her grandchildren, and only Dr. Elshikh's oldest child remembers meeting her. *Id.*

In September of 2015, Dr. Elshikh's wife filed an I-130 Petition for Alien Relative on behalf of her mother. On January 31, 2017—after the first Executive Order was put in place—Dr. Elshikh was notified by the National Visa Center that his mother-in-law's application for an immigrant visa had been put on hold. *Id.* ¶ 4. Then, on March 2, 2017—after the first Executive Order was enjoined—Dr. Elshikh and his family were notified by the National Visa Center that his mother-in-law's visa application had progressed to the next stage of the process and that her interview would be scheduled at an embassy overseas. *Id.* Under the new Executive Order, however, Dr. Elshikh fears that his mother-in-law will, once again, be unable to "enter" the country. *Id.* Even though Dr. Elshikh's mother-in-law has a pending visa application, she is now barred from entering the United States under the terms of Section 2(c) of the Executive Order unless she is granted a waiver, because she is not a current visa holder. The family is devastated. *Id.* ¶ 6.

Many members of Dr. Elshikh's Mosque have family and friends living in the countries listed in the new Executive Order. *Id.* ¶ 8. Indeed, Dr. Elshikh personally knows of "more than 20 individuals who are members of [his] community and mosque, who have immediate relatives in the six designated

countries" in the new Order. *Id.* Because of the new Executive Order, these residents of Hawai'i live in forced separation from those family and friends.

The deprivation of contact with loved ones is only one of the profound effects of the new Executive Order on Dr. Elshikh, his family, and his community. Dr. Elshikh's children are deeply affected because the Order conveys to them a message that their own country would discriminate against individuals who share their ethnicity and who hold their religious beliefs. *Id.* ¶¶ 3, 7. Dr. Elshikh's oldest child recently asked him, "Dad, how come we can't have our grandmother like our friends; is it because we are Muslims?" *Id.* ¶ 3. Members of his Mosque feel that the new Executive Order targets Muslim citizens because of their religious views and their national origins. *Id.* ¶ 7. Dr. Elshikh believes that, as a result of the new Executive Order, he and members of the Mosque will not be able to associate as freely with those of other faiths. Compl. ¶ 89. He feels that in the United States, there is now a favored and a disfavored religion. Compl. ¶ 90.

President Trump's new Executive Order is antithetical to Hawaii's State identity and spirit. For many in Hawai'i, including state officials, the Executive Order conjures up the memory of the Chinese Exclusion Acts and the imposition of martial law and Japanese internment after the bombing of Pearl Harbor. As Governor Ige observed two days after President Trump issued the first Executive Order, "Hawai'i has a proud history as a place immigrants of diverse backgrounds

can achieve their dreams through hard work.  Many of our people also know all too

well the consequences of giving in to fear of newcomers.  The remains of the

internment camp at Honouliuli are a sad testament to that fear.  We must remain

true to our values and be vigilant where we see the worst part of history about to be

repeated." Compl. ¶ 105.

## STANDARD OF REVIEW

To obtain a temporary restraining order or a preliminary injunction, a

plaintiff must demonstrate that (1) it is likely to succeed on the merits; (2) it is

likely to suffer irreparable harm in the absence of preliminary relief; (3) the

balance of equities tips in its favor; and (4) an injunction is in the public interest.

*Winter* v. *Nat. Res. Def. Council*, *Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit

has "also articulated an alternate formulation of the *Winter* test, under which

'serious questions going to the merits and a balance of hardships that tips sharply

towards the plaintiff can support issuance of a preliminary injunction, so long as

the plaintiff also shows that there is a likelihood of irreparable injury and that the

injunction is in the public interest.' " *Farris* v. *Seabrook*, 677 F.3d 858, 864 (9th

Cir. 2012) (internal quotation marks omitted).

## ARGUMENT

The Ninth Circuit upheld a preliminary injunction barring enforcement of

the first Executive Order because the unlawful pronouncement irreparably harmed

the States, their citizens, and the public in general. The new Executive Order should be enjoined for the same reasons.

### A. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.

The Ninth Circuit held that the first Executive Order was properly enjoined because the States had "viable claims based on the due process rights of persons" who are in the United States "unlawfully; non-immigrant visaholders who have been in the United States but [have] temporarily departed or wish to temporarily depart; refugees; and applicants who have a relationship with a U.S. resident or an institution that might have rights of its own to assert." *Washington*, 847 F.3d at 1166 (internal citations omitted). The Court of Appeals also held that the States' claims of unconstitutional religious discrimination "raise[d] serious allegations and present[ed] significant constitutional questions." *Id.* at 1168.

The current Order transgresses the same constitutional boundaries as the first. *See* Part A.2, *infra*. But the most salient fact about the new Executive Order is that this Court does not even need to go that far. As the Supreme Court has held time and again, "courts should be extremely careful not to issue unnecessary constitutional rulings." *Am. Foreign Serv. Ass'n* v. *Garfinkel*, 490 U.S. 153, 161 (1989) (per curiam); *see also Bond* v. *United States*, 134 S. Ct. 2077, 2087 (2014) ("[T]he Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

Here, a constitutional holding is unnecessary because Plaintiffs can demonstrate the requisite likelihood of success based purely on statutory grounds. Despite its efforts to "avoid * * * litigation," the Government has not only failed to camouflage the Order's constitutional flaws, but has thrown the Order's conflict with the Immigration and Nationality Act (INA) into sharp relief. Because the President's revised policy runs contrary to the Act's clear bar on nationality based discrimination, as well as the INA's finely reticulated system of immigration controls, the Order's implementation must be enjoined.

**1. The Revised Order Violates The Immigration And Nationality Act.**

Our Founders could not have been clearer. Article I vests Congress with the power to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. Those who built this Nation, fleeing religious persecution, "entrust[ed] exclusively to Congress"—the people's elected representatives—the power to set "[p]olicies pertaining to the entry of aliens and their right to remain here." *Arizona* v. *United States*, 132 S. Ct. 2492, 2507 (2012) (quoting *Galvan* v. *Press*, 347 U.S. 522, 531 (1954)). To be sure, Congress has delegated some of that power to the President through the INA. But it has set important limits—as it must—on that delegation. The President cannot exceed the authority Congress gave him without unlawfully "aggrandizing [his] power at the expense of another branch."

*Zivotofsky* v. *Clinton*, 566 U.S. 189, 196-197 (2012) (quoting *Freytag* v. *Commissioner*, 501 U.S. 868, 878 (1991)).

The revised Executive Order strays far beyond the statute's limits. It contravenes the statute's clear prohibition on "discriminat[ion] * * * because of * * * nationality," 8 U.S.C. § 1152(a)(1)(A), and it flouts the scheme Congress established "for determining terrorism-related inadmissibility," *Kerry* v. *Din*, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring in the judgment). In both respects, the Order is "incompatible with the expressed * * * will of Congress," where the President's power is at "its lowest ebb." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in the judgment).

      *a. The revised Executive Order violates the INA's prohibition on nationality-based discrimination.*

In 1965, Congress abolished the "national origins system" that had governed immigration law for decades by enacting 8 U.S.C. § 1152(a)(1)(A). *See* H.R. Rep. No. 89-745, at 9 (1965) (describing the national origins system as "racially biased, statistically incorrect, and a clumsy instrument of selection based on discrimination"). This landmark civil rights law—passed nearly contemporaneously with the Voting Rights Act—provides that "[e]xcept as specifically provided" in certain subsections, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of

residence." 8 U.S.C. § 1152(a)(1)(A). As Judge Sentelle has written, "Congress could hardly have chosen more explicit language": It "unambiguously directed that no nationality-based discrimination shall occur." *Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State*, 45 F.3d 469, 473 (D.C. Cir. 1995) ("*LAVAS*"), *vacated on other grounds*, 519 U.S. 1 (1996).

Courts have applied this prohibition broadly. In addition to barring the Executive from discrimination in issuing immigrant visas, they have held that Congress made race and nationality "an impermissible basis" for *any* admission or deportation decision. *Wong Wing Hang* v. *INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.). Executive officials, after all, may not exercise their discretion under the immigration laws based on "considerations that Congress could not have intended to make relevant." *United States ex rel. Kaloudis*, 180 F.2d 489, 491 (2d Cir. 1950) (L. Hand, J.); *see, e.g.*, *Judulang* v. *Holder*, 565 U.S. 42, 53 (2011) (immigration decisions must be based on "relevant factors" that have bearing on an alien's "fitness to reside in the country"). And since 1965, it has been clear that Congress considers "invidious discrimination against a particular race or group" an invalid consideration in making entry decisions. *Wong Wing Hang*, 360 F.2d at 719; *see, e.g.*, *Bertrand* v. *Sava*, 684 F.2d 204, 213 n.12 (2d Cir. 1982) (immigration officials may not "discriminate on * * * the basis of race and national origin"); *Abdullah* v. *INS*, 184 F.3d 158, 166 (2d Cir. 1999) (same). Accordingly,

in *Olsen* v. *Albright*, 990 F. Supp. 31 (D.D.C. 1997), the D.C. District Court had little difficulty concluding that consular officials "must not discriminate against particular individuals because of the color of their skin or the place of their birth" even in issuing "*non*immigrant visa[s]." *Id.* at 38-39 (emphasis added).

The Order violates this clear antidiscrimination mandate. It prohibits "nationals of" six listed "countries" from "entry into the United States." Order § 2(c). Furthermore, it states that the President may "prohibit the entry of * * * foreign nationals" from additional "countries," *id.* § 2(e), and authorizes preferential treatment for any "Canadian immigrant who applies for a visa," *id.* § 3(c)(viii). Tracking the words of Section 1152(a)(1)(A) almost verbatim, the Order also provides that immigration officers may "authorize *the issuance of a visa* to * * * a foreign *national* for whom entry is otherwise suspended" *only* if the officers "decide on a case-by-case basis" to waive the Order's restrictions. *Id.* § 3(c) (emphases added). In words too plain to mistake, these provisions direct that aliens should "receive * * * preference or priority [and] be discriminated against in the issuance of an immigrant visa because of * * * nationality," 8 U.S.C. § 1152(a)(1)(A), and they authorize "discriminat[ion] on * * * the basis of * * * national origin," *Bertrand*, 684 F.2d at 212 n.12. The Order flatly violates the statute.

The Government claims that Sections 1182(f) and 1185(a) authorize the President to openly discriminate in this manner. *See* Order § 2(c). Not so. Those provisions, both enacted in 1952, state in general terms that the President may suspend the entry of "any class of aliens" and prescribe "limitations and exceptions" on entry. 8 U.S.C. §§ 1152(a)(1), 1182(f). Section 1152(a)(1)(A), in contrast, contains a specific prohibition on discrimination, was enacted later in time, and exempts several provisions—but not Section 1182(f) or Section 1185(a)—from its scope. Congress thus made plain that the President cannot ignore Section 1152(a)(1)(A)'s antidiscrimination command when invoking those provisions. *See United States* v. *Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012) (recognizing that "[w]here two statutes conflict, the later-enacted, more specific provision generally governs"); *United Dominion Indus.* v. *United States*, 532 U.S. 822, 836 (2001) (describing *expressio unius* canon). Moreover, for decades courts have held that facially neutral grants of discretion in the immigration laws, like Sections 1182(f) and 1185(a), do not authorize "discriminat[ion] on * * * the basis of race and national origin." *Bertrand*, 684 F.2d at 213 n.12; *see Wong Wing Hang*, 360 F.2d at 719 (Friendly, J.); *Olsen*, 990 F. Supp. at 38-39.

Until now, Presidents accepted this limit. Since Congress enacted Sections 1182(f) and 1185(a) in 1952, Presidents have invoked the provisions (either singly or together) over forty times. *See* Cong. Research Serv., *Executive*

*Authority to Exclude Aliens: In Brief* 6-10 (Jan. 23, 2017) ("CRS Report"),

https://fas.org/sgp/crs/homesec/R44743.pdf. No President in these years has ever

engaged in rank nationality-based discrimination without legislative authorization.

This sweeping Order is a first, and the Court cannot allow it to stand.

> b. *The revised Executive Order exceeds the President's authority under 8 U.S.C. § 1182(f).*

In addition to discriminating on the basis of nationality, the Order flouts the

criteria Congress established for denying aliens entry on terrorism-related grounds.

Congress has "establish[ed] specific criteria for determining terrorism-

related inadmissibility." *Din*, 135 S. Ct. at 2140 (Kennedy, J., concurring in the

judgment). Section 1182(a)(3)(B) states that an alien may be denied admission if,

among other things, that alien "has engaged in a terrorist activity"; there is

"reasonable ground to believe" that the alien "is engaged in or is likely to engage

after entry in any terrorist activity"; or the alien is "a member of a terrorist

organization." 8 U.S.C. § 1182(a)(3)(B)(i)(I)-(II), (V)-(VI). The decision to deny

an alien entry under the Act's "terrorism bar" is "legitimate," Justice Kennedy

explained in his controlling opinion in *Din*, only if it "rest[s] on a determination

that [the alien] d[oes] not satisfy the statute's requirements." 135 S. Ct. at 2140.

The Order disobeys that straightforward instruction. It deems millions of

aliens inadmissible on the ground that they may be "foreign terrorists." Order

§§ 2(c), 6(a). But it does not claim—nor could it—that there is "reasonable ground

to believe" that every covered national of six countries and every applicant for refugee status is "likely to engage" in terrorism, or that any other provision of the Act's terrorism bar is satisfied. 8 U.S.C. § 1182(a)(3)(B)(i)(II). Instead, the Order finds merely that there is an "increase[d] * * * chance" and a "heightened risk[]" that refugees and aliens from the banned countries will include *some* "terrorists operatives or sympathizers." Order § 1(d)-(e). And based on that finding, the Order establishes an entirely new set of admission rules: *All* aliens covered by the Order—including refugees who are themselves seeking to escape violence—are presumptively excluded as potential terrorists. *Id.* §§ 2(c), 6(a). They must seek admission based on an intricate scheme of categorical exemptions and case-by-case waivers. *See id.* §§ 3, 6(c).

That cannot be lawful. The President cannot direct immigration officers to ignore the criteria Congress established for excluding aliens as potential terrorists and set up new rules that the President prefers. Congress painstakingly devised and calibrated the limits on the terrorism bar over a period of decades. *See, e.g.*, H.R. Rep. No. 104-469, at 166 (1996) (explaining that Congress was establishing a "slightly less strict standard" for members of terrorist organizations, under which they are not inadmissible if "innocent of involvement with or knowledge of terrorist activity"). Congress altered these limits in the wake of 9/11, *see, e.g.*, USA PATRIOT Act, Pub. L. No. 107-56, § 411 (2001), and only two years ago, it

specifically considered the risks the Order identifies, and chose to address them in a far more limited manner: by authorizing the Government to prohibit persons who had *recently visited* the listed countries from traveling to the United States *without a visa*. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. O, § 203 (2015) (codified at 8 U.S.C. § 1187(a)(12)(D)(ii)) (authorizing the Secretary of State to require an alien to possess a visa if he recently traveled to a country in which the alien's "presence * * * increases the likelihood that the alien is a credible threat to the national security"). The President violates Congress's will by plowing over the system Congress designed and replacing it with one (or two) he likes more.

Section 1182(f) does not permit the President to ignore Congress's judgments in this manner. In sixty-five years, that provision has never been understood to authorize the President to alter or augment the criteria for excluding the "[c]lasses of aliens" that Congress itself addressed in 8 U.S.C. § 1182(a). Rather, Section 1182(f) permits the President to exclude *additional* "class[es] of aliens" on which the statute is silent. *Id.* § 1182(f). As the D.C. Circuit explained, it authorizes the President to exclude a "class of [aliens] that *is not* covered by one of the [inadmissibility] categories in Section 1182(a)." *Abourezk* v. *Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (emphasis added), *aff'd mem.*, 484 U.S. 1 (1987).

Any other interpretation would impermissibly allow Section 1182(f) to "swallow[]" the other categories of inadmissibility in Section 1182. *Id.* at 1056. In *Abourezk*, the D.C. Circuit confronted a similar problem. The Government contended that then-Section 1182(a)(27), which broadly prohibited admission of aliens who might "engage in activities which would be prejudicial to the public interest," could be invoked to exclude certain aliens "simply because of their membership in Communist organizations." *Id.* at 1047, 1057 (quoting 8 U.S.C. § 1182(a)(27) (1982)). Yet an adjacent provision of the immigration laws, 8 U.S.C. § 1182(a)(28) (1982), set specific criteria for excluding members of Communist organizations, and authorized the President to deem aliens inadmissible because of membership in a Communist party only if "the admission of such alien would be contrary to the security interests of the United States." 785 F.2d at 1048 (quoting 8 U.S.C. § 1182(a)(28) (1982); 22 U.S.C. § 2691(a) (1982)). The court held that "[t]he Executive [could] not use subsection (27) to evade the limitations Congress appended to subsection (28)" by setting new criteria that would exclude a broader range of Communists. *Id.* at 1057. That would make subsection (28) "superfluous," and "nullif[y]" "the congressional will expressed" in that provision. *Id.* Considering the same question in *Allende* v. *Shultz*, 845 F.2d 1111 (1st Cir. 1988), the First Circuit agreed, holding that "[e]ach subsection" of

Section 1182 "creates a different and distinct ground for exclusion," and none should be interpreted to render another one "duplicative." *Id.* at 1118.

The President's interpretation of Section 1182(f), however, would permit him to effectively "nullif[y]" any subsection of section 1182(a) and "evade the limitations" Congress elsewhere imposed. He could, if he wished, block aliens from entering the country because of ailments lacking any "public health significance," *id.* § 1182(a)(1); require victims of domestic violence to obtain sponsorship from their spouses, *cf. id.* § 1182(a)(4)(D)(i) (exempting such victims from this requirement); or ban entry of any immediate relatives of U.S. citizens unless they satisfied criteria of the President's choosing, *cf. id.* § 1153(a) (allotting visas to immediate relatives). No statute should be interpreted in a manner that would render another provision "superfluous," or "a mere subset" of the first. *Loughrin* v. *United States*, 134 S. Ct. 2384, 2390 (2014). And it is well-established, for that matter, that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions"—it does not, as Justice Scalia wrote, "hide elephants in mouseholes." *Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Enabling the President to rewrite vast swathes of the immigration laws would surely be an elephant; and the vague terms of Section 1182(f), buried at the end of a list of express statutory limits, are a quintessential

mousehole.  *See FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000).

Moreover, the President's understanding of the scope of section 1182(f) flies in the face of historical practice.  Of course, "[p]ast practice does not, by itself, create power."  *Medellín* v. *Texas*, 552 U.S. 491, 532 (2008).  Therefore, it would not be significant if past presidents had inappropriately expanded their authority through a misreading of Section 1182(f).  But it is significant that past presidents have not tried.  Presidents have repeatedly relied on Section 1182(f) to deny entry to classes of aliens who are subject to U.S. sanctions, *e.g.*, Proc. No. 8693 (July 27, 2011), who have sought to undermine foreign democracies, *e.g.*, Proc. No. 8015 (May 16, 2006), or who engaged in war crimes or similar atrocities, *e.g.*, Proc. No. 6749 (Oct. 27, 1994).  *See generally* CRS Report 6-10.  Each of these classes is "not covered" by Section 1182(a), *Abourezk*, 785 F.2d at 1049 n.2, and so the President has a free hand to "suspend the[ir] entry" as he sees fit, 8 U.S.C. § 1182(f).  No President, until now, has attempted to use Section 1182(f) (or Section 1185(a)) to alter or override the categories Congress established.

Indeed, it is doubtful that Congress *could* delegate such breathtaking authority to the President.  The Constitution vests Congress, not the President, with the responsibility to "establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8, cl. 4.  Congress cannot abdicate that role by giving the President unfettered

authority to write (and rewrite) the rules of admission.  *See Whitman*, 531 U.S. at

472; *see also Clinton* v. *City of New York*, 524 U.S. 417, 443 (1998) (holding that

the Congress may not give the President "the power to cancel portions of a duly

enacted statute").

The Government suggests that Section 1182(f) must be read to grant the

President this vast power because it says that the President may suspend entry of

"*any* class of aliens." 8 U.S.C. § 1182(f) (emphasis added).  But this is not the first

time that courts have encountered—and rejected—the Government's claim that a

broadly-worded immigration statute gives it "unbounded authority."  *United States*

v. *Witkovich*, 353 U.S. 194, 199 (1957).  In *Witkovich*, the Government argued that

a statute requiring aliens to provide "such * * * information * * * as the Attorney

General may deem fit and proper" vested the Attorney General with essentially

"limitless" authority to request information as he saw fit.  *Id.* at 198, 200.  The

Court rejected that claim; although the statute contained no limits when "read in

isolation and literally," in "the context of th[e] [statutory] scheme" it was clearly

intended to authorize only those questions relevant to determining deportability.

*Id.* at 199, 200-202; *see also*, *Zadvydas* v. *Davis*, 533 U.S. 678, 682, 689 (2001)

(statute stating that aliens "may be detained beyond the removal period" must be

read to "contain an implicit 'reasonable time' limitation."); *Kent* v. *Dulles*, 357

U.S. 116, 129-130 (1958) (similarly adopting limiting construction of broadly worded passport statute).

Similar cases proliferate: As the Ninth Circuit has explained, "[i]n the immigration context, courts have often read limitations into statutes that appeared to confer broad power on immigration officials in order to avoid constitutional problems." *Kim Ho Ma* v. *Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001); *see Romero* v. *INS*, 39 F.3d 977 (9th Cir. 1994) (adopting limiting construction); *Tashima* v. *Admin. Office of U.S. Courts*, 967 F.2d 1264, 1271 (9th Cir. 1992) (similar).

The same course is appropriate here. The phrase "any class of aliens" cannot possibly vest the President with unbounded authority to discard the rules of entry Congress designed. Rather, as in many circumstances, the surrounding statutory provisions "counteract the effect" of the "expansive modifier[] * * * 'any.' " *Ali* v. *Fed. Bureau of Prisons*, 552 U.S. 214, 220 n.4 (2008); *see Circuit City Stores, Inc.* v. *Adams*, 532 U.S. 105, 109 (2001) (imposing limiting construction on the phrase "any other class of workers" in light of the surrounding context). The "legislative scheme," and the severe and constitutionally suspect consequences of a broad reading, *Witkovich*, 353 U.S. at 200-202, make clear that the President may not use his authority under Section 1182(f) to modify the criteria for denying entry to a class of aliens Congress already addressed in Section

1182(a).  Because the Order does just that—instructing immigration officers to apply "criteria for determining terrorism-related inadmissibility" that Congress did not establish, *Din*, 135 S. Ct. at 2140—it is unlawful, and cannot stand.

### 2.  The Revised Order Is Unconstitutional.

The Order's obvious conflict with the INA is more than enough to establish the Plaintiffs' likelihood of success on the merits.  But if this Court does reach Plaintiffs' constitutional claims, it should have little trouble holding that they are meritorious.  The Government's constitutional defense of the prior Order was predicated almost exclusively on an assertion of unreviewable Executive power that the Ninth Circuit resoundingly repudiated: "[A]lthough courts owe considerable deference to the President's policy determinations with respect to immigration and national security, it is *beyond question* that the federal judiciary retains the authority to adjudicate constitutional challenges to executive action." 847 F.3d at 1164 (emphasis added).  Stripped of that claim of absolute power, the Government has nothing with which to shield itself from the conclusion that the revised Order violates the Constitution's core due process and religious freedom guarantees.

*a. The revised Executive Order violates Due Process.*

The Fifth Amendment prohibits the Government from depriving individuals of their "life, liberty, or property, without due process of law." U.S. Const. amend. V. The new Order, like the old, runs contrary to this command.

The Ninth Circuit affirmed the injunction of the prior Order based on the strength of the States' due process claims. In doing so, it specifically declined the Government's request to narrow the preliminary injunction to apply only to "lawful permanent residents" and "previously admitted aliens who are temporarily abroad now or who wish to travel and return to the United States in the future." *Washington*, 847 F.3d at 1166. That limitation, the Ninth Circuit held, would "leave[] out at least some who" have "viable due process claims," including "aliens who are in the United States unlawfully," "refugees," and "citizens who have an interest in specific non-citizens' ability to travel to the United States." *Id.*

Flouting that holding, the Government has promulgated a new Order that imposes the same underinclusive limitation the Ninth Circuit rejected. The Government touts the fact that the new Order will not "affect the ability of individuals * * * who are lawfully in the United States on the effective date to leave the country to travel and return later." Notice of Filing of Executive Order at 9 (Mar. 6, 2017) ("Notice"), ECF No. 56. But there was nothing qualified about the Ninth Circuit's holding that "aliens who are in the United States *unlawfull*y"

also "have due process rights."  847 F.3d at 1166 (emphasis added).  The

Government also assures this Court that the new Order will "*not* result in the

revocation or cancellation of valid visas or create an emergent situation whereby

visaholders abroad are prevented from entering the United States."  Notice at 9

(emphasis in original).  But the Ninth Circuit's opinion covered more than just

restrictions on the entry of visaholders.  The Court of Appeals explained that

barring the entry of non-citizens in general creates "viable due process claims" for

"citizens who have an interest in specific non-citizens' ability to travel to the

United States," 847 F.3d at 1166.—such as a citizen whose spouse or parent is

seeking admission, *Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in the

judgment), or a university deprived of the "debates" and "discussion" provided by

a visiting scholar, *Kleindienst* v. *Mandel*, 408 U.S. 753, 764 (1972); *see generally*

*Moore* v. *City of East Cleveland*, 431 U.S. 494 (1977) (recognizing the Due

Process Clause protects family integrity); *Troxel* v. *Granville*, 530 U.S. 57 (2000)

(same).

     The Government also asserts that the new Order contains "a robust and self-

executing waiver provision" that avoids any due process concerns.  Notice at 9.

That cannot be true.  The prior Order also contained waiver provisions, *see* January

27 Order §§ 3(g), 5(e), but that was not enough for it to pass constitutional muster.

The revised Order offers more detail as to who "*could*" be eligible for a waiver, but it does not guarantee appropriate process to anyone.  Compl. ¶ 77. [1]

  b. *The revised Executive Order violates the Constitution's protections against religious discrimination.*

The Ninth Circuit also determined that there were "significant constitutional questions" with regard to the prior Order's compliance with the Establishment Clause and the religious discrimination bar found in the Equal Protection Clause.[2] *Washington*, 847 F.3d at 1168.  That is hardly surprising.  "A law that has a religious, not secular, purpose" violates the Constitution.  *Id.* at 1167.  "It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims."  *Id.*

---

[1] The revised Executive Order may limit the due process rights of other individuals, as well.  Section 3(a)(i) purports to limit the "entry" ban in Section 2 "to foreign nationals of the designated countries who are outside the United States on the effective date of this order."  But the Department of Homeland Security's accompanying Q&A document suggests that foreign nationals of the six designated countries who are in the United States with "single entry visas," student visas, or visas due to expire during the duration of the Order will be prohibited from leaving and reentering the country.  Compl. ¶¶ 83-84.  If so, persons with those visas would also suffer an impairment to their due process rights and their fundamental right to travel under the Fifth Amendment.

[2] For the reasons described above, *see supra* Part A.1.a, the Order also violates the constitutional bar on discrimination based on nationality.  *See Kwai Fun Wong* v. *United States*, 373 F.3d 952, 968-975 (9th Cir. 2004) (holding that the Constitution protects both admitted and non-admitted aliens from discrimination on the basis of national origin).  In addition, its obvious discrimination against those of the Muslim faith burdens free-exercise in violation of the Religious Freedom Restoration Act and the Free Exercise Clause.  Compl. ¶¶ 132-36.

And that evidence may include "the historical background of the decision and statements by decisionmakers." *Id.* (describing the holding of *Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252, 266-68(1977)).

In analyzing this evidence, the key question is whether "a reasonable observer[]" with a "reasonable memor[y]" would infer a religious purpose from the Government's actions. *McCreary County* v. *Am. Civil Liberties Union*, 545 U.S. 844, 867 (2005). The Ninth Circuit has explained that regardless of "the government's *actual* purpose," a constitutional violation occurs if "the practice under review in fact conveys a message of endorsement or disapproval." *Access Fund* v. *U.S. Dep't of Agriculture*, 499 F.3d 1036, 1045 (9th Cir. 2007) (internal quotation marks omitted) (emphasis added).

The history of the initial Order and the statements by the President and his surrogates make it patently obvious that a "reasonable observer" with a "reasonable memory" would recognize that the original Order conveyed a "message of [religious] disapproval." As another district court held, there is ample "unrebutted evidence" demonstrating that challenges to the original Order were "likely to succeed on the Establishment Clause claim." *Aziz*, 2017 WL 580855 at *8.

The new Order seeks to change that conclusion by announcing a series of secular purposes for the policy, and by asserting that the original Order "did not

provide a basis for discriminating for or against members of any particular religion." Order § 1(b)(4). Given the Order's origins and the context of its release, these hollow recitations are not nearly enough to avoid a constitutional violation.

"[A]lthough a legislature's stated reasons will generally get deference, the secular purpose required has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864; *see also, e.g.*, *Edwards* v. *Aguillard*, 482 U.S. 578, 586-587 (1987) (stated secular purpose must be "sincere and not a sham"). Here, there can be little doubt that the stated secular purposes are a "sham," or at the very least "secondary to [the] religious objective" of banning Muslims. The President's senior policy advisor, and one of the Order's architects, has himself stated that the revised Order is designed to accomplish "the same basic policy outcome for the country" as the first, while merely correcting "a lot of very technical issues that were brought up by the court." Compl. ¶ 74.

In fact, the Government seems to be taking a page from the book of the counties that unsuccessfully defended against an Establishment Clause challenge in *McCreary*. In that case, two counties posted public displays of the Ten Commandments. One did so in a ceremony aided by a priest who spoke about God, such that "[t]he reasonable observer could only think that the Counties meant to emphasize and celebrate" the "religious message." 545 U.S. at 868-869. After they were sued, the Counties posted a new display that made their religious

purposes *more* explicit, before changing course and installing a third display that situated the Ten Commandments as part of the "Foundations of American Law and Government." *Id.* The Counties informed the courts that this third display had several secular purposes and that the purposes behind the prior displays were "dead and buried." *Id.* at 870-871. The courts were not fooled.

In a holding that was almost made for this case, the Supreme Court stated that "the world is not made brand new every morning." *Id.* at 866. Courts may not "ignore perfectly probative evidence" as to the "history of the government's actions" and what it "has to show." *Id.* Nor may they "turn a blind eye to the context in which [the] policy arose." *Id.* (quoting *Santa Fe Ind. School Dist.* v. *Doe,* 530 U.S. 290, 315 (2000)).

That, of course, is exactly what the Government asks this Court to do. It wants this Court to ignore the President's repeated pronouncements of a desire to enact a Muslim ban, ignore his statements that he intended to shield that ban from judicial review by cloaking it in secular garb, ignore his surrogate's statement that the first Order was intended to serve as the ban, ignore his own statements that the original Order was intended to favor Christian over Muslim refugees, and ignore the Administration's subsequent assurance that the new Order does nothing more than resolve "technical issues." *See supra* pp. 3-8 (recounting the Order's history). And the Government wants the Court to turn a blind eye to the copious evidence

undermining the avowed national security purpose of the Order.  *See Aziz*, 2017
WL 580855, at *9 (concluding that the original Order "was not motivated by
rational national security concerns").  That ranges from the gross mismatch
between the Order's avowed goal of fighting terrorism and its failure to include the
countries from which the 9/11 attackers came, to the cognitive dissonance of
insisting that the Nation's safety depends on the Order being implemented
immediately and then delaying the roll out of a revised Order to take advantage of
a favorable news cycle.  Compl. ¶ 74.  As Justice Scalia once remarked in another
context, "this wolf comes as a wolf," *Morrison v. Olson*, 487 U.S. 654, 699 (1988)
(Scalia J, dissenting)—and it cannot disguise that fact by throwing on an article or
two of sheep's clothing.

To recognize as much is *not* to hold that the past statements of the President
and his Administration have "forever taint[ed] any effort on their part to deal with
the subject matter" of immigration.  *McCreary*,  545 U.S. at 874.  "[D]istrict courts
are fully capable of adjusting preliminary relief to take account of genuine changes
in constitutionally significant conditions."  *Id.* at 874.  The President, however, has
pointed to none.  He has pointed to no alteration in the global landscape beyond his
own inauguration, and no evidence that his motives have changed beyond self-
serving statements in the Order and in the course of litigation.

Recognizing this wolf is perfectly consistent with the deference owed to the Executive in the national security and immigration context.  Enjoining this Order will not open the door to a slew of future challenges of executive orders.  The unique and unprecedented context means that a constitutional decision in this case will only foreclose future presidents from announcing a nakedly discriminatory intent and then—in the absence of any changed circumstances—carrying out that purpose by effecting a dramatic alteration of Congress's carefully constructed immigration scheme.  That is no more than the Constitution demands.

**B.  The Plaintiffs Will Suffer Irreparable Harm If Relief Is Not Granted.**

The injuries inflicted by this unlawful Order are legion.  Both the State and Dr. Elshikh are already suffering and will continue to suffer myriad irreparable harms.  These injuries not only satisfy the irreparable harm element of the temporary injunction standard, but also easily demonstrate the Plaintiffs' standing.  That is particularly true with respect to Hawai'i because, under *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), States are due "special solicitude in [the] standing analysis" when they assert "sovereign prerogatives."  *Id.* at 520.

*First*, the Order severely damages the State's schools and universities.  In performing its standing analysis, the Ninth Circuit found it obvious that "as a result [of the prior Order], some [nationals of the designated countries] will not enter state universities, some will not join those universities as faculty, some will be

prevented from performing research, and some will not be permitted to return if they leave." *Washington*, 847 F.3d at 1161. The current Order has almost precisely the same effect. As a result, the State has suffered "a concrete and particularized injury to [its] public universities." *Id.* at 1159. The new Order detracts from the University of Hawaii's diversity and impedes the State's commitment to international scholarship and global exchange—inflicting the very harms Congress's prohibition on nationality-based discrimination was designed to prevent. *Id.* at 1160. Those harms are already occurring and will be extremely difficult to undo if the Order is not stayed.

*Second*, the Executive Order will irreparably harm Hawaii's sovereign interest in preventing the unconstitutional "establishment" of religion in the State. This harm alone is sufficient to warrant injunctive relief because in Establishment Clause cases, irreparable harm is presumed. *See, e.g.*, *Chaplaincy of Full Gospel Churches* v. *England*, 454 F.3d 290, 303 (D.C. Cir. 2006) (if a movant demonstrates a likelihood of success on an Establishment Clause claim, "this is sufficient, without more, to satisfy the irreparable harm prong"); *see also Farris*, 677 F.3d at 868 (9th Cir. 2012) (adopting the same rule for First Amendment claims generally). The history of the Establishment Clause demonstrates that the harm is particularly acute with respect to States. *See Elk Grove Unified School Dist.* v. *Newdow*, 542 U.S. 1, 49 (2004) (Thomas, J., concurring).

*Third*, the Order irreparably harms the State because it prevents Hawaiʻi from fully enforcing its antidiscrimination laws and policies. Hawaii's Constitution protects religious freedom and the equal rights of all persons. Hawaiʻi Const. art. 1, §§ 2, 4. Its statutes and policies bar discrimination and further diversity. Haw. Rev. Stat. §§ 378-2(1); 489-3; 515-3; Compl. ¶ 72. The Executive Order commands Hawaiʻi to abandon these sovereign prerogatives by requiring the State, and therefore its universities, its agencies, and its instrumentalities, to exclude individuals based on their nationality and religion. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd.* v. *Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers). The same is true when it is an Executive Order that prevents effectuation of the State's laws.

*Fourth*, the Executive Order will inflict irreparable harm on Hawaii's economy and tax revenues. As the "state's lead[ing] economic driver," tourism is crucial to Hawaii's economy. Compl. ¶ 15. In 2015 alone, Hawaiʻi had 8.7 million visitor arrivals, accounting for $15 billion in spending. *Id.* The Order prevents nationals of the designated countries from visiting the State, and chills tourism from many other countries, resulting in considerable lost revenues. *See Texas* v. *United States*, 809 F.3d 134, 155-156 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (holding that the "financial loss[es]" that

Texas would bear, due to having to grant drivers licenses to deferred action recipients, constituted a concrete and immediate injury for standing purposes); *see also United States* v. *Windsor*, 133 S. Ct. 2675 (2013) (standing to appeal an order to pay a tax refund); *Wyoming* v. *Oklahoma*, 502 U.S. 437, 448 (1992) (standing to sue for "direct injury in the form of a loss of specific tax revenues"). The Order will also inflict incalculable and lasting harm on Hawaii's hard-won reputation as a place of welcome. *See Oracle USA, Inc.* v. *Rimini St., Inc.*, 2016 WL 5213917, at *2 (D. Nev. Sept. 21, 2016). And it will force the State to abandon the refugee program that embodies the State's tradition of openness.

*Fifth*, the Order irreparably harms Dr. Elshikh, in particular, because it deprives him and his family of the company of Dr. Elshikh's mother-in-law. *See Din*, 135 S. Ct. at 2139 (Kennedy, J., concurring in the judgment) (recognizing potential constitutional harm inflicted when a loved one is prohibited from entering the country); *id.* at 2142-43 (Breyer, J., concurring) (same). The Order prolongs the separation of Dr. Elshikh's family, and causes him severe emotional turmoil. Even the Government has acknowledged the standing of a person that asserts an "independent constitutionally protected interest in [a] third-party's admission to the country." 9th Circuit Govt. Reply Br. at 4. Further, Dr. Elshikh is irreparably harmed by the infringement of his rights to be free from governmental discrimination based on religion and nationality.

48

*Finally*, the Order irreparably harms the State by inflicting similar injuries on its population as a whole.  The new Order subjects citizens of Hawaiʻi like Dr. Elshikh to discrimination and marginalization while denying all residents of the State the benefits of a pluralistic and inclusive society.  Hawaiʻi has a quasi-sovereign interest in "securing [its] residents from the harmful effects of discrimination."  *Alfred L. Snapp & Son* v. *Puerto Rico*, 458 U.S. 592, 609 (1982). The Order also harms Hawaiʻi by debasing its culture and tradition of ethnic diversity and inclusion.

## C. The Balance Of The Equities And Public Interest Favor Relief.

The public interest plainly favors a stay of this Order.  It is not only Hawaiʻi but the *country* that has a rich and storied tradition of welcoming immigrants and celebrating differences.  The Order badly encroaches on this core element of America's history and culture, all the while marginalizing minorities, sowing discord in the population, and violating congressional and constitutional commands.  Against all this, the Government pleads only an urgent national security rationale that it has itself undercut in numerous ways.  The Administration's own decision to delay the Order's roll out for publicity purposes establishes that there is no urgency.  Compl. ¶ 74.  Its own DHS memorandum establishes that the Order will not make the country safer.  Compl. ¶ 61.  And the President's own statements regarding the Order's true purpose establish that the

Order is designed to hurt members of a minority religion, not help the American citizenry as a whole.  All a stay will do is preserve a status quo that has existed *for decades*.

### D.  The Court Should Issue A Nationwide Injunction.

Because the factors for issuing a temporary restraining order are easily satisfied, the Court should enter a nationwide injunction prohibiting the enforcement of sections 2 and 6 of the Order.  Both of these sections are unlawful in all of their applications: Section 2 discriminates on the basis of nationality, *see supra* Part A.1.a, Sections 2 and 6 exceed the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), *see supra* Part A.1.b, and both provisions are motivated by anti-Muslim animus, *see supra* Part A.2.a.  Furthermore, each provision infringes on the "due process rights" of numerous U.S. citizens and institutions by barring the entry of non-citizens with whom they have close relationships.  847 F.3d at 1166; *see supra* Part A.2.b.  As the Ninth Circuit explained last month, there is no practicable way to "limit the scope of the TRO" that would not "leave[] out at least some" of those protected individuals.  *Washington*, 847 F.3d at 1166.

Moreover, as the Ninth Circuit also held, the court should not "limit the geographic scope of the TRO."  *Id.*  "[S]uch a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy."  *Id.* at 1166-67 (citing *Texas*, 809 F.3d at 187-188);

*see* U.S. Const. art. I, § 8, cl. 4 (requiring "an *uniform* Rule of Naturalization" (emphasis added)).  In addition, the Ninth Circuit has held that a "nationwide injunction * * * is compelled by the text of the Administrative Procedure Act," one of the causes of action under which the Plaintiffs have brought their statutory and constitutional claims.  *Earth Island Inst.* v. *Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2006), *rev'd in part on other grounds*, 555 U.S. 488 (2009).  And in light of "the nation's multiple ports of entry and interconnected transit system," and the State's geographic remoteness, limiting the injunction to Hawaiʻi would not adequately prevent the State and its citizens from suffering the irreparable harms described above.  *Washington*, 847 F.3d at 1167.

## <u>CONCLUSION</u>

For decades Hawaiʻi has endeavored to consign to history the memories of Japanese internment and the Chinese Exclusion Acts.  It has tried to build a society of openness and inclusion, and to welcome visitors of all nations and religions to its shores, its universities, and its economy.  The State and its citizens, including Dr. Elshikh, should not be compelled to endure discrimination and mistreatment at the hands of their own Government.  The Constitution and laws of this country stand as a bulwark against such Executive acts.  The Order should be enjoined.

DATED: Washington, D.C., March 8, 2017.

Respectfully submitted,

*/s/ Neal K. Katyal*

DOUGLAS S. CHIN (Bar No. 6465)
  Attorney General of the State of Hawaiʻi
CLYDE J. WADSWORTH (Bar No. 8495)
  Solicitor General of the State of Hawaiʻi
DEIRDRE MARIE-IHA (Bar No. 7923)
DONNA H. KALAMA (Bar No. 6051)
KIMBERLY T. GUIDRY (Bar No. 7813)
ROBERT T. NAKATSUJI (Bar No. 6743)
  Deputy Attorneys General

DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAIʻI
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
Email: deirdre.marie-iha@hawaii.gov

NEAL K. KATYAL*
COLLEEN ROH SINZDAK*
MITCHELL P. REICH*
ELIZABETH HAGERTY*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email:
neal.katyal@hoganlovells.com

THOMAS P. SCHMIDT*
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW*
ALEXANDER B. BOWERMAN*
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Admitted Pro Hac Vice*

*Attorneys for Plaintiff, State of Hawaiʻi*

*Attorneys for Plaintiffs, State of Hawaiʻi and Ismail Elshikh*