**ALSTON HUNT FLOYD & ING**

Louise K.Y. Ing          2396
Claire Wong Black        9645
1001 Bishop Street, Suite 1800
Honolulu, Hawai`i 96813
Telephone:  (808) 524-1800
Facsimile:  (808) 524-4591
Email:      ling@ahfi.com
            cblack@ahfi.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Pratik A. Shah (*pro hac pending*)
Robert S. Strauss Building
1333 New Hampshire Avenue, NW
Washington, DC 20036-1564
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288
Email: pshah@akingump.com

*Attorneys for Amici Curiae*

(See Next Page for Additional Counsel)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI`I

| | |
|---|---|
| STATE OF HAWAI`I and ISMAIL ELSHIKH,<br><br>                    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,<br><br>                    Defendants. | Case No. 1:17-CV-00050 DKW-KJM<br><br>**BRIEF OF THE FRED T. KOREMATSU CENTER FOR LAW AND EQUALITY, JAY HIRABAYASHI, HOLLY YASUI, KAREN KOREMATSU, CIVIL RIGHTS ORGANIZATIONS, AND NATIONAL BAR ASSOCIATIONS OF COLOR, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS** |

## ADDITIONAL COUNSEL

Eric Yamamoto          2337
Fred T. Korematsu Professor of
Law and Social Justice
2515 Dole Street
Honolulu, Hawai`i 96822
Telephone:  (808) 956-6548
Facsimile:   (808) 956-5569
Email: ericy@hawaii.edu

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Robert A. Johnson (*pro hac pending*)
One Bryant Park
New York, NY 10036
Telephone:  (212) 872-1000
Facsimile:   (212) 872-1002
Email: rajohnson@akingump.com

Jessica M. Weisel (*pro hac pending*)
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
Telephone:  (310) 229-1000
Facsimile:   (310) 229-1001
Email: jweisel@akingump.com

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE* ............................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................6

ARGUMENT ......................................................................................................9

    I.     THE "PLENARY POWER" DOCTRINE ORIGINATED
            FROM RACIST NOTIONS THAT COURTS NOW REJECT. ........9

    II.    *KOREMATSU* STANDS AS A STARK REMINDER OF THE
            NEED FOR VIGILANT JUDICIAL REVIEW OF
            GOVERNMENTAL ACTION TARGETING DISFAVORED
            GROUPS IN THE NAME OF NATIONAL SECURITY................16

CONCLUSION ...................................................................................................21

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aziz v. Trump*, No. 17-cv-00116-LMB-TCB (E.D. Va. Feb. 13, 2017),
(ECF No. 111) ........................................................................................... 8

*Chae Chan Ping v. United States*,
130 U.S. 581 (1889) ............................................................ 7, 9, 10, 11

*Fong Yue Ting v. United States*,
149 U.S. 698 (1893) .............................................................. 10, 11, 12

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ................................................................................ 12

*Hirabayashi v. United States*,
320 U.S. 81 (1943) .............................................................................. 1, 17

*Hirabayashi v. United States*,
828 F.2d 591 (9th Cir. 1987) ............................................................ 19

*Kerry v. Din*,
135 S. Ct. 2128 (2015) .................................................................. 14, 15

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ........................................................................ 14, 15

*Korematsu v. United States*,
323 U.S. 214 (1944) .................................................................*passim*

*Korematsu v. United States*,
584 F. Supp. 1406 (N.D. Cal. 1984) .............................................. 9, 19

*Landon v. Plasencia*,
459 U.S. 21 (1982) ................................................................................ 13

*Reno v. Flores*,
507 U.S. 292 (1993) .............................................................................. 13

*Shaughnessy v. United States ex rel. Mezei*,
345 U.S. 206 (1953) ........................................................................ 12, 13

*State of Wash. v. Trump*,
847 F.3d 1151 (9th Cir. 2017) .............................................................7, 8, 14, 15

*Yasui v. United States*,
320 U.S. 115 (1943) ......................................................................................1, 17

*Yasui v. United States*,
772 F.2d 1496 (9th Cir. 1985) ...........................................................................19

*Zadvydas v. Davis*,
533 U.S. 678 (2001) ...........................................................................................13, 14

**Other Authorities**

Executive Order No. 13780, "Protecting the Nation from Foreign
Terrorist Entry into the United States," 82 Fed. Reg. 13209 (Mar.
6, 2017) .................................................................................................................6

Executive Order No. 13769, "Protecting the Nation from Foreign
Terrorist Entry into the United States," 82 Fed. Reg. 8977 (Jan. 27,
2017) .....................................................................................................................6

Executive Order No. 9066, "Authorizing the Secretary of War to
Prescribe Military Areas," 7 Fed. Reg. 1407 (Feb. 19, 1942)...........................17

Greene, Jamal, *The Anticanon*, 125 HARV. L. REV. 379 (2011)..............................20

Katyal, Neal K., *The Solicitor General and Confession of Error*, 81
FORDHAM L. REV. 3027 (2012-2013) ................................................................19

Paulsen, Michael Stokes*, Symposium: The Changing Laws of War:
Do We Need a New Legal Regime After September 11?: The
Constitution of Necessity*, 79 NOTRE DAME L. REV. 1257 (2004).....................20

Saito, Natsu Taylor, *The Enduring Effect of the Chinese Exclusion
Cases: The Plenary Power Justification for On-Going Abuses of
Human Rights,* 10 ASIAN AM. L.J. 13 (2003) .....................................................10

U.S. Dep't of Justice, *Confession of Error: The Solicitor General's
Mistakes During the Japanese-American Internment Cases* (May
20, 2011) .............................................................................................................19

## INTEREST OF *AMICI CURIAE*

The Fred T. Korematsu Center for Law and Equality ("Korematsu Center") is a non-profit organization based at the Seattle University School of Law. The Korematsu Center works to advance justice through research, advocacy, and education.  Inspired by the legacy of Fred Korematsu, who defied military orders during World War II that ultimately led to the unlawful incarceration of 110,000 Japanese Americans, the Korematsu Center works to advance social justice for all. The Korematsu Center does not, in this brief or otherwise, represent the official views of Seattle University.

The Korematsu Center has a special interest in addressing government action targeted at classes of persons based on race, nationality, or religion. Drawing on its experience and expertise, the Korematsu Center seeks to ensure that courts understand the historical—and, at times, profoundly unjust—underpinnings of arguments asserted to support the exercise of such unchecked executive power.

Jay Hirabayashi, Holly Yasui, and Karen Korematsu are children of three Japanese Americans who challenged the government's racial curfew and detention programs in the United States Supreme Court during World War II: Gordon Hirabayashi (*see Hirabayashi v. United States*, 320 U.S. 81 (1943)); Minoru Yasui (*see Yasui v. United States*, 320 U.S. 115 (1943)); and Fred Korematsu (*see Korematsu v. United States*, 323 U.S. 214 (1944)).  Their interest

is in reminding this court of the legacy those judicial decisions had on their generation and will have on future generations, and the impact of judicial decisions that fail to protect men, women, and children belonging to disfavored groups in the name of national security.  Guilt, loyalty, and threat are individual attributes. When these attributes are imputed to racial, religious, or national origin groups, courts play a crucial role in ensuring that there is a legitimate basis.  Disaster has occurred when courts have refused to play this role.

During World War II, Gordon Hirabayashi, Minoru Yasui, and Fred Korematsu stood largely alone.  Here, their children are gratified to have such a broad coalition standing with them, and together, standing with those communities and individuals most directly harmed by the Executive Order:

Asian Americans Advancing Justice ("Advancing Justice") is the national affiliation of five nonprofit, nonpartisan civil rights organizations: Asian Americans Advancing Justice – AAJC, Asian Americans Advancing Justice – Asian Law Caucus, Asian Americans Advancing Justice – Atlanta, Asian Americans Advancing Justice – Chicago, and Asian Americans Advancing Justice – Los Angeles.  Members of Advancing Justice routinely file *amicus curiae* briefs in cases in the federal courts.  Through direct services, impact litigation, policy advocacy, leadership development, and capacity building, the Advancing Justice affiliates advocate for marginalized members of the Asian American, Native

Hawaiian, Pacific Islander and other underserved communities, including immigrant members of those communities.

The Asian American Legal Defense and Education Fund ("AALDEF"), founded in 1974, is a national organization that protects and promotes the civil rights of Asian Americans. By combining litigation, advocacy, education, and organizing, AALDEF works with Asian American communities across the country to secure human rights for all. The President's Executive Order, which would curtail the rights of immigrants to be free from discrimination because of their race, national origin, or religion, raises issues central to AALDEF's mission. In 1982, AALDEF testified before the U.S. Commission on Wartime Relocation and Internment of Civilians, in support of reparations for Japanese Americans forcibly relocated and imprisoned in camps during World War II. After 9/11, AALDEF represented more than 800 individuals from Muslim-majority countries who were called in to report to immigration authorities under the Special Registration ("NSEERS") program. AALDEF is currently providing community education and legal counseling to Asian Americans affected by the challenged Executive Order.

The Hispanic National Bar Association ("HNBA") is comprised of thousands of Latino lawyers, law professors, law students, legal professionals, state and federal judges, legislators, and bar affiliates across the country. The HNBA

supports Hispanic legal professionals and is committed to advocacy on issues of importance to the 53 million people of Hispanic heritage living in the United States.  The HNBA regularly participates as *amicus curiae* in cases concerning immigration and the protection of refugees.

The Japanese American Citizens League of Hawaii, Honolulu Chapter ("JACL Honolulu") is a non-profit corporation under Section 501(c)(3) of the Internal Revenue Code based in Honolulu, Hawaii.  JACL Honolulu draws upon Hawaii's rich, multi-ethnic society and strong cultural values, with a particular focus on discrimination and intolerance towards all people victimized by injustice and prejudice.  JACL Honolulu has supported redress for Japanese Americans interned unfairly under Executive Order 9066, in addition to working on and sponsoring annual events to commemorate and educate the public regarding the internment and Executive Order 9066 as well as the suffering and injustice that stemmed from these wrongful actions.  The President's new Executive Order concerning immigration and refugee admissions discriminates based on race, national origin, or religion, and is reminiscent of Executive Order 9066 that paved the way for the mass incarceration of thousands of Japanese Americans.  The history of Japanese Americans and Executive Order 9066 closely parallels current actions targeting Muslims under the President's new Executive Order.  This injustice is one of the core reasons for the founding of the JACL Honolulu chapter.

LatinoJustice PRLDEF, Inc. ("LatinoJustice") is a national not-for-profit civil rights legal defense fund that has defended the constitutional rights and equal protection of all Latinos under the law.  LatinoJustice's continuing mission is to promote the civic participation of the greater pan-Latino community in the United States, to cultivate Latino community leaders, and to engage in and support law reform litigation across the country addressing criminal justice, education, employment, fair housing, immigrants' rights, language rights, redistricting, and voting rights.  During its 45-year history, LatinoJustice has litigated numerous cases in both state and federal courts challenging multiple forms of racial discrimination by government actors including law enforcement practices that illegally target racial groups based upon their race, national origin and immigration status.

The National Bar Association ("NBA") is the largest and oldest association of predominantly African-American attorneys and judges in the United States.  The NBA was founded in 1925 when there were only 1,000 African-American attorneys in the entire country and when other national bar associations, such as the American Bar Association, did not admit African-American attorneys.  Throughout its history, the NBA consistently has advocated on behalf of African Americans and other minority populations regarding issues affecting the legal profession.  The NBA represents approximately 66,000 lawyers, judges, law

professors, and law students, and it has over eighty affiliate chapters throughout the world.

The South Asian Bar Association of North America ("SABA") is the umbrella organization for 26 regional bar associations in North America representing the interests of over 6,000 attorneys of South Asian descent.  SABA provides a vital link for the South Asian community to the law and the legal system.  Within the United States, SABA takes an active interest in the legal rights of South Asian and other minority communities. Members of SABA include immigration lawyers and others who represent persons that have been and will be affected by the Executive Order.

## INTRODUCTION AND SUMMARY OF ARGUMENT

History has taught us the risk of everlasting stains to this Nation's constitutional fabric when the Judiciary turns a blind eye to broad-scale governmental actions targeting particular racial, ethnic, or religious groups.  In light of that history, this court must not abdicate its constitutional duty to critically review Executive Order No. 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States," 82 Fed. Reg. 13209 (Mar. 6, 2017) ("Executive Order").

The Executive Order replaces Executive Order No. 13769, 82 Fed. Reg. 8977 (Jan. 27, 2017), which was enjoined by several courts, including the

Western District of Washington in an order affirmed by the Ninth Circuit. *See State of Wash. v. Trump*, 847 F.3d 1151 (9th Cir. 2017). In defending the prior Order, the federal government argued that the President has "unreviewable authority" to suspend the admission of "any class of aliens," regardless of the constitutional rights and protections implicated by his action. *Id.* at 1161; *see also* Emergency Motion Under Circuit Rule 27-3 for Administrative Stay and Motion for Stay Pending Appeal at 2, *State of Wash. v. Trump*, No. 17-35105 (9th Cir. Feb. 4, 2017). For that sweeping contention, the government invoked the so-called "plenary power" doctrine—a doctrine whose limited role in modern American jurisprudence cannot bear the weight of the government's arguments.

The plenary power doctrine derives from decisions such as *Chae Chan Ping v. United States*, 130 U.S. 581 (1889) ("*Chinese Exclusion Case*"), which were premised on racist and nativist precepts we now reject. In upholding a law that prohibited Chinese laborers from returning to the United States, the *Chinese Exclusion Case* relied on pejorative stereotypes to eschew judicial scrutiny. Hearkening back to dissents from early cases, and informed by contemporary norms and the lessons of history, modern courts have refused to afford complete deference to executive and legislative decisions in the realm of immigration.

To that end, the Ninth Circuit emphatically rejected the federal government's contention that the President's authority to "suspend any class of aliens" is "unreviewable," explaining that the proposition finds no support in precedent and "runs contrary to the fundamental structure of our . . . democracy." 847 F.3d at 1161. *See also* Mem. Op., *Aziz v. Trump*, No. 17-cv-00116-LMB-TCB (E.D. Va. Feb. 13, 2017), ECF No. 111, at 10-12. Moreover, the court of appeals admonished, judicial review is acutely important—and unbounded plenary power is particularly untenable—where, as here, the governmental action being challenged promulgates a broadly-applicable policy targeting groups based on characteristics such as race, religion, or national origin. *See* 847 F.3d at 1162.

Such action, in the name of national security, is all too familiar to the Korematsu Center, which owes its existence to the forced relocation and incarceration during World War II of more than 110,000 men, women, and children of Japanese descent that was challenged—to no avail—in *Korematsu v. United States*, 323 U.S. 214 (1944). Decades later, upon finally vacating Mr. Korematsu's conviction for defying the baseless military order, a federal court observed that the *Korematsu* precedent "stands as a constant caution that in times of war or declared military necessity our institutions must be vigilant in protecting constitutional guarantees"; "national security must not be used to protect governmental actions from close scrutiny and accountability"; and courts "must be

prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused." *Korematsu v. United States*, 584 F. Supp. 1406, 1420 (N.D. Cal. 1984).

That caution must be heeded here, and the new Executive Order must be subjected to the same close judicial scrutiny used to enjoin the prior Order.

## ARGUMENT

### I. THE "PLENARY POWER" DOCTRINE ORIGINATED FROM RACIST NOTIONS THAT COURTS NOW REJECT.

1. To the extent the Supreme Court ever recognized a truly "plenary" power in the immigration realm that would preclude judicial review of any constitutional claims (which it has not), that conception is linked to racist attitudes from a past era and has long since fallen out of favor.

In the *Chinese Exclusion Case*, the Court upheld a statute preventing the return of Chinese laborers who had departed the United States prior to its passage. 130 U.S. at 581-582. Describing the reasons underlying the law's enactment, the Court characterized Chinese laborers as "content with the simplest fare, such as would not suffice for our laborers and artisans," and observed that they remained "strangers in the land, residing apart by themselves[,] . . . adhering to the customs and usages of their own country" and unable "to assimilate with our people." *Id.* at 595. "The differences of race added greatly to the difficulties of the situation." *Id.* Residents of the West coast, the Court explained, warned of an

"Oriental invasion" and "saw or believed they saw . . . great danger that at no distant day [the West] would be overrun by them, unless prompt action was taken to restrict their immigration." *Id.*

Far from applying a skeptical eye to the law in light of the clear animus motivating its passage, the Court found that "[i]f the government of the United States, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security . . . its determination is conclusive upon the judiciary." *Id.* at 606. *See also* Natsu Taylor Saito, *The Enduring Effect of the Chinese Exclusion Cases: The Plenary Power Justification for On-Going Abuses of Human Rights*, 10 ASIAN AM. L. J. 13, 15 (2003). In reality, the "right of self-preservation" that the Court validated as justification for the government's unbounded power to exclude immigrants was ethnic and racial self-preservation, not the preservation of borders or national security. 130 U.S. at 608; *see id.* at 606 ("It matters not in what form . . . aggression and encroachment come, whether from the foreign nation acting in its national character, or from vast hordes of its people crowding in upon us."). Similar racist and xenophobic attitudes are evident in decisions following the *Chinese Exclusion Case*. *See, e.g.*, *Fong Yue Ting v. United States*, 149 U.S. 698, 729-30 (1893) (upholding requirement that Chinese resident aliens offer "at least one credible white witness" in order to remain in the

country); *id.* at 730 (noting Congress's belief that testimony from Chinese witnesses could not be credited because of "the loose notions entertained by the witnesses of the obligation of an oath" (quoting *Chinese Exclusion Case*, 130 U.S. at 598)).

2.      While the Court's early plenary power decisions were undoubtedly influenced by such attitudes now repudiated, the Court nonetheless recognized that the government's sovereign authority is subject to constitutional limitations. *See Chinese Exclusion Case*, 130 U.S. at 604 ("[S]overeign powers[] [are] restricted in their exercise only by the constitution itself and considerations of public policy and justice which control, more or less, the conduct of all civilized nations."). And even in those early years, the Court divided over the reach of the government's plenary power in light of those limitations. *Fong Yue Ting*, which upheld a law requiring Chinese laborers residing in the United States to obtain a special certificate of residence to avoid deportation, generated three dissenting opinions. *See* 149 U.S. at 738 (Brewer, J., dissenting) ("I deny that there is any arbitrary and unrestrained power to banish residents, even resident aliens."); *id.* at 744 (Field, J., dissenting); *id.* at 762 (Fuller, J., dissenting) (similar). Even Justice Field, who authored the Court's opinion in the *Chinese Exclusion Case*, sought to limit the plenary power doctrine's application with regard to alien residents:

> As men having our common humanity, they are protected by all the
> guaranties of the constitution. To hold that they are subject to any

> different law, or are less protected in any particular, than other persons, is, in my judgment, to ignore the teachings of our history, the practice of our government, and the language of our constitution.

*Id.* at 754 (Fields, J., dissenting).

Nearly 60 years later, judicial skepticism regarding an unrestrained plenary power persisted—and grew.  Dissenting in *Harisiades v. Shaughnessy*, 342 U.S. 580 (1952), which upheld a provision permitting the deportation of resident aliens who were members of the Communist Party, Justice Douglas quoted Justice Brewer's dissent in *Fong Yue Ting*, observing that it "grows in power with the passing years":

> This doctrine of powers inherent in sovereignty is one both indefinite and dangerous . . . .  The governments of other nations have elastic powers. *Ours are fixed and bounded by a written constitution. The expulsion of a race may be within the inherent powers of a despotism.* History, before the adoption of this constitution, was not destitute of examples of the exercise of such a power; and its framers were familiar with history, and wisely, as it seems to me, they gave to this government no general power to banish.

*Id.* at 599-600 (Douglas, J., dissenting) (quoting *Fong Yue Ting*, 149 U.S. at 737-738 (Brewer, J., dissenting)) (emphasis added).

In another McCarthy-era precedent, four Justices advocated for limitations on the plenary power doctrine.  In *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), the Court rejected any constitutional challenge to the exclusion of an alien who had previously resided in the United States, despite his resulting detention at Ellis Island.  In dissent, Justice Black, joined by Justice

Douglas, reasoned that "[n]o society is free where government makes one person's liberty depend upon the arbitrary will of another." *Id.* at 217. "Dictatorships," he observed, "have done this since time immemorial. They do now." *Id.* Justice Jackson, joined by Justice Frankfurter, added that, while in his view the "detention of an alien would not be inconsistent with substantive due process," such individuals must be "accorded procedural due process of law." *Id.* at 224.

**3.** Perhaps reflective of the shift away from race-based characterizations and other outdated notions prevalent in its early plenary power precedents, the Court in recent years has been more willing to enforce constitutional limitations on the federal government's authority over immigration matters.

For example, in *Reno v. Flores*, 507 U.S. 292 (1993), the Court held that, despite the broad power of the political branches over immigration, INS regulations must at least "rationally advanc[e] some legitimate governmental purpose." *Id.* at 306. In *Landon v. Plasencia*, 459 U.S. 21 (1982), the Court affirmed that a resident alien returning from a brief trip abroad must be afforded due process in an exclusion proceeding, notwithstanding the government's expansive discretion to exclude. *Id.* at 33. And in *Zadvydas v. Davis*, 533 U.S. 678 (2001), in response to the government's contention that "Congress has 'plenary power' to create immigration law, and . . . the Judicial Branch must defer

to Executive and Legislative Branch decisionmaking in that area," the Court observed that such "power is subject to important constitutional limitations." *Id.* at 695 (citations omitted). "[F]ocus[ing] upon those limitations," *id.*, the Court determined that the indefinite detention of aliens deemed removable would raise "serious constitutional concerns" and accordingly construed the statute at issue to avoid those problems, *id.* at 682. *See also State of Wash.*, 847 F.3d at 1162-1163 (collecting cases demonstrating reviewability of federal government action in immigration and national security matters).

Indeed, even decisions the federal government cited in defending the prior Executive Order do not support the invocation of the plenary power doctrine in the present context. The Court's most recent decision in this area (on which the government relied) in fact suggests that, after more than a century of erosion, the plenary power doctrine as the federal government conceives it no longer exists.

In *Kerry v. Din*, 135 S. Ct. 2128 (2015), the Supreme Court considered a due process claim arising from the denial without adequate explanation of a spouse's visa application. Although it described the power of the political branches over immigration as "plenary," Justice Kennedy's concurring opinion in *Din* makes clear that courts may review an exercise of that power to ensure that the reason offered for the exclusion of an alien is "legitimate and bona fide." Justice Kennedy explained that, although the Court in *Kleindienst v.*

14

*Mandel*, 408 U.S. 753 (1972), had declined to balance the constitutional rights of American citizens injured by a visa denial against "Congress's 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden,'" *Kerry*, 135 S. Ct. at 2139 (quoting *Mandel*, 408 U.S. at 766), the Court did inquire "whether the Government had provided a 'facially legitimate and bona fide' reason for its action," *id.* at 2140 (quoting *Mandel*, 408 U.S. at 770).   And while as a general matter courts are instructed not to "look behind" the government's asserted reason for its decision provided it is "bona fide and legitimate," Justice Kennedy stated that exceptions to that rule would apply if the challenger made "an affirmative showing of bad faith." *Id.* at 2141.

To be sure, Justice Kennedy's opinion in *Din* acknowledged that the political branches are entitled to wide latitude and deference in immigration matters.   But, as the Ninth Circuit recognized, *Din* (and *Mandel* before it) concerned an *individual* visa denial on the facts of that case.   By contrast, the Executive Order sets a nationwide immigration policy, presumptively suspending entry and foreclosing visa adjudications for most aliens of certain nationalities. While it may be sensible for courts to defer to the judgment of the political branches when considering the application of immigration law to a particular alien, "the President's *promulgation* of a sweeping immigration policy," 847 F.3d at

1162—especially one aimed at nationals of particular countries likely to share a common religion—is properly the subject of closer judicial scrutiny. Recognizing that critical distinction, the Ninth Circuit determined that the standard cited in *Din* plainly does not apply to the Executive Order. *Id.*

All told, the proposition that courts may not review the Executive Order is unsupported by modern judicial precedent. Even in cases concerning individual visa denials, the Court has inquired as to whether the government offered a "legitimate and bona fide" reason for the denial and has indicated that courts may look behind the asserted rationale in circumstances suggesting bad faith. Where, as here, the court is asked to review a broadly-applicable policy—promulgated at the highest level of the Executive Branch and targeting aliens based on nationality and religion—precedent and common sense demand a more searching judicial review. But whatever the standard, there is no basis for finding that the Executive Order is immune from judicial scrutiny.

## II.   *KOREMATSU* STANDS AS A STARK REMINDER OF THE NEED FOR VIGILANT JUDICIAL REVIEW OF GOVERNMENTAL ACTION TARGETING DISFAVORED GROUPS IN THE NAME OF NATIONAL SECURITY.

In telling the Ninth Circuit and other courts that the President's discretion to exclude "any class of aliens" is plenary and unreviewable—and, in any event, is justified by national security—the federal government asked the courts to take its word for it. But the notion that the political branches might use

national security as a smokescreen to discriminate against disfavored classes is not an unfounded concern—it is validated by the tragic chapter in our Nation's history that gave rise to *Korematsu v. United States*, 323 U.S. 214 (1944).

Seventy-five years ago, President Roosevelt issued Executive Order No. 9066, which authorized the Secretary of War to designate military areas from which "any or all persons" could be excluded and "with respect to which, the right of any person to enter, remain in, or leave" would be subject to "whatever restrictions the Secretary of War or the appropriate Military Commander may impose." Executive Order No. 9066, "Authorizing the Secretary of War to Prescribe Military Areas," 7 Fed. Reg. 1407 (Feb. 19, 1942). Although it did not explicitly refer to Japanese Americans, that Order resulted in the forcible relocation and incarceration of more than 110,000 men, women, and children of Japanese descent. Fred Korematsu, one of those Japanese Americans, was convicted for defying the military's invocation of the order. The Supreme Court upheld his conviction, along with the convictions of Gordon Hirabayashi and Minoru Yasui, thus effectively sanctioning Japanese-American incarceration during World War II on the purported basis of military necessity. *Korematsu v. United States*, 323 U.S. 214 (1944); *see also Hirabayashi v. United States*, 320 U.S. 81 (1943); *Yasui v. United States*, 320 U.S. 115 (1943).

The Court's decision in *Korematsu* produced vigorous dissents, including one by Justice Murphy, who questioned the validity of the military interest the government advanced.  Although acknowledging that the discretion of those entrusted with national security matters "must, as a matter of . . . common sense, be wide," *Korematsu*, 323 U.S. at 234, Justice Murphy opined that "[i]t is essential that there be definite limits to military discretion" and that individuals not be "left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." *Id.*  In his view, the Order "clearly d[id] not meet th[is] test" as it relied "for its reasonableness upon the assumption that all persons of Japanese ancestry may have a dangerous tendency to commit sabotage and espionage." *Id.* at 235.  While conceding that "there were some disloyal persons of Japanese descent on the Pacific Coast," Justice Murphy dismissed the "infer[ence] that examples of individual disloyalty prove group disloyalty and justify discriminatory action against the entire group" as nothing more than "th[e] legalization of racism." *Id.* at 240-241, 242.

History has proven Justice Murphy right.  More than a half-century after the Court's decision, the Acting Solicitor General acknowledged that, contrary to its representations, the federal government knew at the time of the mass incarcerations that only "a small percentage of Japanese Americans posed a potential security threat, and that the most dangerous were already known or in

custody."  U.S. Dep't of Justice, *Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases* (May 20, 2011), https://www.justice.gov/opa/blog/confession-error-solicitor-generals-mistakes-during-japanese-american-internment-cases; *see also* Neal K. Katyal, *The Solicitor General and Confession of Error*, 81 FORDHAM L. REV. 3027 (2012-2013).  The federal government's revelation occurred decades after a district court reversed Mr. Korematsu's conviction and found "substantial support in the record that the government deliberately omitted relevant information and provided misleading information in papers before the court."  *Korematsu*, 584 F. Supp. at 1420.  The Ninth Circuit made similar findings on its way to vacating Gordon Hirabayashi's convictions.  *See Hirabayashi v. United States*, 828 F.2d 591, 593 (9th Cir. 1987) (observing that, although the Supreme Court accepted the government's contention that "the curfew was justified by military assessments of emergency conditions," available materials demonstrate that "there could have been no reasonable military assessment of an emergency at the time, that the orders were based upon racial stereotypes, and that the orders caused needless suffering and shame for thousands of American citizens") (footnotes omitted); *see also Yasui v. United States*, 772 F.2d 1496 (9th Cir. 1985) (vacating Minoru Yasui's criminal conviction).

The Supreme Court's decision in *Korematsu* gave virtually a blank check to the Executive Branch to take action against disfavored minorities in the

name of national security.   Although the government asserted a facially valid justification for its action, that justification was later discredited.   The revelation that the government's unprecedented action was not in fact necessary is but one reason that *Korematsu* is not only widely understood as wrongly decided as a matter of law, but remains a black mark on our Nation's history and serves as a stark reminder of the dire consequences that result when abuses by the political branches go unchecked by the Judiciary.   *See, e.g.*, Michael Stokes Paulsen, *Symposium: The Changing Laws of War: Do We Need A New Legal Regime After September 11?: The Constitution of Necessity*, 79 NOTRE DAME L. REV. 1257, 1259 (2004) (Complete "judicial acquiescence or abdication" of performing checks on Presidential power "has a name.  That name is Korematsu").

Korematsu, along with *Plessy v. Ferguson*, is regarded as "embod[ying] a set of propositions that all legitimate constitutional decisions must be prepared to refute."  Jamal Greene, *The Anticanon*, 125 HARV. L. REV. 379, 380 (2011).  History may look similarly at this period if courts allow the Executive Order to evade robust review based on a plenary power doctrine rooted in outdated notions and xenophobia, or an unwillingness to apply healthy judicial skepticism to governmental action taken in the name of national security.  This court should not abdicate its duty to stand as a bulwark against governmental action that undermines our core constitutional principles.

## CONCLUSION

For the foregoing reasons, this court should grant the relief sought by

Plaintiffs.

DATED: Honolulu, Hawai`i, March 10, 2017.

Respectfully submitted,


 /s/ LOUISE K.Y. ING
LOUISE K.Y. ING
CLAIRE WONG BLACK
PRATIK A. SHAH*
ROBERT A. JOHNSON*
JESSICA M. WEISEL*
ERIC YAMAMOTO
Attorneys for *amici curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to LR7.5(e) of the Local Rules of Practice for the

United States District Court for the District of Hawai`i, that the attached brief uses

Times New Roman 14-point font and contains a total of 5,320 words, based on the

word count program in Microsoft Word.


DATED: Honolulu, Hawai`i, March 10, 2017.

Respectfully submitted,


 /s/ LOUISE K.Y. ING

LOUISE K. Y. ING
CLAIRE WONG BLACK
PRATIK A. SHAH*
ROBERT A. JOHNSON*
JESSICA M. WEISEL*
ERIC YAMAMOTO
Attorneys for *amici curiae*

* *pro hac vice application pending*