# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| STATE OF HAWAI'I and ISMAIL ELSHIKH, | |
| *Plaintiffs*, | MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA, | Civ. No. 1:17-cv-00050-DKW-KSC |
| *Defendants.* | |

Aaron X. Fellmeth (admitted *pro hac vice*)
Arizona State University
Sandra Day O'Connor College of Law
Mail Code 9520
111 E. Taylor St.
Phoenix, AZ  85004-4467
(480) 241-8414
aaron.fellmeth@asu.edu

Clare Hanusz (No. 007336)
David P. McCauley (No. 006065)
Damon Key Leong Kupchak Hastert
1003 Bishop St. Ste. 1600
Honolulu, HI  96813
(808) 531-8031
dpm@hawaiilawyer.com

*Counsel for* Amici Curiae

**MOTION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF ON BEHALF OF INTERNATIONAL LAW SCHOLARS AND NONGOVERNMENTAL ORGANIZATIONS**

Counsel for *amici curiae* international law scholars and nongovernmental organizations hereby move this Court for an order allowing it to file the attached *amicus curiae* brief in support of Plaintiffs, the State of Hawai'i and Ismail Elshikh.  In support of this motion, the movant states:

1.      The international law scholars specializing in public international law and international human rights law whose views will be represented in the attached *amicus* brief are members of the International Human Rights Committee of the International Law Association, American Branch and the Human Rights Interest Group of the American Society of International Law,[1] as well as university professors and practicing lawyers with expertise in these subjects.  The nongovernmental organizations whose views are represented in this brief have expertise in civil rights law, immigration law, or international human rights law.  The individuals and organizations comprising the *amici* are annexed to the attached brief.

2.      Movants submit this brief to vindicate the public interest in ensuring a proper understanding and application of the international human rights law relevant to this case.  Many of the *amici* are additionally human rights advocates and have a professional interest in ensuring an informed interpretation of international human rights law in our domestic jurisprudence. International law is a field of great complexity, in which *amici* have unique expertise.

---

[1] This brief represents the opinion of the Committee and Interest Group members, but not necessarily that of the American Society of International Law, the International Law Association ("ILA"), or the ILA American Branch.

3.      The Executive Order of March 6, 2017, threatens *amici*'s ability to perform their functions as international lawyers and international human rights advocates by putting the United States in violation of its international human rights law obligations.

4.      Plaintiffs have consented to the filing of this brief, and defendants have stated that they take no position regarding it.

5.      For the foregoing reasons, we respectfully request the Court's permission to file the *amicus* brief attached hereto.  In the alternative, we request a pre-motion conference with the Court for leave to file such a brief.

Respectfully submitted,                                          Dated: Mar. 11, 2017


_____          _____/s/ David P. McCauley_____
Aaron X. Fellmeth (admitted *pro hac vice*)       David P. McCauley (No. 006065)
Arizona State University                          Damon Key Leong Kupchak Hastert
Sandra Day O'Connor College of Law                1003 Bishop St. Ste. 1600
Mail Code 9520                                    Honolulu, HI  96813
111 E. Taylor St.                                 (808) 531-8031
Phoenix, AZ  85004-4467                            dpm@hawaiilawyer.com
(480) 241-8414
aaron.fellmeth@asu.edu


_____/s/ Clare Hanusz_____
Clare Hanusz (No. 007336)
Damon Key Leong Kupchak Hastert
1003 Bishop St. Ste. 1600
Honolulu, HI  96813
(808) 531-8031
cmh@hawaiilawyer.com

*Counsel for* Amici Curiae

**No. 1:17-cv-00050-DKW-KSC**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

---

STATE OF HAWAI'I, et al.,
*Plaintiffs*,

v.

DONALD TRUMP, President of the United States, et al.,
*Defendants*.

---

---

## BRIEF OF INTERNATIONAL LAW SCHOLARS AND
## NONGOVERNMENTAL ORGANIZATIONS
## AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS

---

AARON X. FELLMETH (*pro hac vice*)
Arizona State University, Sandra Day
   O'Connor College of Law
Mail Code 9520
111 E. Taylor St.
Phoenix, AZ  85004-4467
(480) 241-8414
aaron.fellmeth@asu.edu

CLARE M. HANUSZ (No. 007336)
DAVID P. MCCAULEY (No. 006065)
Damon Key Leong Kupchak Hastert
1003 Bishop St. Ste. 1600
Honolulu, HI  96813
(808) 531-8031
cnh@hawaiilawyer.com

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* state the following:

(1)      They have no parent corporations; and

(2)      There are no publicly held corporations that own 10% or more of their stock.

## CONSENT OF THE PARTIES

Counsel for the State of Hawaiʻi and Ismail Elshikh have consented to the filing of this brief.  Counsel for Defendants have stated that they take no position regarding the filing of the brief.

March 11, 2017

_____

Aaron X. Fellmeth (*pro hac vice*)
Arizona State University, Sandra Day
    O'Connor College of Law
Mail Code 9520
111 E. Taylor St.
Phoenix, AZ  85004-4467
(480) 241-8414
aaron.fellmeth@asu.edu

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iv

I.      INTEREST OF *AMICI CURIAE* ......................................................................1

II.     INTRODUCTION ...............................................................................................1

III.    ARGUMENT.......................................................................................................2

    A.  International Law Is Relevant to Assessing the Legality of the Executive Order .............. 2

    B.  International Law Regarding Discrimination on the Basis of Religion and
        National Origin ......................................................................................... 6

        1.  The International Covenant on Civil and Political Rights .............................................6

        2.  The International Convention on the Elimination of All Forms of Racial
            Discrimination..........................................................................................9

    C.  Relevant Provisions of the Executive Order .................................................... 11

IV.     CONCLUSION....................................................................................................12

APPENDIX....................................................................................................................14

# TABLE OF AUTHORITIES

**U.S. Cases**                                                                                                **Page**

*F. Hoffmann-La Roche Ltd. v Empagran S.A.*, 542 U.S. 155 (2004) .............................................4
*Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)......................................................................4
*Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804)........................................4
*Paquete Habana*, 175 U.S. 677 (1900)..........................................................................................5
*Sale v. Haitian Centers Council*, 509 U.S. 155 (1994)...................................................................4
*Talbot v. Seeman*, 5 U.S. (1 Cranch) 1 (1801)...............................................................................4
*United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103 (1801) ...................................................5

**Constitution**

U.S. Constitution, art. II...................................................................................................................5
U.S. Constitution, art. VI .................................................................................................................5

**Legislative History**

Congressional Record, Volume 138:
S4781-01 ...........................................................................................................................................6
Congressional Record, Volume 140:
S7634-02 ...........................................................................................................................................9

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment,
    1990, Hearing Before the Comm. on Foreign Relations, U.S. Senate, 101st Cong. (1990), at
    8........................................................................................................................................................3

Senate Comm. on Foreign Relations, Report on International Convention on the Elimination of
    All Forms of  Racial Discrimination, S. Exec. Rep. No. 103-29, at 25 (1994) ........................3

**Executive Orders**

Executive Order 13780: Protecting the Nation from Foreign Terrorist Entry into the United States
    (Mar. 6, 2017), *at* https://www.whitehouse.gov/the-press-office/2017/03/06/executive-order-
    protecting-nation-foreign-terrorist-entry-united-states ................................................... *passim*

**Treaties**

Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,
    June 26, 1987, 1465 U.N.T.S. 113...............................................................................................9
International Convention on the Elimination of All Forms of Racial Discrimination, Dec. 21, 1965,
    G.A. Res. 2106 (XX), Annex, 660 U.N.T.S. 195 ........................................................... 32-37

International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171 (1976) ......................................................................................................................... *passim*

## International Declarations

American Declaration of the Rights and Duties of Man, O.A.S. Res. XXX (1948), Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L/V/I.4 rev. 13, at 13 (2010) ..........................................................................................................8
Universal Declaration of Human Rights, G.A. Res. 217A(III), U.N. Doc. A/810 at 71 (1948) .....8

## Other International Materials

Committee on the Elimination of Racial Discrimination
    Gen. Recommendation No. 35, U.N. Doc. CERD/C/OC/35 (2013) .......................................10
    *TBB-Turkish Union in Berlin/Brandeburg v. Germany*, Commun. No. 48/2010 (Feb. 26, 2013), U.N. Doc. CERD/C/82/D/48/2010 .........................................................................................11

Human Rights Committee
    Gen. Comment No. 15 (1986), U.N. Doc. HRI/GEN/1/Rev.1, at 18 (1994)............................8
    Gen. Comment No. 18, U.N. Doc. HRI/GEN/1Rev.1 at 26 (1994) .........................................7
    Gen. Comment No. 19, U.N. Doc. HRI/GEN/1/Rev.1 at 28 (1994) .......................................7

State Reports—Convention Against Torture—United States of America, U.N. Doc. CAT/C/28/Add.5 (Feb. 9, 2000) ...............................................................................................4

## Other Sources

AARON XAVIER FELLMETH, PARADIGMS OF INTERNATIONAL HUMAN RIGHTS LAW (2016)............7
Alexander Hamilton, *Pacificus No. 1* (June 29, 1793), *reprinted in* 15 THE PAPERS OF ALEXANDER HAMILTON 33 (Harold C. Syrett ed. 1969) .............................................................................5
Hurst Hannum, The Status of the Universal Declaration of Human Rights in National and International Law, 25 GA. J. INT'L & COM. L. 287 (1995/96) ..................................................9
Restatement (Third) of the Foreign Relations Law of the United States........................................3

# I.     INTEREST OF *AMICI CURIAE*[2]

The individual *amici* whose views are presented here are international law scholars specializing in public international law and international human rights law.  They include members of the International Human Rights Committee of the International Law Association, American Branch, and the Human Rights Interest Group of the American Society of International Law,[3] as well as university professors and practicing lawyers with expertise in these subjects.  *Amici* also include nongovernmental organizations with expertise in civil rights law, immigration law, or international human rights law.  *Amici* submit this brief to vindicate the public interest in ensuring a proper understanding and application of the international human rights law relevant to this case.  The nongovernmental organizations and individual scholars are listed in the Appendix.

# II.     INTRODUCTION

The purpose of this brief is to bring to the Court's attention U.S. treaty provisions and customary international law principles that bear on the legality of the Executive Order 13780 of March 6, 2017 ("EO"), which replaces the now-rescinded EO 13769, dated January 27, 2017.

International law, which includes treaties ratified by the United States as well as customary international law, is part of U.S. law and must be faithfully executed by the President and enforced

---

[2]No counsel for a party has authored this brief in whole or in part, and no party or counsel for a party has made a monetary contribution intended to fund the preparation or submission of the brief. No person other than amici curiae or its counsel has made a monetary contribution to the preparation or submission of this brief.  Fed. R. App. P. 29(a)(4)(E).
[3] This brief represents the opinion of the Committee and Interest Group members, not that of the American Society of International Law, International Law Association, or ILA American Branch.

by U.S. courts except when clearly inconsistent with the U.S. Constitution or subsequent acts of Congress.  The United States is a party to and bound by several international human rights treaties relevant to the subject matter of EO.  In assessing the legality of the EO, the Court should be cognizant of those treaty obligations, and of customary international law, which should influence constructions of the U.S. Constitution and statutes that prohibit discrimination based on religion or national origin.

In addition, the Immigration and Nationality Act and other statutes must be read in harmony with these international legal obligations pursuant to the Supremacy Clause of the Constitution and long established principles of statutory construction requiring acts of Congress to be interpreted in a manner consistent with international law, whenever such a construction is reasonably possible.  In this case, the international law obligations described below reinforce interpretations of those statutes forbidding discrimination of the type threatened by Sections 2 and 11 of the EO.

## III.    ARGUMENT

### A.    International Law Is Relevant to Assessing the Legality of the Executive Order

International law is relevant to this case because the U.S. Constitution makes treaties part of U.S. law.  Customary international law is also part of U.S. law and is enforceable by U.S. courts. Under the Supremacy Clause of the Constitution, "treaties made ... under the authority of the United States, shall be the supreme law of the land, and judges of every state shall be bound

thereby."[4]   Although the Constitution does not require legislation prior to treaties taking legal effect, the Supreme Court distinguishes between self-executing and non-self-executing treaties.[5] The Senate or the President have declared that the relevant human rights treaties to which the United States is a party are non-self-executing.[6] Nevertheless, by ratifying those treaties, the United States bound itself to provide judicial or other remedies for violations of treaty obligations.[7] Thus, even if the treaty provisions themselves were not directly enforceable in U.S. courts, the rights they grant should be protected by courts through their interpretation of constitutional provisions and statutes addressing the same or similar subject matter.

This is consistent with the positions taken by both the Executive Branch and Congress in those cases in which Congress has not passed implementing legislation.[8]  When submitting human rights treaties to the Senate for its advice and consent, both Presidents George H.W. Bush and William Clinton assured the Senate that the United States could and would fulfill its treaty commitments by applying existing federal constitutional and statutory law.[9]   Courts generally

---

[4] U.S. Const. art. VI, cl. 2.

[5] *See* Restatement (Third) of Foreign Relations Law § 111(3)-(4) (1987).

[6] *See, e.g.*, 138 Cong. Rec. S4781-01 (daily ed. Apr. 2, 1992) (International Covenant on Civil and Political Rights); Sen. Exec. Rpt. 101-30, Resolution of Advice and Consent to Ratification (1990), at II(2) (Convention Against Torture).

[7] *See, e.g.*, International Covenant on Civil and Political Rights art. 2(2), Dec. 19, 1966, 999 U.N.T.S. 171 (1976) [hereinafter "CCPR"].

[8] *See, e.g.*, U.N. Doc. CAT/C/28/Add.5, paras. 58-60 ("Where domestic law already makes adequate provision for the requirements of the treaty and is sufficient to enable the United States to meet its international obligations, the United States does not generally believe it necessary to adopt implementing legislation.").

[9] During Senate hearings on the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), June 26, 1987, 1465 U.N.T.S. 113, the State Department Legal Advisor told the Senate: "Any public official in the United States, at any level of government, who inflicts torture . . . would be subject to an effective system of control and

construe federal constitutional and statutory law to be consistent with human rights treaties in part because the Senate has relied on such assurances as a basis for its consent to ratification.[10]  The United States acknowledged this principle in its comments to the U.N. Committee Against Torture: "Even where a treaty is 'non-self-executing,' courts may nonetheless take notice of the obligations of the United States thereunder in an appropriate case and may refer to the principles and objectives thereof, as well as to the stated policy reasons for ratification."[11]  "Taking notice" of treaty obligations comports with a core principle of statutory construction announced by the Supreme Court in *Murray* v. *The Charming Betsy*: "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."[12]  That doctrine has been consistently and recently reaffirmed by the Supreme Court.[13]

Moreover, in *Filartiga v. Pena-Irala*, the U.S. Court of Appeals for the Second Circuit observed that a treaty that is not self-executing may provide evidence of customary international law.[14]  Customary international law must be enforced in U.S. courts even in the absence of

---

punishment in the U.S. legal system." Hearing Before the Comm. on Foreign Relations, U.S. Senate, 101st Cong. (1990), at 8.
    Similarly, with respect to the International Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), Dec. 21, 1965, G.A. Res. 2106 (XX), Annex, 660 U.N.T.S. 195, the Clinton Administration told the Senate: "As was the case with the prior treaties, existing U.S. law provides extensive protections and remedies sufficient to satisfy the requirements of the present Convention." Senate Comm. on Foreign Relations, Report on International Convention on the Elimination of All Forms of Racial Discrimination, S. Exec. Rep. No. 103-29, at 25-26 (1994).
[10] *See, e.g.*, Immigration & Naturalization Serv. v. Stevic, 467 U.S. 407, 426 (1984).
[11] State Reports—Convention Against Torture—U.S.A., U.N. Doc. CAT/C/28/Add.5, para. 57 (Feb. 9, 2000), *citing* Sale v. Haitian Ctrs. Council, 509 U.S. 155 (1994).
[12] 6 U.S. (2 Cranch) 64, 118 (1804); *accord* Talbot v. Seeman, 5 U.S. (1 Cranch) 1, 43 (1801).
[13] *See, e.g.*, F. Hoffmann-La Roche Ltd. v Empagran S.A., 542 U.S. 155, 164 (2004).
[14] 630 F.2d 876, 882 n.9 (2d Cir. 1980).

implementing legislation, regardless of whether customary rules appear in a treaty.[15]   In *The Paquete Habana*, the Supreme Court held that customary international law "is part of our law" and directly enforceable in courts when no conflicting treaty, legislative act, or judicial decision controls.[16]   As discussed below, several human rights treaty rules applicable in this case are also customary international law.

The President is also obligated to respect international law pursuant to his constitutional duty faithfully to execute the law.[17]   Because Article VI of the Constitution makes treaties the supreme law of the land, the President is constitutionally required to comply with U.S. treaty obligations as well as with customary international law.   This was the intent of the Framers.[18] Courts therefore have a duty to restrain federal executive action that conflicts with a duly ratified treaty.   As the Supreme Court wrote in ordering the President to restore a French merchant ship to its owner pursuant to a treaty obligation: "The constitution of the United States declares a treaty to be the supreme law of the land.   Of consequence its obligation on the courts of the United States must be admitted."[19]

Even if the President were not directly bound by international law, however, he is still obligated to comply with the Constitution itself and all applicable legislation enacted by Congress

---

[15] Restatement (Third) of the Foreign Relations Law of the United States § 111(3).

[16] 175 U.S. 677, 700 (1900); *see also Filartiga*, 603 F.2d at 886 ("Appellees . . . advance the proposition that the law of nations forms a part of the laws of the United States only to the extent that Congress has acted to define it.   This extravagant claim is amply refuted by the numerous decisions applying rules of international law uncodified by any act of Congress.").

[17] U.S. CONST. art. II, sec. 3.

[18]   Alexander Hamilton, *Pacificus No. 1* (June 29, 1793), *reprinted in* 15 THE PAPERS OF ALEXANDER HAMILTON 33, 33-43 (Harold C. Syrett ed. 1969).

[19] United States v. The Schooner *Peggy*, 5 U.S. (1 Cranch) 103, 109 (1801).

within its authority, which (as noted) must be interpreted in a manner consistent with international law whenever possible.

The following sections identify the treaties and customary international law relevant to the legality of the EO.

**B.   International Law Regarding Discrimination on the Basis of Religion and National Origin**

**1.   The International Covenant on Civil and Political Rights**

Discrimination based on religion or national origin is prohibited by the International Covenant on Civil and Political Rights ("CCPR").  The United States ratified the CCPR in 1992.[20]

Article 2 of the CCPR states in relevant part:

1.   Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, ... religion, ... national or social origin, ... or other status.
     * * *
3.   Each State Party to the present Covenant undertakes:

(*a*) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;
(*b*) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial, administrative or legislative authorities, or by any other competent authority provided for by the legal system of the State, and to develop the possibilities of judicial remedy;
(*c*) To ensure that the competent authorities shall enforce such remedies when granted.

The United Nations Human Rights Committee ("HRC") is charged by the CCPR to monitor implementation by state parties and to issue guidance on its proper interpretation.  The HRC

_____

[20] 138 Cong. Rec. S4781-01 (daily ed., Apr. 2, 1992).

interprets article 2 to prohibit "any distinction, exclusion, restriction or preference" based on a prohibited ground, and which has "the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise by all persons, on an equal footing."[21]  To justify a derogation from the nondiscrimination (or any other human rights) duty, a measure must pursue a legitimate aim and be proportionate to that aim.[22]  A "proportionate" measure is one effective at achieving the aim and narrowly tailored (or "necessary") to it.[23]

The substantive rights guaranteed by the CCPR, which must be protected without discrimination based on religion or national origin under article 2, include the protection of the family.  Article 23 provides in relevant part: "The family is the natural and fundamental group of society and is entitled to protection by society and the State."[24]  The HRC has interpreted this right to include living together, which in turn obligates the state adopt appropriate measures "to ensure the unity or reunification of families, particularly when their members are separated for political, economic or similar reasons."[25]

Restrictions on travel and entry caused by the EO that impose disparate and unreasonable burdens on the exercise of this right violate CCPR article 2.  The HRC has explained that, although the CCPR does not generally

---

[21] Human Rights Committee, General Comment No. 18, para. 6, U.N. Doc. HRI/GEN/1Rev.1 at 26 (1994).
[22] Committee on the Elimination of Racial Discrimination, General Recommendation No. 30, para. 4, 64th Sess., U.N. Doc. CERD/C/64/Misc.11/rev.3 (2004).
[23] *See* AARON XAVIER FELLMETH, PARADIGMS OF INTERNATIONAL HUMAN RIGHTS LAW 119-21 (2016).
[24] CCPR, *supra* note 7, art. 22(1).
[25] Human Rights Committee, General Comment No. 19, para. 5 (1990), U.N. Doc. HRI/GEN/1/Rev.1 at 28 (1994).

recognize a right of aliens to enter or reside in the territory of a State party ... , in certain circumstances an alien may enjoy the protection of the Covenant even in relation to entry or residence, for example, when considerations of non-discrimination, prohibition of inhuman treatment and respect for family life arise.[26]

Thus, the right of entry is not beyond the scope of the CCPR.  On the contrary, the CCPR's nondiscrimination principles and protections for family life should be considered by courts in interpreting government measures affecting family unification.  This treaty-based protection for family life is consistent with Supreme Court jurisprudence respecting the role of due process of law in governmental decisions affecting family unity.[27]

More generally, article 26 of the CCPR prohibits discrimination in any government measure, regardless of whether the measure violates a Covenant right:

> All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status.

As interpreted by the HRC and consistent with its wording, this provision "prohibits discrimination in law or fact in *any field* regulated" by the government.[28]  Notably, unlike CCPR article 2, the equal protection provisions of CCPR article 26 lack article 2's limitation to "all individuals within [the state party's] territory and subject to its jurisdiction."

---

[26] Human Rights Committee, General Comment No. 15, para. 5 (1986), U.N. Doc. HRI/GEN/1/Rev.1 at 18 (1994).
[27] *See* Landon v. Plasencia, 459 U.S. 21, 34, 37 (1982); Kerry v. Din, __ U.S. __, 135 S. Ct. 2128, 2140-41 (2015) (Kennedy, J., concurring).
[28] Human Rights Committee, General Comment No. 18, *supra* note 21, para. 12 (emphasis added).

The nondiscrimination provisions of the CCPR are also customary international law binding on the United States, forming part of U.S. law unless contrary to the Constitution or a statute. The Universal Declaration of Human Rights, which the United States approved in 1948, mandates nondiscrimination in religion and national origin, equal protection of the law, and protection from arbitrary interference in family life.[29] The American Declaration of the Rights and Duties of Man, which the United States approved when it signed and ratified the Charter of the Organization of American States the same year, has similar provisions in articles 6 and 17.[30] These nondiscrimination principles and the right to family unity have become sufficiently widespread and accepted by the international community that they have entered into customary international law in the present day.[31]

2.  **The International Convention on the Elimination of All Forms of Racial Discrimination**

The International Convention on the Elimination of All Forms of Racial Discrimination ("CERD") also bars discrimination based on national origin. The United States has been a party to the CERD since 1994.[32] Under article 2, paragraph (1)(a), each state party commits to refraining from and prohibiting all forms of racial discrimination, and each further undertakes "to engage in no act or practice of racial discrimination . . . and to ensure that all public authorities and public institutions, national or local, shall act in conformity with this obligation." CERD defines "racial

---

[29] Universal Declaration of Human Rights, arts. 2, 7, 12, G.A. Res. 217A(III), U.N. Doc. A/810 at 71 (1948).

[30] O.A.S. Res. XXX (1948), Basic Documents Pertaining to Human Rights in the Inter-American System, OEA/Ser.L/V/I.4 rev. 13, at 13 (2010).

[31] *See* Hurst Hannum, *The Status of the Universal Declaration of Human Rights in National and International Law*, 25 GA. J. INT'L & COMP. L. 287, 329 (1995/96).

[32] *See* 140 Cong. Rec. S7634-02 (daily ed., June 24, 1994).

discrimination" to include distinctions and restrictions based on national origin. *Id.* art. 1(1). With regard to immigration practices, CERD makes clear that states are free to adopt only such "nationality, citizenship or naturalization" policies that "do not discriminate against any particular nationality." *Id.* art. 1(3). Like the nondiscrimination provisions of CCPR article 26, CERD article 2 does not limit its application to citizens or resident noncitizens. While CERD does not speak specifically to restrictions on entry of nonresident aliens, the general language of CERD expresses a clear intention to eliminate discrimination based on race or national origin from all areas of government activity: "States Parties undertake to prohibit and to eliminate racial discrimination in all its forms ... without distinction as to race, colour, or national or ethnic origin ...." *Id.* art. 5.

Article 4 of CERD further provides that state parties "[s]hall not permit public authorities or public institutions, national or local, to promote or incite racial discrimination," which (as noted) includes discrimination based on national origin. The Committee on the Elimination of Racial Discrimination, the body of independent experts appointed to monitor CERD's implementation, interprets article 4 to require states to combat speech stigmatizing or stereotyping non-citizens generally, immigrants, refugees, and asylum seekers,[33] with statements by high-ranking officials causing "particular concern."[34] In *TBB-Turkish Union in Berlin/Brandenburg v. Germany*, for example, the Committee specifically determined that Germany violated the Convention when it failed to discipline or punish a minor government official who had *inter alia* drawn attention to low employment rates of Turkish and Arab populations in Germany, suggested their unwillingness

---

[33] Committee on the Elimination of Racial Discrimination, General Recommendation No. 35: Combating Racist Hate Speech, para. 6, U.N. Doc. CERD/C/OC/35 (2013).
[34] *Id.* para. 22.

to integrate into German society, and proposed that their immigration should be discouraged.[35]

These statements, the Committee determined, implied "generalized negative characteristics of the Turkish population" and incited racial discrimination.[36]

The legality of the EO in this case, and the proper interpretation of the statutes and constitutional provisions cited by the parties, should be assessed with those proscriptions in mind. By virtue of the *Charming Betsy* canon, those international law principles require U.S. courts to interpret applicable immigration statutes as rejecting discrimination based on religion or national origin, except to the extent explicitly authorized by Congress or proportionate to a legitimate government interest.

## C.      Relevant Provisions of the Executive Order

Section 2 categorically suspends immigration from six specified countries—Iran, Libya, Somalia, Sudan, Syria, and Yemen, and imposes special requirements on immigrants from Iraq. Section 2(a), moreover, authorizes the Secretary of Homeland Security to demand "certain information" from "particular countries even if it is not needed from every country."  Section 6 suspends the admission of refugees from the six countries subject to case-by-case examination.

The EO thus makes an explicit distinctions based on national origin that, unless necessary and narrowly tailored to achieve a legitimate government aim, would violate U.S. obligations under international law.  In effect, the EO also makes a distinction based on religion, as plaintiffs have argued.   Notably, every one of the designated countries has a population that is

---

[35] Comm. on the Elimination of Racial Discrim., Commun. No. 48/2010 (Feb. 26, 2013), U.N. Doc. CERD/C/82/D/48/2010.
[36] *Id.* para. 12.6.

overwhelmingly Muslim,[37] and the EO does not suspend immigration from any state with a non-Muslim majority, including some countries identified by the United States as state sponsors of terrorism.

International law is also relevant to Section 11 of the EO, which requires the Secretary of Homeland Security to "collect and make publicly available" certain information relating *inter alia* to convictions of terrorism-related offenses, government charges of terrorism, and "gender-based violence against women" by foreign nationals.   The EO requires no publication of similar information relating to U.S. nationals.   By mandating that the Secretary publish pejorative information about noncitizens without publishing comparable information about U.S. citizens, section 11 makes a suspect distinction based on national origin.   While section 11 has not been challenged specifically by the plaintiffs, it may bear on the intent to discriminate, because the decision to publish derogatory information about noncitizens alone is stigmatizing, and appears to be motivated by a desire to characterize noncitizens as more prone to terrorism or gender-based violence than U.S. citizens.   Apart from what it may indicate with respect to intent, a measure designed to stigmatize noncitizens cannot be proportionate and thus violates article 26 of the CCPR and articles 2 and 4 of the CERD.

## IV.    CONCLUSION

For the foregoing reasons, *amici* request that the Court consider U.S. obligations under international law, which forms part of U.S. law, in evaluating the legality of the EO.

------

[37] *See* Central Intelligence Agency, World Factbook, *at* https://www.cia.gov/library/publications/ the-world-factbook/geos/xx.html.

Respectfully submitted this 11th day of March, 2017.

_____
Aaron Fellmeth[*]   (admitted *pro hac vice*)
Arizona State University, Sandra Day O'Connor
     College of Law
Mail Code 9520
111 E. Taylor St.
Phoenix, AZ  85004-4467
(480) 241-8414
aaron.fellmeth@asu.edu

Clare Hanusz (No. 007336)
David P. McCauley (No. 006065)
Damon Key Leong Kupchak Hastert
1003 Bishop St. Ste. 1600
Honolulu, HI  96813
(808) 531-8031
dpm@hawaiilawyer.com

*Attorneys for* Amici Curiae

_____

[*] Address is for correspondence and identification only. This brief does not purport to state the views, if any, of Arizona State University or the Sandra Day O'Connor College of Law.

-13-

**APPENDIX**

The *amici* are nongovernmental organizations and legal scholars specializing in public international law and international human rights law.  They have substantial expertise in issues directly affecting the outcome of this case.  These *amici* are identified below.

**Organizations**

Human Rights Advocates

Human Rights & Gender Justice Clinic, City University of New York School of Law

International Association of Democratic Lawyers

International Center for Advocates Against Discrimination

International Justice Project

International Justice Resource Center

Legal Aid Society (New York)

MADRE

National Law Center on Homelessness & Poverty

National Lawyers Guild

Secular Communities of Arizona

T'ruah: The Rabbinic Call for Human Rights

**Individuals**

Institutional affiliations are listed for identification purposes only; opinions in this brief do not reflect those of any affiliated organization.

1. William Aceves, Dean Steven R. Smith Professor of Law, California Western School of Law

2. Dr. Johannes van Aggelen, former senior human rights official, United Nations, Office of the High Commissioner for Human Rights

3. Wanda M. Akin, Esq., Co-Founder, International Justice Project

4. Shifa Alkhatib, Esq., Phoenix, AZ

-14-

5. Don Anton, Professor of International Law & Director, Law Future Centre, Griffith University Law School, Australia

6. Paige Berges, Esq., London, United Kingdom

7. Wendi Warren H. Binford, Associate Professor of Law; Director, Clinical Law Program, Willamette University

8. Carolyn Patty Blum, Interim Director, Benjamin B. Ferencz Human Rights and Atrocity Prevention Clinic, Benjamin N. Cardozo Law School

9. Anthony P.X. Bothwell, Esq., Law Offices of Anthony P.X. Bothwell, San Francisco, CA

10. Bill Bowring, Professor & Director of the LLM/MA in Human Rights, University of London, Birkbeck College School of Law, U.K.

11. Raymond M. Brown, Co-Founder, International Justice Project

12. Gráinne de Búrca, Florence Ellinwood Allen Professor of Law, New York University Law School

13. Elizabeth Burleson, Esq., Greenwich, CT

14. Roderick P. Bushnell, Esq., Law Offices of Roderick P. Bushnell, San Francisco, CA

15. Linda Carter, Professor of Law Emerita, University of the Pacific, McGeorge School of Law

16. Dr. Grace Cheng, Associate Professor of Political Science, Hawai'i Pacific University

17. Marjorie Cohn, Professor Emerita, Thomas Jefferson School of Law

18. Jorge Contesse, Assistant Professor, Rutgers (Newark) Law School

19. Michael D. Cooper, Managing Director, The Ploughshare Group LLC

20. Omar Dajani, Professor, University of the Pacific, McGeorge School of Law

21. Thomas A. Dallal, Esq., Deputy Director, Diakonia International Humanitarian Law Resource Center, Jerusalem

22. Margaret M. deGuzman, Associate Professor, Temple University, Beasley School of Law

23. Daniel H. Derby, Professor, Touro Law Center

24. Margaret Drew, Associate Professor & Director, Human Rights at Home Clinic, University of Massachusetts Law School

25. Ariel Dulitzky, Clinical Professor of Law, University of Texas School of Law

26. Monica Feltz, Esq., Executive Director, International Justice Project

27. Martin S. Flaherty, Leitner Family Professor of International Human Rights Law, Co-Director, Leitner Center for International Law & Justice, Fordham Law School

28. Daniel Fullerton, Counsel, Public International Law & Policy Group

29. Hannah Garry, Clinical Professor of Law & Director, International Human Rights Clinic, University of Southern California, Gould School of Law

30. Seyedeh Shannon Ghadiri-Asli, Legal Officer, International Criminal Tribunal for the Former Yugoslavia

31. Peter Halewood, Professor of Law, Albany Law School

32. Alexandra Harrington, Adjunct Professor, Albany Law School

33. Deena Hurwitz, Esq., Charlottesville, VA

34. Dr. Alice de Jonge, Senior Lecturer, Monash University, Australia

35. Christine Keller, Esq., Legal Officer, International Criminal Tribunal for the Former Yugoslavia

36. Jocelyn Getgen Kestenbaum, Telford Taylor Visiting Clinical Professor of Law, Benjamin N. Cardozo School of Law

37. Nigel N.T. Li, President, International Law Association, Chinese (Taiwan) Branch; Chinese (Taiwan) Society of International Law

38. Robert Lutz, Paul E. Treusch Professor of Law, Southwestern Law School

39. Daniel Barstow Magraw, Senior Fellow, Foreign Policy Institute and Professorial Lecturer, Johns Hopkins University School of Advanced International Studies

40. Anna R. Maitland, Schuette Clinical Fellow, Center for International Human Rights, Northwestern University, Pritzker School of Law

41. Kathleen Maloney, Adjunct Professor, Lewis & Clark School of Law

42. Annette M. Martínez-Orabona, Adjunct Professor, Inter-American University of Puerto Rico, School of Law

43. Thomas M. McDonnell, Professor of Law, Pace University, Elisabeth Haub School of Law

44. Jeanne Mirer, Esq., President, International Association of Democratic Lawyers

45. Catherine Moore, LLB, LLM, Coordinator for International Law Programs, University of Baltimore School of Law

46. Steven S. Nam, Distinguished Practitioner, Center for East Asian Studies, Stanford University

47. Dr. Andrew Novak, Term Assistant Professor of Criminology, Law & Society, George Mason University

48. Natasha Lycia Ora Bannan, President, National Lawyers Guild

49. Aparna Polavarapu, Assistant Professor, University of South Carolina School of Law

50. Dianne Post, Esq., Central Arizona National Lawyers Guild

51. William Quigley, Professor of Law, Loyola University New Orleans, Loyola College of Law

52. Balakrishnan Rajagopal, Professor of Law & Development, Massachusetts Institute of Technology

53. Jaya Ramji-Nogales, I. Herman Stern Professor of Law, Temple University, Beasley School of Law

54. Nicole Rangel, Esq., Associate Legal Officer, International Criminal Tribunal for the Former Yugoslavia

55. Marny Requa, Associate Professor, Georgian Court University (Lakewood, NJ)

56. Nani Jansen Reventlow, Associate Tenant, Doughty Street Chambers, U.K.

57. Francisco J. Rivera Juaristi, Director, International Human Rights Clinic, Santa Clara University School of Law

58. Gabor Rona, Visiting Professor of Law, Cardozo Law School

-17-

59. Joshua Root, Esq., Instructor of Human Rights and International Law, Newport, RI

60. Leila Sadat, Henry H. Oberschelp Professor of Law; Director, Whitney R. Harris World Law Institute, Washington University School of Law

61. Margaret L. Satterthwaite, Professor of Clinical Law, New York University School of Law

62. Beth Van Schaack, Leah Kaplan Visiting Professor in Human Rights, Stanford Law School

63. Mortimer Sellers, Regents Professor and Director, Center for International and Comparative Law, University of Baltimore School of Law

64. Corey Shenkman, Esq., Principal Investigator, Institute for Social Policy and Understanding

65. Dr. Anette Sikka, Asisstant Professor of Legal Studies, University of Illinois, Springfield

66. Matiangai Sirleaf, Assistant Professor, University of Pittsburgh Law School

67. David L. Sloss, Professor of Law, Santa Clara University Law School

68. Rachel A. Smith, International Law Association, American Branch, Program Director

69. Juliet S. Sorensen, Harry R. Horrow Professor of International Law, Northwestern University, Pritzker School of Law

70. Dr. Michael Stein, Executive Director & Visiting Professor, Harvard Law School Project on Disability

71. Milena Sterio, Professor of Law & Associate Dean, Cleveland State University, Cleveland-Marshall College of Law

72. Jessica Stern, Executive Director, OutRight Action International

73. Anastasia Sarantos Taskin, Esq., Taskin Law & Mediation

74. Juliet S. Sorensen, Harry R. Horrow Professor of International Law, Northwestern University, Pritzker School of Law

75. Beth Stephens, Distinguished Professor, Rutgers (Camden) Law School

76. Dr. Tara Van Ho, Assistant Professor, Aarhus University Department of Law

77. Constance de la Vega, Professor of Law, University of San Francisco

78. Meghan Waters, Esq., Denver, CO

79. Dr. Ralph Wilde, Reader, University College of London Faculty of Laws, U.K.

80. Matthew Zagor, Associate Professor, Australia National University College of Law

81. Katja Ziegler, Sir Robert Jennings Professor International Law, Director, Centre of European Law and Internationalisation, University of Leicester School of Law, U.K.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Motion for Leave to File *Amicus Curiae* Brief and Brief of *Amici Curiae* International Law Scholars and Nongovernmental Organizations with the Clerk of the Court for the United States District Court for the District of Hawai'i by using the appellate CM/ECF system on March 11, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct.


DATED this 11th day of March, 2017.


_____
Aaron X. Fellmeth (admitted *pro hac vice*)
Arizona State University
Sandra Day O'Connor College of Law
Mail Code 9520
111 E. Taylor St.
Phoenix, AZ  85004-4467
(480) 241-8414
aaron.fellmeth@asu.edu

Counsel for *Amici Curiae*