OF COUNSEL:

DAVIS LEVIN LIVINGSTON

MARK S. DAVIS          1442-0
MICHAEL K. LIVINGSTON   4161-0
MATTHEW C. WINTER       8464-0
851 Fort Street, Suite 400
Honolulu, Hawaii 96813
Tel: (808) 524-7500 Fax: (808) 545-7802
Email: mdavis@davislevin.com

LANE POWELL PC

CLAIRE LOEBS DAVIS        *[Pro Hac Vice]*
JESSICA N. WALDER
TAYLOR WASHBURN
AARON SCHAER
1420 Fifth Avenue, Suite 4200
Seattle, WA 98111
Tel:   (206) 223-7000 Fax: (206) 223-7107
Email: davisc@lanepowell.com

Attorneys for *Amicus Curiae* Law Professors

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **STATE OF HAWAII** AND **ISMAIL ELSHIKH**,<br><br>            Plaintiffs,<br><br>    vs.<br><br>**DONALD J. TRUMP**, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES; **U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY**, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HOMELAND SECURITY; **REX TILLERSON**, IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE; AND THE **UNITED STATES OF AMERICA**,<br><br>            Defendants. | CIV. NO. 17-00050 DKW-KSC<br><br>**AMICUS CURIAE BRIEF OF LAW PROFESSORS ON ISSUE OF STATE STANDING** |

**EXHIBIT A**

## AMICUS CURIAE BRIEF OF
## LAW PROFESSORS ON ISSUE OF STATE STANDING

### I.   INTERESTS OF *AMICUS CURIAE*

The non-party law professors are Todd Aagaard of Villanova University, Robin Kundis Craig of the University of Utah, Brigham Daniels of Brigham Young University, Lincoln L. Davies of the University of Utah, Noah Hall of Wayne State University, Alexandra B. Klass of the University of Minnesota, David Owen of the University of California-Hastings, Zygmunt J. B. Plater of Boston College, Alexander T. Skibine of the University of Utah, Lisa Grow Sun of Brigham Young University, Joseph P. Tomain of the University of Cincinnati, and Amy J. Wildermuth of the University of Utah ("the Law Professors"). The Law Professors research, teach, and write on federal courts, constitutional law, and administrative law. We are scholars who have spent considerable time studying state standing. As such, our interest is in ensuring that the Court's decision on standing is consistent with this complex and evolving body of law. The Law Professors maintain a neutral position on the underlying merits of the case, and therefore do not file this brief in support of either party.

### II.   INTRODUCTION

The State of Hawaii ("Hawaii" or "State") has brought a challenge to the Executive Order issued on March 6, 2017 ("Executive Order"), asserting claims under the U.S. Constitution as well as several federal statutes, and seeking a

temporary restraining order ("TRO") barring enforcement of the Executive Order. *See* Plaintiffs' Motion for Temporary Restraining Order ("TRO Motion") (Dkt. 65).

There are few cases that address issues of state standing, and, as a result, the Supreme Court has provided limited guidance in this area. *Amici* offer this brief to provide our insight as to the appropriate analysis under existing law.[1] Based on our analysis of the factual pleadings and supporting declarations filed by Hawaii, we conclude that the State has properly asserted standing based on its interests to bring this action and pursue a TRO.

## III.   ARGUMENT

When analyzing state standing, the first task is to identify the interest being asserted by the state. In *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), the Supreme Court articulated three categories of potential interests for a sovereign seeking to bring suit:

(1) proprietary interests,

(2) quasi-sovereign interests, and

(3) sovereign interests.

---

[1]   This brief draws from two of the principal drafter's articles: Amy J. Wildermuth, *Why State Standing in* Massachusetts v. EPA *Matters*, 27 J. LAND, RESOURCES, & ENVTL. L. 273 (2007), and Kathryn A. Watts & Amy J. Wildermuth, Massachusetts v. EPA: *Breaking New Ground on Issues Other Than Global Warming*, 102 NW. U. L. REV. 1029 (2008), 102 NW. U. L. REV. COLLOQUY 1 (2007).

*Id.* at 601–02. Because the standing analysis varies by the type of interest asserted, it is essential to first identify the interest(s) at stake.

In this case, Hawaii has asserted that the Executive Order implicates interests within each of these three categories. This brief will focus on Hawaii's proprietary interests and quasi-sovereign interests as examples of how to identify these interests and apply the standing analysis.

## A.    Proprietary Interests

Proprietary interests are direct interests of a state, such as ownership of land or participation in a business venture. *Id.* These are interests of the same kind that a private party would assert in litigation. *Id.*

When a state asserts an injury to or interference with its proprietary interest, the Article III standing analysis should be no different than the one that would be applied to a case brought by a private plaintiff. *Cf. id.* at 611 (Brennan, J., concurring) ("At the *very* least, the prerogative of a State to bring suits in federal court should be commensurate with the ability of private organizations."). Courts therefore have required that states asserting a proprietary interest satisfy the well-known requirements of *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) for Article III standing, namely, demonstrating (1) an actual and concrete injury (or "injury-in-fact"); (2) that this injury is traceable to the defendant's conduct; and (3) that a favorable decision will likely redress the injury. *Id.* at 560–61; *see also*

*Washington v. Trump*, 847 F.3d 1151, 1158–61 (9th Cir. 2017) (applying *Lujan* factors in analyzing state standing based on alleged harm to proprietary interests).

Here, Hawaii asserts two main proprietary injuries stemming from the Executive Order. The first is the negative financial impact that the Executive Order will have on the University of Hawaii. Like most state universities, the University of Hawaii is an arm of the state. *See* Haw. Const. art. 10, §§ 5, 6; Haw. Rev. Stat. § 304A-103 (2011); *see also Mukaida v. Hawaii*, 159 F. Supp. 2d 1211, 1221 (D. Haw. 2001).

The financial impact of the Executive Order on the university is clear. The university has an established record of recruiting students from the six affected countries. For example, it estimates that twenty-three of its current graduate students hail from those countries. Supplemental Declaration of Risa E. Dickson ("Supp. Dickson Decl.") (Dkt. 66-6, Ex. D-1) ¶ 7.

The prospective students who are without visas as of March 16, 2017, however, are banned. As a result, the University of Hawaii will not be able to collect the money that those students would have paid to attend. *Id.* ¶¶ 7–8 ("Individuals who are neither legal permanent residents nor current visa holders will be entirely precluded from considering our institution.").

In addition, the University of Hawaii has hired and supported many faculty members and visiting scholars from the six listed countries: "The University also

has employees including faculty from two of the designated countries, namely Iran and Sudan, who are here on immigrant visas. In addition, the University has at least 29 visiting faculty members and scholars with valid visas from the six countries affected by the new Executive Order." *Id.* ¶ 7. The University of Hawaii will no longer be able to recruit and hire faculty or staff from the affected countries, or host visiting faculty and scholars from those areas, if they are without valid visas on March 16, 2017. This will be a significant loss for the university because those in faculty, scholarly, or other academic professional roles often perform highly specialized work for which it is difficult to find replacements. The university's cost of finding others to perform the same tasks is expected to be higher than the cost of recruiting such academic professionals from an open and free market of job seekers, allowing for selection of individuals from all over the world.

The Ninth Circuit cited similar injuries asserted by the states of Washington and Minnesota in *Washington v. Trump*, 847 F.3d at 1158–61, in concluding that "the States have alleged harms to their proprietary interests traceable to the [previous version of the] Executive Order."[2] *Id.* at 1161. In particular, the Ninth Circuit observed that, under the prior Executive Order, "some [nationals of the

---

[2]     As Hawaii explains in its Complaint, the March 2017 Executive Order currently under challenge was preceded by a similar order issued on January 25, 2017. The prior Executive Order was the subject of the *Washington v. Trump* litigation. Complaint ¶¶ 47–71.

affected countries] will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be permitted to return if they leave." *Id.*[3] Here, Hawaii has similarly asserted that the Executive Order will constrain its ability to attract and retain faculty and students, and has therefore alleged "a concrete and particularized injury to [its] public universities" sufficient to ground Article III standing. TRO Motion at 46 (quoting *Washington*, 847 F.3d at 1159).[4]

Beyond alleging that the Executive Order will deprive the University of Hawaii of tuition-paying students and hard-to-replace academic personnel, the State also asserts that the Executive Order will "have the effect of depressing international travel to and tourism in Hawai'i," which "directly harms Hawaii's businesses and, in turn, the State's revenue." Complaint ¶ 100.[5] According to

---

[3]     The Ninth Circuit also noted that if the prior Executive Order continued in effect, the University of Washington "will lose its investment" in visa applications for medicine and science interns barred under that Order from entering the country. *Washington*, 847 F.3d at 1159–60.

[4]     The Ninth Circuit's opinion appears to conflate two distinct concepts: (1) a state's standing to sue based on an injury to its own proprietary interests in the form of financial harm suffered by the state's universities; and (2) a state's "third-party" standing "to assert the rights of the students, scholars, and faculty," *Washington,* 847 F.3d at 1159–61. What the Ninth Circuit calls "third-party" state standing might be better classified as "quasi-sovereign" standing, which is analytically distinct from proprietary-interest state standing. Notwithstanding this distinction, the Ninth Circuit correctly held that financial harm to state universities is a valid basis for a state to claim Article III standing. *Id.* at 1161 (identifying harm to state universities as an injury to a state's "proprietary interests").

[5]     *See also* Supplemental Declaration of Luis P. Salaveria ("Supp. Salaveria Decl.") (Dkt. 66-4, Ex. C-1), ¶¶ 6–10 ("I expect, given the uncertainty the new

Hawaii, tourism is the State's "lead[ing] economic driver," accounting for $15 billion in spending in 2015. *Id.* ¶ 18. A decline in tourism would have a direct effect on the State's revenue. For example, as part of the draw for tourists, Hawaii has 51 state parks encompassing approximately 30,000 acres. *See* About Our Parks, Hawaii Department of Land and Natural Resources, Division of State Parks, at http://dlnr.hawaii.gov/dsp/parks/about-our-parks/ (last visited on March 20, 2017). These parks rely on fees charged for various activities, such as camping, which generate significant revenue for the State. When nationals from the designated countries are banned from visiting the United States, they will not be able to visit Hawaii's many state parks, which will result in a direct loss of revenue to the State.

As the Fifth Circuit held in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016), a state's "financial loss[es]" stemming from a federal action constitute a concrete and immediate injury to the state's proprietary interests for the purposes of standing. *Id.* (considering the administrative costs imposed on the state by a federal law requiring that the state issue drivers' licenses to undocumented aliens); *see also Wyoming v. Oklahoma,* 502 U.S. 437, 448 (1992) (holding that a state has standing

executive order and its predecessor have caused to international travel generally, that these changing policies may depress tourism, business travel, and financial investments in Hawaii.").

to sue where it alleges "a direct injury in the form of a loss of specific tax revenues").

Although the financial injuries alleged by Hawaii could be substantial, even limited monetary harm can satisfy Article III standing. Indeed, when any financial damage is alleged, injury-in-fact for standing purposes "is often assumed without discussion." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 293 (3rd Cir. 2006). This principle applies to state as well as private plaintiffs. *Texas,* 809 F.3d at 155 (state had proprietary-interest standing because it would incur "a minimum of $130.89" in administrative costs in connection with each license issued); *see also Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) (holding that an injury-in-fact "may be minimal," and relying on *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973), which noted that the Supreme Court has "allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax").

Hawaii has demonstrated (1) that its institutions of higher education will suffer monetary damage, and that it is likely to suffer a loss of revenue due to a decline in tourism; (2) that such monetary harm will be a direct result of the Executive Order; and (3) that it would not lose that money in the absence of the Executive Order. As a result, the State has satisfied the traditional *Lujan* test for

Article III standing to sue, as is required when a state asserts harm to its proprietary interests.

## B.   Quasi-Sovereign Interests

Hawaii also has asserted standing based on its quasi-sovereign interests, *i.e.*, in its role as *parens patriae* for its citizens.   Quasi-sovereign interests are difficult to describe, and "admittedly vague." 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE JURIS. 2D § 3531.11, at 31 (1984). When a state brings suit based on quasi-sovereign interests, it "must articulate an interest apart from the interests of particular private parties." *Snapp*, 458 U.S. at 607.

The Supreme Court has described this separate interest as the state's own interest "in the well-being of its populace," *id.* at 602, and provided two examples: (1) a state's interest in protecting the health and well-being—"both physical and economic"—of its citizens from injuries, such as transboundary pollution;[6] and (2) a state's interest in seeing that its "residents are not excluded from the benefits that flow from participation in the federal system," including "securing residents from the harmful effects of discrimination." *Id.* at 607–09 (citation omitted).[7]

---

[6]     *See, e.g.*, *North Dakota v. Minnesota*, 263 U.S. 365 (1923) (involving flooding) and *Georgia v. Tenn. Copper Co.*, 206 U.S. 230 (1907) (involving air pollution in Georgia that was caused by the discharge of noxious gases from the defendant's plant in Tennessee).

[7]     As noted in fn. 4, *supra*, the Ninth Circuit held in *Washington v. Trump* that the States had "third-party standing" to "assert the rights of the students, scholars and faculty affected by the Executive Order." 847 F.3d at 1160. Rather than invoke the third-party standing doctrine, the Ninth Circuit could have relied upon the

Even where a state properly asserts a quasi-sovereign interest, an issue arises whether it should be able to sue to protect its residents from the federal government, because the federal government has a similar duty to protect those same residents. In the past, *Massachusetts v. Mellon*, 262 U.S. 447 (1923) was understood to have barred such suits: states could not sue the federal government based on their *parens patriae* interests unless Congress waived the restriction. *See Maryland People's Counsel v. FERC*, 760 F.2d 318, 322 (D.C. Cir. 1985) (Scalia, J.).

In *Massachusetts v. EPA*, 549 U.S. 497 (2007), however, the Court appears to have lifted the bar to a state litigating against the federal government when a quasi-sovereign interest is at stake. In doing so, the Court explained:

> [T]here is a critical difference between allowing a State "to protect her citizens from the operation of federal statutes" (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do). Massachusetts does not here dispute that the Clean Air Act *applies* to its citizens; it rather seeks to assert its rights under the Act.

*Id.* at 520 n.17. Commentators have noted that this footnote seems to confuse the different interests a state might have—namely, it seems to focus on Massachusetts asserting its *own* interests, for which there was traditionally no *Mellon* bar, not those of its residents, for which there would have traditionally been a bar. The

---

States' *own* quasi-sovereign interest in protecting its residents' well-being and freedom from discrimination.

Supreme Court, however, has not provided any further clarification on this point. As a result, although *Massachusetts v. EPA* offered little explanation, it now appears that a state can assert Article III standing based on a quasi-sovereign interest of ensuring that its citizens are provided the benefits of federal law, such as when the federal government acts or fails to act in a way that violates federal statutory or constitutional law. *See, e.g.*, Bradford Mank, *Should States Have Greater Standing Rights Than Ordinary Citizens?:* Massachusetts v. EPA's *New Standing Test for States*, 49 WM. & MARY L. REV. 1701, 1769–74 (2008).

In this case, Hawaii has asserted harm to several quasi-sovereign interests. For the purposes of our analysis, we focus on those suffered by the University of Hawaii.

First, as the Ninth Circuit noted in considering the prior Executive Order, the federal government's actions have impacted the education of state residents attending public universities. *Washington*, 847 F.3d at 1160–61; *see also Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *2 (W.D. Wash. Feb. 3, 2017). By restricting entry from the listed countries, the federal government will block the state universities from attracting and retaining students and faculty from these countries, thus diminishing and devaluing the learning environment that is central to the mission of higher education. Supp. Dickson Decl. ¶¶ 5–9; *see also Grutter v. Gratz*, 539 U.S. 306, 330 (2003) ("student body diversity promotes

learning outcomes, and better prepares students for an increasingly diverse workforce and society").

Second, these restrictions may affect University of Hawaii researchers' ability to do important, sometimes life-saving research. Supp. Dickson Decl. ¶ 5. Many researchers must travel to present their work at conferences. These venues allow researchers to share knowledge quickly as well as to receive critical feedback that moves their work forward. In addition, many researchers must travel to sites where unique raw data or information is located, or to laboratories around the globe to learn new techniques and processes. Hawaii hosts many such conferences and is the home to many research collaboration laboratories and sites. If researchers from the six impacted countries cannot travel to the University of Hawaii to perform or share their work, the work of researchers at the University of Hawaii will be negatively impacted. *See, e.g.*, Henry Fountain, *Science Will Suffer Under Trump's Travel Ban, Researchers Say*, N.Y. TIMES (Jan. 30, 2017).

Once a state asserts a quasi-sovereign interest, the next issue is what further showing is required to establish standing. *Massachusetts* sets forth the Court's most recent articulation of this standard. There, the Supreme Court analyzed the quasi-sovereign interest under the three *Lujan* factors. The dissent pointed out, however, that the Court's analysis appeared to substantially "[r]elax[] Article III standing requirements." *Massachusetts*, 549 U.S. at 536–37 (Roberts, C.J.,

dissenting). Instead of a more rigid, traditional analysis of the *Lujan* factors, the Court employed a less demanding version of the analysis: a "*Lujan*-lite" version. Applying this standard, the Court held that Massachusetts had standing even though its injury—the loss of coastal lands—would occur many years in the future, and even though the relief sought by the parties was less than certain to substantially remedy that harm. In so holding, the Court acknowledged that its analysis was informed by the notion that states are entitled to "special solicitude" when they assert quasi-sovereign interests. *Id.* at 520.[8]

Because *Massachusetts* appears to have changed much with little explanation, and because there has been little additional guidance from the Court, the path for a state to assert quasi-sovereign interest standing is less clear than the path to assert proprietary standing. Nevertheless, *Massachusetts* remains controlling precedent: It removed the *Mellon* bar to a state bringing suit against the federal government in its role as *parens patriae*, which means Hawaii may base its standing to sue the federal government on its quasi-sovereign interests.

In fact, the quasi-sovereign interests asserted by Hawaii are stronger than those invoked by the Commonwealth in *Massachusetts*. In that case, Massachusetts relied on an injury to coastal lands many years in the future, a lengthy causal chain,

---

[8]     It is important to note that *Massachusetts v. EPA* limited its standing analysis to territorial injuries. The Court in *Massachusetts* specifically noted, as *Snapp* did, the "direct and important economic consequences" as part of the injury. *Massachusetts*, 549 U.S. 521–22.

and unclear redressability in terms of solving the larger global problem of climate change when the regulation impacted only greenhouse gas emissions from new motor vehicles in the United States. Here, the injuries asserted by Hawaii—*e.g.*, to its students' learning environment and to its academics ability to do their research—are clear, are directly tied to the Executive Order, and would be immediately remedied by restraining its enforcement.

## IV.   CONCLUSION

Although *amici* offer no recommendation on the ultimate outcome of this case, based on the analysis above, we would conclude that Hawaii has asserted several proprietary and quasi-sovereign interests that would afford it standing to pursue this action and a TRO.

DATED:  Honolulu, Hawaiʻi, March  11, 2017.

_____
MARK S. DAVIS
MICHAEL K. LIVINGSTON
MATTHEW C. WINTER

LANE POWELL LLC
CLAIRE LOEBS DAVIS

Attorneys for
Amicus Curiae Law Professors