JEFFREY B. WALL
*Acting Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

ELLIOT ENOKI
*Acting United States Attorney*
EDRIC M. CHING
*Assistant United States Attorney*

JOHN R. TYLER
*Assistant Branch Director*
BRAD P. ROSENBERG (DC Bar No. 467513)
MICHELLE R. BENNETT (CO Bar No. 37050)
DANIEL SCHWEI (NY Bar)
*Trial Attorneys*
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Tel:  (202) 514-3374; Fax:  (202) 616-8460
E-mail:  brad.rosenberg@usdoj.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I and ISMAIL ELSHIKH, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA, <br><br> *Defendants*. | No. 1:17-cv-00050-DKW-KSC <br><br> **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> Hearing:  March 15, 2017 9:30a.m. <br><br> Judge:  Hon. Derrick K. Watson <br><br> Related Documents: Dkt. No. 65 |

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES ......................................................... iv

INTRODUCTION .........................................................................1

BACKGROUND ...........................................................................3

    I.    Statutory Background..........................................................3

    II.   The Revoked Order ............................................................6

    III.  Litigation Challenging The Revoked Order.........................7

    IV.  The Order ...........................................................................8

        A.   The Order's Temporary Entry Suspension ...............8

            1.   Temporary suspension of entry by certain aliens from six countries ..........................................9

            2.   Case-by-case waivers ...................................10

        B.   The Order's Temporary Refugee Program Suspension..........11

    V.   Dismissal Of The Ninth Circuit Appeal, And Plaintiffs' Amended Complaint And Renewed TRO Motion...........................12

STANDARD OF REVIEW .........................................................13

ARGUMENT ..............................................................................14

    I.    Plaintiffs' Challenges To The Order Are Not Justiciable................14

        A.   Hawaii's Claims Are Not Justiciable......................15

            1.   Hawaii itself lacks any actual or imminent concrete injury ..........................................15

            2.   Hawaii cannot rely on purported injuries to others ......18

3.     Hawaii may not challenge the denial of immigration benefits to third parties ............................20

B.     The Claims Of Elshikh And Any Other Individual Hawaii Seeks To Represent Are Unripe .................................21

II.     Plaintiffs Are Not Likely To Succeed On The Merits ......................23

A.     The Order Is A Valid Exercise Of The President's Authority ......................................................................23

1.     The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a) ...........................................................23

2.     The other statutes plaintiffs invoke do not restrict the President's broad authority under Sections 1182(f) and 1185(a) ......................................26

a.     Section 1152 does not prevent the President from suspending the entry of nationals from the designated foreign countries .............................................26

b.     Section 1182(a) does not prevent the President from suspending the entry of nationals from the designated countries.............32

B.     The Order Does Not Violate The Due Process Clause...........35

1.     The aliens affected by the Order do not have due-process rights with respect to their entry into the United States................................................................36

2.     Plaintiffs' due-process claims on behalf of U.S. citizens lack merit ........................................................37

C.     The Order Does Not Discriminate Based On Religion .........40

1.     The Order draws distinctions on the basis of risk of terrorism, not religion...............................................40

ii

2.      The Order cannot be restrained on the basis of
        campaign statements or the Revoked Order.................42

III.    Plaintiffs Have Not Shown Immediate, Irreparable Harm................48

IV.     The Balance Of Equities And Public Interest Weigh Strongly
        Against Emergency Relief ...............................................49

V.      The Facial, Nationwide Relief Plaintiffs Seek Is Unwarranted........52

CONCLUSION ...................................................................................55

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Abdullah v. INS*,
    184 F.3d 158 (2d Cir. 1999) .......................................................................... 29

*Abourezk v. Reagan*,
    785 F.2d 1043 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) ............... 23, 31, 32

*Adams v. Vance*,
    570 F.2d 950 (D.C. Cir. 1978) ........................................................................ 12

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) ......................................................................................... 20

*Allende v. Shultz*,
    845 F.2d 1111 (1988) ............................................................................... 31, 32

*Angov v. Lynch*,
    788 F.3d 893 (9th Cir. 2013) .......................................................................... 35

*Aziz v. Trump*,
    2017 WL 580855 (E.D. Va. Feb. 13, 2017) ................................................... 52

*Bertrand v. Sava*,
    684 F.2d 204 (2d Cir. 1982) .......................................................................... 29

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ........................................................................................ 38

*Bustamante v. Mukasey*,
    531 F.3d 1059 (9th Cir. 2008) ........................................................................ 37

*Cardenas v. United States*,
    826 F.3d 1164 (9th Cir. 2016) ........................................................................ 20

*Caribbean Marine Servs. Co. v. Baldridge*,
    844 F.2d 668 (9th Cir. 1988) .......................................................................... 46

*Chicago & Southern Air Lines v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ........................................................................................ 49

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ................................................................... 40, 44

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ........................................................................ 52

*Clapper v. Amnesty Int'l*,
    133 S. Ct. 1138 (2013) ................................................................. 15

*Dep't of the Navy v. Egan*,
    484 U.S. 518 (1988) ..................................................................... 49

*Kerry v. Din*,
    135 S. Ct. 2128 (2015) .................................................... 36, 37, 38

*Edward J. DeBartolo Corp. v. Fla. Gulf
    Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988) ..................................................................... 28

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ................................................................ 22, 41

*Glassman v. Arlington County*,
    628 F.3d 140 (4th Cir. 2010) ....................................................... 43

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ..................................................................... 42

*Hodak v. City of St. Peters*,
    535 F.3d 899 (8th Cir. 2008) ....................................................... 19

*Holder v. Humanitarian Law Project*,
    (HLP), 561 U.S. 1 (2010) ............................................................ 49

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ................................................................ 18, 19

*Landon v. Plasencia*,
    459 U.S. 21 (1982) .................................................................. 1, 35

*Larson v. Valente*,
    456 U.S. 228 (1982) ..................................................................... 39

*Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*,
45 F.3d 469 (D.C. Cir. 1995),
*vacated on other grounds*, 519 U.S. 1 (1996) ................................................. 29

*Lewis v. Casey*,
518 U.S. 343 (1996) ......................................................................................... 51

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .............................................................................. 14, 15, 16

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .......................................................................... 23, 35, 41

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ......................................................................................... 20

*Massachusetts v. Mellon*,
262 U.S. 447 (1923) ......................................................................................... 20

*McCollum v. Cal. Dep't of Corr. & Rehab.*,
647 F.3d 870 (9th Cir. 2011) .......................................................................... 18

*McCreary County v. ACLU*,
545 U.S. 844 (2005) .................................................................................. *passim*

*Meinhold v. U.S. Dep't of Defense*,
34 F.3d 1469 (9th Cir. 1994) .......................................................................... 51

*Modrovich v. Allegheny County*,
385 F.3d 397 (3d Cir. 2004) ........................................................................... 43

*Munaf v. Geren*,
553 U.S. 674 (2008) ......................................................................................... 12

*Narenji v. Civiletti*,
617 F.2d 745 (D.C. Cir. 1979) ........................................................................ 28

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ......................................................................................... 30

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ......................................................................................... 42

*Nken v. Holder*,
    556 U.S. 418 (2009) .........................................................................................48

*Olsen v. Albright*,
    990 F. Supp. 31 (D.D.C. 1997) .......................................................................29

*Palmer v. Thompson*,
    403 U.S. 217 (1971) .........................................................................................42

*Phelps v. Hamilton*,
    59 F.3d 1058 (10th Cir. 1995) .........................................................................43

*Professionals & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) .............................................................................42

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    132 S. Ct. 2065 (2012) .....................................................................................30

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) .........................................................................................30

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008) ............................................................................29

*Reno v. American-Arab Discrimination Committee*,
    525 U.S. 471 (1999) .........................................................................................50

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) .........................................................................................43

*Saavedra Bruno v. Albright*,
    197 F.3d  (D.C. Cir. 1999) ............................................................................. 20

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ........................................................................................ 28

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) ....................................................................... 51

*Texas v. United States*,
    523 U.S. 296 (1998) ................................................................................. 21, 22

*United States ex rel. Kaloudis v. Shaughnessy*,
    180 F.2d 489 (2d Cir. 1950) ............................................................... 29

*United States v. Nixon*,
    418 U.S. 683 (1974)......................................................................... 42

*United States v. Salerno*,
    481 U.S. 739 (1987)........................................................... 13, 26, 50

*Valley Forge Christian Coll. v. Americans United for*
    *Separation of Church and State, Inc.*,
    454 U.S. 464 (1982)......................................................................... 18

*Voigt v. Savell*,
    70 F.3d 1552 (9th Cir. 1995) .......................................................... 19

*W. Oil & Gas Ass'n v. Sonoma County*,
    905 F.2d 1287 (9th Cir. 1990) ........................................................ 21

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)......................................................................... 13

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................... *passim*

*Washington v. Trump*,
    2017 WL 462040 (W.D. Wash. Feb. 3, 2017)...................................7

*Weinbaum v. City of Las Cruces*,
    541 F.3d 1017 (10th Cir. 2008) .....................................................43

*Winter v. NRDC*,
    555 U.S. 7 (2008)..................................................................... 12, 46

*Wong Wing Hang v. INS*,
    360 F.2d 715 (2d Cir. 1966) ..........................................................29

*Yassini v. Crosland*,
    618 F.2d 1356 (9th Cir. 1980) .......................................................38

**Statutes**

8 U.S.C. § 1101 ............................................................................................ 3, 25

8 U.S.C. § 1152 ............................................................................................ *passim*

8 U.S.C. § 1157 ............................................................................................ 5, 36

8 U.S.C. § 1181 ............................................................................................ 3, 5, 26

8 U.S.C. § 1182 ............................................................................................ *passim*

8 U.S.C. § 1187 ............................................................................................4, 5

8 U.S.C. § 1201 ............................................................................................4

Pub. L. No. 65-154, § 1(a), 40 Stat. 559 (1918) ................................... 24

Pub. L. No. 95-426, § 707(a), 92 Stat. 963 (1978) ............................. 24

**Regulations, Administrative, and Executive Materials**

Blocking the Property of Certain Persons Engaging in Significant
    Malicious Cyber-Enabled Activities, Exec. Order No. 13,694,
    80 Fed. Reg. 18, 077 (April 1, 2015) ............................................... 33

Blocking Property and Suspending Entry of Certain Persons
    Contributing to the Situation in Venezuela, Exec. Order No. 13,
    692,
    80 Fed. Reg. 12, 747 (March 8, 2015) ............................................ 34

Interdiction of Illegal Aliens, Exec. Order No. 12,807,
    57 Fed. Reg. 23,133 (May 24, 1992) ............................................ 24

Protecting the Nation From Foreign Terrorist Entry Into the United
    States, Exec. Order No. 13, 780, 82 Fed. Reg. 13, 209 (March 6,
    2017) ............................................................................................... 1

Protecting the Nation From Foreign Terrorist Entry Into the United
    States, Exec. Order No. 13, 769, 82 Fed. Reg. 8977 (Jan. 27, 2017)................1

Suspension of Entry as Immigrants and Nonimmigrants of Persons
Who Are Members of the Military Junta in Sierra Leone and
Members of Their Families, Exec. Order No. 2871, 63 Fed. Reg.
2871 (Jan. 14, 1998) ...................................................................... 34

Suspension of Cuban Immigration, Pres. Proc. No. 5517,
51 Fed. Reg. 30,470 (Aug. 22, 1986) ...................................... 24, 27

Suspension of Entry of Aliens Subject to United Nations Security
Council Travel Bans and International Emergency Economic Powers
Act Sanctions, Pres. Proc. No. 8693, 76 Fed. Reg. 44, 751 (July 24,
2011) ............................................................................................. 24

Suspension of Entry as Immigrants and Nonimmigrants of Persons
Who Are Members or Officials of the Sudanese Government or
Armed Forces, Pres. Proc. No. 6958, 61 Fed. Reg. 60,007 (Nov.
22, 1996) .................................................................................. 24, 27

Suspension of Entry as Immigrants and Nonimmigrants of Persons
who Formulate or Implement the Policies of the Noriega/Solis
Palma Regime, Pres. Proc. No. 5829, 53 Fed. Reg. 22, 286 (June
10, 1988) ....................................................................................... 27

Suspension of Entry as Immigrants and Nonimmigrants of Persons
Who Participate in Serious Human Rights and Humanitarian Law
Violations and Other Abuses, Pres. Proc. No. 8697, 76 Fed. Reg.
49, 277 (Aug. 4, 2011)................................................................... 34

Suspension of Entry as Nonimmigrants of Officers and Employees of
the Nicaraguan Government, Pres. Proc. No. 5887, 53 Fed. Reg.
43, 185 (Oct. 22, 1988) ................................................................. 27

To Suspend Entry as Immigrants or Nonimmigrants of Persons
Engaged in or Benefiting from Corruption, Pres. Proc. No. 7750,
69 Fed. Reg. 2287 (Jan. 12, 2004)................................................ 33

To Suspend Entry As Immigrants And Nonimmigrants of Foreign
Government Officials Responsible for Failing To Combat
Trafficking In Persons Billing code 3195-W9-P4790, Pres. Proc.
No. 8342, 74 Fed. Reg. 4093 (Jan. 21, 2009) .............................. 24

Exec. Order No. 13,687, 80 Fed. Reg. 819 (Jan. 2, 2015) .................... 34

x

Exec. Order No. 13, 726 81 Fed. Reg. 23, 559 (April 19, 2016) ....................... 34

Exec. Order No. 13,712, 80 Fed. Reg. 73,633 (Nov. 22, 2015) ......................... 34

President Proclamation No. 7060, 62 Fed. Reg. 65, 987 (Dec. 12, 1997) ............................................................................................................. 34

## <u>Other Authorities</u>

*Immigration Law and Iranian Students*, 4A Op. O.L.C. 133 (Nov. 11, 1979) ...........................................................................................................28

Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Wavier Program,* https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program ....................................................... 5

U.S. Dep't of State, *Country Reports on Terrorism 2015*, https://www.state.gov/documents/organization/258249.pdf ............................4

U.S. Dep't of State, *Executive Order on Visas* (Mar. 6, 2017), https://travel.state.gov/content/travel/en/news/important-announcement.html ..........................................................................................10

U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.html......................................................4

Press Release, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https:// www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program ................................................................. 5

U.S. Visa Office, *Report of the Visa Office of 2015*, https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2015.html ...............26

U.S. Visa, *Report of the Visa Office of 2016,* https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2016.html ...............26

## INTRODUCTION

Consistent with the Executive's broad constitutional authority over foreign affairs and national security, Sections 1182(f) and 1185(a) of Title 8 expressly authorize the President to restrict or suspend entry of any class of aliens when in the national interest. Exercising that authority, the President issued Executive Order No. 13,780 (Order), which temporarily suspends (i) entry of certain foreign nationals from six countries that Congress and the previous Administration determined pose a heightened terrorism risk and (ii) processing of refugee applications. 82 Fed. Reg. 13,209 (2017). Those suspensions apply only for a short period, to enable the new Administration to review the Nation's screening and vetting procedures to ensure that they adequately detect terrorists. For the past 30 years, every President has invoked his power to protect the Nation by suspending entry of categories of aliens. As a legal matter, the Order is no different.

The Order replaces former Executive Order No. 13,769 (Revoked Order), 82 Fed. Reg. 8977 (2017). After the Ninth Circuit declined to stay a nationwide injunction against the Revoked Order, the President decided to issue a new Order to address the court's concerns rather than engaging in protracted litigation. The Order applies only to aliens outside the United States who lack a visa—individuals who "ha[ve] no constitutional rights regarding" their admission. *Landon v. Plasencia,* 459 U.S. 21, 32 (1982). Even as to them, the Order includes a

comprehensive waiver process to mitigate any undue hardship.  It also eliminates any preference for religious minorities.  These and other changes are fatal to plaintiffs' request for a temporary restraining order (TRO) for three reasons.

*First*, plaintiffs' claims are not justiciable.  Hawaii alleges that the Order will hinder recruitment by state universities and deter tourism, but its own submissions demonstrate that those assertions are mere speculation.  Hawaii alternatively tries to assert third-party standing on behalf of individuals affected by the Order, but Hawaii has no close relationship with those individuals—who can in any event seek to bring their own as-applied claims.  The problem with plaintiff Ismail Elshikh's claim here is that it is not ripe:  his mother-in-law has not been denied a waiver.  Until that happens, neither she nor Elshikh has suffered any injury fairly traceable to the Order.

*Second*, the changes to the Order foreclose plaintiffs' claims on the merits.  Plaintiffs implicitly recognize as much, because their constitutional challenges now take a back seat to a statutory claim that the Ninth Circuit did not previously address.  Two separate provisions of the immigration laws, however, grant the President broad authority plainly encompassing the Order's temporary entry and refugee suspensions.  Accordingly, no court has adopted plaintiffs' statutory arguments.  As a constitutional matter, the Order does not cover any aliens with due-process rights with respect to entry.  To the extent U.S. citizens like

Elshikh have minimal due-process rights regarding entry of others, the Order accords more than ample process through the waiver system.  Nor does it discriminate on the basis of religion.  Its text and purpose are explicitly religion-neutral, and it no longer grants any preference for victims of religious persecution.

*Third*, at a minimum, the changes to the Order eliminate any occasion to consider emergency relief.  Its narrowed scope and expanded waiver process fully address the possible scenarios that concerned the Ninth Circuit.  Aliens subject to the Order face no injury unless and until they are denied a waiver.  The proper course if a waiver is denied is to attempt to bring as-applied challenges then on a more developed record.  There is no basis to restrain the Order in the interim, and certainly no basis to restrain it nationwide.  For these reasons, plaintiffs' TRO request should be denied.

## BACKGROUND

### I.    STATUTORY BACKGROUND

The Immigration and Nationality Act, 8 U.S.C. §§1101 *et seq.*, governs admission of aliens into the United States.  Admission (aside from lawful permanent residents) generally requires a valid immigrant or nonimmigrant visa (or another entry document, such as a refugee travel document).  *Id.* §§1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203.  The process of obtaining a visa typically

includes an in-person interview and results in a decision by a State Department consular officer. *Id*. §§1201(a)(1), 1202, 1204.  Eligibility for a visa depends on many factors, including nationality. *See*, *e.g.*, *id.* §§1184(e), 1735.  While a visa may be necessary for admission, it does not guarantee admission if the alien, upon arriving, is found "inadmissible." *Id.* §§1201(h), 1225(a).

Congress has established a Visa Waiver Program that enables nationals of participating countries to seek temporary admission for tourism or certain business purposes without a visa. 8 U.S.C. §§1182(a)(7)(B)(iv), 1187.  In 2015, however, Congress excluded from the Program individuals with connections to specific countries. *Id.* §1187(a)(12).  Congress itself specifically excluded nationals of countries participating in the Program who are dual nationals of or had recently visited Iraq or Syria, where "[t]he Islamic State of Iraq and the Levant (ISIL) … maintain[s] a formidable force," and nationals of and recent visitors to countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1] 8 U.S.C. §1187(a)(12)(A)(i)-(ii).  Congress also authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a

_____

[1] U.S. Dep't of State, *Country Reports on Terrorism* 6 (2016), https://www.state.gov/documents/organization/258249.pdf.

foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country … increases the likelihood that the alien is a credible threat to" U.S. national security, *id.* §1187(a)(12)(D)(i)-(ii), and in February 2016 DHS excluded recent visitors to Libya, Somalia, and Yemen, noting that the designation was "indicative of the Department's continued focus on the threat of foreign fighters."[2]   In short, Congress and the prior Administration determined that the conditions in these seven countries warranted individualized review in admitting aliens into our Nation's borders.

Congress separately has established the U.S. Refugee Admissions Program (Refugee Program), which allows aliens who have been (or have a well-founded fear of being) persecuted on account of race, religion, nationality, or other specified grounds to seek admission.  8 U.S.C. §1101(a)(42); *see id.* §1157.  Refugees are screened for eligibility and admissibility abroad; if approved, they may be admitted without a visa.  *Id.* §§1157(c)(1), 1181(c).  Congress expressly authorized the President to determine the maximum number of refugees admitted each fiscal year. *Id.* §1157(a)(2)-(3).

---

[2]   https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

Critically, although Congress created these various avenues to admission, it accorded the Executive broad discretion to restrict or suspend admission of aliens. First, Section 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

Second, Section 1185(a)(1) makes it unlawful for an alien to enter or attempt to enter the country "except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."

## II.   THE REVOKED ORDER

On January 27, 2017, the President issued the Revoked Order.  It directed the Secretaries of Homeland Security and State to assess current screening procedures to determine whether they were sufficient to detect individuals who were seeking to enter this country to do it harm.  Revoked Order §3(a)-(b).  While that review was ongoing, the Revoked Order suspended for 90 days entry of foreign nationals of the seven countries already identified as posing heightened terrorism-related concerns in the context of the Visa Waiver Program.  *Id.* §3(c).  It authorized the Secretaries, however, to make case-by-case exceptions to the suspension.  *Id.* §3(g).

The Revoked Order similarly directed a review of the Refugee Program, and, pending that review, suspended entry under the Program for 120 days, subject to case-by-case waivers. Revoked Order §5(a), (c). It also suspended admission of Syrian refugees until the President determined "that sufficient changes have been made to the [Refugee Program] to ensure that admission of Syrian refugees is consistent with the national interest." *Id.* §5(c). Finally, it sought to assist victims of religious persecution by directing agencies to prioritize refugee claims premised on religious-based persecution, provided the religion at issue was "a minority religion in the individual's country of nationality." *Id.* §5(b).

## III.   LITIGATION CHALLENGING THE REVOKED ORDER

The Revoked Order was challenged in multiple courts. The State of Washington filed suit in Seattle, seeking a TRO against Sections 3(c), 5(a)-(c), and 5(e). *Washington v. Trump*, No. 17-41 (W.D. Wash.). On February 3, 2017, the district court enjoined those provisions nationwide. 2007 WL 462040 (W.D. Wash. Feb. 3, 2017). On February 9, after accelerated briefing and argument, the Ninth Circuit declined to stay the injunction pending appeal. *Washington v. Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017) (per curiam). Although acknowledging that the injunction may have been "overbroad," the court declined to narrow it, concluding that "[t]he political branches are far better equipped" to do so. *Id.* at 1166-67.

7

## IV.   THE ORDER

Responding to the Ninth Circuit's invitation, on March 6, 2017—at the joint urging of the Attorney General and Secretary of Homeland Security[3]—the President issued the Order.  The Order takes effect March 16, revokes the Revoked Order, and replaces it with substantially revised provisions that address the Ninth Circuit's concerns.

### A.   The Order's Temporary Entry Suspension

The Order's central, explicit purpose is to enable the President and his Administration to assess whether current screening and vetting procedures are sufficient to detect terrorists seeking to infiltrate the Nation.   Order §1(f).  To facilitate that important review, the President ordered a temporary, 90-day pause on entry of certain foreign nationals from six nations previously "identified as presenting heightened concerns about terrorism and travel to the United States" by Congress or the prior Administration:  Iran, Libya, Somalia, Sudan, Syria, and Yemen.  *Id.* §1(a), (d)-(f).

---

[3]  Joint Ltr. to President (Mar. 6, 2017), https://www.dhs.gov/sites/default/ files/publications/17_0306_S1_DHS-DOJ-POTUS-letter_0.pdf (Ex. A).

### 1. Temporary suspension of entry by certain aliens from six countries

As the Order explains, each of those countries "is a state sponsor of terrorism, has been significantly compromised by terrorist organizations, or contains active conflict zones," which is why Congress and the Secretary of Homeland Security previously designated them "countries of concern."  Order §1(d).  The Order details the circumstances of each country that give rise to "heightened risk[s]" that terrorists from those countries would attempt to enter the United States and that those countries' governments may lack the "willingness or ability to share or validate important information about individuals seeking to travel to the United States" to screen them properly.  Order §1(d)-(e).

To that end, the Order "suspend[s] for 90 days" the "entry into the United States of nationals of those six countries."  Order §2(c).  In response to the Ninth Circuit's ruling, however, the Order clarifies that the suspension applies only to aliens who: (1) are outside the United States on the Order's effective date, (2) do not have a valid visa on that date, *and* (3) did not have a valid visa on the effective date of the Revoked Order.  Order §3(a).  It expressly excludes other categories of aliens that concerned the Ninth Circuit, including (among others) any lawful permanent resident; any foreign national admitted to or paroled into the United States; any individual with a document other than a visa permitting travel to the

9

United States; and any foreign national granted asylum, any refugee already admitted to the United States, or any individual granted certain protections from removal. *See id.* §3(b).  Consequently, an alien who is in the United States on the Order's effective date (for example, on a single-entry visa, Mot. 40 n.1 (ECF No. 65)) and seeks to leave will not be subject to the Order's temporary suspension upon return; instead, he will be subject to pre-existing rules governing admission.

## 2.      Case-by-case waivers

The Order also contains a detailed waiver provision.  Order §3(c).  It permits consular officials (and the U.S. Customs and Border Protection Commissioner) to grant case-by-case waivers where denying entry "would cause undue hardship" and "entry would not pose a threat to national security and would be in the national interest." *Id.*  Moreover, it lists circumstances where waivers could be considered, including for (among others):

- foreign nationals who were previously "admitted to the United States for a continuous period of work, study, or other long-term activity," but who are currently outside the country and seeking to reenter;

- individuals who seek entry for "significant business or professional obligations"; and

- individuals who seek entry "to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a U.S. citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa."

*Id.*  These provisions providing examples of instances where a waiver may be warranted expand significantly on the Revoked Order's provisions regarding waivers.

Finally, the Order specifies that requests for waivers will be processed "as part of the visa issuance process."  Order §3(c); *see also* Second Am. Compl. (ECF No. 64), Ex. 14, #Q8 (Dep't of Homeland Security, *Q&A: Protecting the Nation from Foreign Terrorist Entry to the United States* (Mar. 6, 2017)); U.S. Dep't of State, *Executive Order on Visas* (Mar. 6, 2017), https://travel.state.gov/content/travel/en/news/important-announcement.html (Ex. B).    Consular officers reviewing visa applications will carefully review each request under these criteria.

### B.      The Order's Temporary Refugee Program Suspension

The Order also directs an immediate review to determine whether the Refugee Program's processes adequately identify terrorist threats, and "what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat" to the country.  Order §6(a).  To facilitate that review, the Order suspends Refugee Program travel for 120 days.  "Terrorist groups have sought to infiltrate various nations through refugee programs," and "some of those who have entered the United States through our immigration system"— including "individuals who first entered the country as refugees"—"have proved to be threats to our national security."  *Id.* §1(b)(iii), (h).  Moreover, more than 300

11

individuals who entered the United States are currently the subject of counterterrorism investigations. *Id.* §1(h). The Order thus concludes that temporarily pausing the Program is necessary to ensure that those seeking to do the United States harm do not enter as refugees while the new Administration assesses the adequacy of current screening procedures.

The Order authorizes the Secretaries of State and Homeland Security jointly to make "case-by-case" exceptions where doing so is "in the national interest and does not pose a threat" to the Nation's security or welfare—*e.g.*, if "denial of entry would cause undue hardship." Order §6(c). Unlike the Revoked Order, the Order does not prioritize refugee claims based on persecution against religious minorities. It also omits the provision indefinitely suspending refugee applications of Syrian nationals, and exempts refugee applicants the State Department has formally scheduled for transit as of the Order's effective date. *Id.*

## V.  DISMISSAL OF THE NINTH CIRCUIT APPEAL, AND PLAINTIFFS' AMENDED COMPLAINT AND RENEWED TRO MOTION

In light of the Order, on March 7, 2017, the government filed a motion to dismiss its appeal of the Washington court's preliminary injunction, which the Ninth Circuit granted on March 8. The same day, at plaintiffs' request, this Court lifted the stay of proceedings. ECF No. 59. Plaintiffs then filed their operative complaint and a new motion for a TRO.

12

## STANDARD OF REVIEW

Emergency relief is "an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008).  The movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that [a TRO] is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  Injunctive relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954-55 (D.C. Cir. 1978).

Plaintiffs assert facial challenges to the Order.  "Facial challenges are disfavored" compared to as-applied challenges. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008).  They are thus "the most difficult challenge[s] to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Plaintiffs must show more than that the Order "*might* operate unconstitutionally under some conceivable set of circumstances." *Id.* (emphasis added).  Instead, they bear the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *Id.*  Thus, plaintiffs must show that all or almost all applications will result in the unlawful exclusion of foreign nationals seeking entry into the United States.

13

# ARGUMENT

Plaintiffs do not come close to meeting their extraordinary burden.  At the outset, they present no justiciable claim at all.  As explained above, the Order applies only to individuals outside the country who do not have a current visa, and even as to them, it sets forth robust waiver provisions.   Among other things, therefore, plaintiffs cannot show that any individual whom they seek to protect is in imminent risk of being denied entry due to the Order.  All of their alleged injuries are speculative.  Moreover, plaintiffs' claims fail on the merits.  The Order falls well within the President's statutory authority and addresses the constitutional concerns identified by the Ninth Circuit.  Plaintiffs therefore are not entitled to the sweeping relief they seek.

## I.    PLAINTIFFS' CHALLENGES TO THE ORDER ARE NOT JUSTICIABLE

All of plaintiffs' claims fail because they lack Article III standing, because their claims are not yet ripe, or because plaintiffs may not challenge the denial of immigration benefits to third parties.  Plaintiffs must demonstrate a "legally and judicially cognizable" injury, *Raines v. Byrd*, 521 U.S. 811, 819 (1997), consisting of, at minimum, a "concrete and particularized" injury caused by the Order that is "actual or imminent, not conjectural or hypothetical."   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  They have not done so.  The only harms that Hawaii asserts to itself—as opposed to third parties—are far too speculative to

14

satisfy Article III.   Hawaii also invokes third-party standing on behalf of
individuals affected by the Order.   But third-party standing is the narrow exception,
not the rule, and Hawaii has not met its stringent requirements.   In addition,
Hawaii's claims are barred by the well-established rule generally precluding
judicial review of the denial of a visa.   The Ninth Circuit's ruling addressing these
types of issues is not to the contrary.   Its ruling explicitly provided only a "very
preliminary" assessment of standing, and the plaintiffs there established a much
closer relationship to individuals affected by the Revoked Order, which Hawaii
does not establish as to the new Order.   847 F.3d at 1159-61.

Finally, Elshikh claims that he has standing to challenge the inability of his
mother-in-law, a Syrian national, to enter the United States.   But that claim—and
any similar claims Hawaii might assert on behalf of other residents—is not ripe,
since Plaintiffs cannot show that Elshikh's mother-in-law or any other affected
relative of a Hawaiian resident has yet sought, much less been denied, a waiver.

**A.**     **Hawaii's Claims Are Not Justiciable**

**1.**     **Hawaii itself lacks any actual or imminent concrete injury**

A "'threatened injury must be *certainly impending* to constitute injury in
fact'"; "'[a]llegations of *possible* future injury' are not sufficient."   *Clapper v.
Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013).   Here, Hawaii alleges three injuries to
itself.   Each is far too speculative to support Article III standing, and none gives

the State a "legally and judicially cognizable" injury, *Raines*, 521 U.S. at 819, caused by the Order that is "concrete and particularized" and "actual or imminent," *Lujan*, 504 U.S. at 560-61.

First, Hawaii alleges that the 90-day entry suspension will prevent "state agencies and universities" from "recruit[ing] and accept[ing] qualified applicants." Compl. ¶¶93, 97; Mot. 45-46. Hawaii's own declarations, however, show that it is merely guessing. *See, e.g.*, ECF No. 66-6, ¶8 (acknowledging that "*it is too soon to determine full impact* … on the University's future recruitment efforts," and stating only that the university is "*anticipating* that recruitment … *may* be impacted" (emphases added)). Hawaii does not identify any particular persons it seeks to recruit who have concrete plans to relocate to Hawaii and join a state university or agency—let alone specific plans to do so in the next 90 days. Rather, the most Hawaii can say is that unidentified aliens *might* aspire to do so someday. But "[s]uch 'some day' intentions—without any description of concrete plans … —do not support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564. Even if Hawaii could identify individuals whom it sought to recruit from one of the six countries, it still would have to show that the Order would prevent such recruitment—*i.e.*, that those individuals are subject to the entry suspension and could not obtain a waiver. It has not even attempted to make this showing.

16

Second, Hawaii alleges that the Order harms its economy by preventing private firms from hiring foreign nationals from the six countries and by discouraging tourism, thereby reducing tax revenue.  Compl. ¶¶99-103; Mot. 47-48.  Such attenuated effects on a State—which depend on the actions of third parties not before the Court—cannot be sufficient to confer Article III standing.  *See Lujan*, 504 U.S. at 562 ("much more is needed" to establish standing when alleged injury "hinge[s] on the response" of "third part[ies] to the government action").  Otherwise, States could challenge virtually any change in immigration policy that reduced the number of visitors from abroad.  And in any event, Hawaii's allegations of economic injury are even more speculative than its claimed injuries to state agencies and universities.  Hawaii offers no evidence that the 90-day pause on entry will prevent private firms from hiring aliens from the covered countries.  It certainly does not demonstrate that hiring would be so impaired as to materially affect the State's tax revenue.  Moreover, the Order specifically contemplates waivers for foreign nationals who "seek[] to enter the United States for significant business or professional obligations."  Order §3(c)(iii).

Hawaii's only support for anticipating reduced tourism is that visits from the Middle East declined in January 2017.  Compl. ¶¶100-101.  But the Order was in effect only 4 days in that month.  Hawaii also offers nothing to show that the new Order—much narrower in its scope—will have the same effect.  To the contrary,

17

its own evidence refers only to the "potential" for "further uncertainty"—undermining any claim of concrete, imminent injury.  ECF No. 66-4, ¶10.

Finally, Hawaii resorts to alleging "intangible harms" because the Order forces the State to "tolerate a policy" it considers unlawful and "antithetical to Hawaii's State identity and spirit."  Compl. ¶¶98-99, 105; *but see Allen v. Wright*, 468 U.S. 737, 753-55 (1984) (allegation that "Government is violating the law" insufficient to establish standing).  Contrary to plaintiffs' assertion (Mot. 47), the Order does not "command" or forbid Hawaii to do anything.  Hawaii's amorphous assertions about its values simply boil down to disagreement with the Executive's policy judgments.  Such "disagreement," even if "phrased in constitutional terms," "is not an injury sufficient to confer standing."  *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 479-80 (1982).

### 2.      Hawaii cannot rely on purported injuries to others

Unable to show injury to itself, Hawaii attempts to rely on purported injuries to others.  But "a party 'generally must assert his *own* legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  Outside the context of free-speech rights or "'enforcement of [a] challenged restriction *against the litigant*,'" neither of which is at issue here, the Supreme Court "ha[s] not looked favorably upon third-

18

party standing," and has permitted it only where a party demonstrates a "close relationship with the person" whose rights it invokes *and* a "hindrance" to that person's "ability to protect his own interests." *Id*. at 129-30 (emphasis in original); *see McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 878 (9th Cir. 2011). Hawaii falls short on both fronts.

First, Hawaii does not allege any close relationship with the aliens covered by the entry suspension, all of whom are currently abroad and lack a visa. The State cannot premise its participation in a federal lawsuit on the interests of unspecified aliens with whom the State has no identified connection. *See*, *e.g.*, *Voigt v. Savell*, 70 F.3d 1552, 1565 (9th Cir. 1995) (no close relationship where plaintiff may "occasionally be in a position to hire a non-resident"). Hawaii alleges that the suspension of the Refugee Program will hinder its ability to "help[] refugees resettle in Hawaii" through its "small" "refugee program," Compl. ¶104, but even if that were sufficient, Hawaii does not claim any existing relationship with would-be refugees affected by that suspension.

Second, Hawaii also cannot demonstrate that any individuals whose rights it seeks to represent face a "hindrance" in vindicating their own rights. *Kowalski*, 543 U.S. at 129-30. Hawaii asserts that its residents and their family members and friends are injured by the Order. But it fails to explain why they cannot seek relief themselves—as Hawaii's own co-plaintiff Elshikh has done here. *See Hodak v.*

19

*City of St. Peters*, 535 F.3d 899, 905 (8th Cir. 2008) (noting agreement among circuits that, "if a third party actually asserts his own rights, no hindrance exists, and third-party standing is improper"). Whether or not those individuals' claims are justiciable or meritorious, Hawaii's intervention is unnecessary, and therefore impermissible.

Hawaii cannot circumvent these limitations by seeking to represent the rights of its residents under the *parens patriae* doctrine. Although States may sue on their citizens' behalf as *parens patriae* in some settings, "it is no part of [a State's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government." *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *accord Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982). A State can "assert its" own "rights under federal law," *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007), but Hawaii seeks to rely on injuries it claims that *its citizens and residents* will suffer.

### 3. Hawaii may not challenge the denial of immigration benefits to third parties

The impropriety of Hawaii's attempt to seek judicial review on others' behalf is especially acute in the immigration context. The Supreme Court has "long recognized" a doctrine of "consular nonreviewability," under which the denial of a visa is "'largely immune from judicial control'" and thus cannot be challenged in

court, even by the affected alien. *Cardenas v. United States*, 826 F.3d 1164, 1169 (9th Cir. 2016) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792, 794-95 (1977)); *see Brownell v. Tom We Shung*, 352 U.S. 180, 184 n.3, 185 n.6 (1956); *see also, e.g.*, *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1158-59 & n.2 (D.C. Cir. 1999).   The Ninth Circuit has identified "'a limited exception to the doctrine … where the denial of a visa implicates the constitutional rights of American citizens.'" *Cardenas*, 826 F.3d at 1169.   But that "limited exception" for a U.S. citizen asserting her *own* constitutional rights and seeking review of a specific visa denial plainly does not encompass Hawaii's sweeping challenge, which is based largely if not entirely on statutory claims and asserted constitutional rights held by others, not by the State itself.

## B.   The Claims Of Elshikh And Any Other Individual Hawaii Seeks To Represent Are Unripe

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998).   The plaintiff "must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss.'" *W. Oil & Gas Ass'n v. Sonoma County*, 905 F.2d 1287, 1291 (9th Cir. 1990).   Here, the only concrete injury Elshikh alleges is that the Order "will

prevent [his] mother-in-law"—a Syrian national who lacks a visa—from visiting Elshikh and his family in Hawaii. Compl. ¶85.

That claim is not ripe. The Order expressly provides a "case-by-case" waiver process for foreign nationals of one of the six covered countries. Order §3(c). Moreover, it specifically provides that waiver may be appropriate if a "foreign national seeks to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted" and if "the denial of entry during the suspension period would cause undue hardship."   Order §3(c)(iv).   It is therefore entirely possible Elshikh's mother-in-law—if she is otherwise admissible—will obtain such a waiver. Compl. ¶¶26-27, 85. Unless and until she is denied a waiver, her ability or inability to enter—and thus Elshikh's claimed injury—"rests upon 'contingent future events.'" *Texas*, 523 U.S. at 300.

The same is true of other, unidentified foreign-national "family and friends" of Hawaiian residents whom plaintiffs claim may be affected by the Order. Compl. ¶¶91, 96; *see* Mot. 20-21. Like Elshikh's mother-in-law, whether the Order will prevent those individuals from entering the United States turns on (*inter alia*) whether they receive waivers. Any such claims are thus also unripe.

22

## II.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

### A.  The Order Is A Valid Exercise Of The President's Authority

Even if plaintiffs' challenges to the Order were justiciable, they would not warrant emergency relief because none is likely to succeed.  The Order's temporary suspension of entry of certain classes of aliens during a review of the Nation's screening and vetting procedures is a valid exercise of the President's broad statutory authority to "suspend the entry of any aliens or of any class of aliens" (Section 1182(f)) and to prescribe the terms on which aliens may enter (Section 1185(a)(1)).  Plaintiffs do not—and cannot—deny that the Order falls comfortably within the plain terms of those express grants of authority.  Instead, they devote the lion's share of their motion (Mot. 24-37) to arguing that other statutes should be construed as implied repeals of those authorities.  No court has accepted those arguments, which misread the relevant statutes.

#### 1.  The Order falls squarely within the President's broad authority under Sections 1182(f) and 1185(a)

"'[T]he power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international relations and defending the country against foreign encroachments and dangers—a power to be exercised exclusively by the political branches of the government.'"  *Kleindienst v. Mandel*, 408 U.S. 753, 765

(1972). Congress, moreover, has conferred expansive authority on the President, including in two statutory provisions that the Order expressly invokes. Order §2(c).

First, Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or of any class of aliens as immigrants or nonimmigrants," or "impose on the entry of aliens any restrictions he deems to be appropriate." "The President's sweeping proclamation power [under Section 1182(f)] provides a safeguard against the danger posed by any particular case or class of cases that is not covered by one of the [inadmissibility] categories in section 1182(a)." *Abourezk v. Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987). Every President over the last thirty years has invoked that authority to suspend or restrict entry of certain classes of aliens.[4]

---

[4] *See, e.g.*, Proclamation 5517 (1986) (Reagan; Cuban nationals); Exec. Order No. 12,807 (1992) (George H.W. Bush; government officials who impeded anti-human-trafficking efforts); Proclamation 8342 (2009) (George W. Bush; same); Proclamation 6958 (1996) (Clinton; Sudanese government officials and armed forces); Proclamation 8693 (Obama; aliens subject to U.N. Security Council travel bans).

Second, Section 1185(a) broadly authorizes the "President" to "prescribe" reasonable "rules, regulations, and orders," and "limitations and exceptions" regarding entry of aliens.  That provision is the latest in a line of statutory grants of authority tracing back nearly a century.  *See* Pub. L. No. 65-154, §1(a), 40 Stat. 559 (1918).   Originally limited to times of war or declared national emergency, Congress removed that limitation in 1978, when it enacted Section 1185(a) in its current form.  Pub. L. 95-426, §707(a), 92 Stat. 963, 992-93 (1978).

Both of those provisions comfortably encompass the Order's temporary suspension of entry of aliens under the Refugee Program and from six countries that the President—in consultation with the Attorney General and the Secretaries of State and Homeland Security—concluded required special precautions while the review of existing screening and vetting protocols is completed.  That temporary measure is a paradigmatic exercise of the President's authority to "suspend the entry" of "any class of aliens" he finds may be "detrimental to the interests of the United States," 8 U.S.C. §1182(f), and to prescribe reasonable "limitations" on entry, *id.* §1185(a)(1).

25

**2.      The other statutes plaintiffs invoke do not restrict the President's broad authority under Sections 1182(f) and 1185(a)**

**a.      Section 1152 does not prevent the President from suspending the entry of nationals from the designated foreign countries**

Plaintiffs first contend (Mot. 25-29) that Section 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the allocation of immigrant visas, bars the President from drawing nationality-based distinctions under Sections 1182(f) and 1185(a).  Even if that were correct, it would not justify the relief plaintiffs seek because Section 1152(a)(1)(A) applies only to aliens seeking *immigrant* visas—a small fraction of those affected by the Order.  In any event, plaintiffs are quite wrong to assert that Section 1152(a)(1)(A) disables the President from drawing nationality-based distinctions under Sections 1182(f) and 1185(a), as Presidents have done for decades.

**i.**      Even under plaintiffs' reading, Section 1152(a)(1)(A) has no bearing on the vast majority of the Order's applications.  By its terms, that provision governs only issuance of "immigrant" visas.  8 U.S.C. §1152(a)(1)(A); *see id.* §1101(a)(15)-(16), (20).  However, the vast majority—more than 70%—of visas issued in the last two fiscal years to nationals of the six countries at issue were

*nonimmigrant* visas.[5]  Most of the aliens plaintiffs claim will be affected by the Order—students, employees, tourists, and family visiting relatives, like Elshikh's mother-in-law—would likewise seek to enter on nonimmigrant visas.  By its plain terms, Section 1152(a)(1)(A) has no application to such aliens.  It likewise has no application to those entering under the Refugee Program, who do not receive visas at all.  *See* 8 U.S.C. §1181(c).  Even where Section 1152(a)(1)(A) applies, Congress made clear that it does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications," *id.* §1152(a)(1)(B), which at most is all the Order's temporary pause does.  Plaintiffs, therefore, cannot meet the "heavy burden" of "establish[ing] that no set of circumstances exist under which the [Order] would be valid." *Salerno*, 481 U.S. at 745.  To the contrary, it would still be valid in the vast majority of applications.

**ii.**   In any event, plaintiffs' statutory argument is wrong.  Even where it applies, Section 1152(a)(1)(A) does not restrict the President's authority to draw nationality-based distinctions under Sections 1182(f) and 1185(a).  Section 1152(a)(1)(A) was enacted in 1965 to abolish the prior system of nationality-based quotas for immigrant visas.  Congress replaced that system with uniform, per-

---

[5] https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2016.html;   https://travel.state.gov/content/visas/en/law-and-policy/statistics/annual-reports/report-of-the-visa-office-2015.html.

country percentage limits.  Section 1152(a)(1)(A) addresses the subject of relative "preference" or "priority" (and reciprocal disadvantage or "discrimination") in the allocation of immigrant visas by making clear that the uniform percentage limits are the only limits that may be placed on the number of immigrant visas issued to nationals of any country.

Section 1152(a)(1)(A) thus governs the ordinary process of allocating and granting immigrant visas.  Its plain text governs only "the issuance of an immigrant visa"; it does not purport to restrict the President's antecedent, longstanding authority to suspend entry of "any class of aliens" or to prescribe reasonable "rules, regulations, and orders" regarding entry as he deems appropriate.  And it has never been understood to prohibit the President from drawing nationality-based distinctions under Section 1182(f).  For example, President Reagan invoked Section 1182(f) to "suspend entry into the United States as immigrants by all Cuban nationals," subject to exceptions.  Proclamation No. 5517 (1986).  *See also* Proclamation 6958 (1996) (members of Sudanese government and armed forces); Proclamation 5829 (1988) (certain Panamanian nationals); Proclamation 5887 (1988) (Nicaraguan government officers and employees).  Moreover, the Supreme Court has deemed it "perfectly clear that [Section 1182(f)] grants the President ample power to establish a naval blockade that would simply deny illegal Haitian

28

migrants the ability to disembark on our shores." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187 (1993).

Section 1185(a), too, has long been understood to authorize nationality-based distinctions.  In 1979, the Office of Legal Counsel construed it as authorizing the President to "declare that the admission of Iranians or certain classes of Iranians would be detrimental to the interests of the United States." *Immigration Laws and Iranian Students*, 4A Op. O.L.C. 133, 140 (Nov. 11, 1979).  Two weeks later, President Carter invoked Section 1185(a) to direct "limitations and exceptions" regarding "entry" of certain "Iranians."  Exec. Order No. 12,172 (1979).  Plaintiffs are thus simply wrong to assert (Mot. 29) that past Presidents have not drawn nationality-based distinctions in administering the immigration laws. *See also, e.g.*, *Narenji v. Civiletti*, 617 F.2d 745, 746-748 (D.C. Cir. 1979) (upholding regulation that required nonimmigrant-alien post-secondary-school students who were Iranian natives or citizens to provide residence and immigration status to INS).

Interpreting Section 1152(a)(1)(A) to prohibit the President from drawing these and other nationality-based distinctions would also raise serious constitutional questions that the Court must avoid if possible. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  As these examples illustrate, limiting the entry of nationals of particular countries can be critical to the President's ability to conduct the Nation's

29

foreign affairs and protect its security.  Yet plaintiffs' statutory interpretation would completely disable the President from restricting the entry of immigrants from any country—even one with which the United States was on the verge of war.

     **iii.**    Plaintiffs offer no sound reason to adopt that constitutionally dubious interpretation or to upset the long-settled understanding of the President's statutory authority.  Plaintiffs cite (Mot. 26-27) a handful of decisions addressing various types of discrimination in other immigration contexts.  But only two of those decisions even mentioned Section 1152(a)(1)(A), and none of them involved an exercise of the President's authority under Section 1182(f) or Section 1185(a).[6] Plaintiffs are wrong (Mot. 26) that those decisions reflect a general bar on nationality-based distinctions in immigration.  In fact, "given the importance to immigration law of, *inter alia*, national citizenship, passports, treaties, and relations between nations, the use of such classifications is commonplace and almost inevitable."  *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).

---

    [6]  *See generally Wong Wing Hang v. INS*, 360 F.2d 715 (2d Cir. 1966) (not addressing Section 1152(a)(1)(A)); *Bertrand v. Sava*, 684 F.2d 204 (2d Cir. 1982) (same); *Abdullah v. INS*, 184 F.3d 158 (2d Cir. 1999) (same); *United States ex rel. Kaloudis v. Shaughnessy*, 180 F.2d 489 (2d Cir. 1950) (predating Section 1152(a)(1)(A)); *cf. Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 472-73 (D.C. Cir. 1995) (processing immigrant visas), *vacated on other grounds*, 519 U.S. 1 (1996); *Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997) (issuance of nonimmigrant visas by individual consular officers).

Plaintiffs contend (Mot. 28) that Section 1152(a)(1)(A) overrides the President's Section 1182(f) authority because it was enacted "later in time." In fact, plaintiffs have it backwards: to read Section 1152(a)(1)(A) as narrowing the President's Section 1182(f) authority would be to treat it as a partial "'repeal[] by implication,'" which courts will not do unless Congress's "'intention'" is "'clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife (NAHB)*, 551 U.S. 644, 662, 664 n.8 (2007); *see Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). Sections 1152(a)(1)(A) and 1182(f) can, and therefore must, be reconciled by sensibly reading Section 1152(a)(1)(A)'s general, default provisions as not affecting the President's authority to suspend entry under Section 1182(f) based on a specific finding about the national interest. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012) ("'[I]t is a commonplace of statutory construction that the specific governs the general.'").

Furthermore, even if Section 1152(a)(1)(A) could be construed to narrow Section 1182(f), it cannot be read to narrow Section 1185(a)—which was substantially amended in 1978, *after* Section 1152(a)(1)(A)'s enactment. Nothing in Section 1185(a)'s current text or post-1978 history limits the President's authority to restrict entry by nationals of particular countries.

31

### b.    Section 1182(a) does not prevent the President from suspending the entry of nationals from the designated countries

Plaintiffs separately contend (Mot. 29-37) that the Order's entry suspension exceeds the President's Section 1182(f) authority because the suspension is based on terrorism concerns, and Congress has already set forth criteria for denying admission on terrorism-related grounds in Section 1182(a)(3)(B).  That argument is refuted by the very authorities that plaintiffs invoke.

**i.**    Plaintiffs' argument rests (Mot. 32-33) on *Abourezk* and *Allende v. Shultz*, 845 F.2d 1111 (1st Cir. 1988).  Those cases addressed the interaction between (now-superseded) Sections 1182(a)(27) and (28)—two specific exclusions created by Congress.  Section 1182(a)(27) rendered inadmissible aliens who sought to enter the country "to engage in activities which would be prejudicial to the public interest." 8 U.S.C. 1182(a)(27) (1982).  Section 1182(a)(28) rendered inadmissible members of the Communist Party, but was subject to limits and restrictions not applicable to Section 1182(a)(27).  *See Abourezk*, 785 F.2d at 1048.  The First and D.C. Circuits held that Communist Party membership could not be grounds for exclusion under Section 1182(a)(27), because that would render "subsection (28) … superfluous" and would "nullif[y] … that subsection's" specific "restrictions." *Id.* at 1057; *see Allende*, 845 F.2d at 1117-18.

32

Section 1182(f) is markedly different.  It is a broad grant of authority to suspend the admission of aliens, vested in the President himself.  Its whole point is to allow the President to suspend entry of additional aliens, beyond those already rendered inadmissible by Section 1182(a).  The First and D.C. Circuits thus *expressly recognized* that the President may exercise his authority in a manner that overlaps with or reflects the same concerns as the specific exclusions in Section 1182(a).  Both courts made clear that, although Section 1182(a)(28)'s specific provision authorizing exclusion of "the Communist … Party … of any foreign state" precluded interpreting Section 1182(a)(27) to authorize exclusion based on party membership, it did *not* prevent the President from achieving the same result using Section 1182(f)'s "sweeping proclamation power."  *Abourezk*, 785 F.2d at 1049 n.2; *accord Allende*, 845 F.2d at 1118 & n.13.  Indeed, the D.C. Circuit noted that the President had used Section 1182(f) to do just that, by suspending the entry of officers or employees of the "Cuban Communist Party."  *Abourezk*, 785 F.2d at 1049 n.2.  *Abourezk* and *Allende* thus directly refute plaintiffs' reading of Section 1182(f).

**ii.**   Plaintiffs' argument is also unpersuasive on its own terms.  It assumes that the President may not exercise his Section 1182(f) authority based on any general concern that also underlies one of Section 1182(a)'s many specific grounds

for inadmissibility.  That cramped understanding of Section 1182(f) is contrary to the text and structure of the statute and inconsistent with decades of practice.

Section 1182(a) sets forth numerous specific grounds of inadmissibility, including grounds relating to "[h]ealth[]," "[c]riminal" history, "[s]ecurity," and "[f]oreign policy."  8 U.S.C. §1182(a)(1), (2), (3), (3)(C).  Recognizing that specific statutory criteria cannot anticipate every threat to national interests, Section 1182(f) supplements them by granting the President broad authority to "suspend the entry" of additional aliens or classes of aliens.  Nothing in Section 1182(f)'s text suggests that the President cannot exercise that authority in response to concerns that overlap with one of Section 1182(a)'s inadmissibility grounds.  Indeed, given the breadth and variety of those grounds, it is difficult to conceive of a plausible exercise of the President's Section 1182(f) authority that could *not* be characterized as touching a topic already addressed in Section 1182(a).

Experience confirms that Section 1182(f) is not confined to topics on which Section 1182(a) is silent.  For example, Congress identified certain crimes that render aliens inadmissible, 8 U.S.C. §1182(a)(2), yet Presidents have invoked Section 1182(f) to suspend the entry of aliens who committed criminal offenses.[7] Similarly, Section 1182(a) renders inadmissible aliens who have participated in

_____

[7]   *E.g.*, Executive Order No. 13,694 (2015); Proclamation No. 7750 (2004).

34

certain human-rights violations, including "genocide," "torture," and "extrajudicial killing," 8 U.S.C. §1182(a)(3)(E)(ii)-(iii), yet presidents have invoked Section 1182(f) to suspend entry of aliens linked to other human-rights abuses.[8]  More broadly, Section 1182(a)(3)(C) deems an alien inadmissible if the Secretary of State "has reasonable ground to believe" that his entry "would have potentially serious adverse foreign policy consequences."  Virtually every invocation of Section 1182(f) addresses foreign policy and reflects the President's determination that "it is in the foreign policy interests of the United States to suspend the entry" of the affected aliens.  Proclamation No. 7062 (Jan. 14, 1998).[9]  So, too, Section 1182(a)(3)(B)'s exclusion for any alien who has "engaged in" or "is likely to engage" in "terrorist activity" does not bar the President from temporarily suspending certain entries to assess whether existing procedures are adequate to detect potential terrorists.

### B.     The Order Does Not Violate The Due Process Clause

Plaintiffs assert (Mot. 38-40) that the Order abridges due process by "flouting" the Ninth Circuit's decision regarding the Revoked Order.  That is

---

[8]  *E.g.*, Executive Order No. 13,692 (2015); Executive Order No. 13,606 (2012); Proclamation No. 8697 (2011); Proclamation No. 8015 (2006).

[9]  *E.g.*, Proclamation No. 7060 (1997); Executive Order No. 13,726, (2017); Executive Order No. 13,712 (2015); Executive Order No. 13,687 (2015).

wrong.   The Order applies only to aliens who have no due-process rights in connection with their entry into this country, and it specifically excludes all categories of aliens about whom the Ninth Circuit had expressed concern. Plaintiffs thus try to assert the purported due-process rights of Elshikh and other U.S. citizens with respect to the entry of aliens abroad.  But that fails for numerous reasons, including because the Order provides whatever individualized process the Constitution may require.

## 1.   The aliens affected by the Order do not have due-process rights with respect to their entry into the United States

The only persons subject to the Order are foreign nationals outside the United States with no visa or other authorization to enter this country.  Order §3(a)-(b).  The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application." *Landon*, 459 U.S. at 32; *see Mandel*, 408 U.S. at 762.  Such aliens thus have no due-process rights regarding their potential entry.  *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015) (as amended).

The Ninth Circuit's per curiam order did not question that long-settled rule. Instead, it concluded that the Revoked Order raised due-process concerns as applied to lawful permanent residents, "persons who are in the United States, even if unlawfully," and "non-immigrant visaholders who have been in the United States

36

but temporarily departed or wish to temporarily depart" and then return.  847 F.3d at 1166 (emphasis added).  The Order, however, eliminates those concerns because it applies only to persons who "are outside the United States" and lack a visa.  Order §3(a).[10]  It expressly excludes lawful permanent residents, *id.* §3(b)(i), and has no effect on persons who are in the United States or have a valid visa.  *Id.*

### 2. Plaintiffs' due-process claims on behalf of U.S. citizens lack merit

Plaintiffs do not appear to contend that the Order implicates any due-process rights held by the affected aliens.  Instead, their claim focuses on the Order's alleged impact on U.S. citizens and residents in Hawaii—not themselves subject to the Order—who have an interest in the ability of aliens abroad to enter the United States.  The Ninth Circuit described those persons as having "*potential* claims regarding *possible* due process rights."  847 F.3d at 1166 (emphases added).  Even if meritorious, such claims could not justify facially invalidating the Order, but at most could support as-applied claims.  In any event, plaintiffs' attempt to assert such claims fails for three independent reasons.

---

[10] The Ninth Circuit also stated that "refugees" may have "possible" due-process rights.  847 F.3d at 1166.  The court appeared to refer to aliens present in the United States or at the border and who seek asylum or other protection based on a fear of persecution.  *See id.* at 1165.  Those aliens are not affected by the Order's suspension of the Refugee Program, which covers only aliens seeking admission from abroad.  *See* 8 U.S.C. § 1157.

First, the Due Process Clause confers no entitlement on persons in the United States regarding the entry of others. *See Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (plurality opinion) ("There is no such constitutional right."). In a pre-*Din* decision, the Ninth Circuit held that a U.S. citizen spouse had a protected liberty interest in her husband's entry. *See Bustamante v. Mukasey*, 531 F.3d 1059, 1062 (9th Cir. 2008). But Justice Kennedy's concurring opinion in *Din* expressly reserved judgment on whether a person in the United States has any due-process right even with respect to entry of her spouse; he found no "need [to] decide that issue" because "the Government satisfied any" due-process "obligation it might have had." *Id.* at 2139, 2141. There (and in *Bustamante*), the alleged due-process right was tied to the fundamental right to marry, *see* 135 S. Ct. at 2134 (plurality op.)— *i.e.*, "a protected liberty interest in" and "freedom of personal choice in matters of marriage," *Bustamante*, 531 F.3d at 1062. *Din* does not even arguably support extending due-process rights to the entry of more distant family members, such as Elshikh's mother-in-law. *See*, *e.g.*, *Santos v. Lynch*, 2016 WL 3549366, at *3-4 (E.D. Cal. June 29, 2016) (declining to extend *Din* to find "liberty interest an adult child to live in the United States with her parents"); *L.H. v. Kerry*, No. 14-06212, slip op. 3-4 (C.D. Cal. Jan. 26, 2017) (same; daughter, son-in-law, and grandson).

Second, even if the Due Process Clause applied, plaintiffs' procedural due-process claims would fail because they do not explain what further "appropriate

process" (Mot. 40) the Constitution could possibly require.  Unlike the plaintiff in *Din*, plaintiffs here do not seek additional explanation for an individualized immigration decision or contend that officials misapplied a legal standard to a particular case.  *See* 135 S. Ct. at 2132 (plurality opinion).  Instead, plaintiffs challenge the President's decision to suspend the entry of certain nationals of six countries and the Refugee Program.  Plaintiffs do not and cannot claim that due process requires notice or individualized hearings where, as here, the government acts through categorical judgments rather than individual adjudications.  *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915); *Yassini v. Crosland*, 618 F.2d 1356, 1363 (9th Cir. 1980).

Third, even if some individualized process were required, the Order more than provides it through the consular review of waiver requests (part of the visa-application process), including for foreign nationals seeking to "visit or reside with a close family member."  Order §3(c)(iv); *see id.* §3(c)(i)-(ix).  Plaintiffs do not even attempt to identify any inadequacy in that process.  Instead, they simply note (Mot. 39-40) that the Ninth Circuit stated that the Revoked Order's waiver provisions did not cure the court's concerns about that order.  *See* 847 F.3d at 1169.  But the new Order applies only to aliens outside the United States without a visa and establishes a far more detailed waiver process.  *See supra* pp. 9-10.  Those changes resolve the only potential shortcomings the Ninth Circuit identified in the

Revoked Order's waiver provisions.  At an absolute minimum, Plaintiffs cannot claim that the Due Process Clause entitles them to emergency injunctive relief when they have not availed themselves of the process the Order provides.

### C.     The Order Does Not Discriminate Based On Religion

The Order does not discriminate on the basis of religion.  It applies to six countries that Congress and the prior Administration determined posed special risks of terrorism.  It applies to *all* individuals in those countries, regardless of their religion.  And it excludes numerous individuals with ties to this country, while providing a comprehensive waiver process for others.  Plaintiffs nevertheless try to impugn the Order using campaign statements.  As the Supreme Court has made clear, official action must be adjudged by its "'text, legislative history, and implementation of the statute or comparable official act[ion],'" not through "judicial psychoanalysis of a drafter's heart of hearts." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 862 (2005) (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).  Measured against these standards, the Order falls well within the President's lawful authority.

### 1.     The Order draws distinctions on the basis of risk of terrorism, not religion

Plaintiffs correctly do not contend that the Order draws "explicit and deliberate distinctions" based on religion. *Larson v. Valente*, 456 U.S. 228, 246

40

n.23 (1982).   The only language in the Revoked Order touching on religion—a neutral provision intended to assist victims of religious persecution—has been removed.   And the Order's temporary suspensions are expressly premised on the President's finding that a temporary pause in entry was necessary to "prevent infiltration by foreign terrorists" while the review of screening and vetting procedures is ongoing.   Order §2(c).   The six countries covered were previously designated by Congress and the Executive Branch as presenting particular risks, and the risk of continued entry from those countries during the review was, in the President's view, unacceptably high.   *Supra* pp. 8-9.

The Order's stated "secular purpose" is entitled to "deference" so long as it is "genuine," *i.e.*, "not a sham, and not merely secondary to a religious objective." *McCreary*, 545 U.S. at 864.   Courts judge the genuineness of the government's true "object" by considering the "operation" of its action, as "the effect of a law in its real operation is strong evidence of its object." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993).   The "Establishment Clause analysis does not look to the veiled psyche of government officers," but rather to "the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary*, 545 U.S. at 862-63.   Here, the operation of both suspensions confirms the Order's stated purpose.   The suspensions apply irrespective of any alien's religion, and plaintiffs do not contend otherwise.

41

Plaintiffs repeatedly note that the six countries covered by the entry suspension are "Muslim-majority." Mot. 1, 3, 12, 14. But that fact does not establish that the suspension's object is to single out Islam. The six countries covered were previously selected by Congress and the Executive through a process that Plaintiffs do not contend was religiously motivated. In addition, those countries represent only a small fraction of the world's 50 Muslim-majority nations, and are home to less than 9% of the global Muslim population.[11] And the suspension covers *every* national of those countries, including millions of non-Muslim individuals in those countries, if they meet the Order's criteria.

### 2. The Order cannot be restrained on the basis of campaign statements or the Revoked Order

Plaintiffs argue that the Order targets Islam not because of what it says or does, but because of "infer[ences]" they claim can be drawn from "[t]he history of the [Revoked] Order" and "statements by the President and his surrogates," mostly before taking office. Mot. 41. Plaintiffs cannot use either type of parol evidence to evade the Order's "stated secular purpose." Mot. 42.

**a.** As a threshold matter, the Supreme Court has made clear in the immigration context that courts may not "look behind the exercise of [Executive]

---

[11] *See* Pew-Templeton Global Religious Futures Project, Muslim Population by Country (2010), http://www.globalreligiousfutures.org/religions/muslims

42

discretion" taken "on the basis of a facially legitimate and bona fide reason." *Mandel*, 408 U.S. at 77; *see Fiallo v. Bell*, 430 U.S. 787, 796 (1977).  That clear rule alone—which plaintiffs never address—disposes of their Establishment Clause claim.  As those cases recognize, plaintiffs' approach would thrust courts into the untenable position of probing the Executive's judgments on foreign affairs and national security.  And it would invite impermissible intrusion on Executive Branch deliberations, which are constitutionally "privilege[d]" against such inquiry, *United States v. Nixon*, 418 U.S. 683, 708 (1974), as well as litigant-driven discovery that would disrupt the President's ongoing execution of the laws, *see, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).  Searching for governmental purpose outside official pronouncements and the operative terms of governmental action is fraught with practical "pitfalls" and "hazards" that courts should avoid. *Palmer v. Thompson*, 403 U.S. 217, 224 (1971).

**b.**     Even if the Court could look behind the President's facially legitimate reasons for suspending the entry of certain foreign nationals and refugees, informal statements by the President or his surrogates that do not directly concern the Order are irrelevant.  The Supreme Court has declined to rely even on press statements and other informal communications by *incumbent* government officials, recognizing that they may not accurately reflect the government's position.  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 623-24 & n.52 (2006); *see also Professionals*

43

& *Patients for Customized Care v. Shalala*, 56 F.3d 592, 599 (5th Cir. 1995). *A fortiori*, statements by private persons cannot reveal "the government's ostensible object." *McCreary*, 545 U.S. at 859-60; *see Modrovich v. Allegheny County*, 385 F.3d 397, 411-12 (3d Cir. 2004) (declining to rely on position of non-government parties); *Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1031 (10th Cir. 2008) (same); *Glassman v. Arlington County*, 628 F.3d 140, 147 (4th Cir. 2010) (same).

Using comments by political candidates to question the stated purpose of later action is particularly problematic. Candidates are not government actors, and statements of what they might attempt to achieve if elected, which are often simplified and imprecise, are not "official act[s]." *McCreary*, 545 U.S. at 862. They generally are made without the benefit of advice from an as-yet-unformed Administration, and cannot bind elected officials who later conclude that a different course is warranted. *See Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). Permitting campaign statements to contradict official pronouncements of the government's objectives would inevitably "chill political debate during campaigns." *Phelps v. Hamilton*, 59 F.3d 1058, 1068 (10th Cir. 1995) (declining to rely on campaign statements). It also would be unworkable, requiring the "judicial psychoanalysis" that *McCreary* repudiated. 545 U.S. at 862.

44

Even considering plaintiffs' proffered extrinsic evidence, none of it demonstrates that *this Order*—adopted after the President took office, to address the Ninth Circuit's concerns—was driven by religious animus.  Plaintiffs' marquee statement proves the point:  they cite a 15-month-old campaign press release advocating a "complete shutdown" on Muslims' entering the country.  Mot. 3.  That release and other proffered statements reveal nothing about the Order's aim, because the Order does no such thing.  Far from banning Muslims indefinitely, the Order temporarily suspends the Refugee Program globally, and pauses for 90 days entry from just six countries previously identified as posing particular risks—both subject to religion-neutral exceptions and case-by-case waivers.   There is a complete disconnect between plaintiffs' imputed purpose and the Order's actual effect.

    **c.**      Plaintiffs contend (Mot. 41-44) that *McCreary* requires looking behind the Order's text and legal effects to speculate at its aims.  In fact, *McCreary* says the opposite.  *McCreary* makes clear that what matters is not a government official's subjective motive, but only the "official objective" drawn from "readily discoverable fact."  545 U.S. at 862.  As *McCreary* explained, the Supreme Court's previous cases had rested on analysis of objective facts directly related to the law at issue:  "In each case, the government's action was held unconstitutional only because openly available data"—a law's text or obvious effects, the policy it

replaced, official public statements of the law's purpose, or "comparable *official* act[s]"—"supported a commonsense conclusion that a religious objective permeated the government's action." *Id.* at 862-63 (emphasis added); *see Lukumi*, 508 U.S. at 534-35 (gleaning purpose from ordinances' "text" and "operation").

*McCreary*'s analysis of the counties' purpose therefore centered on the text of the resolutions that serially authorized Ten Commandments displays and the features of those displays. *See* 545 U.S. at 868-74.  Although the Court referred to other sources (*e.g.*, official statements made during legislative meetings) in describing the facts, *e.g.*, *id.* at 851, *McCreary*'s reasoning and holding rested on the actions the counties took and inferences fairly drawn from them, *id.* at 868-74. The Court emphatically rejected suggestions that it "look to the veiled psyche of government officers." *Id.* at 863.

The contrast between this case and *McCreary* could not be more stark. There, the religious purpose of the original resolution authorizing the Ten Commandments display was readily evident from the outset.  545 U.S. at 868-69. The counties' second resolution compounded the problem, making the religious aim *explicit*. *Id.* at 870.  The counties' third and final display still showed a "sectarian spirit," since it included a different version of the Ten Commandments that "quoted more of the purely religious language of the Commandments than the

46

first two displays had done," and, significantly, was created "without a new resolution or repeal of the old one." *Id.* at 870, 872.

Here, in contrast, the Order does not convey any religious message; indeed, it does not reference religion at all. The Revoked Order contained provisions addressing religious minorities, but—as the new Order takes care to explain—those provisions did not and never were intended to discriminate along denominational lines. Order §1(b)(iv). Regardless, the current Order responded to concerns about the Revoked Order's aims by removing the provisions that purportedly drew religious distinctions—erasing any doubt that national security, not religion, is the focus. The Order also reflects the considered views of the Secretary of State, the Secretary of Homeland Security, and the Attorney General, who announced the Order and whose motives have not been impugned. In short, the President's efforts to accommodate courts' concerns while simultaneously fulfilling his constitutional duty to protect the Nation only confirms that the Order's intention most emphatically is not to discriminate along religious lines.[12]

---

[12] Plaintiffs do not attempt to show that they are likely to succeed on their complaint's other challenges to the Order. *Cf.* Compl. ¶¶112-17 (equal-protection on basis of national origin), ¶¶118-21 (substantive due process); *id.* ¶¶132-48 (Religious Freedom Restoration Act and Administrative Procedure Act). Those conclusory claims, omitted or mentioned only in passing in plaintiffs' motion (Mot. 40 n.2), are thus irrelevant here.

### III.   PLAINTIFFS HAVE NOT SHOWN IMMEDIATE, IRREPARABLE HARM

Plaintiffs' request for emergency injunctive relief independently fails because they cannot show "irreparable harm."  *Winter*, 555 U.S. at 20.  To secure an injunction, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing"; they "must *demonstrate* immediate threatened injury" that only "preliminary injunctive relief" can prevent.  *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original).  Here, the only harms Plaintiffs identify are entirely speculative, and they have not begun to show any harms they would suffer in the time a TRO would be in effect.  Hawaii contends (Mot. 45-48) that its universities and agencies' recruitment may suffer and that Hawaiian businesses (and, indirectly, state coffers) will lose tourism revenue.  But as its own declarations show, those fears are pure conjecture.  *Supra* pp. 15-17.  At a minimum, Hawaii has not "demonstrate[d] immediate threatened injury" from the short, temporary suspensions of entry and the Refugee Program— particularly because the process of obtaining a visa or securing admission as a refugee already takes time.   *Caribbean Marine*, 844 F.2d at 674 (emphasis omitted).

Elshikh's claim of injury is similarly speculative.  Although he alleges that the Order "deprives him" of his mother-in-law's company, which causes him "emotional turmoil," Mot. 48, he fails to "demonstrate" that the Order will cause

that deprivation. *Caribbean Marine*, 844 F.2d at 674. Elshikh's description of his mother-in-law's circumstances demonstrates that she may qualify for a waiver when her visa application is adjudicated. Neither Elshikh nor his mother-in-law therefore faces any injury caused by the Order today. Until his mother-in-law requests but is denied a waiver, neither one even arguably needs an injunction to avoid irreparable harm. If and when she is denied a waiver, Elshikh can pursue an as-applied challenge at that time.

## IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH STRONGLY AGAINST EMERGENCY RELIEF

The government and the public's interest—which merge here, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—counsel strongly in favor of leaving the Order in effect. The President, in consultation with the Attorney General and the Secretaries of State and Homeland Security, determined that, while the review of screening and vetting procedures is ongoing, the "risk of erroneously permitting entry" of an individual who intends to commit terrorist acts "is unacceptably high." Order §1(f). That risk assessment provides more than sufficient basis to leave the Order's temporary, precautionary safeguards in place.

Experience and empirical data already demonstrate the ability of would-be terrorists to infiltrate the country through cracks in screening and vetting processes; some 300 persons who entered as refugees are currently under investigation, and

hundreds of foreign-born persons have been convicted of terrorism-related crimes. Order §1(h).  Given that reality, the Executive's obligation, and the Order's aim, is to predict where the greatest risk exists *going forward*.  The Order reflects such prediction, identifying six countries that Congress and the prior Administration had found present a "heightened risk" that possibly inadequate screening could enable terrorist infiltration.  Order §1(e).  The Order further details the specific concerns with each of the six countries (and why Iraq now presents a different circumstance). *Id.* §1(e), (g).

The Order thus reflects the Executive's "[p]redictive judgment," which is entitled to the greatest possible degree of judicial deference.  *Dep't of the Navy v. Egan*, 484 U.S. 518, 527-29 (1988).  Such judgments "have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry," as they "are delicate, complex, and involve large elements of prophecy," and are "of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).  "[W]hen it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked, and respect for the Government's conclusions is appropriate."  *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1, 34 (2010) (internal citation omitted).

The "evaluation of the facts by the Executive" to support predictive judgments is especially "entitled to deference" when "litigation implicates sensitive and weighty interest of national security and foreign affairs." *HLP*, 561 U.S. at 33-35. When the Executive adopts "a preventive measure" in order "to prevent imminent harms in the context of international affairs and national security," the government "is not required to conclusively link all the pieces in the puzzle before we grant weight to its empirical conclusions." *Id.* at 35. Thus, where "[t]he Executive … deem[s] nationals of a particular country a special threat," "a court would be ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of that determination. *Reno v. American-Arab Discrimination Committee*, 525 U.S. 471, 491 (1999).

Plaintiffs offer nothing that could plausibly justify disregarding the considerable deference due to the Executive's analysis and predictive judgments. The best they muster is a leaked draft report asserting that "not a single fatal terrorist attack" has already been carried out by a foreign national of one of the six countries subject to the suspension. Compl. ¶53. That single draft document could not possibly overcome the final assessment of the President and multiple Cabinet Secretaries. Joint Ltr. to President (Mar. 6, 2017); *see NAHB*, 551 U.S. at 658-59. More fundamentally, plaintiffs miss the point: the Order's objective is to prevent future terrorist attacks *before* they occur. And that is precisely why the Order

51

focuses on six countries that Congress and the prior Administration recently determined pose the greatest risk of terrorist infiltration in the future.

## V.      THE FACIAL, NATIONWIDE RELIEF PLAINTIFFS SEEK IS UNWARRANTED

The emergency relief plaintiffs request is plainly overbroad for at least two reasons.  First, Plaintiffs have challenged the Order on its face, but they cannot carry their burden of "establish[ing] that no set of circumstances exist[s] under which the [Order] would be valid."  *Salerno*, 481 U.S. at 745.  For example, the Order is clearly constitutional as applied to foreign nationals with no immediate relatives in the country and no other significant connection to it.  The appropriate course is, therefore, for persons subject to the Order to challenge it on an as-applied basis, and to do so only if and when they are denied a waiver.  Only then can the relevant standing and merits questions be resolved in a concrete factual context.

Second, any emergency relief could extend only to redressing the plaintiffs' asserted violations, not the sweeping relief plaintiffs request.  "The remedy" a plaintiff may seek "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  The Ninth Circuit thus has repeatedly vacated preliminary injunctions that were broader than necessary to redress the plaintiff's specific harm pending further proceedings.  *See*, *e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009); *Meinhold v. U.S. Dep't of Defense*, 34 F.3d 1469, 1480 (9th Cir.

1994).  These principles apply with even greater force to TROs.  Thus, for Elshikh, relief could address at most his mother-in-law's ability to enter the country through otherwise applicable visa procedures.  For Hawaii, a TRO could address at most particular individuals with whom it shows it has a close existing relationship, whose own constitutional rights likely have been violated by the denial of entry to a specific alien abroad, who face an imminent risk of injury, and who otherwise are eligible for a visa.

The nationwide relief plaintiffs seek plainly violates this rule.  Elshikh has no "personal stake" in any relief beyond his mother-in-law.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)).  And Hawaii could have no stake in relief beyond the particular persons whose claims it may assert and whose own constitutional rights are violated by the denial of entry to an alien abroad.  It certainly could have no stake beyond its own borders.  As a Virginia district court recognized in litigation over the Revoked Order, nationwide relief beyond the specific individuals plaintiffs seek to represent is unwarranted.  *See Aziz v. Trump*, 2017 WL 580855, at *10 (E.D. Va. Feb. 13, 2017) (limiting injunction to "Virginia residents" who were lawful permanent residents or held valid student or work visas when Revoked Order took effect).

Plaintiffs lean heavily (Mot. 50-51) on the Ninth Circuit's decision not to stay the Washington court's nationwide injunction.  But the Ninth Circuit did not

conclude that that injunction was tailored to the plaintiffs' harms and the applications of the Revoked Order that raised constitutional concerns.  It rested solely on the ground that the injunction applied to many persons whom the court concluded had potentially valid claims—principally, lawful permanent residents— and an injunction tailored only to those persons was not "workable."  *Id.* at 1167.  Moreover, the court specifically explained that the Executive was "far better equipped" to revise the Revoked Order.  *Id.*  The Executive has now done so, and its narrowed Order should not be subject to untailored and nationwide emergency relief.

## CONCLUSION

Hawaii's motion for a TRO should be denied.

DATED:  March 13, 2017          Respectfully submitted,

                                JEFFREY B. WALL
                                *Acting Solicitor General*

                                CHAD A. READLER
                                *Acting Assistant Attorney General*

                                ELLIOT ENOKI
                                *Acting United States Attorney*
                                EDRIC M. CHING
                                *Assistant United States Attorney*

                                JOHN R. TYLER
                                *Assistant Director, Federal Programs Branch*

                                */s/ Brad P. Rosenberg*
                                BRAD P. ROSENBERG (DC Bar. No. 467513)
                                MICHELLE R. BENNETT (CO Bar. No. 37050)
                                DANIEL SCHWEI (NY Bar)
                                *Trial Attorneys*
                                U.S. Department of Justice
                                Civil Division, Federal Programs Branch
                                20 Massachusetts Avenue, N.W.
                                Washington, D.C.  20530
                                Tel:  (202) 514-3374
                                Fax:  (202) 616-8460
                                E-mail:  brad.rosenberg@usdoj.gov

                                *Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing memorandum complies with the word limitation specified in the Court's March 8, 2017, Briefing Scheduling Order (ECF No. 60). The memorandum is set in Times New Roman 14-point type and, according to the word-count facility of the word processing system used to produce the memorandum, contains 11,995 words.


Date:  March 13, 2017          */s/ Brad P. Rosenberg*
                              Brad P. Rosenberg
                              *Trial Attorney*
                              United States Department of Justice
                              Civil Division, Federal Programs Branch
                              20 Massachusetts Ave, N.W.
                              Washington, DC 20530
                              Tel: (202) 514-3374
                              Fax: (202) 616-8460
                              E-mail: brad.rosenberg@usdoj.gov

                              *Attorney for Defendants*