# APPENDIX A

**GOODSILL ANDERSON QUINN & STIFEL LLP**

REGAN M. IWAO          7446-0
riwao@goodsill.com
LYNDA L. ARAKAWA          9543-0
larakawa@goodsill.com
First Hawaiian Center
999 Bishop Street, Suite 1600
Honolulu, Hawaii 96813
Telephone: (808) 547-5600
Facsimile: (808) 547-5880

Attorneys for *Amicus Curiae* T.A.
*\*Pro Hac Vice Application Pending*

**WILLKIE FARR & GALLAGHER LLP**

RICHARD D. BERNSTEIN*
Rbernstein@Willkie.Com
1875 K Street, N.W.
Washington D.C. 20006-1238
Telephone:  (202) 303-10000
Facsimile:  (202) 303-2000

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I and ISMAIL ELSHIKH,<br><br>     Plaintiffs,<br><br> vs.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,<br><br>     Defendants. | CV. No.  1:17-cv-00050-DKW-KJM<br><br><br>**BRIEF OF *AMICUS CURIAE* T.A., A U.S. RESIDENT OF YEMENI DESCENT, SUPPORTING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER; EXHIBITS "1" – "6"** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

STATEMENT OF INTEREST ............................................................................. 1

INTRODUCTION .............................................................................................. 2

FACTUAL BACKGROUND ............................................................................... 4

    A.    President Trump's Campaign Promise to Ban All Muslims ................. 4

        1.    Anti-Muslim Rhetoric (Jul. 2015 – Nov. 2015) ......................... 4

        2.    The Unadorned Muslim Ban (Dec. 2015 – Mar. 2016) .............. 5

        3.    Dressing the Muslim Ban in "National Security" Garb (Jun. 2016 – present) ................................................................. 6

        4.    *Delivering on the Campaign Promise* – The January 27, 2017 Executive Order and March 6, 2017 Amended Order. ......................................................................................... 8

    B.    T.A. ................................................................................................. 11

ARGUMENT ................................................................................................... 11

I.    THE GOVERNMENT'S NATIONAL SECURITY JUSTIFICATION IS REVIWABLE BY THE JUDICIARY ...................................................... 11

II.    A CONSTITIONAL CLAIM IS STRENGTHENED WHERE THE GOVERNMENT'S ASSERTED JUSTIFICATION OF NATIONAL SECURITY APPEARS TO BE A PRETEXT FOR PREJUDICE. .............. 14

III.    THE GOVERNMENT'S NATIONAL SECURITY ASSERTION IS A PRETEXT FOR PREJUDICE. ................................................................. 15

    A.    The Evidence Cited in the Amended Order Regarding National Security is Superficial. ...................................................................... 15

    B.    The Government's Vetting Justification Illustrates the Amended Order's Fatal Overbreadth. ................................................ 19

C.  The Timing Surrounding the Amended Order's Roll-Out Belies Any "National Security" Justification..................................................21

D.  The Extended Time Periods Under the Amended Order Further Suggest "National Security" is a Pretext...........................................24

E.  Absent the Pretext, What Remains is Prejudice.................................25

CONCLUSION ......................................................................................................29

# TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                          <u>**Page(s)**</u>

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995)...................................................................................26

*Alperin v. Vatican Bank,*
  410 F.3d 532 (9th Cir. 2005) ...................................................................12

*American-Arab Anti-Discrimination Comm. v. Reno,*
  70 F.3d 1045 (9th Cir. 1995) ...................................................................12

*Aptheker v. Sec'y of State,*
  378 U.S. 500 (1964)...................................................................................12

*Boumediene v. Bush,*
  553 U.S. 723 (2008)...................................................................................12

*Ex parte Endo,*
  323 U.S. 283 (1944)...................................................................................12

*Hirabayashi v. United States,*
  828 F.2d 591 (9th Cir. 1987) ...................................................................26

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010).......................................................................................12

*Korematsu v. United States,*
  323 U.S. 214 (1944)........................................................................25, 26, 27

*McCreary County, Ky. v. Am. Civil Liberties Union of Ky.,*
  545 U.S. 844 (2005)...................................................................................15

*Ex parte Milligan,*
  71 U.S. 2 (1866).........................................................................................12

*Ex parte Quirin,*
  317 U.S. 1 (1942).......................................................................................12

*Romer v. Evans,*
  517 U.S. 620 (1996)............................................................................14, 15

*United States v. Doe,*
    655 F.2d 920 (9th Cir. 1981) ........................................................................1

*United States v. Robel,*
    389 U.S. 258 (1967) ...................................................................................13

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) .............................................................10, 12

*Washington v. Trump,*
    No. 2:17-CV-00141, (W.D. Wash. Feb. 3, 2017) ECF. No. 52 ..................10

*Washington v. Trump,*
    No. 17-35105, ECF. No. 14 (9th Cir. Feb. 4, 2017).....................................23

*Washington v. Trump,*
    No. 17-35105, 2017 WL 655437 (9th Cir. Feb. 4, 2017)............................12

*Washington v. Trump,*
    No. 17-35105, ECF. No. 28-2 (9th Cir. Feb. 6, 2017).................................17

# STATEMENT OF INTEREST

*Amicus* files this brief in support of Plaintiffs' Motion for a

Temporary Restraining Order to enjoin enforcement of President Trump's

Amended Executive Order, dated March 6, 2017 (the "Amended Order" or the

"Amended Executive Order").

T.A.[1] is a United States citizen who was raised in Yemen.  T.A.'s

father and many members of T.A.'s extended family hold Yemeni passports and

reside abroad.  They are barred from entering the United States under the Amended

Order.   Although the Government states that banned persons "could" apply for

"[c]ase by case" waivers under Section 3 of the Amended Order, Section 16(c)

provides that nothing in the Amended Order provides any "enforceable" right,

"substantive or procedural."  Am. Compl.,[2] Ex. 1 (Amended Order) at § 16(c).  The

Amended Order does not even provide for any *un*enforceable opportunity to be

heard as to any purported reason to deny entry, any timing for or notification of a

denial, much less any reason, or any ability to appeal a denial.

---

[1] This brief uses initials, rather than T.A.'s full name, to reduce the risk of potential reprisals to T.A. or his family members.  *United States v. Doe*, 655 F.2d 920, 922 n.1 (9th Cir. 1981) (Even for a party, "[w]here it is necessary, however, to protect a person from harassment, injury, ridicule or personal embarrassment, courts have permitted the use of pseudonyms.")

[2] Citations to "Am. Compl." refer to the Second Amended Complaint For Declaratory and Injunctive Relief, filed March 8, 2017, at ECF No. 64.

# INTRODUCTION

The travel ban in the Amended Order would cause severe harms to T.A., his family, and countless others.  This brief focuses on one issue:  the assertion that these harms that the Amended Executive Order would impose are justified by national security.  That assertion does not pass even rational basis scrutiny.

The Amended Order is not rationally related to the Government interests it purports to further.  First, no national from any of the six countries has committed a fatal terrorist attack in the United States since 1975.  Thus, the Amended Order is both widely overbroad and too narrow in comparison to its stated purpose.  The Amended Order applies to every national of the six countries identified but, at the same time, does not include any national of the many other countries whose nationals previously committed deadly terrorists attacks against the United States, including 9/11.

Second, although the Amended Order cites the need to review purportedly-deficient vetting procedures, as a Department of Homeland Security ("DHS") report indicates, there is no evidence of a correlation between the adequacy of a country's vetting procedures and the likelihood one of its nationals will commit a terrorist attack within the United States.  Nor is there any indication that the United States cannot introduce its own sufficient, supplemental vetting

procedures to remedy any potential screening deficiencies in the six countries. Indeed, the Amended Order concedes the Government will now do this for Iraqi nationals.

Third, the timing of the Amended Order betrays its supposed national security justification.  President Trump first issued his Executive Order entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States" on January 27, 2017 (the "Original Order" or "Original Executive Order").  Were national security the true impetus for the Amended Order, the Administration would not have waited more than 35 days—after the courts enjoined the enforcement of the Original Executive Order—to roll out the Amended Order and make it effective.  And the Administration certainly would not have waited almost a week to roll out the already-completed, revised version, for the sole purpose of extending favorable press coverage for President Trump's Joint Address to Congress.

All of the above and more demonstrate that national security is more of a pretext than a reason for the Amended Order.  Stripped of this pretext, the Amended Order is what it seems—a payoff on the President's campaign promise to ban Muslims because of their purported terrorist proclivities.  That is prejudice and would cause severe harms.  Even *assuming* there was statutory authorization, the travel ban in the Amended Order is unconstitutional.

# FACTUAL BACKGROUND

## A. President Trump's Campaign Promise to Ban All Muslims.

On January 27, 2017, President Trump issued the Original Executive Order. Am. Compl., Ex. 2 (Original Executive Order). Nationals from seven Muslim-majority countries, Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen, were immediately "suspend[ed]" from entering the United States. *Id*. at § 3(c). Although the Original Executive Order asserted that numerous "foreign-born individuals" had "been convicted or implicated in terrorism-related crimes" since September 11, 2001, *id*. at § 1, it provided no support for that claim. The overwhelming public record demonstrates that this justification was and remains a pretext for a travel ban targeted at Muslims.

### 1. Anti-Muslim Rhetoric (Jul. 2015 – Nov. 2015)

On June 16, 2015, Donald J. Trump announced his candidacy for Presidency. Soon after, at a July 11, 2015, Las Vegas rally, Mr. Trump said: "If you are Islamic . . . it's hard to believe, you can come in so easily." Am. Compl. ¶ 36 (citing Louis Jacobson, *Donald Trump says if you're from Syria and a Christian, you can't come to the U.S. as a refugee*, Politifact (July 20, 2015)).

At a September 30, 2015 New Hampshire rally, Mr. Trump told his followers that a "200,000-man army" might grow out of the 10,000 Syrian refugees the Obama administration had accepted for 2016. *Id. ¶* 37 (citing Ali Vitali, *Donald Trump in New Hampshire: Syrian Refugees Are 'Going Back*, NBC

News (Oct. 1, 2015)).  "[T]hey could be ISIS," Mr. Trump said, but, "if I win, they're going back."  *Id.*

On November 18, 2015, Mr. Trump doubled down on his promise to deport Syrian refugees if elected and, further, claimed that the United States would have "absolutely no choice" but to shut down mosques where "some bad things are happening."  Ex. 1 (Nick Gass, *Trump: 'Absolutely no choice' but to close mosques*, Politico (Nov. 18, 2015)).

### 2.     The Unadorned Muslim Ban (Dec. 2015 – Mar. 2016)

In a December 7, 2015 press release, titled "Donald J. Trump Statement on *Preventing Muslim Immigration*," Trump declared:  "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States . . .[,]" because "there is great hatred towards Americans by large segments of the Muslim population."  Am. Compl., Ex. 6 (Press Release, Donald J. Trump for President, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015)).  Offered a last chance the next day to soften his tone, Mr. Trump declined to relent:

Interviewer:  [What would the customs process look like for a Muslim non-citizen trying to enter the U.S.?]

Trump:  [The official screening the entrant] would say, are you Muslim?

Interviewer:  And if they said 'yes,' they would not be allowed into the country.

Trump:  That's correct.

Am. Compl. ¶ 39 (citing Nick Gass, *Trump not bothered by comparisons to Hitler*, Politico (Dec. 8, 2015)).  Instead, Mr. Trump justified his proposal by invoking one of this country's great shames—the internment of Japanese Americans during World War II—telling reporters, "[Roosevelt] did the same thing." *Id.* (citing Jenna Johnson, *Donald Trump says he is not bothered by comparisons to Hitler*, The Washington Post (Dec. 8, 2015)).

In March 2016, Mr. Trump told another interviewer, "I think Islam hates us," adding that distinguishing between Islam and "radical" Islam was not possible.  Am. Compl. ¶ 41 (citing *Anderson Cooper 360 Degrees: Exclusive Interview With Donald Trump* (CNN television broadcast Mar. 9, 2016, 8:00 PM ET)).  Asked whether "there [was] a war between the West and radical Islam, or between the West and Islam itself," Mr. Trump replied, "It's very hard to separate. Because you don't know who's who."  *Id.*

### 3. Dressing the Muslim Ban in "National Security" Garb (Jun. 2016 – present)

When Mr. Trump became the presumptive Republican nominee, he began to change his semantics.  In June 2016, Mr. Trump promised to "suspend immigration *from areas of the world where there's a proven history of terrorism*

6

*against the United States*, Europe or our allies until we fully understand how to end these threats." *Id. ¶* 42-43 (emphasis added) (citing Ryan Teague Beckwith, *Read Donald Trump's Speech on the Orlando Shooting*, Time (June 13, 2016); Press Release, *Donald J. Trump Addresses Terrorism, Immigration, and National Security,* (Jun. 13, 2016)).  Still, he coupled this promise with dual exhortations to world leaders to stop "importing *radical Islamic terrorism* to the West through a failed immigration system" and "tell the truth about *radical Islam*" in order "to protect the quality of life for all Americans—women and children, gay and straight, Jews and Christians and all people." *Id.*

On July 24, 2016, Mr. Trump admitted that he had changed only the label of his Muslim Ban.  During a Meet the Press interview, a journalist said to the candidate:  "The Muslim Ban.  I think you've pulled back from it, but you tell me."  Am. Compl., Ex. 7 (Transcript, *Meet the Press* (July 24, 2016)).  Mr. Trump responded:  "I don't think it's a rollback.  In fact, you could say it's an expansion. I'm looking now at territories*. People were so upset when I used the word Muslim. Oh, you can't use the word Muslim.  Remember this.  And I'm okay with that, because I'm talking territory instead of Muslim.*" *Id*. (emphasis added).

By the fall, Mr. Trump said his Muslim ban was now called "extreme vetting."  During the October 9, 2016 Presidential debate, a moderator asked, "Your running mate said this week that the Muslim ban is no longer your position.

7

Is that correct?  And if it is, was it a mistake to have a religious test?"  Am. Compl. ¶ 45 (citing The American Presidency Project, *Presidential Debates: Presidential Debate at Washington University in St. Louis, Missouri* (Oct. 9, 2016)).  Mr. Trump replied:  "*The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world*."  *Id.* (emphasis added).  Asked to clarify whether "the Muslim ban still stands," Trump simply responded, "*It's called extreme vetting*."  *Id.* (emphasis added).

Former New York City Mayor and Trump-advisor Rudolph Giuliani has confirmed that Mr. Trump's intention to ban Muslims never changed.  Mr. Giuliani explained that Mr. Trump wanted to enact a "Muslim Ban," and asked how he could get away with it legally.  Mr. Giuliani admitted:  "When [Mr. Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together.  Show me the right way to do it legally.'"  Am. Compl., Ex. 8 (Amy B. Wang, *Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally'*, The Washington Post (Jan. 29, 2017)).

**4.    *Delivering on the Campaign Promise* – The January 27, 2017 Executive Order and March 6, 2017 Amended Order.**

President Trump unveiled the Original Executive Order, "Protecting the Nation From Foreign Terrorist Entry into the United States," on January 27, 2017.  Am. Compl., Ex. 2 (Original Order).  Section 3(c) of the Original Order "suspend[ed] entry into the United States, as immigrants and nonimmigrants" of

individuals from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen.  *Id.* § 3(c).

The Original Order also imposed a 120-day moratorium on the refugee

resettlement program and "suspend[ed]" indefinitely the entry of refugees from

Syria to the United States.  *Id.* §§ 5(a), (c)–(d).  Finally, Section 5(b) of the

Original Order directed the Secretaries of State and Homeland Security, "[u]pon

resumption of USRAP admissions," to "prioritize refugee claims made by

individuals on the basis of religious-based persecution, provided that the religion

of the individual is a minority religion in the individual's country of nationality."

*Id.* § 5(b).

President Trump, in a January 27, 2017 interview with the Christian

Broadcasting network, stated that under his Order, Christians would be given

priority in refugee admissions.  Am. Compl. ¶ 58 (citing *Brody File Exclusive:*

*President Trump Says Persecuted Christians Will Be Given Priority as Refugees*,

Christian Broadcasting Network (Jan. 27, 2017)).  President Trump remarked:

> Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States?  If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians.  And I thought it was very, very unfair.  So we are going to help them.

*Id.*

On February 3, 2017, federal Judge James L. Robart of the Western District of Washington issued a temporary restraining order (the "TRO"), enjoining the Executive Branch from enforcing the Original Order after the State of Washington challenged the ban on constitutional grounds.  *See Washington v. Trump,* No. 2:17-CV-00141, ECF. No. 52 (W.D. Wash. Feb. 3, 2017)).  On February 9, 2017, the Ninth Circuit denied the Government's motion for an emergency stay of the TRO.  *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017) (per curiam).

On March 6, 2017, President Trump issued the Amended Executive Order.  Am. Compl., Ex. 1 (Amended Order.)  Although the Amended Order made a number of changes, including the removal of Iraq from the list of affected countries, and exempting lawful permanent residents, it retains the contours and purpose of both the Original Order and the President's campaign promises. Indeed, the White House Press Secretary, Sean Spicer, heralded the issuance of the Amended Order as the fulfillment of President Trump's campaign promises, telling reporters, "President Trump yesterday *continue[d]* to deliver on ... his *most significant campaign promises*: protecting the country against radical *Islamic* terrorism."  Ex. 2 (Press Briefing by Press Secretary Sean Spicer, (Mar. 7, 2017) (emphasis added)).  Mr. Spicer's statement belies the Government's argument that the Amended Order can be divorced from President Trump's campaign promises.

### B.   T.A.

T.A. is a Muslim and a United States citizen who grew up in Yemen. When T.A. was eighteen, he returned to the United States to attend college. He currently lives and works here as a videographer.

T.A.'s father, aunts, uncles, and cousins—all of whom hold Yemeni passports—now live in Jordan, to which they fled as refugees from the ongoing Yemeni Civil War. Many of them would like to travel to the United States to visit T.A. and their extended family. In particular, T.A.'s cousin, with whom he is close, wishes to travel to this country to look at schools and visit his brother, a U.S. citizen, as well as T.A. The Amended Order would bar T.A.'s father, cousin and his extended family from traveling to this country.

### ARGUMENT

## I.   THE GOVERNMENT'S NATIONAL SECURITY JUSTIFICATION IS REVIEWABLE BY THE JUDICIARY.

Both the Original and Amended Executive Orders asserted national security as a justification. *See* Am. Compl. Ex. 2 (Original Order) at § 2 (The Order is meant "to protect the American people from terrorist attacks by foreign nationals"); Am. Compl., Ex. 1 (Amended Order) at § 1(a). The Government has previously argued that this national security justification renders the Executive Orders "unreviewab[le]," positing that "[j]udicial second-guessing of the President's determination" that the Orders were necessary "to protect national

security" was "an impermissible intrusion" on the Executive's authority. *See* Mot. for Administrative Stay 2, 15-16, *Washington v. Trump*, No. 17-35105, 2017 WL 655437 (9th Cir. Feb. 4, 2017). If the Government were correct that national security assertions are unreviewable in this context, then even an open, avowed ban of all Muslims—or Jews, Hindus, or Sikhs—would be unchallengeable. But, as the Ninth Circuit ultimately concluded, the Government's position is not, and cannot be, the law.

Indeed, the Ninth Circuit found "no precedent to support" the Government's position. *Washington*, 847 F.3d at 1161. Citing a wealth of controlling authority stretching back more than 150 years, the Ninth Circuit confirmed that "concerns of national security . . . do not warrant abdication of the judicial role." *Id.* at 1161-64. (relying on *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010); *Boumediene v. Bush*, 553 U.S. 723, 765 (2008); *Aptheker v. Sec'y of State*, 378 U.S. 500 (1964); *Ex parte Endo*, 323 U.S. 283 (1944); *Ex parte Quirin*, 317 U.S. 1, 19 (1942); *Ex parte Milligan*, 71 U.S. 2, 120-21 (1866); *Alperin v. Vatican Bank*, 410 F.3d 532, 559 n.17 (9th Cir. 2005); *American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995)). Federal courts uncontrovertibly possess the power "to review the political branches' actions with respect to matters of national security." *Id.*

The Ninth Circuit reiterated that while "deference" to the Executive Branch is appropriate in cases involving national security determinations, "given the relative institutional capacity, informational access, and expertise of the courts," national defense is not "an end in itself," and its assertion may not be used to justify unconstitutional exercise of power. *Id.* at 1163 (citing *United States v. Robel*, 389 U.S. 258, 264 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile.")). The Executive Branch's "authority and expertise" in matters involving national security does not "trump the Court's own obligation to secure the protection that the Constitution grants to individuals." *Id.* Thus, courts should "review foreign policy arguments . . . offered to justify legislative or executive action when constitutional rights are at stake." *Id.*

The cases cited by the Ninth Circuit prudently establish that under our constitutional rule of law, the judiciary examines the extent of support for the Executive's invocation of national security. History is replete with too many scares, terrors, and pogroms to mention that occurred when a judiciary lacked either the authority or the resolve to perform such a constitutional role.

## II.   A CONSTITUTIONAL CLAIM IS STRENGTHENED WHERE THE GOVERNMENT'S ASSERTED JUSTIFICATION OF NATIONAL SECURITY APPEARS TO BE A PRETEXT FOR PREJUDICE.

In many areas of constitutional law, where the "breadth" of government action is "so far removed" from the government's "particular justifications," those justifications are "impossible to credit." *Romer v. Evans*, 517 U.S. 620, 632 (1996).  For example, in *Romer*, the Supreme Court reviewed an amendment to the Colorado state constitution that would have prevented any locality in the state from taking any action to recognize homosexuals as a protected class.  *Id*. at 624.  The Government justified the amendment by citing "respect for other citizens' freedom of association," including the rights of landlords to evict gay tenants if they found homosexuality morally offensive.  *Id*. at 635.  Justice Kennedy, writing for the majority, held that the amendment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests."  *Id*. at 632 (the amendment "is at once too narrow and too broad," because it "identifies persons by a single trait and then denies them protection across the board.").

Because, as we next demonstrate, the Amended Executive Order is both radically overbroad and under-inclusive, it cannot withstand any level of review.  As in *Romer*, the Amended Order "is at once too narrow and too broad,"

14

thus revealing its true purpose of animus toward a politically unpopular group.  *Id.* at 633.  Such animus is even clearer here in light of the comments of the President and his aides before and after the election.  *See* supra at 4-10.

## III.   THE GOVERNMENT'S NATIONAL SECURITY ASSERTION IS A PRETEXT FOR PREJUDICE.

In reviewing the Amended Order, the Court should consider its "historical context" and the "specific sequence of events leading to [its pronouncement]."  *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005).  History debunks the national security assertion in the Amended Executive Order.

### A.   The Evidence Cited in the Amended Order Regarding National Security is Superficial.

The Amended Order "suspend[s] entry" into the United States of individuals from six countries:  Iran, Libya, Somalia, Sudan, Syria, and Yemen. Am. Compl., Ex. 1 (Amended Order) at § 2(c).  The Amended Order asserts that its aim is to prevent "the entry into the United States of foreign nationals who may commit, aid, or support acts of terrorism."  *Id.* § 1(j).  It asserts that the ban is intended "to prevent infiltration by foreign terrorists.  *Id.* §§ 1(d)-(e), 2(c). Likewise, the Amended Order justifies its refugee ban on the ground that "individuals seeking admission as refugees" may "pose a threat to the security and welfare of the United States."  *Id.* § 6(a).

As the conservative-leaning Cato Institute has demonstrated, however, no national from any of the countries listed in the Amended Order has committed a fatal terrorist attack in the United States since at least 1975.  Am. Compl. ¶ 53 (citing Alex Nowrasteh, *Little National Security Benefit to Trump's Executive Order on Immigration*, Cato Institute Blog (Jan. 25, 2017)).  Cato also has determined that any American's chance of being killed by a refugee is approximately 1 in 3.6 billion.  *See* Ex. 3 (Alex Nowrasteh, *Syrian Refugees and the Precautionary Principle,* Cato Institute Blog (Jan. 28, 2017)).

A leaked February 24, 2017 DHS draft report came to the same conclusion as the Cato Institute:  citizenship is an "unlikely indicator" of terrorism threats against the United States, given that very few individuals from the seven countries included in the Original Order, or the six countries included in the Amended Order, carried out, or even attempted to carry out, *non-fatal* terrorist activity within the United States since 2011.  Am. Compl., Ex. 10 (Department of Homeland Security, *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States*).

Specifically, of the eighty-two people inspired by a foreign terrorist group to carry out, or attempt to carry out, attacks in the United States, only three have been from Somalia, one each from Iran, Sudan, and Yemen, and none from Syria or Libya.  Am. Compl., Ex. 12 (Phil Helsel, *DHS Draft Report Casts Doubt*

*on Extra Threat from 'Travel Ban' Nationals in U.S.*, NBC News (Feb. 24, 2017)).

As important, there is no evidence that any of these individuals were radicalized

*before* entering the United States.  To the contrary, a second DHS report, dated

March 1, 2017, concludes that "most foreign-born, U.S.-based violent extremists

likely radicalized several years after their entry to the United States."  Am. Compl.,

Ex. 11 (Department of Homeland Security, *Most Foreign-born, US-based Violent*

*Extremists Radicalized after Entering Homeland; Opportunities for Tailored CVE*

*Programs Exist* (March 1, 2017)).  Thus, the lack of "extreme vetting" could not

have contributed to their attacks.

Conversely, the countries with the most individuals on the DHS terror

list remained conspicuously absent from both the Original and Amended Executive

Orders.  Am. Compl. ¶ 53  (citing Scott Schane, *Immigration Ban Is Unlikely to*

*Reduce Terrorist Threat, Experts Say*, N.Y. Times (Jan. 28, 2017)).  Although the

Orders cite the attacks of September 11, 2001 as a rationale, the Amended Order

imposes no restrictions on travelers from the countries whose nationals carried out

those attacks (Egypt, Lebanon, Saudi Arabia, and the United Arab Emirates).  In

reality, as nearly a dozen high-ranking national security and intelligence officials

have declared, these Orders "ultimately undermin[e] the national security of the

United States, rather than making us safer."  *See* Decl. Nat'l Security Advisors ¶ 3,

*Washington v. Trump,* No. 17-35105, ECF. No. 28-2 (9th Cir. Feb. 6, 2017))

(concluding that there is no national security purpose for a total bar on entry from the seven countries named in the Original Order)).

Even the specific examples of individual terrorists cited in the Amended Order only exacerbate the logical inconsistencies inherent in the Administration's national security argument. The Amended Order asserts that "[r]ecent history shows that some of those who have entered the United States through our immigration system have proved to be threats to our national security." Am. Compl., Ex. 1 (Amended Order) at § 1(h). Then it goes on to offer two examples. The Amended Order would have prevented neither.

First, the Administration points to a "January 2013. . . [incident in which] two *Iraqi* nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses." *Id.* (emphasis added). But Iraq was removed from the list of banned countries in the Amended Order. *Id.* at § 1(f).

The second example does not fare any better. The Amended Order states, "[I]n October 2014, a native of Somalia *who had been brought to the United States as a child refugee* and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction as part of a plot to detonate a bomb at a crowded Christmas-tree-lighting ceremony in Portland, Oregon." *Id.* (emphasis added). To start, no one

claims that this person was radicalized before he came to this country as a "child refugee," so this cannot be an example of failed vetting.  Moreover, Section 3(c)(v) of the Amended Order provides for potential waivers in cases where the "foreign national is an infant, a young child or adoptee… ."  *Id.* at § 3(c)(v).     Thus, the Government cannot use either example to justify the still-overbroad Amended Executive Order on national security grounds.

### B.      The Government's Vetting Justification Illustrates the Amended Order's Fatal Overbreadth.

The Amended Order asserts that preventing nationals from Iran, Libya, Somalia, Sudan, Syria, and Yemen from entering the United States, subject to certain exceptions, is needed "[i]n light of the conditions in the[] six countries, [and] until the assessment of current screening and vetting procedures required by section 2 of this order is completed."  Am. Compl. Ex. 1 (Amended Order) at § 1(f).  This purported justification in fact helps demonstrate the overbreadth of the travel ban.

First, there is no demonstrated correlation between the adequacy of a country's vetting procedures and the likelihood that it will produce an individual from that country who will commit a terrorist attack within the United States. Were this the case, then Saudi Arabia and Egypt, two countries with vetting procedures evidently stringent enough for the Administration to omit them from the Amended Order's travel ban list, *see id.* at § 1(f), would not have together

produced sixteen of the nineteen 9/11 hijackers.  *See* Ex. 4 (Sergio Pecanha and

K.K. Rebecca Lai, *The Origins of Jihadist-Inspired Attackers in the U.S.*, New

York Times (Dec. 8, 2015)) (sixteen of the attackers were from Saudi Arabia, one

from Egypt, two from the United Arab Emirates, and one from Lebanon).

Second, the illogic of the Amended Order's travel ban based on

nationality is striking.  For example, a Sudanese national who has lived and

worked in, and travels to the United States from, Saudi Arabia as a doctor would

be banned.  Am. Compl. ¶ 63(c) (citing Jane Morice, *Two Cleveland Clinic doctors*

*vacationing in Iran detained in New York, then released*, Cleveland.com (Jan. 29,

2017)).  But a Saudi national of any background who lives and works in, and

travels to the United States from, Sudan is not.  This illogical disparity is justified

by nothing, including national security.

Third, the Executive Branch has many undoubtedly constitutional

tools at its disposal—such as diplomacy, aid, withholding aid, and sanctions—to

induce other countries to improve their vetting procedures.  But there is simply no

evidence that *barring* citizens of these six countries will induce their respective

governments to increase the stringency of their own vetting efforts.

Fourth, the Government has not demonstrated why, if unsatisfied with

the six countries' existing vetting procedures, our country cannot engage in its

own, additional vetting.  To the contrary, the Amended Order removes Iraq from

the travel ban list, and instead imposes additional screening procedures by the

United States for Iraqi nationals seeking a visa, admission, or other immigration

benefit.  Am. Compl., Ex. 1 (Amended Order) at § 1(f), at § 4 (stating that Iraqi

applications will be subject "to thorough review, including, as appropriate,

consultation with a designee of the Secretary of Defense and use of the additional

information that has been obtained in the context of the close U.S.-Iraqi security

partnership . . .").  The Amended Order offers no reason why supplemental vetting

on the part of the United States would not similarly remedy any deficiencies in the

vetting procedures of any of the remaining six countries on the travel ban list.  To

the contrary is a letter to President Trump from more than 130 generals and

national security experts from across the political spectrum—including former

Secretaries of State Susan Rice and John Kerry and two former Secretaries of the

Department of Homeland Security.  That letter explains that the United States can

and should "implement any necessary [vetting] enhancements without a

counterproductive ban or suspension on entry of nationals of particular countries or

religions."  Ex. 5 (Nat'l Security Experts' March 10, 2017 Letter to Trump).

### C.  The Timing Surrounding the Amended Order's Roll-Out Belies Any "National Security" Justification.

The circumstances surrounding the Amended Order's roll-out further

belies its "national security" justification.  Discussing the Original Executive

Order, President Trump claimed that he initially considered a one-month delay

between signing and implementation.  Am. Compl. ¶ 60 (citing Kevin Liptak, *Trump: I wanted month delay before travel ban, was told no,* CNN Politics (Feb. 9, 2017)).  But after being told by advisors that "you can't do that because then people are gonna pour in before the toughness," he says he relented and opted instead for the ban to become effective immediately.  *Id.*  On January 30, 2017, President Trump took to Twitter to explain:  "If the ban were announced with a one week notice, the 'bad' would rush into our country during that week."  *Id.* (citing Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 5:31 AM ET)).

Indeed, when Judge Robart enjoined enforcement of the Original Executive Order, on February 3, 2017, President Trump's Tweets over the next two days reiterated that the threat to national security was immediate, real, and severely exacerbated by Judge Robart's order:

> Feb 4, 2017 07:48:12 PM The judge *opens up our country to potential terrorists* and others that do not have our best interests at heart.  Bad people are very happy!
>
> Feb 4, 2017 04:44:49 PM Because the ban was lifted by a judge, *many very bad and dangerous people may be pouring into our country*.  A terrible decision
>
> Feb 4, 2017 03:44:07 PM What is our country coming to when a judge can halt a Homeland Security travel ban and *anyone, even with bad intentions, can come into U.S.*?
>
> Feb 5, 2017 03:39:05 PM Just cannot believe a judge would put our country in such peril.  *If something happens blame him and court system. People pouring in. Bad!*

Ex. 6 (Selected Trump Tweets (emphasis added)).  The Justice Department sought an emergency stay of Judge Robart's TRO in the Ninth Circuit, arguing that the TRO put the security of the nation at immediate risk.  *See* Gov't's Emergency Mot. Under Cir. Rule 27-3 for Admin. Stay and Mot. for Stay Pending Appeal at *20, *Washington v. Trump,* No. 17-35105, ECF. No. 14 (Feb. 4, 2017).

Despite the President's rhetoric, his Administration nevertheless *took five weeks* after the Original Order's enforcement was enjoined to roll out the Amended Order.  Indeed, President Trump purposefully delayed rolling out the Amended Order by nearly a week, even *after it was already completed*, because his Administration did not want to disrupt a news cycle of favorable press coverage.  The Amended Order was finished and set for President Trump's signature on March 1, 2017.  *See* Am. Compl. ¶ 74 (citing Laura Jarrett, Ariane de Vogue & Jeremy Diamond, *Trump delays new travel ban after well-reviewed speech*, CNN (Mar. 1, 2017 6:01 AM ET)).  But after President Trump's February 28, 2017 Joint Address to Congress was well received in the national press, the Administration decided to delay the issuance of the Amended Order to March 6, 2017.  *Id.*  It strains credibility to suggest that national security can be the true basis for the Amended Order if its implementation comes second to favorable media coverage.

**D.      The Extended Time Periods Under the Amended Order Further Suggest "National Security" is a Pretext.**

Credibility is further strained by the time periods set forth in the Amended Executive Order.  The January 27, 2017 Original Executive Order declared that Section 3(c)'s entry ban was necessary to "reduce investigative burdens on relevant agencies during the review period" regarding vetting procedures.   Am. Compl. at Ex. 2 (Original Order) at § 3(c).  Accordingly, the Original Order suspended travel from the seven listed countries for 90 days, through April 27, 2017, ostensibly to facilitate such review.  *Id*. § 3(c).

Yet, the March 6, 2017 Amended Executive Order, issued 38 days after the original, delayed its effective date *another* 10 days and called for an *additional* 90-day entry ban—until June 14, 2017—purportedly to enable executive agencies to conduct their already-ongoing review.  *Compare* Am. Compl. Ex. 1 (Amended Order) at § 2(c), *with* Am Compl. Ex. 2 (Original Order) at § 3(c).  The Amended Order does not even try to explain why an additional 48 days are necessary for the review.  That extension brings the total period for the review, since January 27, 2017, to 138 days—a more-than-50% increase over the 90 days originally called for in the Original Order.

The Amended Order does not and cannot blame Judge Robart's TRO as a means to justify the 48-day extension.  Nothing in any TRO across the country would have prevented the review from occurring.  The review undoubtedly could

have continued, and, very likely did continue, after the TRO.  The President does not need an executive order to direct cabinet members, or the Director of National Intelligence, to engage in the sort of review described in Section 3(a) of the Original Order and Section 2(a) of the Amended Order.  To the contrary, such presidential direction to appointed officials is usually accomplished by phone call, email, letter, or other informal communication.

Curiously, the conclusory March 6, 2017 letter from the Attorney General and Secretary of DHS, that is Exhibit A to the Government's brief, does not even purport to request or justify the 48-day extension of the review.  That silence, and the letter's belated timing, further suggest that national security is being used as a pretext for the Amended Order.

In light of all the above, the unwarranted extension of the travel ban until at least June 14, 2017 is further evidence of animus.  So is the Amended Order's suggestion that the ban may well continue indefinitely beyond June 14, 2017, so long as the review is not "completed."  Am. Compl. Ex. 1 (Amended Order) at § 2(c).

## E.  Absent the Pretext, What Remains is Prejudice.

Unlike President Trump during the campaign, *supra* at 5-6, the Government prudently has never cited *Korematsu v. United States*, 323 U.S. 214 (1944).  Even *Korematsu*'s majority opinion provides no help as, among other

reasons, the United States is not at war with any of the six countries named in the travel ban. *See id.* at 217-18 (relying on "the war power of Congress and the executive"); *id.* at 219 ("Approximately five thousand American citizens of Japanese ancestry refused to swear unqualified allegiance to the United States and to remove allegiance to the Japanese Emperor, and several thousand refugees requested repatriation to Japan.").

Moreover, *Korematsu* is no longer considered good law by the Ninth Circuit. *See Hirabayashi v. United States*, 828 F.2d 591, 593 (9th Cir. 1987) ("The *Hirabayashi* and *Korematsu* decisions have never occupied an honored place in our history."). Every indication is that a majority of the Supreme Court would agree. Justice Ginsburg and Breyer have said so. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 275 (1995) (Ginsburg, J. dissenting) (describing the use of strict scrutiny in *Korematsu* to "yield[] a pass for an odious, gravely injurious racial classification . . . . A *Korematsu*-type classification . . . will never again survive scrutiny: Such a classification, history and precedent instruct, properly ranks as prohibited."); Stephen Breyer, *Making Our Democracy Work: A Judge's View* (Knopf, 2010) ("The decision has been so thoroughly discredited, that it is hard to conceive of any future court referring to it favorably or relying on it."). And the Ninth Circuit's website has published a "Reading List of Justice Anthony M. Kennedy," *available at* www.ca9.uscourts.gov, that cites Justice Murphy's

*dissent* in *Korematsu* as an example of "key principles that are integral to our nation's DNA."

The core of Justice Murphy's dissent is:  "Individuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support."  *Korematsu*, 323 U.S. at 234.  Justice Murphy stated that claims by the Executive regarding military necessity "must [be] subject" to the "judicial process of having . . . reasonableness determined and . . . conflicts with other interests reconciled."  *Id*. at 234.  That rational "relation" was "lacking" because the internment order simply "assum[ed] that all persons of Japanese ancestry may have a dangerous tendency to commit sabotage and espionage and to aid our Japanese enemy."  *Id*. at 235.  However, no "reason, logic or experience could be marshalled in support of such an assumption."  *Id*.

What remained, Justice Murphy explained, as the real reasons behind the internment were "an accumulation of much of the misinformation, half-truths, and insinuations that for years have been directed against Japanese Americans by people with racial and economic prejudices—the same people who have been among the most foremost advocates of the evacuation."  *Id*. at 240.  In Justice Murphy's view, even a "military judgment based upon such racial and sociological considerations is not entitled to the great weight" ordinarily given to national

security considerations.  *Id*.  Justice Murphy described the government's action as

the "legalization of racism" and concluded:

> Racial discrimination in any form and in any degree has no justifiable
> part whatever in our democratic way of life.  It is unattractive in any
> setting but it is utterly revolting among a free people who have
> embraced the principles set forth in the Constitution of the United
> States.

*Id.* at 242.

The same is true here.  The Government has marshalled no "reason,

logic or experience" in support of the assumption that nationals from the six

countries possess some innate tendency to commit terrorism in the United States.

Instead, President Trump said in his campaign, "Islam hates us,"  *supra* at 6, and

the White House Press Secretary trumpets that the Amended Order keeps one of

President Trump's "most significant campaign promises: protecting the country

against radical *Islamic* terrorism."  *Supra* at 10 (emphasis added).  That is

prejudice, not national security.  That prejudice does severe harm.  It is

unconstitutional.

## CONCLUSION

Plaintiffs' Motion for a Temporary Restraining Order should be granted.

Dated:  Honolulu, March 13, 2017.

/s/ Regan M. Iwao
REGAN M. IWAO
LYNDA L. ARAKAWA
RICHARD D. BERNSTEIN*

Attorneys for *Amicus Curiae* T.A.

*Pro Hac Vice Application Pending*

# EXHIBIT 1



Trump remarked that things are "happening a lot faster than anybody understands."

## Trump: 'Absolutely no choice' but to close mosques

By NICK GASS | 11/18/15 06:45 AM EST

The United States will have "absolutely no choice" but to close down some mosques where "some bad things are happening," Donald Trump said in a recent interview, explaining his rationale for doing so.

"Nobody wants to say this and nobody wants to shut down religious institutions or anything, but you know, you understand it. A lot of people understand it. We're going to have no choice," the Republican presidential said in an interview from Trump Tower on Fox News' "Hannity" on Tuesday night.

Those remarks go further than Trump did on Monday, when he said he would "strongly consider" closing mosques as part of a response to last Friday's terrorist attacks in Paris that killed more than 130 and injured hundreds more.

Asked to explain his shifting position by Sean Hannity, Trump remarked that things are "happening a lot faster than anybody understands."

"There's absolutely no choice. Some really bad things are happening and they're happening fast," he said, taking a dig at President Barack Obama's response to the attacks. "Certainly a lot faster than our president understands because he doesn't understand anything. He doesn't get it. Refuses to even call it by its correct name," which Trump termed "radical Islam."

In terms of the refugee situation, Trump said he had "a feeling that a lot of bad things will happen out of this."

---

**2016**
## Bobby Jindal drops out of White House race
By **ALEX ISENSTADT**

---

"But yet we take everybody. We don't know where they come from, we don't know what their crime record is. It could be wonderful. It could be a disaster," he speculated, again pledging that if he wins the presidency, "they're going out."

"We can't take a chance. You know, if you take thousands of people, and again I hear it's going to be many more than what you're talking about right now. But if you take thousands of people, Sean, all you need is a couple. You know, you don't need 25, you don't need 100," he said. "Look at the damage done in Paris with just a few people."

Trump repeatedly reiterated his desire to "blast the hell out of" ISIL targets and "bomb the hell out of" the terrorist group's oil resources.

"Now they're just starting to do that, but they're two years late," Trump said. "Interestingly after Paris, all of a sudden they start bombing sites that they knew about for a year and a half. But they started bombing them after the tragic events of Paris. So, so many things are wrong. We need leadership in the world now. You know, it's really a worldwide leadership, but boy, do we need leadership in our country."

# EXHIBIT 2



*the* WHITE HOUSE

≡

## From the Press Office

Speeches & Remarks

**Press Briefings**

Statements & Releases

Presidential Actions

Legislation

Nominations & Appointments

Disclosures

**The White House**

Office of the Press Secretary

For Immediate Release                                                March 07, 2017

# Press Briefing by Press Secretary Sean Spicer, 3/7/2017, #18

James S. Brady Press Briefing Room

1:36 P.M. EST

MR. SPICER:  Hey, guys.  I brought a guest.  Good afternoon.  First off, at the top, I want to acknowledge that there's been an additional wave of threats to Jewish community centers and Anti-Defamation League offices.  According to some reports, there have been over a hundred bomb threats phoned in to Jewish institutions since the start of this year alone.

As the President said at the beginning of his joint address, "We're a country that stands united in condemning hate and evil in all of its forms.  We denounce these latest anti-Semitic and hateful threats in the strongest terms."

It is incredibly saddening that I have to continue to share these disturbing reports with you, and I share the President's thoughts that he fervently hopes that we don't continue to have to share these reports with you. But as long as they will -- as long as they do continue, we'll continue to condemn them and look at ways in which we can stop them.

Now, on to news of the day. You saw President Trump yesterday continue to deliver on two of his most significant campaign promises: protecting the country against radical Islamic terrorism, and repealing and replacing Obamacare with a patient-centric alternative.

We talked a lot about the executive order protecting the nation from foreign terrorists entering the United States yesterday. And so, on to Obamacare. I'd like to introduce the Secretary of Health and Human Services, Dr. Tom Price, to come up and talk to you a little bit about the plan to repeal and replace Obamacare.

Dr. Price.

SECRETARY PRICE: Thanks, Sean. Good afternoon. First, let me just share with you what an honor it is to serve as the Secretary of Health and Human Services. I'm the third physician out of 23 individuals who've had the privilege of serving as the Secretary of Health and Human Services. And the mission at our department is to improve the health and safety and well-being of the American people. And we take that mission very, very seriously.

And for many Americans, right now, their ability to gain healthcare or health coverage is a real challenge. For most Americans, they receive their health coverage through their employer. It's about 175 million folks. Those individuals will see no significant change other than there won't be a penalty for not purchasing coverage. For the folks in the Medicare system, there will be no changes at all in the current law. But we're talking about those people in the individual and small-group market, the moms and pops, the folks who run the corner grocery store, the corner cleaners. Those individuals out there are having huge challenges gaining care and gaining coverage.

And then Medicaid is a program that by and large has decreased the ability for folks to gain access to care, and we want to make certain that we address that.

This is about patients. This is not about money. This is not about something else. This is about patients. And sadly, the costs are going up for those folks in the individual and small-group market. The access is going down, and it's only getting worse. You know the stories. Premiums increased 25 percent over the last year, on average. Arizona had an increase of 116 percent. Deductibles are going up for many, many folks. If you're a mom or a dad out there and you make $40,000, $50,000, $60,000, your deductible in this market, in that individual and small-group market, oftentimes is $8,000, $10,000, $12,000 a year.

What that means is you've got an insurance card but you don't get care because you can't afford the deductible. And we know that this is happening by talking to the folks who are out there trying to provide the care.

A third of the counties in the United States -- one-third of the counties in the United States have only one insurer offering coverage on the exchange. Five states only have one insurer offering coverage on the exchange. One insurer is not a choice. So we need to make certain that we correct that.

In Tennessee this morning, it was announced that there are a number of counties that have no insurer offering coverage on the exchange. Insurers are leaving the market on the exchange. Last year there were 232 insurers that were providing coverage -- that were offering coverage on the exchange; now there are 167. That's a loss of about 30 percent in one year alone. And all of this means that patients are not getting the care that they need.

Now, the principles that we have as our guiding star are affordability, we want a system that's affordable for everybody. Accessibility, we need a system that's accessible for everybody. A system that's of the highest quality, a system that incentivizes innovation in the healthcare system, and a system that empowers patients through both transparency and accountability.

The President spoke last week, last Tuesday to a joint session of Congress, and he laid out his principles. First, wanted to make certain that those with preexisting illness and injury were not priced out of the market. Nobody ought to lose their coverage because they get a bad diagnosis.

In terms of affordability, health savings accounts -- growing choices for patients is incredibly important. Tax credits that allow individuals to be able to purchase the kind of coverage that they want, not that the government forces them to buy. We've always talked about -- in terms of what kinds of reforms need to be put in place, that we need to equalize the tax treatment for the purchase of coverage.

Those, again, in the employer-sponsored market, they get a tax benefit for buying health coverage. Those folks that are out there in the individual and small-group market, no tax benefit. And that's what this plan would do.

State flexibility. It's incredibly important that we allow the states to be the ones that are defining what health coverage is, have the flexibility, especially in the Medicaid program, to be able to respond to their vulnerable population.

Lawsuit abuse. The President mentioned, and it's incredibly important, that -- the practice of defensive medicine wastes billions and billions of dollars every single year, and we need to make certain that we're addressing that as well. The President also talked about a glide

path, an appropriate transition to this new phase for healthcare for our country, and that's important as well so that nobody falls through the cracks.

Buying across state lines, buying insurance across state lines. The President talked about this on the campaign over and over. The American people understand the commonsense nature of purchasing across state lines, and it increases competition. And we need to make certain that that happens, and then addressing the incredible increase in drug prices.

There are three phases of this plan. One is the bill that was introduced last evening in the House of Representatives. That's the start of all of this. Second are the all the regulatory modifications and changes that can be put into place. As you all well know, the previous administration used regulations to a fare-thee-well -- in fact, there were 192 specific rules that were put out as they relate to Obamacare, over 5,000 letters of guidance and the like. And we are going to go through every single one of those and make certain that if they help patients, then we need to continue them. If they harm patients or increase costs, then obviously they need to be addressed. And then there's other legislation that will need to be addressed that can't be done through the reconciliation process.

So the goal of all of this is patient-centered healthcare, where patients and families and doctors are making medical decisions, and not the federal government. We commend the House for the introduction of the bill yesterday and we look forward to working with all individuals in this process.

And I look forward to a few questions. Yes, sir.

Q   Mr. Secretary, you're familiar from your time in the House with the clout that conservative groups like the Club for Growth and Heritage Action have with rank-and-file members. What does it say about this legislation that these groups are already out with opposition to it?

SECRETARY PRICE: Well, I think that this is the beginning of the process. And we look forward to working with them and others to make certain that, again, we come up with that process that aligns with the principles that we've defined that they actually adhere to or agree with as well, and that is that we need a system that's affordable for folks, a system that's accessible for individuals, that's of the highest quality, that incentivizes innovation, and that empowers patients.

And so we look forward to working with them through this process.

Q   Secretary, Congressman Chaffetz said today that Americans may need to forgo a new iPhone to pay for healthcare, and they'll have to kind of make these choices. Does the administration agree with that? Will Americans under this plan -- will they need to maybe sacrifice other goods to pay for their healthcare?

SECRETARY PRICE: This is an important question, because what's happening right now is that the American people are having to sacrifice in order to purchase coverage. And, as I mentioned, many individuals can't afford the kind of coverage that they have right now. So they've got that insurance card but they don't have care.

What our desire is, is to drive down the healthcare costs for everybody. And the way that you do that is to increase choices for folks, increase competition, return the regulation of healthcare where it ought to be, which is at the state level, not at the federal level. All of these things that, taken in their aggregate, will in fact decrease the costs of healthcare and health coverage, and that will allow folks to be able to purchase the coverage that they want.

Yes, sir.

Q    Thank you, Dr. Price. I have two questions for you. First has to do with guarantees that you can make as the administration's point person on this legislation. Can you guarantee that whatever legislation emerges and makes it to the President's desk will allow individuals, if they like their doctor they can keep their doctor? And the second guarantee is, can you also guarantee that healthcare premiums for individuals will come down with this new legislation?

SECRETARY PRICE: Again, a remarkably important question because, as you'll recall, the promise from the last administration was if you like your doctor you can keep your doctor, if you like your plan you can keep your plan. Both of those promises turned out to be not true.

We think it's incredibly important for the American people to be able to select the physician and the place where they're treated themselves, that the government ought not be involved in that process. And so our goal is absolutely to make certain that individuals have the opportunity to select their physician.

In terms of premiums, we believe strongly that through this whole process and as it takes effect, that we'll see a decrease in not only the premiums that individuals will see, but a decrease in the cost of healthcare for folks. Remember, that was another promise that the previous administration made, that you'd see a decrease in $2,500 on average for families across this land; in fact, what they've seen is an increase of $2,500 or $3,000.

So we're going to go in the other direction. We're going to go in a direction that empowers patients and holds down costs.

Yes.

Q    Mr. Secretary, you are quite a distance away from conservatives with this plan in the central part of it, which is tax credits, which they see as yet another entitlement, very similar

to the entitlement of Obamacare but different in form. How do you convince them, since it's going to take tax credits to make this work, that they need to swallow this and move forward with the bill? I mean, you're getting an awful lot of opposition on the central tenet of this whole thing.

SECRETARY PRICE: This is all about patients. And in order to provide that transition and in order to make it so that nobody falls through the cracks. We've got to have a system that allows for individuals to gain the kind of coverage that they want.

And we, conservatives and others, have said for a long, long time that we believe it's important to equalize the tax treatment for those purchasing coverage, gaining coverage through their employer, and those not. And the tax credit is the opportunity to be able to equalize that tax treatment. Folks have talked about this for many, many years, actually, so that there's not a distortion in the tax code for who's able to gain a benefit for being able to purchase coverage and not.

Q   Sir, Mr. Secretary, you were talking about making sure people don't fall through the cracks. The last administration, with Obamacare, focused in on making sure the underserved were part of the equation. What is the safety net or the safeguard that you have to make sure -- to ensure people don't fall through the cracks beyond the tax incentives, but also for the underserved, who are now part of -- many are now part of the program that weren't before, prior to Obamacare.

SECRETARY PRICE: Yes, this is extremely important as well. And the current system, as you likely know, for those vulnerable in our population, especially in the Medicaid population, this is a system that's broken. You've got a third of the physicians in this country -- one-third of the doctors in this country that would be eligible to see Medicaid patients who aren't seeing Medicaid patients right now. And it's not because they've forgotten how to take care of patients, it's because of the rules that are in place that make it too onerous or too difficult for them to see Medicaid patients.

So we believe that it's important to allow states to have that flexibility to fashion the program for their vulnerable population that actually responds to that population in a way that gives them the authority, them the choices, them the opportunity to gain coverage and the care that they believe most appropriate.

Q   What if you find out that that is not happening when you give it to the states? Is there some type of punishment or some type of piece that you're going to put in place to make sure that that happens, that they follow through on your intent?

SECRETARY PRICE: Yes, absolutely. There's accountability throughout the plan that we have that would allow for the Secretary and the Department to be certain that the individuals that we believe need to be cared for are being cared for in the state at the

appropriate level. But we believe this is a partnership. This is about patients and partnership.

The previous administration tended to make it about government. We believe it's about patients and partnership, and we want to partner with every single person in this land who wants to make certain that we allow the kind of choices and quality to exist.

Q   The President tweeted earlier today. He described this bill as "our wonderful new healthcare bill." There's been a little bit of confusion. Does this represent the administration's bill? And is there anything in this bill that the administration cannot support?

SECRETARY PRICE: This has been a work in progress. As you know, this has been going on for over a year. The work that I had the privilege of participating in when I served in the House of Representatives in the last Congress was open and transparent and we invited folks in to give their ideas. And tens, if not hundreds, of people had input into that process.

This grew out of that, and over the past number of weeks, we've been having conversations with folks on the Hill, in the House and in the Senate, and other stakeholders. And so this is a work product that is a result of all of that process. The President and the administration support this step in the right -- what we believe is in the right direction, a step that repeals Obamacare and gets us moving in the direction of those principles that I outlined.

Q   Do you support everything that's in that bill that's sitting on the table, sir? Do you support everything that's in the bill sitting on the table, sir?

SECRETARY PRICE: This is a work in progress and we'll work with the House and the Senate in this process. As you know, it's a legislative process that occurs. I'm glad you pointed out the bill is on the table there. As you'll see, this bill right here was the bill that was introduced in 2009 and '10 by the previous administration. Notice how thick that is. Some of you will recall that I actually turned the pages and went through that piece of legislation in a YouTube. The pile on the right is the current bill.

And what it means is that we are making certain that the process, that the decisions that are going to be made are not going to be made by the federal government. They're going to be made by patients and families and doctors.

One last --

Q   Mr. Secretary, given the opposition that John and others have brought up here today, does this plan already need to be salvaged in your view? And how do you do it?

SECRETARY PRICE: Oh, no. You know what happens with these things. You start at a starting point, people engage and they get involved in the process, sometimes to a greater

degree. Nothing focuses the mind like a bill that's currently on the table and that has a -- as a work in progress -- or in process. And we'll work through it.

Q   So this is a starting point here?

SECRETARY PRICE:  This is an important process to be had.  The American people have said to their elected leaders that the Obamacare process for them gaining coverage and care is not working.  That's what they've said.  And so we believe it's important to respond to the American people and provide a healthcare system that allows for them to purchase the kind of coverage and care that they desire.

Yes.

Q   You said in your letter to the House chairman that necessary technical and appropriate changes might need to be made for this bill to reach the President's desk.  So what specific changes is the White House and the administration looking for in this bill?

SECRETARY PRICE:  Well, as I mentioned, there are three different phases to this process. One is this bill, this legislation that's working through under the rules of reconciliation, which is a fancy term to mean that there are only certain things that you can do from a budgetary standpoint has to affect either spending or revenue.  There are things that you can't do in this bill, and those we plan on doing across the horizon in phase two, which is the regulatory portion, and then in phase three, which is another piece of legislation that would be going through the House and the Senate with a majority -- supermajority in the Senate.

That process will incorporate all of the kinds of things that we believe are absolutely necessary to reconstitute that individual and small-group market and to get us in a position, again, where patients and families and docs are making these decisions.

Q   Mr. Secretary, bearing in mind that the CBO score isn't back yet, can you guarantee that this plan will not have a markedly negative impact on deficit or result in millions of Americans losing health insurance?

SECRETARY PRICE:  What I can say is that the goal and the desire I know of the individuals on the Hill is to make certain that this does not increase the cost to the federal government.

Q   Mr. Secretary, two elements of the bill.  I have questions about how they control costs and how they help with access.  The Medicaid per-capita block grant through the states, how is that sort of fundamentally different from the Obamacare regime on Medicaid in terms of expanding access?

And then the second point, why doesn't this bill do away with the cost-sharing community ratings regime that Obamacare had?

SECRETARY PRICE: So the per-capita cap, Medicaid, again, is a system that doesn't work for patients. You've got folks out there who need care, who need to see particular physicians who aren't able to see them. All Americans should be saddened by the situation that we have when there are patients out there that can't get the care that they need. We believe one of the keys to providing appropriate care in the Medicaid population is allowing the states to have the flexibility to address that Medicaid population.

Remember, Medicaid population is four different demographic groups. It's those who are disabled, it's those who are seniors, it's healthy moms and kids, by and large. Those are the four main demographic groups. And we, the federal government, force states, mostly, to take care of those individuals in exactly the same way. If you describe that to the folks back home on Main Street, they say, that doesn't make any sense at all. You need a program that's different for the healthy moms and kids to respond to their needs that's different than folks who are disabled and seniors.

And so what we believe is appropriate is to say to the states, you know your population best. You know best how to care for your vulnerable population. We're going to watch you and make certain that you do so, but you know how to do that. And that will decrease costs markedly in the Medicaid program. We're wasting significant amounts of money -- not that folks are getting too much care, we're wasting it because it's inefficient and there's significant abuse in the system.

So in terms of the cost-sharing, I think that the cost-sharing measures are being addressed. It's important that we run through that process. This is the process where we felt the previous administration was spending money that they didn't have the authority to spend, and Congress is working through that to make certain that the rightful holders of the authority to spend money in this nation, which is the Congress of the United States, exercises that authority.

Q   How does the White House and you feel about the label "Trumpcare"?

SECRETARY PRICE: I'll let others provide a description for it. I prefer to call it patient care. This is about patients at the end of the day. This isn't about politicians. This isn't about insurance companies. This is about patients. And patients in this nation, especially those in the individual and small-group market, these are the folks.

I had the privilege of going to Cincinnati last week with the Vice President to a small-business roundtable. And one of the business owners, one of the small-business owners there, said he had 18 employees last year at this time. This year, he has 15 employees -- not because he doesn't have the work, but because of the cost of health coverage for those individuals forced him -- forced him -- to let three people go.

Now, they're being forced to let three people go because the federal government has put in place rules and regulations that make it virtually impossible for folks in the individual and small-group market to provide coverage for their employees. This is a system that's not working for people. So if we focus on the patients -- I'll call it patient care. If you focus on the patients, we'll get to the right answer.

Q   Mr. Secretary, a major complaint -- sorry -- a major complaint of conservatives with phase one of the Obamacare repeal-and-replace is that it is missing a measure that would allow healthcare to be sold across state lines. Now, the President said this morning that that would be in either phase two or phase three. Is that something that you believe the President could do through executive action, and then you yourself could do? Or is that something that you believe has to be addressed legislatively?

SECRETARY PRICE: There are different aspects to the purchase across state lines that will allow individuals to gain, again, the kind of choices that they want. Some of this might be able to be done from a regulatory or a rules standpoint. Some of it will require legislation, and that's where we're going to need the assistance of our friends on the other side of the aisle.

The American people have demanded that they be able to purchase coverage across state lines, purchase coverage that they want for themselves. So whether it's through association health plans, which allows individuals who are in small-business groups, like the fellow that I just mentioned, to pool together nationally to be able to purchase coverage, or whether it's mom and dad, who don't gain coverage through their employer through something called individual health pools that allows folks to pool together solely for the purpose of purchasing coverage, even though they're not otherwise economically aligned. That allows people -- there are 18 million folks in that individual and small-group market. That would allow those individuals to be able to purchase coverage and get the purchasing power of millions. That's huge power and authority that we want to put in the hands of people, that we want to put in the hands of patients. And some of that may, in fact, require legislation.

Yes, sir.

Q   Mr. Secretary, thank you. Two questions but first, Congressman John Faso of New York has said that the issue of denying federal funds to Planned Parenthood should be separate from whatever healthcare bill finally emerges from Congress and is signed into law by the President. Is that the administration's position as well?

And my second question is this. You mentioned earlier the people who had their  healthcare plans cancelled when they thought they could keep it. I believe in your state of Georgia, more than a million people had that experience. Will some of the plans that were cancelled be able to come back under the new healthcare plan?

SECRETARY PRICE: Yeah, in terms of Planned Parenthood, we think it's important that the legislature work its will on this process. It's incredibly important that we not violate anybody's conscience. We want to protect the conscience provisions that exist. It's also important to appreciate that through community health centers, the bill that's being proposed right now would allow greater access for women to healthcare in greater numbers of facilities across this land. And they've actually proposed more money for women's healthcare than currently exists. So I think that they're working their best to address that issue.

In terms of whether or not old plans that were available before might be available, absolutely. And we believe that the opportunity to provide a robust market, robust choices for individuals across this land will be secured. And, again, that's one of the keys to bringing down the premium costs, of bringing down the cost for health coverage. So we're excited about that and look forward to that coming to pass.

Q   If the new plan calls for repealing the revenue-generating taxes and penalties but keeping the entitlements, how is that sustainable?

SECRETARY PRICE: That's the work that somebody mentioned over here -- the Congressional Budget Office score, and once the Congress receives that score, then they'll be working through that to make certain that in fact it is fiscally responsible.

Imagine, if you would, however, a system where the incentives within the system are all to drive down costs, to provide greater choices and competition for folks, and respond to the specific needs of patients. And in so doing, what you do is actually get a much more efficient system for the provision and the delivery of healthcare. It's a system we don't have right now because the previous administration felt that the government -- the federal government ought to do all of this. And we've seen what came about when the federal government does all of that -- that it's increasing premiums, increasing deductibles, decreasing choices. You've got a card that says you've got insurance, and you walk in, and you can't afford what it is that's trying to -- for the doctor that's trying to take care of you.

So this is not a system that's working for folks in that individual and small-group market and in the exchanges.

Q   Mr. Secretary, many have complained that Obamacare resulted in higher wait times in the emergency room. Will this new bill cause that? Have you have any idea on that?

SECRETARY PRICE: One of the things that the previous administration said was that they were going to be able to drive folks away from one of the most expensive areas for the provision of healthcare, and that is the emergency rooms. In fact, they did just the opposite. And much of that is because of, again, the rules and the regulations that they put in place.

So from our perspective, we believe that if individuals are able to purchase the kind of coverage that they want, then they'll have access to the kind of doctors and other providers that they desire, and won't need to be able to be seen in the emergency room. They'll already have the care. Emergency rooms ought to be for emergencies, not for the standard care that individuals tend to receive right now.

So we believe that if you put in place the right system, then emergency rooms and emergency physicians will be able to have the opportunity to care for those individuals that appropriately present to their department.

Q   Mr. Secretary, I'm interested in following up on your comment that it's important that no one vote on anything that violates their conscience. Federal funding already can't be used for abortions, but are you saying that the administration has a position on provision of birth control at these community health centers? And secondly, is the administration looking to actively withhold funding to Planned Parenthood if they continue to provide abortions, as has been reported?

SECRETARY PRICE: We're working through all of those issues. As you know, many of those were through the rule-making process and we're working through that. So that's not a part of this piece of legislation right here.

Q   But you don't have a view on provision of birth control and access to it? When you're talking about women's healthcare, which you brought up, and saying you wanted to expand more community funding.

SECRETARY PRICE: Yeah, what we're doing, as I say, is working through the rules and the regulations to see where the previous administration was, see how they did it, and whether or not it needs to be addressed. With the understanding that what we believe is important when we look at the rules and regulations is to define whether or not that rule or regulation actually helps patients and decreases costs, or harms patients and increases costs. If it does the latter, then we need to do away it. If it does the former, then we ought to accentuate it.

Q   What was the issue of conscience you were talking about? What was the issue of conscience you were talking about then?

SECRETARY PRICE: To make certain that individuals in the market are not forced to do things that violate their conscience.

Yes, sir.

Q   Secretary, thank you, sir. Common people and the small businesses have been waiting for this new bill under President Trump. So any message, sir, for them?

SECRETARY PRICE: Well, I think that this is the culmination of years of work. It's the culmination of years of concern and frustration by the American people. They knew at the time that the previous bill -- the previous law passed that it wasn't going to help them. They knew that costs were going to go up. In fact, we predicted at the time that costs would go up and that access would go down. And so this is the culmination of years of hard work by the electorate, by the citizens of this country to say that we want a system, again, that respects patients and families and doctors in these decisions.

One more.

Q   Thank you, Mr. Secretary. The President tweeted out earlier today that he believes that he's working on a plan to have drug prices come down by spurring competition. Can you tell us a little bit about what that plan is going to be, when it might be rolled out? Is it part of these phases? And then the second question, the bill also includes a tax break for insurance executives that make more than $500,000. You said this is about patients. Why is that tax break important for this legislation?

SECRETARY PRICE: To the latter, I'm not aware of that. I'll look into that.

Drug pricing is really important. So many individuals are now having significant difficulty being able to afford the medications that they've been prescribed. And it's not able to be addressed specifically in this phase one because it's not a revenue or spending issue for the federal government. So it can't be in this phase one.

But in phase two and three -- which may be concurrent along with this phase one -- but in phase two and three, then we look forward to bringing solutions, to solve the remarkable challenge that patients have across this line with the increase in pricing of drugs.

I've got to run. You've got a guy right here who is going to answer all the rest of the questions. Thank you so much. God bless you.

MR. SPICER: Thank you, Dr. Price.

Let me just kind of continue on. The bottom line I think that the Secretary was making is that Obamacare sought to cover 20 million people and in the process it drove up costs for everybody, whether or not you were in the exchange or not. Most people get their insurance through their employers. Older populations get their healthcare through Medicare. Low-income populations get their healthcare through Medicaid. And veterans get their insurance through TRICARE. So what we're talking about here is a very defined amount of individuals that we're trying to address and not affect the entire system.

Obamacare turned our healthcare system on its head to address the pool of individuals who don't fall into any of the buckets that I mentioned. Our plan that we're talking about today

with the House will ensure that those individuals receive the care that they need if they want an affordable cost while not sending rates skyrocketing.

Obamacare was an overcomplicated bill that served the special interests and not the American people.  These over 974 pages that were passed and then we were told we had to read them are filled with carve-outs by over $1 billion of healthcare- related lobbying that were spent on the year that Obamacare was crafted.

Our plan, in far fewer pages, 123 -- much smaller, much bigger -- so far we're at 57 for the repeal plan and 66 pages for the replacement portion.  We'll undo this.  And remember, half of it, 57 of those pages, are the repeal part.  So when you really get down to it, our plan is 66 pages long, half of what we actually even have there.  We'll undo the massive disaster and replace it with a plan to return healthcare back to the patient.

As the President outlined in his joint address, he expects five core principles to guide Congress through this healthcare process.  First, ensure that the American people with preexisting conditions have access to coverage.  Second, ensure a stable transition for Americans currently enrolled in the exchanges.  Third, provide more equitable tax treatment through tax credits for people who already don't receive tax-advantage healthcare from their employer.  And I know -- something that Secretary Price was talking about -- for the vast number of people who get their insurance through their employer, they're getting it tax free.  They are not taxed on that benefit, which is something that is not afforded to people who are in the individual market who either run a small business or are sole proprietors.

Fourth, we should expand the power of health savings accounts to return control to Americans over their healthcare dollar and decisions.  They should be able to choose the plan they want, not the plan that's forced on them by government.  And finally, we should give our state governors the resources and flexibility they need with Medicare to make sure that no one is left out.

This is the Obamacare replacement plan that everyone has been asking for, the plan that the President ran on, and the plan that will ultimately save the system.  It's also a culmination of years of dedicated work and careful thought by Republicans to find a replacement that will best undo the damage that's been caused by Obamacare while ensuring that all Americans have peace of mind during this stable transition period.

These are the principles for which conservatives have been fighting for for years.  President Trump looks forward to continuing the dialogue between the administration and the Hill on saving the healthcare system.

What's important to remember is that we're not going to be able to do all of this on one bill. As the Secretary mentioned, there are two other steps as well that allow us to get more of the President's plan accomplished after we pass this first important, major step.

The second piece is already underway, and that's what Secretary Price can do through executive action. He has already rolled out a handful of important actions, including the major marketplace stabilization regulation, to help bring stability to the collapsing insurance market. He'll continue to enact a number of policy changes in the regulatory and administration space -- administrative space to achieve what the first step cannot because of the nature of reconciliation.

The third piece of executing the President's healthcare plan is on -- requires 60 votes in legislation, maybe more depending on what we can do and when. That's how we'll move forward on the policies of purchasing across state lines, lowering drug prices -- that just came up -- and repealing any of Obamacare's premium-spiking insurance market distortions that can't be done through this current bill.

Also, yesterday, in addition to speaking with Israeli Prime Minister Netanyahu, the President also had separate calls with Prime Minister of Japan, Abe, and South Korea's Acting President Hwang. During both of these calls the President reiterated the United States' ironclad commitment to stand with Japan and South Korea in the face of the serious threat posed by North Korea.
He also emphasized that the administration is taking steps to further enhance our ability to deter and defend against North Korea's ballistic missiles using a full range of the United States' military capabilities.

Moving on to today's schedule. This morning, the President had a call with President Kenyatta of Kenya. We'll have a readout for that call soon, if it's not already out. The President and First Lady also announced the official reopening of public tours here at the White House. You may have seen the President stop by to surprise greet some of the first visitors on their tour. We're looking forward to welcoming the people back to -- the American people back what is affectionately referred to as the "People's House."

We are the world's only executive residence and office of head of state that also serves as a museum free to the people. Visiting the White House is obviously an experience that's uniquely American, and we encourage guests of all ages to come visit the White House, their house.

Also this morning, the Secretary of Commerce, Wilbur Ross, held a press conference announcing that Chinese ZTE Corporation has agreed to a record-high, combined criminal and civil penalty of $1.19 billion after the company illegally shipped telecommunications equipment to Iran and North Korea in violation of sanctions. This civil penalty is the largest ever imposed by the Commerce Department's Bureau of Industry and Security and, pending approval from a federal judge, the combined penalties between the Commerce Department, the Department of Justice, and the Department of Treasury would be the largest fine and forfeiture ever levied by the U.S. government in such a case.

This settlement tells the world that the days of flouting the U.S. sanctions regime or violating U.S. trade laws are over.

President Trump is committed to ending the disrespect of American laws and American workers.

So back to the schedule for a second. This morning the President also received his daily intelligence briefing. He had lunch with Senator Lindsey Graham of South Carolina, who will continue to be an important partner as the President's nominee for Supreme Court, Judge Gorsuch, begins the confirmation process in the next couple weeks.

At this moment, the President is leading a discussion on immigration with Senator Cotton and Senator Perdue and members of White House senior staff. The President and the senators are expected to discuss the merit-based immigration reforms that the President mentioned at last week's joint address.

Later this afternoon, the President will lead a meeting with the House Deputy Whip Team focused on repeal and replace of Obamacare. There will be a pool spray at the top of that meeting. The gather time is 3:20 p.m. The President will also meet with Richard Trumka, President of the AFL-CIO. They're expected to discuss the importance of investing in our country's infrastructure and renegotiating trade agreements like NAFTA. There will also be a pool spray at the top of that meeting, and we'll have further details on it.

This evening, the President will visit with a group of Boy Scouts who are in Washington to participate in a near-century-old tradition of sharing scouting's achievement with key government officials. Looking ahead, I want to let you know that the President will be welcoming at least two foreign leaders in the coming weeks, and I expect additional announcements of additional leaders later. But first, next week, Chancellor Merkel of Germany will visit the White House. And the following week, the President will welcome Prime Minister al-Abadi of Iraq.

With that, I'll kick it off with your questions. Jonathan Karl.

Q    Sean, it's been a full --

MR. SPICER:  Jonathan.

Q    Thank you.  (Laughter.)  Sean, it's been a full --

MR. SPICER:  You're out of practice.

Q    I know.  (Laughter.)  It's been a full three days since the President said that President Obama had his wires tapped, his phones tapped at Trump Tower.  In those three days, has the White House come up with any evidence whatsoever to prove that allegation?

MR. SPICER: I addressed this multiple times yesterday. I think the President -- we put out a statement on Sunday saying that we would have no further comment and we were asking the House and the Senate intelligence committees to look into this concern and report back.

Q    Can't the President just ask the FBI director if this happened? Has he asked him?

MR. SPICER: Look, I think -- no, the President has not. And I think that we've gone back and forth with you guys -- I think there is clearly a role that Congress can play in its oversight capabilities. They've made it very clear that they have the staff, the resources and the process. I think that's the appropriate place for this to handle. I think if we were to start to get involved you would then write stories about how we were getting involved.

So it's a no-win situation. I think the smartest and most deliberative way to address this situation is to ask the House and Senate intelligence committees who are already in the process of looking into this to look into this and other leaks of classified information that are troubling to our nation's national security.

So, as the President said in the statement on Sunday, we believe that that investigation, as well as the investigation of other classified leaks and other important information that threatens our national security, be looked into by the House and Senate intelligence committees, and then we encourage them to report back.

Q    Do you believe that President Obama ordered something like this?

MR. SPICER: I get that that's a cute question to ask. My job is to represent the President and to talk about what he's doing and what he wants. And he has made very clear what his goal is, what he would like to have happen. And so I'll just leave it at that. I think we've tried to play this game before. I'm not here to speak for myself, I'm here to speak for the President of the United States and our government.

Zeke.

Q    Sean, one follow-up on what Secretary Price said earlier. I think he was asked by John about whether the administration was willing to make a -- for the American people right now who like their doctor or like their health insurance plan, is the White House willing to make a commitment then today that when this replacement bill is passed, if it passes, that they will at the end of that be able to keep their doctor and keep their healthcare plan?

And secondly, just changing gears radically onto -- China overnight issued some strong rhetoric promising consequences for the deployment of the THAAD missile system to South Korea. If you could respond to that.

MR. SPICER: So on the first piece, I think -- look, one of the things that's important to understand about this process that's very different from when the Democrats did it -- you'll

recall then-Speaker Pelosi said you're going to have to read the bill to know what's in it. I think there's a big difference.

This is the bill. It's right here. It's on the website. We're going through regular order. If you go to the House of Representatives website, Speaker Paul Ryan's website, it's listed. Everybody can read it, and it's going to go through what they call regular order. We're not jamming this down anybody's throat. It's going to go through a committee process. All parties involved, all representatives in the House will be able to have input into it.

I think that's the way to conduct this process, is to do it to allow people to watch the process happen in the committees, allow members of Congress to have their input in it, to make amendments, to see that we get the best bill that achieves the goal for the American people.

When it was done the last time, it was jammed down people's throat, and look what happened. You had 974 pages that people struggled to read afterwards and figure out what had just gotten passed, and the consequences were, frankly, devastating.

So to your point about keeping your doctor, in a lot of cases you've lost your doctor for a couple of reasons. One, they may not participate in the plan. They may not take insurance at all anymore. Two, they may not take Medicaid -- or three, they may not take Medicaid. And the list goes on and on about why they might not be there -- or your plan, the plan that you got is no longer accessible.

As the Secretary mentioned, one-third of all counties in the United States no longer take Medicaid -- or, excuse me, have only one plan that you can choose from. So it's a fact right now that you -- in most cases, you have no choice. In many cases, you've lost that ability.

Our goal is to actually add more choice and more competition. Right now, the government tells you, you must have this plan or you will pay a penalty, and within this plan, here's what you have to have. We've lost the element of choice and competition in healthcare, and by bringing all of that back, I think there's a higher degree of likelihood that you're going to get the plan that you want and you're going to get the doctor you want. Because it will be your choice, not the government's choice.

And that's a big, big difference. This plan was jammed down everybody's throat, and the consequences took their plans away, it took their doctors away, and it drove up costs. This plan allows more competition, more people to enter it, and the American people and patients to make a decision on what plan they want. If they have a plan and a doctor they like, then they're going to choose a plan that allows them to continue with that doctor. But there's going to be more competition and more choice, not less. And that's, frankly, what you have now.

With respect to China, I think I addressed this yesterday. We stand shoulder to shoulder with Japan and South Korea in doing what we can to protect that region in particular from an attack from North Korea. We understand the situation and we continue to work with them. As I've mentioned, the President spoke to both leaders yesterday. We provided a readout of those calls. But we obviously understand the concerns of China, but -- this is a national security issue for them.

Hunter.

Q    Thank you, Sean. How concerned is the President with the situation between North Korea and Malaysia right now?

MR. SPICER:  Well, as I said, I think we're very well aware of the -- what's going on in the region. The President obviously had a conversation with, in particular, the leader -- the acting President of South Korea last night with respect to what's going on there. And again, I'll refer that to the National Security Committee to give you further -- Cheryl Bolen.

Q    Thanks, Sean.

MR. SPICER:  Cheryl.  I know, sorry, I forgot you yesterday.

Q    I appreciate it. So two questions. One on healthcare. If the CBO scores this bill and it does not provide the amount of coverage that the Affordable Care Act did, will the President still support it?

MR. SPICER:  Well, I'm not going to get ahead -- Secretary Price mentioned this -- let's not get ahead of the CBO going through this. But I think, as I mentioned to Zeke, one of the things that's important to understand there's -- this is -- this bill has to be done in the phases that it has to to address the repeal part of it, and the replace part of it.

There are only certain things that we can do through reconciliation. I know there's the regulatory piece that we can do through actions that the Secretary is empowered to do, frankly, under Obamacare. And then third is an additional piece of legislation that addresses things.

But there are cost-saving measures that -- and competition aspects of this that have to be included in phase two or three because they're not allowed in the reconciliation bill because of the nature of how reconciliation works on Capitol Hill.

So I think that one of the things that we have to understand is that how that score comes out from the Congressional Budget Office will depend on whether they look at it specifically with just a phase one or whether they look at it in its totality. But I'm confident that if you look at what's going on right now, Cheryl, it's unsustainable. Premiums in state after state, as Dr. Price mentioned, they're up 25 percent on average. Arizona is 116 percent. I think

Oklahoma is the 50s. Minnesota is in the 40s. This is unsustainable for a family to continue to pay the premiums that they have and for individuals, small-business owners, et cetera.

So the question is, can we allow people to go on this trajectory where more and more of their paycheck is getting eaten up in a plan that's, frankly, not giving them choice, doctors, or plans that they want. This plan I think clearly achieves those goals a lot better. It gets the price -- cost containment down. It gets price control under it. And it allows doctors and plans to reengage in the marketplace, as they were prior to this. And I think that is a major aspect of it.

Hold on. Cheryl waited.

Q    Thank you. From yesterday, I had a nominations question. Is there something that's preventing the White House from submitting the nominations of Sonny Perdue for Agriculture and Alex Acosta for Labor?

MR. SPICER:  I believe Alex Acosta was sent up to the Hill earlier today. We should have an announcement officially out. So sometimes there's a little bit of a lag. I apologize between my office and -- but that one is up, and I'll check on Sonny Perdue. I think some of it is just in coordination with the Senate, so pardon my time.

Q    Thanks, Sean. I have two questions for you. First, will the President offer a correction to his tweet this morning that states that 122 prisoners were released from Gitmo by the Obama administration and then returned to the battlefield? Can you take that first?

MR. SPICER:  Yes, I mean, obviously the President meant in totality the number that had been released on the battlefield -- that have been released from Gitmo since -- individuals have been released. So that is correct.

Q    Then my second question. Is the White House concerned about this new information that came out in WikiLeaks today that U.S. intelligence agencies are potentially, purposely providing vulnerabilities to tech products here in the United States?

MR. SPICER:  I'm not going to comment on that. I think obviously that's something that has not been fully evaluated, and if it was, I would not comment from here on that.

Kevin.

Q    Yes, Sean, I was going to ask about branding. The President in the past put his name on buildings and different products. When it comes to healthcare, does the White House feel that the bill presented today should be known as "Trumpcare" from here on out? I know it was asked of the Secretary. And at what point do you think that the transition should go away from Obamacare to the new administration?

MR. SPICER:  Well, as soon as it's repealed we can get rid of that.  I think that will happen quickly.

And as Secretary Price mentioned, I think we're less concerned with labels right now and more in terms of action and results.  And I think that's what our focus has been is getting that cost down, getting that choice back that we mentioned.  Yeah.

Q   Sean, DHS is reportedly considering separating families that cross the border illegally.  How does the President feel about that?

MR. SPICER:  I'm going to -- that's a DHS matter.  We don't get involved in either Customs or ICE enforcement.  So I think that's a question better reserved to both DHS and ICE specifically.

Jim.

Q   Oh, thanks, Sean.  On the Obamacare question, one of the criticisms on this is that there is still a de facto individual mandate because it allows insurance companies to increase premiums up to 30 percent of people -- if there's a gap in coverage.  And I have one more.

MR. SPICER:  Well, that's not -- the difference is under the current bill that's here, if you don't buy insurance, you pay a fine.  Under the current bill you don't have -- there's nothing that mandates you to buy insurance.  That's up to an individual.  So by its very definition, it is not -- can't be considered that.

What's your second one?

Q   Well, you don't think it's a de facto mandate in the sense of there's a penalty --

MR. SPICER:  It can't be.

Q   -- in place as there is now?  Not by the government, but is by the insurance companies.

MR. SPICER:  Right.  But there's no -- I think you answered your own question on that one.

Q   I have one more.

MR. SPICER:  Okay.

Q   Another topic.  The President has blamed the Democrats in the Senate for blocking the Cabinet.  Last Thursday, the Republicans actually called a recess early -- adjourned on Thursday early.  Previously they called a recess the week before.  Does the President have any plans to call for the Senate to remain in session and the Congress to stay in session until they approve the nominees and maybe even also repeal Obamacare?

MR. SPICER:  This isn't a Republican issue.  I mean it's not Republicans that are playing beat the clock on a lot of these nominees.  And we've discussed this since the transition time.  There were several nominees that, frankly, weren't even considered controversial by the standards of Senate Democratic leadership, and yet have been held up over and over again.  I don't think -- that's a very different scenario than going back and being with constituents, which was on the Senate schedule.  So I don't think -- that's a synonymous thing.

Do we have Michael Medved ready to go for a Skype question?  Michael?

Q   Yes, hello.  Sean, thank you very much.  Obviously, today there was a big emphasis on Obamacare, which is profoundly important to the American people.  But it seems that too often in the last several weeks, the administration has gotten distracted and media have gotten distracted by talk of wiretapping at Trump Tower, or the President calling his predecessor a "bad" and "sick guy" or criticizing the ratings of "Celebrity Apprentice."  Do you think the White House could do a better job of focusing on the issues that really matter, the reforms that matter to the American people rather than getting distracted to these subsidiary conflicts as we move forward into the coming months?

MR. SPICER:  Thanks, Michael.  Respectfully, I would say that we have been focused.  We're here talking about Obamacare and the need to drive down the cost and access for healthcare for every American.  I think that's a pretty significant thing to be focused on.

Yesterday, we were talking about the President's effort to continue to keep the nation safe, to make sure that people aren't coming into the country who aren't here for peaceful purposes.  The President has talked to almost 50 world leaders.  He's had 30-plus executive actions on all sorts of stuff from regulatory aspects to things that will create more jobs.  I think that's a fairly focused effort.

That being said, I think, look, whether it was Candidate Trump, President-elect Trump, or now President Trump, the President has always made it very clear -- or not he made it clear, but I think the voters made it clear that one of the things that they appreciate about him is his ability to be authentic and to speak very forcefully and very directly with the American people.  And that's an aspect that I think was central to why he was elected, is because he's not a canned politician that's going to give the same staid answers over and over again.

Sara.

Q   Going back to Fred's question, conservatives have started to call this "Obamacare Lite."  But President Trump has promised to fully repeal Obamacare, but this bill leaves a lot of the structure of Obamacare intact.  If this is the policy that passes, is President Trump confident in the future he can say that he fully repealed Obamacare?

MR. SPICER: Yeah, absolutely. As I mentioned, the first half of the bill that we put forward repeals it. There are three things, I mean -- each phase that we've talked about, phase one, phase two, and phase three, there's a repeal-and-replace aspect in each one. But Republicans and conservatives have been talking about adding competition and driving costs down for decades now, selling across state lines, small-business pooling. All of those things have been part of conservative plans for a long time. And I think instilling that competition in it, allowing more access -- I think there is a big difference.

There is no -- we have for the longest time -- if you're a conservative, you think about this right now that you have -- anyone who has an employer-based -- their job comes from an employer that gives them healthcare, they're getting a subsidy. They're getting a credit. They don't pay taxes on their healthcare, and their employer doesn't either. That's a huge disadvantage to anyone who is a sole proprietor or owns a small business.

And so, frankly, to allow the playing field to be leveled and allow small businesses, which are, frankly, the job creators in this country, to allow entrepreneurs and self-starters to get the same tax treatment that a Fortune 500 company gets you is a very conservative principle.

And again, look, one of the things that's important, Sara, is for all of the people who have concerns about this -- especially on the right -- look at the size. This is the Democrats, this is us. You can't get any clearer in terms of this is government, this is not.

And I think that part of the reason the visual is important is that when you actually look at the difference, you realize this is what big government does. It crowds out competition. It drives up prices. It stifles entrepreneurship and innovation. Doctors leaving the markets. More and more people not taking Medicaid or TRICARE. That should concern people. When you've got veterans that can't -- because most of the time, Medicaid and TRICARE are tied together. So when you have those systems not accepted by doctors, that means the lowest of our -- people on the low-income scale and people who have served our country have fewer and fewer choices. That alone should be a problem and concerning for many people.

But the premium spikes are another problem. Because again, even if you're in the exchange, now you're seeing over and over again that happen. You're also seeing young people decide that they'd rather just pay a penalty because the cost of those basic programs is out of reach for a lot of young people who are just entering the job market.

But again, I think the greatest illustration of the differences in the approaches is that size. Our bill, which is a tenth of the size, does repeal and replace in what their bill just did in massive government bureaucracy. And that is a big difference.

Jim.

Q   Just want to ask you -- I mean you had the Health and Human Services Secretary out here, you just talked about this is the Republican bill, this is the Democrat bill.  Is that the President's bill?  Is that his healthcare bill?

Q   That is a bill that we have worked with with Congress. We feel very good about where it is.  We are looking forward -- as I mentioned earlier, the President is meeting with the Whip Team to encourage them to support it and to build it out.  I don't think -- and I'm not trying to be cute here -- but I think it's not his bill or their bill.  It's a bill that we have worked on with them together.  We're very proud of where it stands now.

The big difference, Jim, is that, unlike before, as I mentioned, when the Democrats jammed it down people's throat and said -- waited to get that 60th vote, with Senator Kennedy still around, and then basically said, literally, you will have to wait and see what it looks like before we passed it -- we not only posted it out there for everybody to look at, but by sending it through regular order, not just putting it up for a House vote, but sending it through the committee process, allows Republicans, Democrats, and independents alike to offer up amendments and suggestions.  And the House will work its will.

Now, we will continue to give guidance and thoughts and suggestions.  But I think the President's core principles are what's going to guide us as we head through the Hill and then -- the House and then to the Senate.

Q   And just one quick follow-up on Jonathan Karl's question, because the President made a very serious allegation over the weekend, and I think we would all be remiss if we went through this briefing and not tried to get you on camera to at least offer us some evidence.  Where is the evidence, where is the proof that President Obama bugged President Trump?

MR. SPICER:  Well, I answered this question yesterday on camera on your air.  So just so we're clear -- I know this is now -- it will be twice.  But I think I made it clear yesterday --

Q   But since yesterday, since yesterday --

MR. SPICER:  Nothing has changed.

Q   -- is there any new proof --

MR. SPICER:  No.  And it's not a question of new proof or less proof, or whatever.  The answer is the same, which is that I think that there is a concern about what happened in the 2016 election.  The House and Senate intelligence committees have the staff and the capabilities and the processes in place to look at this in a way that's objective.  And that's where it should be done.  And, frankly, if you've seen the response from -- especially on the House side, but as well as the Senate, they welcome this.

And so let's let the Senate do their job and the House -- excuse me -- intelligence committees, and then report back to the American people.

Q   Will the President withdraw the accusation?  Does he have any --

MR. SPICER:  Why would he withdraw it until it's adjudicated?  That's what we're asking, is for them to look at this and see if there is --

Q   No regrets with him about raising this accusation?

MR. SPICER:  No.  Absolutely not.  And I think that what he wants them to do is to look into wiretapping, other surveillance, and again, as I mentioned before, the other leaks that are threatening our national security.  You're seeing the leaks happen over and over again that come out throughout the administration, throughout government, and undermine national security.  And I think the appropriate thing to do is to ask the House and the Senate to look into it.

Glenn Thrush.

Q   To follow up on a follow-up, in terms of -- you were given the opportunity on air to say whether or not the President still supported Director Comey.  Does the President support Director Comey?  And I have a quick follow-up.

MR. SPICER:  I have no reason to believe he doesn't.  He has not suggested that to me.  So now to the non-follow-up to the --

Q   Have you seen any evidence yourself?  Has the evidence been shared with you or other senior members of the President's staff as to why he made this particular accusation?

MR. SPICER:  As far as me, no.  I'm not in a position that that would be regularly part of my daily duties for the President to sit down and go through that.  That's probably a level above my pay grade.  But as I've mentioned, I think the President believes that the appropriate place for this to be adjudicated is for the House and Senate intelligence committees who have the clearances, the staff, the processes, to go through this, look at it and report back.

Q   Did he share it with --

MR. SPICER:  I'm not going to get in -- as the President made very clear, Glenn --

Q   -- with his National Security Advisor?

MR. SPICER:  As the President said in the statement that he issued on Sunday, we're not going to have further comment on this until this matter is resolved.

Yes.

Q   Two quick questions.  So just to follow up on the follow-up.  So does the White House feel that it's appropriate -- you say that you want it to be adjudicated by the congressional committees, but the President made declarative statements on Twitter.

MR. SPICER:  Right.

Q   So I guess, is the White House position that the President can make declarative statements about a former President basically committing a crime and then the congressional committees should look into that and basically prove it?  I mean, how does that exactly --

MR. SPICER:  I take issue with -- it's not a question of "prove it."  I think as I said, now, five times to a follow-up to a follow-up, that it's not a question of "prove it."  It's that they have the resources and the clearances and the staff to fully and thoroughly and comprehensively investigate this and then issue a report as to what their findings are.

Q   But President Trump's Twitter statement shouldn't be taken at face value about what --

MR. SPICER:  Sure it should.  Of course, it -- I mean, why
-- no.  There's nothing -- as I mentioned to Jim, it's not that he's walking anything back or regretting.  He's just saying that they have the appropriate venue and capabilities to review this.

Margaret.  I'm sorry.

Q   So on the Obamacare replacement, so you said that it will be in phases and that you're going to need additional legislation.  So just to clarify, are the cost savings that you guys are projecting, is that dependent on phase three of the national competition plan?  Because if that's the case then --

MR. SPICER:  Yeah, well, it's not dependent.  I think that in order to see it fully come to fruition, yeah, you have to see all parts of it.  But the way that it was passed doesn't allow for -- the way that it was passed is almost the same way that we're going through this now, which is they pass certain things, then the Secretary of Health and Human Services, at the time, was granted significant regulatory authority that allowed her to do certain things at the time to implement pieces of Obamacare that we now have to act backwards and go almost in the same steps to do what they did to lay it out.  We've got to repeal it, and then we've got to replace it with the plan that's going to do the same.

Certain things can be done in the same way and certain things can't.  It just -- it literally depends on how that was done.

John Frederick.

Q   Sean, in the replacement plan, it says that the states that accepted the Medicare expansion money would continue to be funded.  So what is the message you have to Republican state legislators that thought they were fiscally responsible in rejecting Medicaid expansion in their states and now they didn't get the federal dollars on either end?  What is your response to them?

MR. SPICER:  I think what we need to do is to make sure, as the President said in his statements, as Secretary Price did, we've got to make sure that we continue to protect people through this transition process.  Let the bill work its way.  But this is the first time -- as we address the Medicaid portion of this, this is probably the first time that we've really addressed an entitlement aspect of something in almost 30 years.  So I think we've got to let this piece of it work its way through the House.

But there is -- remember, one of the things that happened through the Medicaid expansion was the goal has always been about Medicaid to help people who were disabled or poor or met a specific number of criteria.  For the first time in Obamacare, we expanded Obamacare -- or the Obama administration did, rather -- to able-bodied individuals that -- in a way that had never been done before, and it was not a specific class.  That's led largely to the ballooning cost.

I think a lot of the reforms that will be contained in this bill will address that, but I think we've got to let it work its will through the process.

Alexis.

Q   Sean, I want to ask you two communications questions on two topics.  Because the President gave himself a middling grade on communication, let me ask you about the experience that the previous administration had when Obamacare was going through its own phases.  The President -- President Obama said that the opposition to the legislation was able to seize the opportunity while it was being legislated to create public perceptions about what was in the legislation.  So my question is on ACA.  What is the President going to do to improve his communications, to be out there, explaining what is in the bill, to work with lawmakers?  That's the first question.  And then I'll ask you the next one.

MR. SPICER:  Okay, thank you.  So on the first one, as I've mentioned, he's had and continues to have significant outreach to members of Congress.  He's talked to health insurers.  I mean, I think we've read out a lot of the activities of the last couple weeks.  And literally, in just -- within an hour, he's going to sit down with the House Deputy Whip Team to talk about the legislative piece of this in the House.

So this is going to be a very aggressive, laser-like focus of this administration over the next month or two to get this thing through the House and then moved over to the Senate.  But there's a big difference, Alexis.  What we're doing is vastly different.  They were expanding

government, promising people something.  And I think what's happened is there was a lot of difference with how they approach it.

Right now, the American people, no matter where you are, you understand the state of your healthcare, the costs that you're seeing and the lack of choice that you've now been presented with.  And in many cases, you realize that when you go in to see the doctor or a loved one is going to see a doctor that they're not getting -- they're not either able to get in, they're not taking the Medicare or the exchange insurance that they got, the costs are going out of control.

And I think it's really interesting -- I mean, one of the things that Dr. Price mentioned that is so apropos of this is, having a card does not mean you have insurance.  It's like handing someone a blank check -- it doesn't mean that you have money, it means you have a check.  And I think what we've seen over the last few years with Obamacare is you can have an insurance card, but that doesn't mean someone is going to take it, and it sure doesn't mean that it's going to be affordable.  And there's a big difference between having a card and having healthcare that's affordable.  And that's the difference that we're trying to solve right now.

So when it comes to communication, I think one of the things that's really helpful is that part of the sell is done for us.  The American people understand the state of their healthcare.  They understand how much they're paying for.  They've gone to see a doctor or gone to a hospital or had a notice from their carrier saying we are no longer part of this, or their employer says, hey, whatever your particular carrier is, is no longer available, we're switching you into this.

And so for so many Americans, healthcare is a very, very real part of their daily experience because they're caring for themselves, they're dealing with an ailment, or dealing with children or a loved one or someone else in their family where they're seeing, firsthand, the devastation and disaster that Obamacare has caused them in their personal life.

So I think there's a welcoming of this effort and I think it's a lot easier for us to go in -- because we don't have to explain the problem.  People are living it.  And I think for them to understand what we're giving you is more choice, greater competition.  We're incentivizing more people to be part of the process, and we're going to be driving down the cost of those premiums.

You had a second.

Q   My second question on communications has to do with the President's assertion about the wiretapping.  Because the White House wants this now to be handled by the legislative branch, and in confidence and in classification, can we count on the President to, himself,

while this investigation is going on, to cease and desist using Twitter or any other public venue to make accusations that are in public but he will not respond to in public?

MR. SPICER: With respect to this particular situation? I'll ask that and I'll get back to you on that.

John Gizzi.

Q    Thank you, Sean. Just getting back to the question about if one likes his or her healthcare, they can keep it. In 2013, Congressman Fred Upton, then Chairman of the House Energy Committee, offered legislation that put precisely those words into law and it received the votes of every Republican member in the House and between 40 and 50 Democrats, and then it died in the Senate. Would the administration support a revival of the Upton Amendment? In other words, putting the right to keep one's healthcare plan and doctor if he or she liked it, today?

MR. SPICER: I mean, I think that's the goal. I don't want to start talking about what we're going to -- as we go through the process. We've now put our stamp on this and sent it to the House. It will work its will as amendments come up through regular order. Our team will weigh in on those with their staff and, again, the President is meeting with the Whip Team today.

I don't want to start saying we're going to support this amendment or that amendment now, but I think generally speaking, obviously the goal is to make sure that people get a plan that they like that's affordable, that meets what they need to have met, that they shouldn't have to have a one-size-fits-all, government-instilled healthcare system that doesn't offer any choice or, frankly, isn't tailored to the needs that they have. I think that's an important thing.

John.

Q    Sean, right now you're two votes short of passing repeal-and-replace in the Senate because you've got four Republican senators who are saying they can't support the bill because of rolling back the Medicaid expansion. What do you say to those senators who are very concerned that people will lose coverage that this does not provide enough stability for those people who rely on Medicaid for their healthcare?

MR. SPICER: Well, there's two things, John. One is, we're at day one. We're going to go through the House first, so we've got a little bit of time. And I think as we go through that process, these senators -- and not just the additional two but I think and hope that we'll get additional ones -- they recognize that those people, as I've said over and over again here -- if we do nothing, they're going to be in a very, very worse scenario than they are now.

More and more people -- if you're on Medicaid, which serves so many low-income Americans, as I mentioned, they have a card. And that card does not allow them to go to doctor after doctor who are saying, we're not going to take Medicaid or TRICARE anymore.

So I would ask those senators, what are you doing to help us work on a bill that will get them insured again? Because for too many Americans, they've got a card, but they don't have insurance. And I think that's a very, very big thing to -- a distinction to make.

They're the ones who have the problem right now. They've got a Medicaid card and nowhere to go. And what we need to do is to make sure that low-income Americans, veterans, small business owners, individuals who desperately need healthcare have options and affordability.

Q   One other piece of this. You could bring down the cost of the insurance itself through efficiencies in the system, selling across state lines. But the biggest driver of the increase in health insurance cost is the skyrocketing cost of medicine. What in this overall plan do you propose to do to either cap the rise or even bring it down?

MR. SPICER: Well, I think you -- the Secretary mentioned this, but I mean, the cost of prescription drugs is --

Q   That's one small --

MR. SPICER: No, it's not. It's a big factor. I think that --

Q   But when you're paying $50,000 out of pocket to get a stent? I mean, it's --

MR. SPICER: Again, what is the biggest thing missing --

Q   -- but it's getting out of control.

MR. SPICER: Fair enough, but --

Q   Fair enough, drugs is one part of it but -- huge other part of it.

MR. SPICER: Okay, when you talk about procedures or drugs, the biggest thing that's missing in this whole equation is competition. I mean, we're down to one plan in many places. There's nothing for these places to compete --

Q   There's plenty of competition between hospitals.

MR. SPICER: No, there's -- I mean, that's fine, but if they know they're going to get the same reimbursement rate, if they know that there's no other options, that plans aren't trying to get people -- then that's a big difference. Right now, there's a lack of competition in the industry.

And I think one of the President's -- I get it may be one part of that, but you're right, that all-over medicine -- procedures and such -- there's a reason he met with drug executives and talked about getting those costs down; that there's a multi-faceted approach, and how do we instill competition, how do we drive down costs?

But you're right, we've got to do more to get the cost of that down, of the procedures to allow additional options. Everything that is -- it's the same way that, again -- think about your insurance. One of the things that was driving up cost in the past was people were exercising the option of going to an emergency room over and over again for their primary care. And what happened is that you saw all of these "clinics" pop up from around and insurance carriers actually made it cheaper in terms of co-pays to go see that than an emergency room, driving people to somewhere that didn't continue to drive up cost, clog insurance. That competition alone starts saving the plans money and helping to keep cost down. We've got to instill more aspects of competition in medicine.

Jennifer.

Q   Sean, can you give us an update on the effort to roll back regulations? Have the taskforce -- regulatory reform taskforces identified any regulations to roll back? And have any actually been repealed?

MR. SPICER: I think that they have had their work cut out for them. They've started as they -- the President has met with different industries and companies, corporations, associations. That is a constant subject of discussion, which is those regulatory aspects of our economy that are keeping companies from growing, expanding and hiring. And so I know that the domestic policy team and others have been working on that. And if I can get further updates on specific legislation or, excuse me, specific regulatory action, I'll get back to you.

Hallie.

Q   Thanks, Sean. Two topics for you. I'm trying to get some clarity on something that my colleagues have tried to follow up on as well. You've said that the President stands by his tweets Saturday morning that President Obama ordered this wiretap. You've also said that the administration wants Congress -- let me just be clear -- he found out this information. You've also said that the President wants Congress to investigate. Some members of Congress, by the way, have asked the White House and asked the President to come forward with that information. So bottom line, why would the President want Congress to investigate for information he already has?

MR. SPICER: I think there's a separation-of-powers aspect here as I mentioned to Jonathan that we think it's --

Q   Talk about resources and time -- why waste that?

MR. SPICER:  Well, it's not a question of waste it.  It's a question of appropriateness.

Q   But if the President has the info, Sean -- and I guess that's what I'm trying to get to -- if he's sitting on this information that he found out, he's now directing or asking or recommending that the intelligence committees look into this.  And you talked about they have resources and staff, which they do, but why expend those resources and staff if the President found out this information and has it?

MR. SPICER:  I think there's a difference between directing the Department of Justice, which may be involved in an ongoing investigation, and asking Congress as a separate body to look into something and add credibility to the look -- adds an element that wouldn't necessarily be there if we were directing the Department of Justice, for example.  But again, I think we've made it very clear how he wants this done and where we go from there.

Q   Second question then.  Millions of Americans are working on their tax returns right now.  Will the President commit to releasing his tax returns for this year and is he still under audit for his past returns?

MR. SPICER:  My understanding is he's still under audit and I'll follow up on the question.

Q   Question and quick follow-up.  How do you understand what we've seen on the growing number of cases at the Canadian border of Canadians born and raised in Canada with valid passports being stopped at the border and told just to go back?  They won't let them come in and -- in the U.S.

MR. SPICER:  I'm not aware of that.  I think that's something that probably should be addressed to the Department of Homeland Security.

Q   Do you think there might be a misunderstanding of the messages sent on the immigration --

MR. SPICER:  I don't know.  I think it's a good question that is probably best directed towards the Department of Homeland Security.

Dr. Swan.

Q   Thank you.  Is the White House going to keep its promise to withdraw from the Paris climate agreement?  And our understanding is that there is some divisions of opinion -- Rex Tillerson wants to stay in; Steve Bannon wants to get out.  What's going on?  Will you keep the promise?  If not, why not?

MR. SPICER:  I think that's something I'd be glad to follow up with you and everyone.  I don't have anything on that right now.  I'm aware of the discussion of it, so let me -- if I can, I'll get back to you

Mike.

Q   I have an unrelated question, but I also want to follow up on something --

MR. SPICER:  Unrelated questions are my favorite.  (Laughter.)

Q   You talked about the communications strategy.  Will the President play a public role in selling this bill?  Will he speak to the public about it?  Will he answer questions about it?

MR. SPICER:  That's a good question.  I think that we are going to have a very comprehensive strategy.  As I mentioned, just a few minutes from now the President is going to engage with members of the House Whip Team to talk to them.

Q   -- talking to members of Congress.

MR. SPICER:  I understand that, but -- and I understand that.  This is step one.  There's a lot of time -- as I mentioned, we expect to be dealing with this for the next several weeks.  There will be plenty of opportunities for the President to speak about that, to engage with the public.  But it's going to be a comprehensive plan that we will discuss.

We had I can't even begin to tell you how many administration folks, members of Congress flooding the broadcast and radio airwaves today, both nationally and in local markets.  We were very, very active throughout the country getting out the word on what we're doing and why we're doing it, from national broadcast shows to cable to -- I mean, to radio.  We had a very, very aggressive start to this effort.  We're working with the House, in particular.  We're continuing to start really engaging with the Senate.

But this is going to be a comprehensive effort, working with the House and the Senate, to get this thing done, and other partners -- doctors and outside groups that share this concern.  As I mentioned earlier to one of the other folks, there's a need by companies and corporations who are feeling the weight of additional cost to join us in this effort.  And I just want -- this is obviously something that needs to get dealt with.  The escalating costs are having a significant impact not just on our economy, but on the ability of people to get hired, or, frankly, people who are hired leave their job because the cost of healthcare is not allowing especially people in the small- and medium-sized businesses to keep up with those costs.

With that, thank you guys very much.  I look forward to seeing you --

Q   -- meeting tomorrow -- congressmen coming to the meeting with the President.

MR. SPICER:  We'll have a readout --

Q   Sean, I have that unrelated question, which was --

MR. SPICER:  I'm sorry.  That's not fair.  Mike gets his unrelated question.

Q   And answer mine after that, please.

Q   Will the Trump administration continue the Obama administration's practice of releasing publicly the visitor logs?

MR. SPICER:  We're currently evaluating our procedures on that and we'll have some -- and when we have an announcement I'll let you know.

And, April, I'll have a readout on our schedule for tomorrow later.

Q   He's meeting tomorrow with --

MR. SPICER:  Once it's confirmed, I will let you know first, and then everybody else.

Thank you, guys.  Have a great day.

END
2:54 P.M. EST



**HOME**      **BRIEFING ROOM**      **ISSUES**      **THE ADMINISTRATION**      **PARTICIPATE**      **1600 PENN**

USA.gov   |   Privacy Policy   |   Copyright Policy

# EXHIBIT 3



# CATO AT LIBERTY

---

JANUARY 28, 2017 11:00AM

# Syrian Refugees and the Precautionary Principle

*By* ALEX NOWRASTEH

In environmental policy, the precautionary principle states that a new product, method, or proposal whose effects are disputed or unknown should not be introduced if it is harmful. The burden of proving that it is harmless falls on its backers—virtually guaranteeing that it won't be produced. In contrast, a cost-benefit analysis that compares the probability of harm with the expected magnitude of the benefits is a better method.

The methods of the precautionary principle are implicitly applied by many opposing the resettlement of Syrian refugees because they deem any risk of terrorism as too great. The precautionary principle is as improper a standard for determining refugee policy as it is for guiding environmental policy.

Arguments derived from the precautionary principles are often emotionally driven. Senator Shelby (R-AL) made such an appeal when he stated, "We don't know much about these people. They haven't really been vetted. They come from an area where there's a lot of turmoil, a lot of terrorists come from. We don't need one more terrorist; we got enough right now."

Senator Shelby is correct that we don't *need* another terrorist, but he didn't explain that the risk of a terrorist coming through the refugee system is low.

3,252,493 refugees were admitted to the United States from 1975-2015. During that time period, 20 of those individuals attempted to carry out a terrorist attack or succeeded in doing so inside of the United States. That is a single terrorist for every 162,625 refugees admitted or one every two years since 1975.

Although there were only 20 refugee terrorists admitted since 1975, they have only succeeded in murdering three Americans. Each one of those murders is a tragedy but the chance that an American would be successfully killed by a refugee terrorist was one in 3.6 *billion* a year. Each year an American had a 0.000000028 percent chance of being murdered by a refugee terrorist each year (for those with poor eyesight, that's seven zeros to the right of the decimal point). That's a small risk.

But, as the implicit proponents of the precautionary principle claim, the costs of refugees in the future could be greater. Letting them in today could set up a whole raft of unforeseeable future problems unlike those of the past. That is possible. So even if the annual rate of murder from future refugee terrorist attacks is 100 *times greater* than it was during the 1975-2015 period, the chance of an American being murdered each year would rise to one in 36.4 million annually.

Anything could change in the future. The precautionary principle always rigs the outcome in favor of immigration restriction because it's impossible to prove that all refugees will be harmless just like it is impossible to prove that any other person will be harmless. If the precautionary principle becomes a starting point for debate, those favoring refugees will always fail. No debate should be stacked this way.

Perhaps the victims of terrorism from refugees should be very heavily weighted than other deaths in any risk calculation. Perhaps the threat from ISIS or Syrian refugees is unlike any ever faced and more caution is warranted (highly, highly unlikely). Perhaps our social, political, economic institutions are more fragile than they appear and could be easily undone by a few refugee terrorists. Any of those factors being true could tilt the cost-benefits scales against admitting Syrian refugees, but such dire predictions are currently unwarranted and must be weighed against the costs of not admitting Syrian refugees.

*Unforeseen Costs of Barring Refugees*

There are costs to current Americans from not granting entry to some Syrian refugees. Barring their admission could create a greater security risk in the future. Refugees who languish in refugee camps for years or decades are more likely to be radicalized and become terrorists. Under such a situation, allowing them to resettle in the United States could drain the swamp and decrease the fecundity of terrorist breeding grounds.

Refugees going to other countries, like Sweden, often settle in horrid welfare-subsidized situations in over-regulated labor markets where their LFPRs are initially less than half those of natives—producing another fertile breeding ground for violence. Their LFPRs do increase over time but do not converge with natives. Allowing many of those refugees to instead settle in the United States where they are about as active in the labor market as native-born Americans and usually build themselves out of poverty without much welfare would also decrease the long-term global terrorism risk.

Syrian refugees could also be valuable foreign intelligence assets, just like many Hungarian, Vietnamese, and Cuban refugees were during the Cold War. As my colleague Patrick Eddington noted, refugees should be especially motivated to help contain ISIS. More accurate intelligence decreases the risks of future terrorist attacks, all else being equal.

*Other Policy Changes to Further Reduce the Risks*

If the refugee gate is widened, other policy changes can reduce the risk of violent extremism now and in the future as well as the short-term fiscal costs that turn net-positive after 10 to 15 years. Cutting off government welfare benefits for refugees will decrease the public expense and incentivize economic self-sufficiency, self-confidence, and decrease alienation—all character attributes correlated with terrorism. Allowing private sponsorship of refugees is another way to decrease the public risk by outsourcing the monitoring of refugee integration to committed NGOs and individuals spending their own money. Canada has successfully used this strategy and some Senators are now interested.

Not overreacting to small terrorism risks would aid in the assimilation of immigrants with the same religious background.

The precautionary principle emphasizes the "better safe than sorry" mentality but shelters us from the reality that nothing is absolutely safe. Risk exists on a spectrum, it is not binary. The fear of high risks and uncertainty should not stop the resettlement of Syrian refugees here, only if a realistic projection that the long-term harms would exceed the long-term benefits should convince the government to further block Syrian refugees. A cold, hard look at the risks and benefits of allowing more Syrian refugees favors a more open policy.

---

**Topics:** International Economics, Development & Immigration

**Tags:** syrian, refugees, syrian refugees, precautionary principle

(cc) BY-NC-SA

This work by Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 3.0 Unported License.

# EXHIBIT 4

 A Glimpse Into the Life of a Slave Sold to Save Georgetown

 When a Common Sedative Becomes an Execution Drug

 2 of a Farmer's 3 Children Overdosed. What of the Third — and the Land?

 As Daylight Saving Starts, Some Ask: Why Fall Back at All?

U.S.


When interest rates go up, sit back and relax.
3 YEAR VARIABLE RATE CURRENTLY YIELDING 1.52% APY*
RIDGEWOOD SAVINGS BANK
MEMBER FDIC

➡ SHARE

# The Origins of Jihadist-Inspired Attackers in the U.S.

By SERGIO PEÇANHA and K.K. REBECCA LAI    UPDATED December 8, 2015

All of the Sept. 11 attackers entered the United States using tourist, business or student visas. Since then, among attackers claiming or appearing to be motivated by extremist Islam, only one would have needed a visa to enter the United States at the time of the attack.

Sept. 11 attackers: tourist, business and student visas



## After 9/11

## Half of the attacks since 2001 were committed by men born in the United States.

U.S.-born citizen



Naturalized citizen                Green card              No visa        Tourist visa
                                                           needed

The paths to violence for the United States-born attackers varied. Some were recent converts to Islam. At least three who were born in the U.S. had previous criminal histories, and one

had a history of mental illness.

One seemed to have radicalized after spending time in Yemen. Another became radicalized after being convicted of lying to F.B.I. agents — denying he had made plans to travel to Somalia when in fact he had.

Security experts argue that the risks of routine travel — including the U.S. visa waiver program, which allows citizens of Britain, France, Belgium and 35 other countries to enter the United States without a visa for stays of up to 90 days — are greater than the threat of foreign terrorists coming through the refugee program.

"Further restricting the acceptance of refugees does not address the most likely vulnerability to attacks from abroad, which is the large number of people from visa-waiver countries involved in the conflict in Syria," said David Sterman, a researcher for the International Security Program at the New America think tank who has been cataloging terrorist attacks carried out since Sept. 11.

### Attacks With the Most Victims

U.S.-born  Green card

Syed Rizwan Farook and Tashfeen Malik, the couple suspected of killing 14 people and wounding 21 others at a social services center in San Bernardino, Calif., met online and had a 6-month-old baby. On the day of the assault, Ms. Malik posted on Facebook that the couple was dedicating the massacre to the Islamic State.

Mr. Farook was born in Illinois and raised in Southern California; his parents were born in Pakistan. Ms. Malik was born in Pakistan, grew up in Saudi Arabia and went to college in Pakistan. She moved to the United States in 2014 with a Pakistani passport and a K-1 visa, which designated her Mr. Farook's fiancée. She was granted a conditional green card in July. After the attack, President Obama said that he had ordered a revision of the program under which Ms. Malik entered the country.

U.S.-born 

Nidal Malik Hasan, who killed 13 people in a mass shooting at Fort Hood, Tex., in 2009, was born and raised in Virginia. Mr. Hasan had exchanged messages with Anwar al-Awlaki, an American radical cleric who was later killed by a drone strike

in Yemen. Despite those exchanges, investigators have not linked Mr. Hasan's attack to terrorism.



Naturalized citizen          Green card

Dzhokhar and Tamerlan Tsarnaev, the brothers responsible for the Boston Marathon bombings in 2013, settled in the United States after their parents were granted political asylum, which involves a less extensive vetting process than the program for Syrian and Iraqi refugees.

At the time of the Boston bombings, which killed three people and injured more than 260, Dzhokhar Tsarnaev was a naturalized American citizen, and Tamerlan had a green card.

## Attacks by Foreign Residents



No visa needed          Tourist visa

Since 2001, "hardly any foreign-born have committed (or tried to commit) terrorism in (or on the way to) the U.S.," John Mueller, a political scientist at Ohio State and the Cato Institute who tracks terrorism in the United States, wrote in an email.

Umar Farouk Abdulmutallab, a Nigerian man who tried to detonate explosives in his underwear during a flight from Amsterdam to Detroit in 2009, had a tourist visa. Richard C. Reid, who tried to detonate explosives in his shoes on a flight from Paris to Miami in 2001, is a British citizen, and would not have needed a visa to enter the United States.

In a speech after the attack in San Bernardino, Mr. Obama said he was working with Congress to strengthen screening of those who come to the United States without a visa, "so that we can take a hard look at whether they've traveled to war zones."

## Most Prominent Attacks Linked to Extremist Islam

2014                    Ali Muhammad Brown          Charged with murdering three men in Washington State and one in New Jersey.

U.S.-born citizen

| 2014 |  | Alton Nolen<br>U.S.-born citizen | Charged with first-degree murder in the beheading of a co-worker in Oklahoma. |
|---|---|---|---|
| 2013 | <br> | Dzhokhar Tsarnaev<br>Naturalized citizen<br><br>Tamerlan Tsarnaev<br>Green card | The two brothers were responsible for the Boston Marathon bombings in 2013. Three people were killed and more than 260 were injured; an M.I.T. police officer was killed during the subsequent manhunt. |
| 2009 |  | Abdulhakim Mujahid Muhammad<br>U.S.-born citizen | Killed one soldier and wounded another at a military recruiting center in Little Rock, Ark. |
| 2009 |  | Nidal Malik Hasan<br>U.S.-born citizen | Killed 13 people and wounded dozens of others in a shooting at Fort Hood in Texas. |
| 2006 |  | Naveed Haq<br>U.S.-born citizen | Shot and killed one person and wounded five others at the Jewish Federation of Greater Seattle. |
| 2002 |  | Hesham Mohamed Hadayet<br>Green card | Fatally shot two people at the El Al ticket counter at Los Angeles International Airport. |
| 2015 | <br><br> | Elton Simpson<br>U.S.-born citizen<br><br>Nadir Hamid Soofi<br>U.S.-born citizen<br><br>Abdul Malik Abdul Kareem<br>U.S.-born citizen | Mr. Simpson and Mr. Soofi opened fire outside a gathering in Garland, Tex., that showcased artwork and cartoons depicting the Prophet Muhammad. Both men were killed by the police. Mr. Kareem was later charged with helping plan the attack. |
| 2014 |  | Zale H. Thompson<br>U.S.-born citizen | Attacked police officers with a hatchet in New York. |



| 2010 | Faisal Shahzad<br>*Naturalized citizen* | Planted a car bomb in Times Square. |
| 2010 | Yonathan Melaku<br>*Naturalized citizen* | Fired shots at five military buildings in the Washington area, including the Pentagon. |
| 2009 | Umar Farouk Abdulmutallab, Nigerian<br>*Tourist visa* | Tried to detonate explosives sewn into his underwear on a Detroit-bound airliner on Christmas Day. |
| 2006 | Mohammed Reza Taheri-azar<br>*Naturalized citizen* | Drove a sport utility vehicle through a crowded common area at the University of North Carolina at Chapel Hill. |
| 2001 | Richard C. Reid, British<br>*No visa needed* | Tried to detonate explosives in his shoes during a flight from Paris to Miami. |
| 2015 | Mohammod Youssuf Abdulazeez<br>*Naturalized citizen* | Killed four Marines and one sailor at a military recruiting office in Chattanooga, Tenn. |
| 2015 | Syed Rizwan Farook<br>*U.S.-born citizen*<br><br>Tashfeen Malik<br>*Green card* | Killed 14 people and wounded 21 others at a social services center in San Bernardino, Calif. |

Correction: An earlier version of this chart misstated the number of people killed during an attack at a military recruiting center in Chattanooga. It was five, not four.

     MORE

**More on NYTimes.com**

# EXHIBIT 5

March 10, 2017


The Honorable Donald J. Trump
The White House
1600 Pennsylvania Avenue NW
Washington, D.C. 20050


Dear Mr. President,

We have worked for years, under both Democratic and Republican administrations, to protect America's national security. We are deeply concerned that the March 6, 2017 executive order halting refugee resettlement and suspending visa issuance and travel from six Muslim-majority countries will, like the prior version, weaken U.S. national security and undermine U.S. global leadership. The United States faces serious threats from terrorist networks and must take all prudent and effective steps to combat them, including the appropriate vetting of travelers to the United States. But the recent order suffers from the same core substantive defects as the previous version.

The revised executive order will jeopardize our relationships with allies and partners on whom we rely for vital counterterrorism cooperation and information-sharing. To Muslims— including those victimized by or fighting against ISIS—it will send a message that reinforces the propaganda of ISIS and other extremist groups, that falsely claim the United States is at war with Islam. Welcoming Muslim refugees and travelers, by contrast, exposes the lies of terrorists and counters their warped vision.

We must remain vigilant to keep our nation safe from terrorists, whether foreign or homegrown. At the same time, we must remain true to our ideals. These are not mutually exclusive goals. In fact, resettlement initiatives advance U.S. national security interests by protecting the stability of U.S. allies and partners struggling to host large numbers of refugees.

Following the 9/11 attacks, the United States developed a rigorous system of security vetting for travelers to our homeland, leveraging the full capabilities of the intelligence and law enforcement communities. Since then, the U.S. has added enhanced vetting procedures for travelers and has revised them continuously. Our government applies this process to travelers not once, but multiple times. Refugees are vetted more intensively than any other category of traveler. They are screened by national intelligence agencies and INTERPOL, their fingerprints and other biometric data are checked against terrorist and criminal databases, and they are interviewed several times. These processes undergo review on an ongoing basis to ensure that the most updated and rigorous measures are applied, and any additional enhancements can be added without halting refugee resettlement or banning people from certain countries.

We welcome the removal of Iraq from the 90-day travel ban, but we remain concerned that the Iraqis who risked their lives to work with the U.S. military, U.S. government and other U.S. organizations will be left in harm's way for even longer due to the order's 120-day suspension of the U.S. Refugee Admissions Program and overall reduction in refugee admissions. These individuals were given priority access to U.S. resettlement under the Refugee Crisis in Iraq Act, but their resettlement, like that of many

other vetted refugees, will now likely be delayed as security clearances and other approvals expire, adding many more months onto their processing.  The United States has a moral obligation to protect these allies.

Bans like those included in this order are harmful to U.S. national security and beneath the dignity of our great nation. Further, the order's drastic reduction in the number of refugees to be resettled in this fiscal year after the 120-day moratorium weakens this country's ability to provide global leadership and jeopardizes our national security interests by failing to support the stability of our allies that are struggling to host large numbers of refugees. America's much-admired compassion and openness are sources not of weakness but strength. These qualities accord with the ideals on which our nation was founded, and on which our greatness rests.

The revised executive order is damaging to the strategic and national security interests of the United States.  We urge that, in moving forward, the United States: ensure any vetting enhancements are necessary, non-discriminatory and otherwise consistent with the U.S. Constitution; implement any necessary enhancements without a counterproductive ban or suspension on entry of nationals of particular countries or religions; and immediately restart a strong non-discriminatory refugee resettlement initiative, which will in turn advance U.S. global leadership and national security interests.

We firmly believe that these steps will strengthen U.S. national security and appreciate your attention to the concerns we raise in this letter.

Sincerely,
(names in alphabetical order)

Wally Adeyemo
Former Deputy Assistant to the President and
Deputy National Security Advisor for International
Economics

Christopher Le Mon
Former Special Assistant to the President for
National Security Affairs

Dr. Madeleine K. Albright
Former Secretary of State

Marcel Lettre
Former Under Secretary of Defense for
Intelligence

Steven L. Arnold
Lieutenant General
U.S. Army (Ret.)

George Little
Former Assistant Secretary of Defense for Public
Affairs

Alyssa Ayres
Former Deputy Assistant Secretary of State for
South Asia

Albert J. Madora
Major General
U.S. Army (Ret.)

Jeremy Bash
Former Chief of Staff,
Department of Defense

Kelly Magsamen
Former Principal Deputy Assistant Secretary of
Defense for Asian and Pacific Security Affairs

Rand Beers
Former Acting Secretary of the Department of
Homeland Security

Daniel Benjamin
Former Coordinator for Counterterrorism,
Department of State

Rob Berschinski
Former Deputy Assistant Secretary of State for
Democracy, Human Rights, and Labor

Nisha Biswal
Former Assistant Secretary of State for South and
Central Asian Affairs

Jarrett Blanc
Former Deputy Special Representative to
Afghanistan and Pakistan

Charles Blanchard
Former General Counsel
U.S. Air Force

Antony Blinken
Former Deputy Secretary of State

Max Boot
Jeane J. Kirkpatrick Senior Fellow in National
Security Studies
Council on Foreign Relations

David M. Brahms
Brigadier General
U.S. Marine Corps (Ret.)

Michael Breen
Retired United States Army Officer

Thomas Malinowski
Former Assistant Secretary of State for
Democracy, Human Rights, and Labor

Robert Malley
Former Special Assistant to the President and
White House Coordinator for the Middle East,
North Africa, and the Persian Gulf Region

Brian McKeon
Former Acting Under Secretary of Defense for
Policy

Pete McCloskey, Jr.
U.S. Congressman, 1967-1983
11th, 17th, and 12th Congressional Districts of CA

John McLaughlin
Former Deputy Director and Acting Director of
Central Intelligence Agency

Philip McNamara
Former Assistant Secretary for Partnerships and
Engagement, Department of Homeland Security

Bernadette Meehan
Former Special Assistant to the President for
National Security Affairs

Sarah Mendelson
Former Ambassador to the Economic and Social
Council, United Nations

James Miller
Former Undersecretary of Defense for Policy

Lisa Monaco
Former Assistant to President for Homeland
Security and Counterterrorism and Deputy
National Security Advisor

Rosa Brooks
Former Counselor to Under Secretary of Defense for Policy

Ambassador (ret.) Nicholas Burns
Former Under Secretary of State for Political Affairs, Ambassador to NATO and to Greece

Ambassador William J. Burns
Former Deputy Secretary of State

Luis C.deBaca
Former Ambassador at Large to Monitor and Combat Trafficking in Persons

Michael Carpenter
Former Deputy Assistant Secretary of Defense for Russia, Ukraine, Eurasia

Derek Chollet
Former Assistant Secretary of Defense for International Security Affairs

Richard Clarke
Former National Coordinator for Security, Infrastructure Protection and Counterterrorism for the U.S.

David Cohen
Former Deputy Director, Central Intelligence Agency

Bathsheba Crocker
Former Assistant Secretary of State for International Organization Affairs

Ryan C. Crocker
Former U.S. Ambassador to Lebanon, Kuwait, Syria, Pakistan, Iraq, and Afghanistan

James P. Cullen
Brigadier General
U.S. Army (Ret.)

Alberto Mora
Former General Counsel, Department of the Navy

Janet Napolitano
Former Secretary of the Department of Homeland Security

William L. Nash
Major General
U.S. Army (Ret.)

Thomas Nides
Former Deputy Secretary of State for Management and Resources

Michael P. Noonan
U.S. Army Veteran
Director of Research, Foreign Policy Research Institute

Suzanne Nossel
Former Deputy Assistant Secretary of State for International Organizations Affairs

James C. O'Brien
Former Special Envoy for Hostage Recovery

Matthew Olsen
Former Director of the National Counterterrorism Center

Rick Olson
Former Special Representative for Afghanistan and Pakistan

Charles Otstott
Lieutenant General
U.S. Army (Ret.)

Eric Pelofsky
Former Special Assistant to the President and Senior Director for North Africa and Yemen

Mary DeRosa
Former Deputy Counsel to the President for
National Security Affairs

Daniel Drezner
Professor
Fletcher School of Law and Diplomacy

Paul D. Eaton
Major General
U.S. Army (Ret.)

Mari K. Eder
Major General
U.S. Army (Ret.)

Brian Egan
Former Legal Adviser
U.S. State Department

Evelyn Farkas
Former Executive Director, Commission on the
Prevention of WMD Proliferation and Terrorism

Daniel Feldman
Former Special Representative for Afghanistan
and Pakistan

Steve Feldstein
Former Deputy Assistant Secretary of State for
Democracy, Human Rights, and Labor

Jose W. Fernandez
Former Assistant Secretary of State for Economic,
Energy, and Business Affairs

Jonathan Finer
Former Director of Policy Planning, Department of
State

Michele Flournoy
Former Under Secretary of Defense for Policy

Gale Pollock
Major General
U.S. Army (Ret.)

Amy Pope
Former Deputy Homeland Security Advisor and
Deputy Assistant to the President for National
Security Affairs

Michael Posner
Former Assistant Secretary of State for
Democracy, Human Rights and Labor

Samantha Power
Former United States Ambassador to the United
Nations

Jeffrey Prescott
Former Senior Director for Iran, Iraq, Syria, and
the Gulf States, National Security Council

Ned Price
Former Special Assistant to the President and
National Security Council Spokesperson

Dafna Rand
Former Deputy Assistant Secretary of State for
Democracy, Human Rights, and Labor

William D. Razz Waff
Major General
U.S. Army (Ret.)

Susan Rice
Former National Security Advisor to the President
of the U.S.

Bill Richardson
Former Governor of New Mexico and United
States Ambassador to the United Nations

Leon Rodriguez
Former Director, U.S. Citizenship and
Immigration Services

Eugene Fox
Major General
U.S. Army (Ret.)

Danielle Garbe
Former Director for Lebanon and Jordan, National
Security Council

Dennis P. Geoghan
Brigadier General
U.S. Army (Ret.)

Suzy George
Former Deputy Assistant to the President, Chief of
Staff and Executive Secretary, National Security
Council

F. Stephen Glass
Rear Admiral, JAGC
U.S. Navy (Ret.)

Rachel Goldbrenner
Former Senior Policy Advisor to the U.S.
Ambassador to the United Nations

Mary Beth Goodman
Former Special Assistant to the President for
Development and Democracy

Philip Gordon
Former Special Assistant to the President and
White House Coordinator for the Middle East,
North Africa, and the Persian Gulf Region

Wilton Scott Gorske
Major General
U.S. Army (Ret.)

Donald J. Guter
Rear Admiral, JACG
U.S. Navy (Ret.)

Ziad Haider
Former Special Representative for Commercial
and Business Affairs, U.S. Department of State

Laura Rosenberger
Former Chief of Staff to the Deputy Secretary of
State

Tommy Ross
Former Deputy Assistant Secretary of Defense for
Security Cooperation

Murray G. Sagsveen
Brigadier General
U.S. Army (Ret.)

Eric Schwartz
Former Assistant Secretary of State for
Population, Refugees, and Migration

Norman R. Seip
Lieutenant General
U.S. Air Force (Ret.)

Wendy Sherman
Former Under Secretary of State for Political
Affairs

Vikram Singh
Former Deputy Assistant Secretary of Defense for
South and Southeast Asia

Elissa Slotkin
Former Acting Assistant Secretary of Defense for
International Security Affairs

Jeff Smith
Former General Counsel, Central Intelligence
Agency

Julianne "Julie" Smith
Former Deputy National Security Advisor to the
Vice President of the United States

Tara Sonenshine
Former Under Secretary of State for Public
Diplomacy and Public Affairs

Irv Halter
Major General
U.S. Air Force (Ret.)

Lee H. Hamilton
U.S. Congressman, 1965-1999
9th Congressional District of IN

Keith Harper
Former Ambassador to the United Nations Human Rights Council

Luke Hartig
Former Senior Director for Counterterrorism National Security Council

Caitlin Hayden
Former National Security Council Spokesperson

Leif H. Hendrickson
Brigadier General
U.S. Marine Corps (Ret.)

Heather Higginbottom
Former Deputy Secretary of State for Management and Resources

John D. Hutson
Rear Admiral, JACG
U.S. Navy (Ret.)

David. R. Irvine
Brigadier General
U.S. Army (Ret.)

John H. Johns
Brigadier General
U.S. Army (Ret.)

Colin Kahl
Former National Security Advisor to the Vice President of the United States

Matthew Spence
Former Deputy Assistant Secretary of Defense for Middle East Policy

James Steinberg
Former Deputy Secretary of State

Nik Steinberg
Former Counselor to the U.S. Permanent Representative to the United Nations

Seth M.M. Stodder
Former Assistant Secretary of Homeland Security for Border, Immigration & Trade Policy

Jake Sullivan
Former National Security Advisor to the Vice President of the U.S.

Timothy S. Sullivan
Rear Admiral
U.S. Coast Guard (Ret.)

Antonio M. Taguba
Major General
U.S. Army (Ret.)

Jim Townsend
Former Deputy Assistant Secretary of Defense for European and NATO Policy

Michael G. Vickers
Former Under Secretary of Defense for Intelligence

David Wade
Former Chief of Staff,
Department of State

William Wechsler
Former Deputy Assistant Secretary of Defense for Counterterrorism and Special Operations

Gil Kerlikowske
Former Commissioner, United States Customs and
Border Protection

John Kerry
Former Secretary of State

Jeremy Konyndyk
Former Director, Office of U.S. Foreign Disaster
Assistance, USAID

Charles Kupchan
Former Special Assistant to the President for
National Security Affairs

Mark P. Lagon
Former U.S. Ambassador-at-Large to Combat
Trafficking in Persons

Jonathan Lee
Former Deputy Chief of Staff,
Department of Homeland Security

Michael R. Lehnert
Major General
U.S. Marine Corps (Ret.)

Paul N. Lekas
Former Deputy General Counsel for Legal Counsel,
Department of Defense

Moira Whelan
Former Deputy Assistant Secretary of State for
Public Affairs

Catherine Wiesner
Former Deputy Assistant Secretary of State,
Bureau of Population, Refugees, and Migration

Douglas Wilson
Former Assistant Secretary of Defense for Public
Affairs

Tamara Cofman Wittes
Former Deputy Assistant Secretary of State for
Near Eastern Affairs

Jon Brook Wolfsthal
Former Special Assistant to the President for
National Security Affairs

Lee Wolosky
Former Special Envoy for Guantanamo Closure

Tom Wyler
Former Counselor to the Secretary of Commerce
and Senior Advisor for International Economics

Stephen N. Xenakis
Brigadier General
U.S. Army (Ret.)

CC:
The Honorable Rex W. Tillerson, Secretary of State
The Honorable James N. Mattis, Secretary of Defense
The Honorable Jefferson B. Sessions, Attorney General of the United States
The Honorable John F. Kelly, Secretary of Homeland Security
The Honorable Michael P. Dempsey, Acting Director of National Intelligence

# EXHIBIT 6

| 15 | Search... |
|---|---|

latest    retweets    not exact

1. **Feb 5, 2017 10:36:54 PM** What an amazing comeback and win by the Patriots. Tom Brady, Bob Kraft and Coach B are total winners. Wow! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828447350200926212)

2. **Feb 5, 2017 05:49:42 PM** Enjoy the #SuperBowl and then we continue: MAKE AMERICA GREAT AGAIN! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828375073006444544)

3. **Feb 5, 2017 03:47:25 PM** I will be interviewed by @oreillyfactor at 4:00 P.M. (prior to the #SuperBowl Pre-game Show) on Fox Network. Enjoy! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828344301381939200)

4. **Feb 5, 2017 03:42:33 PM** I have instructed Homeland Security to check people coming into our country VERY CAREFULLY. The courts are making the job very difficult! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828343072840900610)

5. **Feb 5, 2017 03:39:05 PM** Just cannot believe a judge would put our country in such peril. If something happens blame him and court system. People pouring in. Bad! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828342202174668800)

6. **Feb 4, 2017 07:48:12 PM** The judge opens up our country to potential terrorists and others that do not have our best interests at heart. Bad people are very happy! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828042506851934209)

7. **Feb 4, 2017 07:34:50 PM** Interview with @oreillyfactor on Fox Network - 4:00 P.M. (prior to Super Bowl). Enjoy! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828039143318024194)

8. **Feb 4, 2017 06:37:59 PM** Why aren't the lawyers looking at and using the Federal Court decision in Boston, which is at conflict with ridiculous lift ban decision? [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/828024835670413312)

9. **Feb 4, 2017 04:44:49 PM** Because the ban was lifted by a judge, many very bad and dangerous people may be pouring into our country. A terrible decision [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827996357252243456)

10. **Feb 4, 2017 03:44:07 PM** What is our country coming to when a judge can halt a Homeland Security travel ban and anyone, even with bad intentions, can come into U.S.? [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827981079042805761)

11. **Feb 4, 2017 09:26:10 AM** MAKE AMERICA GREAT AGAIN! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827885966509604865)

12. **Feb 4, 2017 08:39:27 AM** After being forced to apologize for its bad and inaccurate coverage of me after winning the election, the FAKE NEWS @nytimes is still lost! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827874208021639168)

13. **Feb 4, 2017 08:12:02 AM** The opinion of this so-called judge, which essentially takes law-enforcement away from our country, is ridiculous and will be overturned! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827867311054974976)

14. **Feb 4, 2017 08:06:39 AM** Interesting that certain Middle-Eastern countries agree with the ban. They know if certain people are allowed in it's death & destruction! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827865957750161408)

15. **Feb 4, 2017 07:59:35 AM** When a country is no longer able to say who can, and who cannot , come in & out, especially for reasons of safety &.security - big trouble! [Twitter for Android]   link   (https://twitter.com/realdonaldtrump/status/827864176043376640)