FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
12:32 pm, Mar 15, 2017
SUE BEITIA, CLERK

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| STATE OF HAWAI'I and ISMAIL ELSHIKH, | CV. NO. 17-00050 DKW-KSC |
| Plaintiffs, | **ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |
| vs. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

## **INTRODUCTION**

On January 27, 2017, the President of the United States issued Executive

Order No. 13,769 entitled, "Protecting the Nation from Foreign Terrorist Entry into

the United States."   *See* 82 Fed. Reg. 8977 (Jan. 27, 2017).   On March 6, 2017, the

President issued another Executive Order, No. 13,780, identically entitled,

"Protecting the Nation from Foreign Terrorist Entry into the United States." (the

"Executive Order").   *See* 82 Fed. Reg. 13209 (Mar. 6, 2017).   The Executive Order

revokes Executive Order No. 13,769 upon taking effect.[1]   Exec. Order §§ 13, 14.

Like its predecessor, the Executive Order restricts the entry of foreign nationals from

specified countries and suspends entrants from the United States refugee program

for specified periods of time.

Plaintiffs State of Hawai'i ("State") and Ismail Elshikh, Ph.D. seek a

nationwide temporary restraining order that would prohibit the Federal Defendants[2]

from "enforcing or implementing Sections 2 and 6 of the Executive Order" before it

takes effect.   Pls.' Mot. for TRO 4, Mar. 8, 2017, ECF No. 65.[3]   Upon evaluation

of the parties' submissions, and following a hearing on March 15, 2017, the Court

concludes that, on the record before it, Plaintiffs have met their burden of

establishing a strong likelihood of success on the merits of their Establishment

Clause claim, that irreparable injury is likely if the requested relief is not issued, and

that the balance of the equities and public interest counsel in favor of granting the

requested relief.   Accordingly, Plaintiffs' Motion for TRO (ECF. No. 65) is granted

for the reasons detailed below.

---

[1]By its terms, the Executive Order becomes effective as of March 16, 2017 at 12:01 a.m., Eastern Daylight Time—*i.e.*, March 15, 2017 at 6:01 p.m. Hawaii Time.   Exec. Order § 14.

[2]Defendants in the instant action are: Donald J. Trump, in his official capacity as President of the United States; the U.S. Department of Homeland Security ("DHS"); John F. Kelly, in his official capacity as Secretary of DHS; the U.S. Department of State; Rex Tillerson, in his official capacity as Secretary of State; and the United States of America.

[3]Plaintiffs filed a Second Amended Complaint for Declaratory and Injunctive Relief ("SAC") on March 8, 2017 simultaneous with their Motion for TRO.   SAC, ECF No. 64.

## BACKGROUND

### I.   The President's Executive Orders

#### A.   Executive Order No. 13,769

Executive Order No. 13,769 became effective upon signing on January 27, 2017.   *See* 82 Fed. Reg. 8977.   It inspired several lawsuits across the nation in the days that followed.[4]   Among those lawsuits was this one: On February 3, 2017, the State filed its complaint and an initial motion for TRO, which sought to enjoin, nationwide, Sections 3(c), 5(a)–(c), and 5(e) of Executive Order No. 13,769.   Pls.' Mot. for TRO, Feb. 3, 2017, ECF No. 2.

This Court did not rule on the State's initial TRO motion because later that same day, the United States District Court for the Western District of Washington entered a nationwide preliminary injunction enjoining the Government from enforcing the same provisions of Executive Order No. 13,769 targeted by the State here.   *See Washington v. Trump*, 2017 WL 462040.   As such, the Court stayed this case, effective February 7, 2017, specifying that the stay would continue "as long as

---

[4]*See, e.g., Mohammed v. United States*, No. 2:17-cv-00786-AB-PLA (C.D. Cal. Jan. 31, 2017); *City & Cty. of San Francisco v. Trump*, No. 3:17-cv-00485-WHO (N.D. Cal. Jan. 31, 2017); *Louhghalam v. Trump*, Civil Action No. 17-cv-10154, 2017 WL 386550 (D. Mass. Jan. 29, 2017); *Int'l Refugee Assistance Project v. Trump*, No. 8:17-0361-TDC (D. Md. filed Feb. 7, 2017); *Darweesh v. Trump*, 17 Civ. 480 (AMD), 2017 WL 388504 (E.D.N.Y. Jan. 28, 2017); *Aziz v. Trump*, --- F. Supp. 3d ----, 2017 WL 580855 (E.D. Va. Feb. 13, 2017); *Washington v. Trump*, Case No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017), *emergency stay denied*, 847 F.3d 1151 (9th Cir. 2017).   This list is not exhaustive.

the February 3, 2017 injunction entered in *Washington v. Trump* remain[ed] in full force and effect, or until further order of this Court."   ECF Nos. 27 & 32.

On February 4, 2017, the Government filed an emergency motion in the Ninth Circuit Court of Appeals seeking a stay of the *Washington* TRO, pending appeal.[5] *See Washington v. Trump*, No. 17-35105 (9th Cir. Feb. 4, 2017).   The Ninth Circuit heard oral argument on February 7, after which it denied the emergency motion via written Order dated February 9, 2017.   *See* Case No. 17-35105, ECF Nos. 125 (Tr. of Hr'g), 134 (Filed Order for Publication at 847 F.3d 1151).

On March 8, 2017, the Ninth Circuit granted the Government's unopposed motion to voluntarily dismiss the appeal.   *See* Order, No. 17-35105 (9th Cir. Mar. 8, 2017), ECF No. 187.   As a result, the same sections of Executive Order No. 13,769 initially challenged by the State in the instant action remain enjoined as of the date of this Order.

### B.   The New Executive Order

Section 2 of the new Executive Order suspends from "entry into the United States" for a period of 90 days, certain nationals of six countries referred to in Section 217(a)(12) of the Immigration and Nationality Act ("INA"), 8 U.S.C.

---

[5]The Government also requested "an immediate administrative stay pending full consideration of the emergency motion for a stay pending appeal" on February 4, 2017 (Emergency Mot. to Stay, No. 17-35105 (9th Cir.), ECF No. 14), which the Ninth Circuit panel swiftly denied (Order, No. 17-35105 (9th Cir.), ECF No. 15).

§ 1101 *et seq.*: Iran, Libya, Somalia, Sudan, Syria, and Yemen.[6]   8 U.S.C.

§ 1187(a)(12); Exec. Order § 2(c).   The suspension of entry applies to nationals of

these six countries who (1) are outside the United States on the new Executive

Order's effective date of March 16, 2017; (2) do not have a valid visa on that date,

and (3) did not have a valid visa as of 5:00 p.m. Eastern Standard Time on January

27, 2017 (the date of the prior Executive Order, No. 13,769).   Exec. Order § 3(a).

The 90-day suspension does not apply to: (1) lawful permanent residents; (2)

any foreign national admitted to or paroled into the United States on or after the

Executive Order's effective date (March 16, 2017); (3) any individual who has a

document other than a visa, valid on the effective date of the Executive Order or

issued anytime thereafter, that permits travel to the United States, such as an advance

parole document; (4) any dual national traveling on a passport not issued by one of

the six listed countries; (5) any foreign national traveling on a diplomatic-type or

other specified visa; and (6) any foreign national who has been granted asylum, any

refugee already admitted to the United States, or any individual granted withholding

of removal, advance parole, or protection under the Convention Against Torture.

*See* Exec. Order § 3(b).

---

[6]Because of the "close cooperative relationship" between the United States and the Iraqi government, the Executive Order declares that Iraq no longer merits inclusion in this list of countries, as it was in Executive Order No. 13,769.   Iraq "presents a special case."   Exec. Order § 1(g).

Under Section 3(c)'s waiver provision, foreign nationals of the six countries who are subject to the suspension of entry may nonetheless seek entry on a case-by-case basis.   The Executive Order includes the following list of circumstances when such waivers "could be appropriate:"

> (i) the foreign national has previously been admitted to the United States for a continuous period of work, study, or other longterm activity, is outside the United States on the effective date of the Order, seeks to reenter the United States to resume that activity, and denial of reentry during the suspension period would impair that activity;
>
> (ii) the foreign national has previously established significant contacts with the United States but is outside the United States on the effective date of the Order for work, study, or other lawful activity;
>
> (iii) the foreign national seeks to enter the United States for significant business or professional obligations and the denial of entry during the suspension period would impair those obligations;
>
> (iv) the foreign national seeks to enter the United States to visit a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship;
>
> (v) the foreign national is an infant, a young child or adoptee, an individual needing urgent medical care, or someone whose entry is otherwise justified by the special circumstances of the case;
>
> (vi) the foreign national has been employed by, or on behalf of, the United States Government (or is an eligible dependent of

6

such an employee) and the employee can document that he or she has provided faithful and valuable service to the United States Government;

(vii) the foreign national is traveling for purposes related to an international organization designated under the International Organizations Immunities Act (IOAI), 22 U.S.C. § 288 et seq., traveling for purposes of conducting meetings or business with the United States Government, or traveling to conduct business on behalf of an international organization not designated under IOIA;

(viii) the foreign national is a landed Canadian immigrant who applies for admission at a land border port of entry or a preclearance location located in Canada; or

(ix) the foreign national is traveling as a United States Government sponsored exchange visitor.

Exec. Order § 3(c).

Section 6 of the Executive Order suspends the U.S. Refugee Admissions Program for 120 days.   The suspension applies both to travel into the United States and to decisions on applications for refugee status for the same period.   *See* Exec. Order § 6(a).   It excludes refugee applicants who were formally scheduled for transit by the Department of State before the March 16, 2017 effective date.   Like the 90-day suspension, the 120-day suspension includes a waiver provision that allows the Secretaries of State and DHS to admit refugee applicants on a case-by-case basis.   *See* Exec. Order § 6(c).   The Executive Order identifies examples of circumstances in which waivers may be warranted, including: where

the admission of the individual would allow the United States to conform its conduct to a pre-existing international agreement or denying admission would cause undue hardship.   Exec. Order § 6(c).   Unlike Executive Order No. 13,769, the new Executive Order does not expressly refer to an individual's status as a "religious minority" or refer to any particular religion, and it does not include a Syria-specific ban on refugees.

Section 1 states that the purpose of the Executive Order is to "protect [United States] citizens from terrorist attacks, including those committed by foreign nationals."   Section 1(h) identifies two examples of terrorism-related crimes committed in the United States by persons entering the country either "legally on visas" or "as refugees":

> [1] In January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were sentenced to 40 years and to life in prison, respectively, for multiple terrorism-related offenses. [2] [I]n October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction[.]

Exec. Order § 1(h).

By its terms, the Executive Order also represents a response to the Ninth Circuit's decision in *Washington v. Trump.   See* 847 F.3d 1151.   According to the Government, it "clarifies and narrows the scope of Executive action regarding

8

immigration, extinguishes the need for emergent consideration, and eliminates the potential constitutional concerns identified by the Ninth Circuit." *See* Notice of Filing of Executive Order 4–5, ECF No. 56.

It is with this backdrop that we turn to consideration of Plaintiffs' restraining order application.

## II.   Plaintiffs' Motion For TRO

Plaintiffs' Second Amended Complaint (ECF No. 64) and Motion for TRO (ECF No. 65) contend that portions of the new Executive Order suffer from the same infirmities as those provisions of Executive Order No. 13,769 enjoined in *Washington*, 847 F.3d 1151.   Once more, the State asserts that the Executive Order inflicts constitutional and statutory injuries upon its residents, employers, and educational institutions, while Dr. Elshikh alleges injuries on behalf of himself, his family, and members of his Mosque.   SAC ¶ 1.

Plaintiffs allege that the Executive Order subjects portions of the State's population, including Dr. Elshikh and his family, to discrimination in violation of both the Constitution and the INA, denying them their right, among other things, to associate with family members overseas on the basis of their religion and national origin.   The State purports that the Executive Order has injured its institutions,

economy, and sovereign interest in maintaining the separation between church and state.   SAC ¶¶ 4–5.

According to Plaintiffs, the Executive order also results in "their having to live in a country and in a State where there is the perception that the Government has established a disfavored religion."   SAC ¶ 5.   Plaintiffs assert that by singling out nationals from the six predominantly Muslim countries, the Executive Order causes harm by stigmatizing not only immigrants and refugees, but also Muslim citizens of the United States.   Plaintiffs point to public statements by the President and his advisors regarding the implementation of a "Muslim ban," which Plaintiffs contend is the tacit and illegitimate motivation underlying the Executive Order.   *See* SAC ¶¶ 35–51.   For example, Plaintiffs point to the following statements made contemporaneously with the implementation of Executive Order No. 13,769 and in its immediate aftermath:

> 48.    In an interview on January 25, 2017, Mr. Trump discussed his plans to implement "extreme vetting" of people seeking entry into the United States.   He remarked: "[N]o, it's not the Muslim ban.   But it's countries that have tremendous terror. . . . [I]t's countries that people are going to come in and cause us tremendous problems."
>
> 49.    Two days later, on January 27, 2017, President Trump signed an Executive Order entitled, "Protecting the Nation From Foreign Terrorist Entry into the United States."

50.    The first Executive Order [No. 13,769] was issued without a notice and comment period and without interagency review. Moreover, the first Executive Order was issued with little explanation of how it could further its stated objective.

51.    When signing the first Executive Order [No. 13,769], President Trump read the title, looked up, and said: "We all know what that means."   President Trump said he was "establishing a new vetting measure to keep radical Islamic terrorists out of the United States of America," and that: "We don't want them here."

. . . .

58.    In a January 27, 2017 interview with Christian Broadcasting Network, President Trump said that persecuted Christians would be given priority under the first Executive Order.   He said (once again, falsely): "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States?   If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians.   And I thought it was very, very unfair. So we are going to help them."

59.    The day after signing the first Executive Order [No. 13,769], President Trump's advisor, Rudolph Giuliani, explained on television how the Executive Order came to be. He said: "When [Mr. Trump] first announced it, he said, 'Muslim ban.'  He called me up.  He said, 'Put a commission together.   Show me the right way to do it legally.'"

60.    The President and his spokespersons defended the rushed nature of their issuance of the first Executive Order [No. 13,769] on January 27, 2017, by saying that their urgency was imperative to stop the inflow of dangerous persons to the United States.   On January 30, 2017, President Trump tweeted: "If the ban were

announced with a one week notice, the 'bad' would rush into our country during that week."   In a forum on January 30, 2017 at George Washington University, White House spokesman Sean Spicer said: "At the end of the day, what was the other option? To rush it out quickly, telegraph it five days so that people could rush into this country and undermine the safety of our nation?" On February 9, 2017, President Trump claimed he had sought a one-month delay between signing and implementation, but was told by his advisors that "you can't do that because then people are gonna pour in before the toughness."

SAC ¶¶ 48–51, 58–60 (footnotes and citations omitted).

Plaintiffs also highlight statements by members of the Administration prior to the signing of the new Executive Order, seeking to tie its content to Executive Order No. 13,769 enjoined by the *Washington* TRO.   In particular, they note that:

On February 21, Senior Advisor to the President, Stephen Miller, told Fox News that the new travel ban would have the same effect as the old one.   He said: "Fundamentally, you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will be addressed.   But in terms of protecting the country, those basic policies are still going to be in effect."

SAC ¶ 74(a) (citing *Miller: New order will be responsive to the judicial ruling; Rep. Ron DeSantis: Congress has gotten off to a slow start*, The First 100 Days (Fox News television broadcast Feb. 21, 2017), transcript *available at* https://goo.gl/wcHvHH (rush transcript)).   Plaintiffs argue that, in light of these and similar statements "where the President himself has repeatedly and publicly

espoused an improper motive for his actions, the President's action must be invalidated." Pls.' Mem. in Supp. of Mot. for TRO 2, ECF No. 65-1.

In addition to these accounts, Plaintiffs describe a draft report from the DHS, which they contend undermines the purported national security rationale for the Executive Order. *See* SAC ¶ 61 (citing SAC, Ex. 10, ECF No. 64-10). The February 24, 2017 draft report states that citizenship is an "unlikely indicator" of terrorism threats against the United States and that very few individuals from the seven countries included in Executive Order No. 13,769 had carried out or attempted to carry out terrorism activities in the United States. SAC ¶ 61 (citing SAC, Ex. 10, ECF No. 64-10). According to Plaintiffs, this and other evidence demonstrates the Administration's pretextual justification for the Executive Order.

Plaintiffs assert the following causes of action: (1) violation of the Establishment Clause of the First Amendment (Count I); (2) violation of the equal protection guarantees of the Fifth Amendment's Due Process Clause on the basis of religion, national origin, nationality, or alienage (Count II); (3) violation of the Due Process Clause of the Fifth Amendment based upon substantive due process rights (Count III); (4) violation of the procedural due process guarantees of the Fifth Amendment (Count IV); (5) violation of the INA due to discrimination on the basis of nationality, and exceeding the President's authority under Sections 1182(f) and

1185(a) (Count V); (6) substantially burdening the exercise of religion in violation of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 200bb-1(a) (Count VI); (7) substantive violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2)(A)–(C), through violations of the Constitution, INA, and RFRA (Count VII); and (8) procedural violation of the APA, 5 U.S.C. § 706 (2)(D) (Count VIII).

Plaintiffs contend that these alleged violations of law have caused and continue to cause them irreparable injury.   To that end, through their Motion for TRO, Plaintiffs seek to temporarily enjoin Defendants from enforcing and implementing Sections 2 and 6 of the Executive Order.   Mot. for TRO 4, ECF No. 65.   They argue that "both of these sections are unlawful in all of their applications:" Section 2 discriminates on the basis of nationality, Sections 2 and 6 exceed the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a), and both provisions are motivated by anti-Muslim animus.   TRO Mem. 50, Dkt. No. 65-1. Moreover, Plaintiffs assert that both sections infringe "on the 'due process rights' of numerous U.S. citizens and institutions by barring the entry of non-citizens with whom they have close relationships."   TRO Mem. 50 (quoting *Washington*, 847 F.3d at 1166).

Defendants oppose the Motion for TRO.   The Court held a hearing on the

matter on March 15, 2017, before the Executive Order was scheduled to take effect.

## DISCUSSION

I.   **Plaintiffs Have Demonstrated Standing At This Preliminary Phase**

A.   **Article III Standing**

Article III, Section 2 of the Constitution permits federal courts to consider

only "cases" and "controversies."   *Massachusetts v. EPA*, 549 U.S. 497, 516

(2007).   "Those two words confine 'the business of federal courts to questions

presented in an adversary context and in a form historically viewed as capable of

resolution through the judicial process.'"   *Id*. (quoting *Flast v. Cohen*, 392 U.S. 83,

95 (1968)).   "[T]o satisfy Article III's standing requirements, a plaintiff must show

(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and

(b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

traceable to the challenged action of the defendant; and (3) it is likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision."

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81

(2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"At bottom, 'the gist of the question of standing' is whether petitioners have

'such a personal stake in the outcome of the controversy as to assure that concrete

adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  *Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1048 (9th Cir. 2010) (en banc) (quoting *Massachusetts*, 549 U.S. at 517)).

"At this very preliminary stage of the litigation, the [Plaintiffs] may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden."  *Washington*, 847 F.3d at 1159 (citing *Lujan*, 504 U.S. at 561).   "With these allegations and evidence, the [Plaintiffs] must make a 'clear showing of each element of standing.'"  *Id.* (quoting *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 907 (2014)).   At this preliminary stage of the proceedings, on the record presented, Plaintiffs meet the threshold Article III standing requirements.

## B.   <u>The State Has Standing</u>

The State alleges standing based both upon injuries to its proprietary interests and to its quasi-sovereign interests, *i.e.*, in its role as *parens patriae*.[7]   Just as the

_____

[7]The State's *parens patriae* theory focuses on the Executive Order

> subject[ing] citizens of Hawai'i like Dr. Elshikh to discrimination and marginalization while denying all residents of the State the benefits of a pluralistic and inclusive society.   Hawai'i has a quasi-sovereign interest in 'securing [its] residents from the harmful effects of discrimination.'  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 609 (1982).   The [Executive]

Ninth Circuit panel in *Washington* concluded on a similar record that the alleged harms to the states' proprietary interests as operators of their public universities were sufficient to support standing, the Court concludes likewise here.   The Court does not reach the State's alternative standing theory based on the protection of the interests of its citizens as *parens patriae*.   *See Washington*, 847 F.3d at 1168 n.5 ("The States have asserted other proprietary interests and also presented an alternative standing theory based on their ability to advance the interests of their citizens as *parens patriae*.   Because we conclude that the States' proprietary interests as operators of their public universities are sufficient to support standing, we need not reach those arguments.").

Hawaii primarily asserts two proprietary injuries stemming from the Executive Order.   First, the State alleges the impacts that the Executive Order will have on the University of Hawaii system, both financial and intangible.   The University is an arm of the State.   *See* Haw. Const. art. 10, §§ 5, 6; Haw. Rev. Stat. ("HRS") § 304A-103.   The University recruits students, permanent faculty, and visiting faculty from the targeted countries.   *See, e.g.*, Suppl. Decl. of Risa E. Dickson ¶¶ 6–8, Mot. for TRO, Ex. D-1, ECF No. 66-6.   Students or faculty

---

Order also harms Hawaiʻi by debasing its culture and tradition of ethnic diversity and inclusion.

TRO Mem. 48, ECF No. 65-1.

suspended from entry are deterred from studying or teaching at the University, now and in the future, irrevocably damaging their personal and professional lives and harming the educational institutions themselves.   *See id.*

There is also evidence of a financial impact from the Executive Order on the University system.   The University recruits from the six affected countries.   It currently has twenty-three graduate students, several permanent faculty members, and twenty-nine visiting faculty members from the six countries listed.   Suppl. Dickson Decl. ¶ 7.   The State contends that any prospective recruits who are without visas as of March 16, 2017 will not be able to travel to Hawaii to attend the University.   As a result, the University will not be able to collect the tuition that those students would have paid.   Suppl. Dickson Decl. ¶ 8 ("Individuals who are neither legal permanent residents nor current visa holders will be entirely precluded from considering our institution.").   These individuals' spouses, parents, and children likewise would be unable to join them in the United States.   The State asserts that the Executive Order also risks "dissuad[ing] some of [the University's] current professors or scholars from continuing their scholarship in the United States and at [the University]."   Suppl. Dickson Decl. ¶ 9.

The State argues that the University will also suffer non-monetary losses, including damage to the collaborative exchange of ideas among people of different

religions and national backgrounds on which the State's educational institutions depend.   Suppl. Dickson Decl. ¶¶ 9–10, ECF no. 66-6; *see also* Original Dickson Decl. ¶ 13, Mot. for TRO, Ex. D-2, ECF, 66-7; SAC ¶ 94.   This will impair the University's ability to recruit and accept the most qualified students and faculty, undermine its commitment to being "one of the most diverse institutions of higher education" in the world, Suppl. Dickson Decl. ¶ 11, and grind to a halt certain academic programs, including the University's Persian Language and Culture program, *id.* ¶ 8.   *Cf. Washington*, 847 F.3d at 1160 ("[The universities] have a mission of 'global engagement' and rely on such visiting students, scholars, and faculty to advance their educational goals.").

These types of injuries are nearly indistinguishable from those found to support standing in the Ninth Circuit's decision in *Washington*.   *See* 847 F.3d at 1161 ("The necessary connection can be drawn in at most two logical steps: (1) the Executive Order prevents nationals of seven countries from entering Washington and Minnesota; (2) as a result, some of these people will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be permitted to return if they leave.   And we have no difficulty concluding that the States' injuries would be redressed if they

could obtain the relief they ask for: a declaration that the Executive Order violates the Constitution and an injunction barring its enforcement.").

The second proprietary injury alleged Hawaii alleges is to the State's main economic driver: tourism.   The State contends that the Executive Order will "have the effect of depressing international travel to and tourism in Hawaiʻi," which "directly harms Hawaii's businesses and, in turn, the State's revenue."   SAC ¶ 100, ECF No. 64.   *See also* Suppl. Decl. of Luis P. Salaveria ¶¶ 6–10, Mot. for TRO, Ex. C-1, ECF No. 66-4 ("I expect, given the uncertainty the new executive order and its predecessor have caused to international travel generally, that these changing policies may depress tourism, business travel, and financial investments in Hawaii.").   The State points to preliminary data from the Hawaii Tourism Authority, which suggests that during the interval of time that the first Executive Order was in place, the number of visitors to Hawaiʻi from the Middle East dropped (data including visitors from Iran, Iraq, Syria and Yemen).   *See* Suppl. Decl. of George Szigeti, ¶¶ 5–8, Mot. for TRO, Ex. B-1, ECF No. 66-2; *see also* SAC ¶ 100 (identifying 278 visitors in January 2017, compared to 348 visitors from that same region in January 2016).[8]   Tourism accounted for $15 billion in spending in 2015,

---

[8]This data relates to the prior Executive Order No. 13,769.   At this preliminary stage, the Court looks to the earlier order's effect on tourism in order to gauge the economic impact of the new Executive Order, while understanding that the provisions of the two differ.   Because the new

and a decline in tourism has a direct effect on the State's revenue.   *See* SAC ¶ 18. Because there is preliminary evidence that losses of current and future revenue are traceable to the Executive Order, this injury to the State's proprietary interest also appears sufficient to confer standing.   *Cf. Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (holding that the "financial loss[es]" that Texas would bear, due to having to grant drivers licenses, constituted a concrete and immediate injury for standing purposes).

For purposes of the instant Motion for TRO, the State has preliminarily demonstrated that: (1) its universities will suffer monetary damages and intangible harms; (2) the State's economy is likely to suffer a loss of revenue due to a decline in tourism; (3) such harms can be sufficiently linked to the Executive Order; and (4) the State would not suffer the harms to its proprietary interests in the absence of implementation of the Executive Order.   Accordingly, at this early stage of the litigation, the State has satisfied the requirements of Article III standing.[9]

---

Executive Order has yet to take effect, its precise economic impact cannot presently be determined.

[9]To the extent the Government argues that the State does not have standing to bring an Establishment Clause violation on its own behalf, the Court does not reach this argument.   *Cf. Washington*, 847 F.3d at 1160 n.4 ("The Government argues that the States may not bring Establishment Clause claims because they lack Establishment Clause rights.   Even if we assume that States lack such rights, an issue we need not decide, that is irrelevant in this case because the States are asserting the rights of their students and professors.   Male doctors do not have personal rights in abortion and yet any physician may assert those rights on behalf of his female patients." (citing *Singleton v. Wulff*, 428 U.S. 106, 118 (1976))).   Unlike in *Washington* where there was no

### C.    <u>Dr. Elshikh Has Standing</u>

Dr. Elshikh is an American citizen of Egyptian descent and has been a resident of Hawai'i for over a decade.   Declaration of Ismail Elshikh ¶ 1, Mot. for TRO, Ex. A, ECF No. 66-1.   He is the Imam of the Muslim Association of Hawai'i and a leader within Hawaii's Islamic community.   Elshikh Decl. ¶ 2.   Dr. Elshikh's wife is of Syrian descent, and their young children are American citizens.   Dr. Elshikh and his family are Muslim.   Elshikh Decl. ¶¶ 1, 3.   His mother-in-law, also Muslim, is a Syrian national without a visa, who last visited the family in Hawaii in 2005.   Elshikh Decl. ¶¶ 4–5.

In September 2015, Dr. Elshikh's wife filed an I-130 Petition for Alien Relative on behalf of her mother.   On January 31, 2017, Dr. Elshikh called the National Visa Center and learned that his mother-in-law's visa application had been put on hold and would not proceed to the next stage of the process because of the implementation of Executive Order No. 13,769.   Elshikh Decl. ¶ 4.   Thereafter, on March 2, 2017, during the pendency of the nationwide injunction imposed by *Washington*, Dr. Elshikh received an email from the National Visa Center advising that his mother-in-law's visa application had progressed to the next stage and that her interview would be scheduled at an embassy overseas.   Although no date was

_____

individual plaintiff, Dr. Elshikh has standing to assert an Establishment Clause violation, as discussed herein.

given, the communication stated that most interviews occur within three months.

Elshikh Decl. ¶ 4.   Dr. Elshikh fears that although she has made progress toward

obtaining a visa, his mother-in-law will be unable to enter the country if the new

Executive Order is implemented.   Elshikh Decl. ¶ 4.   According to Plaintiffs,

despite her pending visa application, Dr. Elshikh's mother-in-law would be barred in

the short-term from entering the United States under the terms of Section 2(c) of the

Executive Order, unless she is granted a waiver, because she is not a current visa

holder.

Dr. Elshikh has standing to assert his claims, including an Establishment

Clause violation.   Courts observe that the injury-in-fact prerequisite can be

"particularly elusive" in Establishment Clause cases because plaintiffs do not

typically allege an invasion of a physical or economic interest.   Despite that, a

plaintiff may nonetheless show an injury that is sufficiently concrete, particularized,

and actual to confer standing.   *See Catholic League*, 624 F.3d at 1048–49; *Vasquez

v. Los Angeles Cty.*, 487 F.3d 1246, 1250 (9th Cir. 2007) ("The concept of a

'concrete' injury is particularly elusive in the Establishment Clause context.").

"The standing question, in plain English, is whether adherents to a religion have

standing to challenge an official condemnation by their government of their

religious views[.]   Their 'personal stake' assures the 'concrete adverseness'

23

required." *Catholic League*, 624 F.3d at 1048–49.   In Establishment Clause

cases—

> [e]ndorsement sends a message to nonadherents that they are
> outsiders, not full members of the political community, and an
> accompanying message to adherents that they are insiders,
> favored members of the political community.   Disapproval
> sends the opposite message."   Plaintiffs aver that not only does
> the resolution make them feel like second-class citizens, but that
> their participation in the political community will be chilled by
> the [government's] hostility to their church and their religion.

*Id.* at 1048–49 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J.,

concurring)).   Dr. Elshikh attests that he and his family suffer just such injuries

here.   He declares that the effects of the Executive Order are "devastating to me, my

wife and children."   Elshikh Decl. ¶ 6, ECF No. 66-1.

Like his children, Dr. Elshikh is "deeply saddened by the message that [both

Executive Orders] convey—that a broad travel-ban is 'needed' to prevent people

from certain Muslim countries from entering the United States."   Elshikh Decl. ¶ 1

("Because of my allegiance to America, and my deep belief in the American ideals

of democracy and equality, I am deeply saddened by the passage of the Executive

Order barring nationals from now-six Muslim majority countries from entering the

United States."); *id.* ¶ 3 (["My children] are deeply affected by the knowledge that

the United States—their own country—would discriminate against individuals who

are of the same ethnicity as them, including members of their own family, and who

hold the same religious beliefs.   They do not fully understand why this is happening, but they feel hurt, confused, and sad.").

"Muslims in the Hawai'i Islamic community feel that the new Executive Order targets Muslim citizens because of their religious views and national origin. Dr. Elshikh believes that, as a result of the new Executive Order, he and members of the Mosque will not be able to associate as freely with those of other faiths."   SAC ¶ 90.   These injuries are sufficiently personal, concrete, particularized, and actual to confer standing in the Establishment Clause context.

The final two aspects of Article III standing—causation and redressability—are also satisfied.   Dr. Elshikh's injuries are traceable to the new Executive Order and, if Plaintiffs prevail, a decision enjoining portions of the Executive Order would redress that injury.   *See Catholic League*, 624 F.3d at 1053. At this preliminary stage of the litigation, Dr. Elshikh has accordingly carried his burden to establish standing under Article III.

## II.   <u>Ripeness</u>

"While standing is primarily concerned with who is a proper party to litigate a particular matter, ripeness addresses when litigation may occur."   *Lee v. Oregon*, 107 F.3d 1382, 1387 (9th Cir. 1997).   "[I]n many cases, ripeness coincides squarely with standing's injury in fact prong."   *Thomas v. Anchorage Equal Rights Comm'n*,

25

220 F.3d 1134, 1138 (9th Cir. 2000) (en banc).   In fact, the ripeness inquiry is often

"characterized as standing on a timeline."   *Id*.   "A claim is not ripe for adjudication

if it rests upon 'contingent future events that may not occur as anticipated, or indeed

may not occur at all.'"   *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting

*Thomas v. Union Carbide Agric. Prods. Co*., 473 U.S. 568, 580–81 (1985)).

The Government argues that "the only concrete injury Elshikh alleges is that

the Order 'will prevent [his] mother-in-law'—a Syrian national who lacks a

visa—from visiting Elshikh and his family in Hawaii."   These claims are not ripe,

according to the Government, because there is a visa waiver process that Elshikh's

mother-in-law has yet to even initiate.   Govt. Mem. in Opp'n to Mot. for TRO

(citing SAC ¶ 85), ECF No. 145.

The Government's premise is not true.   Dr. Elshikh alleges direct, concrete

injuries to both himself and his immediate family that are independent of his

mother-in-law's visa status.   *See, e.g.,* SAC ¶¶ 88–90; Elshikh Decl. ¶¶ 1, 3.[10]

These alleged injuries have already occurred and will continue to occur once the

---

[10]There is no dispute that Dr. Elshikh's mother-in-law does not currently possess a valid visa, would be barred from entering as a Syrian national by Section 2(c) of the Executive Order, and has not yet applied for a waiver under Section 3(c) of the Executive Order.   Since the Executive Order is not yet effective, it is difficult to see how she could.   None of these propositions, however, alter the Court's finding that Dr. Elshikh has sufficiently established, at this preliminary stage, that he has suffered an injury-in-fact separate and apart from his mother-in-law that is sufficiently concrete, particularized, and actual to confer standing.

Executive Order is implemented and enforced—the injuries are not contingent ones. *Cf. 281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) ("Plaintiffs' alleged injury is not based on speculation about a particular future prosecution or the defeat of a particular ballot question. . . . Here, the issue presented requires no further factual development, is largely a legal question, and chills allegedly protected First Amendment expression."); *see also Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[W]hen the threatened enforcement effort implicates First Amendment [free speech] rights, the inquiry tilts dramatically toward a finding of standing.").

The Court turns to the merits of Plaintiffs' Motion for TRO.

## III.   <u>Legal Standard: Preliminary Injunctive Relief</u>

The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing is held.   *Granny Goose Foods*, 415 U.S. 423, 439 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006).

The standard for issuing a temporary restraining order is substantially identical to the standard for issuing a preliminary injunction.   *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).   A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed

27

on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."   *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted).

"[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor,' and the other two *Winter* factors are satisfied."   *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (emphasis by *Shell Offshore*)).

For the reasons that follow, Plaintiffs have met this burden here.

## IV.   Analysis of TRO Factors: Likelihood of Success on the Merits

The Court turns to whether Plaintiffs sufficiently establish a likelihood of success on the merits of their Count I claim that the Executive Order violates the Establishment Clause of the First Amendment.   Because a reasonable, objective observer—enlightened by the specific historical context, contemporaneous public statements, and specific sequence of events leading to its issuance—would conclude that the Executive Order was issued with a purpose to disfavor a particular religion,

in spite of its stated, religiously-neutral purpose, the Court finds that Plaintiffs, and

Dr. Elshikh in particular, are likely to succeed on the merits of their Establishment

Clause claim.[11]

## A.   Establishment Clause

"The clearest command of the Establishment Clause is that one religious

denomination cannot be officially preferred over another."   *Larson v. Valente*, 456

U.S. 228, 244 (1982).   To determine whether the Executive Order runs afoul of that

command, the Court is guided by the three-part test for Establishment Clause claims

set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).   According to *Lemon*,

government action (1) must have a primary secular purpose, (2) may not have the

principal effect of advancing or inhibiting religion, and (3) may not foster excessive

entanglement with religion.   *Id.*   "Failure to satisfy any one of the three prongs of

the *Lemon* test is sufficient to invalidate the challenged law or practice."   *Newdow*

*v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1076–77 (9th Cir. 2010).   Because

the Executive Order at issue here cannot survive the secular purpose prong, the

Court does not reach the balance of the criteria.   *See id.* (noting that it is

unnecessary to reach the second or third *Lemon* criteria if the challenged law or

practice fails the first test).

---

[11]The Court expresses no views on Plaintiffs' due-process or INA-based statutory claims.

B.   **The Executive Order's Primary Purpose**

It is undisputed that the Executive Order does not facially discriminate for or against any particular religion, or for or against religion versus non-religion.   There is no express reference, for instance, to any religion nor does the Executive Order—unlike its predecessor—contain any term or phrase that can be reasonably characterized as having a religious origin or connotation.

Indeed, the Government defends the Executive Order principally because of its religiously neutral text —"[i]t applies to six countries that Congress and the prior Administration determined posed special risks of terrorism.   [The Executive Order] applies to *all* individuals in those countries, regardless of their religion."   Gov't. Mem. in Opp'n 40.   The Government does not stop there.   By its reading, the Executive Order could not have been religiously motivated because "the six countries represent only a small fraction of the world's 50 Muslim-majority nations, and are home to less than 9% of the global Muslim population . . . [T]he suspension covers *every* national of those countries, including millions of non-Muslim individuals[.]"   Gov't. Mem. in Opp'n 42.

The illogic of the Government's contentions is palpable.   The notion that one can demonstrate animus toward any group of people only by targeting all of them at once is fundamentally flawed.   The Court declines to relegate its Establishment

Clause analysis to a purely mathematical exercise.   *See Aziz*, 2017 WL 580855, at *9 (rejecting the argument that "the Court cannot infer an anti-Muslim animus because [Executive Order No. 13,769] does not affect all, or even most, Muslims," because "the Supreme Court has never reduced its Establishment Clause jurisprudence to a mathematical exercise.   It is a discriminatory purpose that matters, no matter how inefficient the execution" (citation omitted)).   Equally flawed is the notion that the Executive Order cannot be found to have targeted Islam because it applies to *all individuals* in the six referenced countries.   It is undisputed, using the primary source upon which the Government itself relies, that these six countries have overwhelmingly Muslim populations that range from 90.7% to 99.8%.[12]   It would therefore be no paradigmatic leap to conclude that targeting these countries likewise targets Islam.   Certainly, it would be inappropriate to conclude, as the Government does, that it does not.

The Government compounds these shortcomings by suggesting that the Executive Order's neutral text is what this Court must rely on to evaluate purpose. Govt. Mem. in Opp'n at 42–43 ("[C]ourts may not 'look behind the exercise of [Executive] discretion' taken 'on the basis of a facially legitimate and bona fide

---

[12]*See* Pew-Templeton Global Religious Futures Project, Muslim Population by Country (2010), *available at* http://www.globalreligiousfutures.org/religions/muslims.

reason.'").   Only a few weeks ago, the Ninth Circuit commanded otherwise: "It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims." *Washington*, 847 F.3d at 1167–68 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."); *Larson*, 456 U.S. at 254–55 (holding that a facially neutral statute violated the Establishment Clause in light of legislative history demonstrating an intent to apply regulations only to minority religions); and *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (explaining that circumstantial evidence of intent, including the historical background of the decision and statements by decisionmakers, may be considered in evaluating whether a governmental action was motivated by a discriminatory purpose)).   The Supreme Court has been even more emphatic: courts may not "turn a blind eye to the context in which [a] policy arose."   *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 866 (2005) (citation and quotation signals omitted).[13]   "[H]istorical context and 'the specific sequence of events leading up

---

[13]In *McCreary*, the Supreme Court examined whether the posting of successive Ten Commandments displays at two county courthouses violated the Establishment Clause.   545 U.S. at 850–82.

to'" the adoption of a challenged policy are relevant considerations. *Id*. at 862; *see also Aziz*, 2017 WL 580855, at *7.

A review of the historical background here makes plain why the Government wishes to focus on the Executive Order's text, rather than its context. The record before this Court is unique. It includes significant and unrebutted evidence of religious animus driving the promulgation of the Executive Order and its related predecessor. For example—

> In March 2016, Mr. Trump said, during an interview, "I think Islam hates us." Mr. Trump was asked, "Is there a war between the West and radical Islam, or between the West and Islam itself?" He replied: "It's very hard to separate. Because you don't know who's who."

SAC ¶ 41 (citing *Anderson Cooper 360 Degrees: Exclusive Interview With Donald Trump* (CNN television broadcast Mar. 9, 2016, 8:00 PM ET), transcript *available at* https://goo.gl/y7s2kQ)). In that same interview, Mr. Trump stated: "But there's a tremendous hatred. And we have to be very vigilant. We have to be very careful. And we can't allow people coming into this country who have this hatred of the United States. . . [a]nd of people that are not Muslim."

Plaintiffs allege that "[l]ater, as the presumptive Republican nominee, Mr. Trump began using facially neutral language, at times, to describe the Muslim ban." SAC ¶ 42. For example, they point to a July 24, 2016 interview:

33

> Mr. Trump was asked: "The Muslim ban.   I think you've pulled
> back from it, but you tell me."   Mr. Trump responded:   "I don't
> think it's a rollback.   In fact, you could say it's an expansion.
> I'm looking now at territories.   People were so upset when I
> used the word Muslim.   Oh, you can't use the word Muslim.
> Remember this.   And I'm okay with that, because I'm talking
> territory instead of Muslim."

SAC ¶ 44; Ex. 7 (*Meet the Press* (NBC television broadcast July 24, 2016),

transcript *available at* https://goo.gl/jHc6aU).   And during an October 9, 2016

televised presidential debate, Mr. Trump was asked:

> "Your running mate said this week that the Muslim ban is no
> longer your position.   Is that correct?   And if it is, was it a
> mistake to have a religious test?"   Mr. Trump replied:   "The
> Muslim ban is something that in some form has morphed into
> a[n] extreme vetting from certain areas of the world."   When
> asked to clarify whether "the Muslim ban still stands," Mr.
> Trump said, "It's called extreme vetting."

SAC ¶ 45 (citing The American Presidency Project, *Presidential Debates:*

*Presidential Debate at Washington University in St. Louis, Missouri* (Oct. 9, 2016),

*available at* https://goo.gl/iIzf0A)).

The Government appropriately cautions that, in determining purpose, courts

should not look into the "veiled psyche" and "secret motives" of government

decisionmakers and may not undertake a "judicial psychoanalysis of a drafter's heart

of hearts."   Govt. Opp'n at 40 (citing *McCreary*, 545 U.S. at 862).   The

Government need not fear.   The remarkable facts at issue here require no such

impermissible inquiry.   For instance, there is nothing "*veiled*" about this press release: "Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States.[]"   SAC ¶ 38, Ex. 6 (Press Release, Donald J. Trump for President, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015), *available at* https://goo.gl/D3OdJJ)).   Nor is there anything "*secret*" about the Executive's motive specific to the issuance of the Executive Order:

> Rudolph Giuliani explained on television how the Executive Order came to be.   He said: "When [Mr. Trump] first announced it, he said, 'Muslim ban.'   He called me up.   He said, 'Put a commission together.   Show me the right way to do it legally.'"

SAC ¶ 59, Ex. 8.   On February 21, 2017, commenting on the then-upcoming revision to the Executive Order, the President's Senior Adviser, Stephen Miller, stated, "Fundamentally, [despite "technical" revisions meant to address the Ninth Circuit's concerns in *Washington*,] you're still going to have the same basic policy outcome [as the first]."   SAC ¶ 74.

These plainly-worded statements,[14] made in the months leading up to and contemporaneous with the signing of the Executive Order, and, in many cases, made

---

[14]There are many more.   *See, e.g.*, Br. of The Roderick and Solange MacArthur Justice Center as Amicus Curiae in Supp. of Pls.' Mot. for TRO, ECF No. 204, at 19-20 ("It's not unconstitutional keeping people out, frankly, and until we get a hold of what's going on.   And then if you look at Franklin Roosevelt, a respected president, highly respected.   Take a look at Presidential proclamations back a long time ago, 2525, 2526, and 2527 what he was doing with Germans, Italians, and Japanese because he had to do it.   Because look we are at war with radical Islam.")

by the Executive himself, betray the Executive Order's stated secular purpose.   Any

reasonable, objective observer would conclude, as does the Court for purposes of the

instant Motion for TRO, that the stated secular purpose of the Executive Order is, at

the very least, "secondary to a religious objective" of temporarily suspending the

entry of Muslims.   *See McCreary*, 545 U.S. at 864.[15]

To emphasize these points, Plaintiffs assert that the stated national security

reasons for the Executive Order are pretextual.   Two examples of such pretext

include the security rationales set forth in Section 1(h):

> "[I]n January 2013, two Iraqi nationals admitted to the United
> States as refugees in 2009 were sentenced to 40 years and to life
> in prison, respectively, for multiple terrorism-related offenses."
> [Exec. Order] § 1(h).   "And in October 2014, a native of
> Somalia who had been brought to the United States as a child
> refugee and later became a naturalized United States citizen was

---

(quoting Michael Barbaro and Alan Rappeport, *In Testy Exchange, Donald Trump Interrupts and 'Morning Joe' Cuts to Commercial,* New York Times (Dec. 8, 2015), *available at* https://www.nytimes.com/politics/first-draft/2015/12/08/in-testy-exchange-donaldtrump-interrup ts-and-morning-joe-cuts-to-commercial/)); Br. of Muslim Advocates et al. as Amici Curiae in Supp. of Pls.' Mot. for TRO, ECF No. 198, at 10-11 ("On June 13, 2016, after the attack on a nightclub in Orlando, Florida, Mr. Trump said in a speech: 'I called for a ban after San Bernardino, and was met with great scorn and anger, but now many are saying I was right to do so.'   Mr. Trump then specified that the Muslim ban would be 'temporary,' 'and apply to certain 'areas of the world when [sic] there is a proven history of terrorism against the United States, Europe or our allies, until we understand how to end these threats.'") (quoting Transcript: Donald Trump's national security speech, *available at* http://www.politico.com/story/2016/06/ transcript-donald-trump-national-security-speech-22427).

[15]This Court is not the first to examine these issues.   In *Aziz v. Trump,* United States District Court Judge Leonie Brinkema determined that plaintiffs were likely to succeed on the merits of their Establishment Clause claim as it related to Executive Order No. 13,769.   Accordingly, Judge Brinkema granted the Commonwealth of Virginia's motion for preliminary injunction.   *Aziz v. Trump*, ___ F. Supp. 3d ___, 2017 WL 580855, at *7–*10 (E.D. Va. Feb. 13, 2017).

> sentenced to 30 years in prison for attempting to use a weapon of mass destruction[.]"   *Id.*   Iraq is no longer included in the ambit of the travel ban, *id.*, and the Order states that a waiver could be granted for a foreign national that is a "young child."   *Id.* § 3(c)(v).

TRO Mem. 13.   Other indicia of pretext asserted by Plaintiffs include the delayed timing of the Executive Order, which detracts from the national security urgency claimed by the Administration, and the Executive Order's focus on nationality, which could have the paradoxical effect of "bar[ring] entry by a Syrian national who has lived in Switzerland for decades, but not a Swiss national who has immigrated to Syria during its civil war," revealing a "gross mismatch between the [Executive] Order's ostensible purpose and its implementation and effects."   Pls.' Reply 20 (citation omitted).

While these additional assertions certainly call the motivations behind the Executive Order into greater question,[16] they are not necessary to the Court's Establishment Clause determination.   *See Aziz,* 2017 WL 580855, at *8 (the Establishment Clause concerns addressed by the district court's order "do not involve an assessment of the merits of the president's national security judgment. Instead, the question is whether [Executive Order No. 13,769] was animated by

---

[16]*See also* Br. of T.A., a U.S. Resident of Yemeni Descent, as Amicus Curiae in Supp. of Pls.' Mot. for TRO, ECF No. 200, at 15-25 (detailing evidence contrary to the Executive Order's national security justifications).

national security concerns at all, as opposed to the impermissible notion of, in the context of entry, disfavoring one religious group, and in the context of refugees, favoring another religious group").

Nor does the Court's preliminary determination foreclose future Executive action.   As the Supreme Court noted in *McCreary*, in preliminarily enjoining the third iteration of a Ten Commandments display, "we do not decide that the [government's] past actions forever taint any effort on their part to deal with the subject matter."   *McCreary*, 545 U.S. at 873–74; *see also Felix v. City of Bloomfield*, 841 F.3d 848, 863 (10th Cir. 2016) ("In other words, it is possible that a government may begin with an impermissible purpose, or create an unconstitutional effect, but later take affirmative actions to neutralize the endorsement message so that "adherence to a religion [is not] relevant in any way to a person's standing in the political community." (quoting *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984) (O'Connor, J., concurring))).   Here, it is not the case that the Administration's past conduct must forever taint any effort by it to address the security concerns of the nation.   Based upon the current record available, however, the Court cannot find the actions taken during the interval between revoked Executive Order No. 13,769 and the new Executive Order to be "genuine changes in constitutionally significant

conditions." *McCreary*, 545 U.S. at 874.[17]   The Court recognizes that "purpose needs to be taken seriously under the Establishment Clause and needs to be understood in light of context; an implausible claim that governmental purpose has changed should not carry the day in a court of law any more than in a head with common sense." *Id.*   Yet, context may change during the course of litigation, and the Court is prepared to respond accordingly.

Last, the Court emphasizes that its preliminary assessment rests on the peculiar circumstances and specific historical record present here.   *Cf. Aziz,* 2017 WL 580855, at *9 ("The Court's conclusion rests on the highly particular 'sequence of events' leading to this specific [Executive Order No. 13,769] and the dearth of evidence indicating a national security purpose.   The evidence in this record focuses on the president's statements about a 'Muslim ban' and the link Giuliani

---

[17]The Tenth Circuit asked: "What would be enough to meet this standard?"

> The case law does not yield a ready answer.   But from the above principles we conclude that a government cure should be (1) purposeful, (2) public, and (3) at least as persuasive as the initial endorsement of religion.   It should be purposeful enough for an objective observer to know, unequivocally, that the government does not endorse religion.   It should be public enough so that people need not burrow into a difficult-to-access legislative record for evidence to assure themselves that the government is not endorsing a religious view.   And it should be persuasive enough to countermand the preexisting message of religious endorsement.

*Felix*, 841 F.3d 863–64.

established between those statements and the [Executive Order].") (citing *McCreary*, 545 U.S. at 862).

## V.   Analysis of TRO Factors: Irreparable Harm

Dr. Elshikh has made a preliminary showing of direct, concrete injuries to the exercise of his Establishment Clause rights.   *See, e.g.*, SAC ¶¶ 88–90; Elshikh Decl. ¶¶ 1, 3.   These alleged injuries have already occurred and likely will continue to occur upon implementation of the Executive Order.

Indeed, irreparable harm may be *presumed* with the finding of a violation of the First Amendment.   *See Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Washington*, 847 F.3d at 1169 (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'")) (additional citations omitted).   Because Dr. Elshikh is likely to succeed on the merits of his Establishment Clause claim, the Court finds that the second factor of the *Winter* test is satisfied—that Dr. Elshikh is likely to suffer irreparable injury in the absence of a TRO.

**VI.    Analysis of TRO Factors: The Balance of Equities and Public Interest Weigh in Favor of Granting Emergency Relief**

The final step in determining whether to grant the Plaintiffs' Motion for TRO

is to assess the balance of equities and examine the general public interests that will

be affected.   Here, the substantial controversy surrounding this Executive Order,

like its predecessor, illustrates that important public interests are implicated by each

party's positions.   *See Washington*, 847 F.3d at 1169.   For example, the

Government insists that the Executive Order is intended "to protect the Nation from

terrorist activities by foreign nationals admitted to the United States[.]"   Exec.

Order, preamble.   National security is unquestionably important to the public at

large.   Plaintiffs and the public, on the other hand, have a vested interest in the "free

flow of travel, in avoiding separation of families, and in freedom from

discrimination."   *Washington*, 847 F.3d at 1169–70.

As discussed above, Plaintiffs have shown a strong likelihood of succeeding

on their claim that the Executive Order violates First Amendment rights under the

Constitution.   "[I]t is always in the public interest to prevent the violation of a

party's constitutional rights."   *Melendres*, 695 F.3d at 1002 (emphasis added)

(citing *Elrod*, 427 U.S. at 373); *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir.

2013) ("[E]nforcement of an unconstitutional law is always contrary to the public

interest." (citing *Lamprecht v. FCC*, 958 F.2d 382, 390 (D.C. Cir. 1992); *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

When considered alongside the constitutional injuries and harms discussed above, and the questionable evidence supporting the Government's national security motivations, the balance of equities and public interests justify granting the Plaintiffs' TRO.   *See Aziz*, 2017 WL 580855, at * 10.   Nationwide relief is appropriate in light of the likelihood of success on the Establishment Clause claim.

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion for TRO is hereby GRANTED.


## TEMPORARY RESTRAINING ORDER

It is hereby ADJUDGED, ORDERED, and DECREED that:

Defendants and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined from enforcing or implementing Sections 2 and 6 of the Executive Order across the Nation.   Enforcement of these provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.

No security bond is required under Federal Rule of Civil Procedure 65(c).

The Court declines to stay this ruling or hold it in abeyance should an emergency appeal of this order be filed.

Pursuant to Federal Rule of Civil Procedure 65(b)(2), the Court intends to set an expedited hearing to determine whether this Temporary Restraining Order should be extended.   The parties shall submit a stipulated briefing and hearing schedule for the Court's approval forthwith.

IT IS SO ORDERED.

Dated: March 15, 2017 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

*State of Hawaii, et al. v. Trump, et al.*; CV 17-00050 DKW-KSC; **ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER**