JEFFREY B. WALL
*Acting Solicitor General*
CHAD A. READLER
*Acting Assistant Attorney General*
ELLIOT ENOKI (No. 1528)
*Acting United States Attorney*
EDRIC M. CHING (No. 6697)
*Assistant United States Attorney*
JOHN R. TYLER
*Assistant Branch Director*
BRAD P. ROSENBERG (DC Bar No. 467513)
MICHELLE R. BENNETT (CO Bar No. 37050)
DANIEL SCHWEI (NY Bar)
*Trial Attorneys*
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Tel:  (202) 514-3374; Fax:  (202) 616-8460
E-mail:  brad.rosenberg@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAI'I and ISMAIL ELSHIKH,<br><br>     *Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,<br><br>     *Defendants*. | No. 1:17-cv-00050-DKW-KSC<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO CONVERT TRO TO PI**<br><br>Judge:  Hon. Derrick K. Watson<br><br>Hearing:  Wednesday, March 29, 2017, 9:30 a.m.<br><br>Related Documents: Dkt. No. 238 |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................4

    A.    Section 2 of the Executive Order ..........................................................4

    B.    Section 6 of the Executive Order ..........................................................6

    C.    Plaintiffs' Characterizations of This Case's Procedural History ........7

ARGUMENT .......................................................................................................9

I.    Plaintiffs Do Not Even Attempt to Carry Their Burden on Seeking to Convert the Court's TRO to a Preliminary Injunction ..................................9

II.    If This Court Enters a Preliminary Injunction, It Should Not Apply to Section 6 of the Executive Order ...........................................................13

    A.    Plaintiffs Lack Standing to Challenge Sections 6(a) and 6(b) Because They Have Failed to Identify Any Particularized and Judicially Cognizable Injury to Themselves That Arises from Enforcement of Those Sections ........................................................14

        1.    Section 6(a) ...............................................................................14

        2.    Section 6(b) ...............................................................................19

    B.    Even if This Court Finds That Plaintiffs Have Standing to Challenge Section 6, They Are Unlikely to Succeed on the Merits of Their Claims Regarding Sections 6(a) or 6(b) .................20

        1.    Section 6(a) ...............................................................................21

        2.    Section 6(b) ...............................................................................24

III.    At a Minimum, This Court Should Not Enjoin Those Portions of Sections 2 and 6 That Relate to Governmental Operations ........................25

CONCLUSION .................................................................................................29

# TABLE OF AUTHORITIES

## CASES

*Califano v. Yamasaki*,
　442 U.S. 682 (1979) ..........................................................................10

*Caribbean Marine Servs. Co. v. Baldridge*,
　844 F.2d 668 (9th Cir. 1988) ............................................................27

*Church of the Lukumi Babalu Aye v. City of Hialeah*,
　508 U.S. 520 (1993) ..........................................................................23

*Clapper v. Amnesty Int'l*,
　133 S. Ct. 1138 (2013) ......................................................................16

*Consol. Salmonid Cases*,
　713 F. Supp. 2d 1116 (E.D. Cal. 2010) ............................................12

*Covenant Media of SC, LLC v. City of N. Charleston*,
　493 F.3d 421 (4th Cir. 2007) ............................................................14

*DaimlerChrysler Corp. v. Cuno*,
　547 U.S. 332 (2006) ..................................................................... 14, 23

*FW/PBS, Inc. v. City of Dallas*,
　493 U.S. 215 (1990) ..................................................................... 14, 15

*Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*,
　415 U.S. 423 (1974) ........................................................................ 9, 10

*HonoluluTraffic.com v. FTA*,
　Civ. No. 11-00307, 2012 WL 1805484 (May 17, 2012) ...................15

*In re Adelphia Commc'ns Corp.*,
　No. 02-41729 (REG), 2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006) .....11

ii

*Int'l Refugee Assistance Project v. Trump*,
   No. TDC-17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017),
   *appeal docketed*, No. 17-1351 (4th Cir. Mar. 17, 2017) ...................... 2, 11, 12

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................. 14, 23

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................. 14, 27

*Luxottica Group S.p.A. v. Light in the Box Ltd.*,
   No. 16-cv-05314, 2016 WL 6092636 (N.D. Ill. Oct. 19, 2016) ....................... 11

*McCormack v. Hiedeman*,
   694 F.3d 1004 (9th Cir. 2012) ........................................................................ 10

*Office of Personnel Mgmt. v. Am. Fed'n of Gov't Employees*,
   473 U.S. 1301 (1985) ...................................................................................... 13

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*,
   636 F.3d 1150 (9th Cir. 2011) ........................................................................ 10

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004) ........................................................................ 10

*Prime Media, Inc. v. City of Brentwood*,
   485 F.3d 343 (6th Cir. 2007) .......................................................................... 15

*Reno Air Racing Ass'n v. McCord*,
   452 F.3d 1126 (9th Cir. 2006) ........................................................................ 10

*Sarsour v. Trump*,
   No. 17-cv-00120-AJT-IDD, slip op. (E.D. Va. Mar. 24, 2017) ........... 22, 23, 24

*Serv. Emps. Int'l Union v. Roselli*,
   No. C 09-00404 WHA, 2009 WL 2246198 (N.D. Cal. July 27, 2009) ............. 11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................ 20

*Texas v. United States*,
  523 U.S. 296 (1998)..........................................................................27

*Washington v. Trump*,
  No. C17-0141JLR, 2017 WL 1045950 (W.D. Wash. Mar. 16, 2017) ....... 22, 24

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ..........................................................23

*Washington Envtl. Council v. Bellon*,
  732 F.3d 1131 (9th Cir. 2013) ................................................... 14, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)..............................................................................10

*Zepeda v. INS*,
  753 F.2d 719 (9th Cir. 1983) ...........................................................11

**RULES**

Fed. R. Civ. P. 65(b)(3)...........................................................................9

**REGULATIONS**

Exec. Order No. 13,769, 82 Fed. Reg. 8977 (Jan. 27, 2017).......................... 21, 22

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 6, 2017) ...................... *passim*

**OTHER AUTHORITIES**

11A Charles Alan Wright & Arthur R. Miller,
  Federal Practice & Procedure § 2953 (3d ed.)....................................9

Stephanie Saul, *Amid 'Trump Effect' Fear, 40% of Colleges
  See Dip in Foreign Applicants*, N.Y. Times, Mar. 16, 2017 ............................18

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION TO CONVERT
TEMPORARY RESTRAINING ORDER
TO A PRELIMINARY INJUNCTION**

## INTRODUCTION

Seeking to bar the provisions of Executive Order No. 13,780[1] from taking effect, Plaintiffs sought a Temporary Restraining Order from this Court "[a]s an immediate remedy."[2]  This Court in turn granted Plaintiffs that immediate, temporary relief.[3]

Plaintiffs now seek to convert that temporary relief, awarded after extremely expedited briefing and argument, into a preliminary injunction of far longer duration. Yet Plaintiffs effectively treat this significant procedural and substantive step as a mere formality.[4]  They fail to offer additional, relevant evidence to support their request, despite carrying the burden to demonstrate that a preliminary injunction is necessary, irrespective of the issuance of the prior TRO.  And their legal arguments

---

[1]  82 Fed. Reg. 13,209 (Mar. 6, 2017).

[2]  Plaintiffs' Motion for Temporary Restraining Order at 4 (ECF No. 65).

[3]  *See* Order Granting Motion for Temporary Restraining Order (ECF No. 219) ("TRO").

[4]  *See generally* Mem. in Supp. of Motion to Convert Temporary Restraining Order to a Preliminary Injunction (ECF No. 238-1) ("Pl. Mem.").

are equally light, even in the face of Defendants' filing of their Motion for Clarification,[5] which emphasized that the relief granted by the Court was still broader in scope than anything justified by Plaintiffs' arguments and evidence (even if one were to accept those arguments in full).

The Court should not sidestep its duty to weigh the arguments and evidence at this critical phase.  Now that the Court has an opportunity to more carefully evaluate Plaintiffs' claims, Defendants believe they should be rejected in full for the reasons set forth in Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order.[6]  But at the very least, the Court should limit any preliminary injunction to the arguments and injuries Plaintiffs have alleged.

In particular, this Court should limit any preliminary injunction to Section 2(c) of the Executive Order, which is what the Maryland district court did in *International Refugee Assistance Project v. Trump*.[7]  Section 2(c) contains the 90-day suspension-of-entry provision that was (and remains) the focus of Plaintiffs' briefing, and is the only section of the Executive Order on which Plaintiffs have submitted any evidence of alleged injury.  Because their alleged injury is limited to Section 2(c), Plaintiffs

---

[5]     ECF No. 227.

[6]     ECF No. 145 ("Def. TRO Mem.").

[7]     Civil Action No. TDC-17-0361, 2017 WL 1018235 (D. Md. Mar. 16, 2017), *appeal docketed*, No. 17-1351 (4th Cir. Mar. 17, 2017) (hereinafter, "*IRAP*").

2

lack standing to seek preliminary relief regarding:  (a) Section 6(a)'s 120-day suspension of certain aspects of the U.S. Refugee Admissions Program ("USRAP"); or (b) Section 6(b)'s 50,000-refugee cap (which, it bears emphasis, is not mentioned *anywhere* in Plaintiffs' Second Amended Complaint or TRO papers).   Nor are Plaintiffs likely to succeed on the merits of their challenges to these provisions, which are not limited to the six countries and draw no distinction on the basis of religion.  Accordingly, any preliminary injunction should be limited to Section 2(c) of the Executive Order.

At an absolute minimum, however, this Court should reject Plaintiffs' request to grant a preliminary injunction as to the provisions of Sections 2 and 6 that provide for inter-governmental reporting and consultation within the Executive Branch and that also may require requesting information from foreign governments.  Plaintiffs cannot possibly explain how they face immediate and irreparable injury from the implementation of these provisions.  They do not apply to Plaintiffs at all, but instead simply facilitate the Government's ability to identify and fix potential gaps in the Nation's vetting procedures.  Plaintiffs therefore lack standing to challenge these provisions, any such challenge is not ripe, and these provisions do not even arguably violate the Establishment Clause.

## BACKGROUND

Defendants refer to their Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order for the procedural background of this case. *See* Def. TRO Mem. Plaintiffs' motion to convert, however, raises particular issues regarding the application of the provisions contained in Sections 2 and 6 of the Executive Order, which are described below. Defendants also provide a brief response to Plaintiffs' characterizations regarding certain aspects of the procedural history of this case.

### A. Section 2 of the Executive Order

Section 2 of the Executive Order concerns vetting procedures for immigration benefits. It contains two basic sets of provisions.

*First,* Section 2(c) suspends entry into the United States of certain nationals from six countries, subject to exceptions and waivers. *See* Exec. Order No. 13,780 § 2(c). Section 2(c) was the near-exclusive focus of Plaintiffs' TRO briefing.

*Second*, the remainder of Section 2 contains inward-facing provisions aimed at allowing the Government to identify potential cracks in the Nation's vetting procedures. These provisions set forth a process by which the President may make future determinations about whether any restrictions on entry are necessary for certain foreign nationals or categories of foreign nationals. To begin that process, Section 2(a) requires the Secretary of Homeland Security, in consultation with the

Secretary of State and the Director of National Intelligence, to conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country so that in adjudicating an application by a national of that country for a visa, admission, or other benefit, it can be determined that the individual is not a security or public safety threat.   Section 2(b) requires the preparation and submission to the President of a report based upon that review.   *See id.* § 2(a), (b).   Section 2(d) provides that, following the submission of the report referenced in subsection (b), the Secretary of State shall request that foreign governments begin to supply additional, needed information.   *Id.* § 2(d).   Sections 2(e) and 2(f) contain various procedures to assist the President in making any subsequent determinations about whether restrictions on entry are warranted for "appropriate categories of foreign nationals of countries that have not provided the information requested[.]"   *Id.* § 2(e), (f).   Finally, Section 2(g) provides that the Secretaries of State and Homeland Security shall submit to the President various joint reports on their progress in implementing the provisions of the Order.   *Id.* § 2(g).

Neither Plaintiffs' TRO briefing, nor this Court's TRO opinion, addresses these provisions in any meaningful way (to the extent they even address them at all). And for good reason:  None of these provisions targets specific countries or regions at all, much less a specific religion.  Instead, they call on cabinet agencies to conduct

a "worldwide" review to determine whether and how the Nation's defenses can be strengthened.

## B.      Section 6 of the Executive Order

Section 6 of the Executive Order concerns certain aspects of the USRAP.  It contains three basic sets of provisions.

*First,* Section 6(a) suspends travel under USRAP and decisions on refugee applications for a period of 120 days after the effective date of the Executive Order, subject to waivers provided for in Section 6(c).   *See* Exec. Order No. 13,780 § 6(a), (c).   Section 6(a) also provides that, during the suspension period, the Government shall conduct an internal review of USRAP application and adjudication processes and implement additional procedures identified by the review.  *Id.* § 6(a).   The Secretary of State shall resume allowing travel of refugees into the United States under USRAP 120 days after the effective date of the Order, and the Secretary of Homeland Security shall resume making decisions on applications for refugee status for stateless persons and nationals of countries for which the Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have jointly determined that adequate additional procedures to protect the security and welfare of the Nation are in place.   *Id.*

*Second*, Section 6(b) provides "that the entry of more than 50,000 refugees in fiscal year 2017 would be detrimental to the interests of the United States" and, on

that basis, "suspend[s] any entries in excess of that number until such time as [the President] determine[s] that additional entries would be in the national interest." *Id.* § 6(b).   Plaintiffs' Second Amended Complaint and TRO papers do not address this provision.   Nor is it addressed in the Court's TRO opinion, which again makes sense, since Section 6(b) applies worldwide and without regard to religion.

*Finally*, Section 6(d) sets forth a policy of coordinating refugee placement and settlement with state and local jurisdictions. *See id.* § 6(d).  The provision is intended to allow those jurisdictions to "have greater involvement in the process of determining the placement or resettlement of refugees in their jurisdictions." *Id.* Once again, this provision is not referenced in Plaintiffs' Second Amended Complaint and TRO papers, or in this Court's TRO opinion.

## C.   Plaintiffs' Characterizations of This Case's Procedural History

Plaintiffs assert that Defendants, in opposing Plaintiffs' TRO motion, failed to argue the appropriate scope of any TRO that the Court might issue. *See* Pl. Mem. at 15.  That characterization is incorrect.  Defendants' opposition to Plaintiffs' TRO motion addressed Hawaii's (unsupported) claims regarding the suspension of aspects of the USRAP. *See* Def. TRO Mem. at 19, 48.  Defendants also argued that "any emergency relief could extend only to addressing the plaintiffs' asserted violations, not the sweeping relief plaintiffs request." *Id.* at 52; *see also id.* at 53 (asserting that any TRO should be narrow in scope).  As described herein, Plaintiffs

7

requested sweeping relief but failed to provide supporting facts or arguments to justify the scope of that relief.  Defendants' response matched, if not exceeded, the level of detail in Plaintiffs' briefs.

Plaintiffs also inexplicably accuse Defendants of litigating at a "plodding pace."  Pl. Mem. at 13.  That is simply not true.  The same day that Executive Order No. 13,780 was signed by the President, the parties conferred regarding a briefing schedule for Plaintiffs' TRO motion and agreed to such a schedule in short order.  That schedule allowed this Court to issue a decision before the provisions of Executive Order No. 13,780 were to take effect.  A mere two days after the Court issued its TRO, Defendants filed their motion to clarify.  This Court denied that motion on Sunday, March 19.  The very next day, the parties submitted an agreed-upon joint schedule for Plaintiffs' conversion motion, which is also being briefed on an expedited basis.  *See* ECF No. 235.  The fact that Defendants did not, as Plaintiffs put it, "rush[ ] to the Ninth Circuit," but instead sought to provide this Court with an opportunity to refine the scope of its preliminary relief, does not mean that Defendants "resisted at every turn Plaintiffs' efforts to expedite these proceedings." Pl. Mem. at 13.  It means that Defendants respect this Court's role in issuing findings with respect to the parties' dispute.

# ARGUMENT

## I.   Plaintiffs Do Not Even Attempt to Carry Their Burden on Seeking to Convert the Court's TRO to a Preliminary Injunction

Plaintiffs have already received from this Court the precise form of relief that they sought—a temporary restraining order.  Having obtained that emergency relief, Plaintiffs now treat the proposed conversion of the TRO into a preliminary injunction as a mere formality.  Rule 65 dictates otherwise.

Even though this Court issued a TRO, Plaintiffs retain the burden of proof in seeking a preliminary injunction.  Rule 65 specifically contemplates proceedings during which "the party who obtained the [temporary restraining] order must proceed with the motion [for preliminary injunction]; if the party does not, the court must dissolve the order."  Fed. R. Civ. P. 65(b)(3); *cf.* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2953 (3d ed.) ("If the hearing is converted into one under Rule 65(a) [for a preliminary injunction], the burden of persuasion remains on the party who requested the temporary restraining order[.]"); *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 441 (1974) ("At such hearing, as in any other hearing in which a preliminary injunction is sought, the party seeking the injunction would bear the burden of demonstrating the various factors justifying preliminary injunctive relief[.]").

9

Accordingly, this Court's TRO anticipated that there would be further proceedings before a preliminary injunction could be issued. Among other things, the Court specifically noted that "[t]he underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm *before a preliminary injunction hearing is held*." TRO at 27 (emphasis added) (citing *Granny Goose Foods*, 415 U.S. at 439; *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130-31 (9th Cir. 2006)). To that end, the Court indicated that it "intends to set an expedited hearing to determine whether [the TRO] should be extended" and directed the parties to "submit a stipulated briefing and hearing schedule" on that issue. *Id.* at 43.

One of the purposes of holding further proceedings is to revisit and, if appropriate, narrow the scope of emergency relief granted in a TRO. As this Court is aware, "[i]njunctive relief is an 'extraordinary remedy' [which] 'must be tailored to remedy the specific harm alleged.'" *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011)). In reviewing Plaintiffs' request for a preliminary injunction, the Court should therefore narrow the scope of its relief to ensure it is "no more burdensome to the defendant[s] than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (noting that an injunction should

10

"remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law'" (quoting *Zepeda v. INS*, 753 F.2d 719, 728 n.1 (9th Cir. 1983))).

Courts thus routinely narrow the scope of relief previously granted in a TRO when entering preliminary injunctions that will last for the course of the litigation. *See, e.g.*, *Luxottica Group S.p.A. v. Light in the Box Ltd.*, No. 16-cv-05314, 2016 WL 6092636, at *4, *9 (N.D. Ill. Oct. 19, 2016) ("[T]he court will narrow the TRO it previously granted so that the preliminary injunction covers eyewear only" where plaintiffs failed to present evidence that defendants "sold any products other than eyewear or eyewear accessories that infringe on its protected trademarks."); *Serv. Emps. Int'l Union v. Roselli*, No. C 09-00404 WHA, 2009 WL 2246198, at *2 (N.D. Cal. July 27, 2009) (district court issued preliminary injunction that was "more narrowly tailored than the TRO"); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 1529357, at *1 (Bankr. S.D.N.Y. June 5, 2006) ("I am granting the TRO in the form in which it was requested, though at the time of the hearing on the preliminary injunction, I will [consider] . . . whether I can address the very substantial needs and concerns of the Debtors and their creditors by a somewhat narrower injunction[.]").

In *IRAP v. Trump*, decided the same day this Court issued its TRO, the plaintiffs sought to preliminarily enjoin Executive Order No. 13,780 in its entirety,

11

including both Sections 2 and 6. *See IRAP*, 2017 WL 1018235. That court, however, declined plaintiffs' invitation, finding instead that "[p]laintiffs' Establishment Clause and INA arguments focused primarily on the travel ban for citizens of the six Designated Countries in Section 2(c)." *Id.* at *17. The court therefore "enjoin[ed] that provision only." *Id.* As set forth below, the same is true here: Hawaii and Dr. Elshikh focus their challenges "primarily on" Section 2(c) of the Executive Order. Plaintiffs rely upon *IRAP* for the proposition that this Court should convert its "TRO into a preliminary injunction granting the same scope of relief" as in its TRO, Pl. Mem. at 14, but do not mention that the preliminary injunction entered in *IRAP* was limited to Section 2(c).

Plaintiffs misapprehend the nature of their own motion when they argue that Defendants must point to "changed circumstances," or that the Court has already "rejected" Defendants' arguments regarding the scope of the TRO. Pl. Mem. at 2, 15. Plaintiffs' points might be relevant if Defendants were moving to dissolve the TRO or a subsequent preliminary injunction, but that is not the procedural posture here. Instead, Plaintiffs continue to bear the burden of proof in seeking a preliminary injunction.[8] As described in more detail below, Plaintiffs fail to carry that burden,

---

[8]     It is questionable whether Plaintiffs can even properly rely on the Court's legal conclusions in the TRO decision. *See Consol. Salmonid Cases*, 713 F. Supp. 2d 1116, 1122 n.1 (E.D. Cal. 2010) ("The denial of a TRO motion is not dispositive of

particularly to the extent that they are seeking a preliminary injunction against any sections of the Executive Order other than Section 2(c).

## II.   If This Court Enters a Preliminary Injunction, It Should Not Apply to Section 6 of the Executive Order

Defendants disagree with the Court's TRO ruling.  For the reasons set forth in Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order (ECF No. 145) and as explained at the TRO hearing, Defendants do not believe that Plaintiffs are entitled to any form of preliminary relief. Defendants incorporate by reference and reiterate those arguments here.   But accepting this Court's reasoning, its ruling does not justify a preliminary injunction with respect to any provision of the Executive Order other than Section 2(c). Plaintiffs are simply incorrect that the Court's TRO ruling can justify a preliminary injunction with respect to Section 6(a), Section 6(b), or the remaining, inward-facing provisions of Sections 2 and 6.

---

the merits of a related motion for preliminary injunction." (citing *Office of Personnel Mgmt. v. Am. Fed'n of Gov't Emps.*, 473 U.S. 1301, 1305 (1985)).

**A.**     **Plaintiffs Lack Standing to Challenge Sections 6(a) and 6(b) Because They Have Failed to Identify Any Particularized and Judicially Cognizable Injury to Themselves That Arises from Enforcement of Those Sections**

To have standing, Plaintiffs must demonstrate a "concrete and particularized" injury that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation omitted). However, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). Instead, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see Washington Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) ("A plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." (citation omitted)). Here, Plaintiffs lack standing to challenge either Section 6(a) or Section 6(b) of the Executive Order.

**1.**     **Section 6(a)**

In order to obtain a preliminary injunction regarding Section 6(a), Plaintiffs must demonstrate that they have standing to challenge the provisions of that Section. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 233-35 (1990) (refusing to assess constitutionality of certain provisions of ordinance that no plaintiff had standing to challenge); *Covenant Media of SC, LLC v. City of N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007) ("[A] plaintiff must establish that he has standing to challenge each

14

provision of an ordinance by showing that he was injured by application of those provisions." (citing *FW/PBS*, 493 U.S. at 230)); *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007) (A plaintiff's standing with respect to one provision of an ordinance "does not magically carry over to allow it to litigate other independent provisions of the ordinance without a separate showing of an actual injury under those provisions."); *HonoluluTraffic.com v. FTA*, Civ. No. 11-00307, 2012 WL 1805484, at *2-*4 (May 17, 2012) (plaintiffs challenging Honolulu rail project for failure to consider site impacts were required to show standing with regard to each challenged site separately).

Plaintiffs lack standing to challenge Section 6(a) because they have failed to demonstrate any concrete and particularized injury to judicially cognizable interests of theirs that arise from the enforcement of the Executive Order's 120-day suspension of certain aspects of USRAP. To the contrary, Plaintiffs' briefing for both the TRO and their conversion motion focuses on the 90-day suspension-of-entry provision contained in Section 2(c) of the Executive Order and the alleged impact that the application of that provision would have on them.

For example, in its TRO papers Hawaii claimed that its university system would be harmed by the Executive Order because it would not be able to recruit and retain foreign students and faculty from the six countries subject to the suspension of entry provision. *See* Mem. in Supp. of Plaintiffs' Mot. for a Temporary

Restraining Order at 14-15 (ECF No. 65-1) ("Pl. TRO Mem."). Hawaii also claimed that the Executive Order would harm the State's economy and, in particular, would have a negative impact on tourism. *See id.* at 17-18.[9]  The State's TRO briefing barely discussed the refugee provisions at all, relegating them to occasional references in passing, *see, e.g.*, *id.* at 12 (noting that Section 6(a) "suspends [USRAP] for a period of 120 days"), or vague predictions that the State's "small" program "to resettle and assist refugees" would be hindered, *id.* at 16; *see id.* at 48 (conclusory assertion that Hawaii would be forced to "abandon" its refugee program).  Nor did the State submit any declarations identifying any injuries deriving specifically from or relating to any of the refugee provisions of the Executive Order.  *See* ECF No. 66 (declarations in support of TRO motion).

Based on the claims Plaintiffs presented, this Court concluded that Hawaii has Article III standing "[f]or purposes of" the TRO because "(1) its universities will suffer monetary damages and intangible harms; (2) the State's economy is likely to

---

[9]     Defendants reiterate that Plaintiffs' standing showing is conspicuously weak even with regard to these claims.  *See* Def. TRO Mem. at 15-18.  For example, Hawaii's declarations do not identify any particular persons whom it seeks to recruit or who have concrete plans to relocate to Hawaii, but are precluded from doing so within the next 90 days by the provisions of Section 2(c).  *See id.* at 15-16.  Nor do its declarations regarding the impacts on tourism provide evidence of a concrete and particularized injury.  *See id.* at 17-18.  These claims of possible future injury are insufficient to confer standing.  *See Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013).

suffer a loss of revenue due to a decline in tourism; (3) such harms can be sufficiently linked to the Executive Order; and (4) the State would not suffer the harms to its proprietary interests in the absence of implementation of the Executive Order." TRO at 21. Notably, none of these harms relied upon by the Court has any relation to the Executive Order's refugee provisions in Section 6 (let alone provisions regarding internal review of the Nation's screening and vetting procedures as discussed in Part III, *infra*).

For the reasons given in our brief opposing Plaintiffs' TRO motion, it is Defendants' position that Plaintiffs' submissions do not warrant relief even as to Section 2(c). But Plaintiffs have now moved to convert the TRO to a preliminary injunction, and have done nothing to address these deficiencies or otherwise supplement the record regarding their supposed injuries. Like their TRO briefs, Plaintiffs' conversion brief contains references to the 120-day suspension of certain aspects of USRAP, *see, e.g.*, Pl. Mem. at 4, 18-20, but otherwise offers no factual evidence, or even unsupported argument, about how that suspension will cause concrete and cognizable harm to the State. Instead, Hawaii merely reiterates its prior arguments that the Executive Order will impact tourism and the University of Hawaii

system, *see id.* at 12, even though neither of these impacts has anything at all to do with refugees.[10]

As for Dr. Elshikh's injury, Plaintiffs rely entirely on this Court's TRO to assert that he "can still easily make a showing 'of direct, concrete injuries to the exercise of his Establishment Clause rights.'" Pl. Mem. at 12 (quoting TRO at 40). Even if that were true, his showing has nothing at all to do with the Executive Order's refugee provisions, and Plaintiffs' reliance on this Court's prior ruling does not demonstrate otherwise. This Court's TRO focused on Dr. Elshikh's Declaration,[11] which in turn discussed the impacts of the suspension-of-entry provision.[12] That is

---

[10]    The only new "evidence" that Plaintiffs offer regarding harm comes in the form of a *New York Times* article about the impact of the Executive Orders on foreign student enrollment at American universities. *See* Pl. Mem. at 12 (citing Stephanie Saul, *Amid 'Trump Effect' Fear, 40% of Colleges See Dip in Foreign Applicants*, N.Y. Times, Mar. 16, 2017, Katyal Decl. Ex. C). That article, which does not even mention the University of Hawaii system other than a reference to this Court's TRO, says nothing about the impact of Executive Order No. 13,780's refugee provisions.

[11]    The Court's TRO also cited Plaintiffs' Second Amended Complaint, but the referenced paragraphs—which are allegations only at this early stage of the proceedings—discussed the Executive Order in general terms. *See* TRO at 26 (citing SAC ¶¶ 88-90).

[12]    *See* Elshikh Decl. ¶ 1 (ECF No. 66-1) (describing how Elshikh is "deeply saddened by the passage of the Executive Order *barring nationals from now-six Muslim majority countries from entering the United States*" (emphasis added)); *id.* ¶ 3 (describing Elshikh's claim that the Executive Order "prevent[s] people from *certain Muslim countries* from entering the United States" (emphasis added)); *id.* ¶ 4 (claiming the "revised travel ban will have a direct personal effect on me, my wife, and my children because it creates an obstacle to the ability of my mother-in-law"

not surprising, as Dr. Elshikh's mother-in-law is not a refugee, and the refugee provisions contained in Section 6 apply on a global basis without regard to religion or nationality.   Dr. Elshikh has therefore failed to identify any concrete and particularized injury arising directly from the refugee provisions contained in Section 6.

Because neither Hawaii nor Dr. Elshikh has identified any injury that arises specifically from the refugee provisions contained in Section 6(a) of the Executive Order, neither has standing to challenge that Section.   This Court therefore lacks jurisdiction over Plaintiffs' claims regarding Section 6(a) and, accordingly, should not issue a preliminary injunction that enjoins enforcement or implementation of that Section.

### 2.    Section 6(b)

As set forth above, Plaintiffs do not provide any factual support to show that they have standing to challenge the 120-day suspension of certain aspects of USRAP.   That is equally, if not even more, true with regard to the 50,000-refugee

---

to visit); *id.* ¶ 6 ("President Trump's issuance of the *new Executive Order banning Syrian nationals* from the United States has directly impacted my family" (emphasis added)); *id.* ¶ 7 (claiming that "the travel ban targets Muslim citizens" and referring to Mosque members who "have family and friends *still living in the countries affected by* the revised travel plan" (emphasis added)); *id.* ¶ 8 (personal knowledge of community and Mosque members "who have immediate relatives in the *six designated countries*" (emphasis added)).

cap contained in Section 6(b).  That provision is cited nowhere in Plaintiffs' Second Amended Complaint, TRO papers, or conversion brief, save for a cryptic reference to provisions that "limit and control the admission of refugees going forward," Pl. Mem. at 4 (citing Exec. Order No. 13,780 § 6(b)-(d)), and a note that "all of the provisions of Section 6 are components of an integrated process for 'suspend[ing]' and 'review[ing]' refugee admission rules," *see id.* at 18 (quoting Mem. in Supp. of Motion for Clarification at 4, ECF No. 227-1).  Plaintiffs' complete silence on this point makes it impossible to understand how the operation of that provision could have injured them.   Plaintiffs have therefore failed to carry their burden of identifying, for standing purposes, a "concrete [action] that threatens imminent harm to [their] interests" arising from Section 6(b) of the Executive Order.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

> **B.   Even if This Court Finds That Plaintiffs Have Standing to Challenge Section 6, They Are Unlikely to Succeed on the Merits of Their Claims Regarding Sections 6(a) or 6(b)**

On the merits, Plaintiffs rely primarily on a bootstrapping argument that, because the Court has already issued a TRO as to Sections 2 and 6 based on Plaintiffs' prior briefing about Section 2, it should now grant a preliminary injunction regarding both Sections.  But the mere fact that the Court has already entered a TRO does not perforce entitle Plaintiffs to a preliminary injunction—in particular as to both Sections 6(a) and 6(b).

### 1.    Section 6(a)

As noted above, the 120-day suspension of refugee admissions contained in Section 6(a) operates on a global basis without regard to religion or nationality. Plaintiffs, however, fail to address this point, other than referring to provisions contained in the prior Executive Order, as well as "the factual record [that they] have developed in this case," to argue generally that Section 6 "was motivated by discriminatory animus toward Muslims."  Pl. Mem. at 18; *see id.* at 18-20.  But on review, their "factual record" fails to support this conclusion.

For their "record," Plaintiffs argue that the changes made to the new Executive Order were merely a superficial attempt to "sanitize" or "water[ ]-down" the prior Order.  *See id.* at 18-20.  The various public statements on which Plaintiffs rely do not constitute a record that is even relevant to Section 6, much less facts on which this Court should rely.  To the contrary, a substantive comparison of Executive Order No. 13,769 to Executive Order No. 13,780—including, in particular, a comparison of the refugee provisions—reveals that the Executive Branch revised the new Executive Order to avoid any Establishment Clause concerns.  At a general level, Executive Order No. 13,780 involved a detailed review of the national security risks

21

that pose the greatest threats to the nation, and it then provided targeted measures to address those security risks in a religiously neutral manner.[13]

Indeed, the New Executive Order *eliminated* preferences for religious minorities and the indefinite suspension that applied to Syrian refugees. *See Sarsour v. Trump*, No. 17-cv-00120-AJT-IDD, slip op. at 18 (E.D. Va. Mar. 24, 2017) ("The text of [Executive Order No. 13,780], unlike that of [Executive Order No. 13,769], makes no mention of religion as a criterion for benefits or burdens") (attached hereto).  As two district courts have now concluded, these changes are substantial and reflect the Executive's "response to judicial decisions that identified problematic aspects of [Executive Order No. 13,769] and invited revisions." *Sarsour*, slip op. at 23; *see Wash. v. Trump*, Case No. C17-0141JLR, 2017 WL 1045950, at *3 (W.D. Wash. Mar. 16, 2017) ("The Court agrees with Defendants that the Ninth Circuit implicitly invited Defendants to attempt to 'rewrite' [Executive Order 13,769] 'to make appropriate distinctions' and 'eliminate constitutional defects.'" (quoting

---

[13]    The entire Executive Order, including Section 2, is neutral with respect to religion.  Section 1 of the Executive Order lays out detailed findings of fact with respect to the six countries covered by the temporary travel suspension, and critically, Section 1(g) of the Order excludes Iraq, a Muslim-majority country covered by Executive Order No. 13,769, from the scope of this Order because, "since Executive Order 13769 was issued, the Iraqi government has expressly undertaken steps to enhance travel documentation, information sharing, and the return of Iraqi nationals subject to final orders of removal."  Exec. Order No. 13,780 § 1(g).

22

*Wash. v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017)).   Based on "the real substantive differences between the two orders," *Sarsour*, slip op. at 27, there is no basis to enjoin enforcement of Section 6(a).[14]

For this reason, Plaintiffs' citation to *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993), is inapposite.   *See* Pl. Mem. at 16-17.   In that case, there was no evidence that the challenged ordinance was enacted for any reason other than for religious purposes, notwithstanding the ordinance's non-religious applications.   508 U.S. at 539-40.   Here, by contrast, the Executive Order's refugee provisions were substantially modified in order to address constitutional concerns.[15] As a result, this Court is not at all "faced with a facially discriminatory order" and these changes satisfy the Supreme court's instruction for "[d]istrict courts [to]

---

[14]     Defendants also wish to make the Court aware of a recent development in the appeal of *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017).   In that case, Judges Bybee, Kozinski, Callahan, Bea, and Ikuta issued three separate opinions dissenting from the denial of reconsideration *en banc* of a panel decision affirming the denial of the Government's motion to stay the preliminary injunction issued by the Washington district court against the prior Executive Order.   *See id.* (panel decision). A copy of the slip opinion containing the dissents from the denial of reconsideration *en banc* is attached hereto.

[15]     Even if *Lukumi* were applicable, it does not address the requirement that this Court limit its injunctive relief to those portions of the Executive Order that Plaintiffs can show would cause them a concrete and particularized injury.   *See Lewis*, 518 U.S. at 358 n.6; *DaimlerChrysler*, 547 U.S. at 352; *Washington Envtl. Council*, 732 F.3d at 1139; Part II.A, *supra*.

adjust[ ] preliminary relief to take account of genuine changes in constitutionally significant conditions." *Sarsour*, slip op. at 23 (denying a motion to enjoin the enforcement of Executive Order No. 13,780 as violating Establishment Clause) (quoting *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 848 (2005)); *Wash. v. Trump*, 2017 WL 1045950, at *3 (denying Washington's motion to enforce TRO of prior Executive Order against Executive Order No. 13,780 because of "substantial distinctions" in implementation and rationale between the Orders).

### 2.    Section 6(b)

Plaintiffs present no argument on the merits *at all* regarding the implementation of the 50,000-person refugee cap contained in Section 6(b). Although Plaintiffs cite various statements regarding refugees, describe the provisions of Section 6 as being "components of an integrated process," and argue that the Executive Order was motivated by animus, *see* Pl. Mem. at 18-20, they make no effort whatsoever to tie any of their Establishment Clause claims to the specific provisions of Section 6(b). It is therefore impossible to ascertain what argument they are presenting on this point, to the extent they are even challenging this provision at all. No other court addressing either Executive Order No. 13,780 or the revoked Order has enjoined Section 6(b) (or the refugee cap contained in the prior

Order). This Court should likewise decline to enjoin implementation of that provision.

## III. At a Minimum, This Court Should Not Enjoin Those Portions of Sections 2 and 6 That Relate to Governmental Operations

At the very least, this Court should not enjoin the remaining, internal-facing provisions of Sections 2 and 6 of Executive Order No. 13,780, including the following:

- Section 2(a) (requiring the Secretary of Homeland Security to conduct a worldwide review to ensure that foreign governments are providing whatever information may be necessary to ensure that individuals seeking visas or other immigration benefits are not a security or public safety threat);

- Section 2(b) (requiring the preparation and submission to the President of a report based upon the review described in Section 2(a));

- Section 2(d) (providing that the Secretary of State shall request that foreign governments begin to supply additional, needed information about their nationals);

- Section 2(e) (instructing the Secretary of Homeland Security to submit to the President, after the period in Section 2(d) expires, recommendations regarding future restrictions on entry of appropriate

25

categories of foreign nationals of countries that have not provided the

requested information);

- Section 2(f) (authorizing the Secretary of Homeland Security to make additional recommendations to the President following the initial recommendations);

- Section 2(g) (providing that the Secretaries of State and Homeland Security shall submit various joint reports on their progress in implementing the provisions of the Order);

- Portions of Section 6(a) to the extent those portions call for review of the USRAP application and adjudication process, including the implementation of additional procedures; and

- Section 6(d) (encouraging the coordination of refugee placement with state and local jurisdictions).

These provisions involve only internal governmental activities (such as conducting reviews and updating policies) or inter-governmental diplomatic activities. They cannot have any immediate impact on Plaintiffs.

Plaintiffs clearly lack standing to challenge these provisions of the Executive Order because they have failed to identify any injury that they have suffered or would suffer that arises from the implementation of these specific provisions.

Instead, all they offer is a bare-bones assertion that "the remainder of Section 2 is designed to help the President extend his discriminatory ban on entry to additional countries and for additional periods of time." Pl. Mem. at 18. Even if there were factual support for this assertion—Plaintiffs offer none—the President has not yet taken any action to extend the provisions of the Executive Order. And any extension could undermine this Court's rationale for issuing a TRO, especially if applied to countries that do not have a majority-Muslim population. Plaintiffs' claims, if any, are therefore speculative and hypothetical, *Lujan*, 504 U.S. at 560-61; and they certainly are not ripe, *see Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (quotation omitted)).[16]

Plaintiffs also claim that it would be "particularly illogical to enjoin only parts of the ban" because these provisions are, in Plaintiffs' view, "inextricably linked" to the suspension of entry provision in Section 2(c). Pl. Mem. at 17. That argument, of course, ignores that Plaintiffs themselves seek to "enjoin only parts of" the

---

[16]   Even if Plaintiffs somehow had standing, they have made no attempt to demonstrate that they will be irreparably harmed by the implementation of these specific provisions. That, too, is fatal to their attempt to enjoin the implementation of these provisions. *See Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (to secure an injunction, plaintiffs "must do more than merely allege imminent harm sufficient to establish standing"; they "must *demonstrate* immediate threatened injury" that only "preliminary injunctive relief" can prevent).

Executive Order.  Moreover, as a matter of both law and logic, the provisions are severable.  As to the former, the Executive Order contains an express severability provision.  *See* Exec. Order No. 13,780 § 15.[17]  As to the latter, an internal review of procedures obviously can take place independently of the 90-day suspension-of-entry provision (though doing so would place additional burdens on the Executive Branch, which is one of the several reasons for the 90-day suspension).  *See* Exec. Order No. 13,780 § 2(c).

Further, limiting the scope of any injunction at this stage to permit these operational activities of the Government to proceed would be consistent with the goals expressed in this Court's previous Order.  As the Court explained, it did not intend the TRO to suggest that it "forever" barred "any effort by [the Executive Branch] to address the security concerns of the nation."  TRO at 38.  Yet precluding the Secretary of Homeland Security or the Secretary of State from engaging in these activities limits the ability of those officers to fulfill their duty to assess future security concerns and identify the means to address such concerns consistent with the Court's recognition that "context may change during the course of litigation." *Id.* at 39.

---

[17]    That provision provides, in relevant part, that "[i]f any provision of this order . . . is held to be invalid, the remainder of this order . . . shall not be affected thereby." Exec. Order No. 13,780 § 15(a).

28

Plaintiffs characterize Defendants' concern about the application of an injunction to these provisions as "meritless." Pl. Mem. at 20. Instead, Plaintiffs put their own gloss on the current TRO (and the preliminary injunction that they are seeking), asserting that the TRO "merely prevents Executive [B]ranch action under the auspices of an illegal Executive Order" and noting that "[t]he Government could engage in appropriate consultations and an appropriate review of the immigration system as a whole independent of this Order." Pl. Mem. at 21. Defendants, however, do not have the luxury of defining for themselves the scope of this Court's orders; as it stands now, the Court's TRO does not contain a carve-out for "appropriate consultations," as Plaintiffs put it. Plaintiffs' concession acknowledges the basic inappropriateness of an injunction against internal governmental communications and activities, most if not all of which could take place in the absence of the Executive Order but the status of which is now, at the very least, unclear in view of the current TRO.

## CONCLUSION

For the reasons stated herein, in Defendants' opposition to Plaintiffs' TRO motion, and by Defendants at the TRO hearing, the Court should not enter a preliminary injunction. To the extent that the Court issues a preliminary injunction, it should limit the scope of that preliminary injunction to particular identifiable aliens affected by the Executive Order to the extent that they have ripe claims and the

application of the Order causes irreparable injury to judicially cognizable rights of

the Plaintiffs.  In the alternative, the Court should limit the scope of a preliminary

injunction to Section 2(c) of the Executive Order.  At the very least, the Court should

not enjoin the inward-facing provisions of Sections 2 and 6.

Dated:  March 24, 2017          Respectfully submitted,

JEFFREY B. WALL
*Acting Solicitor General*

CHAD A. READLER
*Acting Assistant Attorney General*

ELLIOT ENOKI (No. 1528)
*Acting United States Attorney*
EDRIC M. CHING (No. 6697)
*Assistant United States Attorney*

JOHN R. TYLER
*Assistant Director, Federal Programs Branch*

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar. No. 467513)
MICHELLE R. BENNETT (CO Bar. No. 37050)
DANIEL SCHWEI (NY Bar)
*Trial Attorneys*
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Tel:  (202) 514-3374
Fax:  (202) 616-8460
E-mail:  brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

30

# CERTIFICATE OF SERVICE

I hereby certify that, on this 24th day of March, 2017, by the methods of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

<u>Served Electronically through CM/ECF:</u>

| | |
|---|---|
| Alexander Bowerman | alexander.bowerman@hoganlovells.com |
| Clyde J. Wadsworth | clyde.j.wadsworth@hawaii.gov |
| Colleen Roh Sinzdak | colleen.rohsinzdak@hoganlovells.com |
| Deirdre Marie-Iha | deirdre.marie-iha@hawaii.gov |
| Donna H. Kalama | Donna.H.Kalama@hawaii.gov |
| Douglas S.G. Chin | hawaiig@hawaii.gov |
| Elizabeth Hagerty | elizabeth.hagerty@hoganlovells.com |
| Kimberly T. Guidry | kimberly.t.guidry@hawaii.gov |
| Mitchell Reich | mitchell.reich@hoganlovells.com |
| Neal Katyal | neal.katyal@hoganlovells.com |
| Robert T. Nakatsuji | robert.t.nakatsuji@hawaii.gov |
| Sara Solow | sara.solow@hoganlovells.com |
| Thomas Schmidt | thomas.schmidt@hoganlovells.com |

Date:  March 24, 2017

/s/ Brad P. Rosenberg
Brad P. Rosenberg
*Trial Attorney*
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, N.W.
Washington, DC 20530
Tel: (202) 514-3374
Fax: (202) 616-8460
E-mail: brad.rosenberg@usdoj.gov

*Attorney for Defendants*