IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| STATE OF HAWAI‘I and ISMAIL ELSHIKH,<br><br>Plaintiffs,<br><br>vs.<br><br>DONALD J. TRUMP, *et al.*,<br><br>Defendants. | CV. NO. 17-00050 DKW-KSC<br><br><br>**ORDER GRANTING MOTION TO CONVERT TEMPORARY RESTRAINING ORDER TO A PRELIMINARY INJUNCTION** |

**<u>INTRODUCTION</u>**

On March 15, 2017, the Court temporarily enjoined Sections 2 and 6 of Executive Order No. 13,780, entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States," 82 Fed. Reg. 13209 (Mar. 6, 2017). *See* Order Granting Mot. for TRO, ECF No. 219 [hereinafter TRO]. Plaintiffs State of Hawai‘i and Ismail Elshikh, Ph.D., now move to convert the TRO to a preliminary injunction. *See* Pls.' Mot. to Convert TRO to Prelim. Inj., ECF No. 238 [hereinafter Motion].

Upon consideration of the parties' submissions, and following a hearing on March 29, 2017, the Court concludes that, on the record before it, Plaintiffs have met

their burden of establishing a strong likelihood of success on the merits of their

Establishment Clause claim, that irreparable injury is likely if the requested relief is

not issued, and that the balance of the equities and public interest counsel in favor of

granting the requested relief.   Accordingly, Plaintiffs' Motion (ECF No. 238) is

GRANTED.

## BACKGROUND

The Court briefly recounts the factual and procedural background relevant to

Plaintiffs' Motion.   A fuller recitation of the facts is set forth in the Court's TRO.

*See* TRO 3–14, ECF No. 219.

## I.   The President's Executive Orders

### A.   Executive Order No. 13,769

On January 27, 2017, the President of the United States issued Executive

Order No. 13,769 entitled, "Protecting the Nation from Foreign Terrorist Entry into

the United States," 82 Fed. Reg. 8977 (Jan. 27, 2017).[1]   On March 6, 2017, the

---

[1]On February 3, 2017, the State filed its complaint and an initial motion for TRO, which sought to enjoin Sections 3(c), 5(a)–(c), and 5(e) of Executive Order No. 13,769.   Pls.' Mot. for TRO, Feb. 3, 2017, ECF No. 2.   The Court stayed the case (*see* ECF Nos. 27 & 32) after the United States District Court for the Western District of Washington entered a nationwide preliminary injunction enjoining the Government from enforcing the same provisions of Executive Order No. 13,769 targeted by the State.   *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040 (W.D. Wash. Feb. 3, 2017).   On February 4, 2017, the Government filed an emergency motion in the United States Court of Appeals for the Ninth Circuit seeking a stay of the *Washington* TRO, pending appeal.   That emergency motion was denied on February 9, 2017.   *See Washington v. Trump*, 847 F.3d 1151 (9th Cir.) (per curium), *denying reconsideration en banc*, --- F.3d ---, 2017

President issued another Executive Order, No. 13,780, identically entitled,

"Protecting the Nation from Foreign Terrorist Entry into the United States" (the

"Executive Order"), 82 Fed. Reg. 13209.   Like its predecessor, the Executive Order

restricts the entry of foreign nationals from specified countries and suspends the

United States refugee program for specified periods of time.

## B.   Executive Order No. 13,780

Section 1 of the Executive Order declares that its purpose is to "protect

[United States] citizens from terrorist attacks, including those committed by foreign

nationals."   By its terms, the Executive Order also represents a response to the

Ninth Circuit's per curiam decision in *Washington v. Trump*, 847 F.3d 1151.

According to the Government, it "clarifies and narrows the scope of Executive

action regarding immigration, extinguishes the need for emergent consideration, and

eliminates the potential constitutional concerns identified by the Ninth Circuit."

Notice of Filing of Executive Order 4–5, ECF No. 56.

Section 2 suspends from "entry into the United States" for a period of 90 days,

certain nationals of six countries referred to in Section 217(a)(12) of the

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*.: Iran, Libya, Somalia,

---

WL 992527 (9th Cir. 2017).   On March 8, 2017, the Ninth Circuit granted the Government's unopposed motion to voluntarily dismiss the appeal.   *See* Order, Case No. 17-35105 (9th Cir. Mar. 8, 2017), ECF No. 187.

Sudan, Syria, and Yemen.   8 U.S.C. § 1187(a)(12); Exec. Order § 2(c).   The

suspension of entry applies to nationals of these six countries who (1) are outside the

United States on the new Executive Order's effective date of March 16, 2017; (2) do

not have a valid visa on that date; and (3) did not have a valid visa as of 5:00 p.m.

Eastern Standard Time on January 27, 2017 (the date of Executive Order No.

13,769).   Exec. Order § 3(a).   The 90-day suspension does not apply to: (1) lawful

permanent residents; (2) any foreign national admitted to or paroled into the United

States on or after the Executive Order's effective date (March 16, 2017); (3) any

individual who has a document other than a visa, valid on the effective date of the

Executive Order or issued anytime thereafter, that permits travel to the United

States, such as an advance parole document; (4) any dual national traveling on a

passport not issued by one of the six listed countries; (5) any foreign national

traveling on a diplomatic-type or other specified visa; and (6) any foreign national

who has been granted asylum, any refugee already admitted to the United States, or

any individual granted withholding of removal, advance parole, or protection under

the Convention Against Torture.   *See* Exec. Order § 3(b).   Under Section 3(c)'s

waiver provision, foreign nationals of the six countries who are subject to the

suspension of entry may nonetheless seek entry on a case-by-case basis.

4

Section 6 of the Executive Order suspends the U.S. Refugee Admissions Program for 120 days.   The suspension applies both to travel into the United States and to decisions on applications for refugee status.   *See* Exec. Order § 6(a).   It excludes refugee applicants who were formally scheduled for transit by the Department of State before the March 16, 2017 effective date.   Like the 90-day suspension, the 120-day suspension includes a waiver provision that allows the Secretaries of State and Homeland Security to admit refugee applicants on a case-by-case basis.   *See* Exec. Order § 6(c).   Unlike Executive Order No. 13,769, the new Executive Order does not expressly refer to an individual's status as a "religious minority" or refer to any particular religion, and it does not include a Syria-specific ban on refugees.

## II.   <u>Plaintiffs' Claims</u>

Plaintiffs filed a Second Amended Complaint for Declaratory and Injunctive Relief ("SAC") on March 8, 2017 (ECF No. 64) simultaneous with their Motion for TRO (ECF No. 65).   The State asserts that the Executive Order inflicts constitutional and statutory injuries upon its residents, employers, and educational institutions, while Dr. Elshikh alleges injuries on behalf of himself, his family, and members of his Mosque.   SAC ¶ 1.

According to Plaintiffs, the Executive Order results in "their having to live in a country and in a State where there is the perception that the Government has established a disfavored religion."   SAC ¶ 5.   Plaintiffs assert that by singling out nationals from the six predominantly Muslim countries, the Executive Order causes harm by stigmatizing not only immigrants and refugees, but also Muslim citizens of the United States.   Plaintiffs point to public statements by the President and his advisors regarding the implementation of a "Muslim ban," which Plaintiffs contend is the tacit and illegitimate motivation underlying the Executive Order.   *See* SAC ¶¶ 35–60.   Plaintiffs argue that, in light of these and similar statements "where the President himself has repeatedly and publicly espoused an improper motive for his actions, the President's action must be invalidated."   Pls.' Mem. in Supp. of Mot. for TRO 2, ECF No. 65-1.   Plaintiffs additionally present evidence that they contend undermines the purported national security rationale for the Executive Order and demonstrates the Administration's pretextual justification for the Executive Order.   *E.g.*, SAC ¶ 61 (citing Draft DHS Report, SAC, Ex. 10, ECF No. 64-10).

## III.   <u>March 15, 2017 TRO</u>

The Court's nationwide TRO (ECF No. 219) temporarily enjoined Sections 2 and 6 of the Executive Order, based on the Court's preliminary finding that Plaintiffs

demonstrated a sufficient likelihood of succeeding on their claim that the Executive Order violates the Establishment Clause.   *See* TRO 41–42.   The Court concluded, based upon the showing of constitutional injury and irreparable harm, the balance of equities, and public interest, that Plaintiffs met their burden in seeking a TRO, and directed the parties to submit a stipulated briefing and preliminary injunction hearing schedule.   *See* TRO 42–43.

On March 21, 2017, Plaintiffs filed the instant Motion (ECF No. 238) seeking to convert the TRO to a preliminary injunction prohibiting Defendants from enforcing and implementing Sections 2 and 6 of the Executive Order until the matter is fully decided on the merits.   They argue that both of these sections are unlawful in all of their applications and that both provisions are motivated by anti-Muslim animus.   Defendants oppose the Motion.   *See* Govt. Mem. in Opp'n to Mot. to Convert TRO to Prelim. Inj., ECF No. 251.   After full briefing and notice to the parties, the Court held a hearing on the Motion on March 29, 2017.

## DISCUSSION

The Court's TRO details why Plaintiffs are entitled to preliminary injunctive relief.   *See* TRO 15–43.   The Court reaffirms and incorporates those findings and conclusions here, and addresses the parties' additional arguments on Plaintiffs' Motion to Convert.

## I.    <u>Plaintiffs Have Demonstrated Standing At This Preliminary Phase</u>

The Court previously found that Plaintiffs satisfied Article III standing requirements at this preliminary stage of the litigation.   *See* TRO 15–21 (State), 22–25 (Dr. Elshikh).   The Court renews that conclusion here.

### A.    <u>Article III Standing</u>

Article III, Section 2 of the Constitution permits federal courts to consider only "cases" and "controversies."   *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007).   "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"At this very preliminary stage of the litigation, the [Plaintiffs] may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden."   *Washington*, 847 F.3d at 1159 (citing *Lujan*, 504 U.S. at 561).   "With these allegations and evidence, the [Plaintiffs] must make a 'clear showing of each element of standing.'"   *Id.* (quoting

8

*Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 907 (2014)).   On the record presented at this preliminary stage of the proceedings, Plaintiffs meet the threshold Article III standing requirements.

### B.     The State Has Standing

For the reasons stated in the TRO, the State has standing based upon injuries to its proprietary interests.   *See* TRO 16–21.[2]

The State sufficiently identified monetary and intangible injuries to the University of Hawaii.   *See, e.g.*, Suppl. Decl. of Risa E. Dickson, Mot. for TRO, Ex. D-1, ECF No. 66-6; Original Dickson Decl., Mot. for TRO, Ex. D-2, ECF No. 66-7. The Court previously found these types of injuries to be nearly indistinguishable from those found sufficient to confer standing according to the Ninth Circuit's *Washington* decision.   *See* 847 F.3d at 1161 ("The necessary connection can be drawn in at most two logical steps: (1) the Executive Order prevents nationals of seven countries from entering Washington and Minnesota; (2) as a result, some of these people will not enter state universities, some will not join those universities as faculty, some will be prevented from performing research, and some will not be

---

[2]The Court once again does not reach the State's alternative standing theory based on protecting the interests of its citizens as *parens patriae*.  *See Washington*, 847 F.3d at 1168 n.5 ("The States have asserted other proprietary interests and also presented an alternative standing theory based on their ability to advance the interests of their citizens as *parens patriae*.   Because we conclude that the States' proprietary interests as operators of their public universities are sufficient to support standing, we need not reach those arguments.").

permitted to return if they leave.   And we have no difficulty concluding that the

States' injuries would be redressed if they could obtain the relief they ask for: a

declaration that the Executive Order violates the Constitution and an injunction

barring its enforcement.").   The State also presented evidence of injury to its

tourism industry.   *See, e.g.,* SAC ¶ 100; Suppl. Decl. of Luis P. Salaveria, Mot. for

TRO, Ex. C-1, ECF No. 66-4; Suppl. Decl. of George Szigeti, ¶¶ 5–8, Mot. for TRO,

Ex. B-1, ECF No. 66-2.

For purposes of the instant Motion, the Court concludes that the State has

preliminarily demonstrated that: (1) its universities will suffer monetary damages

and intangible harms; (2) the State's economy is likely to suffer a loss of revenue

due to a decline in tourism; (3) such harms can be sufficiently linked to the

Executive Order; and (4) the State would not suffer the harms to its proprietary

interests in the absence of implementation of the Executive Order.   *See* TRO 21.

These preliminary findings apply to each of the challenged Sections of the Executive

Order.   Accordingly, at this early stage of the litigation, the State has satisfied the

requirements of Article III standing.

### C.   Dr. Elshikh Has Standing

Dr. Elshikh likewise has met his preliminary burden to establish standing to

assert an Establishment Clause violation.   *See* TRO 22–25.   "The standing

question, in plain English, is whether adherents to a religion have standing to challenge an official condemnation by their government of their religious views[.] Their 'personal stake' assures the 'concrete adverseness' required." *See Catholic League for Religious & Civil Rights v. City & Cty. of San Francisco*, 624 F.3d 1043, 1048–49 (9th Cir. 2010) (en banc).   Dr. Elshikh attests that the effects of the Executive Order are "devastating to me, my wife and children."   Elshikh Decl. ¶ 6, Mot. for TRO, Ex. A, ECF No. 66-1; *see also id.* ¶¶ 1, 3 ("I am deeply saddened . . . . by the message that both [Executive Orders] convey—that a broad travel-ban is 'needed' to prevent people from certain Muslim countries from entering the United States."); SAC ¶ 90 ("Muslims in the Hawaiʻi Islamic community feel that the new Executive Order targets Muslim citizens because of their religious views and national origin.   Dr. Elshikh believes that, as a result of the new Executive Order, he and members of the Mosque will not be able to associate as freely with those of other faiths.").   The alleged injuries are sufficiently personal, concrete, particularized, and actual to confer standing in the Establishment Clause context.   *E.g.,* SAC ¶¶ 88–90; Elshikh Decl. ¶¶ 1, 3.   These injuries have already occurred and will continue to occur if the Executive Order is implemented and enforced; the injuries are neither contingent nor speculative.

The final two aspects of Article III standing—causation and redressability—are also satisfied with respect to each of the Executive Order's challenged Sections.   Dr. Elshikh's injuries are traceable to the new Executive Order and, if Plaintiffs prevail, a decision enjoining portions of the Executive Order would redress that injury.   *See Catholic League*, 624 F.3d at 1053.   At this preliminary stage of the litigation, Dr. Elshikh has accordingly carried his burden to establish standing under Article III.

The Court turns to the factors for granting preliminary injunctive relief.

## II.   <u>Legal Standard: Preliminary Injunctive Relief</u>

The underlying purpose of a preliminary injunction is to preserve the status quo and prevent irreparable harm.   *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974); *see also Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1130–31 (9th Cir. 2006).

The Court applies the same standard for issuing a preliminary injunction as it did when considering Plaintiffs' Motion for TRO.   *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).   A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted).

The Court, in its discretion, may convert a temporary restraining order into a preliminary injunction. *See, e.g.*, *ABX Air, Inc. v. Int'l Bhd. of Teamsters*, No. 1:16-CV-1096, 2016 WL 7117388, at *5 (S.D. Ohio Dec. 7, 2016) (granting motion to convert TRO into a preliminary injunction because "Defendants fail to allege any material fact suggesting that, if a hearing were held, this Court would reach a different outcome"; "[n]othing has occurred to alter the analysis in the Court's original TRO, and since this Court has already complied with the requirements for the issuance of a preliminary injunction, it can simply convert the nature of its existing Order."); *Productive People, LLC v. Ives Design*, No. CV-09-1080-PHX-GMS, 2009 WL 1749751, at *3 (D. Ariz. June 18, 2009) ("Because Defendants have given the Court no reason to alter the conclusions provided in its previous Order [granting a TRO], and because '[t]he standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction,' the Court will enter a preliminary injunction." (quoting *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002))).   Here, the parties were afforded notice, a full-briefing on the

merits, and a hearing both prior to entry of the original TRO and prior to consideration of the instant Motion.

For the reasons that follow and as set forth more fully in the Court's TRO, Plaintiffs have met their burden here.

## III.   **Analysis of Factors: Likelihood of Success on the Merits**

The Court's prior finding that Plaintiffs sufficiently established a likelihood of success on the merits of their Count I claim that the Executive Order violates the Establishment Clause remains undisturbed.   *See* TRO 30–40.[3]

### A.   **Establishment Clause**

*Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), provides the benchmark for evaluating whether governmental action is consistent with or at odds with the Establishment Clause.   According to *Lemon*, government action (1) must have a primary secular purpose, (2) may not have the principal effect of advancing or inhibiting religion, and (3) may not foster excessive entanglement with religion. *Id.*   "Failure to satisfy any one of the three prongs of the *Lemon* test is sufficient to invalidate the challenged law or practice."   *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1076–77 (9th Cir. 2010).

---

[3]The Court again expresses no view on Plaintiffs' additional statutory or constitutional claims.

The Court determined in its TRO that the preliminary evidence demonstrates the Executive Order's failure to satisfy *Lemon*'s first test.   *See* TRO 33–36.   The Court will not repeat that discussion here.   As no *new* evidence contradicting the purpose identified by the Court has been submitted by the parties since the issuance of the March 15, 2017 TRO, there is no reason to disturb the Court's prior determination.

Instead, the Federal Defendants take a different tack.   They once more urge the Court not to look beyond the four corners of the Executive Order.   According to the Government, the Court must afford the President deference in the national security context and should not "'look behind the exercise of [the President's] discretion' taken 'on the basis of a facially legitimate and bona fide reason.'"   Govt. Mem. in Opp'n to Mot. for TRO 42–43 (quoting *Kliendienst v. Mandel*, 408 U.S. 753, 770 (1972)), ECF No. 145.   No binding authority, however, has decreed that Establishment Clause jurisprudence ends at the Executive's door.   In fact, *every court* that has considered whether to apply the Establishment Clause to either the Executive Order or its predecessor (regardless of the ultimate outcome) has done so.[4]   Significantly, this Court is constrained by the binding precedent and guidance

---

[4]*See Sarsour v. Trump*, No. 1:17-cv-00120 AJT-IDD, 2017 WL 1113305, at *11 (E.D. Va. Mar. 27, 2017) ("[T]he Court rejects the Defendants' position that since President Trump has offered a legitimate, rational, and non-discriminatory purpose stated in EO-2, this Court must confine its

offered in *Washington.*    There, citing *Lemon*, the Ninth Circuit clearly indicated

that the Executive Order is subject to the very type of secular purpose review

conducted by this Court in considering the TRO.    *Washington*, 847 F.3d at 1167–

68; *id.* at 1162 (stating that *Mandel* does not apply to the "promulgation of sweeping

immigration policy" at the "highest levels of the political branches").

The Federal Defendants' arguments, advanced from the very inception of this

action, make sense from this perspective—where the "historical context and 'the

specific sequence of events leading up to'" the adoption of the challenged Executive

Order are as full of religious animus, invective, and obvious pretext as is the record

here, it is no wonder that the Government urges the Court to altogether ignore that

history and context.    *See McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545

U.S. 844, 862 (2005).    The Court, however, declines to do so.    *Washington,* 847

---

analysis of the constitutional validity of EO-2 to the four corners of the Order.") (citations
omitted); *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, 2017 WL 1018235, at *16
(D. Md. Mar. 16, 2017) ("Defendants argue that because the Establishment Clause claim
implicates Congress's plenary power over immigration as delegated to the President, the Court
need only consider whether the Government has offered a 'facially legitimate and bona fide
reason' for its action.  *Mandel*, 408 U.S. at 777 . . . .   [A]lthough '[t]he Executive has broad
discretion over the admission and exclusion of aliens,' that discretion 'may not transgress
constitutional limitations,' and it is 'the duty of the courts' to 'say where those statutory and
constitutional boundaries lie.' *Abourezk[ v. Reagan]*, 785 F.2d [1043,] 1061 [(D.C. Cir. 1986)]."); 
*Aziz v. Trump*, No. 1:17-CV-116 LMB-TCB, 2017 WL 580855, at *8 (E.D. Va. Feb. 13, 2017)
("Moreover, even if Mandel[, 408 U.S. at 770,] did apply, it requires that the proffered executive
reason be 'bona fide.'   As the Second and Ninth Circuits have persuasively held, if the proffered
'facially legitimate' reason has been given in 'bad faith,' it is not 'bona fide.'   *Am. Academy of
Religion v. Napolitano*, 573 F.3d 115, 126 (2d Cir. 2009); *Bustamante v. Mukasey*, 531 F.3d 1059,
1062 (9th Cir. 2008).   That leaves the Court in the same position as in an ordinary secular purpose
case: determining whether the proffered reason for the EO is the real reason.")).

F.3d at 1167 ("It is well established that evidence of purpose beyond the face of the challenged law may be considered in evaluating Establishment and Equal Protection Clause claims.").   The Court will not crawl into a corner, pull the shutters closed, and pretend it has not seen what it has.[5]   The Supreme Court and this Circuit both dictate otherwise, and that is the law this Court is bound to follow.

## B.   **Future Executive Action**

The Court's preliminary determination does not foreclose future Executive action.   The Court recognizes that it is not the case that the Administration's past conduct must forever taint any effort by it to address the security concerns of the nation.   *See* TRO 38–39.   Based upon the preliminary record available, however, one cannot conclude that the actions taken during the interval between revoked Executive Order No. 13,769 and the new Executive Order represent "*genuine* changes in constitutionally significant conditions."   *McCreary*, 545 U.S. at 874 (emphasis added).

The Government emphasizes that "the Executive Branch revised the new Executive Order to avoid any Establishment Clause concerns," and, in particular,

---

[5] *See Int'l Refugee Assistance Project*, 2017 WL 1018235, at *14 ("Defendants have cited no authority concluding that a court assessing purpose under the Establishment Clause may consider only statements made by government employees at the time that they were government employees.   Simply because a decisionmaker made the statements during a campaign does not wipe them from the 'reasonable memory' of a 'reasonable observer.'" (quoting *McCreary*, 545 U.S. at 866)).

removed the preference for religious minorities provided in Executive Order No.

13,769.   Mem. in Opp'n 21, ECF No. 251.   These efforts, however, appear to be

precisely what Plaintiffs characterize them to be: efforts to "sanitize [Executive

Order No. 13,769's] refugee provision in order to 'be responsive to a lot of very

technical issues that were brought up by the court.'"   Mem. in Supp. of Mot. to

Convert TRO to Prelim. Inj. 20, ECF No. 238-1 [hereinafter PI Mem.] (quoting SAC

¶ 74(a)).   Plaintiffs also direct the Court to the President's March 15, 2017

description of the Executive Order as "a watered-down version of the first one."   PI

Mem. 20 (citing Katyal Decl. 7, Ex. A, ECF No. 239-1).   "[A]n implausible claim

that governmental purpose has changed should not carry the day in a court of law

any more than in a head with common sense."   *McCreary*, 545 U.S. at 874.

## IV.   Analysis of Factors: Irreparable Harm

Irreparable harm may be *presumed* with the finding of a violation of the First

Amendment.   *See Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir.

2009) ("The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S.

347, 373 (1976))).   Because Dr. Elshikh is likely to succeed on the merits of his

Establishment Clause claim, the Court finds that the second factor of the *Winter* test

is satisfied—that Dr. Elshikh is likely to suffer irreparable, ongoing, and significant

injury in the absence of a preliminary injunction. *See* TRO 40 (citing SAC ¶¶ 88–90; Elshikh Decl. ¶¶ 1, 3).

## V.    Analysis of Factors: Balance of Equities And Public Interest

The final step in determining whether to grant Plaintiffs' Motion is to assess the balance of equities and examine the general public interests that will be affected. The Court acknowledges Defendants' position that the Executive Order is intended "to protect the Nation from terrorist activities by foreign nationals admitted to the United States[.]" Exec. Order, preamble. National security is unquestionably of vital importance to the public interest. The same is true with respect to affording appropriate deference to the President's constitutional and statutory responsibilities to set immigration policy and provide for the national defense. Upon careful consideration of the totality of the circumstances, however, the Court reaffirms its prior finding that the balance of equities and public interest weigh in favor of maintaining the status quo. As discussed above and in the TRO, Plaintiffs have shown a strong likelihood of succeeding on their claim that the Executive Order violates First Amendment rights under the Constitution. *See* TRO 41–42; *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is *always* in the public interest to prevent the violation of a party's constitutional rights." (emphasis added) (citing *Elrod*, 427 U.S. at 373)).

19

## VI.   Scope of Preliminary Injunction: Sections 2 And 6

Having considered the constitutional injuries and harms discussed above, the balance of equities, and public interest, the Court hereby grants Plaintiffs' request to convert the existing TRO into a preliminary injunction.   The requested nationwide relief is appropriate in light of the likelihood of success on Plaintiffs' Establishment Clause claim.   *See, e.g., Texas v. U.S.*, 809 F.3d 134, 188 (5th Cir. 2015) ("[Because] the Constitution vests [district courts] with 'the judicial Power of the United States' . . . , [i]t is not beyond the power of the court, in appropriate circumstances, to issue a nationwide injunction." (citing U.S. Const. art. III, § 1)), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016); *see also Washington*, 847 F.3d at 1167 ("Moreover, even if limiting the geographic scope of the injunction would be desirable, the Government has not proposed a workable alternative form of the TRO that accounts for the nation's multiple ports of entry and interconnected transit system and that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders.").

The Government insists that the Court, at minimum, limit any preliminary injunction to Section 2(c) of the Executive Order.   It makes little sense to do so. That is because the entirety of the Executive Order runs afoul of the Establishment Clause where "openly available data support[] a commonsense conclusion that a

religious objective permeated the government's action," and not merely the promulgation of Section 2(c).   *McCreary*, 545 U.S. at 863; *see* SAC ¶¶ 36–38, 58, 107; TRO 16, 24–25, 42.   Put another way, the historical context and evidence relied on by the Court, highlighted by the comments of the Executive and his surrogates, does not parse between Section 2 and Section 6, nor does it do so between subsections within Section 2.   Accordingly, there is no basis to narrow the Court's ruling in the manner requested by the Federal Defendants.[6]   *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 539–40 (1993) ("[It would be] implausible to suggest that [Section 2(c)] but not the [other Sections] had as [its] object the suppression of [or discrimination against a] religion. . . . We need not decide whether the Ordinance 87–72 could survive constitutional scrutiny if it existed separately; it must be invalidated because it functions, with the rest of the enactments in question, to suppress Santeria religious worship.").

---

[6]Plaintiffs further note that the Executive Order "bans refugees at a time when the publicized refugee crisis is focused on Muslim-majority nations."   Reply in Supp. of Mot. to Convert TRO to Prelim. Inj. 14.   Indeed, according to Pew Research Center analysis of data from the State Department's Refugee Processing Center, a total of 38,901 Muslim refugees entered the United States in fiscal year 2016, accounting for nearly half of the almost 85,000 refugees who entered the country during that period.   *See* Br. of Chicago, Los Angeles, New York, Philadelphia, & Other Major Cities & Counties as Amici Curiae in Supp. of Pls.' Mot. to Convert TRO to Prelim. Inj. 12, ECF No. 271-1 (citing Phillip Connor, *U.S. Admits Record Number of Muslim Refugees in 2016*, Pew Research Center (Oct. 5, 2016), http://www.pewresearch.org/fact-tank/2016/10/05/u-s-admits-record-number-ofmuslim-refugees -in-2016).   "That means the U.S. has admitted the highest number of Muslim refugees of any year since date of self-reported religious affiliations first became publicly available in 2002."   *Id.*

The Court is cognizant of the difficult position in which this ruling might place government employees performing what the Federal Defendants refer to as "inward-facing" tasks of the Executive Order.   Any confusion, however, is due in part to the Government's failure to provide a workable framework for narrowing the scope of the enjoined conduct by specifically identifying those portions of the Executive Order that are in conflict with what it merely argues are "internal governmental communications and activities, most if not all of which could take place in the absence of the Executive Order but the status of which is now, at the very least, unclear in view of the current TRO."   Mem. in Opp'n 29.   The Court simply cannot discern, on the present record, a method for determining which enjoined provisions of the Executive Order are causing the alleged confusion asserted by the Government.   *See, e.g.*, Mem. in Opp'n 28 ("[A]n internal review of procedures obviously can take place independently of the 90-day suspension-of-entry provision (though doing so would place additional burdens on the Executive Branch, which is one of the several reasons for the 90-day suspension (citing Exec. Order No. 13,780, § 2(c)).   Without more, "even if the [preliminary injunction] might be overbroad in some respects, it is not our role to try, in effect, to rewrite the Executive Order."   *Washington*, 847 F.3d at 1167.

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion to Convert Temporary Restraining Order to A Preliminary Injunction is hereby GRANTED.


## PRELIMINARY INJUNCTION

It is hereby ADJUDGED, ORDERED, and DECREED that:

Defendants and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined from enforcing or implementing Sections 2 and 6 of the Executive Order across the Nation.   Enforcement of these provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.

No security bond is required under Federal Rule of Civil Procedure 65(c).

The Court declines to stay this ruling or hold it in abeyance should an appeal of this order be filed.

IT IS SO ORDERED.

Dated: March 29, 2017 at Honolulu, Hawai'i.



Derrick K. Watson
United States District Judge

*State of Hawaii, et al. v. Trump, et al.*; Civ. No. 17-00050 DKW-KSC; **ORDER GRANTING MOTION TO CONVERT TEMPORARY RESTRAINING ORDER TO A PRELIMINARY INJUNCTION**