```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3
       STATE OF HAWAI'I and ISMAIL    ) CIVIL NO. 17-00050-DKW-KJM
 4     ELSHIKH,                       )
                                      ) Honolulu, Hawaii
 5               Plaintiffs,          ) March 15, 2017
                                      ) 9:33 a.m.
 6          vs.                       )
                                      ) PLAINTIFFS' MOTION FOR
 7     DONALD J. TRUMP, in his        ) TEMPORARY RESTRAINING ORDER
       official capacity as          )
 8     President of the United       )
       States; U.S. DEPARTMENT OF    )
 9     HOMELAND SECURITY; JOHN F.    )
       KELLY, in his official        )
10     capacity as Secretary of      )
       Homeland Security; U.S.       )
11     DEPARTMENT OF STATE; REX      )
       TILLERSON, in his official    )
12     capacity as Acting            )
       Secretary of State; and the   )
13     UNITED STATES OF AMERICA,     )
                                      )
14               Defendant.          )
                                      )
15     _____)

16
                     TRANSCRIPT OF PROCEEDINGS
17         BEFORE THE HONORABLE DERRICK K. WATSON,
              UNITED STATES DISTRICT COURT JUDGE
18

19     APPEARANCES:

20     For the Plaintiffs     DOUGLAS CHIN, ESQ.
       State of Hawaii and    DEIRDRE MARIE-IHA, ESQ.
21     Ismail Elshikh:        CLYDE WADSWORTH, ESQ.
                              KIMBERLY GUIDRY, ESQ.
22                            JOSH WISCH, ESQ.
                              DONNA KALAMA, ESQ.
23                            Department of the Attorney General,
                              State of Hawaii
24                            425 Queen Street
                              Honolulu, Hawaii  96813
25
```

```
 1    APPEARANCES: (CONT.)

 2    For the Plaintiffs        NEAL KATYAL, ESQ. (VIA PHONE)
      State of Hawaii and       COLLEEN ROH SINZDAK, ESQ. (VIA
 3    Ismail Elshikh:           PHONE)
                                Hogan Lovells US LLP
 4                              555 13th Street NW
                                Washington, DC 20004
 5
      For the Defendants        ELLIOT ENOKI, ESQ.
 6    Donald J. Trump, et       Office of the United States
      al:                       Attorney
 7                              Prince Kuhio Federal Building
                                300 Ala Moana Blvd. Ste 6100
 8                              Honolulu, Hawaii  96850

 9                              JEFFREY B. WALL, ESQ. (VIA PHONE)
                                U.S. Department of Justice
10                              Office of the Solicitor General
                                950 Pennsylvania Ave. N.W.
11                              Washington, DC  20530

12                              (APPEARANCES BY PHONE)
                                BRAD P. ROSENBERG, ESQ.
13                              EDWIN KNEEDLE, ESQ.
                                JONATHAN BOND, ESQ.
14                              BRIAN FLETCHER, ESQ.
                                AUGUST FLENTJE, ESQ.
15                              CHAD A. READLER, ESQ.
                                DANIEL SCHWEI, ESQ.
16                              U.S. Department of Justice
                                Civil Division, Federal Programs
17                              Branch
                                20 Massachusetts Ave, NW
18                              Washington, DC  20530

19

20

21    Official Court           GLORIA T. BEDIAMOL, RPR, RMR FCRR
      Reporter:                 United States District Court
22                              P.O. Box 50131
                                Honolulu, Hawaii 96850
23


24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

1    Wednesday, March 15, 2017                          9:33 a.m.

2            THE CLERK:  Calling Civil Number 17-00050-DKW-KSC,

3    State of Hawaii, et. al. versus Donald J. Trump, et al. This

4    case has been called for a hearing on plaintiffs' motion for

5    temporary restraining order.

6            Counsel, please make your appearances for the record.

7            MR. CHIN:  Good morning, Your Honor, Hawaii attorney

8    general on behalf of the State of Hawaii.  I'll be entering the

9    following appearances:  With me at counsel table is Deputy

10   Attorney General Deirdre Marie-Iha; also, in front of the bar

11   is Solicitor General Clyde Wadsworth, First Deputy Solicitor

12   General Kimberly Guidry; and also the following deputies Josh

13   Wisch, and Donna Kalama.  Arguing telephonically and appearing

14   on behalf of the plaintiffs are the following:  Neal Katyal as

15   well as Colleen Roh Sinzdak.

16           THE COURT:  All right.  Good morning.

17           Mr. Katyal and Ms. Sinzdak, can you hear me?

18           MR. KATYAL:  We can hear you well, thank you.  Good

19   afternoon.

20           THE COURT:  Good afternoon.

21           MR. ENOKI:  Good morning, Your Honor, Elliot Enoki for

22   the United States and other defendants.  Appearing and arguing

23   for the defendants is Jeffrey Wall, the acting solicitor

24   general for the United States.

25           THE COURT:  Good morning to you, Mr. Enoki, as well.

1   You seem a little bit outmanned at least in court.  You may be

2   seated.

3          All right, Mr. Katyal, I understand that you folks

4   have worked out some kind of division in terms of

5   responsibility for argument this morning.  Can you give me a

6   clue as to what that division looks like?

7          MR. KATYAL:  Sure, absolutely.  If it's okay with you,

8   I'll handle the two statutory violation arguments as well as

9   the TRO factors, and Ms. Sinzdak will handle the constitutional

10  claims on the merits.  And if possible, I would like to reserve

11  a few minutes for rebuttal if that's okay.

12         THE COURT:  That's perfectly fine with me.  There are

13  a couple of preliminary matters that I want to address with

14  you, the first of which is the plaintiffs have filed a

15  27-paged, 5900-plus-word reply brief.  That reply brief is in

16  violation of the court's local rules, notwithstanding the

17  certification of compliance that's attached to that reply

18  brief.  Nonetheless, the Court will consider that reply brief

19  in full as opposed to striking it or asking that it be modified

20  in any way.  However, I do note that this litigation,

21  regardless of what happens with the particular motion in front

22  of the Court today, will continue, and I certainly urge the

23  plaintiffs, as well as the defendants, to pay closer attention

24  to compliance with the court's local rules.

25         The second matter is, as you begin your argument, and

1    given the division of responsibility that you've just

2    described, I do want to advise that I'm personally more

3    interested in the constitutional claims that have been asserted

4    as the basis for the temporary restraining order.  You can

5    certainly argue whatever you wish, but that is guidance that I

6    hope you will pay some attention to.

7         With that, Mr. Katyal, you may proceed.

8         MR. KATYAL:  Thank you, Judge Watson.  May it please

9    the Court, and we certainly apologize for any local rules

10   discompliance; we'll be very careful in the future.

11        On February 9th of this year, the Ninth Circuit

12   enjoined President Trump's first executive order restricting

13   immigration finding a likelihood of success that the State of

14   Washington would prevail in their legal challenge.  And in so

15   doing, the Ninth Circuit rejected a bevy of government

16   arguments including that the ban was only temporary, that the

17   ban had a waiver provision, that the State did not have

18   standing because it hadn't asserted a concrete injury to

19   itself, that the State couldn't demonstrate a likelihood of

20   success that the ban complies with the constitution, and, most

21   striking of all, that the federal courts had no business

22   whatsoever reviewing the president's decision in the realm of

23   immigration and national security.

24        And if the government's opposition brief, filed before

25   you, Judge Watson, two days ago sounds familiar, it's because

1    it should; they repeat all of these arguments.  And for the

2    reasons that the Ninth Circuit found them wanting before, they

3    are wanting now.  We believe that this order violates both the

4    constitution and the statutes of the United States, and that it

5    is the most solemn duty of this Court to review government

6    action for compliance with these foundational laws.

7         Now I appreciate, Your Honor, that you would like to

8    focus on the constitutional claims, but maybe I'll spend a few

9    moments on the statutory violations because the Supreme Court

10   has said that if there is a statutory violation that that's the

11   first thing that a court would ordinarily look at.

12        We have two separate different statutory violations

13   that we have asserted; they're independent and mutually

14   reenforcing.  The first is Section 1152.  Section 1152 provides

15   clearly, quote, no person shall be discriminated against in the

16   issuance of an immigrant visa because of the person's

17   nationality.

18        And when the DC circuit, the Judge Sentelle writing in

19   the Legal Assistance case, considered the statute, he said the

20   following:  That the law, quote, unambiguously directs that no

21   nationality based discrimination shall occur.

22        And when one looks at this new executive order, it

23   says, quote, nationals of six countries are presumptively

24   ineligible for visas.  And if that isn't discrimination because

25   of nationality, then it seems to me that nothing really is.

1          THE COURT:  What about nonimmigrant visas?  What about

2     the refugee provisions of the order?

3          MR. KATYAL:  Absolutely.  So the government does admit

4     that if our theory was accepted it would cover, at the very

5     minimum, immigrant visas which are approximately 30 percent of

6     all visas; so that would at least have to be struck down.

7          But as our brief explains, there is a long standing

8     rule on immigration that immigration officials can only look to

9     relevant factors.  And the statute that I read to you, Section

10    1152, is landmark legislation of 1965 that really changed the

11    the rules of the game and said that nationality based

12    discrimination is impermissible, not just for immigrant visas

13    but also for nonimmigrant ones.

14         And that starts with Judge Friendly's opinion in 1966

15    in the Wong Wing Hang decision.  And it goes further.  Indeed

16    it goes so far that even the federal government itself, in the

17    Olsen case, admitted that they, quote, were not permitted to

18    engage in discrimination on the basis of race, ethnicity, or

19    nationality in the issuance of nonimmigrant visas.  So it would

20    cover certainly, Judge Watson, all of the provisions in Section

21    2 that both for immigration and nonimmigration visas together.

22         The second statutory violation that we assert is a bit

23    more complicated, but it's quite important, and that is the

24    fact that the immigration laws in Section 1182 and 1185 set out

25    a certain scheme, as Justice Kennedy put it in the Din case,

1    specific criteria for determining terrorism related

2    inadmissibility.

3         THE COURT:  Before you get there, Mr. Katyal, why is

4    it that I can't read and harmonize 1152 with the statutory

5    provision 1185(f) that the government cites me to for the

6    proposition that the executive in fact has what is -- sounds

7    close to unfettered discretion to suspend the entry of aliens

8    as he has done in this series of executive orders?

9         MR. KATYAL:  I completely agree, Your Honor, that

10   you'd have to reconcile them, and I think the reconciliation is

11   very easy.  Section 1152 is a flat and comprehensive and

12   specific bar, and it gives -- and 1182 by contrast just gives

13   the president the ability to cover certain classes.  There is

14   nowhere in there that it authorizes nationality based

15   discrimination, and we know that because actually 1152, this

16   landmark law, actually had four exceptions in it.  But there is

17   no exception for 1182 generally; there is a specific exception

18   for Panamanians in the 827.

19        So when congress wanted to write a nationality

20   exception, they knew exactly how to do so and indeed they did

21   in the text of 1152.  And so I completely agree, Your Honor,

22   that the statutes have to be reconciled, but that's very easy.

23   That is to say, the president has broad powers under 1182, but

24   it doesn't extend to undoing congress's flat prohibition on

25   nationality based discrimination.  It would require something

1 very explicit and clear for that to happen.

2          If I could, and I apologize because I can't see you

3 physically; but if I could turn to the second statutory

4 argument, or would you like to ask any other questions on 1152?

5          THE COURT:  With regard to 1152, I'd go back to the

6 first question that I asked you.  What about the Section 6

7 provisions of the executive order would be prohibited by 1152?

8 The refugee provisions is what I'm talking about.

9          MR. KATYAL:  Correct.  I don't think we're making an

10 argument about the refugee provisions with respect to 1152.

11 It's really about defection to an immigrant and nonimmigrant

12 visas, and that is what our brief focuses on.

13          THE COURT:  All right.

14          MR. KATYAL:  With respect to this other statutory

15 argument, congress has established specific criteria, as

16 Justice Kennedy has said, for determining terrorism related

17 inadmissibility.  And that is a reticulated, very complex

18 scheme, and it requires a reason to believe that an individual

19 has engaged in terrorism offenses.

20          The executive order, by contrast, just as mere

21 nationality is enough, and the most important point here is

22 that two years ago congress specifically considered terrorism

23 risks from Iraq and Syria, and the solution was to require

24 visas from those two countries.  And the solution was to say,

25 Mr. President, you have the ability to add more countries to

1   this visa list.  So congress has considered the very same

2   evidence that the executive order relies on, not just the same

3   problem, and its determined that there is a terrorism bar in a

4   specific complex statutory scheme that must be followed.

5         There is nothing in law that says the president can

6   add to that scheme in derogation and supplant what congress has

7   done.  The constitution does not give the president powers over

8   immigration.  Article I, Section 8 of the constitution vests

9   congress and puts it in the driver's seat here. And if there is

10   any decision to read in this case, I think that Abourezk, the

11   DC circuit decision written by then Judge Ginzburg, is the key

12   case.

13         Because what that says, particularly in footnote 2,

14   which I think the government has misread, is to say that the

15   president can't add new categories to his 1182(f) power.

16   That's something that congress has thought about then and dealt

17   with.  Then the president doesn't have the ability to supplant

18   that statutory scheme, or as then Justice Ginzburg put it, to

19   swallow the whole statute.  And that is effectively what the

20   government has done here.  They have taken and removed what --

21   they removed congress's specific criteria for terrorism related

22   inadmissibility and replaced it with a flat prohibition.  And

23   whatever the powers of the president may be, they do not extend

24   that far.

25         If there are any questions on this I can answer;

1   otherwise, we will follow, Judge Watson, your lead and move to

2   the constitutional claims.

3        THE COURT:  One other question in this particular

4   area.  Now, the plaintiffs have invited, and in I think a fair

5   reading, have urged me to rule in their favor on the statutory

6   grounds that you've just argued and not reach the

7   constitutional questions.  I don't know that you fear me

8   reaching the constitutional questions, I don't mean to suggest

9   that, but that you assert that it's not necessary.

10       The same or very similar iterations of the statutory

11   argument have been presented to other courts including by

12   Hawaii to the Washington panel in the Ninth Circuit.  Yet I'm

13   not aware, and I'm wondering if you are, of whether any other

14   court has in fact reached these questions one way or the other?

15       MR. KATYAL:  We are not aware that there has been a

16   square holding with respect to either executive order.  And I

17   certainly agree with you, Your Honor, we aren't by any means

18   suggesting, as the government insinuates, that we're afraid of

19   a constitutional ruling by you at all.  We do think that, as

20   we'll do here in a moment, the Ninth Circuit decision on this

21   in Washington versus Trump is absolutely compelling.

22       We have been presenting it to you this way as a matter

23   of ordering based on what the Supreme Court has said about the

24   constitutional avoidance doctrine, which I don't think has been

25   fully teed up in the other cases.  But we are more than happy

```
 1   to talk about the constitutional violations and explain why
 2   this is a flat prohibition -- why the constitution flatly
 3   prohibits what President Trump has done here.
 4        THE COURT:  All right.  But to answer my question, you
 5   are not aware of any other court having addressed these
 6   statutory arguments?
 7        MR. KATYAL:  Correct.  I don't think anyone has
 8   reached them.  I think there have been some questions in oral
 9   argument from them, but I think they've all found it
10   unconstitutional for other reasons, and those reasons are
11   pretty clear as you'll hear about it in a moment.
12        THE COURT:  All right.  Before we turn to Ms. Sinzdak
13   you had mentioned, Mr. Katyal, at the beginning of your
14   remarks, that you also were intending on addressing the TRO
15   standard?
16        MR. KATYAL:  Correct.  And I can either do that now or
17   I can do that after the merits, whichever you would prefer.
18        THE COURT:  Whichever you prefer is fine with me.
19        MR. KATYAL:  Well, Your Honor, how about if we, just
20   following your lead, we'll do the constitutional points first
21   because you had expressed an interest in that, and then any
22   questions you have about the other TRO factors I'll be happy to
23   answer.
24        THE COURT:  All right, Ms. Sinzdak.
25        MS. SINZDAK:  Thank you.  May it please the Court.
```

1   Colleen Sinzdak for the plaintiffs. I will address the

2   establishment clause and due process issues.

3          Just last month, the Ninth Circuit recognized the

4   serious constitutional deficiencies presented by the executive

5   order barring the entrance of nationals from certain Muslim

6   majority countries.  The government contends that the revised

7   order have remedied these defects, but it has not.  Perhaps

8   most clearly the order has not altered the underlying policy of

9   religious discrimination that prompted the original order.

10         To the contrary, the administration has asserted the

11  new order accomplishes, quote, the same basic policy.  Because

12  the new order, like the old, is motivated by religious animus,

13  it must be invalidated.  And because the establishment clause

14  injury is already occurring and is irreparable, the order must

15  be immediately enjoined.

16         When the government announces its hostility towards a

17  particular faith and then makes policy embodying that

18  hostility, courts must intervene.  Otherwise, the atmosphere of

19  religious freedom that is guaranteed by the first amendment may

20  be permanently harmed.

21         THE COURT:  And who has the standing in this case, if

22  anyone, as between the two plaintiffs, to assert that claim?

23         MS. SINZDAK:  Both, Your Honor.  We believe that the

24  state has standing to assert an establishment clause violation.

25  Justice Thomas had sometimes argued that it is exclusively the

1    state's that the establishment clause is designed to protect.

2    Other members of the court have not been willing to go quite

3    that far, but I think there is no question that the framers

4    intended, in part to the establishment clause, to protect the

5    state and the states' residents from any federal government

6    establishment of religion.

7         THE COURT:  Well, it would seem to me that the

8    Washington panel would beg to differ.

9         MS. SINZDAK:  I think I would disagree.  I believe

10   what happened in the Washington case is that they held on due

11   process grounds.  And because there's a very strong presumption

12   against unnecessary constitutional rulings, the court then did

13   not also hold on the establishment clause grounds.  But I don't

14   think anything in the opinions suggest that the court did not

15   believe there might be a very serious establishment clause

16   violation.  In fact, the court said that the allegations were

17   very serious, and it said that there were serious

18   constitutional questions raised.

19        THE COURT:  I'm not speaking of the merits of the

20   establishment clause argument; I know what the circuit said

21   with regard to that.  I'm speaking of the standing issue;

22   that's the question that I posed.

23        MS. SINZDAK:  Sure.  I think that they were tailoring

24   their standing arguments to the merits decision that they were

25   going to reach, because in general you have to have standing to

1    bring the particular claim that they were able to get relief

2    on.  And so I think because their merits decision was focused

3    on due process, their standing discussion was similarly focused

4    on due process.

5          But, again, I don't think anything that they said

6    would suggest that the states wouldn't have standing to reach

7    the -- wouldn't have standing to bring the establishment

8    clause.  In fact, I believe that the very facts that they

9    address the issue, without mentioning any concerns about

10   standing, indicates that they did think that there was standing

11   to raise the establishment clause issues.  The Supreme Court

12   has been very clear that a court may not reach the merits

13   unless there is standing.  So the fact that we even have that

14   discussion in the Ninth Circuit opinion demonstrates that there

15   is standing here.

16         Just to return, I also want to emphasize that

17   Dr. Elshikh certainly has standing in this case.  He, along

18   with all of the Muslim residents of the State of Hawaii, now

19   face higher hurdles in uniting with family members because of

20   their Muslim faith.  And when citizens in general are made

21   aware that their government can infringe on their rights based

22   on religious animus, their ability to practice the religion of

23   their choice suffers.  This is not merely a harm to Muslim

24   citizens of Hawaii to the State of Hawaii, but it is a harm to

25   those in the United States as a whole.  And, in fact, it's

1   precisely the harm that the first amendment was designed to

2   prevent.

3         There is more than ample evidence that the executive

4   order was motivated by religious animus.  That evidence comes

5   from the face of the order itself and from the numerous

6   statements of President Trump and his administration about his

7   intent to implement a Muslim ban.  The Ninth Circuit

8   specifically recognized that these statements may be considered

9   in evaluating an establishment clause violation.

10        To take just a handful of the most significant

11  statements, which are catalogued more fully in our second

12  amended complaint, while campaigning, the president announced

13  an intention to impose a Muslim ban.

14        THE COURT:  I'm very familiar with those statements.

15  What on the face of the document -- since that's what you said

16  a minute ago, what on the face of the document gives you pause

17  in so far as an establishment clause violation is concerned?

18        MS. SINZDAK:  Sure.  I think, first of all, it's

19  contextual; so I'm going to point to several elements of the

20  document that do give me pause or give the state pause.  But I

21  want to emphasize that the document, in a very different

22  context, might be constitutional, and that's consistent with

23  what both the Ninth Circuit and the Supreme Court have

24  consistently held.

25        But on the face of this particular order, we find that

1    it's reaching six countries, all of which are Muslim majority.

2    It uses terms and targets conduct that is typically associated

3    with Islam, particularly negatively.  And those terms include,

4    for example, honor killings and the risk of people being

5    radicalized.  And also importantly I think the fit between the

6    announced secular purpose and the policy that actually has been

7    enacted is so poor that even the Department of Homeland

8    Security has recognized that this order is not a good means of

9    combating terrorism.

10        And in this regard, I think this situation is very,

11    very similar to the one that the Supreme Court addressed in the

12    Church of Lukumi.  In that case, the court first looked to the

13    face of the document, it acknowledged that the document was

14    intended to be facially neutral, but it found certain clues --

15    it found certain words in the document that suggested a

16    religious purpose, it also found that the fit between the

17    stated secular purpose and the actual implementation and

18    operation of the statute was very poor.  And again that's

19    precisely the situation we have here.

20        But the Supreme Court did not stop there.  It moved on

21    and it assessed the context of the passage of the ordinances.

22    And it looks to a wide variety of context evidence including

23    even, for example, the reaction of the crowds to the negative

24    religious rhetoric that was used at a council meeting

25    discussing the order.

1          So I think the context here similarly, in combination

2     with an order that gives certain clues on the face of the

3     document, is more than sufficient to demonstrate an

4     establishment clause violation.

5          If the Court has no other questions on the

6     establishment clause, I could address the due process claims;

7     but I'm more than happy to keep talking about the establishment

8     clause.

9          THE COURT:  I don't think you need to go any further

10    with establishment clause.  I would point out a couple of

11    things.  The context is far stronger for the state than the

12    text of the document.  There's -- some of the things that

13    you're pointing to, as far as the language of the executive

14    order itself, don't give me any particular religious feeling or

15    connotation.  I'm not sure, for example, that you mentioned

16    honor killings.  I think maybe in some circumstances an honor

17    killing could reflect some reference to a religion, not

18    necessarily Islam but to a religion, but there are many

19    circumstances in which honor killings occur that have nothing

20    to do at all with religion.

21         Secondly, we had discussed, and I don't need you or

22    want you to address this any further, but we had discussed the

23    standing issue with regard to the establishment clause, and I

24    had asked you about which of the two plaintiffs, if either, has

25    the standing to assert an establishment clause violation.  And

1    you said that the circuit discussed in part the merits of the

2    establishment clause argument suggesting or inferring that

3    someone had standing.

4           I'm not doubting that someone has standing, that

5    doesn't answer my question though.  And more specifically

6    footnote 4 of the Washington versus Trump panel opinion

7    gives -- is what I was suggesting you might want to consider in

8    terms of the Ninth Circuit seeming to have reservations with

9    regard to whether the state has sufficient standing to assert

10   this particular claim.

11          Again, I don't expect you to address that any further,

12   and you may proceed to your due process arguments.

13          MS. SINZDAK:  Sure.  I only very quickly want to touch

14   on those two points.  First of all, in the standing case --

15   with respect to standing, there were only two plaintiffs before

16   the Ninth Circuit and both were states.  And the standing

17   decision there of course said that the states had a right to

18   bring some of the challenges of their citizens.  But, again,

19   there were only two states there, and we are in precisely the

20   situation, actually a little bit better here, because we have

21   Dr. Elshikh who is an Islamic citizen of Hawaii.  But, if

22   anything, we believe that our standing argument is stronger

23   than in in the Ninth Circuit opinion.

24          THE COURT:  I don't disagree at all.

25          MS. SINZDAK:  Thank you very much.

1          On the second point about the text.  I agree with you

2    that, and I don't want to suggest that if this policy had been

3    enacted in a vacuum or in a very, very different context we

4    would be here arguing an establishment clause violation.  What

5    I'm saying, and I think what the Supreme Court has said, is

6    that context matters.

7          And so when you have a document that maybe has a few

8    clues, a poor fit between the stated secular purpose and the

9    real implementation, the singling out of Muslim majority

10   countries, even though some others have been -- some other

11   countries where terrorist threats exist, but you might -- that

12   in and of itself might not be enough.  But when you look to the

13   context there is certainly enough.  And I think that the Ninth

14   Circuit opinion again pointed to the fact that you do consider

15   context in an establishment clause situation.

16         To name just one piece of evidence, President Trump

17   put up on his campaign website a statement calling

18   for preventing all Muslim immigration into the United States.

19   That statement is still on the campaign website, which has been

20   updated as recently as today.  And President Trump and his

21   aides continue to tout the fact that they have met their

22   campaign promises.  So I think that alone is a lot and, as you

23   have alluded to, there is quite a bit more than that.

24         To move to the due process arguments, again, this is

25   the ground that the Ninth Circuit held on, and the government

1    maintains that they have made these changes to the order that

2    will allow it to survive scrutiny.  But they only point to two

3    major alterations.  The first is that they claim that --

4    correct me, the order has been narrowed in terms of the scope,

5    but it hasn't been narrowed enough.

6          And there are two reasons for that:  First, the Ninth

7    Circuit specifically singled out refugees as having due process

8    rights and the order continues to apply to refugees.  And

9    second --

10         THE COURT:  Well, the problem with relying on that

11   though, I think I know what you're speaking of, that's the

12   Ninth Circuit's reference to 8 U.S.C. Section 1231, Note 8;

13   isn't that correct?

14         MS. SINZDAK: Yes.  Yes.

15         THE COURT:  There is no Note 8.  I'm not sure you

16   looked up that section.  I'm not sure what exactly that

17   statement is based on, and there is no further discussion about

18   that in the Ninth Circuit's order.  So I'm not sure if that was

19   an error or what to make of that.  I certainly am not making as

20   much as you are.

21         MS. SINZDAK:  Certainly.  I would say though that the

22   court uses the term refugees and discusses the fact that a due

23   process challenge was brought because the refugees are not able

24   to go through the standard procedures, so it's not nearly one

25   reference.

1          I would also say that a citation, even an erroneous

2    citation, cannot change a precedent, that what the Ninth

3    Circuit said was that certain groups, including refugees, had

4    due process rights.  The Court can of course clarify its --

5    what it means by that.  But I think that it is not necessary to

6    assume that it was an error because the prior order, like the

7    order before us now, did take away the due process rights of

8    refugees seeking to enter the United States.

9          And there is another category, even if that mysterious

10   Note 8 is troubling, which the Ninth Circuit explicitly

11   recognized as having due process rights, and that is people

12   like Dr. Elshikh who are in the United States and who seek to

13   have family members come and join them here.

14         THE COURT:  This is like the plaintiff in Kerry versus

15   Din.

16         MS. SINZDAK:  Exactly.  Exactly.  And the order does

17   nothing to prevent those people from having their due process

18   rights harmed.  And so that, in and of itself, is sufficient to

19   find the due process violation here.

20         THE COURT:  Isn't it problematic though that the

21   plurality opinion in Kerry doesn't come out expressly of course

22   and say that there is such a right -- well, the decision

23   overall doesn't say that.  The plurality opinion does, but then

24   the for judge concurring opinion, or I forget how they

25   characterized it, seems to reach the opposite conclusion, and

1   so we are left scratching our head.

2          And what seems most difficult for me in this regard is

3   the procedural posture of your motion now is markedly

4   different, it seems to me, than what the burden was on appeal

5   before the Washington panel.  Doesn't that matter?

6          MS. SINZDAK:  A few things.  I think, first of all,

7   the divided opinion in Din is a bit of a head scratcher.  The

8   Ninth Circuit in Cardenas said that Justice Kennedy's opinion

9   was controlling.  And so I think I might not want to be the

10  Supreme Court trying to figure out the law, but in the Ninth

11  Circuit certainly it's clear that Justice Kennedy's standard

12  applies.

13         THE COURT:  But Justice Kennedy didn't reach the

14  question of whether there was a due process right either.

15         MS. SINZDAK:  He assumes that there was one.  And

16  again the Ninth Circuit did not question that in any way.  The

17  Ninth Circuit affirmed an order in which a judge had enjoined

18  the prior executive order based in part on the due process

19  rights of citizens within the United States.

20         So I think that in the Ninth Circuit it is clear that

21  those citizens have due process rights.  Not just those

22  citizens, but also institutions which have due process rights.

23  And I would point out that in the Mandel case that was relied

24  on heavily in Din the right there was a first amendment right

25  of members of the university to have a scholar come and visit,

1   and that was a first amendment concern.  And Justice Kennedy

2   said that the inquiry there was the same inquiry that was

3   driving him in Din.

4        Here, we certainly have this -- a state with many

5   universities just as in Washington versus Trump, and those

6   universities have a first amendment interest in allowing these

7   individuals from the other countries to come in and enrich

8   their communities.  And so they at least have due process

9   claims.

10       THE COURT:  Well, let's assume, for purposes of the

11  discussion, that you're right, that there are due process

12  rights in refugees, and let's just say others for now, what is

13  constitutionally infirm about the process that is described in

14  the executive order?

15       MS. SINZDAK:  There is not one is part of the problem.

16  The government has pointed to the waiver provision as what was

17  done to distinguish the due process problems.

18       THE COURT:  Well, if there isn't one, then why isn't

19  this more properly brought as an as-applied challenge?

20       MS. SINZDAK:  Because it is unconstitutional in all of

21  its applications, because it denies all of those who are

22  subject to the order of their due process rights.  So it's not

23  necessary to have an as-applied challenge for the same reason

24  that it wasn't necessary to have an as-applied challenge in

25  Washington versus Trump.

 1            THE COURT:  I'm not sure I follow.

 2            MS. SINZDAK:  Sure.  So because the order deprives

 3    everyone that it affects of their due process rights.  So

 4    because the order is unconstitutional in all of its

 5    applications, then there is no need to have an as-applied

 6    challenge.  We're in the same posture as in the prior

 7    litigation where this challenge was allowed to move forward.

 8            Again, all that the government has said in terms of

 9    why this is different is the waiver provisions.  And the waiver

10    provisions all they say is that consular officers may consider

11    whether to give a waiver, and they could give a waiver based on

12    certain factors.  That is certainly not a set of procedures for

13    immigrants -- for would be immigrants to go through in order to

14    come into the United States.  So again, the due process

15    violation is the same.

16            If there are no further questions on this?

17            THE COURT:  Well, what about the burden issue that I

18    asked about before?

19            MS. SINZDAK:  Sure.  Yeah, that's a good question.

20    And certainly the burden had shifted at the time of the Ninth

21    Circuit, but there is -- I don't think the opinion is relying

22    heavily on the burden.  And, in particular, the district court

23    in Washington, of course the burden was on the state plaintiff,

24    and he still had no difficulty in determining that there was a

25    constitutional violation.  So I don't think the burden is what

1    is doing the work in this case.

2           THE COURT:  Well, there is a big difference.  I'm

3    obligated to follow what the Ninth Circuit says I'm not with

4    regard to Judge Robarts, right?

5           MS. SINZDAK:  That is certainly true, but I think that

6    in this case Judge Robart acted correctly in recognizing that

7    whoever has the burden, there is a due process violation.  And

8    I would also say that whoever has the burden, there is a clear

9    establishment clause violation.  And so on either of those

10   constitutional grounds the order should be enjoined.

11          THE COURT:  All right.  Mr. Katyal, you wanted to

12   address one last thing before we turn it over to Mr. Wall?

13          MR. KATYAL:  Sure.  If there's any questions on the

14   TRO standards, the public equities and the like, I would be

15   happy to answer them, irreparable harm, anything that you got;

16   otherwise, I would be happy to turn it over to Mr. Wall, Your

17   Honor.

18          THE COURT:  All right.  Mr. Wall.

19          MR. WALL:  Thank you, Judge Watson.  May it please the

20   Court.  Jeffrey Wall for the United States.

21          As you know, the Ninth Circuit had concerns about the

22   revoked order.  It asked the executive to narrow it, and rather

23   than continue to litigate, the president consulted with three

24   cabinet level officials and responded directly and serially to

25   the Ninth Circuit's concern.  And yet despite all the fairly

1   substantial changes to the order, we're right back where we

2   were before with the plaintiffs asking for the same

3   extraordinary relief, which is to say a facial nationwide

4   injunction against any portion of the order that suspends the

5   entry of any alien.  And the plaintiffs have spent most of

6   their time so far talking about the merits.

7          And I'd like to reverse the order, if I could, and

8   talk first about why we're here and whether in fact there is

9   any immediate irreparable harm that requires the entry of a TRO

10  today before the order takes effect, and then if I could turn

11  to the merits and talk both about the statutory claims and the

12  constitutional claims.

13         The plaintiffs have said very little about harm today,

14  and I think there is a reason for that.  And I just want to say

15  three quick things if I could.  The first is that for both of

16  the plaintiffs their harms are very speculative within the time

17  frame that would be covered by a TRO.  We know that

18  Dr. Elshikh's mother-in-law can seek a waiver as part of the

19  visa application process.  So she'll go through the normal visa

20  application process and when she gets to her visa interview at

21  the end of that process with a consular officer, and we don't

22  know from plaintiffs' pleadings exactly when that is, they of

23  course bear the burden of showing irreparable harm.  But

24  whenever that interview occurs, as part of that interview she

25  will be asked a series of questions, and she will at that time

 1   have the ability to demonstrate her eligibility for a waiver.

 2           Unless and until that waiver is denied, which could be

 3   well out in the future, we don't know or it could be granted

 4   based on their pleadings, she may well be eligible for one.

 5   There is no harm at all it let alone an impending harm that

 6   would require a TRO over the next few weeks.

 7           And Hawaii of course is even more speculative because

 8   it's not pointed to anyone specific who make wishes to enter

 9   let alone someone who can't get the waiver.  And in its reply

10   brief, the state doesn't even try to point to anyone.  It just

11   says the Ninth Circuit decided the standing question.  But of

12   course, Your Honor, as you were pointing out, the Ninth Circuit

13   not only labeled its standing discussion preliminary, but the

14   burden of course was on the government at that point seeking a

15   stay.

16           Here the burden is on the plaintiffs, and even still

17   the revoked order was broader.  So the State of Washington

18   could point to current students or faculty who actually would

19   have been affected by the revoked order.  And Hawaii doesn't

20   have anything like that.  Basically Hawaii is just pointing to

21   the kind of generalized harms that would happen any time the

22   federal government tweaked the immigration laws, which is to

23   say fewer people of particular kinds might be coming into

24   Hawaii and elsewhere, and that's really at bottom all the state

25   has got.

1          Because you asked about the establishment clause

2     claim, I want to say just a word about that.  Neither of the

3     plaintiffs pretty clearly has standing on that claim.

4     Dr. Elshikh's mother-in-law, as a foreign national, doesn't

5     have rights under the establishment clause.  And the order

6     operates only against her, not against Dr. Elshikh.

7          Again, Hawaii is even further removed.  The order

8     doesn't do anything in Hawaii.  It doesn't require Hawaii to do

9     anything, it doesn't require Hawaii to refrain from doing

10    anything.  So the only thing, at the end of the day, stripped

11    of all the rhetoric, that Hawaii is actually complaining about

12    is the offense it takes at a federal executive order that it

13    happens to believe violates the establishment clause.  And

14    although it's entitled to that judgment, it doesn't give Hawaii

15    standing to raise an establishment clause violation.

16         Now, Hawaii had tried, through third-party standing,

17    to raise the due process claims.  But as I read Hawaii's reply

18    brief, they've effectively abandoned the third-party standing

19    argument, which I think is a wise concession, because they

20    don't have a close relationship to the aliens affected by the

21    order, there is no hindrance to people in the United States

22    like Dr. Elshikh raising those claims themselves.  And on any

23    of these theories they run smack into the doctrine of consular

24    non-reviewability, which plaintiffs have just steadfastly

25    refused to address.  The alien that Kemal (phonetic) herself

 1    cannot seek judicial review of the denial of a waiver.

 2         So it would be passing strange if relatives in the

 3    United States could do so, or if Hawaii could do so on behalf

 4    of residents of Hawaii who have relatives or close family

 5    members abroad.  So Hawaii is two degrees removed from a

 6    nonreviewble decision, and Dr. Elshikh is one degree removed.

 7         But no matter how you do the math, you can't get

 8    around the doctrine.  And even if they could get the standing,

 9    I think the United States' basic submission here is none of

10    this amounts to a need for emergency relief.  None of this is a

11    harm that plaintiffs had demonstrated is somehow special or

12    unique over the next couple of weeks such that this Court has

13    got to enter a TRO against the order.

14         THE COURT:  If I were reading the record in a vacuum

15    with regard to standing and the speculativeness of some of what

16    the state asserts, the harm to the citizens of Hawaii, the harm

17    to the aloha spirit to the diversity that the state wishes to

18    foster in the communities, the type of quasi sovereign

19    interests that I think some of the case law and some of the

20    commentary describe, if I were to agree with you, in fact I'm

21    not sure that I disagree with you quite frankly, Mr. Wall, on

22    many of those fronts, the difficulty though that I face with

23    regard to standing is with the Washington order.

24         The Washington order seems very, very close, if not on

25    all fours, with regard to the State of Hawaii's standing in

1    this case and how it aligns with the State of Washington and

2    its presentation before that particular panel.

3          And I'm bound, that doesn't depend on the burdens that

4    I've mentioned, and there are several aspects of the Ninth

5    Circuit's ruling that doesn't as well.  But certainly with

6    regard to standing, I feel that I'm constrained in many regards

7    by the panel opinion that is only a few weeks old.

8          MR. WALL:  Judge Watson, I take your point.  I guess

9    I'd say a couple of things.  It's pretty clear, at least for

10   the establishment clause, as you point out in footnote 4, the

11   Ninth Circuit did not decide that, and I don't think there is

12   even arguably a ruling there that binds you.  I think the most

13   that could be drawn from the Ninth Circuit's order is on the

14   due process side.  Again, the court didn't consider the

15   statutory claims, so we're just talking about due process.

16         And for the standing on due process, I take your

17   point, but I guess I take two things that I really think are

18   pretty critical.  The first is the burdens were different, and

19   so I really do think that matters because the burden was on the

20   government there, and here the burden is on the plaintiffs.

21   And so they've got to demonstrate it through their pleadings.

22         So if you're sympathetic to our argument that they

23   haven't done that, because they basically just pointed to what

24   I'll call dignitary or quasi sovereign harms, then I don't

25   think there is anything in the Ninth Circuit's opinion that

1   would keep you from finding that they haven't met their burden.

2         And the second thing, which may be even more

3   important, is that because the revoked order was broader and

4   covered -- at least in the Ninth Circuit's interpretation --

5   covered classes of aliens like lawful permanent residents that

6   have due process rights.  There really was a much closer

7   connection there between the state and the affected aliens,

8   because they were pointing to lawful permanent residents who

9   were students and faculty, and they were saying that they were

10  going to have trouble traveling out of the country, they were

11  currently out of the country, and they were going to have

12  trouble getting back in.  And so they had a pretty close

13  connection there to classes of aliens that had due process

14  rights.

15        And here we're really very different.  Not only did

16  the plaintiffs not contest that the aliens here don't have due

17  process rights, at least I didn't take them to in their briefs,

18  I couldn't tell if they were saying now that refugees had due

19  process rights.  If they were, we disagree with that.  We think

20  the law is clearly to the contrary.  But not only do the

21  affected aliens here not have due process rights, but Hawaii

22  can't point to anyone specific at all.  It's just making

23  generalized allegations that some unspecified number of unnamed

24  aliens may, at some point in the future, wish to come into

25  Hawaii for various reasons and not be able to do so.  And with

1   all respect, Judge Watson, I think that's pretty different from

2   what was going on in Washington.

3           Again, under a different burden, but even setting that

4   to the side, I just think the facts here and the allegations

5   are far weaker than what you had in the Washington case.  And

6   the one thing I would stress is, even if that were enough to

7   get them the standing, none of it gets them to the irreparable

8   harm they would need for emergency injunctive relieve.  And

9   even if it did, I guess the one thing -- or two things I would

10  want to stress is it shouldn't be facial, because many of the

11  applications of the order are going to be perfectly lawful.

12  And so as you say, the appropriate course is for as-applied

13  challenges when aliens, if and when, they are denied waivers,

14  and then courts can decide those questions on a more developed

15  record once we actually know what the claimed injury is.

16          And also it shouldn't be nationwide.  It has to be, as

17  a matter of Article III and principles of equitable relief,

18  it's got to be tailored to the violations that the plaintiffs

19  here are complaining about, which is to say violations tied to

20  either Dr. Elshikh or Hawaii's universities.

21          So we would urge the Court not to enter -- not to

22  enter injunctive relief at all, frankly; but if you are

23  inclined to do that, not to make it nationwide because that

24  would preempt other suits which, as you say, are going on

25  around the country, and it would have the effect of draining

1   relief to parties that are not before the court.  And that's

2   really what I had on the harm piece of it.

3         And so before I turn to the merits, let me stop there.

4   But if the Court has no further questions on the harms and

5   standing, I'm happy to turn to the merits.

6         THE COURT:  Please do.

7         MR. WALL:  Thank you, Your Honor. I intended to start

8   with the constitutional claims, but I'll start with the

9   statutory claims because I want to say just a little bit about

10  them because I think that the plaintiffs' arguments are not

11  just fairly, clearly wrong but dangerously so.

12        No court, as far as we can tell, has ever read any

13  limitation into Section 1182(f), and that would, I think, set a

14  highly -- a very dubious constitutional precedent by

15  restricting the president's authority to suspend the flow of

16  aliens he deems dangerous to the United States.

17        I think plaintiffs have committed themselves to the

18  view that if the president got actionable intelligence tomorrow

19  that, let's say a Yemenee national, but we didn't know anything

20  more about him, was attempting to smuggle a bomb into the

21  country, that the president could not, under 1182(f),

22  temporarily suspend the entry of Yemenee nationals into the

23  United States.  And that's exactly the power that 1182(f) has

24  always been understood to vest in the executive, consistent

25  with his constitutional authority over national security and

1    foreign affairs.

2         So I think, from the United States' point of view, the

3    statutory claims here are quite dangerous from a constitutional

4    perspective.  And that is itself a reason not to read the

5    statutes that way to the extent you find them ambiguous.  In

6    addition to the fact that the president gets deference in the

7    interpretation of 1182(f), and the attorney general is charged

8    by statute, and I think this is in 1103, with controlling

9    deference is what the statute says in the interpretation of the

10   immigration laws.

11        So I just wanted to put those two background

12   principles out there of constitutional avoidance and deference

13   to the executive in interpreting the immigration laws that's

14   sort of the framework for the discussion.  Because remarkably

15   plaintiffs say at page 8 of their reply that this doesn't even

16   raise a constitutional question.  And in our view that's

17   entirely wrong.

18        Just to take 1152 first, on its face it only applies

19   to immigrant visas.  And even then it does not apply to

20   procedures, and that's pretty clearly what we have here because

21   the president is saying, in consultation with the attorney

22   general and the secretary of the state and Homeland Security,

23   that we're going to take a brief pause to make sure that the

24   procedures we have in place for the nationals from these listed

25   countries are adequate to insure we're getting reliable

1    information such that we can separate out anyone who presents a

2    threat to the United States.  And I think any time you put in

3    place a pause in procedures so that you can examine the

4    procedures and make sure you've got them right, that is by

5    definition a procedural change, not a substantive change.

6         So we don't read 1152(a) to apply at all.  But even if

7    we are wrong about that, it could at most apply to immigrant

8    visas.  The other side makes a lot of trying to extend it to

9    nonimmigrant visas.  And I want to be very clear about that

10   because the United States government draws nationality based

11   distinctions all the time when it comes to nonimmigrant visas,

12   and indeed that's exactly what the visa waiver program does.

13   It says that nationals from some countries are not required to

14   give visas and nationals from some countries are.

15        And so when the previous administration took these

16   listed countries and took their nationals out of the visa

17   waiver program, it was very much making a nationality based

18   distinction with respect to nonimmigrant visas.  Now no one has

19   contended that was religiously based.  Everyone seems to

20   recognize that the previous administration did that because it

21   thought that the governments in these troubled countries might

22   not be providing us with reliable information, and so we needed

23   to make sure that their nationals got visas.

24        Now, this administration has gone a step beyond that.

25   It's taken a look at the same countries and the same risk and

1    it basically said it's willing to tolerate a lower degree of

2    risk.  So in addition to taking the nationals out of the visa

3    waiver program, it wants to put their entry on hold, subject to

4    case-by-case waivers for a brief period, so that it can take a

5    hard look at the procedures.

6           And granted that is a step further than what the

7    previous administration did, but I think it is a difference of

8    degree and not of kind.  And, importantly, what both

9    administrations did was very much nationality based with

10   respect to nonimmigrant visas.  No one has ever understood 1152

11   to apply to that.

12          And then I guess my third and fallback and final

13   argument is, even if you did, 1182(f) has always been

14   understood as a catchall authority that's not limited by 1152.

15   And so looking at the history of 1182(f), you have of course

16   Reagan's order on Cuban nationals, you have orders on

17   Panamanian nationals and Nicaraguan nationals.  Those orders

18   also drew other distinctions in addition to nationality, but

19   they drew the nationality distinction too.

20          And so I think the basic message to the Court is

21   nationality based distinctions are common in immigration law.

22   It's often how we make judgments based on the country from

23   which people are coming.  And 1182(f) is no different in that

24   respect.  It's always been understood as a catchall authority

25   for the president to take action when he deems it in the

1   national interest, and I think plaintiffs' attempts to limit

2   that are not just wrong but dangerous.

3       THE COURT:  Were any of those prior orders based on

4   nationality -- Cubans you mentioned, I think you said

5   Panamanians as well -- were any of those prior actions by the

6   executive challenged in the courts?

7       MR. WALL:  Your Honor, that's a good question.  We

8   have not been able to find a record of challenges to those; so

9   I don't think that there is developed case law.  I do think

10  that with the Haitian situation, obviously in the Sale case,

11  that went up to the Supreme Court, now that was an order that

12  dealt with unlawful entry by sea.  So I suppose that the

13  plaintiffs could say, well, it wasn't a nationality based

14  distinction, but of course it was aimed at the Haitian migrants

15  coming in by sea.  And the Supreme Court in Sale deemed it,

16  quote, perfectly clear, unquote, that there was no problem with

17  the executive setting up a naval blockade to stop Haitian

18  migrants from coming into the country.

19      Now, I do think -- I want to acknowledge, Your Honor,

20  because I think it's a fair question, I don't think that in

21  that case, or a lot of others, people were bringing the

22  statutory arguments that the plaintiffs are here.  I think

23  these arguments are novel, and I don't think they have been

24  fleshed out in the courts.  But I want to point out that I

25  think the novelty cuts against the plaintiffs, not for them.  I

1   think the reason we haven't seen these challenges is no one has

2   ever understood 1182(f) to be limited by either 1182(a) or

3   1152(a).

4        And so I think plaintiffs have come up with some sort

5   of creative lawyering, but I think when you dig behind it it's

6   not consistent with how these statutes have worked over a very

7   long period, and we have some pretty settled understandings

8   built up.  And so I think that's the fairest answer I can give

9   you about where we are.

10       If I could just turn very quickly to 1182(a), couple

11  of things.  First, the class of aliens here is not covered by

12  1182(a).  The president is not suspending the entry of

13  nationals from these countries because he believed them all to

14  be terrorists or likely terrorists.  He's suspending them

15  because they come from countries whose governments may not be

16  providing us with reliable information.  Now, that may be the

17  same area of general concern at most that a3B touches on.  But

18  as plaintiffs say in their brief, there's no problem with using

19  82(f) on the same areas of general concern.  So I just don't

20  think it doesn't do what a3B actually does.

21       Second, even if you thought it did, a3B is an

22  exclusion.  It doesn't mean somebody is entitled to be admitted

23  to the country.  You can still be excluded under any other

24  provision in 1182, including 1182(f), and that's just the way

25  the system has always worked.  And I'd encourage the Court -- I

1    agree with Mr. Katyal that Abourezk is a very important

2    decision.  We just read footnote 2 of that decision very

3    differently.  Because the court, after saying the executive

4    couldn't do it under the specific subsection, said, but it's a

5    very different question whether the president could do it under

6    his sweeping proclamation power under 1182(f).

7            And since what you were talking about there was people

8    who were clearly, unlike here, picked up by a specific

9    subsection, because they were members of the Cuban communist

10   party, and the specific subsection dealt with members of the

11   communist party, I think then Judge Ginzburg left no doubt,

12   taken fairly and in context, that 1182(f) is the catchall

13   authority that I'm describing.

14           And, again, even if you didn't buy any of those

15   arguments, our fallback is still, if you limit it, it presents

16   really serious constitutional concerns, and that's the reason

17   to avoid their reading.

18           And that's really that's all I wanted to say on the

19   statutory claims.  Unless the Court has questions, I'll move

20   quickly to the constitutional claims.

21           I'll start with the due process challenge, because I

22   think now that we have the reply brief, the plaintiffs'

23   arguments have shifted over time, and I just want to say three

24   things about it.

25           The first is the plaintiffs can't assert due process

1      claims with respect to the entry of aliens affected by the

2      order because those aliens have no due process rights.  And so

3      recognizing that, they try to assert the due process rights of

4      citizens here as well.  And we'll concede, though we dispute

5      that it is correct, but we will concede that the Ninth Circuit

6      sit and read Din in a case called Bustamante to say that a

7      citizen's spouse has a due process right.

8           But the treatment of spouses is based on the

9      fundamental right to marry.  And courts have now extended due

10     process rights outside of the spousal relationship.  So I think

11     for them to take Din and say, well, Dr. Elshikh has a due

12     process right in the entry of his mother-in-law, I think that

13     is well beyond where the court went in Din, in Justice

14     Kennedy's opinion, or where the Ninth Circuit went in

15     Bustamante.

16          But even if I'm wrong about that, and this is my

17     second point, their reply brief really abandons the due process

18     argument that the Ninth Circuit adopted.  The Ninth Circuit

19     said in the pin cited, this is 1164 in the Ninth Circuit's

20     opinion, it said what due process requires, and again this was

21     for aliens that had due process rights, like lawful permanent

22     residence, it said they ought to get notice in a hearing.  But

23     in their reply brief plaintiffs specifically say, no, we're not

24     claiming that due process requires individualized hearings.

25     That's at page 15 of their reply.  And I think they are

1    recognizing that the waiver process gives whatever process the

2    constitution would otherwise require.

3          At bottom what they are really making is a substantive

4    claim.  They're not saying, we're not getting enough

5    explanation about why Dr. Elshikh's mother-in-law may not be

6    able to come into the country.  They are saying, we disagree

7    with the policy judgment, the foreign affairs judgment that the

8    president is making that may keep her out of the country if she

9    can't get a waiver.  And that's a substantive claim.  And they

10   can bring that under the statutes or they can bring that under

11   the establishment clause; but it is, at the end of the day,

12   fundamentally not a due process claim.

13         And I think that's really a crucial point that

14   separates this case from the Washington case.  Washington

15   really was making a procedural due process challenge, and I

16   read page 15 of the plaintiffs' reply brief to disavow a

17   procedural due process challenge.  And although they don't say

18   it, what they're really bringing now is a substantive claim.

19         So I guess the last thing then to talk about is the

20   establishment clause.  And, Your Honor, I don't know how much I

21   have to add to the question that you were asking the other

22   side, I mean all of the cases, including McCreary, are clear

23   that you look at the official action, you look at the text of

24   whatever the law or order or regulation is at issue, and you

25   look at how it operates.

1           And here the order doesn't say anything about

2    religion, and it applies to all aliens from the listed

3    countries regardless of religion.  And it's really not a

4    McCreary case because it's not religious on its face.  And

5    that's what the McCreary line of cases is about.  And what the

6    plaintiffs don't have is they don't have any case where a court

7    has come in and applied McCreary to something that was secular

8    on its face like what we have here.

9           The McCreary line of cases is very much about

10   religious messages, things that are explicitly religious, and

11   whether they have somehow been endowed with a secular

12   component.  And this is just different from that.  It had a

13   reference to victims of religious persecution in the revoked

14   order.  And the new order of course no longer had that.

15          And so I guess the only other thing that I would add

16   there is, you know, they really don't have anything on the

17   order because, as you say, the honor killings and all the rest,

18   we quote the human rights watch report in our brief.  But the

19   honor killings are unfortunately, sadly, not confined to any

20   religion or region of the world.  And that's a provision of

21   violence against women.

22          And so I think if you actually look at the four

23   corners of the document, sort of nothing that you could mount

24   an establishment clause claim off of, it's really just the

25   statements.  And you've got the Mandel Fiallo rule that you

1    shouldn't look behind the facially legitimate, bona fide reason

2    that the executive puts forward.  And then even if you do, it's

3    a limited exception if you take Justice Kennedy's concurring

4    opinion for bad faith.

5         But this is really the opposite of bad faith.  Because

6    unlike McCreary it's not like when the revoked order was

7    challenged the president just clung to the religious part of

8    the order and tried to dress it up somehow.  The president went

9    back, and with the attorney general and the secretary of the

10   state in Homeland Security, revised the order substantially

11   including removing that reference and disagreed with the Ninth

12   Circuit's judgment but modified the order and accommodated the

13   Ninth Circuit's concerns all the same.

14        THE COURT:  So if you have a governmental action then

15   that is on its face neutral, which I don't know that there's so

16   much dispute over whether that accurately describes the present

17   executive order, how do we assess a situation where that

18   neutrality might be a subterfuge in some way?  We close our

19   eyes to the historical context?  We close our eyes to the

20   sequence of events leading to the issuance of the governmental

21   action?  We close our eyes to the background?  Is that what the

22   Supreme Court law counsels us to do?

23        MR. WALL:  No, Judge Watson, not at all.  That's not

24   the position that we are taking.  You can have cases like

25   McCreary where you're looking at what people have done, what

1    McCreary called official acts, and so the statements in the

2    city council and the pastor who shows up when you put the ten

3    commandments on the wall.

4          But this case is very different.  The statements that

5    they are talking about go well beyond that.  There were

6    statements made by a private citizen who was campaigning for

7    office.  And several very important things have occurred since

8    then.  First, that person got elected and took an oath of

9    office to support and defend the constitution, formed an

10   administration, and consulted with three cabinet level

11   officials who have agreed with this order and whose motives

12   have never been impugned, who have never made statements like

13   this --

14         THE COURT:  But what case says that I can't look at

15   that or I can't consider that type of information?

16         MR. WALL:  Judge Watson, what I say is that McCreary

17   and other cases talk about official acts --

18         THE COURT:  I don't think the case law is so limiting.

19         MR. WALL:  Well, I guess what I would say is there is

20   no case, Your Honor, that has ever impugned a law or order on

21   the basis of campaign statements made by a private citizen

22   leading up to office.  And those statements have gotten clearer

23   over time and they've shifted and the president has made clear

24   that what he is talking about is terrorists.

25         But whether or not you agree with me on that, there is

 1    no -- I don't think any court has ever not just looked behind a

 2    law but looked past what were official acts to things said or

 3    done by people who were private citizens.

 4           THE COURT:  You don't think any court has ever done

 5    that?

 6           MR. WALL:  Well, I guess I should be more careful,

 7    Judge Watson, you're right, and say plaintiffs haven't pointed

 8    to any case in which a court has impugned a law on the basis of

 9    statements made by a private citizen in the middle of a

10    campaign.

11           THE COURT:  Yes, they have.

12           MR. WALL:  Well, I at least am not familiar with those

13    cases, Your Honor, and so I apologize if they are out there,

14    but I think --

15           THE COURT:  Didn't Judge Brinkema so find on

16    February 13th?

17           MR. WALL:  I apologize, Your Honor.  Before the

18    current round of -- before the current litigation over the

19    executive order, I'm not aware of any of those cases.  But you

20    are right that Judge Brinkema, in her opinion, did look behind

21    the law and looked at those statements.

22           But with regard to the old order, the other thing that

23    has happened here, besides the president coming into office, is

24    we have before us a very different order, an order that

25    accommodates a lot of the concerns, indeed really virtually all

1   of the concerns, that courts were raising and excises the

2   religious provision.

3       And so I think what the actual law before the Court

4   now is quite different from the law that was before Judge

5   Brinkema in her decision.  But I apologize, Your Honor, for

6   not -- I meant pre-executive order litigation.

7       But I do think, Your Honor, that having -- where you

8   have a president consulting with three cabinet level officials

9   and putting forward a national security determination that on

10  its face doesn't touch on religion, I do think it would be

11  remarkable to look behind that and to say that the president

12  and a substantial number of his cabinet level officials are

13  acting for a constitutionally improper motive.  I do think that

14  would be a fairly remarkable thing to do.

15      And I will say that the Ninth Circuit sent it back

16  obviously to the executive to narrow the order.  So although

17  the Ninth Circuit didn't say this, its decision didn't seem to

18  contemplate that if there was a problem with the order in its

19  infancy, that it could never be cured or narrowed and that this

20  was all a futile exercise.

21      The president took that invitation very seriously, and

22  I think it warrants some caution in some respect, and I think

23  it undercuts any contention at the very least that the

24  plaintiffs need emergency facial nationwide relief.  That's

25  just not the way that this litigation ought to proceed.

1          THE COURT:  Anything further, Mr. Wall?

2          MR. WALL:  No.  Thank you very much, Your Honor.

3          THE COURT:  All right, thank you for your comments.

4          Mr. Katyal you reserved a few minutes.

5          MR. KATYAL:  Thank you very much.  I think it's very

6     telling that Mr. Wall emphasizes standing in consular

7     reviewability because I think he doesn't -- he wants this Court

8     to close its eyes to what this is all about.  And I think

9     that's most telling when you see what he said about religion.

10          He said that basically that there were no private

11    citizen cases except, as he corrected it, Judge Brinkema, but

12    it's not Judge Brinkema's opinion, it's also the Ninth Circuit

13    decision in the first executive order case, Washington versus

14    Trump, which quoted all of the same Trump statements that the

15    complaint does.  And indeed the United States Supreme Court, as

16    our brief explains in Church of Lukumi, talked about the

17    reactions of the crowd.  So private citizens have always been

18    part of the context. We don't disagree, as we said in response

19    to your question before, that official action is generally what

20    you look to, but you also look to context, and that's what the

21    Supreme Court has said.

22          Now Mr. Wall says that there is no irreparable harm to

23    the state.  But, Judge Watson, we believe you're absolutely

24    correct.  The Washington decision order binds you, and you are

25    constrained, and it rejects exactly what Mr. Wall was just

1   pushing.  The government at page 10 of its brief in Washington

2   versus Trump made all the same arguments about how the state

3   had to identify particular students, particular employees and

4   so on.  The court rejected all of that and footnote 4, to be

5   sure, is ambiguous with respect to the establishment clause.

6   But the very fact that the court dealt with the merits meant

7   that they had jurisdiction, jurisdiction being the power to say

8   what the law is.  They reached it and that's enough.

9          Our declarations point out imminent threat to the

10  University of Hawaii right now.  That is, it's admission season

11  right now for the next 90 days, the school is trying to decide

12  which students to admit and which not to.  There are 40

13  applicants from Iran to one of its program.  They have to

14  decide now can they admit them or not.  And students of course,

15  come April, will be deciding precisely these questions about

16  whether to come or not.

17         With respect Dr. Elshikh's standing, it's really quite

18  striking what Mr. Wall said because I remind you about what the

19  justice department told the Ninth Circuit in Washington versus

20  Trump.  They admitted that, quote, a United States citizen with

21  a connection to someone seeking entry would be able to make a

22  constitutional challenge.  Now faced with that exact person,

23  Mr. Elshikh, they come up with things saying, oh, you can't do

24  it yet or so on.  The affidavits explain why Dr. Elshikh has

25  current injury to himself why his mother-in-law who has applied

 1   for a green card can't come in right now because if this new

 2   executive order were to go into effect that the family is

 3   devastated right now.

 4         Now Mr. Wall's answer is to say, well, there is a

 5   waiver of provision in the new executive order.  There is a

 6   waiver of provision in the old order.  The Ninth Circuit

 7   rejected that argument.  And for reasons we explained before,

 8   the waiver provision -- the last lines in the executive order

 9   say you don't even have a right to the waiver of provision.

10   They don't have to give it to you at all.  They say no right is

11   created, procedural or substantive.

12         And as Gratz versus Bollinger says, the existence of a

13   waiver is irrelevant because the injury is not being denied

14   entry but that someone like Dr. Elshikh's mother-in-law is

15   subjected to an additional barrier right now purely because of

16   her nationality.  And that's why the Ninth Circuit in cases

17   such as Oklevueha, which is cited in our reply brief at page

18   22, make very clear the existence of a waiver of provision or

19   something does not defeat standing or defeat ripeness.

20         And I'll just say a couple more things.  One is

21   Mr. Wall focused on this being an as-applied challenge, he said

22   it couldn't be facial.  But the government tried exactly that

23   argument on page 2 of its brief before the Ninth Circuit, and

24   it was rejected by the Ninth Circuit.  In this order of course

25   facially is invalid to everyone because it exceeds statutory

1    limits, it creates an establishment of religion, and it

2    violates due process protections.

3         Mr. Wall makes an argument about page 15 of our reply

4    brief saying we disavowed something in the Ninth Circuit.  I

5    think his reading on page 15 of our reply brief is about as

6    good as his case law reading about Abourezk which is to say not

7    good at all.  That is, we relied very much on the Ninth Circuit

8    holding.  The waiver provisions in this executive order did

9    zilch to someone.

10        They provide no right whatsoever to a waiver, they put

11   the burden on the person seeking it, and required national

12   interest to be shown and all sorts of other things that at most

13   just say a waiver may be provided.  Certainly due process under

14   the Ninth Circuit's decision requires more.

15        And then of course he said, relying on the Mandel

16   case, but the Ninth Circuit rejected that argument too, saying

17   of course that only applies to individualized hearings, not to

18   a broad systemic challenge like this.  And for many times the

19   Ninth Circuit has been confronted with these types of

20   challenges and has decided them facially as our brief explains.

21        Finally on the statutes, and I understand, Judge

22   Watson, you said that wasn't your focus; but I do think that

23   the arguments here sharpens the need to look at them because

24   they also show, I think quite clearly, why it's not just an

25   establishment in the procedural due process violation, but a

1   statutory one as well.

2          I take Mr. Wall to be almost conceding that 30 percent

3   of the executive order is unconstitutional.  That applied to --

4   illegal -- that applied to immigrant visas.  The only arguments

5   he makes is that, well, that's about regulating procedure, and

6   that's got to be nonsense.  I mean this is a substantive

7   regulation through and through.  It is a flat ban on these

8   people coming in.  If that's not substantive, I don't know what

9   is.

10         Mr. Wall says there's a visa waiver program for

11  nonimmigrant visas.  Absolutely.  But that's something that

12  congress set up in the statute.  We don't disagree that the

13  government can make nationality based distinctions. What we are

14  saying is that congress in landmark legislation in 1965 forbade

15  it in general except for some very specific exceptions, as in

16  this case, falls within none of them.

17         Finally, the last statutory argument about 1182(f).

18  We think the case law on this is very clear, it's the Abourezk

19  case.  And the point of Abourezk is to say if congress thought

20  about the problem, then the president is bound by that because

21  congress is in the driver's seat.

22         Mr. Wall said, well, what if there's a Yemenee with a

23  bomb and someone who is bringing it in, shouldn't the president

24  be able to close immigration to the Yemenees?  Absolutely.

25  That's precisely what we don't have here.  That is to say the

1    president has pointed to no evidence whatsoever of any new

2    thing that wasn't before congress in 2015 when it created a

3    program to deal with this exact threat about nationalities that

4    don't -- nations in governments that don't adequately screen

5    people and so on.  Of course the president's hands are not tied

6    for newfangled things, but this is the opposite.  Was that a

7    question, I'm sorry?

8            THE COURT:  No, there was no question.

9            MR. KATYAL:  We are not saying the president's hands

10   are tied to newfangled threats, but this is the precise

11   opposite of this.  Congress reviewed the very same evidence,

12   the very same threats, and it created a reticulated and

13   meticulous scheme, and if you accept their interpretation, you

14   are giving the president the powers to undo all of congress's

15   handy work something that no deference case they can cite

16   supports and particularly not when we're dealing with

17   congress's Article I immigration powers.

18           And if I could maybe just conclude with this:  Our

19   brief at pages 19 through 21 tells the story about Dr. Elshikh

20   which is really the story of America.  He is a man of Egyptian

21   descent, he becomes an American citizen, and marries a woman of

22   Syrian descent, and has a large family of wonderful children.

23   His mother-in-law living in Syria wanted to visit her

24   grandchildren and applied for a green card visa.  And when the

25   first executive order came down, the national visa center put

 1   her application on hold.

 2          And then after Judge Robart's injunction, the

 3   application moved forward only to be stymied again by the new

 4   executive order.  And Mr. Wall is right, we're now back where

 5   we started, and that's why of all the millions of words spilled

 6   on this executive order, the most important question was the

 7   simplest, and it's found at page 21 of our brief, and it comes

 8   from a child, Dr. Elshikh's child, quote, Dad, how come we

 9   can't have our grandmother like our friends?  Is it because we

10   are Muslims?

11          There was a time in World War II when similar

12   questions had to be asked, but not since, and that is because

13   the federal courts protected us.

14          We respectfully ask this Court to follow the Ninth

15   Circuit's precedent and enjoin this illegal and un-American

16   executive order.

17          THE COURT:  Mr. Katyal, I think your understanding of

18   the word "finally" is different than mine.  The matter of the

19   state's and Mr. Elshikh's motion for temporary restraining

20   order is submitted.  The Court will issue a written order prior

21   to the 6:01 p.m. Hawaii time deadline by which the executive

22   order would otherwise take effect.  We are in recess.

23          (Proceedings were concluded at 10:52 a.m.)

24

25

```
 1              COURT REPORTER'S CERTIFICATE

 2        I, Gloria T. Bediamol, Official Court Reporter, United

 3   States District Court, District of Hawaii, do hereby certify

 4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

 5   true, and correct transcript from the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the regulations

 8   of the Judicial Conference of the United States.

 9

10        DATED at Honolulu, Hawaii, March 20, 2017.

11

12

13                              /s/ Gloria T. Bediamol

14                              GLORIA T. BEDIAMOL.

15                              RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25
```