```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3
        STATE OF HAWAI'I and ISMAIL  )  CIVIL NO. 17-00050-DKW-KJM
 4      ELSHIKH,                     )
                                     )  Honolulu, Hawaii
 5               Plaintiffs,         )  March 29, 2017
                                     )  9:35 a.m.
 6           vs.                     )
                                     )
 7      DONALD J. TRUMP, in his      )  MOTION TO CONVERT TEMPORARY
        official capacity as         )  RESTRAINING ORDER TO
 8      President of the United      )  PRELIMINARY INJUNCTION
        States; U.S. DEPARTMENT OF   )
 9      HOMELAND SECURITY; JOHN F.   )
        KELLY, in his official       )
10      capacity as Secretary of     )
        Homeland Security; U.S.      )
11      DEPARTMENT OF STATE; REX     )
        TILLERSON, in his official   )
12      capacity as Acting           )
        Secretary of State; and the  )
13      UNITED STATES OF AMERICA,    )
                                     )
14               Defendant.          )
                                     )
15      _____)

16
                    TRANSCRIPT OF PROCEEDINGS
17          BEFORE THE HONORABLE DERRICK K. WATSON,
               UNITED STATES DISTRICT COURT JUDGE
18

19      APPEARANCES:

20
        For the Plaintiffs      DOUGLAS CHIN, ESQ.
21      State of Hawaii and     DEIRDRE MARIE-IHA, ESQ.
        Ismail Elshikh:         CLYDE WADSWORTH, ESQ.
22                              KIMBERLY GUIDRY, ESQ.
                                JOSH WISCH, ESQ.
23                              DONNA KALAMA, ESQ.
                                Department of the Attorney General,
24                              State of Hawaii
                                425 Queen Street
25                              Honolulu, Hawaii  96813
```

```
1    APPEARANCES: (CONT.)

2    For the Plaintiffs        COLLEEN ROH SINZDAK, ESQ. (VIA
     State of Hawaii and       PHONE)
3    Ismail Elshikh:           Hogan Lovells US LLP
                               555 13th Street NW
4                              Washington, DC 20004

5
     For the Defendants        EDRIC MING-KAI CHING, ESQ.
6    Donald J. Trump, et       Office of the United States
     al:                       Attorney
7                              Prince Kuhio Federal Building
                               300 Ala Moana Blvd. Ste 6100
8                              Honolulu, Hawaii  96850

9                              ANNE MURPHY, ESQ.
                               U.S. Department of Justice
10                             Office of the Solicitor General
                               950 Pennsylvania Ave. N.W.
11                             Washington, DC  20530

12                             BRAD P. ROSENBERG, ESQ. (VIA PHONE)
                               CHAD A. READLER, ESQ. (VIA PHONE)
13                             U.S. Department of Justice
                               Civil Division, Federal Programs
14                             Branch
                               20 Massachusetts Ave, NW
15                             Washington, DC  20530

16

17

18

19

20

21   Official Court           GLORIA T. BEDIAMOL, RPR, RMR FCRR
     Reporter:                 United States District Court
22                             P.O. Box 50131
                               Honolulu, Hawaii 96850
23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

```
 1   Wednesday, March 29, 2017                          9:35 a.m.
 2            THE CLERK:  Calling Civil Number 17-00050-DKW-KSC,
 3   State of Hawaii, et. al. versus Donald J. Trump, et al. This
 4   case has been called for hearing on a motion to convert
 5   temporary restraining order to preliminary injunction.
 6            Counsel, please make your appearances for the record.
 7            MR. CHIN:  Good morning, Your Honor.  Douglas Chin,
 8   attorney general for the State of Hawaii; with me at the table
 9   is Deputy Attorney General Deirdre Marie-Iha as well as in
10   front of the bar is Solicitor General Clyde Wadsworth, Kimberly
11   Guidry and then deputies Josh Wisch and Donna Kalama.  And
12   finally on the phone and arguing a portion of this will be
13   Colleen Roh Sinzdak.
14            THE COURT:  All right.  Good morning to all seven of
15   you, including Ms. Sinzdak.
16            Ms. Sinzdak, can you hear me okay?
17            MS. SINZDAK:  Yes, I can.  Thank you.
18            THE COURT:  Great.
19            MR. CHING:  Good morning, Your Honor.  Assistant
20   United States Attorney Edric Ching appearing on behalf of the
21   United States of America.  Standing right behind me is Anne
22   Murphy from the Department of Justice civil division, appellate
23   division.  Your Honor, appearing via telephone this morning we
24   have Chad Readler, acting assistant attorney general from the
25   Department of Justice, and also Brad Rosenberg, trial attorney
```

```
 1    with the Department of Justice federal programs branch.
 2           THE COURT:  Good morning to all of you as well --
 3    maybe good afternoon.
 4           All right.  Mr. Chin, how are you guys going to divide
 5    this up then?
 6           MR. CHIN:  Yes, Your Honor.  I intend to speak first
 7    to address this motion, initially discussing why the Court
 8    should grant it and then why the scope of the injunction should
 9    remain intact.  And then my co-counsel, Colleen Roh Sinzdak, is
10    on the phone representing Dr. Elshikh and also available to
11    make remarks or address any other questions that the Court may
12    have.  And if we could also, with the Court's permission, have
13    a few minutes for rebuttal, that would be great.
14           THE COURT:  All right.  So Ms. Sinzdak does not intend
15    to address the motion then unless the Court has specific
16    questions that she might be in a better to position to answer?
17           MR. CHIN:  That's correct, thank you.
18           May I approach?
19           THE COURT:  Yes, you may.
20           MR. CHIN:  We thank the Court for hearing the
21    plaintiffs' motion today.  I begin with this quote from
22    March 15th:  This is a watered-down version of the first one.
23    This is a watered-down version.  And let me tell you something:
24    I think we ought to go back to the first one and go all the
25    way, which is what I wanted to do in the first place, end
```

1    quote.

2          Those are the words of the president uttered when he

3    was the president in a public forum on national T.V. hours

4    after this Court issued its TRO in direct response to this TRO.

5    And, for the record, we heard it, the justice department heard

6    it, the people of Hawaii heard it, the University of Hawaii

7    leadership heard it, Dr. Elshikh heard it, as did members of

8    his mosque, his children heard it.  And within hours of the TRO

9    our argument that the second executive order was a pretext for

10   a Muslim ban only became stronger.

11         The significant and unrebutted evidence of anti-Muslim

12   animus identified by this court two weeks ago, when it issued

13   the TRO, has not been cured; and to the contrary, it is

14   calcified.  Therefore, we respectfully ask the Court to grant

15   this motion and maintain the limited scope that it was set

16   forth on March 15th with respect to Sections 2 and 6 of the

17   executive order.

18         Here's where we are now.  The plaintiffs are asking

19   for a preliminary injunction.  The government, to my mind, has

20   rather lukewarmly responded that it does not want any

21   injunction; but more repetitiously insists that if there is

22   one, then it should be limited to Section 2C alone, which would

23   be identical to the Southern District of Maryland's preliminary

24   injunction dated March 16th.

25         So I've sequenced my remarks to first argue why a

1    preliminary injunction is warranted and then address the scope

2    of the injunction, but I'm willing to follow whatever queue

3    that assists the Court.

4        THE COURT:  That's perfectly fine.

5        MR. CHIN:  Great.  Thank you very much.

6        With respect to granting the preliminary injunction,

7    the plaintiffs do not mean to imply at all that this motion is

8    a mere formality or an afterthought.  We know what this hearing

9    is all about, and we're prepared to argue it.

10       What we would suggest though is that in this case much

11   of the work that went into supporting the TRO also supports the

12   preliminary injunction.  We would submit that for the purposes

13   of this injunction we may continue to rely upon the allegations

14   in our well-pled complaint, the exhibits, the public documents

15   and declarations.  But more than that, very few facts, if

16   anything, appear to be in controversy.

17       This TRO possessed the qualities of a preliminary

18   injunction because the TRO was strongly challenged in

19   adversarial proceedings before this Court, and it appears that

20   the time for it to remain in force is longer than the 14-day

21   period that's identified in Rule 65B.

22       There has been a vigorous adversarial proceeding on

23   the issues of standing, ripeness, the establishment clause

24   claim, and even statutory and due process claims.  And the

25   parties have done so in written briefs and in oral argument

1    before the district court lasting 90 minutes, not counting the

2    argument that we're having right now.

3          On the plaintiffs' side alone we have a 38-paged

4    complaint, 14 exhibits, eight declarations.  These publicly

5    available documents and the facts contained within our

6    affidavits and detailed pleadings have been largely

7    uncontroverted.

8          And I should say this at this point, which is that no

9    one has been doubting the veracity of the remarks made by

10   Donald Trump or his surrogates.  There is no dispute apparently

11   that the president has said what he said about a Muslim ban or

12   that his campaign has called for a Muslim ban.  And I should

13   just point out that this morning the campaign website for

14   Donald Trump still calls for that -- I checked.

15         THE COURT:  If those facts are in dispute, it is a

16   very well-hidden dispute.

17         MR. CHIN:  That's correct.  And I take -- I'm reading

18   a dryness to that and so that's what I -- I don't think there

19   is any dispute on that.

20         Furthermore, the declarations from the University of

21   Hawaii, the Hawaii Department of Business Economic Development

22   and Tourism, the Hawaii Tourism Authority, Dr. Elshikh and

23   Mr. Ounsafi, have mostly gone unchallenged.  Since the TRO,

24   we've offered the president's March 15th public statements and

25   other actions taken by the administration, which include a ban

1    on laptops from certain middle east countries and instructions

2    to consular officers to conduct extreme vetting.

3         And for its part, the government has offered no new

4    evidence or a changed circumstance to undermine the integrity

5    of the Court's original opinion.  It offers the up words of the

6    revised executive order and an interpretation of the law to

7    which we respectfully disagree and hope the Court continues to

8    reject as well.

9         The legal standards for a TRO and preliminary

10   injunction are substantially identical.  And given that similar

11   framework, this Court has concluded once that the plaintiffs

12   have met the preliminary injunction factors, although

13   characterized within the temporary restraining order.

14        So we'd simply just point out, as far as likelihood of

15   success on the merits -- and I'll go quickly through this

16   before we get to the scope.  But as far as likelihood of

17   success on the merits, as the Court pointed out in its TRO, the

18   plainly worded statements of the president and his aides in the

19   months leading up to and contemporaneous with the signing of

20   the executive order betray the executive order stated secular

21   purpose.

22        We would argue that since the TRO the president has

23   confirmed any changes between Executive Order 1 and 2 were

24   pretextual.  He described the second order as merely a

25   watered-down version of the first and reiterated his statements

1   that it is hard to assimilate Muslims into the United States.

2            So under the reasonable objective observer standard,

3   not the how well do lawyers characterize what has been said

4   standard, if the plaintiffs' likelihood of success was strong

5   on March 15th, it has only become stronger today.

6            As far as irreparable harm is concerned, I realize

7   that -- I will address that because I think that, Judge Watson,

8   you, as well as some other courts have -- the Court has looked

9   at some other -- has looked at the irreparable harm issue, and

10  so I wanted to just touch on that briefly.

11           I will say that every court, of the five trial courts

12  and appellate courts that have looked at this issue, of all the

13  five courts that found an establishment clause violation,

14  they've also found irreparable harm.

15           Judge Watson, in your order you find that Dr. Elshikh

16  has suffered irreparable harm; and in doing so, you cite to

17  paragraphs 88 to 90 of the second amended complaint which talks

18  about how Dr. Elshikh is deeply saddened, how he is concerned

19  about the fact that the highest levels of government have now

20  created an environment where one religion is favored and

21  another religion is disfavored.

22           But more than that, in this order -- in this Court's

23  order, irreparable harm says it may be presumed with a finding

24  of a violation of the first amendment.  And there is a

25  reference to Elrod, the U.S. Supreme Court case.  And I only

1   wanted to make a comment about that because it does appear that

2   the next day, in the Southern District of Maryland, Judge

3   Chuang was also looking at that same irreparable harm analysis.

4   And in doing so, he was trying to look for cases within his own

5   circuits that would stand for the proposition that an

6   establishment clause violation necessarily results in

7   irreparable harm.  He didn't appear to find it, but he did find

8   several other cases in the DC Circuit, Second Circuit, several

9   other circuits that talked about that.

10        But I'll go to a third example as well, which is that

11   in the Ninth Circuit the judges pointed out in their discussion

12   of the balance of equities and the public interest -- this is

13   on page 28 of their opinion -- they describe that the

14   deprivation of constitutional rights unquestionably constitutes

15   irreparable injury.  And to be sure --

16        THE COURT:  You're speaking of Washington?

17        MR. CHIN:  Correct.  In Washington vs. Trump, thank

18   you.  And to be sure, they had primarily focused their claim --

19   they primarily placed their focus on the due process claim.

20   But then they went into describing the establishment clause

21   claim as also having raising serious questions and allegations.

22   And then that's followed by a discussion of constitutional

23   rights unquestionably constitutes irreparable injury.  Citation

24   to Elrod.  And so that's where I think we can link up that

25   there is an irreparable harm that has occurred here certainly

1   with Dr. Elshikh.

2          And as far as the state is concerned, we have

3   submitted the declaration of Risa Dickson from the University

4   of Hawaii saying that the universities are in the midst of

5   their admission season, they're suffering a loss of revenue,

6   and the state has submitted declarations saying that it suffers

7   a loss of revenue due to a decline in tourism.

8          I'll simply just say, as far as the balance of

9   equities and the public interest is concerned, that this Court

10  wrote in its TRO that it is always in the public interest to

11  prevent the violation of constitutional rights.  And it sure

12  seems like once you have a constitutional right that seems to

13  flow into all of the other factors, but that really makes sense

14  just because we are talking about the first amendment and the

15  freedom of religion as the Court has chosen to do so.

16         But it also wrote that national security motivations

17  have grown more questionable.  And to that we would simply

18  remark that the president has tipped his hand.  The government

19  has no urgency to implement this executive order to our minds.

20  There is no longer any rushing to the Ninth Circuit, there is

21  no longer appealing a TRO that has arguably been briefed and

22  discussed in more detail as ours is than in Judge Robart's

23  litigation.  They did not stipulate to convert this TRO into a

24  preliminary injunction.  And so it goes to pretext, and that's

25  why we point that out.

1          So finally as to this point, I'll just say that other

2     courts have treated similar cases such as these as a

3     preliminary injunction.  Judge Chuang immediately entered a

4     preliminary injunction in his case, Judge Brinkema immediately

5     entered a preliminary injunction, the Ninth Circuit in

6     Washington treated the TRO as a preliminary injunction.  And I

7     would say that in at least the Brinkema decision -- I'm trying

8     to think if it's in the Ninth Circuit, but there is also -- I

9     don't think it's in the Ninth Circuit.  In the Brinkema

10    decision there is a point that the Court is making, which is

11    that the order is likely to last longer than 14 days anyway,

12    and so they are reaching that point.

13         So for all of those reasons, we do respectfully ask

14    for the Court to convert this into a preliminary injunction.

15    I'm ready to move to scope then.

16         THE COURT:  All right.  Please do so.

17         MR. CHIN:  Thank you, Your Honor.

18         So with respect to the scope of the injunction, if the

19    government has been less than full throated in its opposition

20    to a preliminary injunction, it has vehemently argued before

21    this Court that the scope should be narrowed.  So I would

22    imagine that a lot of our discussion might revolve around that.

23         And essentially the government is asking the Court to

24    narrow the injunction to subsection -- excuse me, Section 2C as

25    it did so in its motion to clarify.  And as the Court pointed

1    out, something that had not been asked for before, and this

2    would result in the injunction being the same as the one that

3    Judge Chuang issued.

4         THE COURT:  I'll be plainer about it.  It appears to

5    me that the argument never occurred to the United States until

6    it read Judge Chuang's decision.  Isn't that a fair reading of

7    what happened?

8         MR. CHIN:  Right.  Sure.

9         THE COURT:  You're asking me now to conform my order

10   to what Judge Chuang did.  They never argued it before.  I

11   don't think there is any dispute about that.  They never

12   briefed the distinction before.  The motion what they styled as

13   really was an improper motion to clarify was the first time it

14   made the argument, and it came immediately on the heels of

15   Dr. Chuang's decision where he limited the scope of his TRO to

16   Section 2C.

17        MR. CHIN:  Well, Your Honor, I think that's perfectly

18   reasonable and within the Court's discretion to reach that

19   finding.

20        I think when we look at the narrowing of the

21   injunction, both parties have scoured the country and they have

22   shown the Court many possible decisions where courts have

23   recently issued preliminary injunctions.  And I think what we

24   can all learn from that is that courts find a lot of ways to

25   exercise their discretion in terms of deciding whether to issue

1    an injunction.

2         But there is a principle or a pattern that I suggest

3    to the Court, which is that where the record has changed a

4    preliminary injunction might be narrower than a TRO.  But where

5    the record has not changed, then it certainly -- it is

6    acceptable and reasonable for a preliminary injunction to

7    contain the same scope as the temporary restraining order.

8         But even more than the fact that the government has

9    poked this issue once before, the president's anti-Muslim

10   comments are inextricably linked with a peculiar component that

11   disfavors Muslim refugees.  And if the Court can indulge me, I

12   know I'm reading from the second amended complaint, but the

13   point that I want to make is there are so many comments that

14   are made by the president that the Court can choose from that I

15   think just even devoting a minute to stringing these together

16   really drives the point home, which is on July 11, 2015, he

17   falsely claimed that Christian refugees were being prevented

18   from coming to the United States, while if you're Islamic it's

19   hard to believe you can come in so easily.  They are pouring

20   over the border.

21        In September 2015, he referred to Syrian refugees that

22   were accepted in a year as a 200,000-man army that could be

23   ISIS.  And said, If I win they're going back.

24        In June 2016, he issued a press release saying, We

25   have to stop the tremendous flow of Syrian refugees into the

 1   United States.  In July 2016, he said under Clinton, you'd be

 2   admitting hundreds of thousands of refugees from the middle

 3   east with no system to vet them or to prevent the

 4   radicalization of the children and their children.  And the

 5   middle east refugee children will take over our children and

 6   convince them how wonderful ISIS is.

 7        And then of course on the campaign website to this

 8   day, March 29, 2016, it says this:  Donald J. Trump is calling

 9   for a total and complete shut down of Muslims entering the

10   United States until our country's representatives can figure

11   out what is going on.

12        And I would just like to contrast that with paragraph

13   104 of our second amended complaint where Governor Ige, long

14   before President Trump made any of these statements, said,

15   Hawaii and our nation have a long history of welcoming refugees

16   impacted by war and oppression.  Hawaii is the aloha state

17   known for its tradition of welcoming all people with tolerance

18   and mutual respect.

19        And so we know the real animus behind this.  And I

20   don't think I think -- I think it's a stretch for the

21   U.S. Government in their briefs to try to divorce the religious

22   animus that's still apparent from keeping Muslims from coming

23   into the country from what I'm calling a peculiar component of

24   that which is that Muslim refugees in particular are ones that

25   should be prevented from coming into the country.

1          The Court has identified significant and unrebutted

2     evidence of religious animus, and the government has failed to

3     cure the animus.

4          You know, another reason why we would respectfully ask

5     that the Court not narrow the injunction any further is that

6     it's important to preserve the status quo.  So, in addition to

7     the fact that Section 6 is part and parcel of the religious

8     animus that has been displayed by the president in his remarks

9     and the evidence that has been significant and unrebutted, the

10    usual function of a preliminary injunction is to preserve the

11    status quo.

12         Other -- I want to point this out is that we do not

13    ask the Court to enjoin more than Sections 2 and 6.  We of

14    course would not object to, if the Court decided to enjoin more

15    than Sections 2 and 6 under the establishment clause claim that

16    has been placed before that, the religious animus infects the

17    entire policy.  And so under Lukumi there is at least a

18    precedent that allows the Court to be able to do that.

19         But in asking for Sections 2 and 6 to be enjoined, we

20    chose to focus on what the president focused on in his

21    statements, which was Muslim nations and Syrian refugees.  And

22    that's clear even from Section 1 of the executive order under

23    policy and purpose where it's very clear that what this is all

24    about is the visa program and the refugee program.  And so

25    Sections 2 and 6 are essentially those parts.  So we are

1    respectfully asking that the status quo be kept.

2          We do have a concern that if Section 6 is allowed to

3    immediately go into effect, that it would have an immediate and

4    disruptive impact on refugees in the United States refugee

5    admissions program who may be traveling to the United States at

6    this very moment.  And so we have the status quo, we got it

7    with the temporary restraining order, and we are asking for

8    that to remain with Section 6.

9          Your Honor, I simply want to just point this out.  In

10   paragraph 42 on page 9 of our second amended complaint, I will

11   just close with another statement that was made by Donald

12   Trump.  And why am I making these points?  Well, I think that

13   actually is what drives what the Court referred to as the

14   peculiar circumstances in the specific historical record that

15   is at play in this case.  And this was following the mass

16   shootings at an Orlando nightclub in June of last year.

17         Mr. Trump promised to suspend immigration from areas

18   of the world where there is a proven history of terrorism

19   against the U.S. until we fully understand how to end those

20   threats.  We need to stop importing radical Islamic terrorism

21   to the west through a failed immigration system.  I refuse to

22   be politically correct.  The travel ban is the fulfillment of

23   that promise.

24         Your Honor, in asking for this preliminary injunction,

25   we do not fault the president for being politically incorrect,

1    but we do fault him for being constitutionally incorrect.

2    Freedom of religion is the bedrock of our constitution.

3    Religious freedom is why this country was formed.  And so we

4    are asking that Sections 2 and 6 be enjoined.

5         I think Ms. Sinzdak might also want to add in a few

6    remarks in case I forgot anything.  But thank you, Your Honor,

7    for your indulgence.

8         THE COURT:  All right, Mr. Ching.  Thank you.

9         Ms. Sinzdak.

10        MS. SINZDAK:  Ms. Sinzdak representing Dr. Elshikh.  I

11   think that my colleague covered all of the key points, but I'm

12   very happy to respond to any questions you may have with

13   respect to Dr. Elshikh in particular.

14        THE COURT:  All right.  I do not have any such

15   questions at this time.

16        Mr. Readler and Mr. Rosenberg, how are you intending

17   on handling your part of the proceedings this morning?

18        MR. READLER:  Thank you, Your Honor.  May it please

19   the Court.  This is Chad Readler on behalf of the United

20   States.  I will be handling the arguments, and Mr. Rosenberg

21   may want to weigh in as well.

22        I would like to first start by apologizing for not

23   being with all of you in the courtroom today.  The press of

24   various cases, many of which General Chin alluded to regarding

25   this executive order, create a pretty heavy demand for work

1    here and we were unfortunately not able to travel to Hawaii to

2    argue today, but I do appreciate you allowing us to appear by

3    phone.

4            THE COURT:  Certainly.

5            MR. READLER:  Your Honor, today's case follows earlier

6    proceedings that the Court is well aware of in the Ninth

7    Circuit that addressed the earlier executive order on

8    immigration.  And there are two key aspects of that decision

9    that I think are informative for today's hearing that I would

10   like to highlight.

11           The first, of course, is that the appeals court

12   indicated that it was left to the executive order to rewrite

13   the order, to address the constitutional and breadth concerns

14   identified by the Ninth Circuit.  And the executive took those

15   concerns to heart in issuing a new executive order after weeks

16   of study and consultation.

17           And I think nowhere are those changes better reflected

18   than they are in Section 6 of the current executive order which

19   addresses refugee provisions.  There is no longer a preference

20   for religious minorities, there is no longer a ban on Syrian

21   refugees, and there is certainly nothing facially

22   discriminatory about that section.

23           Second, with respect to the Ninth Circuit's opinion,

24   all the decisions from the Ninth Circuit, the panel decision,

25   the concurring and dissenting decisions from the en banc

1   proceedings all know the extremely expedited nature of that

2   appeal and the challenge that that created for the court in

3   resolving the case in that manner.  And so we do appreciate the

4   Court allowing us this hearing today so that we can have full

5   consideration of all the issues before the Court.  And if the

6   Court does issue relief, that it's appropriately tailored to

7   the issues and the harm presented to the Court.

8          Now, the Court has been presented with briefs at the

9   TRO stage regarding a host of constitutional and statutory

10  issues.  And I'm happy to talk about those issues if the Court

11  has questions about them.  Otherwise, at the moment I would

12  like to focus on two or three other issues that are specific to

13  today's hearing and that are presented by this stage of the

14  hearing a preliminary injunction request.

15         The first, Your Honor, is to highlight some of the

16  cases that General Chin also discussed, the four decisions that

17  have been issued since this Court issued its temporary

18  restraining order.  The most far reaching opinion, other than

19  this Court's opinion, was the decision in Maryland.  And that

20  case of course issued an injunction only with respect to

21  Section 2C of the executive order.  Even though the court there

22  was asked to issue an injunction blocking the entire order, the

23  court declined to grant that relief.

24         The other decisions in this area have largely gone in

25  favor of the government.  Judge Robart, of course, who issued

 1    the first injunction with respect to the first executive order,

 2    declined to extend that order to the most recent executive

 3    order, knowing the significant changes between the first and

 4    second executive orders.

 5         And Judge Treyger in Virginia just last week rejected

 6    in total a challenge to the entire executive order finding no

 7    constitutional or statutory flaws in the second executive order

 8    or any irreparable harm to the plaintiffs.  And I think those

 9    cases are very helpful in informing the Court what sort of

10    relief, if any, it will enter today.

11         One other issue I would like to discuss, it's sort of

12    a threshold level, is the fact that this hearing allows the

13    parties to come before with evidence and argument regarding a

14    standing of harm and other issues that are important to the

15    Court's consideration of whether to issue relief today.

16         My friend on the other side addressed some of those

17    issues and essentially the plaintiffs have relied on the

18    documents they gave you at the TRO stage, which there's

19    essentially no additional evidence added today.  And I think

20    the concerns and the evidence cited there are extremely

21    generalized, when you compare them to what was presented to the

22    Ninth Circuit in the Washington case.

23         If you look at the slip opinion there on page 10, the

24    Ninth Circuit addressed the very specific precise declarations

25    that were submitted by the State of Washington.  There, for

```
 1   example, the court talked about two specific visiting students,
 2   both of whom were prevented from entering the United States,
 3   and one of whom was told they could not get a visa.  The court
 4   also talked about two interns and three perspective employers
 5   in their precise specific circumstances and how they were
 6   impacted by the executive order.
 7           And here what we have are, by and large, generalized
 8   concerns about impacts and students and tourism and really
 9   nothing, in my mind, that would go to the refugee provision.
10           THE COURT:  I recall an extensive discussion on this
11   subject with Mr. Wall at the TRO hearing.
12           MR. READLER:  On the issue of standing?
13           THE COURT:  Yes.
14           MR. READLER:  Yes, Your Honor.  And I
15   would respectfully --
16           THE COURT:  Why are we talking about it now?
17           MR. READLER:  Well, Your Honor, this is a phase where
18   of course other parties can come forward with additional
19   evidence.
20           THE COURT:  Yes, so what additional evidence are you
21   coming forward with?  There is no additional evidence on this
22   particular subject.
23           MR. READLER:  Well, with respect to the refugee
24   provision, Your Honor, I would point to the declaration that we
25   submitted to the Court.  Of course, in our mind, it's the
```

    1    plaintiffs' burden to justify its standing and to justify the
    2    irreparable harm that it feels it's experiencing from the
    3    executive order.  And as the evidence that we put forward
    4    shows, at least with respect specifically to the refugee
    5    provision in Section 6, there is essentially no impact on the
    6    state.
    7         In fiscal year 2016, zero refugees were resettled in
    8    Hawaii.  So I think it's impossible to draw any harm with
    9    respect to Section 6 as to the state.  In fiscal year '17,
   10    which is still ongoing, there are three refugees that have been
   11    resettled to the state.  I think it's worth noting that those
   12    three come from Burma and not from any of the countries that
   13    are at issue here.  But I do think the state has come up short
   14    with respect to its evidence to show injury, especially
   15    irreparable injury, that flows from Section 6.  Because the
   16    refugee program has added -- has very little, if any, impact on
   17    the state.
   18         And just very briefly with respect to the broader
   19    evidence about the universities and tourism.  My friend on the
   20    other side, General Chin, cited Ms. Dickson's declaration.
   21    That declaration doesn't talk about any specific students, but
   22    it does reference 27 international students at the university.
   23    I think it's important to note those are all students that are
   24    currently at the university in the United States and is not
   25    impacted by the executive order.

1    And with respect to tourism numbers, the last point

2 I'll make on this, Your Honor, unless you have additional

3 questions, the state had submitted travel numbers from January

4 in making the point that the executive order has had such an

5 impact that it declined tourism from the middle east in January

6 2017.  But of course all that came before the executive

7 order -- the first executive order was issued at the very end

8 of the January.  Our research, from looking at Hawaii's own

9 state website, shows that foreign visitors are overall up 10

10 percent in January and 9 percent in February.

11    So we'd just point to the very high level which is

12 evidence that's been presented to you and a lack of time to

13 specific students or business people or others who want to

14 travel to this country who have been impacted by an order that

15 again affects no one in the United States.

16    What I would like to spend the most time on, Your

17 Honor, is talking about the scope of relief that this court

18 might issue.  And we have raised that issue for you in a couple

19 of ways.  But with respect to the TRO relief that the Court

20 issued --

21    THE COURT:  Well, let me get back to your points with

22 regard to standing.  So the first point that you made

23 concerns -- I gather you're referring to Mr. Bartlet's

24 declaration that you submitted; is that right?

25    MR. READLER:  Yes, Your Honor.

1            THE COURT:  So that evidence that you submitted shows

2      that there were, I think it was, 20 total refugees who were

3      resettled in Hawaii between the years 2010 and the present,

4      right?

5            MR. READLER:  That's correct.

6            THE COURT:  You highlighted 2016 and 2017 fiscal years

7      to show that there were three.  So is standing -- the standing

8      analysis that I'm to employ is this a mathematical exercise

9      that 20 is not enough, but 25 might be and 30 might be, but

10     we're not sure?  I mean, what am I to make of that?

11           MR. READLER:  No, Your Honor, it's the plaintiffs'

12     burden to show irreparable injury flowing from the refugee

13     program.  And they have, in my mind, presented no evidence

14     regarding what the impact of that is.  The government has tried

15     to come forward with the best evidence that we have, and it

16     shows a, at most, de minimis impact on the state with respect

17     to --

18           THE COURT:  Well, that's what I'm asking you though.

19     That's what I'm asking you.  So you gave me 20 examples between

20     2010 and the present.  So what am I to make of that is my

21     question?  I understand whose burden it is, but you're the one

22     who came forward with this evidence and with this argument.  So

23     what am I supposed to do with that information?  And what case

24     law tells me that that's insufficient to support standing?

25           MR. READLER:  Well, two issues -- there are two

1   responses, Your Honor.  First, it shows it's an incredibly

2   minimal number.

3         THE COURT:  In whose judgment?

4         MR. READLER:  In the government's judgment, it's a

5   small number.  The plaintiffs have not identified a specific

6   number.

7         But the second issue I think to emphasize with respect

8   to how the order operates, it's not to say that no refugees

9   will be allowed to enter into Hawaii.  The executive order puts

10   in place a 120-day pause on entry, but it doesn't completely

11   bar relocation refugees to Hawaii.

12         And again the point here -- of course the broader

13   point is that the attack on this section is -- that there is a

14   religious animus for it, and of course again we go back to the

15   terms of the order itself with respect to the merits.  And this

16   is a neutrally applied section that applies worldwide.  There

17   is no invocation of religion or region or nationality here.  So

18   I think both on the standing and harm and merits issues, the

19   state has not carried its burden to show a basis for injunctive

20   relief as to the refugee provision.

21         THE COURT:  With regard to the tourism numbers that

22   you mentioned, the 10 percent increase in January, the 9

23   percent increase in February that you're saying your research

24   discovered, you're offering that to counter the state's

25   submissions in support of its TRO where they showed, after the

```
 1    few days the initial executive order was in place, the decline

 2    in tourism from the specific affected countries.  Where is this

 3    evidence that you just argued?

 4            MR. READLER:  Well, two responses, Your Honor.  I'm

 5    just looking at, and I'm happy to submit a declaration, and I'm

 6    just looking at the State of Hawaii's website --

 7            THE COURT:  Well, now is the time, right?  I mean

 8    you're arguing it now.  Where is the evidence?  It's not

 9    appropriate to argue it and not provide it to me, right?

10            MR. READLER:  Well, I'm happy to submit it after the

11    hearing, Your Honor.

12            THE COURT:  Why wasn't it submitted before the

13    hearing?

14            MR. READLER:  Well, Your Honor, we didn't have a

15    chance to prepare a declaration with respect to that

16    information.  I would say there is no harm, I don't think, to

17    the State of Hawaii in the sense that we took these numbers

18    from the State of Hawaii's website on tourism.  It's a broad

19    point that again the state has not given you specific

20    individuals who have been impacted by the executive order with

21    respect to restriction to traveling to the State of Hawaii.

22            THE COURT:  It may be a broad point, but it's one that

23    you think it's important enough to argue here this morning.

24    You had time to write Mr. Bartlet's declaration, you had time

25    to file a 30-paged brief, right, but you didn't have time to
```

1    provide this into evidentiary form that I can consider.

2    Instead, all you give me is argument at the time of the hearing

3    and offer under the short time frame that we have to address

4    this, you offer to provide it later.  Don't you think that's

5    tardy?

6           MR. READLER:  Well, Your Honor, the Court can

7    certainly take judicial notice of these numbers that are again

8    are publicly available from the State of Hawaii.  And if they

9    want to refute them, they're certainly happy to -- we'd be

10   happy to submit a declaration after the hearing, if the Court

11   would like it.

12          But I do also want to return to the point that the

13   Court made about the impact of the first executive order.

14   Again, this is just referring to the number that Hawaii gave

15   you, and just as an objective criticism and not an evidentiary

16   -- there's no evidence to support the point.  The number they

17   gave you was a change in middle eastern tourism between

18   January 2016 and January 2017.  This executive order came out

19   on January 27th.

20          So that date is completely irrelevant to the impact of

21   the executive order because all the data for that month

22   essentially came from the time before the executive order

23   issued.  And certainly anyone traveling to Hawaii had certainly

24   made their plans well in advance.  So I think this is zero

25   evidentiary value for that data.  And also it goes of course to

1    the first executive order, not the second.

2         If the Court has more questions on that area, I'm

3    happy to answer them.  Otherwise, I would turn to specific

4    aspects of the relief that the Court might consider entering.

5         THE COURT:  All right.

6         MR. READLER:  The Court of course enjoined application

7    of complete all of Section 2 and all of Section 6 of the

8    executive order.  And we think that is far broader than the

9    relief that at most would be required here, which would be an

10   injunction with respect to Section 2C what the Maryland court

11   did.

12        I would like to start with the Court's waiver concern.

13   Of course, we are at a different stage in the proceeding, and

14   we are certainly pressing these arguments.  But I think we did

15   preserve those arguments I believe in our opposition to the TRO

16   at pages 19 and 48.  We discussed the United States refugee

17   assistance program.  I know we said on pages 52 and 53 of our

18   brief that the relief should be limited to the actual

19   violations, that the relief should be narrow in scope.

20        And my reading of the plaintiffs' arguments is that

21   they were largely focused on Section 2C and the six countries

22   at issue.  But we do press that argument today, this is relief

23   that with respect to this executive order, no other court has

24   granted.

25        And I would like to go to refer to just a couple of

1    the sections of Section 6.  There is a couple of key things

2    that it does.  One, of course, is it places a 120-day pause in

3    Section 6A, and then it allows for study by the government of

4    the process the government has in place for the admission of

5    refugees.  And it requires DHS, the state department and

6    director of national intelligence, to provide information

7    regarding procedures and protections for the security of the

8    nation.

9         That aspect of the order has been enjoined, but those

10   are fundamental responsibilities that those agencies carry out

11   day to day.  The executive order certainly highlighted them as

12   part of a broader immigration order.  But those are fundamental

13   aspects of those agencies that they carry out to, one, manage

14   the refugee program; and two, to make sure the national

15   security concerns are being met with respect to who is entering

16   into the country.

17        On Section 6B is the cap that 50,000 refugees, which

18   the president determined are more than that, would be

19   detrimental to the interest of the United States.  He did so in

20   accordance with the statutory and constitutional power.  And

21   Section 6D then is a policy for coordinating refugee placement

22   with state and local jurisdictions.  Again, a continuing

23   obligation or responsibility for the federal government.

24        The Court enjoined, at least initially at the

25   temporary phase, all of those sections.  And we think any

1    relief here should not include a limitation on the enforcement

2    of Section 6.  I again make the point that the section is

3    neutral on its face with respect to any sort of discrimination.

4    And I point to the lack of harm that the state has identified

5    here with respect to an absence of refugees for a 120-day

6    period.

7           And, again, I want to reiterate that the most

8    significant changes that the executive order makes between

9    Executive Order 1 and Executive Order 2 are as to Section 6.

10   Again, the first executive order had a specific provision

11   regarding Syria; that was removed.  The initial executive order

12   also had a very specific provision that granted preference for

13   religious minorities, no matter the religion, but preference

14   for religious minorities, that section was removed as well.

15          And the plaintiffs -- I know the Court asked questions

16   about how the government pressed this issue; but in the second

17   amended complaint and the TRO papers, I'm not sure they make

18   any specific reference at all to the 50,000 refugee cap, for

19   example.  So this, is in mind, was not an issue that was

20   pressed significantly, if at all, by the state, but the

21   government has responded to it.  And the bottom line is that

22   there is a lack of harm and a lack of constitutional basis for

23   enjoining that aspect of the executive order.

24          Unless the Court has questions about Section 6, I

25   would also like to talk briefly about Section 2.

1          THE COURT:  All right.

2          MR. READLER:  Which is the other section that was

3    enjoined by the Court.

4          Setting aside Section 2C, which I think we are all

5    quite familiar with, Section 2 imposes a host of other -- or

6    adds a number of other provisions asking for some inward facing

7    assessments by the federal government.

8          I'm not sure that my friend on the other side, General

9    Chin, talked much about these, and it may be that the state is

10   not pressing an argument with respect to enjoining these inward

11   facing provisions.  But they are important functions, again,

12   important responsibilities that the federal government, that

13   the State Department of Homeland Security are required to carry

14   out on a day-to-day basis.

15         It's an assessment of what our security risks are and

16   what information we need from other countries around world to

17   insure that we have factual, reliable information about people

18   coming to this country from other countries.  And Section 2C

19   asks for a host of steps that these agencies take that

20   essentially those are sort of traditional responsibilities and

21   functions of those agencies anyway.

22         We don't think there is any harm to the plaintiffs

23   from these inward facing provisions, and we don't think they

24   apply to the plaintiffs at all.  And we would ask that the

25   Court also not enjoin those sections to the extent the Court is

1    going to enjoin anything with respect to the executive order.

2            Finally, I would like to talk about Section 2C, Your

3    Honor.  That's the section that imposes the temporary

4    suspension for 90 days on immigration from certain countries.

5    I will return back to the evidentiary point just again to say

6    that we don't have -- we haven't identified here anyone

7    specifically who is impacted by that section.

8            And if there are students, for example, who are trying

9    to come to the University of Hawaii to enroll, there are a

10   number of protections that are built into this system.  One, of

11   course, is the waiver provision in Section 2C that says that

12   anyone coming abroad can attempt to avail themselves of, but

13   especially students seeking to come here.  And the secretary of

14   state has already issued a bulletin stating that the waiver

15   process will be built into the interview process, that's a

16   standard part of the visa application.

17           And also I think it's important to note that with

18   respect to students and other seeking nonimmigrant visas,

19   people coming here for school or work, that that process works

20   extremely quickly in general.  So it's a matter of weeks once

21   they get their paperwork in to the time of getting an interview

22   and typically getting adjudication of their request.

23           So a 90-day pause, one, they can still avail

24   themselves of the process; and two, it's unlikely that it would

25   actually impact in any way their ability to come to the United

1  States either because they'll get a waiver or they could go
2  through this process after the 90-day period expires and before
3  the next semester of school begins.

4       THE COURT:  Well, that waiver process, or at least a
5  very, very similar one, was also a feature of the initial
6  executive order that was considered by Washington, right?

7       MR. READLER:  There was a more limited -- yes, Your
8  Honor, there was a waiver provision.  One of the changes that
9  was made in this executive order was to spell out specifically
10 more of the criteria for how the waiver process would work.
11 That was, of course, done in response to the Ninth Circuit
12 decision that cited a number of concerns with respect to the
13 scope of the first executive order.  And we think that's an
14 important change from the first to the second executive order.

15      If the Court does not have any questions with respect
16 to those sections, then I would just close briefly on some of
17 the constitutional arguments that my friend on the other side
18 made.  And we think that the court in Virginia got this issue
19 right, which is to say that even if there is a concern with
20 respect to the first executive order and that there was an
21 improper bias that motivated that, the significant changes to
22 the second executive order were made to address that very
23 issue, and importantly of course, the removal to the reference
24 about religion.  That is now removed from the new executive
25 order.

```
 1              And so for those reasons, we believe the Court should

 2     not enter any sort of relief here.  But if it does, that relief

 3     should be limited to Section 2C only and allow the other

 4     provisions to carry forward.

 5              THE COURT:  All right, Mr. Reader. Thank you.

 6              Mr. Rosenberg, did you have anything you wish to add?

 7              MR. ROSENBERG:  I don't have anything at this time,

 8     Your Honor.  Thank you.

 9              THE COURT:  All right.  Attorney General Chin.

10              MR. CHIN:  Thank you.  I did want to make sure before

11     I began my rebuttal that if Ms. Sinzdak has anything that she

12     wants to say, now would be the right time to do that.  So if

13     the Court could just check on that.

14              THE COURT:  All right.  Ms. Sinzdak, did you have

15     anything that you wish to comment on in rebuttal before

16     Attorney General Chin concludes our proceedings this morning?

17              MS. SINZDAK:  Yes, if Your Honor doesn't mind, on

18     behalf of Dr. Elshikh, I wanted to touch on a few points.

19     First, and most notably, the government has made an argument

20     today that is devoted exclusively to the state's asserted lack

21     of harm and has not even touched on Dr. Elshikh.

22              And this Court, of course, has already found that

23     Dr. Elshikh has been harmed by this order, not merely Section

24     2C, but by the order in general in particularly Section 2 and

25     Section 6, which implements the animus that my colleague
```

1    Attorney General Chin articulated in those quotations from

2    President Trump.  The effect of that on Dr. Elshikh and his

3    family is immense.

4         Also, even in terms of the standing of the state, I

5    wanted to just note that Your Honor was speaking about

6    mathematical equations, and I think the Supreme Court recently

7    sounded a similar note.  On page 11 of our reply brief, we cite

8    a recent opinion in which they emphasized that even a small

9    amount of harm is harm for standing purposes.

10        Also, the government emphasized the Maryland court

11   offering more limited relief.  I just wanted to, as a matter of

12   record, correct that the Maryland court didn't reject the

13   propriety of an injunction of Section 6.  It simply said that

14   there hadn't been enough argument, and that was due in large

15   part to the peculiar procedural posture in Maryland where

16   originally the litigation had focused more on refugees and, in

17   fact, there was still a fully briefed preliminary injunction

18   motion with respect to the refugees that was pending during

19   that hearing and is still pending.  So I just want to be clear

20   that the Maryland court was not necessarily disagreeing with

21   this Court in any way.

22        Similarly, the government mentioned Judge Robart's

23   opinion; but again, Judge Robart was very clear in saying that

24   he was not holding as to whether the changes the government had

25   made were sufficient to render the opinion constitutional.

 1          Just a few other very minor points on the issue the
 2   government repeated again and again that Section 6 is facially
 3   neutral, but of course this Court focused not on the facial
 4   neutrality but rather on the context and the quotations that
 5   indicate that they were motivated by discriminatory animus.
 6          And, finally, the government suggested that they --
 7   that an injunction will inhibit them from undertaking
 8   procedures that they are required to undertake because of other
 9   laws, and of course that is not what we are arguing.  What we
10   have argued is that the government cannot undertake procedures
11   under the auspices of a policy that is discriminatory and that
12   inflicts harm on Muslim residents such as Dr. Elshikh.
13          If the Court has no further questions, that was all.
14          THE COURT:  Thank you for your comments.
15          MR. CHIN:  I'm most grateful to my co-counsel because
16   she shortened my remarks.  So with respect to the Maryland
17   case, I simply wanted to add to that, when Judge Chuang, who
18   was also looking at something that was procedurally different
19   and had different parties involved, made an interesting remark
20   where he also spoke of the situation that was before him as a
21   highly unique case.  And he wrote that there were strong
22   indications that the national security purpose is actually not
23   the primary purpose.  And that echoed one day later what this
24   Court has found in its TRO.
25          So, with respect to that, I think what's really

1    happening, when the government is making all of its arguments

2    about not being able to essentially connect up what's happening

3    in terms of tourism or the university, I think that argument

4    would make better sense had we -- had the Court decided to

5    pursue only the statutory violation and was thinking about what

6    harms would actually incur from that.  But as I mentioned in my

7    original presentation, we're talking about a constitutional

8    violation, and it's a violation of the establishment clause.

9         So when you have the highest level of government

10   that's disfavoring one religion through its pretextual policy,

11   that causes harm.  It doesn't matter if it's one day or if it

12   only affects 20 people.  The constitution is there for us

13   365 days a year, and that's what we all sign up for or are

14   blessed enough to be born into.  So that is -- as far as the

15   irreparable harm is concerned, I just think that the government

16   is focusing on something that doesn't have to do necessarily

17   with the constitutional violations that are occurring.

18        As far as the tourism numbers, all I wanted to say is

19   I think the point that the State of Hawaii is simply trying to

20   make is that these are people who are not getting in who would

21   be getting in, who would potentially be traveling to the State

22   of Hawaii, and this is a threat to our economy.  It's our

23   number one economic driver.

24        I am just going to talk about Section 2 and Section 6.

25   As Ms. Sinzdak already pointed out, I think the point is not

1   that the government is incapable or disallowed by this order

2   from being able to write reports or to write instructions or

3   carry on with its business.  The key situation, because this is

4   an establishment clause claim, is to not institute this kind of

5   policy under the auspices of this order.

6        And so we do think that this is -- to the extent that

7   the Court is inclined to grant a preliminary injunction, that

8   this is a good opportunity to make that clear so that the

9   government can understand.  But we certainly do not want to

10  give up on the provisions within Section 2 that were part of

11  this Muslim ban.

12       I also wanted to point out that the waivers and

13  exception program that the Court had commented on was something

14  that the Ninth Circuit had also been dubious about.  Now, this

15  was the first executive order, but they did devote a paragraph

16  to mentioning that they had concerns about the discretionary

17  waiver provisions that were allowed under Section 2; and, in

18  fact, wrote that the government has offered no explanation for

19  how these provisions would function in practice.  How would the

20  national interest be determined?  Who would make that

21  determination and when?  And so they wrote -- the government

22  has not otherwise explained how the executive order could

23  realistically be administered only in parts such that the

24  injuries listed above could be avoided.

25       So we have that problem, and I think that problem

1    extends even to the other provisions within Section 6.  So what

2    you have is you have the refugees -- the suspension of the

3    refugee program.  But even more than that, you have other

4    provisions that are described that say, notwithstanding the

5    suspension, there will be a case-by-case admission -- well,

6    that's up to the discretion of the Department of Homeland

7    Security -- in a fashion that's even worse than what was in the

8    waivers and exemption program, because it clearly is left up to

9    the discretion.

10         And the problem with this pretextual policy is that

11    President Trump is still able to accomplish every single thing

12    that he wants to accomplish with his religious animus under

13    this neutral policy.  He can still, if he wanted to, on a

14    case-by-case basis direct his Department of Homeland Security

15    secretary to allow Christians in and favor them, it's just not

16    saying that anymore.  But we all know that that's what he said

17    before.

18         So we are very concerned about the other provisions of

19    Section 6, not just the suspension.  And, in fact, I have to

20    say this too, there is even another section that talks about

21    how state and local governments are encouraged to have greater

22    involvement in settling or resettling people.  Well, again,

23    that's -- it's a dog whisper. It's a description of what states

24    and cities can then do to be able to shift around or move

25    around people who would otherwise have the right to be within

1  their state and city.

2       All right.  And then my final remark before I make one

3  more thing is just to say that in the supplemental Risa Dickson

4  declaration on page 9, she says this, when she talks about the

5  university and their ability to recruit, she writes that the

6  ability to recruit and enroll students and graduate students at

7  UH and to recruit and hire visiting faculty from these six

8  countries is constrained.  And that's the declaration. It's not

9  rebutted, and it is describing the irreparable harm that is in

10  place.

11       So with that, Your Honor, we thank you for hearing our

12  remarks.  Our concern about this is that what you have is a

13  neutral argument where what has gone on is behind the scenes.

14  It's as if you're looking at neutral words in a policy, but

15  there is this flashing neon sign that's just saying, Muslim

16  ban, Muslim ban, Muslim ban, and nobody in the government has

17  bothered to turn off those lights.

18       So it doesn't make any difference how you look at the

19  neutral words.  The animus that's behind it, the one that's

20  hurting Dr. Elshikh and hurting the State of Hawaii going

21  against the values of our state, are still out there.  And so

22  that is the reason why we ask for this to be constrained.

23       Before I conclude, on the chance that the Court is

24  going to not convert the TRO to a PI on all of Sections 2 and

25  6, we would ask the Court to temporarily enjoin the

 1   implementation of Sections 2 and 6 of the revised order pending

 2   our appeal under Rule 62C.  And the reason why we are saying

 3   that is, again, if the Court was to allow Section 6A and B to

 4   immediately go into effect, that would have an immediate and

 5   disruptive impact on refugees who may be traveling to the U.S.

 6   at this very moment.  And we saw how the implementation of the

 7   first executive order, when it was going back and forth, was

 8   extremely disruptive.  And so we would ask this Court to

 9   preliminarily enjoin 6A and B under Rule 62 and see pending

10   appeal.  So we put that out there.

11         Your Honor, thank you very much for listening to our

12   remarks.

13         THE COURT:  Mr. Readler and Mr. Rosenberg, before we

14   adjourn, I know it's the state and Mr. Elshikh's motion -- or

15   Dr. Elshikh's motion, excuse me, nonetheless, if you have

16   anything that you wish to add, I know you are a little bit

17   disadvantaged by being on the telephone, and that's why I'm

18   giving you a further opportunity, any further comments before

19   we adjourn for the morning?

20         MR. READLER:  Yes, thank you very much, Your Honor.

21   This is Chad Readler again.  Just three very brief points.  The

22   first is with respect to Dr. Elshikh.  We certainly don't mean

23   to exclude him, but when you look at his declaration it is

24   targeted very much to Section 2C of the executive order and the

25   harm he's -- from the limitation on immigration from the six

1    countries at issue.  He has no harm or claim with respect to,

2    for example, inward facing aspects of Section 2 or with respect

3    to Section 6, that's about refugees.  And Dr. Elshikh did not

4    say anything about refugees, he's not trying to have a refugee

5    visit the country.  So that's why there was little discussion

6    with respect to Dr. Elshikh.

7         Ordinarily, the process for bringing someone here is

8    governed by sort of the Mandel/Din line of cases which the

9    Court is very familiar with.  And of course the government's

10   position is that the waiver process, which is built into the

11   visa interview process, is made clear from the secretary of

12   state's bulletin would resolve any potential harm because

13   Dr. Elshikh's mother-in-law, when she does go for her

14   interview, she would be asked about -- assuming it's within the

15   90-day period -- she would be asked about her requirements for

16   satisfying the waiver provision.

17        Those are questions that a consular official would

18   generally get to anyway, those are the kinds of things that

19   they do, and so we don't think there is any harm with respect

20   to Dr. Elshikh for that specific section, but not beyond

21   Section 2C.

22        The second point I would like to address is just the

23   scope of the -- the scope of the order and the discussion about

24   how this order impacts the federal government and what it

25   limits the federal government from doing. Under the current

1    provisions of the Court's TRO, which the government is very

2    respectful of and certainly has no intention to or interest in

3    violating, it enjoins a wide range of activity that's covered

4    by the executive order.

5          Now, the government has said that it doesn't mean --

6    or the State of Hawaii has said it doesn't mean to enjoin

7    certain kind of conduct, only other kind of conduct, is

8    extremely difficult for the Department of Homeland Security and

9    the secretary of state to discern what is and is not enjoined.

10   We think clearly the answer to that is to not enjoin the inward

11   facing aspects, so that those agency can carry out their

12   everyday responsibilities without concern of violating this

13   Court's injunction.  That's a very important issue to my

14   client, so I wanted to share with the Court, and I hope the

15   Court will consider that when it frames any sort of relief it

16   may grant in this case.

17         The third point is just with respect to the concern

18   about refugees traveling to the United States.  The original

19   executive order -- certainly the government does not want to

20   disrupt the travel plans of anyone who has documentation to

21   come to the United States.  That's why the original executive

22   order built in a ten-day period before it went into effect and

23   why it also excluded from its coverage anybody who had a visa

24   or documentation allowing them to come to the United States.

25   And that is very important to the United States.

1          And to the extent the Court is going to allow Section

2     6 to go into effect, the purported harm that my friend on the

3     other side is referring to is not caused by the government,

4     only the result, if it would play out the way as proposed, the

5     result of the injunction which enjoined the ten-day period.  So

6     we would not oppose a very brief ten-day period, like we had in

7     the executive order, to allow for implementation of Section 6.

8     But we don't think it should go beyond that.

9          And unless the Court has any other questions, we again

10    very much appreciate you allowing us to appear on this

11    important case by phone.  I hope we have another chance to join

12    you in person.

13         THE COURT:  All right.  I thank all concerned for

14    their remarks and comments that will guide our decision here

15    this morning.  And we will certainly endeavor to get out a

16    written order in what remains of the day.  We are in recess.

17         (Proceedings were concluded at 10:37 a.m.)

18

19

20

21

22

23

24

25

1              COURT REPORTER'S CERTIFICATE

2              I, Gloria T. Bediamol, Official Court Reporter, United

3   States District Court, District of Hawaii, do hereby certify

4   that pursuant to 28 U.S.C. §753 the foregoing is a complete,

5   true, and correct transcript from the stenographically reported

6   proceedings held in the above-entitled matter and that the

7   transcript page format is in conformance with the regulations

8   of the Judicial Conference of the United States.

9

10             DATED at Honolulu, Hawaii, March 30, 2017.

11

12

13                                  /s/ Gloria T. Bediamol

14                                  GLORIA T. BEDIAMOL.

15                                  RMR, CRR, FCRR

16

17

18

19

20

21

22

23

24

25