DOUGLAS S. CHIN (Bar No. 6465)
  Attorney General of the State of Hawaiʻi
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAIʻI
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
  *Attorneys for Plaintiff, State of Hawaiʻi*

NEAL K. KATYAL*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
*Admitted Pro Hac Vice*

  *Attorneys for Plaintiffs, State of Hawaiʻi and Ismail Elshikh*

(See Next Page For Additional Counsel)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAIʻI**

| | |
|---|---|
| STATE OF HAWAIʻI and ISMAIL ELSHIKH,<br><br>                    Plaintiffs,<br><br>          v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,<br><br>                    Defendants. | Civil Action No. 1:17-cv-00050-DKW-KSC<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE OR, IN THE ALTERNATIVE, TO MODIFY PRELIMINARY INJUNCTION** |

## ADDITIONAL COUNSEL

CLYDE J. WADSWORTH (Bar No. 8495)
Solicitor General of the State of Hawai'i
DEIRDRE MARIE-IHA (Bar No. 7923)
DONNA H. KALAMA (Bar No. 6051)
KIMBERLY T. GUIDRY (Bar No. 7813)
ROBERT T. NAKATSUJI (Bar No. 6743)
  Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAI'I
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
Email: deirdre.marie-iha@hawaii.gov

*Attorneys for Plaintiff, State of Hawai'i*

COLLEEN ROH SINZDAK*
MITCHELL P. REICH*
ELIZABETH HAGERTY*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email:
neal.katyal@hoganlovells.com

THOMAS P. SCHMIDT*
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW*
ALEXANDER B. BOWERMAN*
HOGAN LOVELLS US LLP
1835 Market St., 29th Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs, State of
   Hawai'i and Ismail Elshikh*

# INTRODUCTION

Just over three months ago, this Court issued an injunction that prevented untold harms that would otherwise have been inflicted by an unconstitutional and unlawful Executive Order. The Supreme Court stayed that injunction in part, blocking its enforcement as to aliens with no connection to the United States. But it left in place the core of the Court's injunction, and so preserved the rights of Plaintiffs and the American public. One week ago, when the Government announced plans to violate that injunction—by excluding vast numbers of aliens with "bona fide relationships" to U.S. persons and entities—the State of Hawaii and Dr. Elshikh immediately sought to vindicate their rights and those of their fellow citizens.

This Court found that it lacked authority to grant the particular relief Plaintiffs requested: a motion to clarify. But the Ninth Circuit has stated that there is an alternative, viable route for this Court to prevent these brazen violations of its order. This Court, it explained, "*does* possess * * * the authority to enjoin against * * * a party's violation of the Supreme Court's order placing effective limitations on the scope of the district court's preliminary injunction." Dkt. 327, at 3.

Plaintiffs respectfully request that this Court follow the path the Ninth Circuit laid out. It should enjoin the Government's bald attempts to thwart the Supreme Court's and this Court's will. In the alternative, Plaintiffs respectfully

1

request that this Court modify its injunction to make clear that the Government's current course of conduct is unlawful.  One thing is clear:  This Court should not permit the Government to flout its directives at the expense of countless Americans and their loved ones, and it possesses the authority to prevent the Government from so doing.

## BACKGROUND

On March 29, 2017, this Court issued a preliminary injunction prohibiting the Defendants "from enforcing or implementing Sections 2 and 6 of the Executive Order across the Nation."  Dkt. 270, at 23.  After the Ninth Circuit largely affirmed that injunction, *see Hawaii* v. *Trump*, No. 17-15589, slip op. at 78 (9th Cir. June 12, 2017) (per curiam), the Supreme Court granted a partial stay of the injunction.  The Supreme Court approved of the way this Court balanced the equities with respect to "people or entities in the United States who have relationships with foreign nationals abroad."  *Trump* v. *Int'l Refugee Assistance Project* ("*IRAP*"), Nos. 16-1436 and 16-1540, slip op. at 11, 13 (U.S. June 26, 2017) (per curiam).  It held, however, that the equities "do not balance in the same way" with respect to the admission of "foreign nationals abroad who have no connection to the United States."  *Id.* at 11.  "In practical terms, this means that §2(c) *may not be enforced* against foreign nationals who have a credible claim of a bona fide relationship with

a person or entity in the United States." *Id*. at 12 (emphasis added). The same standard applies with respect to refugee admissions. *Id.* at 13.

Three days later—hours before the Government began implementing its travel ban—Plaintiffs moved this Court to clarify the preliminary injunction in light of the Supreme Court's ruling. This Court denied the motion. "[I]t is evident," this Court stated, "that the parties quarrel over the meaning and intent of words and phrases authored not by this Court, but by the Supreme Court." Dkt. 322, at 2. Accordingly, it held that "clarification should be sought" in the Supreme Court in the first instance. *Id*. at 5.

Plaintiffs appealed to the Ninth Circuit, and filed an emergency motion for an injunction pending appeal. The Ninth Circuit dismissed the appeal for lack of jurisdiction, explaining that this Court's order was not immediately appealable. The Ninth Circuit "note[d]," however, "that although the district court may not have authority to *clarify* an order of the Supreme Court, it does possess the ability to interpret and enforce the Supreme Court's order, as well as the authority to enjoin against, for example, a party's violation of the Supreme Court's order placing effective limitations on the scope of the district court's preliminary injunction." Dkt. 327, at 3.

## ARGUMENT

Although the Ninth Circuit did not disturb this Court's conclusion that it

3

could not grant Plaintiffs' motion to clarify, it held this Court *could* "enjoin against * * * a party's violation of the Supreme Court's order." *Id.* Plaintiffs now seek that very relief. They have filed a motion to enforce this Court's injunction as narrowed by the Supreme Court, or—in the alternative—to modify the injunction to specify that it prohibits the Government's brazen violations of the Supreme Court's directive. Both forms of relief are within this Court's power to award, and Plaintiffs respectfully ask that this Court act swiftly to vindicate its injunction and halt the Government's campaign of unlawful conduct.

**I.     This Court May Enforce Its Injunction Or, In The Alternative, Modify The Injunction To Enjoin The Government's Unlawful Guidance.**

"[D]istrict courts have continuing jurisdiction to enforce their injunctions." *Crawford* v. *Honig*, 37 F.3d 485, 488 (9th Cir. 1994); *cf. Courthouse News Service* v. *Planet*, 750 F.3d 776, 792 (9th Cir. 2014) ("Any plaintiff who obtains equitable relief * * * enforcing his constitutional rights against a state official may need to return to court to ensure compliance with the judgment.").

Accordingly, where a party discovers that the defendant is engaging in conduct that the injunction prohibits, he may move the district court to issue an order barring that forbidden conduct. *See, e.g., Armstrong* v. *Brown*, 857 F. Supp. 2d 919, 951 (N.D. Cal. 2012); *see also Salazar* v. *Buono*, 559 U.S. 700, 712 (2010) ("A party that obtains a judgment in its favor acquires a 'judicially cognizable' interest in ensuring compliance with that judgment."). And if the district court

determines that a violation is occurring, it is *required* to grant the relief necessary to prevent the infringement of its injunction. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 194 (1949); *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014). An injunction affords the prevailing party a "right[]" to its enforcement, and the district court must take actions necessary to "vindicat[e]" that right. *Salazar*, 559 U.S. at 712-713.

In March, this Court issued an injunction barring enforcement of Sections 2(c), 6(a), and 6(b) in their entirety. The Supreme Court later "plac[ed] effective limitations on [that injunction's] scope" by staying its enforcement as to aliens with no connection to U.S. persons or entities. Dkt. 327, at 3. But Plaintiffs retain their right to enforcement of the non-stayed part of the injunction—that is, they still have a right to ensure that the Government does *not* enforce the Order against aliens who have a "bona fide relationship" with a U.S. person or entity. Slip Op. at 12. Because the Government has already begun to implement the Order in accordance with guidance that violates that right, Plaintiffs are entitled to the relief necessary to prevent the violation.

In the course of issuing that relief, this Court of necessity must interpret the scope of the Supreme Court's order. But as the Ninth Circuit made clear, this Court "*does* possess the ability to interpret and enforce the Supreme Court's order" and to "enjoin against * * * a party's violations of the Supreme Court's order."

5

Dkt. 327, at 3 (emphasis added); *see Daniel B.* v. *O'Bannon*, 588 F. Supp. 1095, 1102 (E.D. Pa. 1984) (explaining that a district court narrowly construed the terms of the Supreme Court's stay in enforcing its injunction on remand, and the Supreme Court "declined to disturb [the district court's] interpretation of its stay"). In order to vindicate Plaintiffs' rights in the existing injunction, this Court has the obligation to determine whether the Government has exceeded the boundaries of the Supreme Court's stay. If the Court determines that it has, it must issue the relief necessary to bring the Government back into compliance.

In the alternative, this Court has the authority to modify its injunction to preserve the appropriate balance of the equities. The Court has "wide discretion" to modify an injunction, which "often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *System Federation No. 91* v. *Wright,* 364 U.S. 642, 647 (1961); *see also, e.g.*, *Taheny* v. *Wells Fargo Bank, N.A.*, No. CIV. S-10-2123 LKK, 2011 WL 864678, at *1 (E.D. Cal. Mar. 10, 2011). Changed circumstances or new facts may warrant modification, *A&M Records, Inc.* v. *Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002), as may an intervening judicial decision, *Toussaint* v. *McCarthy*, 801 F.2d 1080, 1090 (9th Cir. 1986). Modification is also appropriate when necessary to "achieve the purposes" of the original injunction. *United States* v. *United Shoe*

6

*Mach. Corp.*, 391 U.S. 244, 249 (1968). And a modification may be appropriate to ensure that the injunction "state[s] its terms specifically" and "describe[s] in reasonable detail * * * the act or acts restrained or required." Fed. R. Civ. P. 65(d).

Under these principles, it is appropriate for this Court to modify its injunction to add specific terms precluding the Government from implementing the bans to exclude numerous people with a "credible claim of a bona fide relationship with a person or entity in the United States." Slip Op. 12. Because—as set out below—the Government has now made clear the unlawful path it intends to pursue, the Court should foreclose that pathway. *Columbia Pictures Industries, Inc.* v. *Fung*, 710 F.3d 1020, 1048 (9th Cir. 2013) (because "the district court has jurisdiction to enforce the injunction, [plaintiff] can request modification in the future to add, upon competent proof, specific other terms as well").

## II. The Government's Guidance Flouts the Terms of the Preliminary Injunction That Remains In Place.

Regardless of which form of relief the Court grants, the result is the same. As "partially limit[ed]" by "the Supreme Court's order," this Court's injunction prohibits the Government from excluding aliens who have "a bona fide relationship with an individual or entity in the United States." Slip Op. at 12. The Government cannot categorically exclude grandparents, nieces, or refugees with extensive ties to this country; and its ongoing efforts to do so should be enjoined.

7

### A. The Injunction Bars the Government from Applying Sections 2(c), 6(a), and 6(b) to Exclude the Grandparents, Grandchildren, Brothers-in-Law, Sisters-in-Law, Aunts, Uncles, Nieces, Nephews, and Cousins of Persons in the United States.

As Plaintiffs have explained, the Government has instructed its agencies that "grandparents, grandchildren, aunts, uncles, nieces, nephews, cousins, brothers-in-law, and sisters-in-law" of U.S. persons may be excluded under the President's order.  *See* Katyal Decl. Ex. A ¶ 11, Ex. B, Ex. C.  Each of these relationships, however, is closely comparable to the relationship between Dr. Elshikh and his mother-in-law—a relationship that the Supreme Court said "clearly" qualified as "close famil[y]." Slip Op. at 12.  They too are immediate relatives of someone in a U.S. person's nuclear family.  Moreover, U.S. persons would plainly suffer "concrete hardship" from the exclusion of these relatives.  Slip Op. at 13.  As the Supreme Court has explained, an individual suffers a constitutionally cognizable injury if the Government interferes with his relationship with his "uncles, aunts, cousins, and especially grandparents," all of whom it has expressly described as "close relatives."  *Moore* v. *City of E. Cleveland*, 431 U.S. 494, 503 (1977); *see also Overton* v. *Bazzetta*, 539 U.S. 126, 131 (2003).

The Government's only argument to the contrary rests on its speculation that when the Court used the term "close family," it "ha[d] * * * in mind" the types of family relationships delineated in certain provisions of the INA.  Dkt. 301 at 2.

But one of the two relationships the Supreme Court said was "clearly" close family—Dr. Elshikh's mother-in-law—is not found in any provision of the immigration laws the Government relies on. *Id.* at 11. The Government attempts to ignore this fatal problem by speculating that when the Court said "mother-in-law," it really meant "mother," because it was *sub silentio* relying on the fact that Dr. Elshikh's wife is a U.S. citizen. *Id.* Yet the Court never so much as hinted that it was concerned with the burden on Dr. Elshikh's wife; it said the injunction was justified because of "the concrete burdens that would fall on * * * Dr. Elshikh"; that the Order may not be enforced against "parties similarly situated to * * * Dr. Elshikh"; and that "*Dr. Elshikh's mother-in-law*[] clearly has [a qualifying] relationship." Slip Op. at 10-12 (emphases added).

In any event, the immigration laws recognize and protect the very relationships the Government dismisses as insubstantial. In the Family Sponsor Immigration Act of 2002, for instance, Congress amended the immigration laws to provide that an alien's "close family" could sponsor the alien for admission, and included in that term an alien's "sister-in-law, brother-in-law, grandparent, or grandchild."[1] The immigration laws similarly state that a juvenile alien may be released from immigration detention to the custody of her "aunt, uncle, [or] grandparent," a group of relations the Supreme Court has described as "*close blood*

---

[1] Pub. L. No. 107-150, § 2(a) (codified at 8 U.S.C. § 1183a(f)(5).

*relatives*, whose protective relationship with children our society has also traditionally respected." *Reno* v. *Flores*, 507 U.S. 292, 297, 310 (1993) (emphasis added) (quoting 8 C.F.R. § 242.24 (1992), *recodified at* 8 C.F.R. § 236.3(b)(1)(iii)). Other provisions enable an individual to seek admission on behalf of "[g]randchild(ren)" and "[n]iece[s] or nephew[s]"[2]; to apply for asylum if a "grandparent, grandchild, aunt, uncle, niece, or nephew" resides in the United States[3]; to apply for naturalization on behalf of a grandchild[4]; or to qualify as a special immigrant if he is the "grandparent" of a U.S. person.[5] Even if these laws were relevant, then, they would provide only further confirmation that the Court's order extends to the very same "close blood relatives" the Government has excluded. *Reno*, 507 U.S. at 310.

### B. The Government May Not Exclude Refugees With Formal Assurances And Other Bona Fide Relationships.

#### 1. The Injunction Covers Refugees With A Formal Assurance From A U.S. Resettlement Agency.

The Supreme Court made clear that this Court's injunction continues to apply where a U.S. entity "has a bona fide relationship with a particular" refugee such that the entity "can legitimately claim concrete hardship if that person is excluded." Slip Op. at 13; *see Spokeo Inc.* v. *Robins*, 136 S. Ct. 1540, 1548

---

[2] 81 Fed. Reg. 92,266, 92,280 (Dec. 19, 2016).
[3] 69 Fed. Reg. 69,480, 69,488 (Nov. 29, 2004).
[4] 8 U.S.C. § 1433(a).
[5] USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 421(b)(3).

10

(2016). The Government has nonetheless announced that it is applying the ban to refugees that have a formal assurance from a resettlement agency in the United States. Katyal Decl. Ex. B. That is plainly unlawful.

The Government's own submissions in the District Court easily establish both that there is a bona fide relationship between a refugee and the resettlement agency that provides the refugee's formal assurance, and that—as a result of this relationship—the agency will suffer real harm if the refugee is excluded. When a resettlement agency submits an "assurance," it makes a "written commitment * * * to provide, or ensure the provision of" basic services to the "refugee[] named on the assurance form." Katyal Decl. Ex. D, Att. 2, at Page ID # 5694. The same document demonstrates that the resettlement agency must invest extensively in its relationship with the named refugee well before she arrives. The entity must, for example, provide "[p]re-arrival services" for the refugee and take all steps necessary to ensure that, as soon as the refugee gets off the plane, she is "transported to furnished living quarters," receives "ready-to-eat food and seasonal clothing," and has her "basic needs" met for at least thirty days. *Id.* at Page ID ## 5704-5708. And that is only the beginning of the countless tasks that the entity must undertake on behalf of the refugee as soon as it submits the formal assurance. *See* Dkt. 297-1, HIAS & IRAP Amicus Br. at 6-7; Dkt. 297-3, Hetfield Decl.

When a refugee's travel is blocked, however, all of this planning and preparation is wasted. That is a "concrete hardship" far more severe than the one an entity might experience if an arranged "lecturer" is forbidden admission. Slip Op. at 12; *cf. Vill. of Arlington Heights* v. *Metro Hous. Dev. Corp.*, 429 U.S. 252, 253, 262-63 (1977) (finding agency experienced concrete "economic injury" as a result of expenditures on planning and review).

The Government has attempted to sweep aside this tremendous burden on the ground that a resettlement agency's efforts are simply "resettlement services for which the Government has contracted with [the entity] to provide." Dkt. 301 at 20. But, as the Government requires resettlement agencies to inform newly arrived refugees, "[t]he local resettlement agency *is not a government agency*," Katyal Decl. Ex. D, Att. 2, at Page ID # 5709 (emphasis added), and the agencies receive only "*partial* funding" from the Government "for resettlement services," *id.* ¶ 20 (emphasis added). They are required to provide the Government with a detailed break-down of the *private* resources they have devoted and are prepared to devote to refugee work. *See, e.g., id.* Ex. E, at pp. 80, 83, 86. And even if the agencies did not invest their own resources, the loss of proposed federal funding constitutes a "concrete injury." *Clinton* v. *City of New York*, 524 U.S. 417, 430-431 (1998).

In any event, the Supreme Court in no way suggested that only purely private relationships qualify as "bona fide." The injunction applies to any foreign

national whose relationship with a U.S. entity is "formal, documented, and formed in the ordinary course rather than for the purpose of evading EO-2." Slip Op. at 12. There is no exception for "relationships facilitated by the Government." The fact that a local resettlement agency may not have personally interacted with a refugee is equally irrelevant. The same may easily be true of the relationship between a U.S. entity and an invited lecturer the entity has arranged through an agent, *see* Slip Op. at 12, or a refugee and a son-in-law she has never met.

Moreover, the Ninth Circuit held that Hawaii's harm from the refugee ban flows from the fact that the ban prevents the State from "assisting with refugee resettlement." *Hawaii*, No. 17-15589, slip op. at 24. The Government urged the Supreme Court to reject that holding. Instead, the Supreme Court held that the "facts of these cases" illustrate the kind of relationships that remain covered by the injunction. Thus, at a minimum, the injunction covers refugees with a relationship to a U.S. entity similar to the one between Hawaii and the refugees it intends to resettle—a relationship if anything *more* removed than a resettlement agency's. *See* Katyal Decl. Ex. D ¶ 23 (explaining that "state and local governments" work with resettlement agencies to "meet the needs of forthcoming refugees").

  2. *The Government Is Violating the Injunction on Section 6 In Several Other Important Ways.*

*First,* the Government has asserted that it "has yet to determine" whether aliens who have already booked travel may enter the United States after July 6.

13

Dkt. 301 at 18-19. But refugees who have booked travel necessarily not only have a relationship with a U.S. resettlement agency, but also have a place to live and services lined up for them when they enter the country. They therefore *a fortiori* have the requisite bona fide relationship. *See supra* Part II.B.1.

*Second*, in guidance sent on July 3, the Government stated that it was temporarily halting the process through which refugees obtain the advanced booking notifications necessary for travel, even with respect to refugees "with * * * the required bona fide relationship to a person or entity" in the United States. Katyal Decl. Ex. F ¶ 11. But the Order "*may not be enforced* against an individual seeking admission as a refugee who can credibly claim a bona fide relationship with a person or entity in the United States." Slip Op. at 13 (emphasis added).

*Third*, while the Government appears to accept that some client relationships with a legal services organization are protected by this Court's injunction, it refuses to say whether all relationships qualify. *See* Dkt. 301 at 20-21. The fact that an alien has a "formal, documented" relationship with a legal services organization that is "formed in the ordinary course," however, is *ipso facto* sufficient under the Court's order. Slip Op. at 12; *see* Dkt. 297-1, HIAS & IRAP Amicus Br. at 5-6.

In its prior briefing, the Government attempted to sidestep each of these issues by asserting that the disputes are unripe. Opp. at 18-19. But the

14

Government is already enforcing its Order, and its guidance and equivocations demonstrate that it is doing so unlawfully. An immediate injunction is warranted, particularly because refugee and visa processes are notoriously slow and backlogged. The Government cannot be permitted to continue implementing the ban in a way that drags this process out even further for those that should be protected by this Court's injunction. Nor can the Government be permitted to employ a cumbersome individualized process for applicants that should be categorically exempt from the bans.[6] The time wasted in that process may, for example, unfairly preclude refugees from entering the country before October 1, when President Trump is authorized to set a new refugee cap.

## CONCLUSION

For the foregoing reasons, the Court should issue an order either enforcing or modifying its preliminary injunction, in order to reflect the scope of relief requested herein and set forth in the attached Proposed Orders.

DATED: Washington, D.C., July 8, 2017.

---

[6] While the Government has properly recognized that certain categories of foreign nationals seeking entry are categorically exempt from the bans, *see* Opp. at 18-19, it still refuses to acknowledge that three categories of refugee applicants are similarly categorically exempt: "U.S.-affiliated Iraqis" at risk of persecution because of their contributions to the United States' combat mission in Iraq; and participants in the Lautenberg Program and the Central American Minors Program, each of which requires participants to have close family ties with the United States, a relationship with a "designated resettlement agency," or both. *See* Dkt. 297-1, HIAS & IRAP Amicus Br. at 10; https://www.uscis.gov/CAM.

                              Respectfully submitted,

                              */s/ Neal K. Katyal*

| | |
|---|---|
| DOUGLAS S. CHIN (Bar No. 6465) | NEAL K. KATYAL* |
|   Attorney General of the State of Hawaiʻi | COLLEEN ROH SINZDAK* |
| CLYDE J. WADSWORTH (Bar No. 8495) | MITCHELL P. REICH* |
|   Solicitor General of the State of Hawaiʻi | ELIZABETH HAGERTY* |
| DEIRDRE MARIE-IHA (Bar No. 7923) | THOMAS P. SCHMIDT* |
| DONNA H. KALAMA (Bar No. 6051) | SARA SOLOW* |
| KIMBERLY T. GUIDRY (Bar No. 7813) | ALEXANDER B. BOWERMAN* |
| ROBERT T. NAKATSUJI (Bar No. 6743) | HOGAN LOVELLS US LLP |
|   Deputy Attorneys General | |
| DEPARTMENT OF THE ATTORNEY | *Admitted Pro Hac Vice |
|   GENERAL, STATE OF HAWAIʻI | |
| | *Attorneys for Plaintiffs, State of* |
| *Attorneys for Plaintiff, State of Hawaiʻi* | *Hawaiʻi and Ismail Elshikh* |