**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 7 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| STATE OF HAWAII; ISMAIL ELSHIKH, | No.    17-16426 |
| Plaintiffs-Appellees, | D.C. No. 1:17-cv-00050-DKW-KSC |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX W. TILLERSON, in his official capacity as Secretary of State; UNITED STATES OF AMERICA, | OPINION |
| Defendants-Appellants. | |

Appeal from the United States District Court
for the District of Hawaii
Derrick Kahala Watson, District Judge, Presiding

Argued and Submitted August 28, 2017
Seattle, Washington

Before:  Michael Daly Hawkins, Ronald M. Gould, and Richard A. Paez, Circuit Judges.

Per Curiam Opinion

PER CURIAM:

We are asked to review the district court's modified preliminary injunction,

which enjoins the Government from enforcing Executive Order 13780 against (1) grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States; and (2) refugees who have formal assurances from resettlement agencies or are in the U.S. Refugee Admissions Program ("USRAP") through the Lautenberg Amendment.

For the reasons that follow, we conclude that in modifying the preliminary injunction to preserve the status quo, the district court carefully and correctly balanced the hardships and the equitable considerations as directed by the Supreme Court in *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017), and did not abuse its discretion.  We affirm.

# I

## A

On March 6, 2017, President Trump issued Executive Order 13780, entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States."  Exec. Order No. 13780, 82 Fed. Reg. 13209 (Mar. 6, 2017) (the "Executive Order").[1] Section 2(c) of the Executive Order suspends for ninety days the entry of nationals

---

[1] The President revoked Executive Order 13780's predecessor, Executive Order 13769, after a district court entered a nationwide injunction enjoining its enforcement and this court denied the Government's emergency motion to stay the injunction pending appeal.  *See Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), *reconsideration en banc denied*, 853 F.3d 933 (9th Cir. 2017), *amended and superseded by* 858 F.3d 1168 (9th Cir. 2017).

of Iran, Libya, Somalia, Sudan, Syria, and Yemen into the United States.  *Id.* at

13213.  Section 6(a) suspends for 120 days the entry of refugees into the United

States and decisions on applications for refugee status, and § 6(b) cuts by more

than half the number of refugees that may be admitted to the United States in fiscal

year 2017 from 110,000 persons to 50,000 persons.  *Id.* at 13215–16.

## B

On March 15, 2017, the District of Hawaiʻi temporarily enjoined § 2 and § 6

of the Executive Order, holding that Plaintiffs, the State of Hawaiʻi and Dr.

Elshikh, had shown a likelihood of success on the merits of their Establishment

Clause claim.  *Hawaiʻi v. Trump*, — F. Supp. 3d —, No. CV 17-00050 DKW-

KSC, 2017 WL 1011673 (D. Haw. Mar. 15, 2017).  Plaintiffs had argued that the

Executive Order was primarily motivated by anti-Muslim animus and not by its

purported national security objective.

On March 29, 2017, the district court converted the temporary restraining

order into a preliminary injunction, and entered the following injunction:

> Defendants and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined from enforcing or implementing Sections 2 and 6 of the Executive Order across the Nation. Enforcement of these provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.

*Hawaiʻi v. Trump*, — F. Supp. 3d —, No. CV 17-00050 DKW-KSC, 2017 WL

1167383, at *9 (D. Haw. Mar. 29, 2017), *aff'd in part, vacated in part, remanded*, 859 F.3d 741 (9th Cir. 2017).

On June 12, 2017, we affirmed in substantial part the preliminary injunction. *See Hawaiʻi v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080.  Rather than reach the constitutional question, we resolved the appeal on statutory grounds, concluding that the President exceeded the scope of his delegated authority and that the Executive Order violated other provisions of the Immigration and Nationality Act ("INA").  *Id.* at 755–56.  We also vacated parts of the injunction that enjoined the Government from conducting internal reviews of its vetting procedures and vacated the injunction to the extent it ran against the President.  *Id.* at 788–89.

We remanded the case to the District of Hawaiʻi to enter an amended preliminary injunction consistent with our opinion and granted the parties' motion to expedite the issuance of the mandate.  *See id.* at 789.  On June 19, 2017, the district court entered the following amended preliminary injunction:

> Defendants JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined from enforcing or implementing Sections 2 and 6 of Executive Order No. 13780 across the Nation— except for those portions of Sections 2 and 6 providing for internal review procedures that do not burden individuals outside of the

4

executive branch of the federal government. Enforcement of the enjoined provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.

*Hawai'i v. Trump*, No. 1:17-cv-00050-DKW-KSC (D. Haw. June 19, 2017), ECF No. 291 (footnote omitted).

## C

On March 16, 2017, the District of Maryland entered a separate preliminary injunction, barring enforcement of § 2(c) of the Executive Order, concluding that the plaintiffs were likely to succeed on the merits of their Establishment Clause claim. *Int'l Refugee Assistance Project v. Trump*, — F. Supp. 3d —, No. CV TDC-17-0361, 2017 WL 1018235, at \*16 (D. Md. Mar. 16, 2017), *aff'd in part, vacated in part*, 857 F.3d 554 (4th Cir. 2017).

The Fourth Circuit largely affirmed the injunction. *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc), *cert. granted*, 137 S. Ct. 2080 (2017).  The majority of the Fourth Circuit's en banc court held that plaintiff John Doe #1, a permanent resident who alleged that the Executive Order prevented his wife from obtaining a visa, was likely to prevail on the merits of the Establishment Clause claim. *Id.* at 578–79, 601.

## D

The Government then filed petitions for certiorari and applications to stay the preliminary injunctions entered in *Hawai'i* and in *International Refugee*

5

*Assistance Project*.  On June 26, 2017, the Supreme Court granted the petitions for

certiorari and granted the stay applications in part.  *Trump*, 137 S. Ct. at 2083.

As to § 2(c) of the Executive Order, the Supreme Court stayed the

preliminary injunctions "to the extent the injunctions prevent enforcement of § 2(c)

with respect to foreign nationals who lack any bona fide relationship with a person

or entity in the United States."  *Id.* at 2087.  The Court "balance[d] the equities,"

*id.*, and concluded that for foreign nationals "who have no connection to the United

States at all[,] . . . [d]enying entry to such a foreign national does not burden any

American party by reason of that party's relationship with the foreign national," *id.*

at 2088.  But the Court left the injunctions in place "with respect to parties

similarly situated to [John Doe #1], Dr. Elshikh, and Hawaii."  *Id.*  The Court

explained: "In practical terms, this means that § 2(c) may not be enforced against

foreign nationals who have a credible claim of a bona fide relationship with a

person or entity in the United States."  *Id.*  The Court explained how the

relationships held by the plaintiffs "illustrate the sort of relationship that qualifies":

> For individuals, a close familial relationship is required.  A foreign
> national who wishes to enter the United States to live with or visit a
> family member, like Doe's wife or Dr. Elshikh's mother-in-law, clearly
> has such a relationship.  As for entities, the relationship must be formal,
> documented, and formed in the ordinary course, rather than for the
> purpose of evading [the Executive Order].  The students from the
> designated countries who have been admitted to the University of
> Hawaii have such a relationship with an American entity.  So too would
> a worker who accepted an offer of employment from an American
> company or a lecturer invited to address an American audience.  Not so

6

someone who enters into a relationship simply to avoid § 2(c): For example, a nonprofit group devoted to immigration issues may not contact foreign nationals from the designated countries, add them to client lists, and then secure their entry by claiming injury from their exclusion.

*Id.*

As to § 6(a) and § 6(b) of the Executive Order, the Supreme Court stated that the "equitable balance struck" regarding § 2(c) "applies in this context as well." *Id.* at 2089. Thus, the Executive Order may not be enforced against "an individual seeking admission as a refugee who can credibly claim a bona fide relationship with a person or entity in the United States." *Id.* The Court explained: "An American individual or entity that has a bona fide relationship with a particular person seeking to enter the country as a refugee can legitimately claim concrete hardship if that person is excluded. As to these individuals and entities, we do not disturb the injunction." *Id.*

### E

On June 29, 2017, the Government began to enforce the non-enjoined parts of the Executive Order.[2] The relevant agencies published public guidance on the

---

[2] The President issued a memorandum that changed the effective date of the Executive Order and directed the relevant agencies to "begin implementation of each relevant provision of sections 2 and 6 of the Executive Order 72 hours after all applicable injunctions are lifted or stayed with respect to that provision." Effective Date in Executive Order 13780, 82 Fed. Reg. 27965, 27966 (June 14, 2017).

scope of the implementation and enforcement of the Executive Order.  On June 29, 2017, Plaintiffs filed an emergency motion to clarify the scope of the preliminary injunction.  On July 6, 2017, the district court denied that motion, ruling that "[b]ecause Plaintiffs seek clarification of the June 26, 2017 injunction modifications authored by the Supreme Court, clarification should be sought there, not here."  *Hawai'i v. Trump*, — F.3d —, No. 17-00050 DKW-KSC, 2017 WL 2882696, at *3 (D. Haw. July 6, 2017), *appeal dismissed*, No. 17-16366, 2017 WL 3048456 (9th Cir. July 7, 2017).

Plaintiffs appealed that district court ruling on July 7, 2017, and we *sua sponte* dismissed the appeal for lack of jurisdiction that same day.  *Hawaii v. Trump*, — F.3d —, No. 17-16366, 2017 WL 3048456, at *1 (9th Cir. July 7, 2017).  We also noted that the district court "possess[es] the ability to interpret and enforce the Supreme Court's order, as well as the authority to enjoin against, for example, a party's violation of the Supreme Court's order placing effective limitations on the scope of the district court's preliminary injunction."  *Id.*

On the evening of July 7, 2017, Plaintiffs filed a new motion in the district court, this time seeking enforcement or modification, rather than clarification, of the district court's preliminary injunction.  Plaintiffs contended the following: (1) the Government's definition of "close familial relationship" was artificially narrow; (2) refugees with a formal assurance from a refugee resettlement agency

have a "bona fide relationship" with a U.S. entity; (3) clients of legal services

organizations have a "bona fide relationship" with a U.S. entity; and (4) refugees in

the Direct Access Program for U.S.-Affiliated Iraqis, the Central American Minors

Program, and the Lautenberg Program are categorically protected.

On July 13, 2017, the district court granted in part Plaintiffs' motion to

enforce or modify the preliminary injunction. *Hawai'i v. Trump*, — F. Supp. 3d —

, No. CV 17-00050 DKW-KSC, 2017 WL 2989048, at *1 (D. Haw. July 13, 2017).

The district court concluded that the Government too narrowly defined "close

familial relationships" by restricting it to parents, parents-in-law, spouses, fiancés,[3]

children, adult sons and daughters, sons- and daughters-in-law, siblings (half and

whole relationships), and step relationships. *Id.* at *5–6.  The district court

modified the preliminary injunction to include grandparents, grandchildren,

brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of

persons in the United States. *Id.* at *6, *10.  The district court also concluded that

refugees with a formal assurance have bona fide relationships with refugee

resettlement agencies and that refugees in USRAP through the Lautenberg

Amendment should categorically be protected by the injunction.[4]  *Id.* at *7, *9.

---

[3] The Government's initial guidance indicated that fiancés would not be considered close family members.  Subsequent guidance reversed the Government's position as to fiancés.

[4] The district court did not grant relief with respect to foreign nationals in a client relationship with a legal services organization or to participants in the Direct

The district court entered the amended preliminary injunction as follows:

> Defendants JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them, are hereby enjoined from enforcing or implementing Sections 2 and 6 of Executive Order No. 13,780 across the Nation— except for those portions of Sections 2 and 6 providing for internal review procedures that do not burden individuals outside of the executive branch of the federal government. Enforcement of the enjoined provisions in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas is prohibited, pending further orders from this Court.
>
> Defendants JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; REX W. TILLERSON, in his official capacity as Secretary of State; and all their respective officers, agents, servants, employees, and attorneys, and persons in active concert or participation with them are enjoined fully from the following:
>
> 1. Applying section 2(c), 6(a) and 6(b) of Executive Order 13,780 to exclude grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States.
>
> 2. Applying Section 6(a) and 6(b) of Executive Order 13,780 to exclude refugees who: (i) have a formal assurance from an agency within the United States that the agency will provide, or ensure the provision of, reception and placement services to that refugee; or (ii) are in the U.S. Refugee Admissions Program through the Lautenberg Program.

*Id.* at *10.

---

Access Program for U.S.-Affiliated Iraqis and the Central American Minors Program. *See Hawai'i*, 2017 WL 2989048, at *8–9. Plaintiffs do not challenge these aspects of the district court's order.

On July 14, 2017, the Government filed a notice of appeal from the district court's order, along with a motion for a stay pending appeal.  The Government also filed a motion at the Supreme Court, requesting that the Court clarify its June 26, 2017 stay ruling concerning the issues presented in the appeal, along with an application for a temporary administrative stay of the district court's injunction. On July 19, 2017, the Supreme Court summarily denied the motion for clarification but stayed in part the district court's modified injunction "with respect to refugees covered by a formal assurance," pending resolution of the Government's appeal before us. *Trump v. Hawaii*, No. 16-1540, 2017 WL 3045234, at \*1 (U.S. July 19, 2017).

On July 21, 2017, the parties filed a joint motion to expedite the Government's appeal, which we granted.

We now turn to the merits of the Government's appeal.

## II

We have jurisdiction under 28 U.S.C. § 1292(a)(1).  "We review de novo the legal premises underlying a preliminary injunction" and "review for abuse of discretion the terms of a preliminary injunction." *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1096 (9th Cir. 2002).  "As long as the district court got the law right, it will not be reversed simply because [we] would have arrived at a different result if [we] had applied the law to the facts of the case." *Id.* (alterations

11

in original) (quoting *Gregorio T. v. Wilson*, 59 F.3d 1002, 1004 (9th Cir. 1995)).

The district court has the power to supervise compliance with an injunction and to "modify a preliminary injunction in consideration of new facts." *Id.* at 1098; *accord* Fed. R. Civ. P. 62(c). "A party seeking modification . . . of an injunction bears the burden of establishing that a significant change in facts or law warrants revision . . . of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000).

### III

On appeal, the Government contends that the district court disturbed the status quo "by significantly expanding the preliminary injunction beyond the limits of the stay." The Government argues that the district court erred in modifying the preliminary injunction to bar its enforcement against: (1) certain family members, including grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins; and (2) refugees for whom the Department of State has obtained an assurance from a U.S.-based resettlement agency, as well as refugees in USRAP through the Lautenberg Program.

### A

We first address the Government's challenge of the district court's modified preliminary injunction that enjoins the Government from enforcing the Executive Order against grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts,

uncles, nieces, nephews, and cousins of persons in the United States. *See Hawai'i*, 2017 WL 2989048, at *5–6, *10.

Emphasizing that the Supreme Court limited the injunction to aliens who have "*close* familial relationships" with a person in the United States, the Government argues that it appropriately construed the stay to include only immediate relationships such as parents, parents-in-law, spouses, fiancés, children, adult sons or daughters, sons-in-law, daughters-in-law, siblings (whole or half), and step-relationships, but to exclude "more distant relatives." The Government argues that it justifiably drew these lines by relying on provisions of the INA and because the Supreme Court's weighing of the equities approvingly cited the Executive Order's waiver provision.

The Government unreasonably interprets the Supreme Court's reference to "close familial relationship[s]." *Trump*, 137 S. Ct. at 2088. The Supreme Court granted the stay "with respect to foreign nationals who lack *any* bona fide relationship with a person or entity in the United States." *Id.* at 2087 (emphasis added). The Court criticized the lower courts' preliminary injunctions because the injunctions barred enforcement of the Executive Order "against foreign nationals abroad who have *no connection* to the United States at all." *Id.* at 2088 (emphasis added). The Court explained that, in considering the stay, the balance of equities favored the Government because an injunction covering "foreign nationals

13

*unconnected* to the United States" would "appreciably injure [the Government's] interests, without alleviating obvious hardship to anyone else." *Id.* (emphasis added); *see also id.* ("[T]he Government's interest in enforcing § 2(c), and the Executive's authority to do so, are undoubtedly at their peak when there is *no tie* between the foreign national and the United States." (emphasis added)).

In crafting the stay, the Supreme Court "balance[d] the equities," *id.* at 2087, and declined to stay the injunction for foreign nationals whose exclusion would burden any American party by inflicting "concrete . . . hardships," *id.* at 2088.  The Supreme Court went on to illustrate the types of qualifying "close" familial relationships, explaining, "[a] foreign national who wishes to enter the United States to live with or visit a family member, like Doe's wife or Dr. Elshikh's mother-in-law, *clearly* has such a relationship."  *Id.* (emphasis added).

From this explanation, it is clear that the Supreme Court's use of "close familial relationship[s]" meant that the Court wanted to exclude individuals who have no connection with the United States or have remote familial relationships that would not qualify as "bona fide."[5]  *Id.*  The Government does not meaningfully argue how grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States

---

[5] A "bona fide" relationship is one "[m]ade in good faith; without fraud or deceit" or a "[s]incere; genuine" relationship. *Bona Fide*, BLACK'S LAW DICTIONARY (10th ed. 2014).

can be considered to have "no connection" to or "lack any bona fide relationship" with persons in the United States.  Nor does the Government explain how its proposed scope of exclusion would avoid the infliction of concrete hardships on such individuals' family members in the United States.  Stated simply, the Government does not offer a persuasive explanation for why a mother-in-law is *clearly* a bona fide relationship, in the Supreme Court's prior reasoning, but a grandparent, grandchild, aunt, uncle, niece, nephew, or cousin is not.

The Government contends that it drew this particular familial boundary based on the text of the INA.  Section 201 of the INA pertains to aliens "who are not subject to the worldwide levels or numerical limitations" of immigrant visas and defines "immediate relatives" as "the children" (unmarried children under the age of twenty-one), "spouses, and parents of a citizen of the United States."  8 U.S.C. § 1151(b)(2)(A)(i); *see id.* § 1101(b)(1).  Section 203, which concerns the allocation of immigrant visas, prioritizes sons and daughters of U.S. citizens; siblings of U.S. citizens (if the citizen is at least twenty-one years of age); and spouses, unmarried sons, and unmarried daughters of permanent resident aliens. *Id.* § 1153(a).  The Government points out that the INA also recognizes the fiancé relationship.  *See id.* §§ 1101(a)(15)(K), 1184(d).

There are at least two problems with the Government's justification.  First, there is no support for the proposition that the Supreme Court's equitable decision

15

was informed by technical definitions of family from the INA.  Indeed, the Court's conclusion that mothers-in-law—a close familial relationship not recognized by the sections of the INA upon which the Government relies—are "clearly" covered by the injunction indicates that the Court did not intend to limit the injunction to only the family relationships recognized in the specific provisions of the INA identified by the Government.  Rather than rely on the INA's definition for "immediate relatives" to define "close familial relationships," the Supreme Court instead focused its consideration on the harms faced by persons in the United States based on the denial of entry of foreign nationals with whom they have bona fide relationships.  In doing so, the Supreme Court deployed fundamental equitable considerations that have guided American law for centuries.

Second, the Government's reference to its favored INA provisions is unduly narrow and selective.  Sections 201 and 203 deal only with those seeking lawful permanent residence in the United States.  Given that the Executive Order bars entry for even those seeking temporary admission with non-immigrant visas, it does not follow that provisions dealing with permanent residence in the United States should properly inform whether foreign nationals have "bona fide relationships" that are exempt from the Executive Order.[6]  Persons in the United

---

[6] Such provisions, like those relating to aliens wishing to travel or visit family in the United States on short-term, non-immigrant visas, do not impose any familial relationship-based requirements at all.  *See, e.g.*, 8 U.S.C. § 1101(a)(15)(B);

States affected by the exclusion extend beyond those petitioning for an immediate relative to live permanently in the United States.

But even if the INA may inform the construction of "close familial relationship[s]," the Government's decision to rely on the cited specific provisions of the INA is troubling because other provisions of the INA (and other immigration laws) offer broader definitions.  In the Family Sponsor Immigration Act of 2002, for example, Congress amended the INA to provide that when the sponsor of an alien's immigrant visa petition has died, another member of the alien's "close family"—defined to include family members such as "sister-in-law, brother-in-law, grandparent, or grandchild"—could sponsor the alien for admission.  Pub. L. No. 107-150, § 2(a) (codified at 8 U.S.C. § 1183a(f)(5)).  In other words, the INA explicitly refers to sisters-in-law, brothers-in-law, grandparents, and grandchildren as *close* family.  The Government's "cherry-picked" INA provisions recognize immediate family relationships as those between parents, spouses, children, and siblings, yet other provisions of the INA and other immigration laws offer broader definitions for close family.  As Plaintiffs further point out, other immigration laws enable an individual to seek admission on behalf of aunts, uncles, and close blood

---

Directory of Visa Categories, U.S. Dep't of State, https://travel.state.gov/content/visas/en/general/all-visa-categories.html (last visited Aug. 29, 2017).

relatives.[7]

The Government offers no explanation as to why it relied on its selected provisions of the INA, while ignoring other provisions of the same statute as well as other immigration laws. The INA was implemented with "the underlying intention of . . . preservation of the family unit." H.R. Rep. No. 82-1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1680. The Government's artificially narrow interpretation of close familial relationships directly contradicts this intention.

The Government next contends that the Supreme Court approvingly cited the Executive Order's waiver provision when describing the equities that the Court weighed in partially granting the stay. The Executive Order sets out a number of

---

[7] For example, Plaintiffs cite an immigration law that permits a juvenile alien to be released from detention to the custody of parents, legal guardians, or "other close blood relatives." *Reno v. Flores*, 507 U.S. 292, 310 (1993). Such relatives include "brother, sister, aunt, uncle, [and] grandparent." *Id.* at 297 (quoting 8 C.F.R. § 242.24(b)(1), *recodified at* 8 C.F.R. § 236.3(b)(1)(iii)). Other immigration laws enable an individual to seek admission on behalf of grandchildren, nieces, or nephews, *see* 81 Fed. Reg. 92266, 92280 (Dec. 19, 2016); to apply for asylum if a "grandparent, grandchild, aunt, uncle, niece, or nephew" resides in the United States, 69 Fed. Reg. 69480, 69488 (Nov. 29, 2004); to apply for naturalization on behalf of a grandchild, 8 U.S.C. § 1433(a); or to qualify as a special immigrant if he or she is the "grandparent" of a child orphaned by the September 11, 2001 attacks, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 421(b)(3). The Board of Immigration Appeals has also held that an alien has "close family ties in the United States" for purposes of obtaining cancellation of removal or waiver of inadmissibility if a sibling-in-law or grandchild lives here. *See, e.g.*, *In re Mulholland*, No. A42 655 803 - DALL, 2007 WL 2299644, at *1 (BIA July 12, 2007) (considering mother, step-father, and brother-in-law as close family ties); *In re Gomez*, No. A28 911 501 - DANB, 2006 WL 2391225, at *1 (BIA July 6, 2006) (considering children and grandchildren as close family ties).

18

case-by-case waivers, including one for a foreign national seeking "to enter the United States to visit or reside with a close family member (e.g., a spouse, child, or parent) who is a United States citizen, lawful permanent resident, or alien lawfully admitted on a valid nonimmigrant visa, and the denial of entry during the suspension period would cause undue hardship." 82 Fed. Reg. at 13214. The Supreme Court cited to this waiver provision as further evidence in support of its conclusion that the equities "do not balance the same way" for all parties. *Trump*, 137 S. Ct. at 2088. In the Supreme Court's view, the Executive Order's allowance for waivers serves as evidence that even the Government distinguishes between "foreign nationals who have some connection to this country, and foreign nationals who do not." *Id.* Moreover, the waiver provision does not state or imply that the waiver for close family members gives an exhaustive list of qualifying relationships. The waiver provision on its face only notes examples of the types of relationships that the Executive Order considers "close." This list does not include fiancés, siblings, and parents-in-law, which are familial relationships that the Government now includes in its guidance. Nor did the Supreme Court's stay order import these examples as the only types of close family relationships that should fall within the scope of the injunction. To reiterate, the Supreme Court's stay order considered whether a foreign national lacked *any* bona fide relationship with a person in the United States. It is hard to see how a grandparent, grandchild, aunt,

uncle, niece, nephew, sibling-in-law, or cousin can be considered to have no bona fide relationship with their relative in the United States.

Finally, the Government argues that the district court erred by creating a much larger exception "unmoored from the INA and the Order's waiver provision" by referring to Dr. Elshikh's mother-in-law. The Government urges that Dr. Elshikh's wife is a U.S. citizen, and that "parents-in-law of persons in the United States will typically also be parents of persons in the United States." The Supreme Court, however, did not rely on the relationship between Dr. Elshikh's wife and her mother. Instead, the Court emphasized the relationship between Dr. Elshikh and his mother-in-law—who "clearly [have] such a [close familial] relationship." *Trump*, 137 S. Ct. at 2088. Plaintiffs correctly point out that the familial relationships the Government seeks to bar from entry are within the same "degree of kinship" as a mother-in-law. *See Moore v. City of E. Cleveland*, 431 U.S. 494, 505–06 (1977) (plurality). As Plaintiffs aptly state, "[a] brother-in-law is the brother of a person's spouse; a niece is the daughter of one's brother or sister. These relations are just as 'close,' if not closer, than the mother of a person's spouse." If mothers-in-law *clearly* fall within the scope of the injunction, then so too should grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins.

We find further support in other Supreme Court decisions, albeit that arise in

different contexts from immigration law, for this broad definition of "close familial relationship." These cases show how the denial of entry can cause concrete hardship to family members in the United States. In *Moore v. City of East Cleveland*, the Court invalidated as unconstitutional a housing ordinance that limited occupancy of a dwelling unit to members of a nuclear family. 431 U.S. at 495–96, 506. The Court discussed "a larger conception of [] family," derived from "the accumulated wisdom of civilization, gained over the centuries and honored throughout our history," that was worthy of constitutional protection. *Id.* at 505. To that end, the Court recognized and protected the tradition of "close relatives"—"uncles, aunts, cousins, and especially grandparents"—"sharing a household along with parents and children." *Id.* at 504–05. Other cases have likewise addressed extended family relationships. *See Troxel v. Granville*, 530 U.S. 57, 64–65 (2000) (discussing the "important role" grandparents often play); *Tooahnippah v. Hickel*, 397 U.S. 598, 608 (1970) (noting the "close and sustained familial relationship" between a testator and his niece). In these cases, the Court described the importance of close relatives such as grandparents, aunts, uncles, nieces, nephews, and cousins. The recognition of close family relationships, whether in particular INA statutory provisions or in other Supreme Court cases describing family relationships, are relevant to determining the proper scope of the Supreme Court's June 26, 2017 stay order.

In sum, the district court did not err in rejecting the Government's restricted reading of the Supreme Court's June 26, 2017 stay ruling and in modifying the injunction to prohibit enforcement of the Executive Order against grandparents, grandchildren, brothers-in-law, sisters-in-law, aunts, uncles, nieces, nephews, and cousins of persons in the United States.[8] Denying entry to these foreign nationals would burden persons in the United States "by reason of that party's relationship with the foreign national."[9] *Trump*, 137 S. Ct. at 2088.

---

[8] We reject the Government's invitation to "evaluate the [familial] relationships separately rather than on a blanket basis," for all relationships or at least for siblings-in law, cousins, aunts, uncles, nieces, and nephews. That argument is without merit because it starts from the false premise that each individual must prove a close family relationship, while the Supreme Court clearly intended the exception to the stay order to allow continuing relief to the categories of persons with a close family relationship without additional inquiry. Moreover, the Government did not raise this argument regarding the scope of the injunction before the district court, and has therefore waived it. *See Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014) (explaining that a party waived arguments about scope of injunction by not raising them before the district court). The Government also does not meaningfully argue the distinction between a grandparent and the other familial relationships it seeks to exclude from the modified injunction.

[9] In a related argument, the Government challenges the district court's modified injunction with respect to the Lautenberg Program—a program "permit[ting] certain nationals of the former Soviet Union and other countries with 'close family in the United States' to apply for refugee status." *Hawai'i*, 2017 WL 2989048, at *9 (citing U.S. Dep't of State, *Proposed Refugee Admissions for Fiscal Year 2017* (Sept. 15, 2016), https://www.state.gov/j/prm/releases/ docsforcongress/261956.htm). The Government's challenge regards the Lautenberg Amendment's inclusion of grandparents and grandchildren as qualifying "close family." *See* Public Law No. 1010-167, § 599, 103 Stat. 1261 (1989) (codified at 8 U.S.C. § 1157). Because the district court did not err in its analysis of what constitutes a "close familial relationship," it did not err by

22

**B**

We next address the Government's challenge to the district court's modified injunction that enjoins the Government from excluding refugees covered by formal assurances.[10] *See Hawai'i*, 2017 WL 2989048, at *7. The Government's guidance had specified that "[t]he fact that a resettlement agency in the United States has provided a formal assurance for a refugee seeking admission . . . is not sufficient in and of itself to establish a qualifying relationship for that refugee with an entity in the United States." U.S. Dep't of State, *Fact Sheet: Information Regarding the U.S. Refugee Admissions Program*, June 30, 2017, https://www.state.gov/j/prm/releases/factsheets/2017/272316.htm.

The Government argues that the district court erred because a formal assurance denotes the relationship between a resettlement organization and the Department of State, *not* a relationship between the organization and the refugee. The Government also contends that affirming the district court would mean that the Supreme Court's stay would cover "virtually no refugee" because about 24,000

---

modifying the injunction as to refugees in USRAP through the Lautenberg Program.

[10] Notably, many refugees lack close familial relationships with persons in the United States, and the Government's interpretation of the Supreme Court's stay order interposes another barrier for refugees seeking admission into the United States. *See* Declaration of Erol Kekic, Executive Director of Church World Service, Dist. Ct. Dkt. No. 344-1 at 1–2 (noting that more than one-thousand refugees with formal assurances from Church World Service do not have a qualifying family relationship as defined by the Government).

23

refugees have been assured.

As the district court correctly identified, a refugee is covered by the preliminary injunction, as modified by the Supreme Court's stay order, if the refugee has a bona fide relationship with an entity in the United States, meaning a relationship that is formal, documented, and formed in the ordinary course rather than to evade the Executive Order. *See Trump*, 137 S. Ct. at 2088–89. Applying this standard, the district court held that formally assured refugees have bona fide relationships with resettlement agencies and are covered by the injunction because the assurance is formal, documented, and formed in the ordinary course rather than to evade the Executive Order. Mindful of the narrow standard that governs our review, we affirm, considering the individualized screening process necessary to obtain a formal assurance and the concrete harms faced by a resettlement agency because of that refugee's exclusion.

**1**

It typically takes a refugee applicant eighteen to twenty-four months to successfully complete the application and screening process before he or she can be resettled in the United States. Most refugees first register with the United Nations High Commissioner for Refugees ("UNHCR") in the country to which he or she has fled. UNHCR interviews each refugee applicant and collects identifying documents. After UNHCR determines that an applicant meets the United States'

24

criteria for resettlement consideration and presents no disqualifying information, UNHCR refers the case to a U.S. Embassy, which then sends the case to one of nine Resettlement Support Centers ("RSC").  An RSC, under the guidance of the State Department, next refers an applicant for resettlement consideration and helps with completing other technical requirements.  The RSC interviews the applicant, collects identification documents and information, and initiates security checks.

United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security, then conducts a personal interview with the refugee in the country in which the refugee is located and determines whether the applicant qualifies for refugee status under U.S. law and meets other resettlement criteria.  A refugee who meets these qualifications is then security screened.  USCIS next notifies the Bureau of Population, Refugees, and Migration ("PRM"), a division of the State Department, that a refugee applicant is approved.  The applicant then undergoes medical screening.

After refugees have cleared these hurdles,[11] the RSC then obtains a "sponsorship assurance" from one of nine private non-profit organizations, known

---

[11] The sum total of these hurdles means that refugees with formal assurances have been reviewed by: UNHCR, the National Counterterrorism Center, the Federal Bureau of Investigation, the Department of Homeland Security, the Department of Defense, the Department of State, and others in the U.S. intelligence community.

as resettlement agencies.[12]  All refugees receive a sponsorship assurance from a resettlement agency before they travel to the United States.  The assurance is a "written commitment, submitted by a [resettlement agency], to provide, or ensure the provision of, the basic needs . . . and core services . . . for the refugee(s) named on the assurance form."  As of June 30, 2017, 23,958 refugees had formal assurances from a resettlement agency.  Resettlement agencies determine the best resettlement location for a refugee candidate, and consider whether a refugee has family ties in a certain locality, whether the local agency has the language skills necessary to communicate with the refugee, whether the refugee's medical needs can be addressed in the local community, and whether employment opportunities are available and accessible.

Once an applicant has been approved for resettlement, the applicant has passed all required medical exams, and the RSC has obtained the necessary sponsorship assurance from the resettlement agency, the RSC only then refers the case for transportation to the United States through a PRM-funded program.[13]

---

[12] The nine resettlement agencies are: Church World Service, Episcopal Migration Ministries, Ethiopian Community Development Council, HIAS, International Rescue Committee, Lutheran Immigration and Refugee Service, United States Committee for Refugees and Immigrants, United States Conference of Catholic Bishops, and World Relief.

[13] According to amici curiae the International Refugee Assistance Project and HIAS, Inc., a refugee who has received an assurance typically travels to the United States within two to six weeks, and must take care of matters such as selling possessions and terminating leases.

Once a refugee reaches his or her resettlement location in the United States, the

resettlement agency and its local affiliate facilitate the initial reception; provide

core services, including housing, furnishings, seasonal clothing, and food; and

assist in obtaining medical care, employment, educational services, and other

needed services.

2

Plaintiffs, as well as amici curiae, discuss two types of concrete hardships

that will be faced by resettlement agencies and local affiliates if formally assured

refugees are barred: (1) tangible injuries through the loss of invested resources and

financial support; and (2) intangible injuries from the inability to effectuate their

spiritual and moral missions.[14]

*Tangible Injuries:* A resettlement agency provides pre-arrival services for a

formally assured refugee and engages in an intensive process to match the

individual to resources even before the refugee is admitted.  These efforts, which

the formal assurance embodies, evince a bona fide relationship between a

resettlement agency and a refugee, and further demonstrate the hardship inflicted

---

[14] Other entities, including church congregations, volunteers, and landlords, who must wait to learn whether refugees with an assurance will be admitted, also will experience harm.  For example, resettlement organizations recruit foster families in the United States for refugee children living abroad without parental support, and refugee children receive an assurance *after* they have been assigned to a foster family or other placement.  Enforcing the Executive Order against such children harms American families who are waiting to welcome them.

on an agency if a refugee is not admitted.  Once an agency provides an assurance, but before the refugee arrives in the United States, the agency makes substantial investments in preparing for resettlement.  *See* Declaration of Mark Hetfield, President and CEO of HIAS, Inc., Dist. Ct. Dkt. No. 336-2 at 6, ¶ 18 ("After a refugee has been given an assurance, but before the refugee has been issued a visa, HIAS and its affiliates begin the involved process of arranging for the reception, placement, and appropriate initial resettlement assistance for the refugee."); *see also* Brief of Amicus Curiae U.S. Committee for Refugees and Immigrants in Support of Plaintiffs-Appellees ("USCRI Amicus Brief"), Dkt. No. 51 at 7 ("Most of the groundwork USCRI and the local agency perform in integrating a refugee into a community is the result of significant investments of money, time, effort, and emotion made after USCRI provides its written assurance of services to the State Department, but before the refugee arrives here.").  If a refugee does not arrive in the United States, or is delayed in arriving, the agency will lose the money and resources it has already expended in preparing for arrival, including securing rental housing, buying furniture, and arranging for basic necessities.  *Cf. Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) (determining that a nonprofit real estate developer had a sufficient injury to confer standing based on resources expended on planning and studies in anticipation of a project).

Resettlement agencies will not receive expected Government reimbursements if a refugee with a formal assurance is not admitted.  Each agency receives partial grant funding from the Government for the resettlement services it performs on behalf of each particular refugee covered by an assurance. Resettlement agencies and their affiliates advance these funds, for example, to secure lodging, purchase furniture, clothing and other necessities, and receive reimbursement from the State Department the month after the refugee's arrival in the United States.  *See* Declaration of Mark Hetfield, President and CEO of HIAS, Inc., Dist. Ct. Dkt. No. 336-2 at 7, ¶ 22; USCRI Amicus Brief, Dkt. No. 51 at 7. Reimbursements are withheld, however, if a refugee does not arrive in the United States.  For USCRI, these per capita payments accounted for over $25 million— nearly 43% of its total revenue—for the fiscal year ending September 30, 2016. USCRI Amicus Brief, Dkt. No. 51 at 7.  Since mid-June 2017, USCRI has been forced to lay off 17 full-time employees and its partner affiliates have laid off an additional 70 employees.  USCRI Amicus Brief, Dkt. No. 51 at 13.  USCRI plans to make additional layoffs in the next two months, and has already cut employee benefits by more than $1 million.  USCRI Amicus Brief, Dkt. No. 51 at 13. Resettlement agencies experience concrete hardship through the loss of federal funds withheld.  *Cf. Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 730 (S.D. Ind. 2016) (holding that loss of federal funding to a resettlement

29

nonprofit is an Article III injury), *aff'd*, 838 F.3d 902 (7th Cir. 2016).

   *Intangible Injuries:* Resettlement agencies also will face non-economic harms if formally assured refugees are barred from entry.  Assisting refugees and providing humanitarian aid are central to the core belief systems of resettlement entities and their employees.  Efforts to work on behalf of marginalized and vulnerable populations are undercut when the Government bars from entry formally assured refugees.  *Cf. Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987) (holding that a nonprofit satisfied Article III standing, including its injury component, where the nonprofit alleged that the government's interdiction program thwarted its organizational purpose).

   Resettlement agencies have bona fide relationships with refugees seeking to be admitted to this country and "can legitimately claim concrete hardship if [these refugees are] excluded." *Trump*, 137 S. Ct. at 2089.  Other courts have identified harms as evidence of a legally cognizable relationship between a resettlement organization and a refugee for whom it provided a formal assurance.  For example, in *Exodus Refugee Immigration, Inc. v. Pence*, the State of Indiana had directed state agencies not to pay federal grant funds to local refugee resettlement agencies for services the agencies provided to Syrian refugees.  165 F. Supp. 3d at 726–27.  In concluding that the nonprofit had third-party standing, the district court determined that the resettlement organization "undoubtedly ha[d] a sufficiently

close relationship" that was "current [and] ongoing" with the specific refugees it had been assigned to resettle "in the next few weeks or months." *Id.* at 732 (internal quotation marks omitted).

The Government contends that a formal assurance does not create a bona fide relationship between a resettlement agency and a refugee, and stresses that "[t]he assurance is not an agreement between the resettlement agency and the refugee; rather, it is an agreement between the agency and *the federal government*." But the Supreme Court's stay decision specifies that a qualifying relationship is one that is "formal, documented, and formed in the ordinary course, rather than for the purpose of evading [the Executive Order]." *Trump*, 137 S. Ct. at 2088. We cannot say that the district court clearly erred in its factual findings or ultimately abused its discretion in holding that the written assurance an agency submits, obligating the agency to provide core services for the specific refugee(s) listed on the assurance form, meets the requirements set out by the Court. Although the assurance is technically between the agency and the Government, the Government's intermediary function does not diminish the bona fide relationship between the resettlement agency and the specific refugee covered by the assurance.[15] Before signing the formal assurance, the agency undertakes a careful

---

[15] In fact, at oral argument, the government conceded as much stating, "We acknowledge that if an alien had a relationship with a U.S. entity indirectly, through an intermediary, that would count." Oral Arg. Vid. at 14:19–14:27.

selection process that "match[es] the particular needs of each incoming refugee with the specific resources available in a local community." U.S. Dep't of State, *The Reception and Placement Program*, https://www.state.gov/j/prm/ra/receptionplacement/ (last visited Aug. 5, 2017). After the assurance is executed but before the refugee arrives, the agency makes extensive preparations that are individualized to each refugee. This advance preparation and expenditure of resources supports the district court's determination that a bona fide relationship with the refugee exists.

Even if a resettlement agency does not have "direct contact" with a refugee before arrival, this does not negate the finding that a relationship has formed. The agency still expends resources and arranges for individualized services based on the specific refugees that the agency has agreed to resettle. Further, relationships can exist even without direct contact between the foreign national and the entity, as demonstrated by three examples of qualifying non-familial relationships in the Supreme Court's June 26, 2017 stay order. *See Trump*, 137 S. Ct. at 2088. An academic's lecture may be arranged through her organization, rather than between the academic and the American university. An employer may make a job offer to a foreign national through a third-party recruiter. An applicant may apply and receive an offer of admission through a coordinating organization separate from the university. And, likewise, a resettlement agency commits to provide basic

needs and core services to a specific refugee through the formal assurance it executes with the Government.

The Government also raises concerns that because about 24,000 refugees have been assured, the district court's ruling causes the Supreme Court's stay order to "cover[] virtually no refugee" and renders the order inoperative. The Supreme Court's stay considered the concrete hardship of U.S.-based persons and entities. *See Trump*, 137 S. Ct. at 2088–89. The Court's equitable decision did not express concern about the number of refugees that would fall within the scope of the injunction; rather, the Court's order clarifies that the Government is still enjoined from enforcing the 50,000-person cap of § 6(b) to exclude refugees who have a bona fide relationship with a U.S. person or entity and are otherwise eligible to enter the United States. *Id.* at 2089.

Furthermore, the Government's assertion that the modified injunction renders the Court's stay order inoperative is false. More than 175,000 refugees currently lack formal assurances. Without another bona fide relationship with a person or entity in the United States, the Executive Order suspends those refugees' applications. *See* U.S. Dep't of Homeland Security, *Frequently Asked Questions on Protecting the Nation from Foreign Terrorist Entry into the United States* at Q.27, https://www.dhs.gov/news/2017/06/29/frequently-asked-questions-protecting-nation-foreign-terrorist-entry-united-states (last visited Aug. 30, 2017)

("USCIS officers have been instructed that they should not approve a refugee application unless the officer is satisfied that the applicant's relationship complies with the requirement to have a credible claim of a bona fide relationship with a person or entity in the United States and was not formed for the purpose of evading the Executive Order.").

Resettlement agencies will face concrete harms and burdens if refugees with formal assurances are not admitted. In the same way that the Court considered the harms of the U.S. citizen who wants to be reunited with his mother-in-law and the permanent resident who wants to be reunited with his wife, the employer that hired an employee, the university that admitted a student, and the American audience that invited a lecturer, the district court correctly considered the resettlement agency that has given a formal assurance for specific refugees. The district court did not abuse its discretion with regard to this portion of the modified preliminary injunction.

## IV

Our decision affirming the district court's modified preliminary injunction will not take effect until the mandate issues, which would not ordinarily occur until at least 52 days after this opinion is filed. *See* Fed. R. App. P. 41; Fed. R. App. P. 40(a)(1).

Refugees' lives remain in vulnerable limbo during the pendency of the Supreme Court's stay.  Refugees have only a narrow window of time to complete their travel, as certain security and medical checks expire and must then be re-initiated.  Even short delays may prolong a refugee's admittance.

Because this case is governed by equitable principles, and because many refugees without the benefit of the injunction are gravely imperiled, we shorten the time for the mandate to issue.  *See* Fed. R. App. P. 41(b).  The mandate shall issue five days after the filing of this opinion.

## V

We affirm the district court's order modifying the preliminary injunction. The mandate shall issue five days after the filing of this opinion.

**AFFIRMED.**

## COUNSEL

Jeffrey B. Wall, Acting Solicitor General; Edwin S. Kneedler, Deputy Solicitor General; Chad A. Readler, Acting Assistant Attorney General; Elliot Enoki, Acting United States Attorney; Hashim M. Mooppan, Deputy Assistant Attorney General; Douglas N. Letter, Sharon Swingle, H. Thomas Byron III, and Lowell V. Sturgill Jr., Attorneys, Appellate Staff; Civil Division, U.S. Department of Justice, Washington, D.C.; for Defendants-Appellants.

Neal Kumar Katyal, Colleen Roh Sinzdak, Mitchell P. Reich, and Elizabeth Hagerty, Hogan Lovells US LLP, Washington, D.C.; Thomas P. Schmidt, Hogan Lovells US LLP, New York, New York; Sara Solow and Alexander B. Bowerman, Hogan Lovells US LLP, Philadelphia, PA; Douglas S. Chin, Attorney General; Clyde J. Wadsworth, Solicitor General; Deirdre Marie-Iha, Donna H. Kalama, Kimberly T. Guidry, and Robert T. Nakatsuji, Deputy Attorneys General; Department of the Attorney General, State of Hawaii, Honolulu, Hawai'i; for Plaintiffs-Appellees.

Michael Price and Faiza Patel, Brennan Center for Justice at New York University School of Law, New York, New York; Lena F. Masri, Gadeir I. Abbas, Council on American-Islamic Relations, Washington, D.C.; Jethro Eisenstein, Profeta & Eisenstein, New York, New York; for Amici Curiae Adam Soltani, Asma Elhuni, Hassan Shibly, and Basim Elkarra.

Jonathan M. Freiman and Tahlia Townsend, Wiggin and Dana LLP, New Haven, Connecticut; Harold Hongju Koh and Hope Metcalf, Rule of Law Clinic, Yale Law School, New Haven, Connecticut; for Amici Curiae Former National Security Officials.

G. Eric Brunstad, Jr., Dechert LLP, Hartford, Connecticut; for Amicus Curiae Human Rights First.

Robert A. Wiygul and Mark A. Aronchick, Hangley Aronchick Segal Pudlin & Schiller, Philadelphia, Pennyvania; for Amici Curiae Law Professors.

Barbara D. Underwood, Solicitor General, Anisha S. Dasgupta, Deputy Solicitor General, Zainab A. Chaudhry, Assistant Solicitor General, Eric T. Schneiderman, Attorney General, State of New York; for Amici Curiae States of New York, California, Connecticut, Delaware, Illinois, Iowa, Maine, Maryland, Massachusetts, New Mexico, Oregon, Rhode Island, Vermont, Virginia, and

Washington, and the District of Columbia.

Omar C. Jadwat, Lee Gelernt, Hina Shamsi, Hugh Handeyside, Sarah L. Mehta, Spencer E. Amdur, and David K. Hausman, American Civil Liberties Union Foundation, New York, New York; Karen C. Tumlin, Nicholas Espíritu, Melissa S. Keaney, and Ester Sung, National Immigration Law Center, Los Angeles, California; Justin B. Cox, National Immigration Law Center, Atlanta, Georgia; Cecilia D. Wang and Cody H. Wofsy, American Civil Liberties Union Foundation, San Francisco, California; Mateo Caballero, ACLU of Hawaiʻi Foundation, Honolulu, Hawaiʻi; Mariko Hirose, Rebecca Heller, and Mark Wasef, International Refugee Assistance Project, New York, New York; David Cole, Daniel Mach, and Heather L. Weaver, American Civil Liberties Union Foundation, Washington, D.C.; for Amici Curiae International Refugee Assistance Project and HIAS, Inc.

James C. Martin, Donna M. Doblick, and Devin M. Misour, Reed Smith LLP, Pittsburgh, Pennsylvania; Jayne Fleming, Reed Smith LLP, New York, New York; for Amicus Curiae U.S. Committee for Refugees and Immigrants.