IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAII and ISMAIL ELSHIKH, <br><br>         Plaintiffs, <br><br>    v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA, <br><br>         Defendants. | Civil Action No. 1:17-cv-00050-DKW-KSC |

**<u>MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND .............................................................................. 2

   A.   The First and Second Executive Orders ................................................. 2

   B.   The Third Executive Order ..................................................................... 4

   C.   The Effects of EO-3 on Plaintiffs ......................................................... 6

       1.   The State of Hawaii .......................................................................... 6

       2.   The Individual Plaintiffs .................................................................. 8

       3.   The Muslim Association of Hawaii ................................................. 9

ARGUMENT ..................................................................................................... 10

   A.   Plaintiffs Are Likely To Succeed On The Merits Of Their Claims ................................................................................................. 11

       1.   The Order Is Reviewable ............................................................... 11

       2.   EO-3 Violates the Immigration and Nationality Act .................... 13

            a.   *EO-3 Violates the INA's Prohibition on Nationality-Based Discrimination* ....................................... 13

            b.   *EO-3 Violates Section 1182(f)* ............................................ 18

                i.   EO-3 does not adequately "find" that entry "would be detrimental to the interests of the United States" ................................... 18

                ii.   EO-3 exceeds the longstanding limits on the President's § 1182(f) power ................................. 22

       3.   EO-3 Violates the Establishment Clause ....................................... 30

B.      The Remaining TRO Factors Are Met ......................................................34

C.      The Court Should Issue A Nationwide Injunction ...................................35

CONCLUSION .........................................................................................................37

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Am. Trucking Ass'ns, Inc.* v. *City of L.A.*,
   559 F.3d 1046 (9th Cir. 2009) ..........................................................................34

*Ariz. Christian Schs. Tuition Org.* v. *Winn*,
   563 U.S. 125 (2011).........................................................................................12

*Arizona* v. *United States*,
   567 U.S. 387 (2012).....................................................................................22, 27

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
   135 S. Ct. 1378 (2015).....................................................................................11

*Burlington Truck Lines, Inc.* v. *United States*,
   371 U.S. 156 (1962).........................................................................................19

*Carlson* v. *Landon*,
   342 U.S. 524 (1952).........................................................................................24

*Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*,
   508 U.S. 520 (1993).....................................................................................11, 33

*Dada* v. *Mukasey*,
   554 U.S. 1 (2008)............................................................................................14

*Dames & Moore* v. *Regan*,
   453 U.S. 654 (1981).....................................................................................12, 26

*Galvan* v. *Press*,
   347 U.S. 522 (1954).........................................................................................22

*Hawaii* v. *Trump*,
   241 F. Supp. 3d 1119 (D. Haw. 2017)......................................................3, 31, 34

*Hawaii* v. *Trump*,
   245 F. Supp. 3d 1227 (D. Haw. 2017)..............................................................30

*Hawaii* v. *Trump*,
   859 F.3d 741 (9th Cir. 2017) ....................................................................*passim*

*INS* v. *Nat'l Ctr. for Immigrants' Rights, Inc.*,
  502 U.S. 183 (1991).............................................................................24

*INS* v. *St. Cyr*,
  533 U.S. 289 (2001).............................................................................27

*Int'l Refugee Assistance Project* v. *Trump*,
  241 F. Supp. 3d 539 (D. Md. 2017)....................................................3

*Int'l Refugee Assistance Project* v. *Trump*,
  857 F.3d 554 (4th Cir. 2017) .........................................................4, 17

*Jama* v. *Immigration and Customs Enforcement*,
  543 U.S. 335 (2005).............................................................................27

*Jean* v. *Nelson*,
  472 U.S. 846 (1985).........................................................................16, 24

*Kent* v. *Dulles*,
  357 U.S. 116 (1958).................................................................22, 23, 26

*Kerry* v. *Din*,
  135 S. Ct. 2128 (2015).........................................................................29

*Kim Ho Ma* v. *Ashcroft*,
  257 F.3d 1095 (9th Cir. 2001) ........................................................23, 24

*Kleindienst* v. *Mandel*, 408 U.S. 753 (1972) ..........................................30

*Legal Assistance for Vietnamese Asylum Seekers* ("*LAVAS*") v. *Dep't of State*, 45 F.3d 469 (D.C. Cir. 1995)...............................12, 13, 15, 16

*Loving* v. *Virginia*,
  388 U.S. 1 (1967).................................................................................17

*Mahler* v. *Eby*,
  264 U.S. 32 (1924).........................................................................24, 26

*McCreary Cty.* v. *ACLU*,
  545 U.S. 844 (2005).........................................................................31, 33

*Melendres* v. *Arpaio*,
  695 F.3d 990 (9th Cir. 2012) .............................................................34

*Nken* v. *Holder*,
556 U.S. 418 (2009)........................................................................36

*Olsen* v. *Albright*,
990 F. Supp. 31 (D.D.C. 1997)........................................................16

*RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*,
132 S. Ct. 2065 (2012)....................................................................15

*Romero* v. *INS*,
39 F.3d 977 (9th Cir. 1994) ............................................................24

*Sale* v. *Haitian Centers Council, Inc.*,
509 U.S. 155 (1993)........................................................................12

*Santa Fe Indep. Sch. Dist.* v. *Doe*,
530 U.S. 290 (2000)........................................................................35

*Sekhar* v. *United States*,
133 S. Ct. 2720 (2013)....................................................................26

*Sierra Club* v. *Bosworth*,
510 F.3d 1016 (9th Cir. 2007) ........................................................35

*Trump* v. *Int'l Refugee Assistance Project*,
137 S. Ct. 2080 (2017)......................................................................4

*United Dominion Indus., Inc.* v. *United States*,
532 U.S. 822 (2001)........................................................................15

*United States* v. *Juvenile Male*,
670 F.3d 999 (9th Cir. 2012) ..........................................................15

*United States* v. *Witkovich*,
353 U.S. 194 (1957)........................................................................23

*Util. Air Regulatory Grp.* v. *EPA*,
134 S. Ct. 2427 (2014)....................................................................35

*Washington* v. *Trump*,
847 F.3d 1151 (9th Cir. 2017) ...................................................*passim*

*Winter* v. *Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................10

*Wong Wing Hang* v. *INS*,
  360 F.2d 715 (2d Cir. 1966) .........................................................................17

*Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) ............................29

*Zadvydas* v. *Davis*,
  533 U.S. 678 (2001) .....................................................................................23

*Zemel* v. *Rusk*,
  381 U.S. 1 (1965) ........................................................................*passim*

**STATUTES:**

5 U.S.C. § 702 ..............................................................................................11

8 U.S.C. § 1152(a) ..................................................................................*passim*

8 U.S.C. § 1182(a)(3)(B)................................................................................29

8 U.S.C. § 1182(f) ..................................................................................*passim*

8 U.S.C. § 1185(a)(1) ....................................................................................15

8 U.S.C. § 1187(a)(12) ..................................................................................29

8 U.S.C. § 1361 ............................................................................................20

Act of June 21, 1941, 55 Stat. 252 .................................................................25

Foreign Relations Authorization Act,
  Fiscal Year 1978, Pub. L. 95-105, § 511 (1977) ..............................................27

Pub. L. 107-173 (2002)..................................................................................28

Pub. L. 110-53 (2007)....................................................................................28

Haw. Rev. Stat. Ann. § 368-1 ..........................................................................8

Haw. Rev. Stat. Ann. § 378-2 ..........................................................................8

Haw. Rev. Stat. Ann. § 489-3 ..........................................................................8

Haw. Rev. Stat. Ann. § 515-3 ...................................................................8

CONSTITUTIONAL PROVISIONS:

U.S. Const. art. I, § 8, cl. 4 ...................................................................36

Hawaii Const. art. I, § 4 .........................................................................8

LEGISLATIVE MATERIALS:

87 Cong. Rec. 5051 (1941) ....................................................................19

87 Cong. Rec. 5326 (1941) ....................................................................25

H.R. Rep. No. 77-754 (1941) .................................................................24

H.R. Rep. No. 89-745 (1965) ...........................................................14, 16

REGULATIONS AND EXECUTIVE MATERIALS:

22 C.F.R. § 58.53 (1945) .......................................................................25

Exec. Order No. 12,807 (1992) ..............................................................27

Exec. Order No. 13,606 (2012) ..............................................................27

Exec. Order No. 13,712 (2015) ..............................................................26

Exec. Order No. 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017) ...............2, 3

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) ...............3

Exec. Order No. 13,810, 82 Fed. Reg. 44,705 (Sept. 25, 2017) ...........10

Proc. 1473 (1918) ..................................................................................24

Proc. 2523 (1941) ..................................................................................25

Proc. 5517 (1986) ..................................................................................27

OTHER AUTHORITIES:

Cong. Research Serv., *Executive Authority to Exclude Aliens:*
  *In Brief* (2017) ..................................................................................27

Letter from Noel J. Francisco, Solicitor Gen., United States Dep't of
Justice, to Scott S. Harris, Clerk, Supreme Court of the United
States (Oct. 5, 2017) ............................................................................................6

U.S. Dep't of State, *Directory of Visa Categories*,
https://goo.gl/c1t3P3 ...........................................................................................21

U.S. Reply Br., *Trump* v. *Hawaii*, No. 16-1540 (U.S. Oct. 4, 2017) ......................14

## **INTRODUCTION**

On September 24, 2017, the President issued a proclamation that imposes an indefinite nationality-based ban on travel and targets an overwhelmingly Muslim population.  The President has fulfilled his prior promises:  He has issued a "larger, tougher, and more specific"[1] version of the travel ban that this Court and the Ninth Circuit found violative of the Nation's laws and most basic constitutional commitments.

It should come as little surprise, then, that the new order replicates all of the legal flaws evident in its precursors.  It again openly "discriminate[s] * * * in the issuance of an immigrant visa because of * * * nationality."  8 U.S.C. § 1152(a)(1)(A).  It still fails, despite its elaborate rationalizations, to make any "find[ing]" remotely adequate to support its sweeping ban of millions of foreign nationals.  *Id.* § 1182(f).  It exceeds the limits on the President's exclusion authority that have been recognized for nearly a century, by supplanting Congress's immigration policies with the President's own unilateral and indefinite ban.  And it continues to effectuate the President's unrepudiated promise to exclude Muslims from the United States.

---

[1] *See* [Proposed] Third Amended Complaint ("Compl.") ¶ 87 (quoting statements President Trump made on Twitter nine days before the new order was released).

These same defects led this Court and the Ninth Circuit to enjoin the old travel ban, thereby preserving the fundamental boundaries of our immigration laws and our constitutional scheme, and vindicating the Judiciary's role as guardian of our Nation's liberties and the rule of law.  Plaintiffs the State of Hawaii and Dr. Ismail Elshikh, as well as prospective Plaintiffs John Does 1 and 2 and the Muslim Association of Hawaii (the "Association"), respectfully ask this Court to do so again.[2]  They request that the Court restore the rights that the laws and Constitution afford them, protect their institutions and their dignity, and enjoin this illegal and unconstitutional order.

## FACTUAL BACKGROUND

### A. The First and Second Executive Orders

By now, this Court is well familiar with the background of this case.  For over a year, then-candidate Donald J. Trump campaigned on a promise to enact a "total and complete shutdown on all Muslims entering the United States."  Compl. ¶¶ 52-64.  Just one week after taking office, he made good on that promise, signing an executive order entitled "Protecting the Nation From Foreign Terrorist Entry Into the United States" ("EO-1").  *Id.* ¶¶ 65-66; *see* Exec. Order No. 13,769, 82

---

[2] The State of Hawaii and Dr. Elshikh are already Plaintiffs in this suit.  John Does 1 and 2 and the Muslim Association of Hawaii are named parties to the Third Amended Complaint that is the subject of a concurrently filed motion for leave to file a Third Amended Complaint.

Fed. Reg. 8,977 (Feb. 1, 2017).  The order was almost immediately enjoined by multiple courts, including the U.S. District Court for the Western District of Washington in an injunction that was upheld by the Ninth Circuit.  *See Washington* v. *Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (per curiam).

Rather than continue defending EO-1, the Government decided to repackage the order's restrictions in a new guise.  On March 6, 2017, the President issued a second executive order ("EO-2") with the same title as the first one, and virtually identical travel and refugee bans.  Compl. ¶¶ 75-80; *see* Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017).  In the words of Senior Advisor to the President Stephen Miller, EO-2 achieved the "same basic policy outcome" as EO-1.  Compl. ¶ 76.  Unsurprisingly, EO-2 met the same basic fate in the courts.  Before it could take effect, it was enjoined by this Court and the U.S. District Court for the District of Maryland.  *See Hawaii* v. *Trump*, 241 F. Supp. 3d 1119, 1140 (D. Haw. 2017); *Int'l Refugee Assistance Project* v. *Trump*, 241 F. Supp. 3d 539, 566 (D. Md. 2017).

Both orders were affirmed.  The Ninth Circuit concluded that Plaintiffs were likely to succeed on their claims for two principal reasons.  First, the court found that the President failed to comply with the "essential precondition" for invoking Section 1182(f), by failing to make "findings" that "support[ed] the conclusion" that a blanket ban on 180 million aliens was necessary to protect national security.

*Hawaii* v. *Trump*, 859 F.3d 741, 755, 770-773 (9th Cir. 2017) (per curiam).

Second, the court held that the President had plainly violated 8 U.S.C.

§ 1152(a)(1)(A) by discriminating on the basis of nationality in the issuance of

immigrant visas. *Id.* at 779.  Meanwhile, the Fourth Circuit, sitting en banc, held

that EO-2 likely violated the Establishment Clause.  *Int'l Refugee Assistance*

*Project* v. *Trump* ("*IRAP*"), 857 F.3d 554, 601 (4th Cir. 2017) (en banc).

The Supreme Court granted certiorari in both cases.  Pending its review, it

rejected the Government's request to overturn the injunctions.  Instead, it left both

injunctions intact except as to persons who lacked "a credible claim of a bona fide

relationship with a person or entity in the United States."  *Trump* v. *Int'l Refugee*

*Assistance Project*, 137 S. Ct. 2080, 2088 (2017).  The Government did not seek

expedited review, and the Court set oral argument for October 10, 2017.  *See id.* at

2086.

## B. The Third Executive Order

On September 24, 2017, just two weeks before the scheduled date for oral

argument, the President issued a proclamation entitled "Enhancing Vetting

Capabilities and Processes for Detecting Attempted Entry Into the United States by

Terrorists or Other Public-Safety Threats" ("EO-3").  Compl. ¶ 89; *see also*

Compl. Ex. 1 (text of EO-3).  Despite the change in nomenclature, EO-3 is a direct

descendant of EO-1 and EO-2.  The very first line of the Proclamation

acknowledges that it is the outgrowth of a process initiated and governed by EO-2.

EO-3 pmbl.  And the order continues, and makes indefinite, substantially the same

travel ban that has been at the core of all three executive orders.  *See* EO-3 § 2.

In particular, EO-3 continues to ban all immigration from five of the six

overwhelmingly Muslim countries covered by EO-2:  Iran, Libya, Syria, Yemen,

and Somalia.  And EO-3 swaps out the sixth Muslim-majority country, Sudan, for

another Muslim-majority country, Chad.  In addition, the order prohibits all non-

immigrant visas for nationals of Syria, bars all non-immigrant visas except student

and exchange visas for nationals of Iran, and prohibits business and tourist visas

for nationals of Libya, Yemen, and Chad.

EO-3 also adds two non-Muslim countries.  But both additions are almost

entirely symbolic.  The order prohibits a small set of Venezuelan government

officials from traveling to the United States on business and tourist visas.  EO-

3 § 2(f).  And it bans all entry from North Korea—a country that sent fewer than

100 nationals (many of them diplomats) to the United States last year and that was

already subject to extensive bans on entry pursuant to previously-issued sanctions.

*See* Compl. ¶ 93 nn.57-59.[3]

---

[3] EO-3 replaces only the country-based entry restrictions imposed by Section 2(c) of EO-2.  It does not disturb the limits on refugee admissions imposed by Sections 6(a) and 6(b) of EO-2, which remain partially enjoined pursuant to this Court's order.  The Government has informed the Supreme Court, however, that it intends

One day after EO-3 was issued, the Supreme Court removed the case challenging EO-2 from its oral argument calendar and ordered briefing on whether that controversy is now moot.  A decision on that question remains pending.

## C. The Effects of EO-3 on Plaintiffs

In addition to replicating the content of EO-1 and EO-2, EO-3 mimics its predecessors by inflicting the same profound harms on Plaintiffs.

### 1.  The State of Hawaii

As a result of EO-3, the State of Hawaii will suffer numerous severe injuries to its educational institutions, its tourism industry, and its sovereign rights.

*First*, EO-3 will hinder the University of Hawaii from recruiting and retaining a world-class faculty and student body.  Compl. ¶¶ 97-98; Straney Decl. ¶¶ 8-15 (Ex. F).  The University has 20 students from the eight designated countries, and has already received 5 new graduate applications from students in those countries for the Spring 2018 Term.  Straney Decl. ¶ 13.  It also has multiple faculty members and scholars from the designated countries.  Compl. ¶¶ 99-100; Straney Decl. ¶¶ 7-8.

---

to "undertake * * * new actions regarding refugees by October 24."  Letter from Noel J. Francisco, Solicitor Gen., United States Dep't of Justice, to Scott S. Harris, Clerk, Supreme Court of the United States 6 (Oct. 5, 2017).  Plaintiffs reserve the right to seek leave to amend their complaint to challenge any such future actions, as appropriate.

EO-3 will impede the University's ability to recruit similar candidates in the future and to retain those that they have.  Some individuals will themselves be covered by the ban on entry; others will be unwilling to accept offers or remain in the country because the ban prevents their family members from immigrating with them or even making brief visits.  Compl. ¶¶ 97-101; Straney Decl. ¶¶ 9-14; Doe 3 Decl. ¶ 15 (Ex. C); Doe 4 Decl. ¶ 15 (Ex. D); Doe 5 Decl. ¶ 7 (Ex. E).  Already, at least two current professors have stated that they may leave the United States if EO-3 takes effect.  Doe 2 Decl. ¶¶ 8-9 (Ex. B); Doe 5 Decl. ¶¶ 9-10; *see* Doe 3 Decl. ¶ 14; Doe 4 Decl. ¶ 12.

EO-3 will also prevent the University from conducting events that involve individuals from the targeted nations.  For example, if EO-3 is implemented, the University will be forced to cancel several upcoming speaking engagements by individuals including a Syrian expert on his country's civil war, Sharma Decl. ¶ 9 (Ex. H); a Chadian film director, *id.* ¶¶ 10-11; and three award-winning artists from Syria and Iran, Chan Decl. ¶¶ 6-10 (Ex. G); *see also* Compl. ¶ 99.

*Second*, EO-3's entry ban will strike at the backbone of Hawaii's economy: its tourism industry.  Data from 2017 show that since EO-1 was adopted, the number of visitors from the targeted regions has fallen every month as compared to 2016, in keeping with national trends reflecting a 44% drop in travel from the banned countries.  Compl.  ¶¶ 103-106 & n.62; Szigeti Decl. ¶¶ 10-14 (Ex. J).

7

*Third*, because of EO-3, Hawaii will lose its sovereign right to fully implement its policies prohibiting discrimination based on religion or nationality. Compl. ¶¶ 108-109.  Article I, § 4 of the Hawaii Constitution provides that "[n]o law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof."  The State's laws also declare "that the practice of discrimination because of race, color, religion, age, sex, including gender identity or expression, sexual orientation, marital status, national origin, ancestry, or disability * * * is against public policy."  Haw. Rev. Stat. § 368-1; *accord id.* §§ 378-2, 489-3, 515-3.

### 2.  The Individual Plaintiffs

The three individual Plaintiffs are residents of the United States who have family members in the targeted countries.  Dr. Ismail Elshikh is an American citizen of Egyptian descent who has lived in Hawaii for over a decade.  Elshikh Decl. ¶ 1 (Ex. I).  He is also the Imam of the Muslim Association of Hawaii.  *Id.* ¶ 2.  John Doe 1 is an American citizen of Yemeni descent who has lived in Hawaii for nearly 30 years and is a member of Dr. Elshikh's mosque.  Doe 1 Decl. ¶¶ 1, 3 (Ex. A).  John Doe 2 is a legal permanent resident of the United States who is a professor at the University of Hawaii.  Doe 2 Decl. ¶¶ 1-3.

All three have family members who have concrete plans to immigrate to or visit the United States, but who will not be able to do so as a direct result of EO-3.

Dr. Elshikh's brothers-in-law, who are Syrian, are in the process of applying for visas to travel to Hawaii for their nephews' upcoming birthday party in March 2018. Compl. ¶ 129; Elshikh Decl. ¶ 6. One of them has already submitted his application. Elshikh Decl. ¶ 6. Doe 1's daughter has filed a visa petition for her husband (Doe 1's son-in-law), a Yemeni national, to immigrate to the United States and reunite the family. Compl. ¶ 116; Doe 1 Decl. ¶¶ 7-9. Doe 2's mother, an Iranian national, has applied for a tourist visa to visit her son, as have other close relations living in Iran. Compl. ¶¶ 119-120; Doe 2 Decl. ¶ 4. EO-3 will bar all of these relatives from coming to the United States, depriving Plaintiffs of their company and companionship. Compl. ¶¶ 130, 135, 139.

In addition, EO-3, like its predecessors, denigrates Dr. Elshikh and Doe 1 as Muslims. It conveys to them that they are outsiders in their own country, and subjects them to distinct burdens because of their faith.

### 3. The Muslim Association of Hawaii

The Association is a mosque with members from Syria, Somalia, Iran, Yemen, and Libya. EO-3 will hamper the mosque's ability to welcome new members and visitors from the affected countries, and will cause current members to leave the country. Ouansafi Decl. ¶¶ 11-15, 18 (Ex. L). Since the mosque "relies on contributions from its members and from visitors" to support it, "EO-3 will harm [its] finances." *Id.* ¶ 19. EO-3 will also interfere with the mosque's

"religious practice" of welcoming visitors from abroad.  *Id.* ¶ 10.  Moreover, the mosque, like the individual Plaintiffs, believes that EO-3 denigrates the Muslim faith and those who practice it.  *Id.* ¶ 20.

Unless EO-3 is enjoined, it will go into effect at 6:01 PM HST on October 17, 2017.  These harms to the State of Hawaii, the individual Plaintiffs, the Association, and the Nation as a whole will immediately ensue.

## ARGUMENT

To obtain a temporary restraining order ("TRO") or a preliminary injunction, a plaintiff must demonstrate that (1) it "is likely to succeed on the merits;" (2) it "is likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [its] favor; and" (4) "an injunction is in the public interest."  *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  As with the prior orders, Plaintiffs readily meet this standard.[4]

---

[4] Plaintiffs do not seek to enjoin the travel ban as to North Korea and Venezuela. The President's September 20, 2017 order imposing additional sanctions on North Korea already excludes "North Korean person[s]" under Section 1182(f).  *See* Exec. Order No. 13,810 §§ 1(a)(iv), 5, 82 Fed. Reg. 44,705, 44,705, 44,707 (Sept. 25, 2017).  That separate sanctions order is not part of the present challenge. Moreover, the current state of relations between the United States and North Korea presents the sort of exigent circumstance that has been found to justify executive action of this sort.  *See infra* pp. 14-15, 28.  As for Venezuela, the President's decision to apply the ban only to certain Venezuelan officials distinguishes the treatment of that country from the other nations affected by the ban.  The Court therefore need not address the lawfulness of EO-3 with respect to those two countries.

## A. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.

### 1. The Order Is Reviewable.

Plaintiffs plainly satisfy the primary requirement for judicial review:  Article III standing.  Like EO-1 and EO-2, EO-3 will prevent the individual Plaintiffs from reuniting with their family members and denigrate their faith.  It will diminish the State of Hawaii's universities, harm its tourism industry, and override its sovereign interests.  The Ninth Circuit held these injuries sufficient to establish standing with respect to the prior orders, and the result should be the same here.  *Hawaii*, 859 F.3d at 762-765; *Washington,* 847 F.3d at 1158-61.  Nor is there any question that the Muslim Association of Hawaii has standing:  EO-3 reduces the Association's membership, diminishes the financial contributions it receives from its members, damages its community, and impairs its religious practice of welcoming visitors from abroad.  Ouansafi Decl. ¶¶ 11-20; *see Church of the Lukumi Babalu Aye, Inc.* v. *City of Hialeah*, 508 U.S. 520, 528 (1993) (allowing religious organization to challenge ordinance that interfered with religious practice).

Plaintiffs also satisfy the other requirements for review.  *See Hawaii*, 859 F.3d at 768-769; *Washington*, 847 F.3d at 1161-64.  Individuals aggrieved by a statutory violation have a cause of action to enjoin "violations of federal law by federal officials."  *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see* 5 U.S.C. § 702.  In adjudicating such claims, the Judiciary may

determine whether "the President [has] act[ed] in contravention of the will of Congress." *Dames & Moore* v. *Regan*, 453 U.S. 654, 669 (1981).  That is no less true when the President is exercising powers related to immigration.  In *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), for instance, the Supreme Court evaluated whether "[t]he President * * * violate[d]" various provisions of the INA by invoking his authority under 8 U.S.C. § 1182(f) to "suspend[] the entry of undocumented aliens from the high seas."  509 U.S. at 158, 160.  Further, as the Ninth Circuit found, Plaintiffs are within the "zone of interests" protected by the relevant statutes.  *See Hawaii*, 859 F.3d at 766-767; *Legal Assistance for Vietnamese Asylum Seekers* ("*LAVAS*") v. *Dep't of State*, 45 F.3d 469, 471-472 (D.C. Cir. 1995).

It is equally clear that the Court may review Plaintiffs' constitutional claims: "If an establishment of religion is alleged to cause real injury to particular individuals, the federal courts may adjudicate the matter." *Ariz. Christian Sch. Tuition Org.* v. *Winn*, 563 U.S. 125, 145 (2011).  And the Ninth Circuit has repeatedly rejected the Government's contention that the President's actions are immune from statutory or constitutional review because of inapposite doctrines that restrict the review of an *individualized* decision to exclude an alien, not "*sweeping*" Executive branch policies.  *Washington*, 847 F.3d at 1162-63 (emphasis added); *see also Hawaii*, 859 F.3d at 768-769.

12

## 2. EO-3 Violates the Immigration and Nationality Act.

EO-3 violates both the INA and the Establishment Clause.  As the Ninth

Circuit has explained, principles of constitutional avoidance make it "appropriate

to turn first to the INA claim."  *Hawaii*, 859 F.3d at 761.  Plaintiffs therefore begin

with the President's statutory violations.

### a. EO-3 Violates the INA's Prohibition on Nationality-Based Discrimination.

Section 1152(a)(1)(A) provides that "no person shall receive any preference

or priority or be discriminated against in the issuance of an immigrant visa because

of * * * nationality."  8 U.S.C. § 1152(a)(1)(A).  "Congress could hardly have

chosen more explicit language" in "unambiguously direct[ing] that no nationality-

based discrimination shall occur."  *LAVAS*, 45 F.3d at 473.  The Ninth Circuit thus

had little difficulty concluding that, by "suspending the issuance of immigrant

visas and denying entry based on nationality," Section 2(c) of EO-2 "exceed[ed]

the restriction of § 1152(a)(1)(A) and the overall statutory scheme intended by

Congress."  *Hawaii*, 859 F.3d at 779.

Instead of following the Ninth Circuit's ruling, EO-3 reenacts and makes

indefinite precisely the same policy of nationality-based discrimination that the

Ninth Circuit deemed unlawful.  EO-3 once again bans immigrant visas and denies

entry based on nationality to nationals of six countries.  EO-3 § 2.  In doing so,

EO-3 recreates the pernicious "national origins system" that Congress sought to

abolish in 1965 when it enacted Section 1152(a) as part of a landmark series of civil rights laws.  *See* H.R. Rep. No. 89-745, at 8 (1965).

The Government has previously attempted to circumvent Section 1152(a)(1)(A)'s plain statutory bar by asserting that the President's travel bans discriminate with respect to "entry," not visa issuance.  The Ninth Circuit rejected that distinction, and it is meritless for two reasons.  First, EO-3 specifies that a national of one of the targeted countries—unlike any other would-be immigrants— must obtain a waiver in order to secure the "issuance of a visa."  EO-3 § 3(c)(iii). It is hard to imagine a more straightforward example of nationality discrimination in the "issuance of an immigrant visa."  8 U.S.C. §1152(a)(1)(A).  Second, the Government's distinction between visa issuance and entry would impermissibly render Section 1152(a)(1)(A) a "nullity."  *Dada* v. *Mukasey*, 554 U.S. 1, 16 (2008). It would allow the President to circumvent the statute's limits whenever he wished by issuing visas and then refusing to honor them at the border based on the visa-holder's nationality.  *Hawaii*, 859 F.3d at 777.

The Government has also argued that Section 1152(a) cannot bar nationality-based distinctions like the ones in EO-3 because that would leave the President unable to—for example—"temporarily bar the entry of all Iranian nationals" if he knew "that an unidentified Iranian national was seeking to enter the country with a dirty bomb."  U.S. Reply Br. 25-26, *Trump* v. *Hawaii*, No. 16-1540

14

(U.S. Oct. 4, 2017).  That is plainly false.  Section 1152(a) bars "discrimination," a well-established term in the law that typically does not extend to restrictions narrowly tailored to a compelling interest.  *LAVAS*, 45 F.3d at 473.  The need to prevent an imminent terrorist attack would undoubtedly qualify.  But as Judge Sentelle has explained, the fact that Section 1152(a) may permit the Government to draw nationality-based distinctions in the face of the "most compelling" need does not mean that the President may make such distinctions in the ordinary course.  *Id.*

Equally unavailing is the Government's claim that 8 U.S.C. §§ 1182(f) and 1185(a)(1) authorize the President to override Section 1152(a)'s ban on nationality discrimination.  That contention is squarely foreclosed by every available canon of statutory interpretation.  *See Hawaii*, 859 F.3d at 778.  Section 1152(a)(1)(A) is more "specific" than Sections 1182(f) and 1185(a)(1).  *See RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012).  It was enacted more than a decade later.  *See United States* v. *Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012).  And it contains several express exceptions—some of them of surpassing obscurity—that do not include Sections 1182(f) and 1185(a)(1).  *See* 8 U.S.C. § 1152(a)(1)(A)-(B); *see also United Dominion Indus., Inc.* v. *United States*, 532 U.S. 822, 836 (2001).  Moreover, as the Ninth Circuit observed, no "prior executive order[] [or] proclamation[]" has "suspend[ed] classes of aliens on

the basis of national origin"; every example the Government has attempted to muster is easily distinguishable.  *Hawaii*, 859 F.3d at 778-779.

Thus, Section 1152(a) plainly prohibits national-origin discrimination as to aliens seeking immigrant visas, and EO-3 must be enjoined to that extent.  But Section 1152(a) also indicates robust congressional opposition to *any* nationality-based discrimination in the issuance of visas.  Congress enacted this statute to abolish the "national origins system" for selecting entrants to this country.  *Hawaii*, 859 F.3d at 776 (quoting H.R. Rep. No. 89-745, at 8).  Accordingly, since the statute's enactment, courts have held that the Executive is barred, except in exceptional circumstances or where expressly authorized by Congress, from drawing nationality-based distinctions for immigrants and nonimmigrants alike.

In *Jean* v. *Nelson*, 472 U.S. 846 (1985), for example, the Supreme Court held that immigration officers generally must implement grants of "broad statutory discretion * * * without regard to race or national origin."  *Id.* at 857.  And in *Olsen* v. *Albright*, 990 F. Supp. 31 (D.D.C. 1997), the district court concluded, and the Government did not dispute, that the Government may not discriminate against aliens on the basis of nationality with respect to "nonimmigrant visa[s]."  *Id.* at 38-39.  In *LAVAS*, the D.C. Circuit flatly declared that "Congress has unambiguously directed that no nationality-based discrimination shall occur."  45 F.3d at 473; *see Hawaii*, 859 F.3d at 778 (stating that Congress "in effect prohibited nationality-

16

based discrimination in the admission of aliens").  As Judge Friendly explained in 1966, one year after Section 1152(a)'s enactment, "discrimination against a particular race or group" is an "impermissible basis" for exclusion, and the Executive may not use its immigration authority to draw distinctions on that basis. *Wong Wing Hang* v. *INS*, 360 F.2d 715, 719 (2d Cir. 1966).

This conclusion is reinforced by the backdrop norms of our constitutional system.  For decades, the Supreme Court has held that discrimination on the basis of an inherent characteristic such as nationality is highly "suspect," and subject to the most serious scrutiny.  *IRAP*, 857 F.3d at 614 (Wynn, J., concurring); *see Loving* v. *Virginia*, 388 U.S. 1, 11 (1967).  Absent a clear statement from Congress, the immigration laws should not be construed to authorize such disfavored and "invidious discrimination."  *IRAP*, 857 F.3d at 617-618 (Wynn, J., concurring).

No law relied on by the President in issuing EO-3 contains a clear statement authorizing him to depart from this fundamental norm.  And, indeed, Section 1152(a)(1)(A) expressly bars such discrimination.  The order's nationality-based restrictions therefore should be enjoined in their entirety.

### b.  EO-3 Violates Section 1182(f).

EO-3 also exceeds the limits of the President's authority under 8 U.S.C.

§ 1182(f).[5]  It fails to make "find[ings]" that support the sweeping bans it imposes,

and it excludes aliens on a ground that this provision's text—when read in light of

its history and long-settled meaning—does not allow.

### i.  EO-3 does not adequately "find" that entry "would be detrimental to the interests of the United States."

Section 1182(f) permits the President to exclude aliens only if he "finds"

that their entry "would be detrimental to the interests of the United States."  As the

Ninth Circuit made clear, although this language is "broad," it "is not unlimited."

*Hawaii*, 859 F.3d at 770.  The President cannot satisfy this "essential precondition"

for invoking his Section 1182(f) power merely through a "talismanic incantation"

of national security harm.  *Id.* at 755, 774 (internal quotation marks omitted).

Rather, the President must make "findings" that actually "support the conclusion"

that the order's restrictions are warranted.  *Id.* at 770; *see id.* at 771, 774, 775

(same).

---

[5] Although the order cites Section 1185(a) as well, the Government has never identified any respect in which that statute "provides an independent basis for the suspension of entry."  *Hawaii*, 859 F.3d at 770 n.10.  Accordingly, this Court, like the Ninth Circuit, should conduct its analysis on the "understanding that" the President's use of Section 1185(a) must, "at a minimum, align with the President's authority under Section 1182(f)."  *Id.*

This interpretation accords with both longstanding precedent and common sense. When a statute requires that an officer make "findings," courts invariably have authority to inquire whether there is some "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc.* v. *United States*, 371 U.S. 156, 168 (1962). Otherwise, the President could justify an exclusion for an irrational reason or no reason at all—by "finding," for example, that Somali nationals must be excluded because their visas are printed in a color the President dislikes. In addition, the statute's history makes clear that Congress drafted this statute and its predecessors to use the word "find," rather than "deem," precisely so that the President would need to "base his [decision] on some fact," and could not rely on mere "opinion" or "guesses." 87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins).

The President fails to satisfy that requirement here. The principal reason the order gives for banning every national of six countries is that those countries do not follow adequate "identity-management and information-sharing protocols and practices" to provide the United States "sufficient information to assess the risks" that their nationals pose. EO-3 § 1(h)(i). That finding is wholly inadequate for three reasons.[6]

---

[6] The President did not find that Somalia's information sharing and identity-management protocols failed to satisfy the "baseline" standards set by the

19

*First*, the law already addresses the problem the President identifies. As the Ninth Circuit previously explained, "[a]s the law stands, a visa applicant bears the burden of showing that the applicant is eligible to receive a visa," and "[t]he Government already can exclude individuals who do not meet that burden." *Hawaii*, 859 F.3d at 773 (citing 8 U.S.C. § 1361). EO-3, like EO-2, offers no "reason explaining how this individualized adjudication process is flawed." *Id.* If a foreign government does not provide information necessary to determine whether a national of that country is a terrorist, immigration officers can deny entry to that individual. There is no logical reason why an additional, blanket ban is warranted to exclude such individuals.

*Second*, EO-3 contradicts its stated rationale. If the Government in fact "lack[ed] sufficient information to assess the risks," EO-3 § 1(h)(i), that nationals of the banned countries purportedly pose, then surely those nationals would need to be barred from obtaining *any* visas. But EO-3 permits nationals from nearly every banned country to enter on a wide variety of nonimmigrant visas—documents for which applicants receive *less* vetting than immigrant visas. *See* EO-3 § 2(a)-(c), (g)-(h). Just as EO-2 failed to explain why the 50,000th refugee would serve the

---

Secretary of Homeland Security. *See* EO-3 § 1(g), (i). Rather, the ban on Somalia rests almost exclusively on the finding that a substantial "terrorist threat * * * emanates from its territory." *Id.* § 1(i), 2(h). The Ninth Circuit has already held that this concern about "country conditions" cannot justify a ban based on nationality. *Hawaii*, 859 F.3d at 773.

national interest but the "50,001st to the 110,000th" would not, *Hawaii*, 859 F.3d at 776, EO-3 fails to explain why it would be detrimental to the national interest to admit aliens as business travelers or tourists but not as crewmembers, exchange visitors, or agricultural workers. *See generally* U.S. Dep't of State, *Directory of Visa Categories*, https://goo.gl/c1t3P3.

*Third*, EO-3 is substantially overbroad with respect to its asserted rationale. The United States does not need information from a foreign government in order to confirm that a child under the age of 5 or an alien fleeing persecution from that very government is not a terrorist. Nor is it plausible that the banned countries have meaningful information about aliens "who left as children" or "whose nationality is based on parentage alone." *Hawaii*, 859 F.3d at 773. Like EO-2, EO-3 makes no finding sufficient to show that "nationality alone renders" the banned individuals "a heightened security risk." *Id.* at 772.[7]

Perhaps recognizing these problems, the President also offered an alternative justification for the travel ban: EO-3 states that the bans will serve as a bargaining chip to help "elicit" greater cooperation from the affected governments. EO-3 § 1(h)(i), (iii). That reason is legally insufficient. *Every* restriction on entry

---

[7] The order's waiver provision does not solve this problem: It continues to subject all individuals from the targeted countries to heightened restrictions, and it bars their entry unless they can show that denying admission would cause "undue hardship" and that "entry would be in the national interest." EO-3 § 3(c)(i).

imposes diplomatic pressure on the target government, just as every such restriction helps "preserv[e] * * * government resources." *Hawaii*, 859 F.3d at 771. The Ninth Circuit made plain that such generic interests do not provide a valid basis for a ban on entry. *See id.* Rather, the President must find that "absent" the bans "there likely will be *harm* to our national interests." *Id.* The order contains no such finding.

ii.  EO-3 exceeds the longstanding limits on the President's
§ 1182(f) power.

Even if the Government's findings were somehow deemed sufficient, EO-3 would still violate Section 1182(f) because the Order goes far beyond the substantive authority that Congress delegated to the Executive through that provision.

a. The Supreme Court and the Ninth Circuit have made clear that courts should not construe "broad" immigration statutes as grants of "unbridled discretion." *Kent* v. *Dulles*, 357 U.S. 116, 127-128 (1958). The Constitution entrusts immigration policy "exclusively to Congress." *Arizona* v. *United States*, 567 U.S. 387, 409 (2012) (quoting *Galvan* v. *Press*, 347 U.S. 522, 531 (1954)). While Congress often "paint[s] with a brush broader than it customarily wields" when writing immigration laws, that "does not mean * * * it can grant the Executive totally unrestricted freedom of choice." *Zemel* v. *Rusk*, 381 U.S. 1, 17

22

(1965). "[E]ven for the President," "immigration * * * is not"—and, under our Constitution, cannot be—"a one-person show." *Hawaii*, 859 F.3d at 755.

Accordingly, "[i]n the immigration context, courts have often read significant limitations into statutes that appeared to confer broad power on immigration officials." *Kim Ho Ma* v. *Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001); *see Zadvydas* v. *Davis*, 533 U.S. 678, 689 (2001) (similar). In *Kent*, for instance, the Court held that the President's seemingly unqualified authority to "designate and prescribe [passport rules] for and on behalf of the United States" permitted the President to refuse passports "only" on "those two [grounds] * * * which it could fairly be argued were adopted by Congress in light of prior administrative practice." 357 U.S. at 123, 128.[8] Similarly, in *United States* v. *Witkovich*, 353 U.S. 194 (1957), the Court held that the President's "seemingly limitless power" to request information of aliens acquired a far more "restrictive

---

[8] *Kent* also relied on concerns that the President's interpretation would violate the First Amendment. But seven years later, in *Zemel*, the Court made clear its interpretation of the statute did not rest on that premise: Construing the same statute, the Court rejected the plaintiff's contention that the statute raised First Amendment concerns, but nonetheless "reaffirm[ed]" that it "must take its content from history" so that it "does not constitute an invalid delegation." 381 U.S. at 17-18.

meaning" in light of the "Act as a whole" and the relevant "history" and constitutional backdrop. *Id.* at 199-200.  Other similar cases abound.[9]

b. Read in light of these principles, it is plain that Section 1182(f) does not give the President the "unlimited" authority to implement sweeping and indefinite policies like EO-3.  *Hawaii*, 859 F.3d at 770.  Rather, the settled meaning of Section 1182(f)'s text—confirmed by nearly a century of practice—is that the President may invoke 1182(f) to exclude (1) aliens akin to subversives, war criminals, and the statutorily inadmissible, and (2) aliens who would undermine congressional policy during an exigency in which it is impracticable for Congress to act.

To start, this was the well-understood meaning of the statute's words when Congress enacted Section 1182(f) in 1952.  Since 1918, Presidents had issued proclamations during wartime that excluded spies, saboteurs, and other similar aliens they deemed "prejudicial to the interests of the United States."  Proc. 1473, § 2 (1918).  In 1941, President Roosevelt asked Congress to codify that authority by enacting a provision that allowed the President to exclude aliens he found harmful to "the interests of the United States."  H.R. Rep. No. 77-754, at 1 (1941).

---

[9] *See, e.g. INS* v. *Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 191-194 (1991); *Jean*, 472 U.S. at 855-856; *Carlson* v. *Landon*, 342 U.S. 524, 543-544 (1952); *Mahler* v. *Eby*, 264 U.S. 32, 40 (1924); *Kim Ho Ma*, 257 F.3d at 1106-11; *Romero* v. *INS*, 39 F.3d 977, 980-981 (9th Cir. 1994).

Several members of Congress objected on the ground that this language appeared to "give the President unlimited power, under any circumstances, to make the law of the United States."  87 Cong. Rec. 5326 (1941) (statement of Sen. Taft); *see also id.* at 5050 (statement of Rep. Jonkman).  But the bill's sponsors and the Roosevelt Administration both "assur[ed]" them that the words "interests of the United States" merely codified the authority that had been exercised since 1918, and that the statute "would not be used except for the objective" of "suppress[ing] subversive activities."  *Id.* at 5386 (statement of Sen. Van Nuys); *see id.* at 5048 (statement of Ruth Shipley, Director, Passport Division, Dep't of State).  Congress enacted the proposed language without change.  Act of June 21, 1941, 55 Stat. 252.

From 1941 to 1952, Presidents fulfilled the Executive's assurance.  In 1941 and 1945, the President promulgated regulations excluding several "[c]lasses of aliens" they deemed "prejudicial to the interests of the United States."  22 C.F.R. § 58.53 (1945); *see* Proc. 2523, § 3 (1941).  Those classes consisted, much as they had since 1918, of (a) spies, saboteurs, and other subversives, (b) war criminals and other serious violators of international law, and (c) aliens who were statutorily inadmissible.  22 C.F.R. § 58.53(a)-(h), (j) (1945).  In addition, the regulations gave the President a residual authority to exclude "[a]ny alien[s] * * * in whose case circumstances of a similar character may be found to exist, which render the

alien's admission prejudicial to the interests of the United States, which it was the purpose of the act of June 21, 1941 * * * to safeguard." *Id.* § 58.53(k).

When Congress enacted Section 1182(f) in 1952, it copied the language of these regulations, proclamations, and statutes almost verbatim. Under ordinary principles of construction, the words "detrimental to the interests of the United States" thus brought "the old soil with" them—that is, they continued to convey the same meaning they had carried for decades. *Sekhar* v. *United States*, 133 S. Ct. 2720, 2724 (2013). That inference is particularly strong in light of *Kent* and *Zemel*. There, too, the power at issue dated back to 1918, was reenacted in 1941, and then was made permanent in 1952. *Kent*, 357 U.S. at 128. Just like here, the President engaged in consistent "administrative practice" during the intervening period. *Id.* Because that statute "must take its content from history," *Zemel*, 381 U.S. at 17, Section 1182(f) must, too. *See also Mahler*, 264 U.S. at 40 (interpreting phrase "undesirable residents of the United States" in light of "previous legislation of a similar character").

Moreover, since 1952, every President—without exception—has applied Section 1182(f) this way. *See Dames & Moore*, 453 U.S. at 686 (relying on "systematic, unbroken, executive practice"). The overwhelming majority of Section 1182(f) orders have excluded aliens who sought to subvert the United States or its allies or support its adversaries, *e.g.*, Exec. Order No. 13,712 (2015);

26

aliens who had committed serious violations of international law, *e.g.*, Exec. Order No. 13,606 (2012); and aliens who were statutorily inadmissible, *e.g.*, Exec. Order No. 12,807 (1992).  *See generally* Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief* 6-10 (2017), https://goo.gl/2KwIfV.  The sole exception is an order that President Reagan issued in 1986, which excluded certain Cuban nationals because of Cuba's ongoing breach of an immigration treaty.  Proc. 5517 (1986).  But that order fell within the second half of the President's power:  It addressed a dynamic diplomatic crisis to which Congress could not easily respond, *see Hawaii*, 859 F.3d at 772 n.13, 779, and it sought to further a congressional policy in favor of normalizing relations with Cuba "on a reciprocal basis," Foreign Relations Authorization Act, Fiscal Year 1978, Pub. L. 95-105, § 511 (1977).

This understanding of Section 1182(f) accords with the longstanding balance of authority in the immigration sphere.  *See INS* v. *St. Cyr*, 533 U.S. 289, 305 (2001) (rejecting construction that would "depart[] from historical practice in immigration law").  It ensures that Congress retains "exclusive[]" authority to set immigration policy.  *Arizona*, 567 U.S. at 409.  Yet it still allows the President to act in "changeable and explosive" circumstances to which Congress cannot "swiftly" respond, *Zemel*, 381 U.S. at 17—the context in which it is "customary" for the President to have the greatest discretion.  *Jama* v. *Immigration and Customs Enforcement*, 543 U.S. 335, 348 (2005).

c. EO-3 exceeds the longstanding limits on the President's Section 1182(f) authority.  As an initial matter, EO-3 does not exclude aliens akin to subversives, war criminals or the statutorily inadmissible—the heartland of the President's exclusion power for the last 99 years.  Indeed, the Government has long disclaimed any contention that all 180 million aliens the President is excluding are terrorists or otherwise harmful.  EO-3 is thus dissimilar to virtually every exclusion order for the last century.

Nor does EO-3 fall within the President's residual authority to further congressional policy during an exigency.  *First*, the order does not respond to an exigency of any kind.  Rather, it identifies problems in screening and vetting that have existed for years if not decades—ones that Congress has repeatedly enacted legislation to address.  *See, e.g.*, Pub. L. 110-53, §§ 701-731 (2007); Pub. L. 107-173 (2002).  Unlike President Reagan's Cuba order or the wartime proclamations issued in 1918 and 1941, EO-3 does not respond to a fast-breaking diplomatic crisis, a war, a national emergency, or any other "changeable and explosive" circumstance to which Congress cannot "swiftly" respond.  *Zemel*, 381 U.S. at 17. It seeks instead to make immigration policy that will endure indefinitely.  Section 1182(f) does not confer that authority.

*Second*, EO-3 does not follow but instead subverts congressional policy. Congress has established an intricate scheme for identifying and vetting terrorists.

28

That system includes "specific criteria for determining terrorism-related inadmissibility," *Kerry* v. *Din*, 135 S. Ct. 2128, 2140 (2015) (citing 8 U.S.C. § 1182(a)(3)(B)), finely reticulated vetting procedures, and exclusions from the Visa Waiver Program for aliens from countries deemed to present a heightened terrorist threat, 8 U.S.C. § 1187(a)(12).  As the Ninth Circuit made clear, "executive action" under Section 1182(f) "should not render superfluous" these "specific grounds for terrorism-related admissibility."  *Hawaii*, 859 F.3d at 781-782

Yet the President has effectively supplanted Congress's scheme and replaced it with his own.  EO-3 excludes aliens who do not satisfy any of the criteria set in the statutory terrorism bar.  It sidesteps entirely the vetting scheme Congress established.  And whereas Congress determined—in the face of "similar security concerns"—that aliens from five of the targeted countries could be admitted if they underwent "vetting through visa procedures," the Order deems such vetting categorically inadequate and instead imposes a "blanket ban."  *Hawaii*, 859 F.3d at 774.

Just as in EO-2, then, the President has taken "measures that [a]re incompatible with the expressed will of Congress, placing his power 'at its lowest ebb.'"  *Id.* at 782 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)).  When Congress enacted Section 1182(f) in

29

1952, it assuredly did not give the President authority to cast aside its laws in this manner. The order must be enjoined on that basis, as well.

### 3. EO-3 Violates the Establishment Clause.

As the Ninth Circuit held in evaluating EO-1, "[a] law that has a religious, not secular, purpose violates [the Establishment Clause], as does one that officially prefers one religious denomination over another." *Washington*, 847 F.3d at 1167 (internal quotation marks, alterations, and citations omitted). A policy implemented for the purpose of preventing Muslim immigration falls afoul of both strictures. This Court has already held that EO-2 was enacted for just such an unconstitutional purpose. EO-3, which on its face and in substance continues the unlawful policies of EO-2, suffers from the same defect.[10]

The constitutional analysis in this instance is particularly straightforward. The Establishment Clause inquiry involves examining "evidence of purpose beyond the face of the challenged law," including "the historical background of the decision and statements by decisionmakers." *Washington*, 847 F.3d at 1167-68.

_____

[10] In the past, the Government's primary defense has been to ask the Court to look away, relying on *Kleindienst* v. *Mandel*, 408 U.S. 753 (1972). But the Ninth Circuit has already rejected *Mandel*'s application to "sweeping proclamations" like EO-3, *Washington*, 847 F.3d at 1166. Thus, just as with EO-2, this Court is not required to "pull the shutters closed" when confronted with an obvious constitutional violation. *Hawaii* v. *Trump*, 245 F. Supp. 3d 1227, 1236 (D. Haw. 2017).

When this Court examined that evidence with respect to EO-2, it held that "[a]ny reasonable, objective observer would conclude * * * that the stated secular purpose of the Executive Order is, at the very least, 'secondary to a religious objective' of temporarily suspending the entry of Muslims." *Hawaii*, 241 F. Supp. 3d at 1137 (quoting *McCreary Cty.* v. *ACLU*, 545 U.S. 844, 864 (2005)).  EO-3 expressly acknowledges that it emerged as a result of EO-2, and it indefinitely continues the bulk of EO-2's entry suspensions.  Thus, the historical record that prompted the Court's conclusion with respect to EO-2 applies equally to EO-3.

Moreover, since the Court concluded that EO-2 likely violated the Establishment Clause, the record has only gotten worse.  *See* Compl. ¶¶ 84-88.  For example, on June 5, 2017, days after the Government asked the Supreme Court to stay the injunction of EO-2, President Trump issued a series of Twitter posts championing the "original Travel Ban," decrying the fact that the "Justice Dep[artment]" submitted a "watered down, politically correct version * * * to S.C," and calling for "[a] much tougher version" of the ban.  Compl. ¶ 86.  Nine days before EO-3 was released, he again used Twitter to demand a "larger, tougher and more specific" ban, reminding the public that he remains committed to a "travel ban" even if it is not "politically correct."  Compl. ¶ 87.  And on the day EO-3 was released, he made clear that the Proclamation was the harsher version of

31

the travel ban he had repeatedly championed, telling reporters "The travel ban: the tougher, the better." Compl. ¶ 94.

Even more to the point, though, is what the President has not said and what he has not done. In the seven months since this Court ruled, the President has *never* renounced his campaign promise to ban Muslim immigration, which remained on his frequently updated campaign website until *minutes* before the Fourth Circuit arguments on EO-2. And the President has *never* retreated from his attempt to impose a ban that will overwhelmingly exclude Muslims. Indeed, while EO-3 purports to be the result of a neutral process involving a study of vetting procedures, it reimposes virtually the same travel restrictions as its predecessors and makes them indefinite. Nor is that result surprising given that the "neutral" process was itself dictated by EO-2, and given that the President has made clear that the primary purpose of EO-3 is to impose a "tougher" version of his travel ban.

To be sure, the new Order adds two non-Muslim majority countries to its ban. But the addition has little practical significance: EO-3 bans immigration from North Korea, whose nationals almost never apply for admission to the United States and whose entry is restricted by a prior sanctions order. Compl. ¶ 93 & nn.57-59. And while EO-3 also targets Venezuela, the restrictions on that country affect only a small handful of government officials, not Venezuelan nationals in

general.  The upshot is that, just as with EO-1 and EO-2, Muslims constitute the

overwhelming majority of those banned by EO-3.  Compl. ¶ 92 & n.56.

Given this result, one might be forgiven for assuming that Venezuela and

North Korea were added to the list primarily to improve the Government's

"litigating position."  *McCreary*, 545 U.S. at 871.  Indeed, their addition resembles

nothing so much as the self-consciously secular trappings that the government

defendants in *McCreary* attempted to add to their display of the Ten

Commandments to improve their chances of surviving an Establishment Clause

challenge.  The *McCreary* Court had no trouble looking past those trappings and

finding a constitutional violation, particularly given that the plainly religiously-

motivated resolution underlying the prior display remained in place.  *Id.* at 871-

872.  Because the Government's efforts here are similarly transparent, and because

the travel bans in EO-2 similarly remain in place and have now been made

indefinite, this Court should follow the course set by *McCreary* and hold that EO-3

violates the Establishment Clause.[11]

---

[11] For much the same reason, EO-3 unconstitutionally discriminates on the basis of
race, religion, and nationality, in violation of the equal protection component of the
Due Process Clause.  *See Washington*, 847 F.3d at 1167.  Furthermore, by
stigmatizing and targeting individuals because of their faith, and impairing their
ability to practice their religion freely, EO-3 violates the Free Exercise Clause.  *See
Lukumi*, 508 U.S. at 523-524.

## B. The Remaining TRO Factors Are Met.

Plaintiffs will suffer grave and irreparable harms as a result of EO-3. *See supra* pp. 6-10. Among other things, EO-3 will "hurt the State's university employees and students" and "separate[] families." *Washington*, 847 F.3d at 1169. As the Ninth Circuit has concluded before, those harms are more than sufficient to sustain an injunction. *See id.*; *Hawaii*, 859 F.3d at 783. Indeed, they are textbook examples of irreparable harms because they "cannot be adequately remedied through damages." *Am. Trucking Ass'ns, Inc.* v. *City of L.A.*, 559 F.3d 1046, 1059 (9th Cir. 2009) (internal quotation marks omitted).

The balance of equities and the public interest also support Plaintiffs' request for relief. Plaintiffs and the public have "a vested interest in the 'free flow of travel, in avoiding separation of families, and in freedom from discrimination.'" *Hawaii*, 241 F. Supp. 3d at 1139 (quoting *Washington*, 847 F.3d at 1169-70). EO-3 tramples on those interests: It cuts against the Nation's and Hawaii's storied tradition of welcoming immigrants, separates families, and marginalizes religious minorities. It also contravenes congressional and constitutional commands. *See Melendres* v. *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)).

Against all of that, the Government points to an amorphous national security rationale.  But the Government has not identified any exigency compelling EO-3's indefinite travel bans.  *See supra* p. 28.  Nor, as explained above, has it offered any reason why the vetting process designed by Congress, which permits the exclusion of aliens for whom the Government lacks adequate information, is insufficient to address all of its purported national security concerns.  *See supra* pp. 19-20.  An injunction would simply restore immigration procedures "to the position they were in" prior to the travel bans, preserving the status quo that has existed for decades and that prevails under this Court's existing injunction.  *Hawaii*, 859 F.3d at 783.

## C. The Court Should Issue A Nationwide Injunction.

When an Executive Branch policy contravenes a statute, it is invalid in all its applications and must be struck down on its face.  *See, e.g.*, *Util. Air Regulatory Grp.* v. *EPA*, 134 S. Ct. 2427, 2449 (2014); *Sierra Club* v. *Bosworth*, 510 F.3d 1016, 1023-24 (9th Cir. 2007) (Ninth Circuit has "on many occasions" invalidated administrative actions on their face).  So, too, with an Establishment Clause violation:  When a government policy has the impermissible purpose of denigrating a religion, all applications of that policy are tainted, and the policy must be enjoined in full.  *See Santa Fe Indep. Sch. Dist.* v. *Doe*, 530 U.S. 290, 314-317 (2000).

As the Ninth Circuit has held, it would be improper to "limit the geographic scope of the TRO." *Washington*, 847 F.3d at 1166. A "fragmented immigration policy" would contravene "the constitutional and statutory requirement for uniform immigration law and policy." *Id.* at 1166-67; *see* U.S. Const. art. I, § 8, cl. 4 (requiring a "uniform Rule of Naturalization"). In addition, in light of "the nation's multiple ports of entry and interconnected transit system," limiting the injunction to Hawaii would not prevent harm to the State or its citizens. *Washington*, 847 F.3d at 1167.

Nor is there any other practicable way to limit the scope of the TRO. *See id.* at 1166.[12] Hawaii cannot identify in advance precisely which individuals may wish to travel to the State or enroll in its universities. Nor can the Association identify every individual who wishes to travel to Hawaii and visit the mosque or join its membership. And sparing only the individual Plaintiffs from EO-3 would produce precisely the fragmented immigration policy the Ninth Circuit cautioned against. Only a nationwide injunction can adequately remedy the irreparable harms stemming from EO-3.

---

[12] The Supreme Court issued a partial stay of the injunction on EO-2, but a stay may not be viewed as an adjudication on the merits. *Nken* v. *Holder*, 556 U.S. 418, 432 (2009) (a stay is not a "deci[sion] [on] the merits, in an expedited" form). And, in any event, the balance of the equities with respect to EO-3 is shifted even further in Plaintiffs' favor because EO-3's travel bans are indefinite.

36

# CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue a temporary restraining order blocking the enforcement of Sections 2(a)-(c), (e), (g), and (h) of EO-3.

DATED: Washington, DC, October 10, 2017.

Respectfully submitted,

/s/ Neal K. Katyal

DOUGLAS S. CHIN (Bar No. 6465)
  Attorney General of the State of Hawaii
CLYDE J. WADSWORTH (Bar No. 8495)
  Solicitor General of the State of Hawaii
DEIRDRE MARIE-IHA (Bar No. 7923)
DONNA H. KALAMA (Bar No. 6051)
KIMBERLY T. GUIDRY (Bar No. 7813)
ROBERT T. NAKATSUJI (Bar No. 6743)
KALIKOʻONALANI D. FERNANDES
  (Bar No. 9964)
KEVIN M. RICHARDSON (Bar No.
  10224)
  Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239

*Attorneys for Plaintiff, State of Hawaii*

NEAL K. KATYAL*
COLLEEN ROH SINZDAK*
MITCHELL P. REICH*
ELIZABETH HAGERTY*
YURI S. FUCHS**
SUNDEEP IYER**[†]
REEDY C. SWANSON**[††]
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910

THOMAS P. SCHMIDT*
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW*
ALEXANDER B. BOWERMAN*
HOGAN LOVELLS US LLP

37

1735 Market St., 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Admitted Pro Hac Vice
**Pro Hac Vice Application Forthcoming
†Admitted only in Maryland; supervised by firm members
††Admitted only in Virginia; supervised by firm members

*Attorneys for Plaintiffs, State of Hawaii and Ismail Elshikh, and Prospective Plaintiffs John Does 1 & 2 and the Muslim Association of Hawaii, Inc.*

38

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.5(e), I hereby certify that the foregoing Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order is in Times New Roman, 14-point font and contains 8,570 words, exclusive of case caption, table of contents, table of authorities, and identifications of counsel, as reported by the word processing system used to produce the document. This word count is in compliance with the limitation set forth in Local Rule 7.5(b).

Respectfully submitted,

/s/ Neal K. Katyal

NEAL K. KATYAL*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email: neal.katyal@hoganlovells.com

*Admitted Pro Hac Vice*