DOUGLAS S. CHIN (Bar No. 6465)
  Attorney General of the State of Hawaii
CLYDE J. WADSWORTH (Bar No. 8495)
  Solicitor General of the State of Hawaii
DEIRDRE MARIE-IHA (Bar No. 7923)
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239
Email: deirdre.marie-iha@hawaii.gov

*Attorneys for Plaintiff, State of Hawaii*

NEAL K. KATYAL*
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910
Email:
neal.katyal@hoganlovells.com

*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs*

(See Next Page For Additional Counsel)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| STATE OF HAWAII, ISMAIL ELSHIKH, JOHN DOES 1 & 2, and MUSLIM ASSOCIATION OF HAWAII, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA, <br><br> Defendants. | **THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Civil Action No. 1:17-cv-00050-DKW-KSC |

## ADDITIONAL COUNSEL

DONNA H. KALAMA (Bar No. 6051)
KIMBERLY T. GUIDRY (Bar No. 7813)
ROBERT T. NAKATSUJI (Bar No. 6743)
KALIKO'ONALANI D. FERNANDES
  (Bar No. 9964)
KEVIN M. RICHARDSON (Bar No. 10224)
  Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY
  GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239

*Attorneys for Plaintiff, State of Hawaii*

COLLEEN ROH SINZDAK*
MITCHELL P. REICH*
ELIZABETH HAGERTY*
YURI S. FUCHS*
SUNDEEP IYER*[†]
REEDY C. SWANSON*[††]
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Fax: (202) 637-5910

THOMAS P. SCHMIDT*
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW*
ALEXANDER B. BOWERMAN*
HOGAN LOVELLS US LLP
1735 Market St., 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Admitted Pro Hac Vice*
[†]*Admitted only in Maryland;
supervised by firm members*
[††]*Admitted only in Virginia;
supervised by firm members*

*Attorneys for Plaintiffs*

## **INTRODUCTION**

1.        The State of Hawaii, Dr. Ismail Elshikh, John Does 1 and 2, and the Muslim Association of Hawaii bring this suit to challenge the President's continuing efforts to impose a sweeping policy banning the entry of refugees and nationals of Muslim-majority countries.

2.        On September 24, 2017, the President released the most recent iteration of this policy: a Proclamation entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats" ("EO-3").[1]  EO-3 suffers from the same statutory and constitutional defects as its precursors.

3.        The Immigration and Nationality Act ("INA") mandates that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of * * * nationality."  8 U.S.C. § 1152(a)(1)(A).

4.        EO-3 indefinitely bars the issuance of immigrant and non-immigrant visas to nationals of six Muslim-majority countries.

5.        The INA permits the President to "suspend the entry of * * * aliens" under 8 U.S.C. § 1182(f) only when he finds their entry "would be detrimental to the interests of the United States.  From its inception and throughout United States history, Section 1182(f) has always been understood to encompass authority for the President to exclude aliens akin to subversives, war criminals, or the statutorily inadmissible, or to block the admissions of foreigners in times of exigency when it is impracticable for Congress to act.

---

[1] As of this filing, President Trump's September 24, 2017 Proclamation has not yet been published in the Federal Register.  A copy of the Proclamation published on the White House website is attached as Exhibit 1, and is available at https://goo.gl/XvFZZ9.

6.      EO-3 lacks the findings necessary to support its indefinite travel bans.  And it bars the entry of classes of aliens that bear no resemblance to subversives, war criminals, or the inadmissible, in the absence of an exigency, and in a situation where Congress could plainly act.

7.      The Establishment Clause prohibits any "law respecting an establishment of religion."  U.S. Const. amend. I.  "A law that has a religious, not secular, purpose violates [the Establishment Clause], as does one that officially prefers one religious denomination over another."  *Washington* v. *Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017).

8.      EO-3, which indefinitely excludes a class of aliens that is overwhelmingly Muslim, is the latest outgrowth of the President's stated aim to enact a "total and complete shutdown of Muslims entering the United States."

9.      EO-3 will go into effect at 6:01 PM HST on October 17, 2017. When it does, it will immediately inflict grievous harm on Plaintiffs.  Like its precursors, it will prevent the University of Hawaii from recruiting and retaining qualified individuals, impair the State's tourism industry, undermine its refugee resettlement program, thwart its nondiscrimination laws, and effect an unconstitutional establishment of religion.  It will also bar Dr. Elshikh, John Doe 1, and John Doe 2—as well as thousands of similarly situated individuals—from seeing close family members, impair their livelihoods, and denigrate them as Muslims and as equal citizens.  And EO-3 will inhibit the Muslim Association of Hawaii from welcoming new members and visitors, and subject it to discrimination at the hands of its own government.

10.     Because EO-3 is as unlawful and unconstitutional as its precursors, and because it will inflict the same grave harms, Plaintiffs file this Third Amended Complaint ("TAC" or "Complaint") adding allegations with respect to EO-3 and asking that this Court enjoin the enforcement of Sections 2(a)-(c), (e), (g), and (h)

of EO-3.  Because EO-2 has not been revoked, and continues to inflict widespread harm on Plaintiffs and the public, Plaintiffs continue to ask that this Court enjoin the enforcement of Section 2(c), 6(a), and 6(b) of EO-2.

## JURISDICTION AND VENUE

11.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, the Administrative Procedure Act ("APA"), the INA, and other federal statutes.

12.      The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the APA, 5 U.S.C. § 706, and its equitable powers.

13.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to this claim occurred in this District, and each Defendant is an officer of the United States sued in his or her official capacity.

## PARTIES

### I.  PLAINTIFFS

#### A. The State of Hawaii

14.      Plaintiff State of Hawaii is the nation's most ethnically diverse State.

15.      David Yutaka Ige is the Governor of Hawaii, the chief executive officer of the State of Hawaii.  The Governor is responsible for overseeing the operations of the state government, protecting the welfare of Hawaii's citizens, and ensuring that the laws of the State are faithfully executed.

16.      Douglas S. Chin is the Attorney General of Hawaii, the chief legal officer of the State.  The Attorney General is charged with representing the State in Federal Court on matters of public concern.

17.     Hawaii has a substantial foreign-born population.  Over 250,000 foreign-born individuals reside in the State.[2]  These individuals comprise approximately 20% of the State's labor force and 22.5% of its business owners.[3]

18.     Thousands of foreign-born individuals living in Hawaii obtain lawful permanent resident status each year.[4]  Since 2009, more than 100 of the individuals who obtained lawful permanent status have been nationals of countries designated by both EO-2 and EO-3.[5]

19.     Hawaii has a large foreign-born student population.  The State currently is home to approximately 10,800 foreign-born students, many of whom are nationals of the countries designated by both EO-2 and EO-3.[6]  In the 2016-2017 school year, Hawaii's foreign-born students contributed over $480 million to Hawaii's economy through the payment of tuition and fees, living expenses, and other activities.  These foreign-born students supported 5,093 jobs and generated more than $32 million in state tax revenues during that time.[7]

---

[2] United States Census Bureau, *2016 American Community Survey 1-Year Estimates*, https://goo.gl/IGwJyf.

[3] The Fiscal Policy Institute, *Immigrant Small Business Owners*, at 24 (June 2012), https://goo.gl/vyNK9W.

[4] U.S. Department of Homeland Security, *Lawful Permanent Residents Supplemental Table 1: Persons Obtaining Lawful Permanent Resident Status by State or Territory of Residence and Region and Country of Birth Fiscal Year 2015*, https://goo.gl/ELYIkn.

[5] *See id.*  These figures are incomplete, as DHS has withheld data pertaining to residents from several of the designated countries for each of those years.

[6] Hawaii Department of Business, Economic Development & Tourism, *The Economic Impact of International Students in Hawaii – 2017 Update*, at 8 (July 2017), https://goo.gl/s7q6JV; *see also* U.S. Chamber of Commerce et al., *Help Wanted: The Role of Foreign Workers in the Innovation Economy*, at 21 (2013), https://goo.gl/c3BYBu.

[7] *The Economic Impact of International Students in Hawaii – 2017 Update*, *supra*, at 3, 8-9.

20.     The University of Hawaii enrolls a large number of foreign-born students.  Its student population includes 973 international students, 526 of them graduate students, enrolled with student visas.  Twenty of those international students are nationals of countries designated by both EO-2 and EO-3.   In the spring of 2017, 23 students enrolled at the University of Hawaii were nationals of the countries designated by EO-2.[8]

21.     The University of Hawaii regularly receives applications from, and offers admissions to, international students from the countries designated by both EO-2 and EO-3.  For the fall of 2017, the University received 45 graduate applications from individuals who are nationals of the countries designated by both EO-2 and EO-3, and extended offers to at least 18 applicants.  For the spring of 2018, the University received 5 graduate applications from individuals who are nationals of the designated countries.

22.     The University of Hawaii also employs approximately 313 international faculty and scholars from 48 different countries.  Numerous permanent and visiting faculty members at the University are nationals of countries designated by both EO-2 and EO-3.  In the spring of 2017, the University had 29 visiting faculty members who were nationals of the countries designated by EO-2 and 28 visiting faculty members who were nationals of the countries designated by EO-3.[9]

23.     Tourism is Hawaii's "lead economic driver."[10]  In 2016, before any of the President's travel bans were implemented, Hawaii welcomed 8.94 million visitors accounting for a record $15.6 billion in spending.[11]

---

[8] *See* Dkt. No. 66-6, ¶ 7 (Supplemental Decl. of Risa Dickson).
[9] *See id.*
[10] Hawaii Tourism Authority, *2016 Annual Report to the Hawaii State Legislature*, at 20, https://goo.gl/T8uiWW.

24.     The Office of Community Services ("OCS") operates refugee resettlement programs for the State.  There are two components to OCS's refugee resettlement activities: the "Refugee Social Services Program," through which the State contracts with private organizations to provide job training and placement services to refugees in Hawaii; and "the Refugee Cash Assistance Program," through which the State provides up to eight months of cash assistance to refugees in Hawaii from the date of their arrival in the United States.[12]  These programs are supported by federal grants.  *See* 45 C.F.R. part 400.

25.     In fiscal year 2017, the State received $75,000 in federal grants for its Refugee Services Program, and contracted with private organizations to expend those funds.  As of June 2017, the Refugee Services Program provided English language instruction to 36 refugees, employment and job search services to 6 refugees, and reached 48 refugees total.

26.     The State also receives money from the federal government for each refugee it resettles of a certain income level, pursuant to the Refugee Cash Assistance Program.  *See* Haw. Admin. Rules § 17-661 *et seq*.  In fiscal year 2017, the federal government awarded $17,919 to the State of Hawaii for Refugee Cash Assistance.

27.     The State of Hawaii bars the establishment of religion and many forms of invidious discrimination.  Article I, § 4 of the Hawaii Constitution provides that "[n]o law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof."  The State's laws also declare that the practice of discrimination "because of race, color, religion, age, sex, including

---

[11] Hawaii Tourism Authority, *Hawaii Tourism Industry Set New Records in 2016* (Jan. 30, 2017), https://goo.gl/KBENwb.

[12] State of Hawaii, Office of Community Services, *Refugee And Entrant Assistance Program*, https://goo.gl/dHn8hR (last updated Aug. 18, 2017).

gender identity or expression, sexual orientation, marital status, national origin, ancestry, or disability" is against public policy. Haw. Rev. Stat. Ann. § 381-1; *accord id.* §§ 489-3, 515-3.

28.     The State has an interest in protecting the health, safety, and welfare of its residents and in safeguarding its ability to enforce state law. The State also has an interest in "assuring that the benefits of the federal system," including the rights and privileges protected by the United States Constitution and federal statutes, "are not denied to its general population." *Alfred L. Snapp & Sons, Inc.* v. *Puerto Rico*, 458 U.S. 592, 608 (1982). The State's interests extend to all of the State's residents, including individuals who suffer indirect injuries and members of the general public.

**B. Dr. Ismail Elshikh**

29.     Plaintiff Ismail Elshikh, PhD, is an American citizen of Egyptian descent.

30.     Dr. Elshikh is the Imam of the Muslim Association of Hawaii. He is a leader within Hawaii's Islamic community, and has been a resident of Hawaii for over a decade.

31.     Dr. Elshikh's wife is of Syrian descent and is also a resident of Hawaii. Dr. Elshikh and his wife have five children, who are all American citizens and residents of Hawaii.

32.     Dr. Elshikh has four brothers-in-law who are Syrian nationals, living in Syria. On October 5, 2017, one of Dr. Elshikh's brothers-in-law filed an application for a tourist visa to visit Dr. Elshikh and his family in the United States.

**C. John Doe 1**

33.     Plaintiff John Doe 1 is an American citizen of Yemeni descent.

34.     Doe 1 has been a resident of Hawaii for almost 30 years. Doe 1's wife and four children are U.S. citizens as well.

35.     Doe 1, his wife, and his children are Muslims and members of the mosque where Dr. Elshikh is Imam.

36.     One of Doe 1's daughters is married to a national of Yemen who lives in Malaysia.  In September 2015, Doe 1's daughter filed an I-130 visa petition on behalf of her husband to allow him to immigrate to the United States as the spouse of a U.S. citizen.  The I-130 Petition was approved in June 2017.  Doe 1's family then filed a visa application on behalf of Doe 1's son-in-law.

37.     Doe 1's son-in-law's visa application is still pending.  Under normal visa processing procedures, he would receive a visa with the next three to twelve months.

**D. John Doe 2**

38.     Plaintiff John Doe 2 is a legal permanent resident of the United States who was born in Iran.

39.     Doe 2 is a resident of Hawaii, and a Professor at the University of Hawaii.

40.      Doe 2's mother is an Iranian national living in Iran.   Several months ago, she filed an application for a tourist visa to visit Doe 2.  Her application is currently pending.

41.     Other close relatives of Doe 2 who are Iranian nationals living in Iran have filed applications for tourist visas to visit Doe 2.  They recently underwent visa interviews.  They intend to visit Doe 2 as soon as their applications are approved.

**E. The Muslim Association of Hawaii**

42.     Plaintiff Muslim Association of Hawaii, Inc. (the "Association") is the only formal Muslim organization in the State of Hawaii.

43.     Hakim Ouansafi is the Chairman of the Association.

44.     The Association has approximately 5,000 members, approximately 4,500 of whom reside on Oahu and 500 of whom reside on the other islands.

45.     The Association owns and operates a mosque in Honolulu, Hawaii. Dr. Ismail Elshikh is the Imam of the mosque, which hosts weekly Friday prayer gatherings.  Over 300 people attend the prayer gatherings every week, including visitors and students who are nationals of countries designated by both EO-2 and EO-3.

## II. DEFENDANTS

46.     Defendant Donald J. Trump is the President of the United States.

47.     Defendant U.S. Department of Homeland Security ("DHS") is a federal agency responsible for implementing and enforcing the INA, EO-2, and EO-3.  DHS is a department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).  United States Customs and Border Protection ("CBP") is a component of DHS that is responsible for detaining and removing aliens barred by EO-2 and EO-3 who arrive at air, land, and sea ports across the United States, including Honolulu International Airport and Kona International Airport.

48.     Defendant Elaine Duke is the Acting Secretary of Homeland Security.  She is responsible for implementing and enforcing the INA, EO-2, and EO-3, and she oversees CBP.  She is sued in her official capacity.

49.     Defendant U.S. Department of State is a federal agency responsible for implementing the U.S. Refugee Admissions Program, EO-2, and EO-3.  The Department of State is a department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

50.     Defendant Rex Tillerson is the Secretary of State.  He oversees the Department of State's implementation of the U.S. Refugee Admissions Program,

EO-2, and EO-3.  The Secretary of State has authority to determine and implement certain visa procedures for non-citizens.  Secretary Tillerson is sued in his official capacity.

51.     Defendant United States of America includes all government agencies and departments responsible for the implementation of the INA, EO-2, and EO-3, and for detaining and removing aliens barred by EO-2 and EO-3 who arrive at air, land, and sea ports across the United States, including Honolulu International Airport and Kona International Airport.

## ALLEGATIONS

## I.  THE TRAVEL BANS

### A. President Trump's Campaign Statements

52.     President Trump repeatedly campaigned on the promise that, if elected, he would ban Muslim immigrants and refugees from entering the United States.

53.     On July 11, 2015, Mr. Trump claimed, falsely, that Christian refugees from Syria are blocked from entering the United States.  In a speech in Las Vegas, Mr. Trump said, "If you're from Syria and you're a Christian, you cannot come into this country, and they're the ones that are being decimated.  If you are Islamic * * * it's hard to believe, you can come in so easily."[13]

54.     On December 7, 2015, Mr. Trump issued a press release entitled "Donald J. Trump Statement on Preventing Muslim Immigration."  It stated that "Donald J. Trump is calling for a total and complete shutdown of Muslims entering

---

[13] Louis Jacobson, *Donald Trump says if you're from Syria and a Christian, you can't come to the U.S. as a refugee*, PolitiFact (July 20, 2015, 10:00 AM EDT), https://goo.gl/fucYZP.

the United States." The release asserted that "there is great hatred towards Americans by large segments of the Muslim population."[14]

55.     The next day, Mr. Trump compared his proposal to President Franklin Roosevelt's internment of Japanese Americans during World War II, saying, "[Roosevelt] did the same thing."[15] When asked what the customs process would look like for a Muslim non-citizen attempting to enter the United States, Mr. Trump said, "[T]hey would say, are you Muslim?" The interviewer responded: "And if they said 'yes,' they would not be allowed into the country." Mr. Trump said: "That's correct."[16]

56.     During a Republican primary debate in January 2016, Mr. Trump was told that his "comments about banning Muslims from entering the country created a firestorm," and asked whether he wanted to "rethink this position." He said, "No."[17]

57.     In March 2016, Mr. Trump stated, during an interview, "I think Islam hates us." He went on to say: "[W]e can't allow people coming into this country who have this hatred of the United States * * * [a]nd of people that are not Muslim." Mr. Trump was then asked, "Is there a war between the west and radical

---

[14] Press Release, Donald J. Trump for President, *Donald J. Trump Statement on Preventing Muslim Immigration* (Dec. 7, 2015). A copy of this press release is attached as Exhibit 2.

[15] Jenna Johnson, *Donald Trump says he is not bothered by comparisons to Hitler*, The Washington Post (Dec. 8, 2015), https://goo.gl/6G0oH7.

[16] Nick Gass, *Trump not bothered by comparisons to Hitler*, Politico (Dec. 8, 2015, 7:51 AM EST), https://goo.gl/IkBzPO.

[17] The American Presidency Project, *Presidential Candidates Debates: Republican Candidates Debate in North Charleston, South Carolina* (Jan. 14, 2016), https://goo.gl/se0aCX.

Islam, or between the west and Islam itself?"  He replied:  "It's very hard to separate because you don't know who is who."[18]

58.      Later that month, Mr. Trump said:  "We're having problems with the Muslims, and we're having problems with Muslims coming into the country."  Mr. Trump called for surveillance of mosques in the United States, saying:  "You have to deal with the mosques, whether we like it or not, I mean, you know, these attacks aren't coming out of—they're not done by Swedish people."  And he said:  "This all happened because, frankly, there's no assimilation.  They are not assimilating * * * .  They want to go by sharia law."[19]

59.      As the campaign progressed, Mr. Trump sometimes couched the "total and complete shutdown of Muslims" in different terms.  In a June 2016 speech, Mr. Trump characterized the proposal as "suspend[ing] immigration from areas of the world where there's a proven history of terrorism against the United States, Europe or our allies until we fully understand how to end these threats."  But he linked that idea to the need to stop "importing radical Islamic terrorism to the West through a failed immigration system."[20]

60.      In the same speech, Mr. Trump criticized his opponent for "her refusal to say the words 'radical Islam,'" stating:  "Here is what she said, exact quote, 'Muslims are peaceful and tolerant people, and have nothing whatsoever to do with terrorism.'  That is [my opponent]."  Mr. Trump also warned that his opponent would "admit[] hundreds of thousands of refugees from the Middle East"

---

[18] *Anderson Cooper 360 Degrees: Exclusive Interview With Donald Trump* (CNN television broadcast Mar. 9, 2016, 8:00 PM EST), *transcript available at* https://goo.gl/y7s2kQ.
[19] Jenna Johnson & Abigail Hauslohner, *'I think Islam hates us': A timeline of Trump's comments about Islam and Muslims*, The Washington Post (May 20, 2017), https://goo.gl/zmcJ4o.  A copy of this article is attached as Exhibit 3.
[20] Ryan Teague Beckwith, *Read Donald Trump's Speech on the Orlando Shooting*, Time (June 13, 2016, 4:36 PM EDT), https://goo.gl/kgHKrb.

who would "try[] to take over our children and convince them * * * how wonderful Islam is." And Mr. Trump stated that the Obama administration had "put political correctness above common sense," but said that he "refuse[d] to be politically correct."[21]

61.      That same month, in an interview on a talk radio show, Mr. Trump articulated his view of the President's power to follow through on these promises, claiming: "The president has the right to ban any group or anybody * * * that he feels is going to do harm to our country. * * * They have an absolute right * * * ."[22]

62.      On July 24, 2016, Mr. Trump was asked: "The Muslim ban. I think you've pulled back from it, but you tell me." Mr. Trump responded: "I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territories. People were so upset when I used the word Muslim. Oh, you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim."[23]

63.      During an October 9, 2016 Presidential Debate, Mr. Trump was asked: "Your running mate said this week that the Muslim ban is no longer your position. Is that correct? And if it is, was it a mistake to have a religious test?" Mr. Trump replied: "The Muslim ban is something that in some form has morphed into a[n] extreme vetting from certain areas of the world." When asked to clarify

---

[21] *Id.*

[22] Sopan Deb, *Trump continues to question Obama's commitment to fighting terror*, CBS News (June 14, 2016), https://goo.gl/rMMyCo.

[23] *Meet the Press* (NBC television broadcast July 24, 2016), *transcript available at* https://goo.gl/jHc6aU. A copy of this transcript is attached as Exhibit 4.

whether "the Muslim ban still stands," Mr. Trump said, "It's called extreme vetting."[24]

64.     On December 21, 2016, Mr. Trump was asked whether he had decided "to rethink or re-evaluate [his] plans to create a Muslim registry or ban Muslim immigration to the United States." Mr. Trump replied: "You know my plans. All along, I've been proven to be right."[25]

**B. The First Travel Ban ("EO-1")**

65.     Within a week of taking office, President Trump acted upon his campaign promises to restrict Muslim immigration, curb refugee admissions, and prioritize non-Muslim refugees.

66.     On January 27, 2017, President Trump signed an Executive Order entitled, "Protecting the Nation From Foreign Terrorist Entry into the United States" ("EO-1"). When signing EO-1, President Trump read the title, looked up, and said: "We all know what that means."[26]

67.     EO-1 imposed an immediate, 90-day ban on entry by nationals of seven overwhelmingly Muslim countries: Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen. The Order also suspended the U.S. Refugee Admissions Program ("USRAP") for 120 days, lowered the cap on annual refugee admissions, and indefinitely barred Syrian refugees. The USRAP suspension included a targeted carve-out for refugees who were "religious minorit[ies]" in their home countries.

68.     EO-1 established a process for expanding its travel bans to additional countries. It directed the Secretary of State to "request [that] all foreign

---

[24] The American Presidency Project, *Presidential Debates: Presidential Debate at Washington University in St. Louis, Missouri* (Oct. 9, 2016), https://goo.gl/iIzf0A.
[25] *President-Elect Trump Remarks in Palm Beach, Florida*, C-SPAN (Dec. 21, 2016), https://goo.gl/JlMCst.
[26] *Trump Signs Executive Orders at Pentagon*, ABC News (Jan. 27, 2017), https://goo.gl/7Jzird.

governments" provide the United States with information necessary to determine whether its nationals are security threats, and directed the Secretaries of Homeland Security and State to "submit to the President a list of countries recommended for inclusion" in the ban from among any countries that did not provide the information requested. The order also authorized the Secretaries of State and Homeland Security to "submit to the President the names of any additional countries recommended for similar treatment" in the future.

69.    In a January 27, 2017 interview with Christian Broadcasting Network, President Trump explained that Christians would be given priority under EO-1. He said: "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them."[27]

70.    The day after signing the first Executive Order, President Trump's advisor, Rudolph Giuliani, explained on television how the Executive Order was developed. He said: "[W]hen [Mr. Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'"[28]

---

[27] *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, Christian Broadcasting Network (Jan. 27, 2017), https://goo.gl/2GLB5q.
[28] Amy B. Wang, *Trump asked for a 'Muslim ban,' Giuliani says – and ordered a commission to do it 'legally'*, The Washington Post (Jan. 29, 2017), https://goo.gl/Xog80h. A copy of this article is attached as Exhibit 5.

71.     EO-1 spurred confusion and chaos.  Over 100 people were detained upon arrival at U.S. airports,[29] and in just a few days, over 60,000 visas were revoked.[30]

72.     Within days of EO-1's issuance, hundreds of State Department officials signed a memorandum circulated through the State Department's "Dissent Channel" stating that the Executive Order "runs counter to core American values" including "nondiscrimination," and that "[d]espite the Executive Order's focus on them, a vanishingly small number of terror attacks on U.S. soil have been committed by foreign nationals" here on visas.[31]

73.     Likewise, Senators John McCain (R-AZ) and Lindsey Graham (R-SC) stated:  "This executive order sends a signal, intended or not, that America does not want Muslims coming into our country."[32]

74.     On February 3, 2017, the U.S. District Court for the Western District of Washington enjoined EO-1's enforcement nationwide.[33]  The Ninth Circuit denied the Government's request to stay the district court's injunction.[34]

---

[29] Michael D. Shear et al., *Judge Blocks Trump Order on Refugees Amid Chaos and Outcry Worldwide*, N.Y. Times (Jan. 28, 2017), https://goo.gl/OrUJEr.

[30] Adam Kelsey et al., *60,000 Visas Revoked Since Immigration Executive Order Signed: State Department*, ABC News (Feb. 3, 2017, 6:32 PM EST), https://goo.gl/JwPDEa.

[31] Jeffrey Gettleman, *State Department Dissent Cable on Trump's Ban Draws 1,000 Signatures*, N.Y. Times (Jan. 31, 2017), https://goo.gl/svRdIw.  A copy of the Dissent Channel memorandum is attached as Exhibit 6.

[32] Press Release, Senator John McCain, *Statement By Senators McCain & Graham On Executive Order On Immigration* (Jan. 29, 2017), https://goo.gl/EvHvmc.  A copy of this press release is attached as Exhibit 7.

[33] *Washington* v. *Trump*, 2017 WL 462040, at *2-3 (W.D. Wash. Feb. 3, 2017).

[34] *Washington* v. *Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (per curiam).

## C. The Second Travel Ban ("EO-2")

75.      The Government did not appeal the Ninth Circuit's decision. Instead, it announced that the President intended to issue a new order to replace EO-1.

76.      On February 21, Senior Advisor to the President Stephen Miller made clear that the second travel ban would not meaningfully differ from EO-1. He said:  "Fundamentally, you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will be addressed.  But in terms of protecting the country, those basic policies are still going to be in effect."[35]

77.      During a press conference in February, President Trump said with respect to the new ban:  "I got elected on defense of our country.  I keep my campaign promises, and our citizens will be very happy when they see the result."[36]

78.      While EO-2 was being prepared, the President repeated his view that 8 U.S.C. § 1182(f) means that the President "can suspend, you can put restrictions, you can do whatever you want."[37]  Mr. Miller similarly stated that the President's powers to impose entry restrictions "will not be questioned."[38]

---

[35] *Miller: New order will be responsive to the judicial ruling; Rep. Ron DeSantis: Congress has gotten off to a slow start* (Fox News television broadcast Feb. 21, 2017), *transcript available at* https://goo.gl/wcHvHH.

[36] *Full transcript: President Donald Trump's news conference*, CNN Politics (Feb. 17, 2017, 4:12 AM EST), https://goo.gl/sTLbbx.

[37] *Transcript of President Donald Trump's speech to the Major Cities Chiefs Police Organization*, The Hill (Feb. 8, 2017, 3:40 PM EST), https://goo.gl/BkvQM2.

[38] *Face the Nation transcript February 12, 2017: Schumer, Flake, Miller*, CBS News (Feb. 12, 2017, 2:35 PM EST), https://goo.gl/v7gk6Z.

79.     On February 24, 2017, a draft Department of Homeland Security report concluded that "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity."[39]   The final version of the report, released approximately a week later, concluded "that most foreign-born, [U.S.]-based violent extremists likely radicalized several years after their entry to the United States, [thus] limiting the ability of screening and vetting officials to prevent their entry because of national security concerns."[40]

80.     On March 6, 2017, President Trump issued an executive order entitled "Executive Order Protecting The Nation From Foreign Terrorist Entry Into The United States" ("EO-2").  EO-2 contained substantially the same travel restrictions as EO-1.  Section 2(c) of EO-2 suspended the "entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen" for a period of "90 days from the effective date of this order."   Section 6(a) suspended the "travel" of all refugees to the United States for a period of 120 days, and suspended all "decisions" by the Secretary of Homeland Security on applications

---

[39] *See* U.S. Department of Homeland Security, *Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States*, at 1, https://goo.gl/vyy5qy (last visited Oct. 9, 2017, 6:45 PM EST).  A copy of this draft report is attached as Exhibit 8.  *See generally* Vivian Salama & Alicia A. Caldwell, *AP Exclusive: DHS report disputes threat from banned nations*, Associated Press (Feb. 24, 2017), https://goo.gl/91to90.

[40] *See* U.S. Department of Homeland Security, *Intelligence Assessment: Most Foreign-born, US-based Violent Extremists Radicalized after Entering Homeland; Opportunities for Tailored CVE Programs Exist*, at 1 (Mar. 1, 2017), https://goo.gl/igQQsn.  A copy of this report is attached as Exhibit 9.  *See generally* Tammy Kupperman, *DHS assessment: Individuals radicalized once in US*, CNN Politics (Mar. 4, 2017, 3:02 PM EST), https://goo.gl/Q6OVTd (discussing report); Nikita Vladimirov, *New DHS report finds most US-based extremists radicalized years after entry*, The Hill (Mar. 2, 2017, 10:34 PM EST), https://goo.gl/St8cTc (same).

for refugee status for 120 days.  Section 6(b) lowered the annual cap on refugee admissions to 50,000 refugees for fiscal year 2017.

81.      EO-2 also established a process for expanding its travel bans.  It directed the Secretaries of Homeland Security and State as well as the Director of National Intelligence to "conduct a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA * * * to determine that the individual is not a security or public safety threat."  Those officials were instructed to submit to the President "a list of countries that do not provide adequate information" within 20 days of the effective date of the Order.  The Secretary of State was instructed to "request that all foreign governments that do not supply [the necessary] information regarding their nationals begin providing it within 50 days of notification."  Then, the Secretary of Homeland Security, in consultation with the Secretary of State and the Attorney General, was to "submit to the President a list of countries recommended for inclusion" in the travel ban.  Those officials were also authorized to "submit to the President," at "any point after the submission of the list" of countries recommended for inclusion, "the names of additional countries recommended for similar treatment."

82.      In a briefing the day after EO-2 was signed, White House Press Secretary Sean Spicer told reporters that with EO-2, President Trump "continue[d] to deliver on * * * his most significant campaign promises."[41]  At this time—and until minutes before oral argument in the Fourth Circuit in May 2017—President Trump's regularly updated campaign website continued to feature his campaign

---

[41] The White House, Office of the Press Sec'y, *Press Briefing by Press Secretary Sean Spicer #18* (Mar. 7, 2017), https://goo.gl/dYyRzY.

statement calling for a "total and complete shutdown of Muslims entering the United States."[42]

83.     In March 2017, this Court issued a temporary restraining order, and subsequently a preliminary injunction, enjoining Sections 2 and 6 of EO-2.[43] On June 12, 2017, the Ninth Circuit affirmed in large part this Court's preliminary injunction, but permitted the review prescribed in Section 2 to go into effect.  The Supreme Court granted certiorari and partially stayed this Court's injunction as to aliens who lack a bona fide relationship to a U.S. person or entity.[44]

84.     Shortly after this Court first enjoined EO-2, the President told a rally of his supporters that EO-2 was just a "watered down version of the first one" and had been "tailor[ed]" at the behest of "the lawyers."[45]  He added:  "I think we ought to go back to the first one and go all the way, which is what I wanted to do in the first place."[46]  In addition, President Trump stated that it is "very hard" for Muslims to assimilate into Western culture.[47]

85.     During a rally in April 2017, President Trump recited the lyrics to a song called "The Snake," as he had during the campaign, as a warning about allowing Syrian refugees into the United States.[48]  During a gathering that same

[42] Christine Wang, *Trump website takes down Muslim ban statement after reporter grills Spicer in briefing*, CNBC (May 8, 2017), https://goo.gl/j0kpAi.
[43] *Hawaii* v. *Trump,* 241 F. Supp. 3d 1119 (D. Haw. 2017); *Hawaii* v. *Trump,* 245 F. Supp. 3d 1227 (D. Haw. 2017).
[44] *Hawaii* v. *Trump,* 859 F.3d 741 (9th Cir. 2017).
[45] Katie Reilly*, Read President Trump's Response to the Travel Ban Ruling:  It 'Makes Us Look Weak'*, Time (Mar. 16, 2017), https://goo.gl/UcPHfg.
[46] *See id.*
[47] Chris Cillizza, *Donald Trump's explanation of his wire-tapping tweets will shock and amaze you*, The Washington Post (Mar. 16, 2017), https://goo.gl/yMLIlm.
[48] *Compare* Marc Fisher, *Trump invigorates, enchants crowd during rally in Harrisburg, Pa.*, The Washington Post (Apr. 29, 2017), https://goo.gl/3tUnNo (recounting that President Trump read "The Snake" during a recent speech), *with* Ali Vitali, *'The Snake': Trump Poetry Slams Syrian Refugees With Allegorical*

month, he reiterated his view that Muslim refugees had previously been favored over Christians, and that his Administration would help Christians.[49]

86.      On June 5, 2017, the President endorsed the "original Travel Ban" in a series of tweets in which he complained about how the Justice Department had submitted a "watered down, politically correct version * * * to S.C."[50]  He urged the Justice Department to seek "an expedited hearing of the watered down Travel Ban before the Supreme Court," and to "seek [a] much tougher version!"[51]  He further stated:  "People, the lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!"[52]  And he added: "That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!"[53]

87.      On September 15, 2017, the President issued a tweet stating:  "The travel ban into the United States should be far larger, tougher and more specific- but stupidly, that would not be politically correct!"[54]

---

*Song*, NBC News (Jan. 12, 2016), https://goo.gl/ZF1x1n (recounting that Donald Trump did "[a] dramatic reading" of "The Snake" during a campaign speech).

[49] Scott Johnson, *At the White House with Trump*, PowerlineBlog.com (Apr. 25, 2017), https://goo.gl/ZeXqhY.

[50] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:29 AM EDT) https://goo.gl/dPiDBu.

[51] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:37 AM EDT), https://goo.gl/E3AP7F.

[52] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:25 AM EDT), https://goo.gl/9fsD9K.

[53] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 6:20 PM EDT), https://goo.gl/VGaJ7z.

[54] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 15, 2017, 6:54 AM EDT), https://goo.gl/CGtXnD.

88.     The White House Press Secretary has confirmed that President Trump's tweets represent "official statements."[55]  The President has never renounced or repudiated his calls for a ban on Muslim immigration.

### D. The Third Travel Ban ("EO-3")

89.     On September 24, 2017, President Trump issued a Proclamation entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats" ("EO-3").

90.     Section 2 of EO-3 indefinitely bans immigration into the United States by nationals of seven countries: Iran, Libya, Syria, Yemen, Somalia, Chad, and North Korea.  It also imposes restrictions on the issuance of nonimmigrant visas to nationals of six of those countries:  It bans the issuance of all nonimmigrant visas to nationals of North Korea and Syria; bans the issuance of all nonimmigrant visas except student (F and M) and exchange (J) visas to nationals of Iran; and bans the issuance of business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas to nationals of Chad, Libya, and Yemen.  EO-3 suspends the issuance of business, tourist, and business-tourist visas to certain Venezuelan government officials.

91.     EO-3 states that it is a direct outgrowth of the review process set forth in EO-1 and EO-2.  It asserts that, as directed by those orders, the Secretary of Homeland Security developed criteria to assess whether countries have adequate protocols and practices for sharing identity-management information and national security and public-safety information, and whether they pose a national security and public-safety risk.  The order states that, based on this review, the Department of Homeland Security identified 16 countries that were "inadequate" under these

---

[55] Elizabeth Landers, *White House: Trump's tweets are 'official statements'*, CNN Politics (June 6, 2017, 4:37 PM EDT), https://goo.gl/XYyso5.

criteria and 31 countries that were "at risk" of becoming "inadequate." The Secretary of Homeland Security recommended that entry restrictions be imposed on six of those countries: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. Iraq was also deemed inadequate under these criteria but was not included in the travel ban. Somalia was not deemed inadequate but was nevertheless included.

92.     Six of the seven countries whose nationals are subject to entry restrictions under EO-3—Chad, Iran, Libya, Syria, Somalia, and Yemen—have majority-Muslim populations. Approximately 55.3% of Chad's population is Muslim. Among the other five countries, the percentage of the population that is Muslim ranges from 92.8% to 99.8%.[56]

93.     North Korea does not allow its nationals to emigrate outside of the country, particularly to the United States.[57] The United States issued 100 visas to North Koreans in 2016, and 42 of those were diplomatic visas, which are exempt from EO-3.[58] Three days before the issuance of EO-3, on September 21, 2017, the President imposed sanctions on North Korea that suspended entry by "North Korean person[s]" as immigrants or nonimmigrants.[59]

---

[56] *See* Pew-Templeton Global Religious Futures Project, *Muslim Population by Country* (2010), http://www.globalreligiousfutures.org/countries. This is the same source that the Government relied upon during prior briefing in this Court about EO-1 and EO-2, and this Court cited this source in its Order granting Plaintiffs' motion for a temporary restraining order ("TRO") against enforcement of EO-2. *See, e.g.*, Dkt. No. 219, at 31 (Order Granting Mot. for TRO).

[57] Emily Rauhala, *Almost No North Koreans Travel to the U.S., So Why Ban Them?* The Washington Post (Sept. 25, 2017), https://goo.gl/2szjNc.

[58] Hyung-Jin Kim, *Trump's travel ban unlikely to affect North Korea*, The Washington Post (Sept. 25, 2017), https://goo.gl/81nD68.

[59] President Donald J. Trump, "Presidential Executive Order on Imposing Additional Sanctions with Respect to North Korea," §§ 1(a)(iv), 5 (Sept. 21, 2017), https://goo.gl/Dx3T6a.

94.      In remarks made on the day that EO-3 was released, the President stated: "The travel ban: The tougher, the better."[60]

95.      On September 27, 2017, President Trump responded to a question on why North Korea was added and why Sudan was removed from the list of nations in EO-3 by stating that "we can add countries very easily and we can take countries away," adding: "I want the toughest travel ban you can have."[61]

## II. EFFECTS OF EO-2 AND EO-3 ON PLAINTIFFS

### A. Effects on Plaintiff State of Hawaii

96.      Both EO-2 and EO-3 have had and will continue to have profound negative effects on the State of Hawaii, its University, its public and private employers, its refugee program, and its residents.

97.      EO-2 and EO-3 will negatively affect the University's ability to recruit and hire new faculty members and scholars.  It will be difficult, if not impossible, for the University to hire individuals from the countries subject to entry restrictions under EO-2 and EO-3.  Nationals of the countries subject to the orders may be unable to obtain entry to the United States.  And even if they can obtain entry, faculty and scholars who are uncertain whether they can enter the country, or whose family members and associates would be subject to entry restrictions, will be unlikely to accept an offer of employment to work at the University.

98.      EO-2 and EO-3 will negatively affect the University's ability to recruit and enroll new students.  Nationals of the countries subject to the orders may be unable to obtain entry to the United States.  And even if they can obtain

---

[60] The White House, Office of the Press Sec'y, *Press Gaggle by President Trump, Morristown Municipal Airport, 9/24/2017* (Sept. 24, 2017), https://goo.gl/R8DnJq.
[61] The White House, Office of the Press Sec'y, *Press Gaggle by President Trump* (Sept. 27, 2017), https://goo.gl/5dusi4.

entry, they will be uncertain whether their spouses, children, and other close family members will be able to join them in the United States or visit them here. Prospective students will therefore be deterred from applying to or enrolling in the University.

99.     EO-2 and EO-3 will prevent the University of Hawaii from hosting speakers and visiting scholars from the designated countries.  Specifically:

    a.     The University will be precluded from offering a scholarship to a Syrian national who participated in a Speaker Series event in September 2017 hosted by the International Cultural Studies Program at the University.  The University would like to offer this person a scholarship, but because he has a B-1/B-2 visa that will soon become inoperative—requiring him to obtain an new visa to enter the United States—EO-3 will preclude him from accepting the University's offer.

    b.     The University's International Cultural Studies Program will be precluded from hosting a Syrian national who is an expert on the Syrian revolution to give a presentation at the University in either November 2017 or January 2018, as the University had planned to do.

    c.     The University's International Cultural Studies Program will be precluded from inviting a Chadian national, who is the director of a film that the Honolulu Museum of Art will be screening this year, to a presentation about human rights abuses in Chad in the spring of 2018, as the University had planned to do.

    d.     The University's Department of Art and Art History will be precluded from hosting a Syrian national living in Germany, who is an award-winning artist, as a visiting scholar in the

Department's "Intersections program" this spring, as the University had planned to do.

e.    The University's Department of Art and Art History will be precluded from hosting two award-winning Iranian artists to be visiting scholars, as the University had planned to do.

100.    EO-2 and EO-3 will indefinitely separate many current faculty members, scholars, and students at the University from family members who are nationals of the designated countries.  Many students and faculty members will consequently be unwilling to remain at the University or in the United States. Plaintiff John Doe 2, for instance, has stated that he will be less likely to remain in the country long-term if EO-3 goes into effect.   At least one other University professor whose relatives are subject to EO-3 has expressed plans to move to Canada if EO-3 is not enjoined.

101.    EO-2 and EO-3 will deter University students and faculty from temporarily leaving the country for professional, academic, or personal travel. Some individuals on single-entry visas who are nationals of the banned countries fear that they will not be able to return to the United States if they leave while either order is in effect.  As a result, individuals will not take overseas trips that are important for their educational and scholarly pursuits, or for family reasons (*e.g.*, to care for an ailing family member).  The University may lose talented members of its community who do not wish to or are unable to remain at the University because of this constraint.

102.    In addition, EO-2 and EO-3 will inflict financial, proprietary, and academic injuries on the University.  The University will receive reduced tuition dollars due to the reduced enrollment of students.  It will be unable to win as many competitive grants due to its increased difficulty attracting and retaining highly qualified faculty, scholars, and students.  The quality of the University's academic

work and the diversity of its academic community will also suffer from the loss of otherwise qualified individuals.

103.    EO-2 and EO-3 are harming and will continue to harm Hawaii's economy.  Nationals of the countries designated in each order will be unable to visit the State as tourists.  Because tourism is a principal driver of the State's economy, this reduction in tourism will harm the State's businesses and, in turn, reduce its tax revenue.

104.    Data from the past year confirms that EO-2 and EO-3 will reduce tourism.  Since EO-1 and EO-2 were issued, the number of visitors to Hawaii from the Middle East has fallen in every single month as compared to the same month in 2016, and the aggregate number of visitors from the Middle East has fallen by over 25%.  The aggregate number of visitors from Africa during that same period has declined by 15%.

105.    The reduction in tourism to Hawaii is consistent with the experiences of other States.  During the six-month period from March 2017 through August 2017, the number of visas issued to visitors from the countries designated by EO-2 fell 44% compared to the same period in 2016.   The issuance of nonimmigrant visas to nationals of all Arab countries fell 16% compared to the prior year, even as the number of visas issued to people from all countries was unchanged.[62]

106.    EO-2 and EO-3 also chill tourism to Hawaii from countries that are not yet designated by the orders.  Both EO-2 and EO-3 establish procedures by which the President can extend the travel bans to additional countries.  Nationals of other countries, who fear they may be subject to a subsequent ban, are therefore deterred from traveling to Hawaii.  In addition, both EO-2 and EO-3 give rise to a

---

[62] Nahal Toosi, et al., *Muslim nations targeted by Trump's travel ban see steep visa drop*, Politico (Sept. 29, 2017), https://goo.gl/Ta2cCe.

global perception that the United States is an exclusionary country, impair the State's reputation as a place of welcome, and reduce foreign nationals' interest in visiting.

107.     EO-2 and EO-3 hinder the efforts of the State and its residents to resettle and assist refugees.  The State's refugee program is an important part of its culture and official policies,[63] and refugees from numerous countries have resettled in Hawaii in recent years.[64]  In late 2015, as other States objected to the admission of Syrian refugees, Governor Ige issued a statement that "slamming the door in their face would be a betrayal of our values."  Governor Ige explained:  "Hawaii and our nation have a long history of welcoming refugees impacted by war and oppression.  Hawaii is the Aloha State, known for its tradition of welcoming all people with tolerance and mutual respect."[65]  As long as EO-2 prohibits refugee admissions, the State and its residents are prevented from helping refugees resettle in Hawaii.  The State will receive reduced federal grant funding as a result.

108.     EO-2 and EO-3 prevent Hawaii from fulfilling the commitments to nondiscrimination and diversity embodied in the State's Constitution, laws, and policies.  State agencies and universities cannot accept qualified applicants for open employment positions if they are nationals of the countries designated by these orders, contravening policies designed to promote diversity and recruit talent from abroad.[66]  In addition, the orders require the State to tolerate a policy

---

[63] *See supra* ¶¶ 24-26 & note 12.

[64] U.S. Department of Health & Human Servs., Office of Refugee Resettlement, *Overseas Refugee Arrival Data: Fiscal Years 2012-2015* (Nov. 24, 2015), https://goo.gl/JcgkDM.

[65] Press Release, Governor of the State of Hawaii, *Governor David Ige's Statement On Syrian Refugees* (Nov. 16, 2015), https://goo.gl/gJcMIv.

[66] *See, e.g.*, State of Hawaii, Department of Human Resources Development, Policy No. 601.001: Discrimination / Harassment-Free Workplace Policy (revised Nov. 16, 2016), https://goo.gl/7q6yzJ; University of Hawaii, Mānoa, Policy

designed to disfavor the Islamic faith, in violation of the Establishment Clause of both the federal and state constitutions.

109.     EO-2 and EO-3 are antithetical to the State's identity and spirit. For many in Hawaii, including state officials, the travel bans conjure up the memory of the Chinese Exclusion Acts and the imposition of martial law and Japanese internment after the bombing of Pearl Harbor.  As Governor Ige observed two days after President Trump issued EO-1, "Hawaii has a proud history as a place immigrants of diverse backgrounds can achieve their dreams through hard work.  Many of our people also know all too well the consequences of giving in to fear of newcomers. The remains of the internment camp at Honouliuli are a sad testament to that fear.  We must remain true to our values and be vigilant where we see the worst part of history about to be repeated."[67]

**B. Effects on Plaintiff Dr. Elshikh**

110.     EO-2 and EO-3 have injured Dr. Elshikh by preventing him from reuniting with his relatives and denigrating him as a Muslim and an Imam.

111.     EO-1 and EO-2 separated Dr. Elshikh from his mother-in-law.  Dr. Elshikh's mother-in-law is a Syrian national who until recently lived in Syria.  In 2015, Dr. Elshikh's wife petitioned for an immigrant visa on her mother's behalf so that she could move to the United States and live with their family in Hawaii. On January 31, 2017, after EO-1 was issued, Dr. Elshikh's mother-in-law's visa application was put on hold.  In March 2017, after EO-1 was enjoined, the application was processed and Dr. Elshikh's mother-in-law was scheduled for an

---

M1.100: Non-Discrimination and Affirmative Action Policy, https://goo.gl/6YqVl8 (last visited Oct. 9, 2017, 7:05 PM EDT); *see also, e.g.*, *Campus Life: Diversity*, University of Hawaii, Mānoa, https://goo.gl/3nF5C9 (last visited Oct. 9, 2017, 7:05 PM EDT).
[67] Press Release, Governor of the State of Hawaii, *Statement of Governor David Ige On Immigration To The United States* (Jan. 29, 2017), https://goo.gl/62w1fh.

interview.  She received an immigrant visa in July 2017, immigrated to the United States in August 2017, and now lives in Hawaii with Dr. Elshikh and his family. Had EO-2 gone into effect, it would have barred Dr. Elshikh from seeing and living with his mother-in-law.

112.   EO-3 will separate Dr. Elshikh from his brothers-in-law.  Dr. Elshikh has four brothers-in-law who are Syrian nationals living in Syria.  On October 5, 2017, one of Dr. Elshikh's brothers-in-law filed an application for a tourist visa so that he can travel to Hawaii and visit Dr. Elshikh's family.  Dr. Elshikh will hold a combined birthday celebration for his three sons in March 2018, to which he is inviting all four of his brothers-in-law.  EO-3 will prevent Dr. Elshikh's brothers-in-law from entering the United States or visiting him and his family.

113.   EO-2 and EO-3 denigrate Dr. Elshikh and his family as Muslims. The orders convey to him and his children, all twelve years of age or younger, that they are not equal citizens of the country and that their government discriminates against persons who share their religion and ethnicity.  The order conveys to them that they are members of a disfavored religion in Hawaii and the United States.

114.   EO-2 and EO-3 harm Dr. Elshikh in his capacity as Imam of Hawaii's largest mosque.  The orders denigrate and demean members of his mosque because of their religious views and national origin.  The orders prevent members of the mosque from seeing members of their family, many of whom are nationals of countries designated by the orders, and prevent the mosque from welcoming visitors and refugees.  As a result of the orders, members of the mosque are unable to associate as freely with those of other faiths.

**C. Effects on Plaintiff John Doe 1**

115.   EO-2 and EO-3 prevent John Doe 1 from reuniting with his son-in-law and denigrate him as a Muslim.

116.     John Doe 1's daughter filed an immigrant visa petition for her husband, a Yemeni national, in September 2015.  After the petition was approved in late June 2017, the family submitted a visa application on the son-in-law's behalf.  That application is currently pending.  EO-3 will prevent Doe 1's son-in-law from obtaining a visa to immigrate to the United States.

117.     EO-2 and EO-3 discriminate against and denigrate Doe 1 and his family because they are Muslims and because Doe 1's daughter is married to another Muslim individual from a Muslim-majority country.

**D. Effects on Plaintiff John Doe 2**

118.     EO-2 and EO-3 prevent John Doe 2 from reuniting with his mother and other close relatives and discriminates against Doe 2 because of his nationality.

119.     John Doe 2's mother, an Iranian national living in Iran, filed an application for a tourist visa several months ago so that she could visit Doe 2 in Hawaii.  That application is still pending.  EO-3 will prevent Doe 2's mother from obtaining a visa and visiting Doe 2 in the United States.

120.     Some of Doe 2's close relatives, who are also Iranian nationals living in Iran, have filed applications for tourist visas so that they can visit Doe 2 in Hawaii.  They have been interviewed and their applications are currently pending.  EO-3 will prevent these relatives from obtaining visas and visiting Doe 2 in the United States.

121.     Doe 2 is less likely to remain in the United States on a long-term basis because EO-3, if not enjoined, will continue to deprive him of the company of his family.  EO-3, like EO-1 and EO-2, makes Doe 2 feel like an outcast in his own country because of his Iranian nationality.

### E. Effects on Plaintiff Muslim Association of Hawaii

122.     EO-2 and EO-3 reduce the membership of the Muslim Association of Hawaii, diminish its financial receipts, interfere with its religious exercise, and denigrate the faith of the Association and its members.

123.     EO-2 and EO-3 will diminish the membership of the Association and inflict financial harm.  Over the last decade, many new members of the Association have been refugees and nationals of countries designated by EO-2 and EO-3.  EO-2 and EO-3 will prevent such individuals from entering the United States and becoming members of the Association.  As a result, contributions to the Association will decrease and the Association's finances will be harmed.

124.     EO-2 and EO-3 will also diminish the existing membership of the Association.  Many current members of the Association are foreign-born individuals who are nationals of countries designated by EO-2 and EO-3, and have close family members and friends who remain in those countries.  The orders will prevent these individuals from seeing their friends and family.  As a result, some of these individuals are likely to leave Hawaii and cease being members of the Association.  The Association will be deprived of their membership and suffer decreased contributions as a result.

125.     EO-2 and EO-3 prevent nationals of the countries designated in EO-2 and EO-3 from visiting the mosque and its members.  The orders also deter nationals of other Muslim-majority countries from visiting the Association because they are concerned that they will be subject to a future travel ban or made unwelcome in the United States.  The Chairman of the Association is aware of four families from Morocco who have canceled plans to come to Hawaii because of the travel bans.

126.     EO-2 and EO-3 interfere with the religious exercise of the Association and its members.   Part of the religious practice of the Association and

32

its members is to welcome adherents of the Muslim faith from other countries in order to connect with their fellow Muslims. The orders prevent Muslims living abroad from coming to Hawaii to visit the Association's mosque and to meet and worship with its members. The orders thereby inhibit the free exercise of the Association and its members.

127.   EO-2 and EO-3 denigrate and demean the Association and its members as Muslims. Members of the Association are made to feel that they are less than other Americans because of their religion. The orders have caused children of the Association's members to be ashamed of their own faith. Since the travel bans were promulgated, several children in the Association's community have expressed the desire to their parents to change their Muslim names, and to not wear head coverings, to avoid being victims of violence.

## CAUSES OF ACTION

### COUNT I

### (8 U.S.C. § 1152(a)(1)(A))

128.   The foregoing allegations are realleged and incorporated by reference herein.

129.   8 U.S.C. § 1152(a)(1)(A) provides that "[e]xcept as specifically provided" in certain subsections, "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence."

130.   Section 2(c) of EO-2 discriminates on the basis of nationality in the issuance of immigrant and nonimmigrant visas.

131.   Sections 2(a)-(c), (e), (g), and (h) of EO-3 discriminate on the basis of nationality in the issuance of immigrant and nonimmigrant visas.

132.   Through their actions described in this Complaint, Defendants have violated 8 U.S.C. § 1152(a)(1)(A). Defendants' violations inflict ongoing

harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## COUNT II
### (8 U.S.C. §§ 1182(f) and 1185(a))

133.     The foregoing allegations are realleged and incorporated by reference herein.

134.     8 U.S.C. § 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."  8 U.S.C. § 1185(a)(1) provides that "[u]nless otherwise ordered by the President, it shall be unlawful for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe."

135.     Sections 2(c), 6(a), and 6(b) of EO-2 exceed the scope of the President's authority under Sections 1182(f) and 1185(a) by, *inter alia*, excluding aliens whose entry would not be "detrimental to the interests of the United States" within the meaning of those terms as informed by their text, history, and context, and by failing to adequately "find[]" that the entry of such aliens would be harmful to the United States.

136.     Sections 2(a)-(c), (e), (g), and (h) of EO-3 exceed the scope of the President's authority under Sections 1182(f) and 1185(a) by, *inter alia*, excluding aliens whose entry would not be "detrimental to the interests of the United States" within the meaning of those terms as informed by their text, history, and context,

and by failing to adequately "find[]" that the entry of such aliens would be harmful to the United States.

137.     Through their actions described in this Complaint, Defendants have violated 8 U.S.C. §§ 1182(f) and 1185(a).  Defendants' violations inflict ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

**COUNT III**

**(8 U.S.C. § 1157(a))**

138.     The foregoing allegations are realleged and incorporated by reference herein.

139.     8 U.S.C. § 1157(a)(2) provides that "[e]xcept as provided in subsection (b), the number of refugees who may be admitted under this section in any fiscal year after fiscal year 1982 shall be such number as the President determines, before the beginning of the fiscal year and after appropriate consultation, is justified by humanitarian concerns or is otherwise in the national interest."

140.     Section 6(b) of EO-2 altered the number of refugees who could be admitted for fiscal year 2017 after the beginning of the fiscal year and without engaging in appropriate consultation.

141.     Through their actions described in this Complaint, Defendants have violated 8 U.S.C. § 1157(a).  Defendants' violation inflicts ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

**COUNT IV**

**(First Amendment – Establishment Clause)**

142.     The foregoing allegations are realleged and incorporated by reference herein.

35

143.     The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." This restriction prohibits the Federal Government from officially preferring one religion over another.

144.     Sections 2(c), 6(a), and 6(b) of EO-2 denigrate and disadvantage members of the Islamic faith and effect an unconstitutional establishment of religion.

145.     Sections 2(a)-(c), (e), (g), and (h) of EO-3 denigrate and disadvantage members of the Islamic faith and effect an unconstitutional establishment of religion.

146.     Through their actions described in this Complaint, Defendants have violated the Establishment Clause. Defendants' violations inflict ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## COUNT V

### (First Amendment – Free Exercise)

147.     The foregoing allegations are realleged and incorporated by reference herein.

148.     The Free Exercise Clause of the First Amendment provides that "Congress shall make no law * * * prohibiting the free exercise [of religion]." This Clause prohibits Congress from enacting laws with the purpose or effect of suppressing religious belief or practice.

149.     Sections 2(c), 6(a), and 6(b) of EO-2 target members of the Islamic faith for special burdens and subject them to denigration and disadvantages that have the purpose and effect of suppressing their practice of religion.

150.     Sections 2(a)-(c), (e), (g), and (h) of EO-3 target members of the Islamic faith for special burdens and subject them to denigration and disadvantages that have the purpose and effect of suppressing their practice of religion.

151.     Through their actions described in this Complaint, Defendants have violated the Free Exercise Clause.  Defendants' violations inflict ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## COUNT VI

### (Fifth Amendment – Equal Protection)

152.     The foregoing allegations are realleged and incorporated by reference herein.

153.     The Due Process Clause of the Fifth Amendment prohibits the Federal Government from denying equal protection of the laws, including on the basis of religion and/or national origin, nationality, or alienage.

154.     Sections 2(c), 6(a), and 6(b) of EO-2 discriminate on the basis of religion and/or national origin, nationality, or alienage and were motivated by animus and a desire to effect such discrimination.

155.     Sections 2(a)-(c), (e), (g), and (h) of EO-3 discriminate on the basis of religion and/or national origin, nationality, or alienage and were motivated by animus and a desire to effect such discrimination.

156.     EO-2 and EO-3 differentiate between persons based on their religion and/or national origin, nationality, or alienage and are accordingly subject to strict scrutiny.  The orders fail that test because they over- and under-inclusive in restricting immigration for security reasons.  The statements of President Trump and his advisors also provide direct evidence of the orders' discriminatory motives.

157.     The orders are not rationally related to a legitimate government interest.

158.    Through their actions described in this Complaint, Defendants have violated the equal protection guarantee of the Due Process Clause. Defendants' violations inflicts ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## COUNT VII

### (Religious Freedom Restoration Act)

159.    The foregoing allegations are realleged and incorporated by reference herein.

160.    The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(a), prohibits the Federal Government from substantially burdening the exercise of religion, even if the burden results from a rule of general applicability.

161.    Sections 2(c), 6(a), and 6(b) of EO-2 and Defendants' actions to implement them impose a substantial burden on the exercise of religion.

162.    Sections 2(a)-(c), (e), (g), and (h) of EO-3 and Defendants' actions to implement it impose a substantial burden on the exercise of religion.

163.    Among other injuries, some non-citizens currently outside the United States cannot enter the United States to reunite with their families or religious communities.  Religious communities in the United States cannot welcome visitors, including religious workers, from designated countries.  And some non-citizens currently in the United States may be prevented from travelling abroad on religious trips, including pilgrimages or trips to attend religious ceremonies overseas, if they do not have the requisite travel documents or multiple-entry visas.

164.    Through their actions described in this Complaint, Defendants have violated the RFRA.  Defendants' violations inflict ongoing harm upon the

State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## COUNT VIII
### (Substantive Violation of the Administrative Procedure Act through Violations of the Constitution, Immigration and Nationality Act, and Religious Freedom Restoration Act, and Arbitrary and Capricious Action)

165.    The foregoing allegations are realleged and incorporated by reference herein.

166.    The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

167.    In enacting and implementing Sections 2(c), 6(a), and 6(b) of EO-2, and Sections 2(a)-(c), (e), (g), and (h) of EO-3, Defendants have acted contrary to the Establishment Clause and Fifth Amendment of the United States Constitution, the INA, and RFRA.  Defendants have exceeded their constitutional and statutory authority, engaged in nationality- and religion-based discrimination, and failed to vindicate statutory rights guaranteed by the INA.

168.    Further, in enacting and implementing Sections 2(c), 6(a), and 6(b) of EO-2, and Sections 2(a)-(c), (e), (g), and (h) of EO-3, Defendants have acted arbitrarily and capriciously.  Among other arbitrary actions and omissions, Defendants have not offered a satisfactory explanation for the countries that are and are not included within the scope of the orders.

169.    Through their actions described in this Complaint, Defendants have violated the substantive requirements of the APA.  Defendants' violations

inflict ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## COUNT IX

### (Procedural Violation of the Administrative Procedure Act)

170.    The foregoing allegations are realleged and incorporated by reference herein.

171.    The APA requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

172.    The Departments of State and Homeland Security are "agencies" under the APA.  *See* 5 U.S.C. § 551(1).

173.    The APA requires that agencies follow rulemaking procedures before engaging in action that impacts substantive rights.  *See* 5 U.S.C. § 553.

174.    In enacting and implementing Sections 2(c), 6(a), and 6(b) of EO-2, and Sections 2(a)-(c), (e), (g), and (h) of EO-3, Defendants have changed the substantive criteria by which individuals from the designated countries may enter the United States.  This, among other actions by Defendants, impacts substantive rights.

175.    Defendants did not follow the rulemaking procedures required by the APA in enacting and implementing the orders.

176.    Through their actions described in this Complaint, Defendants have violated the procedural requirements of the APA.  Defendants' violations inflict ongoing harm upon the State of Hawaii, Dr. Elshikh, John Does 1 and 2, the Muslim Association of Hawaii and its members, and other Hawaii residents.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

a.   Declare that Sections 2(c), 6(a), and 6(b) of EO-2 are unauthorized by, and contrary to, the Constitution and laws of the United States;

b.   Declare that Sections 2(a)-(c), (e), (g), and (h) of EO-3 are unauthorized by, and contrary to, the Constitution and laws of the United States;

c.   Enjoin Defendants from implementing or enforcing Sections 2(c), 6(a), and 6(b) of EO-2 across the nation;

d.   Enjoin Defendants from implementing or enforcing Section 2(a)-(c), (e), (g), and (h) of EO-3 across the nation;

e.   Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended; and

f.   Award damages, attorney's fees, and such additional relief as the interests of justice may require.


DATED:   Washington, DC, October 15, 2017.

Respectfully submitted,

*/s/ Neal K. Katyal*

| | |
|---|---|
| DOUGLAS S. CHIN (Bar No. 6465)<br>  Attorney General of the State of Hawaii<br>CLYDE J. WADSWORTH (Bar No. 8495)<br>  Solicitor General of the State of Hawaii<br>DEIRDRE MARIE-IHA (Bar No. 7923)<br>DONNA H. KALAMA (Bar No. 6051)<br>KIMBERLY T. GUIDRY (Bar No. 7813)<br>ROBERT T. NAKATSUJI (Bar No. 6743)<br>KALIKOʻONALANI D. FERNANDES<br>  (Bar No. 9964)<br>KEVIN M. RICHARDSON (Bar No. 10224)<br>  Deputy Attorneys General<br>DEPARTMENT OF THE ATTORNEY<br>  GENERAL, STATE OF HAWAII | NEAL K. KATYAL*<br>COLLEEN ROH SINZDAK*<br>MITCHELL P. REICH*<br>ELIZABETH HAGERTY*<br>YURI S. FUCHS*[†]<br>SUNDEEP IYER*[†]<br>REEDY C. SWANSON*[†][††]<br>THOMAS P. SCHMIDT*<br>SARA SOLOW*<br>ALEXANDER B. BOWERMAN*<br>HOGAN LOVELLS US LLP<br><br>*Admitted Pro Hac Vice<br>[†]Admitted only in Maryland;<br>supervised by firm members<br>[††]Admitted only in Virginia;<br>supervised by firm members |
| *Attorneys for Plaintiff, State of Hawaii* | *Attorneys for Plaintiffs* |